| | | |
|---|---|---|
| ERIC STEWARD, by his next friend and<br>mother, Lillian Minor; | § | |
| | § | |
| | § | |
| LINDA ARIZPE, by her next friend and<br>guardian, Rudy Arizpe; | § | |
| | § | |
| | § | |
| ANDREA PADRON, by her next friend<br>and guardian, Rosa Hudecek; | § | |
| | § | |
| | § | |
| PATRICIA FERRER, by her next friend and<br>mother, Petra Ferrer; | § | |
| | § | |
| | § | |
| BENNY HOLMES, by his next friend<br>and guardian, Priscilla Holmes; | § | Case No. 5:10-cv-1025 |
| | § | |
| ZACKOWITZ MORGAN, by his next<br>friend and guardian, Sharon Barker, | § | |
| | § | |
| | § | |
|   on behalf of themselves and all others<br>  similarly situated, and | § | |
| | § | |
| | § | |
| THE ARC OF TEXAS, INC. and | § | |
| | § | |
| COALITION OF TEXANS WITH<br>DISABILITIES, INC. | § | |
| | § | |
| | § | |
|             Plaintiffs, | § | |
| v. | § | |
| | § | |
| RICK PERRY, Governor of the State of Texas, | § | |
| | § | |
| THOMAS SUEHS, Executive Commissioner<br>of the Texas Health and Human Services<br>Commission, | § | |
| | § | |
| | § | |
| | § | |
| CHRIS TRAYLOR, Commissioner of<br>the Texas Department of Aging and Disability<br>Services, and | § | |
| | § | |
| | § | |
| | § | |
|        all in their official capacities, | § | |
| | § | |
|           Defendants. | § | |

**COMPLAINT**

## I.      INTRODUCTION

1.      Eric Steward, Linda Arizpe, Andrea Padron, Patricia Ferrer, Benny Holmes, and Zackowitz Morgan, (hereafter the "Individual Plaintiffs") are adult persons with mental retardation or other related conditions (hereafter referred to as "developmental disabilities"). Each of these individuals is qualified for the Defendants' system of community-based services and supports for individuals with developmental disabilities.  Each is able and would prefer to reside in a more integrated, community-based placement.  Nevertheless, the Individual Plaintiffs and thousands of similarly situated individuals in Texas are unnecessarily institutionalized and segregated in nursing facilities because of the Defendants' decision to exclude them from any meaningful access to Texas's system of community-based services and supports which they need to be able to reside in the community.

2.      The Defendants, by their actions and inactions in violation of federal law, have caused the Individual Plaintiffs and the class they seek to represent to live in institutional nursing facilities isolated from their family and friends.  The Individual Plaintiffs and the class are not able to leave the nursing facility to work, attend day habilitation programs or prevocational activities, and are deprived of the right to attend social, recreational or religious activities outside of the nursing home.  Instead, they have no option but to remain in nursing facilities in order to receive Medicaid-funded services.

3.      Despite their ability to benefit from Texas's system of community-based supports that are available to other individuals with disabilities, all of the Individual Plaintiffs and the class they seek to represent are experiencing or will experience unnecessary and prolonged institutionalization in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §

12132 *et seq*., and Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794 *et seq*.

4.      To avoid the inappropriate institutionalization of individuals with developmental disabilities in nursing facilities, Congress enacted the Nursing Home Reform Amendments (NHRA) to the Medicaid Act, 42 U.S.C. § 1396r(e).  These Amendments require that before admission to a nursing facility, an individual with developmental disabilities must be screened by a mental retardation professional to determine whether their needs could be met in the community or other less restrictive placement.  These Amendments also require that the Defendants provide individuals with developmental disabilities who are placed in nursing facilities with specialized services and active treatment, designed to enable the individual to function as independently and with as much self determination as possible, and to prevent regression and loss of abilities.

5.      Despite the requirements of the NHRA, the Defendants have failed to conduct pre-admission screening and assessments that comply with the requirements of the NHRA and have failed to provide all needed specialized services to the Individual Plaintiffs and the class.  As a result, the Individual Plaintiffs and class members have been inappropriately placed in nursing facilities and, while there, have frequently suffered significant regression or stagnation that could have been avoided through the provision of specialized services, required by federal law.

6.      Plaintiffs and the class seek declaratory and injunctive relief against the Defendants to require the provision of adequate community-based services and supports to enable them to transition from their current nursing facility placements to more integrated community placements as required by the ADA, 42 U.S.C. § 12101 *et seq*.; the Rehabilitation

Act, 29 U.S.C. § 794; the NHRA, 42 U.S.C. § 1396r(e); the federal Medicaid Act and the regulations implementing these statutes. They also seek additional declaratory and injunctive relief requiring the Defendants to comply with the pre-admission screening and resident review (PASARR) requirements of the NHRA, including the provision of specialized services and active treatment to class members while residing in nursing facilities.

## II.    JURISDICTION AND VENUE

7.    This is a civil action authorized by 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities guaranteed by federal laws and the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and 1343(4).

8.    This action is also brought pursuant to Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The Defendants are all public entities subject to Title II of the ADA and receive federal financial assistance to operate their Medicaid program and to cover the cost of nursing facility care and the provision of community-based services and supports. This Court has jurisdiction over the claims under the ADA and § 504 pursuant to 42 U.S.C. § 12133 and 29 U.S.C. § 794a.

9.    Plaintiffs' request for declaratory relief is brought pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983 and Rule 65 of the Federal Rules of Civil Procedure.

## III.    PARTIES

### A.    *Individual Plaintiffs*

10.    Plaintiff Eric Steward is a 44 year-old man with developmental disabilities including mental retardation and the related condition of infantile cerebral palsy. He resides at

Buena Vida Nursing & Rehabilitation Center of San Antonio, 5027 Pecan Grove, San Antonio, Texas.  He brings this action through his next friend and mother, Lillian Minor.

11.     Plaintiff Linda Arizpe is a 40 year-old woman.  She has mental retardation.  She resides at Meridian Care, a nursing facility located at 8181 Crestway Drive, San Antonio, Texas.  She brings this action by and through her father and legal guardian, Rudy Arizpe.

12.     Plaintiff Andrea Padron is 26 years old. She has mental retardation and a head injury.  She resides at Meridian Care, a nursing facility located at 8181 Crestway Drive, San Antonio, Texas.  She brings this action by and through her mother and legal guardian, Rosa Hudecek.

13.     Plaintiff Patricia Ferrer is a 46 year-old woman with mental retardation who currently resides at the ManorCare Health Services nursing facility located at 3326 Burgoyne Street, Dallas, Texas 75233.  She brings this action through her mother and next friend, Petra Ferrer, who lives at 814 N. Barnett Avenue, Dallas, Texas 75211

14.     Plaintiff Benny Holmes is a 31 year-old man with mental retardation and cerebral palsy who currently resides at the Renaissance at Kessler Park nursing facility located at 2428 Bahama Drive, Dallas, Texas.  He brings this action through his mother and legal guardian, Priscilla Holmes, who lives at 3404 Bellville Drive, Dallas, Texas.

15.     Plaintiff Zackowitz Morgan is a 40 year-old man with a developmental disability who currently resides in the Silver Springs Healthcare Center, a nursing facility located at 12350 Wood Bayou Drive, Houston, Texas.  Mr. Morgan also has diagnoses of cerebral palsy, obesity, hypertension, hypothyroidism, glaucoma, and peripheral vascular disease, congestive heart failure and a seizure disorder.  He brings this action through his guardian and next-friend, Sharon

Barker who was appointed his legal guardian by the Harris County Probate Court on August 20, 2008. Sharon Barker lives at 118 St. Finans Way, Houston, Texas.

B.     *Organizational Plaintiffs*

16.     The Arc of Texas, Inc. is a statewide non-profit membership organization comprised of persons with mental retardation, their parents and friends, and mental retardation professionals. Members of the Arc of Texas and its local chapters include individuals with developmental disabilities who reside in nursing facilities or the families of such residents. They also include individuals with developmental disabilities who are at risk of placement in nursing facilities due to the Defendants' failure to provide them access to the supports and services they need to live safely in the community.

17.     The Arc of Texas is dedicated to ensuring that all citizens with developmental disabilities in Texas are afforded appropriate services and supports in the most integrated, home-like setting possible, and that all persons with developmental disabilities and their families have meaningful choices about the nature and location of those services. The Arc of Texas, as a statewide advocacy organization, has long monitored the actions of the Defendants in order to ensure that persons with developmental disabilities receive the services to which they are entitled. In this capacity, the Arc of Texas has served as an organizational plaintiff in other federal court litigation against many of the same state agencies.

18.     The Arc of Texas brings this action on its own behalf and on behalf of its members who are directly affected by the actions and inactions of the Defendants at issue in this case.

19.     The Coalition of Texans with Disabilities, Inc. (CTD) is a statewide cross-disability advocacy organization. CTD is a membership organization with both individual and

organizational members.  Its individual members include persons with developmental disabilities and the parents, guardians and caretakers of such persons.  CTD also has over 80 member organizations representing some 3 million unduplicated individuals with all types of disabilities, including developmental disabilities, their families, friends and caretakers.

20.     CTD's mission is to ensure that people with disabilities may live, learn, work, play and participate fully in their community of choice.  In line with this mission, CTD advocacy focuses on full inclusion in all aspects of community living.

21.     CTD brings this action on behalf of itself and its members with developmental disabilities who are residing or are at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

C.      *Defendants*

22.     Governor Rick Perry is the chief executive officer of the State of Texas.  He is responsible for directing, supervising, and controlling the executive departments of state government as well as for seeking funds from the legislature to implement the programs and deliver the services of those executive agencies.  Defendant Perry appoints the Executive Commissioner of the Health and Human Services Commission, and approves the appointment of the Commissioner of the Department of Aging and Disability Services.  He is sued in his official capacity.

