IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

ERIC STEWARD, et. al.,

          Plaintiffs,

          v.

RICK PERRY, et. al,

          Defendants

Case No.  5:10-cv-1025-OG

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

The United States files this Statement of Interest, pursuant to 28 U.S.C. § 517[1], because this litigation implicates the proper interpretation and application of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").  In particular, this case involves Title II's integration mandate.  *See Olmstead v. L.C.*, 527 U.S. 581, 607 (1999).  The Department of Justice has authority to enforce Title II, and to issue regulations implementing the statute.  42 U.S.C. §§ 12133-34.  The United States has a strong interest in the resolution of this matter.  Accordingly, it respectfully submits this Statement of Interest to address three issues raised by the State in its Motion to Dismiss.  First, notwithstanding the State's arguments, Plaintiffs' claims are timely filed and should not be dismissed pursuant to the statute of limitations.  Second, Governor Perry is appropriately named as a defendant for Plaintiffs' claims under the ADA and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Third, enforcement of

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

the Medicaid Act is not limited to a federal government action to terminate funds.

This suit alleges that the State of Texas unnecessarily institutionalizes individuals with developmental disabilities in nursing homes, in violation of Title II of the ADA as interpreted by the Supreme Court in *Olmstead v. L.C.,* 527 U.S. 581 (1999).[2]  The proposed plaintiff class consists of approximately 4,500 individuals with developmental disabilities[3] who are currently confined to nursing facilities and thousands more who are at risk of placement therein. (Complaint ("Compl.") ¶ 26, ECF No. 1 (Dec. 12, 2010).)  With appropriate supports, the individually named plaintiffs and plaintiff class members are able to live in the community instead of in nursing facilities.  (*Id.* at ¶ 1.)  However, the State effectively denies them access to its existing community-based services and supports by placing insurmountable barriers to their transition from nursing facilities, including decade-long waitlists.  (*Id.* at ¶¶ 57, 87, 100.) Nursing facilities are institutions; they house large numbers of unrelated persons and most individuals within them rarely have the opportunity to leave the facility.  Nursing facilities are hospital-like settings, affording residents little to no privacy.  (*Id.* at ¶¶ 101-112.)

Plaintiffs Eric Steward, Linda Arizpe, Andrea Padron and Patricia Ferrer all have developmental disabilities and are currently institutionalized in nursing facilities, but want to leave the nursing facility to enjoy the benefits of community living.  (*Id.* at ¶¶ 10-13, 144, 154,

---

[2] For the purposes of this Statement of Interest, filed in the context of Defendants' Motion to Dismiss, the United States accepts Plaintiffs' pleaded facts as true and views them in their most favorable light.  *EEOC v. Phillips*, 635 F.3d 164, 165 (5th Cir. 2011).

[3] Throughout this brief, the United States will use the term "developmental disabilities" to refer to individuals with intellectual disabilities or related conditions consistent with Plaintiffs' use of the term in their complaint. (Compl. ¶ 1.)

162, 176.)  For example, Ms. Ferrer lived at home for 44 years where she worked as a hotel housekeeper and then in the security department at Love Field in Dallas.  (*Id.* at ¶¶ 166-67.) Since being institutionalized, however, Ms. Ferrer has regressed, becoming less communicative and developing behavior issues requiring medication.  (*Id.* at ¶ 175.)  Mr. Steward enjoyed going to movies, dining out, attending sporting events, bowling and participating in the Special Olympics while he lived in the community.  (*Id.* at ¶¶ 10, 136.)  His mental health has declined since entering the nursing facility.  (*Id.* at ¶ 141.)  Mr. Morgan, who has a very outgoing personality, participated regularly in a vocational workshop operated by EduCare of Texas prior to his nursing facility placement.  (*Id.* at ¶ 207.)  Since moving to a nursing facility, Mr. Morgan is no longer participating in EduCare, has gained a significant amount of weight, is no longer ambulatory and now uses a wheelchair.  (*Id.* at ¶ 208.)

