**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ERIC STEWARD, by his next friend and mother, Lilian Minor, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIV. NO. 5:10-CV-1025-OG |
| RICK PERRY, Governor, *et al*. | § § § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' PARTIAL
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Garth A. Corbett
State Bar No. 04812300
Sean A. Jackson (*pro hac vice*)
State Bar No. 24057550
Disability Rights Texas
7800 Shoal Creek Boulevard., Suite. 171-E
Austin, Texas 78757
(512) 454-4816 (Telephone)
(512) 454-3999 (Facsimile)

Yvette Ostolaza
State Bar No. 00784703
Robert Velevis (*pro hac vice*)
State Bar No. 24047032
Casey Burton (*pro hac vice*)
State Bar No. 24058791
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
(214) 746-7700 (Telephone)
(214) 746-7777 (Facsimile)

Steven J. Schwartz (*pro hac vice*)
J. Paterson Rae (*pro hac vice*)
Center for Public Representation
22 Green Street
Northampton, Massachusetts 01060
(413) 586-6024 (Telephone)
(413) 586-5711 (Facsimile)

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................1

II.  BACKGROUND ...................................................................................................1

    A.   The Legislative History of the Nursing Home Reform Amendments. ...............2

    B.   The Nursing Home Reform Amendments to the Medicaid Act ........................4

    C.   Texas's Implementation of the NHRA ..............................................................7

    D.   Texas's Community Service Programs...............................................................8

III. ARGUMENT                                                                               9

    A.   Plaintiffs Have Stated Cognizable Claims Under the Medicaid Act ..................9

        1.   Plaintiffs Have Stated a Claim Under the NHRA...................................9

        2.   Plaintiffs Have Stated a Claim Under the Reasonable Promptness
             Provision of the Medicaid Act. ..............................................................12

             a.   Plaintiffs Have Stated a Claim that the Defendants Fail to
                 Provide Specialized Services with Reasonable Promptness........12

             b.   Plaintiffs Have Stated a Claim that Community-Based
                 Services and Supports Are Not Provided with Reasonable
                 Promptness.................................................................................12

        3.   Plaintiffs Have Stated a Claim Under the Comparability
             Requirement of the Medicaid Act...........................................................16

        4.   Plaintiffs Have Stated a Claim under the Freedom of Choice
             Provision of the Medicaid Act ................................................................18

    B.   Plaintiffs Have a Private Right of Action Under 42 U.S.C. § 1983 to
       Enforce the Relevant Sections of the Medicaid Act ........................................22

        1.   The Standard for Private Rights of Action .............................................22

        2.   The Medicaid Act Creates Enforceable Rights.......................................24

        3.   The Nursing Home Reform Amendments to the Medicaid Act Are
             Privately Enforceable .............................................................................30

              a.   The Language Chosen By Congress Demonstrates that the
                 NHRA Is Privately Enforceable..................................................30

             b.   The Secretary's Regulations Further Demonstrate that the
                 NHRA Is Privately Enforceable..................................................33

              c.   Applicable Caselaw Further Confirms That The NHRA Is
                 Privately Enforceable..................................................................35

# TABLE OF CONTENTS
## (continued)

Page

4.    The Reasonable Promptness Provision of the Medicaid Act Is Privately Enforceable ................................................................38

5.    The Comparability Provision of the Medicaid Act Is Privately Enforceable. ......................................................................38

6.    The Freedom of Choice Provision of the Medicaid Act Is Privately Enforceable. ......................................................................39

C.    Plaintiffs Have Standing to Assert a Claim Under the Freedom of Choice Provision of the Medicaid Act ..............................................41

D.    The Arc of Texas and the Coalition of Texans with Disabilities Both Have Standing to Assert the Claims Raised in this Case ..............................................45

1.    The Arc of Texas and CTD Have Standing to Sue in their Own Right...........................................................................47

2.    The ARC of Texas Has Standing As a Representative of Its Members ......................................................................49

E.    The Governor Is a Proper Party In this Case .......................................................50

1.    Plaintiffs Have Standing to Assert Their Claims Against the Governor. ......................................................................50

2.    The Governor Is Not Immune from Suit Under the Eleventh Amendment for Violations of Federal Law. ..............................................53

3.    Plaintiffs Have Stated a Claim Against Governor Rick Perry. ................................55

a.    The Governor is a Recipient of Federal Funds for Purposes of Plaintiffs' Section 504 Claim ...........................................................55

b.    The Governor Is Responsible For, and Has the Authority to Correct, the ADA, § 504, and Medicaid Violations Set Forth in the Complaint ..............................................56

IV.    CONCLUSION AND REQUESTED RELIEF ...........................................................58

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alexander v. Choate,*
    469 U.S. 287 (1984)...................................................................................................... 55

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)....................................................................................... 33, 34, 35

*Antricam v. Odom,*
    290 F.3d 178 (4th Cir. 2002) ...................................................................................... 28

*Arc of Washington v. Braddock,*
    129 Fed. Appx. 348 (9th Cir. 2005).......................................................................... 15

*Arc of Washington v. Braddock,*
    403 F.3d. 641(9th Cir. 2005) ...................................................................................... 15

*Arc of Washington v. Braddock,*
    427 F.3d 615 (9th Cir. 2005) ................................................................................ 14, 15

*Assoc. of Cmty. Orgs. For Reform Now v Fowler,*
    178 F.3d 350 (5th Cir. 1999) ...................................................................................... 48

*Association for Retarded Citizens of Texas v. Kavanagh, et al.,*
    483 U.S. 1057 (1987)................................................................................................... 47

*ASW v. Oregon,*
    424 F.3d 970 (9th Cir. 2005) ...................................................................................... 23

*Ball v. Rodgers,*
    492 F.3d 1094 (9th Cir. 2007) ........................................................... 24, 30, 39, 41

*Beckwith v. Kizer,*
    912 F.2d 1139 (2d Cir. 1990)...................................................................................... 14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...................................................................................................... 10

*Benjamin H. v. Ohl,*
    No. Civ. A. 3:99-0338, 1999 WL 34783552, at *15 (S.D. W.Va. July 15, 1999)................... 13

*Bertrand ex rel. Bertrand v. Maram,*
    495 F.3d 452 (7th Cir. 2007) ...................................................................................... 30

iii

*Blanchard v. Forrest*,
  71 F.3d 1163 (5th Cir. 1996) ................................................................. 38

*Blessing v. Freestone*,
  520 U.S. 329 (1997)...................................................................... *passim*

*Boudreau ex rel. Boudreau v. Ryan*,
  No. 00 C 5392, 2001 WL 840583, at *6 (N.D. Ill. May 2, 2001)........................... 58

*Bragg v. Chavez*,
  No. Civ 07-0343 JB/WDS, 2007 WL 6367133, at *13 (D.N.M. Nov. 13, 2007) ................. 58

*Bruggeman ex rel. Bruggeman v. Blagojevich*,
  324 F.3d 906 (7th Cir. 2003) ............................................................... 58

*Bryson v. Shumway*,
  308 F.3d 79 (1st Cir. 2002)................................................................. 38

*Cal. State Foster Parent Ass'n*,
  624 F.3d 974 (9th Cir. 2010) ............................................................... 24

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979)........................................................................ 23

*Carleson v. Remillard*,
  406 U.S. 598 (1972)..................................................................... 13, 14

*City of Rancho Palos Verdes v. Abrams*,
  544 U.S. 113 (2005)........................................................................ 22

*Cleburne Living Center v. City of Cleburne, Texas*,
  726 F.2d 191 (5th Cir. 1984), *aff'd in part, vacated in part on other grounds* 473 U.S. 432
  (1985)..................................................................................... 48

*Cler v. Illinois Educ. Ass'n*,
  423 F.3d 726 (7th Cir. 2005) ............................................................... 11

*Cmty. Health Choice, Inc., v. Hawkins*,
  328 S.W.3d 10 (Tex. App.—Austin 2010, no pet.) ............................................ 54

*Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*,
  249 F.3d 136 (2d Cir. 2001)................................................................ 32

*Cramer v. Chiles*,
  33 F. Supp. 2d 1342 (S.D. Fla. 1999) .................................................. 18, 40

*Doe v. Chiles,*
    136 F.3d 709 (11th Cir. 1998) ............................................................... 13, 38

*Doe v. Kidd,*
    501 F.3d 348 (4th Cir. 2007) ................................................................. 30, 38

*Eliserio v. Floydada Housing Authority, et al.,*
    455 F.Supp.2d 648 (S.D. Tex. 2006) ............................................................ 46

*Ex Parte Young,*
    209 U.S. 123 (1908) ............................................................................ 53

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998) ............................................................................. 45

*Frazar v. Gilbert,*
    300 F.3d 530 (5th Cir. 2002), *rev'd sub nom on other grounds* ......................... 27, 28

*Frew ex rel. Frew v. Hawkins,*
    540 U.S. 431 (2004) ............................................................................ 27

*Friends of the Earth v. Laidlaw Environmental Svcs.,*
    528 U.S. 167 (2000) ............................................................................ 41

*Gonzaga University v. Doe,*
    536 U.S. 273 (2002) ...................................................................... *passim*

*Grammer v. John J. Kane Regional Ctrs.-Glen Hazel,* 570 F.3d 520 (3d Cir. 2009) *cert. denied,*
    130 S. Ct. 1524 (2010) .................................................................. 30, 36, 37

*Grant ex rel Family Eldercare v. Gilbert,*
    324 F.3d 383 (5th Cir. 2003) ............................................................... 37, 45

*Gueli v. United States,*
    No. 806 CV 1080 T27 MSS, 2006 WL 3219272 (M.D. Fla. Nov. 6, 2006) ........................ 58

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ..................................................................... 47, 48, 49

*Hunt v. Washington Apple Advertising Comm'n,*
    432 U.S. 333 (1977) ....................................................................... 49, 50

*Johnson v. Housing Authority of Jefferson Parish,*
    442 F.3d 356 (5th Cir. 2006) .............................................................. 26, 28

*Joseph S. v. Hogan*,
   561 F. Supp. 2d 280 (S.D.N.Y. 2008) ......................................................... 37

*K.P. v. LeBlanc*,
   627 F.3d 115 (5th Cir. 2010) .................................................... 52, 53, 54

*Kentucky v. Graham*,
   473 U.S. 159 (1985) ................................................................................. 56

*King v. Smith*,
   392 U.S. 309 (1968) ............................................................................ 13, 14

*Lelsz, et al. v. Kavanagh, et al*
   807 F.2d 1243 (5th Cir. 1987) ................................................................. 47

*Lewis v. New Mexico Dep't of Health*,
   261 F.3d 970 (10th Cir. 2001) ........................................................... 11, 38

*Lividas v. Bradshaw*,
   512 U.S. 107 (1994) ................................................................................. 36

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 47

*Maher v. Gagne*,
   448 U.S. 122 (1980) ................................................................................. 25

*Maine v. Thiboutot*,
   448 U.S. 1 (1980) ............................................................................... 22, 25

*Makin v. State of Hawaii*,
   114 F.Supp.2d 1017 (D. Haw. 1999) ...................................................... 15

*Martin v. Voinovich*,
   840 F. Supp. 1175 (S.D. Ohio 1993) ...................................................... 37

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011) ......................................................................... 9, 10

*McCarthy v. Gilbert*,
   Civ. No. 03-CA-231-SS (W.D. Tex. 2003) ............................................. 13

*McCarthy v. Hawkins*,
   Civ. No. A-03-CA-231-SS (W.D. Tex 2003) ..................................... 40, 47

*Michelle P. ex rel. Deisenroth v. Holsinger*,
    356 F. Supp. 2d 763 (E.D. Ky. 2005) ................................................................. 40

*Noah v. Government Employees Insurance Company*,
    2001 WL 36199119 (W.D. Tex. 2001) ................................................................. 46

*Okla. Chapter of Am. Academy of Pediatrics v. Fogarty*,
    472 F.3d 1208 (10th Cir. 2007) ................................................................. 30

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ................................................................. 52, 53

*Olmstead v. L.C.*,
    527 U.S. 581 (1999) ................................................................. 14

*Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*,
    443 F.3d 1015 (8th Cir. 2006) ................................................................. 30

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ................................................................. 2

*Price v. City of Stockton*,
    390 F.3d 1105 (9th Cir. 2004) ................................................................. 23

*Quern v. Mandley*,
    436 U.S. 725 (1978) ................................................................. 13, 14

*Rabin v. Wilson-Coker*,
    362 F.3d 190 (2d Cir. 2004) ................................................................. 30

*Rodriguez v. City of New York*,
    197 F.3d 611 (2d Cir. 1999) ................................................................. 16, 17

*Rolland v. Cellucci*,
    52 F. Supp. 2d 231 (D. Mass. 1999) ................................................................. *passim*

*Rolland v. Patrick*,
    483 F. Supp. 2d 107 (D. Mass. 2007) ................................................................. 11

*Rolland v. Romney*,
    318 F.3d 42 (1st Cir. 2003) ................................................................. *passim*

*Rosado v. Wyman*,
    397 U.S. 397 (1970) ................................................................. 22, 26

*Rosie D. ex rel. John D. v. Swift*,
   310 F.3d 230 (1st Cir. 2002) ................................................................ 28

*S.D. ex rel. Dickson v. Hood*,
   391 F.3d 581(5th Cir. 2004) ........................................................ *passim*

*Sabree ex rel. Sabree v. Richman*,
   367 F.3d 180 (3d Cir. 2004) ................................................................ 38

*Schweiker v. Gray Panthers*,
   453 U.S. 34 (1981) ................................................................................ 33

*Shotz v. City of Plantation*,
   344 F.3d 1161 (11th Cir. 2003) ........................................................... 23

*Skandalis v. Rowe*,
   14 F.3d 173 (2d Cir. 1994) ................................................................... 14

*Sobky v. Smoley*,
   855 F. Supp. 1123 (E.D. Cal. 1994) ..................................................... 16

*Soto v. Lene*,
   No. 11-CV-0089 SLB LB, 2011 WL 147679 (E.D.N.Y. Jan. 18, 2011) ................................. 37

*Spann v. Colonial Vill., Inc.*,
   899 F.2d 24 (D.C. Cir. 1990) ............................................................... 48

*Suter v. Artist M.*,
   503 U.S. 347 (1992) ....................................................................... 28, 29

*Tinder v. Lewis Cnty. Nursing Home Dist.*,
   207 F. Supp. 2d 951 (E.D. Mo. 2001) ................................................... 37

*Townsend v. Quasim*,
   328 F.3d 511 (9th Cir. 2003) ............................................................... 14

*Townsend v. Swank*,
   404 U.S. 282 (1971) ....................................................................... 13, 14

*Watson v. Weeks*,
   436 F.3d 1152 (9th Cir. 2006) ............................................................. 30

*Westside Mothers v. Haveman*,
   289 F.3d 852 (6th Cir. 2002) ........................................................ 27, 38

*Westside Mothers v. Olszewski,*
   454 F.3d 532 (6th Cir. 2006) ................................................. 30

*Wilder v. Va. Hosp. Ass'n,*
   496 U.S. 498 (1990) ..................................................... *passim*

*Wis. Dep't of Health & Human Servs. v. Blumer,*
   534 U.S. 473 (2002) ......................................................... 33

*Wood v. Tompkins,*
   33 F.3d 600 (6th Cir. 1994) ........................................... 40, 41

*Wright v. City of Roanoke Redevelopment & Housing Auth.,*
   479 U.S. 418 (1987) ............................................... 24, 25, 27

## **Statutes and Regulations**

28 C.F.R. § 35.130 ..................................................................... 14

42 C.F.R. § 430.25 ..................................................................... 8

42 C.F.R. § 440.240 ................................................................... 16

42 C.F.R. § 441.302 ................................................................... 21

42 C.F.R. § 483.104 - 483.136 .................................................. 34

42 C.F.R. § 483.106 .............................................................. 35, 42

42 C.F.R. § 483.112 .............................................................. 34, 42

42 C.F.R. § 483.116 ................................................................ 6, 10

42 C.F.R. § 483.120 ....................................................... 5, 17, 34, 35

42 C.F.R. § 483.128 ................................................................... 35

42 C.F.R. § 483.130 ................................................................ 6, 35

42 C.F.R. § 483.132 ..................................................................... 5

42 C.F.R. §§ 483.400 *et seq* ...................................................... 2

42 C.F.R. § 483.440 ........................................................... *passim*

29 U.S.C. § 794 .................................................................. *passim*

42 U.S.C. § 12101 ............................................................................................ *passim*

42 U.S.C. § 12132 ............................................................................................ 14

42 U.S.C. § 1320a-2 ................................................................................ 28, 29, 41

42 U.S.C. § 1396a ............................................................................................ *passim*

42 U.S.C. § 1396d ........................................................................ 2,3,17, 18, 26, 38

42 U.S.C. § 1396n ............................................................................................ *passim*

42 U.S.C. § 1396r ............................................................................................ *passim*

42 U.S.C. § 1983 ............................................................................................ *passim*

Fed. R.Civ. P. 12 ............................................................................................ 55

Pub. L. No. 100-203, § 4211(c), 101 Stat. 1330-198 (1987) ........................... 4

Pub. L. No. 101-508, § 4801(e)(4), 104 Stat. 1388-216 (1990) ...................... 5