23.     Thomas Suehs, Executive Commissioner of the Health and Human Services Commission ("HHSC"), is responsible for the oversight, supervision, and control of the health and human services departments within the executive branch, including the Department of Aging and Disability Services.  He is responsible for appointing the Commissioner of the Department of Aging and Disability Services.  Defendant Suehs is also responsible for the supervision,

direction and oversight of the Texas Medicaid Program, including the various waiver programs and other services designed to enable the named plaintiffs and members of the plaintiff class to reside in community-based settings and, if in a nursing facility, to receive specialized services and active treatment. He is sued in his official capacity.

24. Chris Traylor, Commissioner of the Department of Aging and Disability Services ("DADS"), is the chief executive officer of DADS, which is responsible for admissions to, provision of specialized services in, and the funding, licensing, and monitoring of nursing facilities. Defendant Traylor is also charged with the responsibility for ensuring compliance with PASARR requirements of the NHRA, as well as providing information about, and determining eligibility for, an array of home and community-based services that would enable class members to live safely and productively in the community. He is sued in his official capacity.

## IV. CLASS ACTION ALLEGATIONS

25. Pursuant to Rules 23(a)(1)-(4) and (b)(2) of the Federal Rules of Civil Procedure, plaintiffs bring this action as a class action on behalf of all Medicaid-eligible persons over twenty-one years of age with mental retardation and/or a related condition (collectively referred to as persons with developmental disabilities) in Texas who currently or will in the future reside in nursing facilities, or who are being, will be, or should be screened for admission to nursing facilities pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. § 483.112 *et seq.*

26. The size of the class is so numerous that joinder of all members is impracticable. There are approximately 4,500 adult residents with developmental disabilities in nursing facilities throughout Texas, plus thousands more individuals with developmental disabilities who are at risk of being institutionalized in these nursing facilities. Joinder is also impracticable

because the class is dynamic and because the absent class members lack the knowledge, sophistication, and financial means to maintain individual actions.

27.     There are questions of law and fact common to the class, including *inter alia*:

a.  whether Defendants are violating the ADA and Section 504 by: (i) failing to offer and provide community support services to nursing facility residents with developmental disabilities that would enable them to live in the most integrated setting appropriate to their needs; (ii) failing to offer community services to individuals with developmental disabilities who are at risk of admission to nursing facilities, in order to divert the unnecessary admission of those individuals who could be appropriately served in a community or alternative setting; and (iii) utilizing eligibility criteria and methods of administration that have the effect of excluding the named plaintiffs and members of the plaintiff class from access to the services and supports that they need to reside in integrated, community-based settings;

b.  whether Defendants are violating the NHRA by: (i) failing to establish a screening program that accurately determines if persons with developmental disabilities who apply for admission to a nursing facility can be appropriately served in a less restrictive community setting; (ii) failing to conduct professionally acceptable assessments to determine what specialized services these individuals require; and (iii) failing to provide an array of specialized services to all persons with developmental disabilities in nursing facilities who need them, in a manner that satisfies the federal standard for active treatment; and

c. whether Defendants are violating the federal Medicaid program by: (i) failing to provide necessary rehabilitative services to the members of the plaintiff class with reasonable promptness; (ii) denying class members a choice between receiving medically necessary supports and services in a segregated nursing facility or an integrated community-based setting, including failing to provide them with relevant information necessary to exercise this choice, and (iii) failing to afford them meaningful access to community-based services.

28. The plaintiffs' claims are typical of the claims of the class.

29. The representative parties will fairly and adequately protect the interests of the class. Plaintiffs will vigorously represent the interests of the unnamed class members, and all members of the proposed class will benefit by the efforts of the named plaintiffs. The interests of the proposed class and those of the named plaintiffs are identical.

30. Defendants, their agents, employees, and predecessors and successors in office have acted or will act on grounds generally applicable to the plaintiff class, thereby making appropriate injunctive or declaratory relief with respect to the class as a whole.

## V. STATEMENT OF FACTS

### A. *Texas's Community Service Programs for Persons with Developmental Disabilities*

#### (1) The Americans with Disabilities Act and the Rehabilitation Act

31. On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101 *et seq*., (ADA), establishing the most important civil rights laws for persons with disabilities in our nation's history.

32. Congress stated in its findings that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of

discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).

33.     Congress found that "discrimination against individuals with disabilities persists in . . . institutionalization . . . and access to public services."  42 U.S.C. § 12101(a)(3).  Congress found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion . . . , segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. § 12101(a)(5).

34.     Congress further concluded that "[i]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society."  42 U.S.C. § 12101(a)(7).

35.     A major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, and to provide clear, strong, consistent and enforceable standards addressing discrimination against individuals with disabilities.  42 U.S.C. § 12101(b)(1)&(2).

36.      "Discrimination" under the ADA includes the segregation of persons with disabilities from society as a result of unnecessary institutionalization.  As the Supreme Court stated in *Olmstead v. L.C.*, 527 U.S. 581 (1999), "unjustified institutional isolation of persons with disabilities is a form of discrimination" because "[i]n order to receive needed medical services, persons with mental disabilities, because of those disabilities, relinquish participation in community life…."  527 U.S. at 600-601.

11

37.     The regulations implementing the ADA require that: "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

38.     Discrimination on the basis of disability is also prohibited by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Section 504's implementing regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

39.     The ADA and § 504 regulations prohibit the differential treatment of individuals with disabilities or any class of individuals with disabilities with respect to their opportunity to participate in or access the full range of aids, benefits or services in any program operated by a public entity. *See* 28 C.F.R. §§ 35.130(b)(1)(ii) & (b)(1)(iv), 41.51(b)(1)(ii) & (b)(1)(iv); 45 C.F.R. §§ 84.4(b)(1)(ii) & (b)(1)(iv).

40.     The ADA and § 504 regulations prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary institutionalization or "that have the purpose or effect of substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." *See* 28 C.F.R. §§ 35.130(b)(3), 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

41.     The ADA regulations further specify that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program or activity unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

42.     Both the ADA and § 504 also require that public entities must make reasonable modifications in their policies, practices or procedures when necessary to avoid discrimination on the basis of disability, including the unnecessary segregation or institutionalization of such individuals, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program or activity.  42 U.S.C. §§ 12131, 12132; 29 U.S.C. § 794; 28 C.F.R. § 35.130(b)(7).

(2)     Texas's Implementation of the ADA's Integration Mandate

43.     Although Texas provides care, treatment and services to persons with developmental disabilities in large state supported living centers, nursing facilities, private intermediate care facilities for individuals with mental retardation (ICF/MR's), and home and community-based settings, it has enacted laws, promulgated regulations, issued policies, conducted studies, written reports, and developed programs that strongly favor integrated community services and supports.

44.     In Texas, the Persons with Mental Retardation Act ("PMRA") preserves and promotes the rights of individuals with mental retardation "to live in the least restrictive setting appropriate to the person's individual needs and abilities and in a variety of living situations, including living: (1) alone; (2) in a group home; (3) with a family; or (4) in a supervised, protective environment."  Tex. Health & Safety Code § 592.013(3).

45.     The PMRA expressly guarantees an individual's right to receive services in "(1) the available program or facility that is the least confining for the client's condition; and (2) … that is provided in the least intrusive manner reasonably and humanely appropriate to the person's needs."  *Id.* at § 591.005.  Furthermore, "[e]ach client has the right to live in the least

restrictive habilitation setting and to be treated and served in the least intrusive manner appropriate to the client's individual's needs." *Id.* at § 592.032.

46.     In addition the PMRA ensures that "[e]ach person with mental retardation has the right to receive for mental retardation adequate treatment and habilitative services that:  (1) are suited to the person's individual needs; (2) maximize the person's capabilities; (3) enhance the person's ability to cope with the person's environment; and (4) are administered skillfully, safely, and humanely with full respect for the dignity and personal integrity of the person." *Id.* at § 592.017; *see also* 40 Tex. Admin. Code § 4.107(2).

47.     Moreover, in 2001, the Texas legislature, in response to the United States Supreme Court's *Olmstead* decision, passed SB 367, which codified one of the earliest "Money Follows the Person" ("MFP") initiatives in the country that was designed to transition persons in institutional settings to community-based services.

48.     Shortly after the *Olmstead* decision, former Governor George W. Bush issued Executive Order GWB 99-2 (Sept. 28, 1999) declaring that "[t]he State of Texas is committed to providing community-based alternatives for people with disabilities… ."

49.      Similarly, Defendant Perry issued Executive Order RP 13 (Apr. 18, 2002); in which he said that "the State of Texas is committed to providing community-based alternatives for people with disabilities and recognize that such services and supports advance the best interests of Texans."  He further proclaimed that "it is imperative that consumers and their families have a choice from among the broadest range of supports to most effectively meet their needs in their homes, community settings, state facilities or other residential settings," and "that people with disabilities have the opportunity to enjoy full lives of independence, productivity and self-determination."

50.     Texas agencies and commissions have conducted studies and issued reports and plans that confirm that most individuals with developmental disabilities benefit from living in the community, rather than in institutional settings.  The Texas Health and Human Services Commission recently issued the 2008 Revised Texas Promoting Independence Plan.  The Plan recognizes that the *Olmstead* decision "requires states to provide individuals an opportunity to live in the most integrated setting in order to receive their long-term services and supports" and, therefore, establishes as a top priority "full-funding for community-based services and elimination of all interest [waiting] lists."

51.     In its State Plan for Individuals with Developmental Disabilities: Fiscal Years 2002-2006, the Texas Council on Developmental Disabilities noted that "individuals with developmental disabilities should have access to opportunities and the supports needed to be included in community life, have interdependent relationships, live in homes and communities, and make contributions to their families, communities, the state, and the nation."

52.     Texas has developed an array of community-based programs, services and supports that provide habilitation and support to individuals with developmental disabilities in their homes, in adult foster care settings, and in residential homes.  These programs are funded through both federal and state resources and implemented through a complex blend of federally-approved programs.  However, these programs, services and supports are largely unavailable to adult individuals with developmental disabilities residing in Texas nursing facilities.