Plaintiffs further allege that the State fails to administer its Preadmission Screening and Resident Review ("PASRR") program in compliance with the Nursing Home Reform Act ("NHRA").  (*Id.* at ¶¶ 74-100.)  Plaintiffs allege that the State violates PASRR because it fails to properly evaluate individuals with developmental disabilities prior to nursing facility admission to determine whether they are appropriate for nursing facility placement, whether their needs could be met in the community and whether they need specialized services while in the nursing facility to treat their developmental disabilities.  (*Id.* at ¶¶ 74-100.)  Plaintiffs further allege that the State fails to provide or arrange for specialized services in nursing facilities as required by PASRR. (*Id.* at ¶¶ 85-88.)

### *Olmstead* **and the Integration Mandate**

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities.

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

As directed by Congress, the Attorney General issued regulations implementing Title II, which are based on regulations issued under section 504 of the Rehabilitation Act.[4]  *See* 42

---

[4] Title II was modeled closely on section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits discrimination on the basis of disability in federally-conducted programs and in all of the operations of certain entities, including public entities, which receive federal financial assistance. Title II provides that "[t]he remedies, procedures, and rights" applicable to section 504 shall be available to any person alleging discrimination in violation of Title II. 42 U.S.C. § 12133; *see also* 42 U.S.C. § 12201(a) (the ADA must not be construed more narrowly than the Rehabilitation Act). The ADA directs the Attorney General to promulgate regulations to implement Title II, and requires those regulations to be consistent with preexisting federal regulations that coordinated federal agencies' application of section 504 to recipients of federal financial assistance, and interpreted certain aspects of section 504 as applied to the federal government itself. 42 U.S.C. § 12134(a)-(b). Title II thus extended section 504's preexisting prohibition against disability-based discrimination in programs and activities (including state and local programs and activities) receiving federal financial assistance or conducted by the federal government itself to all operations of state and local governments, whether or not they receive federal assistance. Claims under the ADA and the Rehabilitation Act are treated identically unless one of the differences in the two statutes is pertinent to a claim. *Kemp v. Holder*, 610 F.3d 231, 234-35 (5th Cir. 2010). This principle follows from the similar language employed in the two acts. It also derives from the Congressional directive that implementation and interpretation of the two acts "be coordinated to prevent[ ] imposition of inconsistent or conflicting standards for the same requirements under the two statutes." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999) (citing 42 U.S.C. § 12117(b)). *See also Yeskey v. Com. of Pa. Dep't of Corr.*, 118 F.3d 168, 170 (3d Cir. 1997).

U.S.C. § 12134(a); 28 C.F.R. § 35.190(a); Exec. Order 12250, 45 Fed. Reg. 72995 (1980), *reprinted in* 42 U.S.C. § 2000d-1.  The Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible ..." 28 C.F.R. Pt. 35, App. A at 572 (2010) (addressing § 35.130).  This mandate advances one of the principal purposes of Title II of the ADA—ending the isolation and segregation of people with disabilities.  *See Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005).

Twelve years ago, the Supreme Court applied these authorities and held that Title II prohibits the unjustified segregation of individuals with disabilities.  *Olmstead*, 527 U.S. at 596. The Court held that public entities are required to provide community-based services for persons with disabilities who would otherwise be entitled to institutional services when (1) individuals are appropriate for community placement; (2) the affected persons do not oppose such treatment; and (3) the placement can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity.  *Id.* at 607.  The Court explained that this holding "reflects two evident judgments."  *Id.* at 600.  "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  *Id.*  "Second, confinement in an institution severely

---

("[A]ll the leading cases take up the statutes together, as we will."), *aff'd*, 524 U.S. 206 (1998).

diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601. *Olmstead* therefore makes clear that the aim of the integration mandate is to eliminate unnecessary institutionalization. A state's obligation to provide services in the most integrated setting may be excused only where a state can prove that the relief sought would result in a "fundamental alteration" of the state's service system. *Id.* at 603-04.