Pub. L. No. 104-315 (1996) ........................................................................... 4, 6

1 Tex. Admin. Code § 351.15(b). ..................................................................... 20

1 Tex. Admin. Code § 358.107 ......................................................................... 17

Tex. Govt. Code Ann. § 401.0045 .................................................................... 51

Tex. Govt. Code Ann. § 401.041 ...................................................................... 51

Tex. Govt. Code Ann. § 401.043 ...................................................................... 51

Tex. Govt. Code Ann. § 531.005 ...................................................................... 51

Tex. Govt. Code Ann. § 531.0056 ................................................................ 51, 54

Tex. Govt. Code Ann. § 531.007 ...................................................................... 51

Tex. Govt. Code Ann. § 401.0445 .................................................................... 54

**Constitutional Provisions**

U.S. Const. amend. X ................................................................................................ 53

Tex. Const. Art. IV, § 14 ......................................................................................... 51

**Other Authorities**

46 Fed. Reg. 48,532, 48,535-36 (Oct. 1, 1981) ...................................................... 44

57 Fed. Reg. 56,477 ................................................................................................... 6

*Care of Institutionalized Mentally Disabled Persons: Joint Hearings Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Human Resources and the Subcomm. on Labor, Health and Human Services, Educ., and Related Agencies of the Senate Comm. on Appropriations*, 99th Cong., S. Hr'g. 99-50 (1985) at 352 ........................................ 3

Elliott Schwalb, Reconsidering Makin v. Hawaii: The Right of Medicaid Beneficiaries to Home-Based Services As an Alternative to Institutionalization, 26 Ga. St. U. L. Rev. 803, 823-849 (2010) ........................................................................................................... 13, 15, 45

H.R. Conf. Rep. 103-761 at 926, *reprinted in* 1994 U.S.C.C.A.N. 2901 .................... 29

H.R. Rep. 100-391(I) at 459, *reprinted in* 1987 U.S.C.C.A.N. 2313-1 (1987) ............... 4

H.R. Rep. 100-391(I) at 462, *reprinted in* 1987 U.S.C.C.A.N. 2313-282 .................... 6

H.R. Rep. No. 104-817, at 1-4, *reprinted in* 1996 U.S.C.C.A.N. 4198 ........................ 6

Tex. Gov. Exec. Order No. GWB 99-2 (Sept. 28, 1999), 25 Tex. Reg. 1820 .............. 54

Tex. Gov. Exec. Order No. RP 13 (Apr. 18, 2002), 27 Tex. Reg. 3647 .......... 54, 56, 58

Tex. Gov. Exec. Order No.RP 65 (Feb. 2, 2007) ...................................................... 57

**Exhibits**

Exhibit A:  Affidavit of Mike Bright

Exhibit B:  Affidavit of Dennis Borel

Plaintiffs Eric Steward, Linda Arizpe, Andrea Padron, Patricia Ferrer, Benny Holmes, and Zackowitz Morgan (collectively, "individual plaintiffs") and the Arc of Texas and the Coalition of Texans with Disabilities (organizational plaintiffs) hereby file this Response in Opposition to Defendants' Partial Motion to Dismiss Plaintiffs' Amended Complaint, and respectfully state as follows:

## II.    <u>INTRODUCTION</u>

Defendants have filed a Partial Motion to Dismiss Plaintiffs' Amended Complaint (the "Part. MTD 2") (Dkt. No.67), which seeks to dismiss one of the three defendants and all of the claims under the Medicaid Act.  Significantly, the Partial Motion to Dismiss does not challenge either of the central causes of action in this case, the claim under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 or the claim under § 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794.

Because Governor Perry, as opposed to the State of Texas, has no sovereign immunity, and because he has a central role both in the maintenance and the remediation of the federal law violations alleged in this case, he is an appropriate party and should not be dismissed. Furthermore, numerous federal courts have held, in factual situations similar to this one, that plaintiffs can state a claim under the Pre-Admission Screening and Resident Review ("PASARR") provisions of the Nursing Home Reform Amendments ("NHRA") to the Medicaid Act, 42 U.S.C. § 1396r(e)(7), as well as the reasonable promptness, comparability, and freedom of choice provisions of the Act, 42 U.S.C. § 1396a(a)(8), § 1396a(a)(10), and § 1396n(c). Therefore, these claims should not be dismissed and the Motion should be denied in its entirety.

## III.    <u>BACKGROUND</u>

Central to the claims at issue in the Partial Motion to Dismiss are the PASARR provisions of the NHRA.  In order to lend context and content to the arguments in this Response,

it is important to understand the conditions which prompted Congress to enact the NHRA, its

basic requirements, and Texas's response to these statutory mandates.

> ### A.    The Legislative History of the Nursing Home Reform Amendments.[1]

Before the mid-1970s, there were few federal standards for, and little federal

reimbursement of, institutional care for persons with developmental disabilities.[2]    States

provided their own facilities for housing individuals with disabilities.  This state-provided care,

however, was grossly inadequate and abuse was common.  *See, e.g.*, *Pennhurst State Sch. &*

*Hosp. v. Halderman*, 451 U.S. 1, 7 (1981) (cataloguing inhumane, unsanitary, and dangerous

institutional conditions for individuals with mental retardation).

In 1971, Congress gave States the option of obtaining federal Medicaid reimbursement

for care provided in intermediate care facilities for individuals with mental retardation, known as

ICF/MRs.  42 U.S.C. §§ 1396a(a)(31)(A) & 1396d(a)(15).  Texas and other States chose to

provide ICF/MR services in their Medicaid programs.  As a condition of receiving federal funds,

States are required to ensure that adequate care is provided to persons with developmental

disabilities in ICF/MRs, specifically including a program of "active treatment." [3]  42 U.S.C. §

1396d(d)(2).

Federal regulations describe active treatment as an individually tailored series of

programs and therapies designed to help an individual with developmental disability reach an

---

[1]  Because the Motion does not seek to dismiss either the ADA or Rehabilitation Act claims, this section focuses on the legal context for the NHRA claims.

[2]  As defined by federal law, the term "developmental disabilities" includes mental retardation and a range of other disabilities, sometimes referred to as "related conditions," which occur before the age of twenty-two.  *See* 42 U.S.C. § 1396d(d).  Plaintiffs' Amended Complaint adopts the federal definition and refers generally to "persons with developmental disabilities."  Defendants' Partial Motion to Dismiss mirrors this nomenclature.

[3]  Texas, like most States, has elected to operate and fund ICF/MR facilities, including both large public institutions called State Supported Living Centers (SSLCs) and smaller, private residential programs called "private ICF/MRs."  As a condition of receiving extensive federal funding for these facilities, Texas has agreed to comply with federal ICF/MR regulations that govern the operation, services, resident rights, and environmental standards of these institutions.  *See* 42 C.F.R. §§ 483.400 *et seq.*  The process and standard for providing care to ICF/MR residents is called active treatment, which is described in §§ 483.440(a)-(f).

optimal level of independence.  The care provided is "directed toward . . . [t]he acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible [and] [t]he prevention or deceleration of regression or loss of current optional functional status."  *Id.* at § 483.440(a)(1).  An active treatment program can include training and vocational programs, physical, occupational, and speech therapies, and behavioral and interpersonal counseling.  The specific contours of every individual's program are based upon that individual's needs.

In order to avoid the burden and costs of complying with ICF/MR requirements, but to ensure that they continued to receive federal funding, States soon began to transfer large numbers of persons with developmental disabilities from their ICF/MR institutions to nursing facilities (NFs).[4]  Many nursing facilities, ill-equipped to offer appropriate habilitation or treatment for these conditions, soon became warehouses for persons with developmental disabilities.  Because active treatment was not required in nursing facilities, the conditions of individuals with developmental disabilities placed in those facilities deteriorated.  As a consequence, Congress found itself subsidizing the nursing facility care of individuals with developmental disabilities that did not meet professional standards—precisely the situation it sought to rectify when it made compliance with active treatment standards a condition for receipt of federal funding for the care of persons with developmental disabilities in ICF/MRs.

In 1985, the Senate convened hearings to investigate the effects of improper institutionalization of individuals with developmental disabilities, including the inappropriate transfer of these individuals from state-operated institutions to nursing facilities.[5]  The Senate

---

[4]  Nursing facility care has long been a required Medicaid service.  42 U.S.C. § 1396d(f).

[5]  *Care of Institutionalized Mentally Disabled Persons: Joint Hearings Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Human Resources and the Subcomm. on Labor, Health and Human Services, Educ., and Related Agencies of the Senate Comm. on Appropriations*, 99th Cong., S. Hr'g. 99-50 (1985) at 352.

heard testimony about the warehousing of individuals with developmental disabilities in nursing facilities and the failure to provide proper care in those settings.  The widespread practice of dumping individuals with developmental disabilities into nursing facilities was also documented by the General Accounting Office in a 1987 report.  *See Medicaid: Addressing the Needs of Mentally Retarded Nursing Home Residents*, GAO/HRD-87-77 (1987).[6]  A full two-thirds of the residents evaluated by GAO were determined to require active treatment.  *Id.* at 23.  However, not a *single one* of these residents was receiving this necessary treatment.  *Id.*

### B.    The Nursing Home Reform Amendments to the Medicaid Act.

Congress responded with the Omnibus Budget Reconciliation Act of 1987 ("OBRA '87"), Pub. L. No. 100-203, § 4211(c), 101 Stat. 1330-198 (1987), which included a dramatic reform of nursing facility care for persons with developmental disabilities.  OBRA '87 incorporates the Nursing Home Reform Amendments (NHRA), 42 U.S.C. § 1396r, which are designed to prevent and remedy the pervasive warehousing and neglect of people with disabilities in nursing facilities.  Congress intended the NHRA to end the inappropriate placement of mentally ill or mentally retarded individuals in nursing facilities.  H.R. Rep. 100-391(I) at 459, *reprinted in* 1987 U.S.C.C.A.N. 2313-1, 2313-279 (1987).

The NHRA mandates a pre-admission screening and resident review process ("PASARR") for all persons with developmental disabilities referred or admitted to nursing facilities.[7]  The screening and review must be done by a qualified mental retardation professional.  The PASARR review is designed to determine whether an individual is appropriate

---

[6]  Available online at http://www.eric.ed.gov/PDFS/ED288331.pdf.

[7]  The NHRA initially contained a requirement that an annual review be conducted for each nursing facility resident to determine whether the individual continued to need a nursing facility level of care.  In 1996, the NHRA was amended to eliminate the requirement of an annual resident review on the ground that such reviews were duplicative of other annual assessments that were required.  *See* Pub. L. No. 104-315 (1996).  However, the NHRA continued to require a preadmission review for all individuals with developmental disabilities and PASARR reviews whenever there was a significant change in an individual's condition.  42 U.S.C. § 1396r(e)(7)(B)(iii).

for admission and retention in a nursing facility because he needs the level of nursing services that can only be provided in a nursing facility, and, if so, whether he needs active treatment. 42 U.S.C. §§ 1396r(b)(3)(F)(ii), 1396r(e)(7)(A)&(B). A basic condition for federal reimbursement of nursing facilities is that the State determine, pursuant to a thorough assessment according to PASARR standards, that available community alternatives cannot meet the person's needs, and that the individual must be placed in a nursing facility. 42 C.F.R. § 483.132. If the resident review determines that the resident is inappropriately placed in the nursing facility, the State must arrange for the discharge of the resident. *Id.*; 42 U.S.C. §§ 1396r(e)(7)(C)(ii)(I), (ii)(II), (iii)(I), & (iii)(II). Congress intended the number of nursing facility residents with developmental disabilities to decline dramatically as a result of the PASARR screening.

The second major change—the mandatory provision of active treatment—was imposed to ensure that individuals with developmental disabilities obtain the care they need to function with as much independence and self-determination as possible. Specifically, as part of the PASARR screening, Congress required that States determine whether nursing facility residents with developmental disabilities require "specialized services."[8] *Id.* § 1396r(e)(7)(B) (ii). Specialized services consist of an active and continuous treatment program, which includes aggressive, consistent implementation of specialized and generic training, treatment, and health services that are aimed at allowing the individual to function as independently and with as much self-determination as possible, as well as services designed to prevent or decelerate regression and loss of abilities. *See* 42 C.F.R. § 483.120(a)(2), *citing* 42 C.F.R. § 483.440(a)(1) (active

---

[8]  In a 1990 amendment to the Medicaid statute, Congress substituted the term "specialized services" for "active treatment," but made it clear the two terms are synonymous in the context of the PASARR requirements. Pub. L. No. 101-508, § 4801(e)(4), 104 Stat. 1388-216 (1990).

treatment).  If the individual requires specialized services, the State is required to provide them.[9] 42 C.F.R. §§ 483.116(b), 483.120(b), 483.130(m) and (n) (requiring assurances that specialized services will, in fact, be provided).

When the Secretary subsequently issued the PASARR regulations, specialized services were defined with specific reference to the federal ICF/MR active treatment regulations.  The Secretary's definition reflects three distinct duties: (1) the State alone is responsible for the provision of specialized services; (2) the nursing facility is responsible only for traditional nursing services;[10] and (3) the State is ultimately and fully responsible for ensuring that all of these services, taken together, constitute a program of active treatment, as defined by 42 C.F.R. § 483.440(a)-(f).  This definition has never been challenged, amended, or further refined.[11]

In enacting the NHRA, Congress intended to prevent the inappropriate placement of individuals with developmental disabilities in nursing facilities, a problem highlighted by the 1987 GAO report.  Congress also intended to ensure that if the resident requires specialized services, the State actually provides them.  *See id.*; §§ 1396r(e)(7)(C)(i)(IV) & (ii)(III).  The Secretary's regulations carefully reflected these intentions and mandates, and established screening, diversion, placement and treatment requirements that Texas has ignored.

---

[9]  The House Committee on Energy and Commerce, in introducing the bill enacted as the NHRA, plainly stated that "[i]n the Committee's view, the responsibility for providing, or paying for the provision of, active treatment *lies with the States*."  H.R. Rep. 100-391(I) at 462, *reprinted in* 1987 U.S.C.C.A.N. 2313-282 (emphasis added).

[10]  The Secretary's interpretation of the regulations explicitly relieves nursing facilities from having to provide specialized services:

> Response: As noted above, we do not envision holding a facility accountable for deficiencies in the State's actions with respect to specialized services.  We believe the law would need to be changed for us to do so.  Facilities attempting to address a resident's needs would not be in jeopardy of sanctions unless they were otherwise out of compliance with the NF requirements.

57 Fed. Reg. 56,477.

[11]  In subsequent amendments to the statute, Congress left undisturbed the Secretary's definition of specialized services as equivalent to active treatment, as well as the interpretation of Congress' intent that such services must be provided to all persons with mental retardation who have been determined to need these services by the PASARR process.  H.R. Rep. No. 104-817, at 1-4, *reprinted in* 1996 U.S.C.C.A.N. 4198, 4198-201; Pub. L. No. 104-315, § 1(b), 2(c).

C.    **Texas's Implementation of the NHRA.**

Texas institutionalizes more than four thousand persons with developmental disabilities in nursing facilities at any given time.[12]  Am. Compl. ¶ 26.  Thousands more are admitted or at risk of admission each year.[13]  *Id.*  As more fully described in the Amended Complaint, Texas ignores Congress' mandate, the Secretary's requirements, and the rights of persons with developmental disabilities in nursing facilities by operating a wholly inadequate PASARR program.  *Id.* ¶¶ 74-103.  Specifically, in violation of the NHRA and PASARR regulations, Texas's PASARR program fails to identify accurately whether a person who seeks admission to a nursing facility has a developmental disability, whether the individual could be served appropriately in another, less restrictive facility, and whether the person needs specialized services.  *Id.* ¶¶ 74-78.  Concomitantly, Texas fails to provide an array of specialized services that meet federal active treatment standards to persons with developmental disabilities who are in nursing facilities, to the same extent and in the same manner that it does for persons with developmental disabilities who live in ICF/MRs.  *Id.* ¶¶ 79-80, 85-90.

As a result of these deficiencies, a substantial portion of persons with developmental disabilities who are screened for admission should and could be served in alternative settings.  *Id.* ¶¶ 82-83, 102.  Similarly, a substantial portion of persons with developmental disabilities who currently reside in nursing facilities should be and could be served in more integrated community settings.  *Id.* ¶¶ 84, 103.  Finally, virtually all of the persons with developmental disabilities who are in nursing facilities qualify for specialized services, but virtually none of

---

[12]  In fact, the number may be considerably higher than this.  As a result of pervasive deficiencies in its PASARR process, defendants do not have an accurate list or even a general estimate of the total number of persons with developmental disabilities who are currently institutionalized in nursing facilities in Texas.

[13]  The lack of accurate identification makes projections about the number of persons at risk of institutionalization even more problematic.

them are receiving active treatment, as defined in federal regulations and as required by federal law.  *Id.* ¶¶ 85-87, 102.