(3)     Texas's Discriminatory Administration of Its Community Programs

53.     Despite this statutory, regulatory, and policy commitment to integration, Texas has not created a program for adult persons with developmental disabilities in nursing facilities that will allow them to transition to integrated community settings.  Instead, it has developed, implemented, and administered its community service programs in a manner that systemically or

effectively denies adult nursing facility residents with developmental disabilities access to these community service programs.

54. The Individual Plaintiffs and the majority of the class could reside in integrated, community-based settings if they were able to access the full array of community-based programs, services, and supports that the Defendants provide for other individuals with developmental disabilities who are not in nursing facilities.

55. For persons with developmental disabilities residing in nursing facilities or at risk of nursing home placement, the key services and supports that they need in order to safely transition to the community are residential assistance services and habilitation services.

56. Adult persons with developmental disabilities residing in nursing facilities or at risk of placement in a nursing facility are denied to access residential assistance services or necessary community-based habilitation services by the policies and methods of administration of the Defendants that systemically or effectively restrict access to those services to individuals with developmental disabilities who live in their state-supported living centers and private intermediate care facilities for the developmentally disabled (generally referred to as ICF/MRs). As a result, the named plaintiffs and members of the plaintiff class remain unnecessarily institutionalized in segregated nursing facilities, often for decades.

57. Adult persons with developmental disabilities residing in nursing facilities or at risk of placement in a nursing facility are relegated to placing their names on a Home and Community-Based Services (HCS) waiting list, which, as of July 31, 2010, contained 45,756 individuals.

58.     On the other hand, persons with physical disabilities in nursing facilities are able to access the array of community-based services and supports designed to meet their needs immediately, without having to go on a lengthy, slow moving waiting list.

59.     Texas agencies and commissions have conducted studies that confirm that individuals with developmental disabilities are not able to access the community-based services and supports that they require to avoid institutional placements with reasonable promptness and, as a result, are deprived of their right to obtain services in the least restrictive setting appropriate to their individual needs.

60.     Pursuant to Section 531.0235 of the Texas Government Code, the Texas Council for Developmental Disabilities and the Office for the Prevention of Developmental Disabilities are required to prepare a joint biennial report on the state of services to persons with disabilities in Texas.  In their 2008 Biennial Report, these agencies reported that "Texas ranks 49th out of the 50 states in providing community-based services to individuals with developmental disabilities." It then concluded that "[p]eople with MR/RC [mental retardation or a related condition] do not have access to services with reasonable promptness" because "Texas significantly and chronically underfunds its service system."  The Report's second major finding is that "[m]any people with intellectual and developmental disabilities (I/DD) do not receive services within the least restrictive setting appropriate to their needs….  In fact, the discrepancy in Texas's investment in institutions compared to its investment in community services is extraordinary."

61.     The findings of the 2008 Biennial Report largely mirror the conclusions reached by the Human Services Research Institute in its 2008 report, Closing the Gap in Texas: Improving Services for People with Intellectual and Developmental Disabilities.  The "Closing the Gap" report found that "in Texas the gap between present capacity and unmet needs means

Texas does not operate its system in a manner that ensures that individuals will receive services promptly." The report also concluded that "Texas relies on large congregate care facilities to serve people with mental retardation and related conditions to an extraordinary extent. Opportunities for individuals to receive services in the most integrated setting are abridged."

B.    *Texas's Nursing Facilities*

62.    The Medicaid Act defines a nursing facility as an institution which primarily provides: (1) skilled nursing care; (2) rehabilitation services for those who are sick, injured or disabled; and (3) health related care and services to individuals who, because of their mental or physical condition, require care and services which can only be provided in an institutional setting. 42 U.S.C. § 1396r(a)(1)(A-C).

63.    Nursing facilities' services are defined as "services which are ... required to be given an individual who needs ... on a daily basis nursing care (provided by or requiring the supervision of nursing personnel) or other rehabilitation services which as a practical matter can only be provided in a nursing facility on an inpatient basis." 42 U.S.C. § 1396r(a).

64.    A basic condition for state payment and federal reimbursement of Medicaid-funded nursing facilities is that community-based services do not meet the person's needs and that the care that the individual needs can only be provided in an institutional setting.

(1)    The Nursing Home Reform Amendments to the Medicaid Act

65.    The Nursing Home Reform Amendments (NHRA) of 1987 to the Medicaid Act, 42 U.S.C.§ 1396r(e), are part of a comprehensive remedial statute designed to address the widespread problem of warehousing people with developmental disabilities in the Nation's nursing facilities. Congress enacted the Pre-Admission Screening and Resident Review

(PASARR) provisions of the NHRA to prevent and remedy the unnecessary admission and confinement of people with psychiatric and developmental disabilities in nursing facilities.

66.     The PASARR provisions of the NHRA require a careful screening of all individuals being considered for admission to a nursing facility to determine if they may have a developmental disability.  This is referred to as the Level I PASARR screen.  42 C.F.R. § 483.128(a).

67.     All persons seeking admission to a nursing facility whose Level I PASARR screen indicates that they may have a developmental disability must then be assessed and evaluated to determine if they do in fact have a developmental disability, whether they satisfy the nursing facility level of care criteria, whether their needs could be met in the community through the provision of appropriate services and supports, and whether they could benefit from the provision of specialized services designed to maximize their ability for self-determination and independence.  This part of the PASARR process is referred to as the Level II PASARR review. 42 C.F.R. §§ 483.128(a), 483.132.

68.     The Level II review must include a psychosocial evaluation, which analyzes current living arrangements and medical and social supports.  The review also must include a functional assessment of the individual's ability to engage in activities of daily living and must document the level of support that would be needed to assist the individual to perform these activities while living in the community.  42 C.F.R. § 483.134(b)(5).  The assessment must determine whether it would be possible to meet the individual's needs through the provision of services and supports in the community as an alternative to nursing facility placement.

69.     If the Level II PASARR review determines that a resident does not require nursing facility services, but instead requires specialized services in a non-institutional setting,

Defendants have a mandatory duty to provide or arrange for the provision of these services to the resident in an appropriate community setting. 42 U.S.C. § 1396r(e)(7)C)(i); 42 U.S.C. § 1396r(e)(7)(C)(ii); 42 C.F.R. § 483.118(c); 42 C.F.R. § 483.120(b).

70.     The PASARR reviewers are obligated to explain to the individual involved and, where applicable, his or her legal representative the results of the Level II PASARR evaluation, including information regarding the individual's ability to reside in a less restrictive community placement, and must provide the individual and legal representative with a copy of the PASARR report.  42 CFR §§ 483.128(k), 483.130(l)(3).

71.     If the individual is admitted to a nursing facility, periodic reviews must be conducted whenever there is a change in the person's condition to determine whether the individual continues to need a nursing level of care and to require confinement in a nursing facility.  The initial and periodic PASARR Level II evaluations must also determine whether specialized services are necessary to provide habilitation and active treatment.  42 U.S.C. §§ 1396r(b)(3)(F)(i), 1396r(e)(7)(A)&(B); 42 C.F.R. §§ 483.128, 483.132, 483.134, & 483.136.

72.     Specialized services consist of an active and continuous treatment program which includes aggressive, consistent implementation of specialized and generic training, treatment, and health services that are aimed at allowing the individual to function as independently and with as much self-determination as possible, and services designed to prevent or decelerate regression and loss of abilities. 42 C.F.R. §§ 483.120, 483.440(a).   If the individual requires specialized services, under federal law the state must provide those services with the frequency, intensity, and duration that meet the federal standard for active treatment.  42 C.F.R. §§ 440(a)-(f).

73.     If the PASARR review determines that an individual admitted to a nursing facility needs specialized services, it must then be determined if the nursing facility can provide all needed specialized services and active treatment.  If the review concludes the facility cannot, the individual cannot be admitted to that nursing facility.  42 C.F.R. § 483.126.

(2)     Texas's Implementation of the NHRA and PASARR Requirements

74.     Texas's PASARR program does not adequately screen applicants to nursing facilities to determine if they may have a developmental disability.  As a result, many individuals with developmental disabilities are admitted to nursing facilities without being accurately identified and are never provided a Level II PASARR evaluation and determination, as required by federal law.

75.     Texas's PASARR program does not adequately or appropriately assess whether an individual with a developmental disability can be served in the community prior to admission to a nursing facility, as required by federal law.

76.     Texas's PASARR program does not assess whether the individual who needs an institutional level of services can be served in another specialized facility for persons with developmental disabilities, as required by federal law.

77.     Texas's PASARR program does not adequately or appropriately assess whether an individual needs any specialized habilitative services and, if so, what those specific needs and services are.

78.     Texas's PASARR program does not allow for the delivery of the full scope of specialized services required by federal law.

79.     Rather than providing the full array of specialized services necessary to allow class members to function as independently and with as much self-determination as possible, the

Defendants have, by regulation and in violation of federal law, arbitrarily restricted the scope of specialized services to only "physical, occupational, and speech therapy evaluations and services." 40 Tex. Admin. Code § 19.1303.

80.     Not only does the Texas Administrative Code restrict the scope of specialized services in violation of federal law, but also DADS has even further constrained the scope of such services in its MRA OBRA Handbook (Revision 10-0, Oct. 26, 2009).  It has only provided nursing facility residents with developmental disabilities two specialized services – vocational training and alternate placement services – even though it provides similarly situated persons who live in ICF/MRs with a wide range of habilitative services and supports.

81.     Without any change to either its regulations or the MRA OBRA Handbook, DADS issued Information Letter 10-50 to nursing facility providers on April 15, 2010. Information Letter 10-50 stated that nursing facility residents who have had a PASARR Level II review that indicates that they need specialized services may qualify for a customized manual wheelchair or other specified durable medical equipment as a specialized services benefit.