## ARGUMENT

### A.  Motion to Dismiss Standard

"[T]o survive a motion to dismiss, [plaintiffs] need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives v. Siracusano*, __ U.S.__; 131 S.Ct. 1309, 1322 n.12 (2011) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). So long as the allegations suffice to raise a reasonable expectation that discovery will reveal evidence sufficient "to allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," plaintiffs have stated a claim. *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009). In undertaking this analysis, the court "must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party." *Southern Scrap Material Co. LLC v. ABC Ins. Co.*, 541 F.3d 584, 587 (5th Cir. 2008) (internal citation omitted). Further, the Supreme Court's "recent emphasis on the plausibility of a complaint's allegations does not give district courts license to look behind those allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial." *Id.*

**B.  Plaintiffs' Claims Should Not be Dismissed Based on the Statute of Limitations**

The State urges this Court to dismiss Plaintiffs' claims under the ADA and PASRR to the extent that they arose outside the applicable two-year statute of limitations.[5]  (Defendants' Motion to Dismiss ("State's Mot.") 13-15, ECF No. 30 (Mar. 3, 2011).)   This argument is without merit because Plaintiffs have pled sufficient facts to establish that the State's actions constitute continuing violations.  *See McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 867 (5th Cir. 1993) (outlining continuing violation theory).

i.    *General legal principles governing a motion to dismiss based on limitations*

A complaint may only be dismissed based on a statute of limitations defense where it is evident from the pleading that the action is untimely and the pleadings "fail to raise some basis for tolling or the like."  *Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir. 2003); *see also Quantlab Technologies Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 774 (S.D. Tex. 2010). Courts generally will not dismiss a claim based on a statute of limitations defense, unless it is clear from the complaint that no factual basis exists for tolling the limitations period.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (permitting dismissal only where all facts necessary to the [statute of limitations] defense "clearly appear[ ] *on the face of the complaint*.") (emphasis in original).  *See also Clark v. Prudential Ins. Co. of America*, 736 F. Supp. 2d. 902, 923 (D. N.J. 2010) ("A statute of limitations defense is affirmative.… [t]herefore, it may only be

---

[5] Congress has set no statute of limitations under the ADA, the Rehabilitation Act or 42 U.S.C. § 1983.  Thus, the applicable state statute applies. *Wallace v. Kato*, 549 US. 384, 387 (2007).  However, "federal law determines when a civil rights action accrues and, therefore, when the statute of limitations begins to run."  *Perez v. Laredo Junior College*, 706 F.2d 731, 733 (5th Cir. 1983).  Here, the Texas statute of limitations governing torts is two years.  TEX. CIV. PRAC. & REM. CODE § 16.003(a).

resolved on a motion to dismiss if it is clear from the face of the complaint that the statute of limitations bars the claim.") (citing *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385, n.1 (3d Cir. 1994).[6]

> ii.     *Plaintiffs' complaint alleges that the State's actions constitute continuing violations of Title II of the ADA, the Rehabilitation Act and PASRR*

"Under the continuing violations doctrine, a plaintiff may complain of otherwise time-barred discriminatory acts if it can be shown that the discrimination manifested itself over time, rather than in a series of discrete acts." *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003). Once such a showing is made, "a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period[.]" *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004) (internal citations omitted).   Thus, the continuing violation doctrine "preserves claims based on acts outside the prescriptive period if the plaintiff timely files a claim based on a present violation." *McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 866 (5th Cir. 1993). Further, if the violation "occurs as a result of a continuing policy, itself illegal, then the statute [of limitations] does not foreclose an action aimed at the [entity's] enforcement of the policy within the limitations period." *Perez v. Laredo Junior College*, 706 F.2d 731, 734 (5th Cir. 1983).

---

[6] *See also Hernandez v. City of El Monte*, 138 F.3d 393, 402 (9th Cir.1998) ("a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.") (internal citations omitted); *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint."); *In re South African Apartheid Litigation*, 617 F. Supp. 2d 228, 288, n. 368 (S.D.N.Y. 2009) (concluding that the statute of limitations defense remains an affirmative defense requiring court to deny dismissal "unless 'all assertions of the complaint, as read with required liberality, would not permit the plaintiffs to prove that this statute was tolled.'") (quoting *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980)) (internal citations omitted).

In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that a Fair Housing Act claim was timely even though four of the five incidents of discrimination occurred outside the limitations period because "[p]lainly the claims . . . are based not solely on isolated incidents[,] . . . but a continuing violation manifested in a number of incidents— including at least one . . . that is asserted to have occurred within the [statutory] period." *Id.* at 381. The Court reasoned that statutes of limitations are meant only to prevent stale claims: "Where the challenged violation is a continuing one, the staleness concern disappears." *Id.* at 380. Continuous violations are distinguishable from a "single violation followed by continuing consequences." *McGregor,* 3 F.3d at 867 (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558) (1977)).