    **D.**    ***Texas's Community Service Programs.***

    Texas operates several distinct community programs for persons with developmental disabilities, in addition to its private ICF/MR program.  All of these other community programs are funded in significant part by the federal government, either through Home and Community-Based Services ("HCBS") waiver programs authorized by 42 U.S.C. § 1396n(c), or traditional Medicaid state plan services such as personal care attendants or home health care.  The HCBS waiver provision authorizes the Secretary to waive certain other Medicaid provisions in order to encourage States to provide services in the community, provided that the cost of doing so is not greater than the cost of providing similar services in an institution, like a nursing facility or ICF/MR.  *Id.*; *see also* 42 C.F.R. § 430.25(b).  States are required to inform persons who seek admission to, or who reside in, a nursing facility about all of its HCBS waiver programs, must offer them a choice of the waiver program, and must administer its waiver programs in a manner that is fair and efficient for all persons, including those institutionalized in nursing facilities.  42 U.S.C. § 1396n(c)(2).

    The Secretary has approved several waiver programs in Texas, at least four of which could serve certain nursing facility residents with developmental disabilities.  *See* Texas Dept. of Aging and Disability Services Reference Guide 2011 at 31-44 (online at http://cfoweb.dads.state.tx.us/ReferenceGuide/guides/FY11ReferenceGuide.pdf).  First, Texas's Home and Community-based Services ("HCS")[14] waiver provides a broad range of residential and non-residential services to persons with intellectual disabilities and is the State's largest

---

[14]  Plaintiffs use the acronym HCS to refer to Texas's specific waiver program and the acronym HCBS to refer generically to the general category of community-based waivers authorized by 42 U.S.C. § 1396n.

waiver.  Second, the Community Living and Assistance Support Services ("CLASS") waiver serves persons with disabilities other than intellectual disabilities, but including "related conditions," and offers a range of services as an alternative to institutionalization.  Third, the Community Based Alternatives ("CBA") waiver provides many services similar to those in HCS and CLASS for adults with disabilities in order to avoid placement in an institutional facility.  Fourth, the Star+Plus waiver is the managed-care equivalent of the CBA waiver and provides a similar array of services.[15]  While the HCS waiver has a long waiting list, access to the other three waivers is readily available to nursing facility residents through Texas's Money Follows the Person ("MFP") program.[16]

Texas neither provides nursing facility residents with developmental disabilities information about these waivers, nor offers them meaningful choices between nursing facility placement and community waiver programs.  Am. Compl. ¶¶ 53-54, 98-100, 103.  Instead, it administers these waivers in a manner that is neither fair nor efficient, discriminates against persons with developmental disabilities in nursing facilities, and is inconsistent with the federal statutory and regulatory requirements for operating waiver programs.  Am. Compl. ¶ 53-61.

## IV.    ARGUMENT

### A.    *Plaintiffs Have Stated Cognizable Claims Under the Medicaid Act.*

#### 1.    Plaintiffs Have Stated a Claim Under the NHRA.

"[T]o survive a motion to dismiss, [plaintiffs] need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct.

---

[15]  The Star+Plus waiver is administered by HHSC.  A description of the waiver is available at http://www.hhsc.state.tx.us/starplus/Overview.htm.

[16]  The MFP program allows nursing facility residents to gain immediate access to the CBA, CLASS, Star+Plus and several other waiver programs without having to go on a waiting list. Texas DADS, Money Follows the Person to Community Living  at 2-3 (April 2007) available online at
http://www.dads.state.tx.us/news_info/publications/brochures/DADS200_mfp.pdf.

1309, 1322 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Defendants' argument that plaintiffs have failed to state a cognizable NHRA claim is based

entirely upon its conclusory assertion that the provisions of the NHRA relied upon by plaintiffs

do not impose any responsibilities on them.[17]  Part. MTD 2 at 40-41.  However, contrary to

defendants' contention, 42 U.S.C. §§ 1396r(e)(7)(A), (B), & (C) do indeed impose specific

obligations on the State.    Section 1396r(e)(7)(A)(i) requires "the State … "to have a

preadmission screening program under this subparagraph [and] to perform resident reviews

under subparagraph (B)."[18]    Section 1396r(e)(7)(B)(ii) mandates that "the State mental

retardation or developmental disability authority must review and determine … (I) whether or

not the resident … requires the level of services provided by a nursing facility …; and (II)

whether or not the resident requires specialized services…."  Finally § 1396r(e)(7)(C) makes

clear that "the State must … provide for (or arrange for the provision of) such specialized

services for … mental retardation."  See also 42 C.F.R. § 483.116(b)(2) ("The State must provide

or arrange for the provision of the specialized services needed by the individual while he or she

resides in the NF").  It is difficult to envision how Congress could have more clearly indicated

that these various responsibilities were those of the State.[19]   Plaintiffs' allegations that the

defendants fail to comply with all of these obligations certainly states a claim for relief "that is

plausible on its face."  *Matrixx,* 131 S.Ct at 1322 n.12.

---

[17]    This may very well explain why the defendants have failed so completely to ensure that plaintiffs and the class they seek to represent were: 1) screened prior to their nursing facility admission; 2) assessed to determine whether admission to a nursing facility was appropriate and, if so, if they needed specialized services; and 3) actually provided with the specialized services they required.

[18]    Plaintiffs cite § 1396r(b)(3)(F) in their claim for relief because § 1396r(e)(7)(A)(i) cross references to that section in order to fully define and clarify the nature and extent of the preadmission screening program that "the State must have in effect."

[19]    Indeed, the heading of subdivision (7) of § 1396r(e) is "State requirements for preadmission screening and resident review."  The defendants contention that the provisions in §1396r(e) are not directed at them ignores the clear statutory language and intent.

Contrary to their generalized attack on all of plaintiffs' NHRA claims, defendants immediately thereafter concede that plaintiffs have stated a claim with respect to their failure to provide specialized services that satisfy federal active treatment requirements, although disputing the scope of that obligation.  Part. MTD 2 at 41-42.  Specifically, defendants assert that plaintiffs' claim that defendants have "fail[ed] to provide specialized services constituting active treatment as measured by 42 C.F.R. § 483.440(a)-(f)" overstates their obligation and that they need only provide specialized services, as measured by Section 483.440(a)(1).  *Id.*

Defendants' concession that plaintiffs have stated a cognizable claim regarding the failure to provide specialized services sufficient to constitute active treatment as required by 42 C.F.R. § 483.440(a)(1) should end the inquiry at this stage of the proceeding.  The determination of the extent of any violation and the scope of relief to which plaintiffs may be entitled is not appropriate at the motion to dismiss stage—determining the precise contours of defendants' active treatment obligations is best addressed during the merits or remedial phase of the litigation.  *See Lewis v. New Mexico Dep't of Health*, 261 F.3d 970, 977 (10th Cir. 2001) (determining the reach of Medicaid statute "is more appropriately reserved for resolution on the merits of the case"); *Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005) (finding it inappropriate to grant motion to dismiss based on uncertain meaning of statutory term, "prepaid legal services").[20]

---

[20]  Defendants' assertion that the scope of active treatment required by § 483.440(a)(1) does not encompass any of the requirements contained in other subparts of § 483.440 has been rejected by the one court that has addressed the issue.  *Rolland v. Patrick*, 483 F. Supp. 2d 107, 113-14 (D. Mass. 2007).  Recognizing that subpart (a) provides the general definition of active treatment and that subparts (b) through (f) provide the specifics, the Court easily concluded "that paragraphs (b) through (f) of section 483.440 apply as well."  *Id.* at 114.  Defendants' suggestion that the First Circuit decision in *Rolland v. Romney*, 318 F.3d 42 (1st Cir. 2003) somehow supports their position was also raised in *Rolland* and rejected by the district court on remand.  *Rolland*, 483 F. Supp. 2d at 113-14.

2.     **Plaintiffs Have Stated a Claim Under the Reasonable Promptness Provision of the Medicaid Act.**

a.     Plaintiffs Have Stated a Claim that the Defendants Fail to Provide Specialized Services with Reasonable Promptness.

In the Amended Complaint, plaintiffs allege that Texas violates the reasonable promptness provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(8), by failing to provide appropriate specialized services in a timely manner to nursing facility residents with DD.  *See* Am. Compl. ¶¶ 245-246.   Defendants concede that this states a claim under 42 U.S.C. § 1396a(a)(8) to the extent that they are not providing specialized services as measured by 42 C.F.R. § 483.440(a)(1).[21]  Part. MTD 2 at 43.  As a result, Defendants' challenge to this claim must be rejected.

b.     Plaintiffs Have Stated a Claim that Community-Based Services and Supports Are Not Provided with Reasonable Promptness.

Defendants also argue that plaintiffs' reasonable promptness claim regarding the provision of community-based services and supports fails because plaintiffs allegedly are not entitled to prompt waiver services where the Home and Community Based Services (HCS) waiver program is full and has a waiting list.  Part. MTD 2 at 43-45.

There are two problems with defendants' argument.  First, it  erroneously assumes that the HCS waiver cap, as applied to nursing facility residents with DD, is legal.  Second, the defendants ignore the fact that nursing facility residents with DD are eligibile for and could benefit from community services provided through other programs than HCS, including CLASS, CBA and Star+Plus.

Plaintiffs' do not insist that the reasonable promptness provision of the Medicaid Act requires defendants to increase the size of the HCS waiver.  *See* Am. Compl. ¶¶ 230-37, 251-

---

[21]  The scope of specialized services required by 42 C.F.R. § 483.440(a)(1) is neither necessary nor appropriate for determination at the motion to dismiss stage.  *See* fn. 20 *supra*  and related text.

52.[22]    Rather, they merely insist that existing community services must "be furnished with reasonable promptness to all *eligible* individuals."  42 U.S.C. § 1396a(a)(8) (emphasis added).  This statutory requirement can be violated by unreasonably delaying medical assistance to individuals already determined eligible, *see Doe v. Chiles*, 136 F.3d 709, 711 (11th Cir. 1998), or by denying eligibility pursuant to an illegal eligibility requirement.  *See, e.g.*, *King v. Smith*, 392 U.S. 309, 333 (1968); *Quern v. Mandley*, 436 U.S. 725, 740 (1978); *Carleson v. Remillard*, 406 U.S. 598, 600 (1972); *Townsend v. Swank*, 404 U.S. 282, 285-86 (1971).  As the Supreme Court explained in *King*, applying the analogous reasonable promptness provision of the Aid to Families with Dependent Children program, "In denying AFDC assistance to appellees on the basis of this invalid regulation, Alabama has breached its federally imposed obligation to furnish 'aid to families with dependent children' . . . with reasonable promptness to all eligible individuals."  392 U.S. at 333; *see also Townsend*, 404 U.S. at 286; *Quern*, 436 U.S. at 740.

Plaintiffs have alleged that the HCS waiver's restrictive eligibility criteria, which effectively exclude individuals with developmental disabilities in nursing facilities from accessing the HCS and other waiver programs, violate the Medicaid Act, as well as the ADA and Section 504 of the Rehab Act.[23]  *See* Am. Compl. ¶¶ 230-237, 251-252.  The relief available under the integration mandate of the ADA or Section 504 is the reasonable modification of the

---

[22]  Relying upon *McCarthy v. Gilbert*, Civ. No. 03-CA-231-SS (W.D. Tex. 2003), *see* Motion, Ex. 1, defendants assert that the existence of a waiting list for the HCS waiver precludes a promptness claim.  Other cases have held to the contrary.  *See Benjamin H. v. Ohl*, No. Civ. A. 3:99-0338, 1999 WL 34783552, at *15 (S.D. W.Va. July 15, 1999) (applying § 1396a(a)(8) to a waiver waiting list claim and finding that long waiting lists and lengthy delays in obtaining waiver services likely violated reasonable promptness); *see also* Elliott Schwalb, Reconsidering Makin v. Hawaii: The Right of Medicaid Beneficiaries to Home-Based Services As an Alternative to Institutionalization, 26 Ga. St. U. L. Rev. 803, 823-849 (2010) (analyzing the statutory and regulatory text and history and concluding that the reasonable promptness provision should apply to home and community-based waiver services).

[23]  Admittedly, there is a lengthy waiting list for HCS services.  However, certain groups are provided a priority or are permitted to access the HCS waiver through the MFP program.  But adult nursing facility residents with developmental disabilities are neither provided with a priority nor permitted to access the HCS waiver through the MFP program.  As a result, they can expect to wait for six years or more for an HCS waiver slot to open up.  This discriminatory and unreasonable exclusion from the HCS program states a viable promptness claim.

underlying program to eliminate its discriminatory application and to accommodate the needs of the excluded individuals with disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7); *Olmstead v. L.C.*, 527 U.S. 581, 592, 607 (1999). This relief does not create a new program, but simply brings the existing program's eligibility criteria into compliance with the law. Just as in *King, Quern*, *Carleson* and *Townsend*, the allegations here that defendants have denied plaintiffs and the class access to medical services, whether in a waiver program or otherwise, pursuant to an invalid eligibility rule, state a claim under the reasonable promptness provision.[24]

The defendants' reliance on *Skandalis v. Rowe*, 14 F.3d 173 (2d Cir. 1994) and *Beckwith v. Kizer*, 912 F.2d 1139 (2d Cir. 1990) is misplaced. Both *Skandalis* and *Beckwith* involved claims seeking to require States to increase the size or scope of their HCBS waivers. *Skandalis*, 14 F.3d at 177 (waiver limited to individuals with incomes less than 300% of poverty); *Beckwith*, 912 F.2d at 1141 (waiver limited to individuals who were hospitalized for at least 90 days). The challenges in both of these cases were based on a violation of § 1396n of the Medicaid Act, not § 1396a(8), and were rejected because § 1396n provides States with considerable flexibility regarding the categories or groups of recipients that it may elect to cover.[25] *Skandalis*, 14 F.3d at 1143; *Beckwith*, 912 F.2d at 181-82. Neither case referred to the reasonable promptness provision of the Medicaid Act, and neither case involved challenges to the legality of the waiver's exclusion based upon disability, as a violation of the ADA, § 504, or the NHRA.

Similarly, *Arc of Washington v. Braddock*, 427 F.3d 615 (9th Cir. 2005) does not support dismissal of the plaintiffs' reasonable promptness claim. The *Arc of Washington* plaintiffs challenged the waiver's numerical cap – not the exclusion of a class of persons with disabilities –

---

[24]  *See*, *Townsend v. Quasim*, 328 F.3d 511, 516-18 (9th Cir. 2003) (holding that excluding one category of disabled persons, there medically-needy nursing facility residents, from access to home and community-based Medicaid services violates the ADA, subject to state's right to prove fundamental alteration defense).

[25]  It is important to note that neither *Beckwith* nor *Skandalis* challenged the legality of the classifications under the ADA or the NHRA.

in Washington's HCBS waiver program, While one appellate decision disposed of the

plaintiffs' ADA claim,[26] a separate opinion reversed and remanded the district court's dismissal

of the Medicaid Act reasonable promptness claim. *Arc of Washington v. Braddock*, 129 Fed.

Appx. 348, 351-52 (9th Cir. 2005).[27] Thus, *Braddock* as well as other decisions actually support

the reasonable promptness claim here.[28]

Furthermore, there is a waiting list only with respect to the HCS waiver program, and not

for the other waiver programs offered by the defendants but ignored in their motion. *See* Part.

MTD 2 at 43-45. Plaintiffs' reasonable promptness claim with respect to community services is

not limited to services and supports provided through the HCS waiver program. *See* Am. Compl.

¶¶ 131, 138, 232-237, 242-44, 247 (not limiting claim to any particular waiver program).

Plaintiffs are willing to accept appropriate community services under any of Texas's community

support programs through which they can obtain the services needed to allow them to live in the

most integrated setting. These other programs include the MFP program, the CLASS waiver, the

CBA waiver, the Star+Plus waiver and other Medicaid-covered state plan services, such as

personal care assistance. There is no waiting list for many of these programs and services for

---

[26]    Significantly, this decision was issued pursuant to a request for rehearing and superceded an earlier decision by the panel reported at 403 F.3d. 641. The superceded opinion had concluded that where there was a conflict between the waiver provisions of the Medicaid Act and the ADA, the waiver provisions controlled. 403 F.3d at 643-44. The decision on rehearing excised that analysis and holding from the final decision and simply concluded that Washington State's waiver complied with the ADA because the State demonstrated that "it has a 'comprehensive, effectively working plan…'" *Arc of Washington*, 427 F.3d at 621 (internal citation omitted).

[27]    That the plaintiffs raised a reasonable promptness claim which was remanded for further consideration by the Ninth Circuit is made evident by reference to plaintiffs' appellate brief, which is available at 2003 WL 23004532.

[28]    In *Makin v. State of Hawaii*, 114 F.Supp.2d 1017 (D. Haw. 1999) the plaintiffs raised both a reasonable promptness and ADA challenge to the cap on the number of waiver slots in Hawaii's HCBS waiver. The *Makin* Court analyzed the Medicaid Act claims independent of the ADA claim and concluded that plaintiffs' reasonable promptness claim failed because the Medicaid statute specifically permitted states to place limits on the number of individuals served under a waiver. 114 F.Supp.2d at 1030-31. However, the *Makin* Court then addressed the ADA and § 504 integration mandate claims and concluded that both were viable claims. 114 F.Supp.2d at 1033-36. By failing to consider whether the waiver cap needed to be modified to comply with the ADA and § 504 before addressing the reasonable promptness claim, the Court put the proverbial cart before the horse. See, Schwalb, Reconsidering Makin v. Hawaii, 26 Ga. St. U. L. Rev. at 823-849 (criticizing court for its treatment of the reasonable promptness claim).

individuals in NFs.[29]  Because defendants' challenge to the viability of this claim is predicated

entirely on the existence of a lengthy waiting list for HCS services, it should be denied.