82.     National experience demonstrates that where PASARR reviews are properly performed, approximately 80% of individuals with developmental disabilities who are referred for or temporarily admitted to a nursing facility placement are determined to be able to reside in the community with appropriate services and supports and should, therefore, be diverted to a more integrated community placement prior to or shortly after admission to the nursing facility.

83.     Of the approximately 4,500 class members with developmental disabilities who are confined in nursing facilities, most should have been diverted to a more integrated community placement if their PASARR reviews had been performed properly.

84.     Of these 4,500 class members who remain in nursing facilities, most of them could be appropriately transitioned to the community, with appropriate supports.

85.     The overwhelming majority of class members would, if properly assessed during the PASARR review, be identified as needing and qualifying for specialized services.

86.     In Massachusetts, where the state was required by court order to conduct comprehensive PASARR reviews of all individuals with developmental disabilities residing in nursing facilities, more than 90% of those individuals were found to need specialized services.

87.     Due to the failure of the Defendants to ensure that PASARR reviews are properly and professionally completed, compounded by Defendants' failure to provide a full array of specialized services, less than 1% of the persons with developmental disabilities who are currently residing in nursing facilities are receiving any specialized services.

88.     The Defendants' failure to conduct PASSAR reviews in a complete, comprehensive and professional manner and their failure to provide the necessary specialized services, including appropriate habilitation services, to persons with developmental disabilities has resulted in their inappropriate placement in institutional nursing facilities where their habilitation needs are largely ignored, all in violation of the NHRA, the ADA and the Rehabilitation Act.

89.     DADS licenses nursing facilities in Texas.  Because these facilities participate in the federal Medicaid program, DADS is required to review and certify these facilities pursuant to the federal requirements for nursing facilities under 42 C.F.R. §§ 483.1 - 483.75.  As part of its responsibility for surveying, inspecting, and certifying nursing facilities, DADS is required to identify and/or correct any lack of compliance with the PASARR provisions of the NHRA and its implementing regulations.  42 U.S.C. § 1396r(e)(7) and 42 C.F.R. §§ 483.100-138.

90.     Given the systemic failure of Texas's PASARR program to adequately screen, divert, and assess individuals with developmental disabilities, as well as the failure to provide specialized services which meet the federal standard for active treatment, DADS is not fulfilling its responsibilities under federal law.

91.     The federal government apparently agrees.  In 2007, the Office of the Inspector General (OIG) of the United States Department of Health and Human Services conducted an audit of Texas and four other states to determine the extent of compliance with the PASARR requirements of federal law.  The OIG found that Level I PASARR screens to determine whether an applicant or resident has a developmental disability were performed only 88% of the time, and 25% of those that were performed were completed late.

92.     Moreover, the OIG found that 52% of the reviewed files did not contain either a Level II PASARR evaluation or a Level II determination.  Even when Level II evaluations were performed, 22% of those evaluations did not contain evidence that the evaluator assessed whether the individual's needs could be met in a community setting.

93.     The OIG found that the state agencies responsible for oversight and enforcement of PASARR requirements conducted limited, if any, oversight.

94.     Upon information and belief, the Center for Medicare and Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS) has identified deficiencies in DADS design and implementation of its PASARR process.  DADS is in the process of developing a proposal to CMS regarding changes to its PASARR process.

95.     Upon information and belief, any changes resulting from the redesign of its PASARR process will not take effect until September 2012 and will not remedy the major flaws in its current practices.

96.     Despite being alerted by the attorneys for the plaintiffs and the OIG Report,

DADS has not corrected the pervasive problems that exist regarding the timeliness, accuracy and

quality of PASARR Level I screens and Level II reviews, the resulting inappropriate admission

of class members to nursing facilities, the failure to comprehensively assess class members' need

for specialized services, and the total failure to provide specialized services that meet the federal

active treatment standard.

97.     DADS also fails to provide or ensure the provision of information to class

members regarding the limited options available to them to access services in a less restrictive

setting than a nursing facility.  As a result, class members who would prefer to reside in a less

restrictive, more integrated community placement are not even aware that they may be eligible

for community-based services and supports or for a small ICF/MR placement, or how to apply

for such services.

98.     Not surprisingly, almost no members of the class have applied for community-

based services and supports or for admission to a small ICF/MR.

99.     Many persons with developmental disabilities, including the named plaintiffs and

members of the plaintiff class, have unnecessarily been admitted to, or remain segregated in,

nursing facilities.  Many class members who reside in nursing facilities do not need intensive

nursing services that can only be provided in a nursing facility, nor do they require an

institutional setting.  Moreover, virtually all class members do not receive those specialized

services or supports which constitute active treatment, as required by the NHRA and its

regulations.

100.     The plaintiffs and members of the plaintiff class could live and function in an

integrated community setting if they were informed of and provided with support services

appropriate to their needs, such as the habilitative services and residential assistance services operated and funded by the Defendants through their HCS waiver or their ICF/MR program described below.

(3)    <u>Conditions in Texas's Nursing Facilities for Class Members</u>

101.    Nursing facilities are largely institutional.  They are not real homes and or even home-like.  Nursing facilities are segregated and house large numbers of unrelated persons, most of whom are either elderly or disabled.

102.    Most residents of nursing facilities are neither integrated into nor part of the communities in which they live.  Class members in nursing facilities have limited access to the community.  The vast majority of the plaintiffs and plaintiff class members do not participate in community activities, nor are they active members of civic clubs and churches.

103.    Many class members who are confined in nursing facilities never have the opportunity to leave the facility — not because their condition precludes it, but simply because there are few opportunities and limited means to do so.

104.    Many nursing facility residents never receive visitors.

105.    Class members in nursing facilities are denied access to meaningful employment and education opportunities by virtue of the environments in which they live and the limited supports that they are provided.

106.    Most nursing facilities resemble hospitals — they have nurses' stations and "escape guards" posted at the front doors to monitor persons leaving and entering the facility.  Some have locked doors.  There are large common areas or day rooms for congregating.

107.    There is little, if any, privacy for class members in nursing facilities.  Individuals often share rooms with up to five other residents whom they did not know previously and with

whom they did not choose to live. Nursing facility residents are often not free to close the door to their rooms.

108. Many nursing facilities are stark environments where residents have a minimal number of personal possessions. Most class members do not have their own telephones, televisions or furniture.

109. Most class members in nursing facilities have little, if any, choice regarding what to eat or when to eat.

110. Nursing facilities do not provide active treatment or habilitation designed to meet the needs of class members with developmental disabilities. The care that the nursing facilities provide is primarily custodial. There is often a shortage of direct-care staff and trained professionals.

111. The operating philosophy of most nursing facilities is to care for people rather than to have them care for themselves. Consequently, individuals with developmental disabilities in nursing facilities often regress and deteriorate, losing basic skills and competencies as a result of their inappropriate confinement.

112. As a result of these institutional conditions, class members suffer harm from unnecessary confinement in these segregated facilities and rarely, if ever, receive the level of habilitative care and active treatment that is required by federal law.

C. *Texas's Intermediate Care Facilities for the Mentally Retarded (ICF/MR)*

(1) Federal ICF/MR Requirements

113. The ICF/MR Program is an optional Medicaid service authorized by Title XIX of the Social Security Act. 42 U.S.C. § 1396d(a)(15). The program is also known as Intermediate

Care Facilities for the Developmentally Disabled. ICF/MRs provide residential, health, and rehabilitative services for individuals with developmental disabilities.

114. In 1971 Congress passed legislation, P.L. 92-223, that provides Medicaid reimbursement for institutions for persons with developmental disabilities who need long term care. An ICF/MR is defined as an institution for four or more persons with mental retardation or related conditions. Its primary purpose is to provide health or rehabilitative services consistent with standards prescribed by the Secretary of HHS. 42 U.S.C. § 1396d(d).

115. Federal law permits, but does not require, a state to provide ICF/MRs as part of its Medicaid program. Once a state elects to provide such optional services, they become part of the state Medicaid plan and are subject to the requirements of federal Medicaid law. These services must be available to any Medicaid recipients for whom they are medically necessary.

116. Persons residing in ICF/MRs must receive "active treatment." The HHS regulations governing ICF/MRs define active treatment as a continuous active treatment program, which includes aggressive, consistent implementation of specialized and generic training, treatment, health services and related services that is directed at:

      a. the acquisition of behaviors necessary for the client to function as independently and with as much self-determination as possible, and

      b. the prevention or deceleration of regression or loss of current functional status. 42 C.F.R. § 483.440(a).

117. Active treatment in ICF/MRs means an individualized program of habilitative services and supports that is provided throughout the day – from the time the individual wakes up until the time she retires. It must be provided in a consistent manner across all settings and parts of the facility or other locations where the individual is served. It must be designed by a

qualified professional and implemented by competent staff trained in developmental disabilities. It must be based upon a comprehensive assessment of the individual's needs and delivered pursuant to an individualized plan of care that includes measurable goals, timelines, and persons or providers with assigned responsibilities. The plan must be reviewed periodically and modified as the individual attains the stated goals or when the individual's needs change. Finally, the plan must be evaluated for effectiveness and improved when needed. 42 C.F.R. § 483.440(a)-(f).

118. Federal statutes and regulations require that individuals in ICF/MRs receive active treatment, which includes habilitative services, vocational services, occupational therapy, speech therapy, physical therapy, speech and language therapy, assistive technology, auxiliary aides, adaptive equipment, case management, and community integration activities. *See* 42 U.S.C. § 1396d(d); 42 C.F.R. § 440(a)-(f).

119. The type, level and intensity of services must be individually tailored and appropriate to meet the individual's needs, as determined by an Interdisciplinary Team. The Interdisciplinary Team includes several disability professionals from various disciplines who are required to conduct an individualized assessment of each individual's needs and to develop a habilitation plan to provide each individual the services and supports necessary to meet his/her identified needs.