Plaintiffs' allegations constitute continuing violations of the ADA. Plaintiffs allege that the State has institutionalized Plaintiffs for many years up to and including the day they filed their complaint. (Compl. ¶ 56.) Plaintiffs' wrongful institutionalization (including the institutionalization that occurred outside the two-year statutory period) and the State's continuous failure to make reasonable modifications so that Plaintiffs may access community-based services must therefore be seen as "part of an ongoing pattern of discrimination," *McGregor,* 3 F.3d at 866, a pattern that is repeated each day that Plaintiffs are compelled to live in nursing homes unnecessarily. *See Martin v. Voinovich*, 840 F. Supp. 1175, 1188-89 (S.D. Ohio 1993) (applying continuous violations theory to ADA claims that individuals in institutions were denied community placement).

Plaintiffs' allegations under PASRR also constitute continuing violations. The State

argues that Plaintiffs' PASRR claims are stale to the extent that the State's failure to conduct the preadmission screening for several Plaintiffs occurred outside the statutory limitations period. (State's Mot. at 13-14.)   However, the State's failure to conduct the necessary preadmission screening to determine Plaintiffs' need for specialized services while in nursing facilities and the State's ongoing, daily failure to provide Plaintiffs specialized services are part of the same, continuous violation – much of which occurred during the two years preceding Plaintiffs' complaint. (Compl. ¶¶ 5, 87-90, 143, 152, 204, 229, 230, 236-238.)   Further, the State's failure to conduct the preadmission screening to determine whether nursing facility placement is appropriate is part of the same continuing violation. (*Id.* at ¶¶ 10-15.)   Finally, Plaintiffs have alleged significant changes in their physical or mental condition during their stay in the nursing facility sufficient to trigger the State's duty under PASRR to evaluate Plaintiffs for their changed needs. 42 U.S.C. § 1396r(e)(7)(B)(iii); (Compl. ¶¶ 141, 151, 158, 175 and 208.)   Plaintiffs allege that they have yet to receive these evaluations. (Compl. ¶¶ 137, 152, 161, 174, 186.)

The State's reliance on *Joseph S. v. Hogan,* 561 F. Supp. 2d 280 (E.D.N.Y. 2008) is misplaced. (State's Mot. at 15.)   While the court there found that the plaintiffs' narrow PASRR claims were barred by limitations, the court's dismissal was premised on the fact that none of the alleged illegal actions fell within the statutory period. *Joseph S.,* 561 F. Supp. at 313-14.   In contrast, Plaintiffs here have alleged illegal actions that occurred within the statutory time period that are part of the same continuing violation as illegal actions that occurred beyond the statutory period.   Thus, Plaintiffs' claims constitute an ongoing pattern of discrimination and continuing violations of federal law and should not be dismissed as untimely.

### C.  Governor Perry is a Proper Defendant for Plaintiffs' ADA and Rehabilitation Act Claims

> i.      A suit against a state official in his official capacity meets the Title II "public entity" requirement

The State argues that the ADA claim against Governor Perry should be dismissed because he is not a "public entity" within the meaning of Title II.  (State's Mot. at 16.)  Because Plaintiffs sued Governor Perry in his official capacity, however, he is properly considered a public entity under Title II.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (recognizing that "[o]fficial-capacity suits…generally represent only another way of pleading an action against an entity of which an officer is an agent.") (internal citation omitted).  An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.[7] *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

Courts have repeatedly held that state officials may be sued in their official capacities under Title II of the ADA.  *See Carten v. Kent State Univ.,* 282 F.3d 391, 396 (6th Cir. 2002) (internal citation omitted) (A state official "may be held responsible in an official capacity for violating Title II, which by its terms applies only to 'public entit[ies]'" even though the official does not represent the state for purposes of the Eleventh Amendment); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003) ("We also cannot embrace the state defendant's statutory claim that an individual sued in his or her official capacity under the doctrine of *Ex*

---

[7] The State also argues that Governor Perry should be dismissed as to the Rehabilitation Act claim because he is not the recipient of federal financial assistance.  (State's Mot. at 17.)  The argument similarly fails because Plaintiffs sued the Governor in his official capacity and there can be no question that the State of Texas receives federal financial assistance for the operation of its Medicaid program. (Compl. ¶ 8.)