### 3. Plaintiffs Have Stated a Claim Under the Comparability Requirement of the Medicaid Act.

Plaintiffs also allege that defendants are violating the comparability provisions of the

Medicaid Act, 42 U.S.C. § 1396a(a)(10)(B), by failing to provide persons with developmental

disabilities in nursing facilities with services to which they are entitled under the Medicaid

program, while providing similar services to other, similarly-needy persons in ICF/MRs and state

supported living centers in Texas.  It is defendants' failure to offer the same type, level, and

intensity of specialized services to plaintiffs as they offer to ICF/MR residents that is the focus of

plaintiffs' comparability claim.  Am Compl. ¶¶ 127, 135, 137, 248-49.

While defendants are correct that the comparability rule requires that "the amount,

duration, and scope of available services cannot differ among Medicaid recipients based on how

they became eligible for Medicaid," Part. MTD 2 at 49, they also cannot differ among Medicaid

recipients within a particular categorically or medically needy group.  *Sobky v. Smoley*, 855 F.

Supp. 1123, 1140-41 (E.D. Cal. 1994); *Rodriguez v. City of New York*, 197 F.3d 611, 615 (2d

Cir. 1999) ("Section 1396a(a)(10)(B) thus precludes states from discriminating against or among

the categorically needy"); 42 C.F.R. § 440.240(b)(1).[30]  Plaintiffs are all individuals who qualify

for medical assistance under the Texas Medicaid program based upon their disability.  Residents

of ICF/MRs and state supported living centers also qualify for medical assistance based upon

their disability.  See 1 Tex. Admin. Code § 358.107.  As a result, the comparability rule requires

---

[29]    Under the MFP program, residents of NFs are able to bypass the waiting lists for the CLASS, CBA and Star+Plus waivers and access the services and supports immediately.

[30]    Because Medicaid residents of both NFs and ICF/MRs fall within the categorically needy eligibility group, it is § 1396a(a)(10)(i), not § 1396a(a)(10)(ii) which controls.  To the extent that defendants object to that part of the comparability claim predication on subdivision (ii), Part. MTD 2 at 51, they are correct.  Plaintiffs assert their comparability claim solely based upon subdivision (i).

that "the services available to any individual in [either group be] equal in amount, duration, and scope…." 42 C.F.R. 440.240(b).

Defendants are, of course, correct when they state that "[n]othing … requires that *all* of the specific services defined in § 1396d(a) must be provided to every developmentally disabled person … in a nursing facility."  However, all of the services that are covered under the state Medicaid plan[31] must be made equally available to all recipients without discrimination against or among the categorically needy.[32]  *Rodriguez*, 197 F.3d at 615.  Residents of nursing facilities with developmental disabilities have the same need for active treatment as residents of ICF/MRs and state supported living centers.  Am. Compl. ¶¶ 85-88, 102.  Federal law mandates that defendants make available to both groups those services sufficient to achieve active treatment. 42 U.S.C. §§ 1396r(e)(7)(B) (ii)(II) & (C)(i) (nursing facility residents); 42 C.F.R. § 483.120(a)(2) (nursing facility residents); 42 U.S.C. §1396d(d)(2) (ICF/MR residents); 42 C.F.R. § 483.440 (nursing facility and ICF/MR residents); *Rolland*, 318 F.3d at 57 ("For individuals with mental retardation, . . .  the Secretary crafted a definition of specialized services that incorporated the active treatment standard traditionally applied in ICF/MRs").  However, defendants make available the services necessary to constitute active treatment only to residents of ICF/MRs, and not to nursing facility residents.  Am. Compl. ¶¶ 87-88, 90, 96, 102, 249, 256-58.  This differential treatment of similarly-needy Medicaid recipients with respect to the

---

[31]    As defendants acknowledge, Texas covers ICF/MR services under its state Medicaid plan.  The fact that this is an optional, rather than a mandatory, service does not in any way diminish their obligations under § 1396a(a)(10)(B) regarding its availability.  If anything, providing required specialized services sufficient to achieve active treatment as part of the optional ICF/MR service, while failing to provide it as part of the mandatory nursing facility service, renders the disparate treatment even more inappropriate.

[32]    Defendants' suggestion that plaintiffs' comparability claim necessitates that "every Medicaid recipient in any program and in any type of facility must be provided the same care and services" totally misstates the claim. Part. MTD 2 at 50.  Plaintiffs do not contend that everyone should receive the same care and services, simply that everyone who meets the eligibility criteria for a specific service should have equal access to it.  Because residents of NFs with DD and residents of ICF/MRs both are entitled to receive needed specialized services in an amount, duration and scope sufficient to constitute active treatment under 42 C.F.R. § 483.440, it is discriminatory and a violation of the comparability provision to make these services available to one group, but not to the other.

availability of a medical service to which both groups are equally entitled under federal law is precisely what the comparability provision was targeted to prevent.

Not surprisingly, the one court to address this specific issue regarding the disparate availability of specialized services and active treatment between nursing facility and ICF/MR residents had no difficulty in concluding that it stated a claim under § 1396a(a)(10)(B). *Rolland v. Cellucci,* 52 F. Supp. 2d 231, 238-39 (D. Mass. 1999) (holding that "Plaintiffs' claim that individuals residing in ICF/MRs receive active treatment . . . , while those individuals residing in nursing facilities are not receiving ample services . . . supports a cognizable claim of a violation of the comparability provision"). Defendants' assertion that plaintiffs have failed to allege a viable violation of the comparability rule must be rejected.[33]

### 4.   Plaintiffs Have Stated a Claim under the Freedom of Choice Provision of the Medicaid Act.

The Medicaid statute requires that recipients at risk of institutional care be given a choice between Medicaid programs. 42 U.S.C. § 1396n(c)(2)(C).[34] Courts have applied this provision to guarantee persons with developmental disabilities a choice between different Medicaid programs. *See Cramer v. Chiles*, 33 F. Supp. 2d 1342, 1352 (S.D. Fla. 1999) (state Medicaid plan violated 42 U.S.C. § 1396n(c)(2)(C) because it gave individuals with disabilities "no real choice" between ICF/DDs and HCBW services).

---

[33]   Defendants also assert that should the Supreme Court invalidate the entirety of the PPACA, including the revised definition of medical assistance in 42 U.S.C. § 1396d(a), that plaintiffs comparability claim must be dismissed. Plaintiffs disagree that their comparability claim is dependent upon the amendments to the definition of medical assistance in the PPACA. However, this is a question for another day, to be reached if, and only if, the Supreme Court does what no operative decision addressing the legality of the PPACA has yet done, and finds that the Medicaid provisions are not severable from the individual mandate provision.

[34]   Specifically, the statute provides that States must ensure that

such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, *at the choice of such individuals*, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded . . ." *Id.* (emphasis added).

The fundamental purpose of 42 U.S.C. § 1396n(c)(2)(C) is to provide individuals who require an institutional level of care a choice concerning the type of Medicaid services they receive.  In order to make this choice meaningful, Medicaid recipients must be informed of *all* feasible alternatives, including, but not limited to, the various waiver programs, the MFP program, and regular Medicaid state plan services, such as personal care attendant services, home health care services, or private duty nursing services.  They also must be allowed to apply for these services and be afforded meaningful access to the application process.[35] Defendants assert that § 1396n(c)(2)(C) is solely an informational provision and does not provide individuals with any choice of community-based alternatives to institutional care.  Part. MTD 2 at 47.  To support this contention, defendants quote the first half of § 1396n(c)(2)(C), but neglect to include the second half of the provision, which provides the specific language specifying that the individual, after being informed of the available alternatives to institutional care, has "the choice" of accepting those alternatives "to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded."

The Amended Complaint alleges that defendants have, in violation of 42 U.S.C. § 1396n(c)(2)(B) & (C), failed to provide residents of nursing facilities with developmental disabilities with: (1) notice of and equal opportunities to apply for and to have access to community-based services; (2) an assessment of their eligibility for such services; and (3) meaningful choice between institutional and community-based services.  Am. Compl. ¶¶ 236, 247.  Defendants argue that there is no requirement to inform eligible individuals of a particular

---

[35]   States that elect to participate in the HCBS waiver program must comply with additional freedom of choice regulations:

> HCFA will not grant a waiver under this subpart and may terminate a waiver unless the Medicaid agency . . . (d) Assur(es) that . . . the recipient or his or her legal representative will be (1) informed of any feasible alternative under the waiver; and (2) given the choice of either institutional or home and community based services.

42 C.F.R. § 441.302(d).

waiver program if that waiver program is full.  Part. MTD 2 at 48.  Defendants' contention is flawed for several reasons.

First, Medicaid recipients retain their right to be informed of alternatives, regardless of a particular waiver's status or capacity.  This right is especially critical in Texas, where the waiting list for HCS services is long.  It is imperative that individuals be informed about alternatives in a timely manner so that they can exercise their right to be added to the waiting list if they desire.[36] The failure to notify persons with developmental disabilities in nursing facilities about each existing waiver program, regardless of the current capacity of the program, denies them critical information needed to make a meaningful choice about whether to enter, or remain in, a nursing facility.  Knowing that waiver services, although not currently available, may be available in the future certainly could impact an individual's decision about whether to enter a NF or remain in the community.  As a result, it constitutes a violation of § 1396n(c)(2)(C) to fail to inform the individual of this information.  Without this information, the individual cannot make an informed choice regarding whether to enter the NF or to join the waiting list and remain in the community until a slot opens up.

Second, there are several HCBS waivers in Texas, in addition to HCS, for which class members are eligible, including CBA, CLASS, CWP, TxHmL, Star+Plus and DBMD, some or all of which currently have capacity.[37]  The fact that one waiver is full, does not relieve defendants from their duty to inform individuals of other "feasible alternative[s]" under 42

---

[36]  Defendants' own regulations implementing this federal requirement require them to provide individuals who are about to enter a nursing facility with information about "all long-term care and long-term support options appropriate to the clients' needs that are currently available."  However, defendants recognize that there is a distinction between "currently available" and "immediately available," for the regulation goes on to specify that "[i]f the client … selects an option that is not immediately available for any reason, the agency must provide assistance in placing the client's name on a waiting list for that option."  1 Tex. Admin. Code § 351.15(b).

[37]  Nursing facility residents have access to the CBA, CLASS and Star+Plus waivers under the MFP program without having to go on any waiting list.

U.S.C. § 1396n(c)(2)(C). In a similar factual situation, the *Rolland* Court found that individuals with developmental disabilities in nursing homes stated a claim for violation of the freedom of choice provision of 42 U.S.C. U.S.C. § 1396n(c)(2)(C) by alleging that defendants' administration of the Medicaid program failed to inform class members of feasible alternatives to nursing facilities, including ICF/MR, PCA services and HCBS waiver programs. *See Rolland*, 52 F. Supp. 2d at 241. Likewise, here the universe of feasible alternatives is not narrowly limited to the HCS waiver, but rather properly encompasses all community-based services, supports, and programs available under the Texas Medicaid program, including the other waiver and MFP programs, as well as individual state plan services. Defendants provide none of this information to individuals with DD about to enter NFs.

Defendants have failed to inform plaintiffs of the availability of feasible alternatives to NF care under the various waiver programs which Texas operates and other services and supports available under the State Medicaid Program. By failing to provide this necessary and required information, defendants have deprived plaintiffs of the ability to make an informed choice of whether to enter a NF or remain in the community, utilizing the services to which they are currently entitled or may in the future be entitled to receive   Am. Compl. ¶¶ 236, 247. In doing so, defendants have failed to offer plaintiffs a choice about whether to receive community or institutional services. Each of these failures violates plaintiffs' rights under 42 U.S.C. § 1396n(c)(2)(C) and 42 C.F.R. § 441.302(d) to be informed of available alternatives to institutional care and, armed with that information, to choose whether to enter an institution or remain in the community. Therefore, plaintiffs have stated a claim under the freedom of choice provision, 42 U.S.C. § 1396n(c)(2)(C).

**B.    Plaintiffs Have a Private Right of Action Under 42 U.S.C. § 1983 to Enforce the Relevant Sections of the Medicaid Act**

    **1.    The Standard for Private Rights of Action.**

Section 1983 authorizes a civil action against any individual who, "under color of any statute, ordinance, regulation, custom, or usage of any State" deprives an individual "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Rights under federal statutes, as well as the Constitution, may be the basis of a § 1983 action. *Maine v. Thiboutot*, 448 U.S. 1, 4-5 (1980); *see also Rosado v. Wyman*, 397 U.S. 397, 422-23 (1970) (enforcing Social Security Act in § 1983 action).  The Supreme Court has set forth a three-part test for determining if Congress intended to create a right under § 1983: (i)  Congress intended that the provision benefit the plaintiff; (ii)  the statute is not vague and amorphous, and (iii) a binding obligation is unambiguously imposed on the States by the statute.  *See Blessing v. Freestone,* 520 U.S. 329, 340-41 (1997); *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 503 (1990) (applying factors to allow enforcement of a Medicaid Act provision requiring state plans to include payment rates that "the State finds, and makes assurances satisfactory to the Secretary" are "reasonable and adequate" to meet the costs of "efficiently and economically operated facilities").[38]

In *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the Supreme Court clarified that the first *Wilder/Blessing* prong is not met merely by showing that "the plaintiff falls within the general zone of interests that the statute is intended to protect."  *Id.* at 283.  Rather, "it is *rights,* not the broader or vaguer 'benefits' or 'interests' that may be enforced" under § 1983.  *Id.*

---

[38]  If the *Wilder/Blessing* factors are met, there is a presumption that the provision is enforceable under § 1983, unless the State can show that Congress specifically foreclosed that remedy, either expressly in the statute or by creating a "comprehensive enforcement scheme" incompatible with enforcement through § 1983. *Blessing*, 520 U.S at 341.  The Supreme Court has repeatedly listed the Medicaid Act in the category of statutes that do not provide such a comprehensive enforcement scheme.  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121-22 (2005) (citing *Wilder*, 496 U.S. at 521).

(reiterating that *Blessing,* 520 U.S. at 340, "emphasizes that it is only violations *of rights,* not *laws,* which give rise to § 1983 actions").

In determining whether Congress intended to confer individual rights, courts must look at whether the text contains "rights- or duty-creating language;" that is, language with an "unmistakable focus on the benefited class." *Gonzaga*, 536 U.S. at 284 n.3; *see also ASW v. Oregon*, 424 F.3d 970, 976 (9th Cir. 2005) ("these particular statutory provisions are unambiguously framed in terms of the specific individuals benefited and contain explicit duty creating language); *Price v. City of Stockton*, 390 F.3d 1105, 1110 (9th Cir. 2004); *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 n.16 (11th Cir. 2003) (noting that "rights are often thought of as necessarily including a correlative duty, compelling behavior respecting that right"); *Rolland*, 318 F.3d at 52 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979)) ("the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action").

To illustrate rights-creating language, the *Gonzaga* Court quoted from Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 ("no person shall . . . be subjected to discrimination").  To illustrate duty-creating language, the Court cited to several statutes approved by the Court in *Cannon*, 441 U.S. at 690 n.13.  *See Gonzaga*, 536 U.S. at 284 n.3.  As noted by the *Cannon* Court, duty-creating language may be enforced by an individual as long as it is a duty that runs "directly [to] a class of persons that include[s] the plaintiff," rather than to the "public at large." 441 U.S. at 690 n.13.  Indeed, many of the statutes cited by the *Cannon* Court focus more on the duty of the defendant than on the rights of the plaintiff.  *See Cannon*, 441 U.S. at 690 n. 13 (collecting cases).

In sharp contrast to the provision of the Family Educational Rights and Privacy Act ("FERPA") at issue in *Gonzaga*, which spoke at an aggregate level of policy and practice, 536 U.S. at 289, the Medicaid provisions at issue in this case have a distinct focus on the individual Medicaid recipients who are the intended beneficiaries of the specific rights and duties delineated. As shown below, the text and structure[39] of the statutory provisions relied upon by plaintiffs meet the *Wilder/Blessing/Gonzaga* standard.

### 2.    The Medicaid Act Creates Enforceable Rights.

Defendants boldly assert that *none* of the provisions of the Medicaid Act create rights which are judicially enforceable. Part. MTD 2 at 24-29. They support this contention with two arguments, neither of which survive even the most elemental scrutiny.

First, defendants assert that the Medicaid Act confers rights solely on the Secretary, who can cut off federal funding if she determines that the State is violating federal law.[40] Part. MTD 2 at 24-26. This argument has been considered and explicitly rejected by both the Supreme Court and the Fifth Circuit.