(2)    <u>Texas's ICF/MR Program</u>

120. Texas has chosen to provide the optional ICF/MR service. HHSC has delegated the operation and administration of Texas's ICF/MR program to DADS. Texas delivers ICF/MR services through thirteen state-operated supported living centers and numerous privately run facilities licensed by DADS.

121.    The thirteen state-operated ICF/MR schools are large institutions serving from 75 to over 600 individuals with developmental disabilities.  The average census per state-operated ICF/MR is 498.

122.    The privately operated facilities range in size from 4 beds to over 200 beds, with most facilities serving from 6 to 13 residents.

123.    All ICF/MRs are required to provide active treatment to their residents.  The cost of active treatment is built into their Medicaid payment rate and is a condition of licensure.

124.    Thus, while persons with developmental disabilities who reside in the ICF/MR programs which DADS licenses, monitors, and funds receive active treatment through a wide array of habilitative services, persons with the same developmental disabilities who reside in nursing facilities receive almost no habilitative services and no active treatment.

D.      *Texas's Medicaid Programs for Persons with Developmental Disabilities*

(1)     The Federal Medicaid Program

125.    Medicaid is a jointly funded state and federal program that provides medical services to low-income persons pursuant to Title XIX of the Social Security Act.  42 U.S.C. §§ 1396 *et seq*.

126.    State participation in the Medicaid program is optional.  States choosing to receive federal matching funds for their Medicaid program must comply with the requirements of the federal Medicaid Act and with the federal regulations governing state Medicaid programs promulgated by the U.S. Department of Health and Human Services.  42 U.S.C. § 1396, 42 C.F.R. §§ 430 *et seq*.

127.    As a condition of participating in the federal Medicaid program, states must submit to HHS a state Medicaid plan that fulfills the requirements of the Medicaid Act. 42 U.S.C. § 1396a(a).

128.    Medicaid funded services for persons with developmental disabilities include mandated and optional state plan services, the PASARR program, the ICF/MR program, and various community programs funded through federal waivers, pursuant to 42 U.S.C. § 1396n.

(2)    Texas's Medicaid Program

129.    Texas has chosen to participate in the Medicaid program.   It has prepared a state plan which HHS has reviewed and approved.

130.    HHSC and its Executive Commissioner, Defendant Suehs, are responsible for the overall administration of the Medicaid program.  They have delegated to DADS and its Commissioner, Defendant Traylor, responsibility for the delivery of Medicaid and other services and supports to elderly and disabled Medicaid recipients, including plaintiffs and the class. Nevertheless, DADS and Defendant Traylor are subject to HHSC's oversight and control, and HHSC and Defendant Suehs remain responsible for the actions and inactions of DADS, its officers and agents.

131.    DADS and Defendant Traylor are responsible for ensuring that individuals with developmental disabilities are appropriately screened prior to or immediately after admission to a nursing facility to determine whether a nursing facility is an appropriate placement or whether the individual's needs could be met in a more integrated community setting.

132.    If a community placement is appropriate, DADS and Defendant Traylor are responsible for ensuring that appropriate habilitative and other services and supports are provided in the community.  If a nursing facility placement is the most appropriate setting for

meeting the individual's needs, DADS and Defendant Traylor are responsible for ensuring that the individual is comprehensively assessed to determine his or her need for specialized services. Finally, for persons needing specialized services, DADS and Defendant Traylor are responsible for ensuring that those specialized services are in fact provided at the level, frequency, and intensity necessary to satisfy the federal standard for active treatment.

133. The Governor, Defendant Perry, is responsible for ensuring that the State submits a State Medicaid Plan which conforms to federal law, and that Texas's Medicaid program is administered consistent with that Plan, relevant federal statutes, and federal regulations.

134. Defendants Perry, Suehs and Traylor have failed to ensure that plaintiff class members, who are categorically eligible for Medicaid services, are provided those medically necessary services to which they are entitled under the Plan and pursuant to Title XIX of the Social Security Act.

135. Defendants Perry, Suehs and Traylor also have failed to develop plans and budgets which are designed to provide class members with developmental disabilities with the services and supports needed to reside safely in the community. These defendants have also failed to offer class members who require care in a nursing facility the specialized services and active treatment necessary to ensure that they reach their full potential for self-determination and independence and do not suffer regression.

E. *The Individual Plaintiffs*

(1) <u>Eric Steward</u>

136. Eric Steward is a 44 year-old man with developmental disabilities including mental retardation and the related condition of infantile cerebral palsy. Since birth, Mr. Steward has also had a diagnosis of quadriplegia. He uses a power scooter for mobility, can stand with

assistance, is verbal and has receptive language skills.  Mr. Steward is very friendly and likes meeting and talking with other people.

137.    Mr. Steward has resided at the Buena Vida Nursing & Rehabilitation Center of San Antonio since November 2007.  Mr. Steward has lived in nursing facilities since 2002.  His first nursing facility admission occurred subsequent to surgery for a seizure disorder.  Despite residing in two different nursing facilities, Mr. Steward has never received either a Level I PASARR screen or Level II PASARR assessment.

138.    Before his placement in the first nursing facility, Mr. Steward lived in a small community-based ICF/MR for approximately 4 years.  Mr. Steward's ICF/MR provided him, and the other seven individuals with disabilities who resided in the facility, with the opportunity to live in a home-like setting in a residential section of San Antonio.

139.    As an ICF/MR resident, Mr. Steward shared a bedroom in a home where he had access to all living and dining areas.  Mr. Steward also had opportunities to work and participate in community-based activities, including going to movies, dining out, attending sporting events, engaging in sports related activities such as bowling, and participating in Special Olympics.  In addition, Mr. Steward also received active treatment, including the opportunity to engage in skill-based activities, such as day habilitation, vocational training, and employment-related activities.  Living in an ICF/MR also helped Mr. Steward develop independent living skills.  He learned about meal preparation, money management, and doing laundry.

140.    However, in 2002 following surgery and hospitalization for his seizure activity, Mr. Steward lost his ICF/MR placement, resulting in his admission to a nursing facility where he has remained for the past eight years.

141.     According to Mr. Steward's nursing facility medical records, his mental state has declined.  He has increasing periods of what the nursing facility characterizes as "persistent sad mood," and a decline in functioning.  According to Buena Vida's own professionals, Mr. Steward has deteriorated since his last assessment.

142.     Nursing facility notes also indicate that Mr. Steward's communication deficits adversely affect his ability to interact with others.  However, there is no indication in Mr. Steward's chart that he has been evaluated for any form of assistive communication or speech therapy, even though such supports and services are available under the state Medicaid plan and required as part of a program of active treatment.

143.     There is nothing in the Buena Vida medical records indicating that he has ever received a PASARR evaluation.  In fact, the nursing facility's own data indicates that it is unknown whether or not Mr. Steward ever received a PASARR determination.  As a result, there has been no determination or assessment from DADS or the local mental health mental retardation authority regarding his need for specialized services or alternate placement options.  Consequently, Mr. Steward does not receive any specialized services, any active treatment, or any consideration for community living.  Because Mr. Steward lives in a nursing facility, he has very few, if any, meaningful opportunities to go anywhere, to work, or to receive the habilitation and other supportive services he needs to avoid further regression.

144.     Mr. Steward wants to live in the community.  He very much wants the opportunity to work, develop independent living skills and once again have the opportunity to engage in an array of community-based living activities.  Living in a community-based setting would enable him to live and interact with individuals much closer to his age.

    (2)  <u>Linda Arizpe</u>

145. Linda Arizpe is a 41 year-old woman with a significant developmental disability. She is unable to walk and cannot talk, although she does have good receptive communication abilities and is particularly responsive to her parents. She also has a significant visual impairment.

146. Ms. Arizpe was initially admitted to Rosewood Care Center in November 2005 with anoxic brain damage. Ms. Arizpe was admitted to Rosewood from the hospital where, while being treated for a leg injury, she was overmedicated and stopped breathing, resulting in a brain injury. Ms. Arizpe has been living at Meridian Care Nursing Facility in San Antonio since January 2008.

147. Prior to her admission to Rosewood, Ms. Arizpe attended public schools where she participated in special education classes including pre-vocational activities.

148. When Ms. Arizpe was not in school, she traveled extensively with her family. She also participated in a variety of community-based activities including shopping, swimming, hiking and especially dining out.

149. While Ms. Arizpe needs assistance with many of her activities of daily living including eating, dressing, and hygiene related activities, she is able to follow directions, dress and care for herself.

150. Ms. Arizpe is considerably younger than most of the other residents at the nursing facility, and further because of her developmental disability, other nursing facility residents do not interact with her. For instance, Ms. Arizpe's roommate is well over 70 and has significant physical and mental disabilities that result in extremely limited opportunities for social interaction.

151.    Since living at Meridian, Ms. Arizpe has not participated in any of the community-based activities she previously enjoyed.  Moreover, she receives none of the habilitation services that would enable her become more independent and socially engaged.

152.    Despite her longstanding diagnosis of a developmental disability, Ms. Arizpe's Level I PASARR form at the nursing facility indicates that she does not have such a disability.  As a result, she was not identified as requiring a Level II PASARR assessment, and no evaluation has been made to determine (a) the type of community-based placement she may be eligible for and/or (b) the type and intensity of specialized services she could benefit from.

153.    Ms. Arizpe's family, and, in particular, her elderly parents, want to ensure that she is not forced to spend the rest of her life in a nursing facility without the habilitative services she needs to avoid regression and to be as independent as she can be.

154.    Ms. Arizpe and her parents would like very much to have her transferred to a small community-based setting where she could receive all of the needed services, supports, and therapies which she needs and also interact with the outside world.

(3)    Andrea Padron

155.    Andrea Padron is 26 years old. She has resided at Meridian Care in San Antonio since 2001.

156.    When Ms. Padron was ten years old, she suffered a severe head injury from a car accident.  Since the accident, Ms. Padron has required extensive care and habilitation.  Her diagnosis includes quadriplegia and quadriparesis, esophageal reflux, mental retardation, and epilepsy.  In addition, Ms. Padron is nonverbal, although she appears to have good receptive language skills.  Her treating doctor indicates that her rehabilitation potential is fair.