*parte Young* is not a 'public entity' subject to liability under the ADA."); *Glatts v. Lockett*, No.

09-29, 2011 WL 772917, at *10 (W.D. Pa. Feb. 28, 2011) (permitting a Title II claim against

state officials in their official capacities because "a suit against a [state] employee in his or her

official capacity is simply another way of suing the employer, which, in this case . . .

indisputably constitutes a 'public entity' within the ADA.").

Congress incorporated the right to sue public officials in their official capacity into the

ADA.  Title II imposes obligations upon public entities but does not limit the proper defendants

against whom a suit for injunctive relief should be brought.  42 U.S.C. § 12131(1).  Title II

incorporates the "remedies, procedures, and rights" of Section 504 of the Rehabilitation Act,

which adopts the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of

1964." 42 U.S.C. § 12133 (ADA); 29 U.S.C. § 794a(a)(2) (Section 504).  By the time Congress

enacted Title II, courts had long entertained suits for injunctive relief against public officials in

their official capacities to enforce Title VI and Section 504.[8]  By incorporating into Title II of the

ADA the "remedies, procedures, and rights" of Section 504 and Title VI, Congress incorporated

the right to sue government officials in their official capacities under Title II. *Cf. Lorillard v.*

---

[8] For example, the Supreme Court has upheld claims against state officials in their official capacities under Section 504 prior to enactment of the ADA. *See, e.g., Alexander v. Choate*, 469 U.S. 287 (1985); *Honig v. Students of Cat. Sch. for the Blind*, 471 U.S. 148 (1985); *Smith v. Robinson*, 468 U.S. 992 (1984); *Campbell v. Kntse*, 434 U.S. 808 (1977). Circuit courts of appeals had also held that *Ex parte Young* suits were available to enforce Section 504. *See, e.g., Lussier v. Dagger*, 904 F.2d 661, 670 n. 10 (11th Cir. 1990) ("[O]f course, the Eleventh Amendment does not bar Lussier's claims for equitable relief under [§794] against defendants named in this case in their official capacities." (citing *Ex parte Young)); Brennan v. Stewart*, 834 F.2d 1248, 1255, 1260 (5th Cir. 1988) (discussing *Ex parte Young* at length); *Miener v. Missouri*, 673 F.2d 969, 982 (8th Cir. 1982) (finding *Ex parte Young* inapplicable because relief sought was not prospective); *Helms v. McDaniel,* 651 F.2d 800, 806 n.10 (5th Cir. 1981) (citing *Ex parte Young), cert denied*, 455 U.S. 946 (1982). Other cases, while not making an express holding, routinely adjudicated Section 504 suits brought against government officials in their official capacities. *See, e.g, S-l v. Turlington*, 635 F.2d 342 (5th Cir. 1981), *cert denied*, 454 U.S. 1030 (1981); *Baker v. Bell*, 630 F.2d 1046 (5th Cir. 1980).

*Pons*, 434 U.S. 575, 580-581 (1978) (Congress is presumed to incorporate existing judicial interpretations when it adopts a preexisting remedial scheme); *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (same).

ii.     *The Eleventh Amendment does not immunize Governor Perry from Plaintiffs' suit*

"[T]he Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004).   For this reason, "state officers, sued in their official capacities for prospective relief, are proper defendants under Title II of the [ADA] and are not immune [from suit] under the Eleventh Amendment."  *McCarthy v. Hawkins*, 381 F.3d 407, 410 (5th Cir. 2004).  This follows from the *Ex parte Young* exception to the Eleventh Amendment, which provides that, "[i]n making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional . . . such officer must have some connection with the enforcement of the act." *Ex parte Young,* 209 U.S. 123, 157 (1908).

While the Supreme Court has not further elaborated on the meaning of the phrase "some connection," the Court has instructed that, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997)). *Meyers v. Texas*, 410 F.3d 236, 256 (5th Cir. 2005) (citing *Home Telephone & Telegraph Co. v. City of Los Angeles*, 227 U.S. 278 (1913); *Ex parte Young*, 209 U.S. 123 (1908)).