The Supreme Court first addressed this argument in *Wright v. City of Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 424-29 (1987), and held that "HUD's authority to audit, enforce annual contributions contracts, and cut off federal funds . . . are insufficient to indicate a congressional intention to foreclose § 1983 remedies." *Id.* at 428. Similarly, in *Wilder*, 496 U.S. 498, the State of Virginia argued that the Secretary's right to cut off federal reimbursement in the event that a State violates its obligations under the Medicaid Act precludes

---

[39]  "Evidence of congressional intent to create a federal right can be found in a statute's language as well as in its overarching structure." *Cal. State Foster Parent Ass'n,* 624 F.3d 974, 980 (9th Cir. 2010) (quoting *Ball v. Rodgers*, 492 F.3d 1094, 1105 (9th Cir. 2007)).

[40]  Put in the parlance of § 1983 jurisprudence, defendants are asserting that the Medicaid Act contains a "comprehensive enforcement scheme" that signals Congressional intent to foreclose private enforcement. *Blessing*, 520 U.S. at 346-47.

the existence of a private right of action under § 1983. The Court had little difficulty rejecting this argument, noting that the Secretary's authority "to withhold approval of plans . . . , or to curtail federal funds to States whose plans are not in compliance with the Act . . . cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983." *Id.* at 522-23. The Supreme Court addressed and rejected this same argument yet a third time in *Blessing*, 520 U.S. at 346-48. Relying upon *Wright* and *Wilder*, the Court easily concluded that the federal Secretary's "limited powers to audit and cut federal funding" were not sufficient to preclude private enforcement of those provisions of Title IV-D of the Social Security Act which might confer federally enforceable rights on plaintiffs.[41] *Blessing*, 520 U.S. at 348.

Despite these three Supreme Court decisions holding that the federal Secretary's ability to withhold federal funding does not undermine a private right of action under § 1983,[42] defendants cavalierly assert that *Gonzaga* has overruled or effectively abrogated these holdings. Part. MTD 2 at 26. However, the *Gonzaga* Court, citing both *Wright* and *Blessing* with approval, explicitly noted that it was not addressing whether the statute "creat[ed] a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4.

---

[41] While *Blessing* held that there was no generalized right to enforce the statutory scheme of Title IV-D, it remanded the case "for the District Court to construe the complaint in the first instance, in order to determine exactly what rights, considered in their most concrete, specific form, respondents are asserting" and "to determine whether any specific claim asserts an individual federal right." *Id.* at 346. Indeed, contrary to defendants' broad assertion that Spending Clause legislation can never confer privately enforceable rights, the *Blessing* Court specifically noted that "[42 U.S.C.] § 657 may give [respondent] a federal right to receive a specified portion of the money collected on her behalf by Arizona." *Id.*

[42] In addition to *Wright*, *Wilder*, and *Blessing*, the Supreme Court has also held that § 1983 provides a private cause of action to enforce provisions of the Social Security Act in at least two other cases. *Maine*, 448 U.S. at 4-6 (holding that § 1983 provided private individuals with a cause of action to enforce provisions of the Social Security Act); *Maher v. Gagne*, 448 U.S. 122, 128-29 (1980).

Not surprisingly, in light of the above-cited Supreme Court precedent, the Fifth Circuit, both before and after *Gonzaga,* has concluded that the authority of a federal agency to cut off federal funds does not preclude private enforcement of specific provisions of the underlying federal law.  Most recently, the Fifth Circuit in *Johnson v. Housing Authority of Jefferson Parish* rejected the argument that HUD's authority to cut off funds to a housing authority that was violating the National Housing Act precluded private enforcement of the Act.  442 F.3d 356, 365-66 (5th Cir. 2006).

Even more directly on point, the Fifth Circuit in *S.D. ex rel. Dickson v. Hood* held that the Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") provisions of the Medicaid Act, 42 U.S.C. §§ 1396d(a)(4)(B) and 1396d(r)(5), in conjunction with 42 U.S.C. § 1396a(a)(10)(A)(i), are enforceable under § 1983.  391 F.3d 581, 602-04 (5th Cir. 2004).  The *S.D.* Court correctly noted that *Blessing* continues to set forth the test for determining whether a particular federal statute is enforceable pursuant to § 1983 and that *Gonzaga* simply clarified how the first prong of that test—whether the statute contained sufficient "rights creating" language to demonstrate that Congress "intended to confer individual rights upon a class of beneficiaries"—should be applied.  *Id.* at 602 (quoting *Gonzaga*).  With respect to the question of whether the Medicaid Act contains a sufficiently comprehensive enforcement scheme to indicate Congressional intent to foreclose a remedy under § 1983, the Court noted that the defendant had failed to make such a showing.  *Id.* at 606 n.33.[43]  Therefore, defendants' assertion

---

[43]  Defendants also suggest that the fact that a State could include within the broad confines of its Medicaid program certain services for which federal reimbursement is not available somehow undermines plaintiffs' ability to establish a federally-protected right regarding any aspect of the State's Medicaid program, including those for which it receives federal funding.  While the provision by a State of non-mandatory medical assistance under its Medicaid plan with state-only funds might exempt that portion of its Medicaid program from federal judicial review, *see Rosado*, 397 U.S. at 420, those provisions of a State's Medicaid program, both mandatory and optional, for which it receives federal funds, must comply with the requirements of the Medicaid Act.  *Wilder*, 496 U.S. at 502; *S.D.*, 391 F.3d at 585-86.  Because plaintiffs' claims only concern Medicaid services for which defendants receive federal

that the Secretary's ability to withhold funds for noncompliance precludes a private right of action under § 1983 under any provision of the Medicaid Act is directly contrary to consistent holdings of the Supreme Court and Fifth Circuit.

Second, defendants suggest that *Gonzaga* established "a general principle that excludes Spending Clause legislation from judicial enforcement." Part. MTD 2 at 26. Recognizing that *Gonzaga* did not overrule either *Wilder* or *Wright*, they suggest that these cases represent "narrow exceptions" to the general rule, implying that they should be limited to their particular facts. However, if *Gonzaga* had established such a general rule, it would have been unnecessary for that Court to have engaged in the detailed analysis of the specific statutory provision in FERPA to determine if it contained sufficient "rights creating" language.[44] *Gonzaga*, 536 U.S. at 287-89. The *Gonzaga* Court also would not have cited *Blessing* with approval, for *Blessing* explicitly recognized that Spending Clause legislation can be privately enforced pursuant to § 1983. *Blessing*, 520 U.S. at 345-46.

Not only is this Spending Clause exclusion argument not supported by Supreme Court precedent, it has also been rejected by the Fifth Circuit. In *Frazar v. Gilbert*, the Fifth Circuit was confronted with, and explicitly rejected, the argument that "the Medicaid Act, as legislation enacted pursuant to the Spending Clause, was not the supreme law of the land under the Supremacy Clause and therefore the *Ex Parte Young* exception to Eleventh Amendment state immunity was inapplicable." 300 F.3d 530, 550 (5th Cir. 2002), *rev'd sub nom on other grounds, Frew ex rel. Frew v. Hawkins*, 540 U.S. 431 (2004). Noting that this very argument had been rejected by the Sixth Circuit in *Westside Mothers v. Haveman*, 289 F.3d 852, 859-60

---

financial assistance, defendants' assertions regarding solely state-funded services have no bearing on the private cause of action analysis.

[44] There is no question that FERPA is Spending Clause legislation.

(6th Cir. 2002), the *Frazar* Court held that "[f]or purposes of the Supremacy Clause and *Ex Parte Young*, the mandates set out in [the] Medicaid statute are more than contractual, they are federal law." *Frazar*, 300 F.3d at 550. The First and Fourth Circuits also have rejected this same contention. *Antricam v. Odom*, 290 F.3d 178, 188 (4th Cir. 2002) (noting that this "novel argument is . . . at odds with binding precedent"); *Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 235-38 (1st Cir. 2002).

More significantly, in *S.D.*, the Fifth Circuit held that various provisions of the Medicaid Act are privately enforceable. 391 F.3d at 602-06. There is simply no way to reconcile *S.D.* with defendants' assertion that, post-*Gonzaga*, no provisions of the Medicaid Act (or any other Spending Clause legislation) are privately enforceable. *See also Johnson*, 442 F.3d at 366 (concluding post-*Gonzaga* that a provision of the National Housing Act was privately enforceable).

In addition to being foreclosed by binding precedent, defendants' argument is also directly contrary to the clearly expressed intent of Congress. As the Supreme Court has made clear, the *Blessing* test, as clarified by *Gonzaga*, "focuses on congressional intent." *Blessing*, 520 U.S. at 341 Following *Suter v. Artist M.*, 503 U.S. 347, 358-59 (1992), in which the Court suggested that a provision's inclusion as a state plan requirement was a factor weighing against a finding that it created an enforceable right, Congress enacted 42 U.S.C. § 1320a-2. This statute provides that "[i]n an action brought to enforce a provision of [the Social Security Act], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." Congress explained that "[t]he intent of this provision is to assure that individuals who have been injured by a State's failure to comply with the Federal mandates of the State plan titles of the Social Security Act are

28

able to seek redress in the federal courts to the extent they were able to prior to the decision in *Suter v. Artist M*." H.R. Conf. Rep. 103-761 at 926, *reprinted in* 1994 U.S.C.C.A.N. 2901, 3257; *see also S.D.*, 391 F.3d at 603 (relying on § 1320a-2 to find the EPSDT provision of the Medicaid Act created an enforceable right).

Finally, in a somewhat desperate effort to support this untenable argument, defendants assert that "State officials cannot violate the Medicaid statutes … because they impose no affirmative obligation on States that accept federal reimbursement money to preserve their Medicaid programs in any particular manner." Part. MTD 2 at 28. Rather the defendants assert that they can ignore at will the requirements that Congress has imposed and to which they have explicitly agreed in exchange for billions of dollars in federal reimbursement because it is up to the Secretary to decide whether to cut off the flow of federal dollars. *Id.* This is nothing more than a restatement of the earlier argument that the Medicaid Act imposes obligations only on the Secretary based on her ability to cut off federal funds. See, *supra* at 24-27. As the Supreme Court appropriately noted in *Wilder*:

> Any argument that the requirements of findings and assurances {by the State] are procedural requirements only and do not require the State to adopt rates that are actually reasonable and adequate is nothing more than an argument that the State's findings and assurances need not be correct. We reject that argument because it would render the statutory requirements of findings and assurances, and thus the entire reimbursement provision, essentially meaningless.

496 U.S. at 513-14.[45]

---

[45]  Defendants' final assertion, that the pending cases challenging the constitutionality of the PPACA may result in the invalidation of all of the Medicaid statutes upon which plaintiffs rely, is simply wrong. Even if the Supreme Court were to invalidate the entire PPACA, something that no operative decision has done, that would not affect any of the statutory provisions upon which plaintiffs' base their Medicaid claims. All of those provisions pre-date the PPACA, were not altered by the PPACA, and, were the PPACA invalidated in its entirety, would remain operative. The one provision that could be affected, the definition of "medical assistance," is not a provision upon which plaintiffs assert a claim for relief. Indeed the defendants' repeated references to the pending litigation regarding the PPACA are simply a distraction.

Defendants' contention that the Medicaid Act does not create rights, thereby insulating their illegal conduct from any judicial review, is not only novel, but contrary to established Supreme Court and Circuit Court precedent[46] and the expressed intent of Congress. It must be rejected.

### 3. The Nursing Home Reform Amendments to the Medicaid Act Are Privately Enforceable.

#### a. The Language Chosen By Congress Demonstrates that the NHRA Is Privately Enforceable.

In enacting the NHRA, Congress sought to stem the inappropriate placement of individuals with developmental disabilities into nursing facilities that are unable to provide them with needed treatment and insisted that States ensure that those admitted to such facilities receive active treatment. It clearly used "rights- and duty-creating" language in doing so. *Gonzaga*, 536 U.S. at 284 n.3.

With respect to the preadmission screening and resident review requirements of the NHRA, Congress explicitly identifies the intended beneficiaries of this provision as "mentally ill and mentally retarded individuals" in nursing facilities. *See* 42 U.S.C. § 1396r(e)(7)(A)(i). The section imposes a clear duty on "the State," using the mandatory terms "must have" and "responsibility to have . . . or to perform" to describe the nature of the obligation imposed.[47] *Id.*

---

[46]  *Rolland*, 318 F.3d 42 (§ 1396r(e)(7)); *Rabin v. Wilson-Coker*, 362 F.3d 190 (2d Cir. 2004) (§ 1396r-6); *Grammar v. John J. Kane Regional Ctrs.-Glen Hazel*, 570 F.3d 520 (3d Cir. 2009), *cert. denied*, 130 S. Ct. 1524 (2010) (§§ 1396r(b) & (c)); *Doe v. Kidd*, 501 F.3d 348 (4th Cir. 2007) (§ 1396a(a)(8)); *Westside Mothers v. Olszewski*, 454 F.3d 532 (6th Cir. 2006) (§ 1396a(a)(43)); *Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 457-58 (7th Cir. 2007) (§ 1396a(a)(8)); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 443 F.3d 1015 (8th Cir. 2006), *vacated in part, on other grounds sub nom, Selig v. Pediatric Specialty Care, Inc.*, 551 U.S. 1142 (2007) (§§ 1396a(a)(30)(A) & 1396d(a)(13)); *Watson v. Weeks*, 436 F.3d 1152 (9th Cir. 2006) (§ 1396a(a)(10)); *Ball*, 492 F.3d 1094 (§§ 1396n(c)(2)(C) & (d)(2)(C)); *Okla. Chapter of Am. Academy of Pediatrics v. Fogarty*, 472 F.3d 1208, 1212 (10th Cir. 2007) (assuming that § 1983 provides cause of action to privately enforce §§ 1396a(a)(8), 1396a(a)(10)(A), 1396d(a)(4)(B), and 1396d(r)).

[47]  Subsection (e)(7)(A)(i) also cross references to subsection (b)(3)(F), which specifically provides that a nursing facility cannot admit an individual with mental retardation "unless the *State mental retardation or developmental disability authority has determined* . . . that, because of the physical and mental condition of the individual, the individual requires the level of services provided by a nursing facility, and, if the individual requires such level of

---

This subsection creates a right of every person with developmental disabilities to a PASARR assessment prior to nursing facility admission.  Rather than the aggregate focus of the FERPA provision at issue in *Gonzaga*, these provisions have an unmistakable focus on the individual and use mandatory, not precatory, language to describe the State's obligations.[48]

With respect to assessment of the resident's need for specialized services, § 1396r(e)(7)(B) of the NHRA creates a similar, individually-focused and mandatory obligation.[49] The unmistakably individual focus of this provision is evident from the phrase, "in the case of each resident of a nursing facility who is mentally retarded."  It continues to focus on the individual throughout, referring to "the *resident's* physical and mental condition," "whether or not *the resident* requires specialized services," "with respect to a . . . mentally retarded *resident*," and "significant change in the *resident's* physical or mental condition."  The mandatory nature of the obligation imposed upon the State is equally clear and unambiguous: "the State mental retardation . . . authority *must* review and determine . . . ," and "[a] review and determination . . . *must be conducted* promptly."[50]

---

services, whether the individual requires specialized services . . . ."  42 U.S.C. § 1396r(b)(3)(F)(ii).  The cross reference to subsection (b)(3)(F) makes clear that it is the State's responsibility to ensure that individuals with mental retardation are properly screened prior to admission.

[48]   The defendants' assertion that the placement of these obligations in a provision specifying the required components of a state plan renders them unenforceable under § 1983 was rejected first by the Supreme Court in *Wilder*, 496 U.S. at 513-14, and then by Congress when it enacted 42 U.S.C. § 1320a-2 ("[i]n an action brought to enforce a provision of [the Social Security Act], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan").

[49]   Subsection (e)(7)(B), entitled "State requirement for resident review," mandates:

(ii) For mentally retarded residents

… in the case of each resident of a nursing facility who is mentally retarded, the State mental retardation or developmental disability authority must review and determine (using any criteria developed under subsection (f)(8) of this section)--

(I) whether or not the resident, because of the resident's physical and mental condition, requires the level of services provided by a nursing facility or …an intermediate care facility . . . ; and

(II) whether or not the resident requires specialized services. . . .

[50]   That the obligation placed upon the State to conduct such reviews is obligatory is further reinforced by subdivision (iv) which prohibits the "State mental retardation authority" or the "State" from "delegate[ing] (by subcontract or otherwise) their *responsibilities* under this subparagraph…." (emphasis added).

Contrary to defendants' conclusory assertions that the focus of these provisions is on the "nursing homes—not the nursing home residents," Part. MTD 2 at 32-33, a plain reading of the text of the statute reveals that the residents are indeed both the focus and intended beneficiaries of the preadmission screening, resident review and specialized services provisions of § 1396r(e). Indeed, the Second Circuit considered this very issue, and held that "[i]t is clear from the plain language of this provision that it was not 'intend[ed] to benefit the putative plaintiff[s]'—here the health care providers. Rather, the provision is obviously intended to benefit Medicaid beneficiaries." *Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136, 143-44 (2d Cir. 2001) (internal citation omitted).