157.    Until she was 16, Ms. Padron lived at home.  There she received a range of habilitative services and therapies.  She attended public school.  She was able to use a wheelchair and, on occasion, to stand with the use of a standing table.  She also participated in aqua-therapy, as well as arts and crafts classes in the community.

158.    However in 2000, Ms. Padron had to place Andrea in a nursing facility because the family income just exceeded the income criteria for Andrea's continued eligibility for the supplemental security income program.  Because Ms. Hudecek could no longer afford to care for Andrea at home, she placed her in a nursing facility – believing she would get the care and attention she needed.  In December 2004, Ms Hudecek, who was active military with the United State Army, was deployed to Iraq.  When Ms. Hudecek returned from her deployment to Iraq in February 2007, Ms. Hudecek reports that Andrea could no longer even sit in her wheelchair.  She attributes this to the nursing facility's failing to get Andrea out of bed regularly.  As a result, Andrea has regressed.  She is no longer able to stand or use her wheelchair.  She no longer receives aqua-therapy or participates in recreational or social activities.

159.    Following Ms. Hudecek's return from Iraq and her re-involvement with her daughter, the nursing facility staff began to assist Andrea into her wheelchair.  However, the nursing facility staff often left Andrea sitting in her chair for long periods of time unattended, resulting in skin breakdown and sores.

160.    To address both the skin breakdown and sores and to enable Andrea to continue to use her wheelchair, Ms Hudecek purchased Roho cushions.  These cushions are designed to more evenly distribute a patient's body weight, significantly reducing the chances for skin breakdown.  However, over the past two years, nursing facility staff have failed to regularly use these cushions.  As a result, Ms. Padron is no longer using her wheelchair.

161.     A review of Ms. Padron's nursing home record at Meridian indicates that her Level I PASARR screening form was completed incorrectly; erroneously stating that Ms. Padron does not have a developmental disability.  As a result, Ms. Padron was not referred for a Level II assessment and no assessment of her ability to reside in a community-based setting and/or her need for specialized services has ever been done by the local mental health mental retardation authority.  Consequently, she receives no specialized services, no active treatment, and no consideration for community living.

162.     Ms. Hudecek wants Andrea moved to an integrated, community-based setting where she can get the care and habilitation needed to recover lost skills related to mobility, where she can enhance and further develop the skills needed to maximize her ability to function with as much self-direction and independence as possible, and where she will have much greater opportunities to participate in community-based activities.

(4)     Patricia Ferrer

163.     Plaintiff Patricia Ferrer is an individual with developmental disabilities, specifically mental retardation and the related condition of epilepsy.

164.     Plaintiff Patricia Ferrer has been residing at ManorCare Health Services nursing facility since September 2008, when her elderly mother, Petra Ferrer, no longer was able to provide for her care.

165.     Ms. Ferrer has few physical limitations and is quite mobile.  In addition to her intellectual disability, she has epilepsy which is poorly controlled by medication.

166.     For the first forty-four years of her life, Ms. Ferrer lived at home with her parents. She attended public schools, graduating from Adamson High School in Dallas.

167.    After graduation from high school, Ms. Ferrer worked full-time as a chamber maid for a hotel chain for approximately four years.  She then obtained a position in the security department at Love Field in Dallas, where she worked for approximately two years.

168.    Ms. Ferrer ultimately had to leave her employment at Love Field when her epilepsy became more active and difficult to control.  In order to control her epilepsy, Ms. Ferrer must take medication periodically throughout the day.

169.    During the more than forty years that Ms. Ferrer lived in the community with her parents she was very independent and active.  She required no assistance with activities of daily living.  In fact, she sometimes prepared simple meals for the family and would regularly assist in meal preparation.

170.    Until her epilepsy became more active and unpredictable, Ms. Ferrer was able to use public transportation and would often go to the mall, movies, or visit a friend.  After her epilepsy became more active, Ms. Ferrer was not allowed by her parents to take the bus on her own.  Nevertheless, she continued to go out to the movies, shopping, and restaurants, and to visit friends when accompanied by a family member or friend.

171.    Approximately three years ago, Ms. Ferrer's father was diagnosed with Parkinson's disease.  Ms. Ferrer's mother, who is in her seventies and the sole care provider in the household, then had to provide care for both her husband and her daughter.  Ultimately, Mrs. Ferrer realized that she lacked the physical ability to provide both her husband and Patricia with the care and support they needed.

172.    Because of her inability to properly care for her daughter, Patricia, while also attending to the medical needs of her husband, Mrs. Ferrer reluctantly decided to place Patricia in a nursing facility.

173.     When Ms. Ferrer was admitted to ManorCare in September 2008, her admitting records indicated that she was a person with mental retardation.  Nevertheless, her Level 1 PASARR screen indicated that she did not have mental retardation or any other developmental disability.

174.     Because Ms. Ferrer was not identified on the Level 1 PASARR screen as an individual with a developmental disability, she was never evaluated to determine if her needs could appropriately be met in the community or if she could benefit from specialized services.

175.     Since being placed in ManorCare, Ms. Ferrer's condition has deteriorated.  She has become less communicative, cries frequently, has developed behavioral issues requiring medication, and spends most of her waking hours sitting in a chair by the nurses' station.

176.     There is no reason for Ms. Ferrer to be confined in a segregated nursing facility. She is very independent and able to take care of most of her daily living needs.  She would like to live in an integrated community setting where she could meet new people, go to the movies, go shopping, and otherwise interact with the outside world.  She is also interested in obtaining the training and support so that she could go back to work.

(5)     <u>Benny Holmes</u>

177.     Plaintiff Benny Holmes is an individual with developmental disabilities, specifically mental retardation and the related condition of cerebral palsy.

178.     Mr. Holmes has been living at the Renaissance at Kessler Park nursing facility since January 2009 when he was discharged from a local hospital following an admission for treatment related to his epilepsy, weight loss, and hydration issues.

179.     Until Mr. Holmes was a young adult, he lived at home and attended public high school.  Not only did he attend school regularly, but he also participated in school-related activities, including frequently going to school athletic events and attending his senior prom.

180.     Mr. Holmes continued to receive special educations services from the Dallas Independent School District until he was 21 years old.  He lived at home with his mother and legal guardian, Priscilla Holmes, during this period.

181.     Mr. Holmes mother, who is a single parent, had to work to support herself and her son.  When Mr. Holmes' special education services terminated, his mother was not able to both work and care for him during the day.  As a result, Mr. Holmes was placed at the Dallas Health and Rehabilitation Center, where he remained for approximately one year.

182.     After about one year at the Dallas Health and Rehabilitation Center, the local Mental Retardation Authority in Dallas determined that Mr. Holmes' needs could be more appropriately met in a community-based setting.  He was provided with a HCS-waiver slot which enabled him to transfer from the nursing facility to a three bedroom home in the community where he lived for approximately nine years.

183.     During the nine years that Mr. Holmes resided in the community, he attended day habilitation programming, went to the movies, and participated in other community outings.  While he is unable to talk, he could and did communicate with others using sounds and gestures.  He is also not able to walk.  While in the community, he had a wheelchair which provided him with the ability to move around.

184.     After successfully residing in the community for approximately nine years, Mr. Holmes was admitted to a local hospital because of problems he was having with his epilepsy, hydration, and weight loss.  Following his treatment at the hospital, he was not discharged back

to his community residence, but rather was transferred in January 2009 to the Renaissance at Kessler Park nursing facility, where he continues to reside.

185. Shortly after his admission, a preadmission screening and resident review (PASARR) form was filled out regarding his admission. That Level I PASARR screen indicated that Mr. Holmes did not have a developmental disability, even though the Renaissance's own admission form indicates that he has a history of mental retardation and cerebral palsy. That PASARR form also indicated that Mr. Holmes did not need specialized services.

186. Because the Level I PASARR screen incorrectly indicated that Mr. Holmes did not have a developmental disability, no Level II PASARR assessment of Mr. Holmes was undertaken by either DADS or the local Mental Retardation Authority to determine his interest in and ability to reside in a less restrictive community setting, or his need for and interest in specialized services.

187. While Mr. Holmes had a HCS-waiver slot when he was admitted to Renaissance and could have used that waiver slot to move back to a community-based setting, Renaissance nursing facility staff repeatedly informed Mr. Holmes' mother – and legal guardian – that a community-based waiver program would not be appropriate for him.

188. Renaissance staff told Mr. Holmes' mother that a community-based placement was not appropriate without ever contacting the local mental retardation authority, the agency responsible for determining whether or not a community-based alternative would be appropriate. This was never done in part because Renaissance failed to conduct a Level II PASARR assessment, as required by federal law.

189. The Renaissance nursing facility staff also told Mr. Holmes' legal representatives from Advocacy, Incorporated that he was not appropriate for a community-based placement.

When representatives from Advocacy, Incorporated suggested that Mr. Holmes could possibly qualify for and benefit from a HCS Medicaid waiver slot, Renaissance nursing facility staff continued to assert that a community placement was inappropriate, notwithstanding having never contacted a Medicaid waiver provider for information about community-based alternatives.

190.    On information and belief, Mr. Holmes' initial HCS provider, Dallas MetroCare, contacted the Renaissance nursing facility regarding the possibility of Mr. Holmes moving to a small residential home in the community with his HCS-waiver slot, which they were still holding for him.  Dallas MetroCare was told by the Renaissance nursing facility that Mr. Holmes was not appropriate for such a setting.

191.    On information and belief, Renaissance nursing facility staff told MetroCare that Mr. Holmes' mother never visited her son, despite the fact that she regularly visited him. In addition, in response to requests from MetroCare for Ms. Holmes' telephone number, Renaissance never provided Dallas MetroCare with a working phone number for Ms. Holmes.