Other courts have upheld claims against state officials, even if they do not directly administer the statute or program at issue. *See Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th Cir. 2006) (rejecting argument that the *Ex parte Young* exception did not apply because the state official only had a "general connection" to enforcement of the act at issue and not a "specific connection"); *Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 864 (8th Cir. 2006) (holding that the governor has "some connection" to the enforcement of a particular statute even though the statute does not require any affirmative enforcement by a state official). However, a general duty to uphold the law is not sufficient to establish "some connection" to enforcement of the statute at issue. *See 1st Westco Corp. v. School Dist. Of Philadelphia*, 6 F.3d 108, 115 (3rd Cir. 1993); *Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

In a case nearly identical to the present, *Rolland v. Cellucci* involved Massachusetts' unnecessary institutionalization of individuals with developmental disabilities. 52 F. Supp. 2d 231, 243 (D. Mass. 1999). There, the court refused to dismiss the governor, even though he did not directly administer the State's Medicaid program, because "[n]o case holds that the provision which empowers a single state agency to administer a state's Medicaid program was in any way promulgated with the intention of exonerating or limiting the liability of other governmental officials who fail to conform their required actions to federal law." *Id*.

The State cites the plurality opinion in *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) for the proposition that the *Ex parte Young* exception only applies if the state official is "specially charged" with the duty to enforce the action. (State's Mot. at 12.) However, the Fifth

Circuit Court of Appeals later clarified that the "specially charged" requirement in *Okpalobi* is not binding precedent and declined to adopt a standard requiring that the state official be "specially charged" with enforcement of the statute at issue. *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010).

Based on the facts alleged in Plaintiffs' complaint, Governor Perry is not immune from suit because he is sufficiently connected to ensuring the State's compliance with the integration mandate of Title II of the ADA. (Compl. ¶¶ 22, 49, 133.) For example, in issuing a 2002 executive order, Governor Perry directed the Health and Human Services Commission ("HHSC") to "review and amend state policies that impede" adults from moving out of institutions, and further charged the agency with implementing the Promoting Independence Plan, the State's *Olmstead* plan. Exec. Order. RP 13 (Apr. 28, 2002); (Compl. ¶ 49). Further, Governor Perry is responsible for appointing the Commissioner of HHSC, and approves the appointment of the Commissioner of the Department of Aging and Disability Services ("DADS"), who together oversee the Texas Medicaid program and all services for individuals with developmental disabilities, including institutional services and community-based services. (Compl. ¶¶ 22-24.) He is also responsible for "ensuring that the State submits a State Medicaid Plan which conforms to federal law, and that the State's Medicaid program is consistent with that plan, relevant federal statutes and regulations". (*Id.* at ¶ 133.) Governor Perry serves as "the chief budget officer of the state," TEX. GOV'T CODE § 401.041, and is responsible for seeking funds from the legislature to implement the programs and services of the executive agencies. (Compl. ¶ 22.) In this role, the Governor compiles the biennial budget appropriation and

recommends expenditures to the legislature.   TEX. GOV'T CODE §§ 401.0445, 316.021.   Not permitting Plaintiffs to pursue their claims against Governor Perry in his official capacity when the Governor is necessary in order to obtain complete prospective injunctive relief – which may include particular budget allocations – would conflict with the purpose behind the *Ex parte Young* exception.  *See Meyers v. Texas*, 410 F.3d 236, 256 (5th Cir. 2005) ("the purpose of the doctrine of *Ex parte Young* is to allow plaintiffs asserting federal law claims to circumvent the state's sovereign immunity from suit by suing state officers instead." ) The Court should deny Governor Perry's motion to dismiss, as he has the requisite connection to implementing and enforcing the ADA and the Rehabilitation Act in Texas.

> ### iii.       *Plaintiffs have Article III standing to sue Governor Perry*

The State argues that the Governor should be dismissed for lack of Article III jurisdiction because he allegedly has no power to redress Plaintiffs' asserted injuries, nor, the State alleges, could he have caused Plaintiffs' injuries.  (State's Mot. at 9-10.)  Notwithstanding the State's claims, just as Governor Perry is not shielded by the Eleventh Amendment, Plaintiffs have alleged sufficient facts to support Article III standing to sue Governor Perry in his official capacity.