Finally, with respect to the mandatory obligation to provide specialized services, and the corollary right of a nursing facility resident with developmental disabilities to receive specialized services, the NHRA clearly focuses on the individual residents who are the intended beneficiaries of these mandatory services. Section 1396r(e)(7)(C) details the steps that the State must take in response to the preadmission screening and resident review. Like the two sections discussed above, it begins with a mandatory command, "the State *must* meet the following *requirements*." *Id.* It then requires that "in the case of a *resident* . . . who is determined . . . to require specialized services . . . the State *must* . . . inform the *resident* [of alternatives] . . . , offer the *resident* [choices] . . . , and "regardless of the *resident's* choice [of setting], *provide for* . . . such specialized services." 42 U.S.C. § 1396r(e)(7)(C)(i) (emphasis added); *see also* § 1396r(e)(7)(C)(ii). The repeated references to "the resident" make clear the individualized focus of the provision. The repeated use of the word "must" to describe the State's obligations to inform the resident of his or her alternatives and to provide specialized services again utilizes the

mandatory textual language that establishes an enforceable right under the *Wilder / Blessing / Gonzaga* test.

> b.    The Secretary's Regulations Further Demonstrate that the NHRA Is Privately Enforceable.

The regulations further confirm that the statute creates enforceable rights in nursing facility residents with developmental disabilities to preadmission screening, resident review, and specialized services.   While it is true that regulations, standing alone, cannot create rights enforceable under § 1983, *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001), it is equally true that where Congress has explicitly delegated substantive authority to the Secretary of an administrative agency to promulgate regulations in a particular area, those regulations are entitled to "legislative effect."   *Schweiker v. Gray Panthers*, 453 U.S. 34, 44 (1981); *Wis. Dep't of Health & Human Servs. v. Blumer*, 534 U.S. 473, 497 n.13 (2002) ("[w]e have long noted Congress' delegation of extremely broad regulatory authority to the Secretary in the Medicaid area"); *Sandoval*, 532 U.S. at 284 (listing cases in which the Court has enforced validly promulgated regulations interpreting statutory provisions).   Congress, at numerous points in section 1396r, explicitly delegated substantive authority to the Secretary regarding preadmission screening, resident review, and specialized services.   Section 1396r(e)(7)(A)(i) provides that preadmission screening must be conducted "using any criteria developed under subsection (f)(8)."[51]   Section 1396r(e)(7)(B) similarly requires that resident reviews conform to "criteria developed under subsection (f)(8)."   Section 1396r(e)(7)(G)(iii) explicitly provides that "[t]he term 'specialized services' has the meaning given such term by the Secretary."

---

[51]   Section 1396r(f)(8) gives the Secretary authority to establish minimum criteria for States to use in making determinations under subsections (b)(3)(F) and (e)(7)(B) and to monitor state compliance with respect to State obligations under (e)(7)(C)(ii).   The citations to subsections (b)(3)(F) and (f)(8) in plaintiffs' claim for relief are included to further clarify and delineate the scope of the State's responsibilities under subsection (e)(7).

In reliance upon the specific rulemaking authority conferred by this statute, the Secretary has issued regulations authoritatively construing the provisions of the NHRA at issue here. As instructed by Congress, the PASARR regulations define "specialized services" as the equivalent of active treatment in ICF/MRs. 42 C.F.R. § 483.120(a). They establish criteria for preadmission screening and specialized services and require States to comply with them, in fulfillment of the Congressional instruction at §§ 1396r(f)(1) and (8) for the Secretary to establish and enforce criteria that ensure that the care in nursing facilities is adequate to protect the health, safety and welfare of residents. 42 C.F.R. §§ 483.104 - 483.136. Like the regulations favorably referenced by the Supreme Court in *Sandoval*, 532 U.S. at 284, the Secretary's mandate to the State to provide nursing facility residents with developmental disabilities with preadmission screening, resident review, and specialized services both construes Congress's intent and enforces Congress's purpose to create enforceable rights.

Like the statute, the PASARR regulations use mandatory language to require the provision of screening and resident review, and to guarantee specialized services to all nursing facility residents with developmental disabilities who have been assessed to need them.[52] With respect to preadmission screening, they provide that the State mental retardation authority "must determine" whether the individual requires care in a nursing facility and, if so, if he or she requires specialized services. 42 C.F.R. § 483.112(a). The State must ensure that the individual receives written notice of the determination.[53] *Id.* § 483.128(a). The State must use evaluation criteria prescribed by the Secretary. *Id.* § 483.128(e). The State "must provide for or arrange for the provision of specialized services . . . to all NF residents with . . . MR" who need them. *Id.*

---

[52] As the *Sandoval* Court recognized, "When a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable." 532 U.S. at 291.

[53] *See also* § 483.106(a) ("[t]he State PASARR program must require (1) preadmission screening of all individuals with . . . mental retardation who apply as new admissions to Medicaid NFs").

§ 483.120(b).  The State must give assurances that specialized services are, in fact, provided.  *Id.* § 483.130(n).  This regulatory implementation of Congressional intent is entitled to significant weight, as the Supreme Court emphasized: "[s]uch regulations, if valid and reasonable, authoritatively construe the statute itself, and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute.  *Sandoval*, 532 U.S. at 284 (internal citations omitted).

c.    Applicable Case Law Further Confirms That The NHRA Is Privately Enforceable.

In light of the strong textual and other indicia of congressional intent to create enforceable rights regarding the preadmission screening and resident review provisions of the NHRA, it is hardly surprising that the two Circuit Courts of Appeal that have considered the question have found that the NHRA does contain the requisite mandatory, rights-creating language needed for private enforcement pursuant to § 1983.  In a case raising claims virtually identical to those raised here, the First Circuit held, post-*Gonzaga,* that the provisions of the NHRA provide rights enforceable by § 1983.  *Rolland*, 318 F.3d at 51-56.  The First Circuit analyzed the text of the statutory provisions in light of the overall framework of the NHRA, its legislative history, and the Secretary's interpretation, as evidenced by the PASARR regulations. *Id.* at 51-52.  The Court then turned to the *Wilder / Blessing / Gonzaga* test.  Noting that the "[t]he NHRA speaks largely in terms of the persons to be benefited, nursing home residents," the Court easily found that the first prong of the three part test was met.  *Id*. at 53.

Turning to the second prong, whether the right to specialized services is too vague and amorphous to be judicially enforceable, the Court concluded that that the statutory provision, in conjunction with the Secretary's regulations, provided "contextual guidance . . . sufficient to allow residents to understand their rights to services, States to understand their obligations, and

35

courts to review the State's conduct in fulfilling those obligations."[54]  *Id.* at 54.  The *Rolland* Court also had no difficulty finding that the rights asserted under §1396r(e)(7) "unambiguously bind states," noting the frequent and repeated use of the word "must" to denote the State's obligations.  *Id.* at 55.

More recently, the Third Circuit also has considered whether the NHRA creates rights enforceable by § 1983.  In *Grammer*, 570 F.3d 520, the Court held that the NHRA creates rights enforceable under § 1983 against a state-operated nursing facility.  Contrary to defendants' suggestion that nursing facilities, not nursing facility residents, are the focus of the NHRA, the Third Circuit found that "[t]here is no question that the statutory provisions under which Grammer raises her claims meet the first *Blessing* factor.  As both a Medicaid recipient and a nursing home resident, Grammer's mother was an intended beneficiary of 42 U.S.C. § 1396r." *Id*. at 527.  Like the First Circuit, the Third Circuit, in reliance upon the repeated use of such phrases as "must provide," "must maintain" and "must conduct," easily concluded that the rights asserted were neither vague and amorphous nor precatory, thereby satisfying the second and third of the *Blessing* factors.  *Id.* at 528.  The *Grammer* Court also engaged in an extensive analysis of the impact of *Gonzaga* on its cause of action analysis.  Because "[t]he FNHRA are replete with rights-creating language" and "use the word 'residents' throughout . . . in such a way as to stress that these 'residents' have explicitly identified rights," the Court easily concluded that "viewing the terms of the FNHRA . . . through the lens of *Gonzaga Univ.*, we hold that Congress did use rights-creating language sufficient to unambiguously confer individually enforceable rights."  *Id.* at 529, 531.

---

[54]  The Court relied in part on the Supreme Court's decision in *Lividas v. Bradshaw*, 512 U.S. 107, 134 (1994), holding that even if the right asserted is "not provided in so many words in the NLRA, [it is] immanent in its structure."  Just as the *Lividas* Court found the right at issue to be inherent in the statutory scheme, so too the *Rolland* Court found that "petitioner's rights were sufficiently manifest in the statute's structure to avoid being vague and amorphous."  318 F.3d at 54.

While the Fifth Circuit has not directly addressed the issue of whether 42 U.S.C. § 1983 provides a cause of action for claims pursuant to the NHRA, it did "assume, without deciding" that the NHRA is privately enforceable. *Grant ex rel Family Eldercare v. Gilbert*, 324 F.3d 383, 387 n.5 (5th Cir. 2003) (citing with approval *Rolland*, 318 F.3d at 51-56, and *Martin v. Voinovich*, 840 F. Supp. 1175, 1197-1201 (S.D. Ohio 1993)). In addition to *Martin*, which held that § 1983 provides a cause of action for nursing facility residents to enforce the PASARR provisions of § 1396r against the state officials responsible for compliance, several other district courts have also reached the same conclusion. *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 294-304 (S.D.N.Y. 2008); *Tinder v. Lewis Cnty. Nursing Home Dist.*, 207 F. Supp. 2d 951, 954-55 (E.D. Mo. 2001); *Soto v. Lene*, No. 11-CV-0089 SLB LB, 2011 WL 147679, at *2 (E.D.N.Y. Jan. 18, 2011) ("[T]he NHRA creates rights that are presumptively enforceable through § 1983.").[55]

Based upon a careful analysis of the specific provisions of the NHRA at issue in this case, informed by the legislative history and structure of the Act, reinforced by the Secretary's authoritative regulatory interpretation, and supported by a consistent and convincing line of judicial authority, plaintiffs have asserted rights under the PASARR provisions of the NHRA that are privately enforceable against defendants pursuant to § 1983.

---

[55]  Defendants cite to four district court decisions that found no private right of action for damages under the NHRA to enforce the nursing facility "quality of care" requirements of the Act and regulations, not the preadmission screening, resident review and specialized services requirements of the NHRA. Part. MTD 2 at 36 n.40. All of these cases involved damage claims against private nursing facilities which were not state actors, and, therefore, not subject to suit under 42 U.S.C. § 1983. They fail to cite, much less discuss, the numerous cases referenced above which have found the provisions of the NHRA enforceable pursuant to § 1983. The one case they do cite, *Grammer*, is cited not for its holding, but rather for the dissent.

### 4. The Reasonable Promptness Provision of the Medicaid Act Is Privately Enforceable.

Defendants' sole argument regarding the enforceability of the reasonable promptness provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(8), is focused not on whether the provision is privately enforceable under 42 U.S.C. § 1983, but rather whether certain waiver services are covered by it.[56]  It is not surprising that defendants do not dispute that § 1396a(a)(8) is privately enforceable, for every circuit that has considered the question has concluded that it is.[57]  There is no serious question that § 1396a(a)(8) is privately enforceable, and defendants' Part. MTD 2 does not assert otherwise.

### 5. The Comparability Provision of the Medicaid Act Is Privately Enforceable.

As with the reasonable promptness provision, defendants do not appear to challenge the private enforceability of the comparability provision, § 1396a(a)(10)(B), but rather its applicability to the facts of this case.[58]  This is understandable because the Fifth Circuit in *S.D.*, 391 F.3d at 602-07, specifically held that § 1396a(a)(10)(A) is privately enforceable, and in *Blanchard v. Forrest*, 71 F.3d 1163, 1167-69 (5th Cir. 1996), that § 1396a(a)(10)(B) is

---

[56]  Of course, the question of whether a particular waiver service is or is not being provided with reasonable promptness to eligible individuals runs to the merits of the claim, not whether the provision is privately enforceable under § 1983.  The defendants' argument regarding whether § 1396a(a)(8) provides a cause of action with respect to the delivery of community-based waiver services does not speak to whether the reasonable promptness provision is privately enforceable under § 1983, which it clearly is, but rather to whether plaintiffs have stated a claim for relief under it, which they have.  *See supra* at 12-16.

[57]  *Kidd*, 501 F.3d at 356-57; *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 183 (3d Cir. 2004) (holding that an analysis based upon *Gonzaga*, *Blessing*, and other cases "compels the conclusion that the provisions invoked by plaintiffs—42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15)—unambiguously confer rights vindicable under § 1983"); *Bryson v. Shumway*, 308 F.3d 79, 88-89 (1st Cir. 2002); *Chiles*, 136 F.3d at 714; *Haveman*, 289 F.3d. at 863; *Lewis*, 261 F.3d at 976-77.

[58]  As the *Lewis* Court explained, the cause of action issue is answered by determining whether plaintiffs *may* be entitled to relief under the relevant statutory provision.  The question of whether they *are* entitled to relief requires "a more complicated analysis of the Medicaid statutes . . . more appropriately reserved for resolution on the merits of the case.  261 F.3d at 977.

enforceable.[59]  Therefore, the comparability provision of the Medicaid Act provides plaintiffs

with rights enforceable pursuant to § 1983.

### 6.  The Freedom of Choice Provision of the Medicaid Act Is Privately Enforceable.

The defendants assert that § 1396n(c)(2)(C) is not phrased in terms of the persons

benefited and therefore creates no privately enforceable rights for individuals with

developmental disabilities who are at risk of institutionalization.  Part. MTD 2 at 38-40.

However, an examination of the actual text of the freedom of choice provision demonstrates that

it is indeed individually focused and intended to benefit individuals who are at risk of

institutionalization in a nursing facility.

The section's repeated references to "such individuals" makes clear that the obligations

imposed upon the State are phrased in terms of the persons benefited.  As the  Ninth Circuit

recently explained, in concluding that § 1396n(c)(2)(C) confers rights privately enforceable

under 1983, the language of the provision:.

> satisfies the "rights creating" standard set forth in *Gonzaga*, and thus clears the
> first hurdle of the *Blessing* framework. . . . The free choice provisions are focused
> on the rights owed to HCBS-eligible Medicaid recipients, as evinced through their
> repeated use of the word "individuals" and their specific articulations of the
> entitlements guaranteed—in this instance, the right to be informed of alternatives
> to traditional, institutional care and the right to choose from among those options.

*Ball v. Rodgers*, 492 F.3d 1094, 1109 (9th Cir. 2007).  The *Ball* Court expressly distinguished §

1396n(c)(2) from statutes at issue in cases such as *Blessing* and *Gonzaga*, noting specifically that

the freedom of choice provisions

> [s]eek to guarantee that *individual* patients are informed of noninstitutional care
> options and that *individual* patients retain the right to make a choice based on this
> information.  And unlike the plaintiffs seeking to sue under the "substantial
> compliance" provisions discussed in *Blessing* and the "policy or practice"

---

[59]  The two subsections are very similar and often treated as a unitary statutory provision for § 1983 cause of action
purposes.  If anything, subsection (B) has a more individualized focus than subdivision (A).

> provision in *Gonzaga*, the HCBS-eligible Medicaid recipients who comprise the plaintiff-class here are not simply cogs in a grander statutory scheme.  If that were the case, then Congress would have just enacted a barebones HCBS program, … and stopped there.  There would be no need for Congress also to enact provisions mandating that participating states keep *each* eligible Medicaid recipient apprised of these non-institutional care options and afford *each* the opportunity to choose how to live.

*Id.* at 1111 (emphasis in original); *see also Wood v. Tompkins*, 33 F.3d 600 (6th Cir. 1994) (§ 1396n(c)(2) privately enforceable); *Michelle P. ex rel. Deisenroth v. Holsinger*, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005) (noting "individually focused terminology"); *Cramer v. Chiles*, 33 F .Supp. 2d 1342, 1351 (S.D. Fla. 1999)(disabled Medicaid recipients are "intended beneficiaries"); *but, c.f.*, *McCarthy v. Hawkins*, Civ. No. A-03-CA-231-SS, slip op. at 13-14 (W.D. Tex 2003) (recipients are intended beneficiaries if waiver services available, but not if the waiver cap has been reached).[60]

The defendants' alternative argument -- that the structure of the provision, mandating that the Secretary not grant a waiver unless the State provides assurances that it will inform all individuals at risk of institutional care of the feasible alternatives to such a placement, renders it unenforceable -- is equally untenable.  The Supreme Court rejected this very argument that required assurances cannot form the basis of an enforceable obligation. *See Wilder*, 496 U.S. at 513-54 ("the argument …would render the statutory requirement of findings and assurances … essentially meaningless).

---

[60]   The defendants assertion that § 1396n(c)(2)(C) imposes no binding obligation on Texas because there are currently no openings for waiver services in the HCS waiver program does not speak to the enforceability of the provision itself, but rather whether plaintiffs have stated a claim thereunder.  *See* section III(A)(4), *supra* at 18-22.  In addition, there are other waivers which plaintiffs can access with without going on a waiting list, and the defendants have not apprised plaintiffs of the services available under those waivers either.  As to those waiver services, even the *McCarthy* Court would find a private right of action under § 1396n(c)(2)(C).

The argument also has also been explicitly rejected by both the Sixth and Ninth Circuits.