192.     Upon information and belief, these statements regarding Mr. Holmes' appropriateness for community-based care and the frequency of Ms. Holmes' visits were made to MetroCare in order to discourage MetroCare from further pursuing the possibility of providing Mr. Holmes with support and services in the community through the HCS waiver.

193.    As a result of the statements by Renaissance, Dallas MetroCare planned to give Mr. Holmes' HCS-waiver slot to another applicant on the interest list.  However, before this occurred, Advocacy, Incorporated learned that Mr. Holmes' had previously resided in the community through the HCS-waiver program and contacted Dallas MetroCare, providing them with Ms. Holmes' phone number and informing them that, contrary to the nursing facility's claim, Ms. Holmes frequently visits her son at the nursing facility.

194.     Dallas MetroCare contacted Ms. Holmes and, after being informed of the community-based options that were available for her son, Ms. Holmes advised MetroCare that she would like to retain the HCS-waiver slot for her son and develop a plan to transition him back to the community.

195.     To this end, Ms. Holmes recently has had Mr. Holmes evaluated by an HCS-waiver provider in Dallas. That HCS provider states that it can meet all of Mr. Holmes health and habilitation needs in a community setting. The proposed placement is a four bedroom home in a quiet residential neighborhood, where Mr. Holmes will have his own room and live with three other residents. Mr. Holmes' transition to his new residential placement should be complete in or about January 2011.

196.     While Mr. Holmes has not been evaluated by a speech or language pathologist or therapist to determine if he could benefit from any form of assistive augmentative communication device or therapy during his time at the Renaissance nursing facility, he will receive such an evaluation after he moves to his HCS placement.

197.     Since being admitted to the Renaissance nursing facility, Mr. Holmes' condition has deteriorated markedly.  At the time Mr. Holmes was admitted to the Renaissance nursing facility, he was described as alert, able to follow commands, and an active participant in treatment.  But, after only six months at the nursing facility, medical notes indicated that Mr. Holmes rarely, if ever, understands commands from others and no longer is an active participant in his treatment.

198.     During the course of his stay at the Renaissance nursing facility, Mr. Holmes has become withdrawn and depressed. While he used to be active and participate in community

activities, Mr. Holmes now spends his days confined to his bed or in a wheelchair in front of the television.

(6)    <u>Zackowitz Morgan</u>

199.    Plaintiff Zackowitz Morgan is a 39 year-old man with developmental disabilities. Mr. Morgan has diagnoses of mental retardation, cerebral palsy, obesity, hypertension, hypothyroidism, glaucoma, and peripheral vascular disease, congestive heart failure and a seizure disorder.

200.    Mr. Morgan has been in living in a nursing facility since January 2008, following his discharge from a hospital where he was treated for a leg infection. Mr. Morgan was admitted into the Katyville Healthcare Center (nursing facility) on January 25, 2008. Upon his admission, Mr. Morgan did not receive a PASARR screen or a comprehensive assessment for specialized services.

201.    On January 27, 2009, more than a year after being admitted into his nursing facility placement, Mr. Morgan finally received a PASARR screening. That screening simply indicated that he was appropriate for specialized services.

202.    On March 18, 2009, an Inter-Disciplinary Team (IDT) meeting was held at Katyville Healthcare Center. Participants included representatives from the nursing facility, Mr. Morgan's guardian, and his legal counsel. There was no representative from Harris County Mental Health and Mental Retardation Authority (MHMRA), the county branch of the state agency responsible for providing specialized services and community services. The IDT determined that Katyville Healthcare could not meet Mr. Morgan's specialized services needs related to his mental retardation. In addition, the IDT also determined that a nursing facility was not an appropriate placement for him.

203.     In July 2009, Mr. Morgan was transferred to the Silver Springs Healthcare Center at the request of his guardian.

204.     Almost nine months after Mr. Morgan's IDT meeting, a Harris County Mental Health and Mental Retardation Authority (MHMRA) service coordinator finally visited him at Silver Springs Healthcare Center to perform a needs assessment.  That September 16, 2009 assessment determined Mr. Morgan had "…a moderate need for service coordination."  However, there is no indication that Mr. Morgan has ever received any specialized services, and he is not aware of having received any.  He clearly does not receive active treatment.

205.     Despite the IDT determination that a nursing facility was not an appropriate placement for Mr. Morgan, the Defendants have not undertaken any steps to assist him in locating an alternative, more integrated setting in which his habilitation and residential assistance needs could be met.

206.     Upon information and belief, prior to his nursing home placement, Mr. Morgan lived in a small ICF-MR with three other individuals.

207.     Mr. Morgan is an individual with an extremely outgoing personality.  Living in the community would afford him a variety of opportunities that institutional living precludes, including meeting and socializing with people and pursuing his desire to work.  Prior to his nursing home placement, Mr. Morgan participated regularly in a vocational workshop operated by EduCare of Texas.

208.     Since moving to a nursing facility placement, Mr. Morgan has regressed.   He is no longer participating in EduCare workshops.  He has gained a significant amount of weight, and is no longer ambulatory and now uses a wheelchair.  In terms of daily living activities, Mr.

Morgan can no longer self-transfer or self-toilet, tasks that he could perform prior to his nursing facility placement. He now must wear diapers.

209.     Mr. Morgan is both frustrated and depressed about the deterioration of his health, his inability to participate in social activities outside of the nursing facility, and his goal of being employed. At the nursing facility he receives no vocational support or training. He spends all of his waking hours in institutional rooms with little to do or engage him.

## VI.     LEGAL CLAIMS

**First Claim for Relief**
**The Americans with Disabilities Act**

*A.     Violation of the ADA's Integration Mandate*

210.     The plaintiffs and the members of the plaintiff class are qualified individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2).

211.     Title II of the ADA requires that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Defendants Suehs and Traylor, acting in their official capacities, are public entities within the meaning of the ADA.

212.     The Individual Plaintiffs and plaintiff class members qualify for and would benefit from community support services available from the Texas Medicaid program. Although community programs are the most integrated setting appropriate to meet their needs, the plaintiffs remain institutionalized in nursing or rehabilitation facilities, or at imminent risk of such institutionalization. By denying plaintiffs and the class access to existing community programs, and by requiring them to be confined in segregated institutional settings in order to receive the care they require, Defendants discriminate against the plaintiffs and class on the basis of their disability in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d).

## B. *Eligibility Criteria*

213.    Regulations implementing Title II of the ADA specify that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

214.    The Defendants have developed and implemented eligibility criteria for their community-based support services for individuals with developmental disabilities that screen out or tend to screen out the class of individuals with developmental disabilities who are residing in Texas nursing facilities from gaining access to or enjoying those community-based habilitative services and supports in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(8).

## C. *Methods of Administration*

215.    Regulations implementing Title II of the ADA provide that "a public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration:  (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities … ."  28 C.F.R. § 35.130(b)(3).

216.    The Defendants have developed and utilize criteria and methods of administering Texas's long-term care system for persons with developmental disabilities that have the tendency and effect of subjecting the plaintiffs and the class to unnecessary and unjustified segregation on the basis of their disability by, *inter alia*, failing to inform them of the services, supports and programs that would enable them to reside in a less restrictive, more integrated setting, failing to

assess them for such services, supports and programs, failing to offer them a choice of such community-based services, supports and programs, and failing to afford them equal access to such services, supports and programs with other institutionalized individuals on the basis of the nature of their disability and placement, all in violation of 42 U.S.C. § 12132 and 28 U.S.C. § 35.130(b)(3).

217.    It would not fundamentally alter the Defendants' programs, services, or activities to provide the plaintiffs and the class with the services necessary to allow them to live in the community.

**Second Claim for Relief**
**Section 504 of the Rehabilitation Act**

218.    The plaintiffs are qualified individuals with disabilities under Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a).

219.    Defendants receive federal financial assistance to operate the Medicaid Program and other related programs and services designed to provide medically necessary services and supports to the plaintiff class.

220.    The regulations accompanying Section 504 provide that:  "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

221.    These regulations further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration . . . (i) [t]hat have the effect of subjecting handicapped persons to discrimination on the basis of handicap; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

222.     The Individual Plaintiffs and plaintiff class members qualify for and would benefit from community support services provided by the Defendants. Although the community is the most integrated setting appropriate to meet their needs, the plaintiffs remain institutionalized in nursing and rehabilitation facilities, or at risk of such institutionalization. By denying them access to existing community programs, and by requiring that plaintiffs and class members be confined in segregated institutional settings in order to receive needed rehabilitative services, the Defendants violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

223.     The Defendants' criteria and methods of administering their system of long-term services for persons with developmental disabilities subject plaintiffs and the class to illegal discrimination and unnecessary segregation in violation of § 504 of the Rehabilitation Act and its implementing regulations.

224.     It would not fundamentally alter the Defendants' programs, services, or activities to provide the plaintiffs and the class with the services necessary to allow them to live in the community.

### Third Claim for Relief
### Title XIX of the Social Security Act

*A.     Reasonable Promptness*

225.     Title XIX of the Social Security Act requires states to provide Medicaid benefits to all eligible persons with reasonable promptness and for as long as medically necessary. 42 U.S.C. §§ 1396a(a)(8); 1396a(a)(10)(A). Provision of services must not be delayed by the agencies' administrative procedures. 42 C.F.R § 435.930(a).

226.     The Defendants' arbitrary policies, which limit the provision of medically necessary community-based services and supports, as well as medically necessary specialized services, result in extended delays and the outright denial of medically necessary care to the

plaintiffs and members of the plaintiff class. The residential support, habilitation and other specialized services that the plaintiff class needs are not provided with reasonable promptness, in violation of 42 U.S.C. §§ 1396a(a)(8).