To establish Article III standing, Plaintiffs must show that "(1) they have suffered an injury in fact, (2) a causal connection exists between the injury and challenged conduct, and (3) a favorable decision is likely to redress the injury."  *Adar v. Smith*, ___F.3d___, 2011 WL 1367493 (5th Cir. 2011), (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61(1992)).  Further, the alleged injury must be "fairly ... trace[able] to the challenged action of the defendant,

and not  . . th[e] result [of] the independent action of some third party not before the court."
*Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41-42 (1976).

Plaintiffs' unnecessary institutionalization (the injury) is "fairly traceable" to the complained-of conduct – failure to provide access to and sufficient community-based services. Injunctive relief against Governor Perry (and not some unnamed third party) will redress the injury.  The State's assertion that the Governor is powerless to redress this injury is erroneous as a matter of law.  (*See* State's Mot. at 10-12.)

The Governor appoints the Commissioner of HHSC and approves the two-year appointment of the Commissioner of DADS.  TX GOV'T CODE §§ 531.005 and 531.007; (Compl. ¶¶ 22-24.).  DADS and HHSC oversee the Texas programs and services for individuals with developmental disabilities that are directly at issue in this case.  TX GOV'T CODE § 531.0055; (Compl. ¶¶ 22-24).  Second, the Governor is responsible for submitting budgetary requests to the legislature that include appropriations for HHSC and DADS, including the community-based services to which Plaintiffs seek access.  (Compl. ¶ 22.)  Finally, the Governor and his office have taken direct action on the matters at issue in this case.  For example, Governor Perry issued Exec. Order RP 13 (Apr. 18, 2002), which requires HHSC to undertake initiatives, including the development of a detailed plan, to increase the availability of community-based services and ordered that HHSC submit this plan to the Office of the Governor.  *Id.*; (Compl. ¶ 49).  Governor George W. Bush issued a similar order in 1999.  Exec. Order GWB 99-02 (Sept. 28, 1999); (Compl. ¶ 48).  By the exercise of his authority to control the administrators and to provide for the budget, the Governor has sufficient power to redress Plaintiffs' injuries.  *See Rolland v.*

*Cellucci*, 52 F. Supp. 2d 231, 243 (D. Mass. 1999).

The State bases its Article III argument on *Okpalobi*, where the court found that Louisiana's Governor and Attorney General were "impotent" because they had "no power to redress the asserted injuries" such that an injunction issued by the court would be "utterly meaningless".   244 F.3d at 421, 426-27.   The plaintiffs in *Okpalobi* were abortion providers in Louisiana and sought to enjoin the "operation and effect" of a Louisiana statute that provided unlimited private tort liability against doctors by patients for damages related to abortion procedures.  *Id*. at 409.   The court held that the doctors lacked Article III standing against the state officials because "no state official has any duty or ability to do *anything*" with respect to the statute at issue and thus ordered dismissal of the suit.   *Id*. at 427.   Unlike the officials in *Okpalobi*, Governor Perry is not powerless to redress Plaintiffs' injuries, which derive from state programs and policies, state-funded nursing facility placements and state-funded community-based services.   These facts stand in stark contrast to the state officials' total lack of power in *Okpalobi* over private litigation (medical malpractice) between private parties.   Accordingly, this court should not dismiss Governor Perry for lack of Article III jurisdiction.

### D. Enforcement of the Medicaid Act is Not Limited to the Secretary of the Department of Health and Human Services

Plaintiffs seek, *inter alia*, to enforce various provisions of the Title XIX of the Social Security Act ("Medicaid Act"), 42 U.S.C. § 1396, *et seq*..  (Compl. ¶¶ 225-38.)  In response, the State contends that since the Medicaid Act was enacted pursuant to Congress' spending powers, private actions are categorically foreclosed to potential plaintiffs.   (State's Mot. at 18-22.)

Moreover, the State asserts that "[o]nly the Secretary[9] can violate the Act" by failing to withhold federal funding assistance to a state for their noncompliance.  *Id.* at 22.  The State's analysis is incorrect.