*Ball*, 492 F.3d at 1112; *Wood*, 33 F.3d at 608.  Relying upon 42 U.S.C. § 1320a-2 and the Fifth

Circuit's decision in *S.D.* applying that provision, the Ninth Circuit explained that

> the role § 1396n(c)(2)(C) … play[s] in delineating the mandatory contents of a state
> HCBS plan cannot detract from or override the otherwise clear "rights-creating" language
> Congress used in enacting the free choice provisions. To do so would be to ignore
> Congress's directive in the "Suter fix" statute [§ 1320a-2] that courts abjure reliance on
> that consideration.

*Ball*, 492 F.3d at 1112.  Similarly, the Sixth Circuit, in reliance on *Wilder*, stated:

> as regards § 1396n(c)(2)(A), it would make little sense for Congress to require a
> participating state to assure in its Medicaid plan that it will protect the health and welfare
> of home care recipients, without also requiring that the state actually implement the
> promised safeguards

*Wood*, 33 F.3d at 608.

Section 1396n(c)(2) imposes mandatory and enforceable obligations on the defendants

both to inform individuals with developmental disabilities who are at risk of institutionalization

in nursing facilities of their alternatives to nursing facility care and to provide them with a choice

between care in a nursing facility or in an alternative setting.  Based upon the individual focus

and mandatory nature of the obligations imposed upon the defendants by § 1396n(c)(2), as

interpreted and applied by two courts of appeals, this Court should find that the freedom of

choice provision is privately enforceable pursuant to § 1983.

> **C.    *Plaintiffs Have Standing to Assert a Claim Under the Freedom of Choice
> Provision of the Medicaid Act.***

There are three elements to standing: injury in fact; causation, and redressability.  *Friends*

*of the Earth v. Laidlaw Environmental Svcs.*, 528 U.S. 167, 180-81 (2000).  Defendants assert

that the plaintiffs lack standing solely because they have not alleged an injury-in-fact due to

defendants' failure to advise them of the feasible alternatives to institutional care as required by

42 U.S.C. § 1396n(c)(2)(C). Part. MTD 2 at 12. They make two primary arguments in support of this contention, neither of which stands up to careful scrutiny.

First, defendants contend that because plaintiffs were evaluated and determined eligible for nursing facility care, they have no claim predicated upon § 1396n(c)(2)(B).[61]

The defendants' argument fails to recognize that subsections (B) and (C) of § 1396n(c)(2) are interrelated. Subsection (B) requires the State to evaluate whether individuals who may require NF services in fact need them; subsection (C) mandates, for those individuals who are likely to require the level of care in a NF (i.e. those who pass the subsection (B) evaluation), that the State inform them of feasible alternatives to NF care under the State's home and community-based waiver programs. Because the two subsections are inextricably interrelated, the standing analysis under § 1396n properly considers both sections.[62] Defendants' attempt to analyze each subsection as a separate, rather than one indivisible, claim, and then to argue that the plaintiffs' standing requires an independent showing for both subsections, should be rejected.

Second, defendants contend that their obligation under subsection (C) to provide information about waiver services arises at the time the individual is actually being offered a

---

[61]  Plaintiffs have alleged that the defendants have failed to *properly* evaluate and assess their need for NF services, as required by the PASARR provisions of the Medicaid Act. Indeed, this is one of their central claims regarding the defendants' failure to undertake their required preadmission screening and resident review functions required by § 1396r(e)(7). Am. Compl. at ¶¶ 74-77, 146, 171, 183-84, 197-98, 216, 247, 251-52, 258. Contrary to defendants' assertion, *see* Part. MTD 2 at 12 & n.16, a proper evaluation must conform to the  pre-admission screening and resident review procedures required by §§ 1396r(b)(3)(F) and (e)(7)(A) for assessing eligibility and appropriateness for NF admission of an individual with DD. *See also* 42 C.F.R. § 483.112 (specifically providing that determination of whether a NF applicant with MI or MR requires the level of services provided by a NF is made as part of the preadmission resident review process). These requirements, and the mandated process, are not satisfied simply by completing a standardized form called the Multiple Data Set or MDS. The MDS (version 3.0) data collection process is performed by nursing facility staff. The PASARR process is undertaken by the State mental retardation authority. As both the federal statute and regulations mandate, the State mental retardation or developmental disability authority may not delegate its responsibilities for determining whether a NF applicant with DD requires the level of services provided by a NF to a nursing facility or any entity which has a direct or indirect affiliation or relationship with a NF. 42 U.S.C. § 1396r(e)(7)(B)(iv); 42 C.F.R. § 483.106(d)(2) & (e)(1)(iii). To the extent that the defendants suggest that the nursing facility MDS 3.0 data determines the eligibility of an individual with DD for NF admission, this is but another example of how the defendants have ignored their federally mandated responsibilities to plaintiffs and the class they seek to represent.

[62]  In any event, as set forth above, plaintiffs have amply alleged that defendants fail to properly evaluate the plaintiffs' eligibility and appropriateness for NF care.

waiver slot, not at the time the individual is being considered for an institutional placement. Part. MTD 2 at 13.  They then assert that those plaintiffs who have applied and been accepted into the waiver program, those who have applied but remain on the waiting list for the program, and those who have not yet applied all lack standing because the HCS "is full and there is no spot for them at this time." *Id.* at 14.    Under this contorted interpretation of § 1396n, virtually no one who is admitted to the waiver, no one who is waiting for the waiver, and no one who has just applied to the waiver can ever have standing to claim that they were not provided information and choices, as required by law.[63]

This argument both emasculates the import of the State's obligation to offer Medicaid recipients a choice of institutional or waiver programs, and ignores Texas' fundamental failing to provide Medicaid recipients with relevant information to make an informed choice.  Since none of the individual plaintiffs were advised by the defendants of the feasible alternatives to institutional care at the time they applied for NF admission, all have standing to assert a violation of § 1396n..  Am.  Compl.  ¶¶ 146, 158, 171, 184, 186, 198, 199, 225, 226.    Had Congress intended to make the offer of waiver services – as opposed to the decision whether or not to accept institutionalization – the trigger for the requirement to provide individuals with information about the choice between institutional care and the waiver program, it would not have described those persons entitled to such information as individuals who "may require"services in a NF, ICF/MR or hospital.  42 U.S.C.  § 1396n(c)(2)(B)(ii).  The plain language of the statute, its obvious purpose of avoiding unnecessary institutional placements, and

---

[63]  Defendants assert that because Mr. Holmes and Ms. Padron have been offered HCS waiver slots, as a matter of law, they have suffered no injury in fact.  However, as the complaint makes clear, Mr. Holmes spent two years unnecessarily institutionalized in nursing facilities because he was not advised of feasible alternatives to nursing facility admission that were available to him under the waiver as required by § 1396n(c)(2)(C).  Am. Compl. ¶¶ 200-212.  Because of the nature of his medical condition, he also remains at risk of future NF admissions.  Am. Compl. at ¶ 214. Ms. Padron has been in a nursing facility for ten years and continues to remain there.  *Id* at ¶¶ 165, 171-71. Years of needless and inappropriate institutionalization clearly constitutes a sufficient "injury in fact" for standing purposes.

commonsense all confirm that it is the likelihood of admission to a NF or other institution that triggers the obligation to inform regarding potential community alternatives.

The only authority that the defendants cite for their convoluted interpretation of § 1396n(c)(2)(C) is the CMS Technical Guide at p. 106.[64]  But the CMS Technical Guide simply requires that "individuals [be] provided information about the services that are available under the waiver and that they have the choice of institutional or home and community-based services *prior to the enrollment into the waiver program*." CMS Technical Manual at 107.  Not only has the Department of Health and Human Services (HHS) made clear in its Technical Guide that information must be provided prior to waiver enrollment, it has also made clear that the time when the information must be provided is when a Medicaid beneficiary is making the choice between an institutional or community setting, including the choice to wait for a community setting to become available.  In the Commentary to the regulations implementing § 1396n(c)(2), HHS explained that:

> *Beneficiaries determined likely to require an SNF or ICF level of care* must be informed of the feasible alternatives and given a choice as to which type of services to receive . . . . As with other services under Medicaid, a beneficiary who is not given the choice of home or community-based services *as an alternative to SNF or ICF services* may request a fair hearing under 42 C.F.R. Part 431, Subpart E….

46 Fed. Reg. 48,532, 48,535-36 (Oct. 1, 1981)(emphasis added).  Only if the information is required to be provided to applicants for NF or ICF care prior to their admission to the institution does the provision of a right to a hearing to challenge the failure to provide the information "as an alternative to SNF or ICF services" make sense.

The Guide also provides that feasible alternatives "may only be determined after the assessment of an individual's needs and an evaluation of level of care." CMS Technical Guide,

---

[64]  A copy of the Manual is available online at
http://www.dads.state.tx.us/providers/waiver_instructions/cms_waiver_instructions.pdf.

p. 106.  For applicants for NF services with DD, this occurs as part of preadmission screening and review just prior to admission to the NF, which is also when the information regarding alternatives to NF care should be provided.  *See* Elliott Schwalb, Reconsidering Makin v. Hawaii: The Right of Medicaid Beneficiaries to Home-Based Services As an Alternative to Institutionalization, 26 Ga. St. U. L. Rev. 803, 831 (2010) (the emphasis on "individual determinations, without reference to 'quotas', 'caps', or 'resource limitations' in CMS' interpretation of the freedom of choice provision suggests that these are not proper justifications for denying individual choice").

Because all of the plaintiffs were entitled to receive such information prior to their NF admission, but did not, they all have satisfied the "injury in fact" prong of the standing test.  As the Supreme Court held in *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998), "a plaintiff suffers an "injury in fact" when the plaintiff fails to obtain information which must be … disclosed pursuant to a statute"; *see also Grant*, 324 F.3d at 387.   The plaintiffs allegations that Texas state officials fail to provide them with information about waiver and other services that might enable them to avoid institutional placement or reduce the time spent in a nursing facility clearly satisfies the "injury in fact" requirement.   Defendants' motion to dismiss the § 1396n(c)(2) claim based upon standing should be denied.

### D.  *The Arc of Texas and the Coalition of Texans with Disabilities Both Have Standing to Assert the Claims Raised in this Case*

The Arc of Texas is a nonprofit, volunteer organization in the State of Texas that for over 60 years has committed itself to expanding opportunities for people with intellectual and developmental disabilities and to include persons with DD in our communities.  Am. Compl. ¶¶ 16-18.  The Arc of Texas expends agency resources to (a) support individuals, families and other disability organizations in advancing public policies, (b) provide training programs, and (c) build

a statewide network of advocates so that persons with disabilities are able to more fully participate in their community. *Id; See* Affidavit of Mike Bright ("Bright Aff."*)*, at ¶ 2, 3 (copy appended as Ex. 1).[65]

Similarly for more than 33 years the Coalition of Texans with Disabilities (CTD) has played an important role in ensuring that persons with DD are fully included in all aspects of community living. Am. Compl. ¶¶ 19-21. CTD has expended it resources so that persons with DD are able to live, work, learn, and more fully participate in all aspects of community living. *Id.* at ¶ 20. CTD has specifically worked to get the State of Texas to restructure its PASARR program so that persons with DD who are capable of living in the community with appropriate supports are able to do so, rather than being confined to NFs and other institutional settings. *See* Affidavit of Dennis Borel ("Borel Aff."*)* at ¶¶ 2,3 (copy appended as Ex. 2). CTD will continue to devote its resources to ensure that eligible individuals with DD who either apply for or live in Texas nursing facilities receive the services, supports and alternative placement options that they may be entitled to through the Preadmission Screening and Resident Review (PASRR) program. *See* Borel Aff. at ¶ 3.

Both the Arc of Texas and CTD continue to advocate for the inclusion of people with DD in all aspects of society, including persons who are members and supporters of each organization. On behalf of its members, The Arc of Texas, along with CTD, has worked to address the problems associated with the lack of community-based services for persons with DD in institutional settings, including nursing facilities. *See* Bright Aff. at ¶¶ 2,3 and Borel Aff. at ¶¶

---

[65] "For purposes of ruling on a motion to dismiss for lack of standing, the Court must both accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party, but may also consider … affidavits submitted by the parties and further particularized allegations of fact deemed supportive of the plaintiff's standing, in order to illuminate the allegations in the complaint and aid the Court in resolving the standing question." *Eliserio v. Floydada Housing Authority, et al.,* 455 F.Supp.2d 648, 658 n.8 (S.D. Tex. 2006); *see also, Noah v. Government Employees Insurance Company,* 2001 WL 36199119 * 3 (W.D. Tex. 2001).

2,3.  Both the Arc of Texas and CTD have worked with the Texas State Legislature and the appropriate state agencies in efforts to address the problems associated with the lack of funding for more community-based waiver programs and services so that individuals with DD can avoid institutionalization in nursing facilities and other settings.  *See* Bright Aff. at ¶ 3 and  Borel Aff. at ¶ 3,4.

It was only after a concerted effort on the part of individual and organizational plaintiffs, including direct discussions with the defendants, failed to secure reasonable access to appropriate services and community-based waiver services, that the board of directors of  both the Arc of Texas[66] and CTD decided to authorize their Executive Directors to file this suit, in an effort to secure reasonable access to appropriate nursing facility services and community-based supports for eligible nursing facility applicants and residents with DD.  Bright Aff. at ¶ 3 and Borel Aff. at ¶ 3.

### 1.    The Arc of Texas and CTD Have Standing to Sue in their Own Right.

In order to establish Article III standing the plaintiff must have (1) suffered an "injury in fact," (2) there must be a causal connection between the injury and the conduct complained of and (3) the injury must likely be redressable by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (organizational plaintiff suing on its own behalf must meet same standing requirement as an individual).

Both the Arc of Texas and CTD clearly satisfy the first prong of the *Lujan* test since they have suffered an "injury in fact."  The defendants' discriminatory and illegal actions in violation

---

[66] The Arc of Texas has participated in much of the groundbreaking litigation in Texas involving the rights of individuals with mental retardation and related conditions.  For over twenty years, the Arc of Texas participated in the *Lelsz, et al. v. Kavanagh, et al.* litigation, and for much of that time it was a party to the litigation with full Article III standing.  *See Association for Retarded Citizens of Texas v. Kavanagh, et al.*, 483 U.S. 1057 (1987) and *McCarthy v. Hawkins*, 381 F.3d 407 (5th Cir. 2004).

of federal law have resulted in, among other things, (a) the denial of appropriate, integrated community services and supports for individuals with DD in nursing facilities, including the failure to reasonably modify rules and requirements regarding eligibility for and administration of Texas's community-based services, supports and programs and (b) the failure to conduct proper PASARR screens and assessments so that the needs of persons with DD could be appropriately met in a less restrictive setting than a nursing facility. *See* Am. Compl., *passim*. As a result, both organizational plaintiffs have expended organizational resources in an effort to remedy the deficiencies in the defendants' PASARR process and the concomitant failure to provide individuals with DD in nursing facilities access to needed community-based services. *See* Bright Aff. at ¶¶2, 3 and Borel Aff. at ¶¶ 2, 3.  It is well established that the expenditure of organizational resources constitutes an injury-in-fact.  *Havens Realty,* 455 U.S. at 379; *Cleburne Living Center v. City of Cleburne, Texas*, 726 F.2d 191, 203 (5th Cir. 1984), *aff'd in part, vacated in part on other grounds* 473 U.S. 432 (1985).

The injury-in-fact must also be causally related to defendants' allegedly illegal conduct. Here that requirement is easily met for, as the affidavits of Bright and Borel demonstrate, their organizations' resources have been expended in efforts to remedy the defendants' PASARR deficiencies, inappropriate NF placements, and inadequate community-based resources.  As the *Cleburne* Court made clear, if the organization's resources are expended in "combating the the [defendants'] discrimination," the causal connection is met.  *Cleburne,* 726 F.2d at 203; *see also Assoc. of Cmty. Orgs. For Reform Now v Fowler*, 178 F.3d 350, 357 (5th Cir. 1999); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 29 (D.C. Cir. 1990).

The third part of the standing test, redressability, is satisfied since correcting the violations of federal law, as sought in this litigation, would advance the organizations' goals of

securing compliance with the PASARR requirements of the NHRA and the Medicaid Act, and obtaining community-based services and supports for NF residents with DD.

The Arc of Texas and CTD have amply demonstrated "such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction." *Havens*, 455 U.S. at 378-79.

> **2.      Both The Arc of Texas and CTD Have Standing As Representatives of Their Members.**

An organization has standing to sue in a representational capacity when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343-44 (1977).

Both the Arc of Texas and CTD have alleged that they have members who have standing to sue in their own right because they are individuals with DD who reside, or are at risk of residing, in NFs; do not have access to needed community-based services and supports; and are not provided with specialized services in the NF necessary for them to become more independent and self sufficient.  Bright Aff. at ¶¶ 2 & 3; Borel Aff. at ¶ 2, 4; Am. Compl. ¶ 17. The first prong of the *Hunt* test is met.

Second, the interests which the Arc of Texas and CTD seek to protect and advance in this litigation are relevant to their respective missions of advocating for services and supports that enable people with DD to live safely and productively in integrated community settings, as opposed to being isolated in an institution. Bright Aff. at ¶ 3; Borel Aff. at ¶ 3.

Finally, the Arc of Texas and CTD's claims for declaratory and injunctive relief do not require individual members to participate in the lawsuit.  As the *Hunt* Court explained, "[i]f in a

proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."   432 U.S. at 343.