B.     *Freedom of Choice*

227.     The Defendants have failed to provide residents of nursing facilities with developmental disabilities with: 1) notice of and equal opportunities to apply for and access medically necessary community-based services; 2) an assessment of their eligibility for such services; and 3) meaningful choice between institutional and community-based services, in violation of 42 U.S.C. § 1396n(c)(2)(B) & (C).

C.     *Comparability*

228.     Under federal Medicaid law, persons, like plaintiffs and the class, who are "categorically eligible" for Medicaid benefits based upon their disability and income must be provided with assistance which shall not be less in amount, duration and scope than the medical assistance made available to another "categorically eligible" recipient and shall not be less in amount, duration and scope than the medical assistance made available to other recipients in the program. 42 U.S.C. § 1396a(a)(10)(B)(i) and (ii); 42 C.F.R. § 440.240.

229.     By failing to provide Medicaid services, including specialized services and active treatment, to Individual Plaintiffs and members of the plaintiff class who reside in nursing facilities which are comparable to the services provided to similarly-situated individuals such as categorically needy persons who reside in ICF/MRs, the Defendants violate the comparability requirement of the Social Security Act. 42 U.S.C. § 1396a(a)(10)(B).

**Fourth Claim for Relief**
**Nursing Home Reform Amendments**

A.     *Screening, Assessment and Placement*

230.    The federal NHRA requires that states develop and implement a PASARR program for all applicants to, and residents of, Medicaid-certified nursing facilities. 42 U.S.C. § 1396r(e)(7); 42 C.F.R. § 483.100 to 483.138.  Each state's PASARR program must identify all individuals who are suspected of having mental illness or developmental disabilities and must determine whether nursing facility services and other specialized services are necessary.  42 U.S.C. §§ 1396r(b)(3)(F)(i), 1396r(e)(7)(A)&(B); 42 C.F.R. § 483.128.

231.    The Defendants have failed to develop and implement a PASARR program that timely and appropriately screens nursing home applicants for developmental disabilities, assesses whether the needs of individuals with developmental disabilities could be met in an alternative, less restrictive setting than a nursing facility, and advises the applicant or resident of the available alternatives to a nursing home placement in violation of 42 U.S.C. §§ 1396r(b)(3)(F)(i), 1396r(e)(7)(A) & (B) and 42 C.F.R. § 483.128.

232.    The Defendants' failure to appropriately screen all applicants for nursing facility admission for possible developmental disabilities and to then assess whether the needs of those so identified require nursing facility care or, instead, could be met in a more integrated community-based setting has resulted in the inappropriate placement and retention of plaintiffs and many members of the class in nursing facilities in violation of 42 U.S.C. §§ 1396r(e)(7)(B)(ii) & (C) and 42 C.F.R. § 483.132(a).

    B.    *Specialized Services*

233.    The Level II PASARR assessment must determine whether the applicant or resident requires specialized services and, if so, must provide those specialized services either in the nursing facility or in an alternative appropriate setting.  42 U.S.C. § 1396r(e)(7)(B)(ii)(II) & (C); 42 C.F.R. §§ 483.112(b), 483.114(b)(2), 483.116(b)(2), 483.118, 483.120(b).

234.     Specialized services for individuals with developmental disabilities must include all services which are needed to implement "a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services . . . that is directed toward—(i) The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and (ii) The prevention or deceleration of regression or loss of current optimal functional status."  42 C.F.R. § 483.440(a)(1), made applicable to nursing facility residents by 42 C.F.R. § 483.120(a)(2).

235.     The intensity, duration and frequency of specialized services must be sufficient to provide active treatment, using training and qualified staff, to each individual who needs such services.  42 C.F.R. § 483.440 (c) - (f).  The scope and breadth of specialized services cannot be arbitrarily curtailed or limited by the state.  42 C.F.R. § 483.440(c).  In addition, the process for planning, providing and monitoring those services must comply with 42 C.F.R. § 483.440 (c) - (f).

236.     The Defendants have failed to provide a program of active treatment to each resident of a nursing facility who needs specialized services, and have instead arbitrarily and illegally limited these services by regulation to only "physical, occupational, and speech therapy evaluations and services."  40 Tex. Admin. Code §§ 19.1303, 19.2500(e)(3).  Defendants' limitation of the scope of specialized services that they will authorize violates 42 U.S.C. § 1396r(b)(3)(F), (e)(7)(B)(ii), (f)(8) and 42 C.F.R. §§ 483.120(a)(2), 483.440.

237.     In addition to illegally limiting the scope of specialized services available to class members, the Defendants have failed to provide even those limited services to almost all members of the plaintiff class.  Contrary to the their obligation to provide specialized services,

including active treatment, to the class, the Defendants have failed and refused to provide or ensure the provision of needed specialized services to all but 28 members of the class of approximately 4,500 nursing facility residents with developmental disabilities, despite the fact that experience in other states indicates that over 90% of the class are eligible for and in need of such services.

238.     The Defendants' failure to appropriately assess class members' need for specialized services, their failure to provide the full range of needed specialized services and active treatment to individual class members and members of the plaintiff class, and their failure to ensure that plaintiffs and the class are not inappropriately placed or retained in nursing facilities, violates the NHRA, 42 U.S.C. § 1396r(e)(7) and its implementing regulations, 42 C.F.R. § 483.100 *et seq.*

## VII.    PRAYERS FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that this Court:

1.     Certify this case as a class action pursuant to Fed. R. Civ. P. 23;

2.     Issue preliminary and permanent injunctions restraining the Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them from:

(a)     failing to provide appropriate, integrated community services and supports for all class members, consistent with their individual needs;

(b)     failing to make reasonable modifications to the rules and requirements regarding the eligibility for and administration of Texas's community-based services, supports and programs which exclude plaintiffs and the class from the

services and supports needed to reside safely in more integrated community-based settings;

(c)     failing to provide equal access to medically necessary community-based habilitative mental retardation and developmental disability services to all eligible class members based on their individual needs and medical necessity, and without regard to arbitrary funding or service caps or waiting list requirements;

(d)     discriminating against plaintiff class members with developmental disabilities by failing to provide medically necessary habilitation services and supports in the most integrated setting appropriate to their needs;

(e)     failing to provide medically necessary community-based habilitation services and supports with reasonable promptness and in a comparable manner to all eligible class members;

(f)     failing to conduct proper, comprehensive PASARR screens and assessments of class members to determine whether their needs could be appropriately met in a less restrictive setting than a nursing facility, and failing to inform class members of the results of their PASARR assessment;

(g)     failing to assess class members' needs for specialized services;

(h)     failing to provide the full array of needed specialized services, at the frequency, level, intensity, and duration needed to constitute active treatment, to class members as required by the NHRA; and

(i)     arbitrarily restricting the scope of available specialized services.

3.     Issue a declaratory judgment declaring that:

(a)    the Defendants have violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act in their implementation and administration of the state Medicaid program and in their failure to make reasonable modifications to their community programs for persons with developmental disabilities to enable plaintiffs and members of the class to obtain the services and supports they require to reside in the most integrated setting appropriate to their needs;

(b)    the Defendants have violated the Medicaid Act including the comparability, reasonable promptness, and freedom of choice provisions of the Social Security Act governing Medicaid services; and

(c)    the Defendants have violated the Nursing Home Reform Amendments by failing to properly screen and assess class members' ability to reside in a less restrictive, more integrated setting than a nursing facility, by their inappropriate placement of class members in nursing facilities, by their failure to assess class members' need for specialized services, by their arbitrary restriction on the scope of available specialized services, and by their failure to provide members of the plaintiff class with specialized services, including active treatment;

4.    Award plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 & 12205 and 29 U.S.C. § 794a; and

5.    Grant such other relief which is necessary and proper to protect the federal rights of the plaintiffs and the class which they represent.

Respectfully submitted,


     /s/ Garth Corbett
Garth A. Corbett
State Bar No. 04812300
Sean A. Jackson
State Bar No. 24057550
*Pro Hac Vice Forthcoming*
Advocacy, Incorporated
7800 Shoal Creek Boulevard., Suite. 171-E
Austin, Texas 78757
(512) 454-4816 (Telephone)
(512) 454-3999 (Facsimile)

gcorbett@advocacyinc.org

Yvette Ostolaza
State Bar No. 00784703
Robert Velevis
State Bar No. 24047032
*Pro Hac Vice Forthcoming*
Casey A. Burton
State Bar No. 24058791
*Pro Hac Vice Forthcoming*
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
(214) 746-7700 (Telephone)
(214) 746-7777 (Facsimile)

yvette.ostolaza@weil.com

Steven J. Schwartz
*Pro Hac Vice Forthcoming*
J. Paterson Rae
*Pro Hac Vice Forthcoming*
Center for Public Representation
22 Green Street
Northampton, Massachusetts 01060
(413) 586-6024 (Telephone)
(413) 586-5711 (Facsimile)


*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on this 20th of December, 2010, a true and correct copy of Plaintiff's Complaint was sent via Facsimile and U.S. Certified Mail, return receipt requested to:

Governor Rick Perry
Office of the Governor
State Insurance Building
1100 San Jacinto
Austin, Texas 78701
Fax (512) 463-1849

Thomas Suehs, Executive Commissioner
Texas Health and Human Services Commission
4900 N. Lamar Blvd.
Austin, TX 78751-2316
Fax (512) 424-6587

Karen Ray, Assistant General Counsel
Texas Health and Human Services Commission
4900 N. Lamar Blvd.
Austin, TX 78751-2316
Fax (512) 424-6586

Chris Traylor, Commissioner
Texas Department of Aging and Disability Services
701 West 51st Street
Austin, Texas 78751
Fax (512) 320-0667

Marianne Reat, Managing Attorney
Texas Department of Aging and Disability Services
701 West 51st Street
Austin, Texas 78751
Fax (512) 438-4749

Nancy Juren, Assistant Attorney General
Office of Attorney General
General Litigation
300 W. 15th St.
Austin, TX 78701
Fax (512) 320-0667

_____/s/ Garth Corbett_____
GARTH CORBETT