The Supreme Court has made clear that enforcement of legislation enacted pursuant to Congress' spending powers is not necessarily limited to a federal government action to terminate funds and that individuals may bring an enforcement action through 42 U.S.C. § 1983 under certain circumstances.[10]  *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997) (federal powers to "audit and cut federal funding" are insufficient to foreclose section 1983 remedies); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002).  *See also Wright et. al. v. Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 428 (1987) (The "authority . . . [to] cut off federal funds . . . [is] insufficient to indicate a congressional intention to foreclose § 1983 remedies."); *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 522 (1987) (The authority to curtail federal funds is not "sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983."). The Fifth Circuit has similarly addressed this issue.  *See*, *e.g.*, *Johnson v. Housing Auth. of Jefferson Parish*, 442 F.3d 356, 365-66 (5th Cir. 2006) (holding that HUD's authority to withhold funds from violators of the National Housing Act did not foreclose a section 1983 private remedy); *Cf. S.D. v. Hood*, 391 F.3d 581, 602-06 (5th Cir. 2004) (holding

---

[9] The Secretary of the Department of Health and Human Services is authorized to withhold federal financial assistance to states who she finds are not compliant with provisions of the Medicaid Act.  *See* 42 U.S.C. § 1396c.

[10] In *Blessing*, the Supreme Court set forth a three-prong test for determining if Congress intended to create a right under section 1983:  (1) "Congress must have intended that the provision in question benefit the plaintiff[,]" (2) the right protected by the provision must not be "so 'vague and amorphous' that its enforcement would strain judicial competence[,]" and (3) the provision must "unambiguously impose a binding obligation on the States." 520 U.S. at 340-41.  *See also Gonzaga*, 536 U.S. at 283.

that the EPDST provision of the Medicaid Act gives rise to section 1983 remedies).

Contrary to the State's contention that section 1983 actions are unavailable solely because the Medicaid Act is spending clause legislation, remedies under section 1983 may only be categorically foreclosed if Congress expressly "forb[ids] recourse to § 1983 in the statute itself or impliedly by creating a comprehensive enforcement scheme that is incompatible with individual § 1983 enforcement . . . ." *Blessing*, 520 U.S. at 341 (citing *Livados v. Bradshaw*, 512 U.S. 107, 133 (1994)).  Nothing in the Medicaid Act expressly forecloses section 1983 remedies, and the Supreme Court has held that there is no "comprehensive enforcement scheme incompatible with individual enforcement" incorporated therein.  *See Wilder*, 496 U.S. at 521; *See generally S.D.*, 391 F.3d at 602-06 (holding that a private section 1983 right of action is available to enforce provisions of the Medicaid Act).

Since the Medicaid Act neither expressly nor impliedly forbids section 1983 remedies, Plaintiffs have recourse thereto if they can show that their claims satisfy the *Blessing/Gonzaga* three-factor test.

## CONCLUSION

For the reasons stated above, the United States respectfully submits that this Court deny Defendants' motion to dismiss Plaintiffs' Complaint.  Should it be helpful to the Court, counsel for the United States will be present and prepared to argue the present Statement at any upcoming hearings.

Respectfully submitted,


THOMAS E. PEREZ
Assistant Attorney General

SAMUEL R. BAGENSTOS
Principal Deputy Assistant Attorney General
Civil Rights Division

JOHN WODATCH
Acting Deputy Assistant Attorney General
Civil Rights Division

ALISON N. BARKOFF, Special Counsel
*Olmstead* Enforcement


JOHN E. MURPHY
U.S. Attorney for the Western
District of Texas


*/s/ John F. Paniszczyn*
JOHN F. PANISZCZYN
John.paniszczyn@usdoj.gov
Texas Bar No. 15443855
Assistant United States Attorney
United States Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
Telephone:  (210) 384-7325
Facsimile:  (210) 384-7312

*/s/ Regan Rush*
RENEE M. WOHLENHAUS, Acting Chief
KATHLEEN WOLFE, Acting Special Legal
Counsel
REGAN RUSH, Trial Attorney
D.C. Bar No. 980252*
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - NYA
Washington, D.C. 20530
Telephone:     (202) 307-0663
Facsimile:     (202) 307-1197
regan.rush@usdoj.gov

*Counsel for the United States*

*Admission *pro hac vice* pending

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2011, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.


<u>*/s/ Regan Rush*</u>
REGAN RUSH
Trial Attorney
D.C. Bar No. 980252
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - NYA
Washington, D.C. 20530
Telephone:  (202) 307-0663
Facsimile:  (202) 307-1197
regan.rush@usdoj.gov

*Counsel for United States*