Having satisfied the criteria established by the Supreme Court for representational standing, both the Arc of Texas and CTD are appropriate parties to pursue all of the claims raised in this action.

### E.    The Governor Is a Proper Party In this Case

Defendants seek to dismiss Rick Perry, the Governor of the State of Texas, as a party in this litigation.  They argue that dismissal is appropriate because: (1) plaintiffs lack standing to assert Medicaid claims against the Governor; (2) the Governor is immune from suit under the Eleventh Amendment to the United States Constitution; and (3) plaintiffs have failed to state a claim against the Governor under the Medicaid Act.  Because plaintiffs have standing and have stated claims under the ADA, § 504 of the Rehabilitation Act, as well as under the Medicaid Act, and because the Governor lacks sovereign immunity with respect to these federal claims, he is a proper party in this case.

### 1.    Plaintiffs Have Standing to Assert Their Claims Against the Governor.

Defendants contend that plaintiffs do not have standing because the Governor has no direct control over the implementation of Medicaid program and services, and lacks the power to redress plaintiffs' asserted injuries.  Part. MTD 2 at 16-18.  However, the Governor is a key player both with respect to control over the Executive Commission of Health and Human Services ("HHSC") and the Department of Aging and Disability Services ("DADS"), the two entities that defendants concede are appropriate parties in this case.

The Governor is the chief executive officer of the State of Texas.  Relevant to the issues in this case, he appoints the Executive Commissioner of HHSC.    Tex. Govt. Code Ann. § 531.005.  The Executive Commissioner, subject to the approval of the Governor, appoints the Commissioner of DADS, who serves at the pleasure of the Executive Commissioner.  Tex. Govt. Code Ann. § 531.0056.  Furthermore, the Executive Commissioner serves for only a two year term, providing the Governor with the ability to replace him should the Governor disagree with any actions he has taken or failed to take, any policies he has implemented or failed to implement, or personnel he has appointed.  Tex. Govt. Code Ann. § 531.007.  This biennial appointment authority provides the Governor with substantial control over the operation of HHSC and DADS, as well as the ultimate responsibility for ensuring that these agencies comply with federal law.

In addition to being the chief executive officer of the State, the Governor is the chief budget officer.  Tex. Govt. Code Ann. § 401.041.  In this capacity, he convenes and presides over budget hearings and compiles the biennial appropriations budget.  Tex. Govt. Code Ann. §§ 401.043, 401.0045.  He has the duty to ensure that his budget requests are adequate to ensure compliance with federal law and the protection of the rights of Texas citizens under those laws. He also has a line item veto over any appropriations bills.  Tex. Const. Art. IV, § 14.  Both through the budget which he submits to the legislature and his line item veto, the Governor wields substantial power over the budgets of both HHSC and DADS, a power which can be used to facilitate or thwart the provision of compliance with the ADA, § 504, and the Medicaid Act, including the provision of the very community services and supports that are necessary to fulfill Texas's obligations under these federal statutes.  For defendants to assert that the Governor has

no responsibility or ability to provide redress for the injuries that plaintiffs have suffered ignores the broad scope of influence and authority that the Governor possesses.

Defendants' reliance on the Fifth Circuit's *en banc* decision in *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) is misplaced. *Okpalobi* challenged the legality of a law enacted by the Louisiana legislature over which the Governor and Attorney General had no enforcement role or responsibilities. The act created a species of tort liability which patients could assert against providers. Because the two state officials sued did not have "any duty or ability to do anything . . . to redress the injuries alleged," the sharply divided court found that plaintiffs lacked standing. *Id*. at 405, 427. However, contrary to the situation in *Okpalobi*, the injuries alleged here do not flow from the acts of purely private litigants, but rather from the acts of state officials—officials whom the Governor has appointed (or whose appointment he has approved), whom he can replace, and who implement budgets that the Governor has submitted to the legislature and signed. The relief that plaintiffs seek will likely necessitate revisions to the budgets of both HHSC and DADS, revisions that the Governor can facilitate or thwart through his line item veto.

The Governor's involvement and control over HHSC and DADS, and his responsibility to ensure that these agencies properly fulfill their duties under the ADA, § 504, and the Medicaid Act, are more than sufficient to establish that he is an appropriate party to this action. *See K.P. v. LeBlanc*, 627 F.3d 115, 123-24 (5th Cir. 2010) (standing established where defendant "has definite responsibilities relating to" the plaintiffs' claims); *Rolland*, 52 F. Supp. 2d at 243 (finding that the Governor's role in the budget process and appointment of agency heads was sufficient to establish standing in case raising claims virtually identical to those raised here).

2.     **The Governor Is Not Immune from Suit Under the Eleventh Amendment for Violations of Federal Law.**

Defendants claim that this class action law suit against the Governor for violations of the Medicaid Act is barred by the State's Eleventh Amendment immunity.  U.S. Const. amend. XI. According to defendants, because the Governor has no connection with or specific responsibility to enforce the Medicaid statute, sovereign immunity bars plaintiffs from holding the Governor liable for Medicaid Act violations.[67]  Part. MTD 2 at 20-21.  In support of this claim, defendants rely entirely on the several decisions from other circuits which dismissed the Governor or state officers from a case because they had no connection with or control over the issues which were the subject of the case.  *Id.*   However, in the one Fifth Circuit case defendants cite on the Eleventh Amendment issue, *Okpalobi*, the Court was evenly split, rendering that aspect of the decision "not controlling authority for future Eleventh Amendment questions in this Circuit." 244 F.3d at 436 n.6 (Benavides, J, concurring in part and dissenting in part).

In a more recent opinion, *K.P.*, 627 F.3d at 124, the Fifth Circuit again addressed the Eleventh Amendment issue over which the *Okpalobi* Court was unable to garner a majority.  The *K.P.* Court first noted that "[t]he fact that the state officer, by virtue of his office, has '*some connection*' with the enforcement of the act is the important and material fact."  *Id.* at 124 (emphasis added) (quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908)).  It then rejected the defendants' assertion, based on *Okpalobi*, that there needs to be a "'special' relationship – not just 'some connection'" between the defendants and plaintiffs' injury under *Ex Parte Young*. Concluding that the defendants in *K.P.* had "some enforcement authority," the Court found that

---

[67]  As discussed more fully below, the Governor has no immunity from suit for claims brought under the ADA or § 504.  Thus, defendants' sovereign immunity argument could not conceivably result in dismissing the Governor as a party.  Moreover, the argument is little more than the standing argument discussed *supra* recast as an immunity defense.

they had "the requisite connection with [the statute] to fall within the *Ex Parte Young* exception." 627 F.3d at 125.

Here, the Governor clearly has more than just "some connection" with the implementation and enforcement of the Medicaid statute and a very direct connection with the enforcement of the ADA and § 504, pursuant to which the State of Texas receives considerable federal funding. As described above, Governor Perry is responsible for directing, supervising, and controlling the executive departments of state government, for submitting a Medicaid State Plan and developing *Olmstead* plans, and for requesting funds from the legislature for executive agencies so that Medicaid and other state programs can be implemented and services provided in a manner that is consistent with federal law.[68] Am. Compl. ¶¶ 22 & 136; Tex. Govt. Code Ann. §§ 401.0445 & 531.0056. In fact, the Governor has issued several executive orders specifically designed to promote community integration of persons with disabilities and to enforce the ADA's integration mandate. *See* Tex. Gov. Exec. Order No. RP 13 (Apr. 18, 2002), 27 Tex. Reg. 3647; Tex. Gov. Exec. Order No. GWB 99-2 (Sept. 28, 1999), 25 Tex. Reg. 1820.

Just as in *K.P.*, the Governor has "the requisite connection [with the Medicaid program, and the implementation of the ADA and § 504] to fall within the *Ex Parte Young* exception" to the Eleventh Amendment. *See K.P.*, 627 F.3d at 125.

---

[68]  Indeed, this statutory and legislative authority enables the Governor – along with the Legislative Budget Board – to direct the transfer of Medicaid funds when program appropriations are insufficient to meet the expenditure requirements mandated by either state or federal law. *See Cmty. Health Choice, Inc., v. Hawkins,* 328 S.W.3d 10, 15 (Tex. App.—Austin 2010, no pet.) (funds allocated by the legislature to HHSC for Medicaid are a non-specific appropriation; as a result, when Medicaid appropriations are insufficient to meet expenditures that either state or federal law mandate, the Governor and the Legislative Budget Board are authorized to direct the transfer of sufficient amounts of funds to HHSC from Medicaid appropriations made elsewhere).

### 3.    Plaintiffs Have Stated a Claim Against Governor Rick Perry.

Defendants incorrectly claim that plaintiffs have failed to state a claim against Governor Perry under Rule 12 (b)(6).  Part. MTD 2 at 22-23.[69]  Defendants' argument for dismissing the complaint is based on a general claim: that Governor Perry has no responsibility under federal law for providing the relief that plaintiffs request.  *Id.*  However, as set forth above, the Governor plays a significant role in the budget process, issues Executive Orders, appoints the Executive Commissioner of HHSC, and approves the appointment of the DADS Commissioner, among other duties.  Based upon the Governor's significant involvement in these various areas, and in light of the fact that courts are obligated to look only at the pleadings and to consider factual allegations in the complaint as true, there is no basis under Rule 12(b)(6) for dismissing the Governor with respect to any of the legal claims asserted in this case.

> a.    The Governor is a Recipient of Federal Funds for Purposes of Plaintiffs' Section 504 Claim.

Defendants argue that Governor Perry is not a proper party under the Rehabilitation Act because he is not a recipient of federal funds.  Part. MTD 2 at 22-23.  Specifically, defendants assert that Governor Perry does not receive or distribute Medicaid funds.  *Id.*  This argument fails for a number of obvious reasons.  First, defendants ignore the reality that when the Governor is sued in his official capacity as the chief executive officer of the State, the question is not whether he personally receives federal financial assistance, but whether the State of Texas does.  No one can seriously contend that Texas does not receive federal financial assistance to operate its Medicaid program, including its ICF/MRs, its HCBS waivers, its nursing facilities, and a host of other community-based services.  Just as it was appropriate for the plaintiffs in *Alexander v.*

---

[69]   Defendants also contend plaintiffs' claims should be dismissed under Rule 12(b)(1) based on their lack of standing to sue the Governor.  Because plaintiffs address that argument in section III(D)(1), *supra,* this section will focus on defendants' argument for dismissal under Fed. R. Civ. P. 12(b)(6).  Further, defendants do not claim that plaintiffs lack standing to sue Governor Perry under either the ADA or Section 504.  Part. MTD 2 at 16-20.

*Choate*, 469 U.S. 287 (1984) to sue the Governor of Tennessee in their § 504 case challenging

Medicaid cutbacks because the Governor in his official capacity is a recipient of federal funds

for the State of Tennessee, so too it is appropriate to bring the § 504 claim in this case against

Governor Perry in his official capacity. As the Supreme Court explained in *Kentucky v. Graham*,

473 U.S. 159, 165-66 (1985):

> Official-capacity suits … "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

In addition, plaintiffs have alleged that Governor Perry accepts federal financial

assistance to operate Texas's Medicaid program, but fails to ensure its compliance with federal

requirements for that program.  Am. Compl. ¶ 239.  At the motion to dismiss stage, this

allegation must be accepted as true.  Defendants' effort to exclude the Governor from the reach

of the § 504 claim must be rejected.

        b.      The Governor Is Responsible For, and Has the Authority to Correct, the ADA, § 504, and Medicaid Violations Set Forth in the Complaint.

Defendants also maintain that plaintiffs' pleadings are insufficient to state a cognizable

claim against Governor Perry upon which relief can be granted because the Governor did not

cause and cannot provide provide any relief which might remedy their alleged injuries.  Part.

MTD 2 at 22.  These arguments ignore both the considerable responsibility and significant

authority that the Governor has for complying with the ADA, § 504, and the Medicaid Act.[70]

---

[70]  Certainly Governor Perry believes he has ample authority in all these areas.  In Executive Order RP 13, Perry "order[ed]" HHSC to "direct" the Texas Department of Mental Health and Mental Retardation (now DADS) "to implement" a new waiver program to provide community-based services to individuals on the HCS waiver waiting

In a case nearly identical to the one at bar, several individuals with developmental disabilities brought a class action under §1983 against the Governor of Massachusetts and various other state officials for violations of the ADA, § 504 of the Rehabilitation Act, the Medicaid Act, and the PASARR requirements of the NHRA.  *Rolland*, 52 F. Supp. 2d at 243. Defendants filed a motion to dismiss, asserting that plaintiffs failed to state a cognizable claim against the Governor and the Secretary of the Executive Office of Health and Human Services ("EOHHS").  They argued that neither played a significant enough role in the State's Medicaid program to be held liable for plaintiffs' injuries.  Just like in the instant case, the defendants in *Rolland* argued that only the single state Medicaid agency was responsible for the administration of Massachusetts's Medicaid program, and, therefore, the Governor could not have taken any action that caused injuries to the plaintiff class.  *Id.*  In rejecting this argument, the district court concluded that:

> No case holds the provision which empowers a single state agency to administer a state's Medicaid program was in any way promulgated with the intention of exonerating or limiting the liability of other governmental officials who fail to conform their required actions to federal law.

*Id.*  Further, the Court noted that the plaintiffs' amended complaint contained "several unfulfilled administrative duties that may fall outside the DMA's mandate" including that: (i) the Governor is responsible for seeking funds from the legislature and to direct, supervise and control the executive departments of state government; (ii) it is the Governor's responsibility to appoint directors of executive agencies; and (iii) it is the Governor who appoints the EOHHS Secretary who is responsible for the oversight and control of all of the state's Medicaid departments, including DMA.  *Id.*  As a result, the Court found that while

---

list.  In Executive Order RP 65, he ordered HHSC to adopt rules mandating that all girls obtain the HPV vaccine prior to admission to sixth grade.  In both cases, HHSC fully complied with his directives.

> it remains to be seen whether the plaintiff can prove the Governor
> . . . [has] a role in the provision of Medicaid services . . . [t]o the
> extent that those responsibilities go beyond those enumerated and
> required in the state Medicaid plan, the Governor . . . may well be
> [an] appropriate defendant.

*Id.*[71]   The same responsibilities and duties that the *Rolland* Court held provided a basis for including the Governor as a party are also present here.[72]   *See* Am. Compl. ¶ 22.

Many other courts have found that a State's governor is an appropriate party for purposes of ADA, § 504, and Medicaid claims.  *See Boudreau ex rel. Boudreau v. Ryan*, No. 00 C 5392, 2001 WL 840583, at *6 (N.D. Ill. May 2, 2001) (refusing to dismiss the Governor in a case involving Medicaid, the ADA and Section 504), *aff'd in part, and vacated in part on other grounds sub nom*, *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906 (7th Cir. 2003); *Gueli v. United States*, No. 806 CV 1080 T27 MSS, 2006 WL 3219272 (M.D. Fla. Nov. 6, 2006) (finding Governor to be appropriate party when sued in his official capacity; case dismissed on other grounds); *Bragg v. Chavez*, No. Civ 07-0343 JB/WDS, 2007 WL 6367133, at *13 (D.N.M. Nov. 13, 2007) (Medicaid and ADA claims).   Thus, defendants' effort to dismiss the claims against the Governor must be denied.

## V.   <u>CONCLUSION AND REQUESTED RELIEF</u>

For the foregoing reasons, plaintiffs respectfully request that this Court enter an order denying the Partial Motion to Dismiss in its entirety.  Plaintiffs request any other relief to which they may be entitled.

---

[71]  At the end of its decision, the Court comments that "there appears to be no dispute that the Governor and other state officials are appropriate defendants with regard to the ADA." *Rolland*, 52 F. Supp. 2d at 243.  That is the case here as well.  Defendants' motion to dismiss does not allege that the Governor is not an appropriate defendant regarding the ADA.  Here, of course, Governor Perry is properly sued in his official capacity.

[72]  The Governor himself has recognized that other agencies over which he has considerable influence and control are critical to the development of an effective community-based service system.  *See* Executive Order RP 13 (ordering "all affected agencies and public entities [to] cooperate fully with" HHSC in the development of the Promoting Independence Plan)

November 23, 2011

Respectfully submitted,

/s/ Garth A. Corbett
Garth A. Corbett
State Bar No. 04812300
Sean A. Jackson
State Bar No. 24057550
Disability Rights Texas
7800 Shoal Creek Boulevard., Suite. 171-E
Austin, Texas 78757
(512) 454-4816 (Telephone)
(512) 454-3999 (Facsimile)

Yvette Ostolaza
State Bar No. 00784703
Robert Velevis
State Bar No. 24047032
Casey Burton
State Bar No. 24058791
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
(214) 746-7700 (Telephone)
(214) 746-7777 (Facsimile)

Steven J. Schwartz
J. Paterson Rae
Center for Public Representation
22 Green Street
Northampton, Massachusetts 01060
(413) 586-6024 (Telephone)
(413) 586-5711 (Facsimile)

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Garth Corbett, hereby certify that all parties have been served through the

Court's ECF system, or if such party does not accept service through the Court's ECF system,

then by first class mail.


/s/ Garth A. Corbett
Garth A. Corbett