

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ERIC STEWARD, LINDA ARIZPE, ANDREA PADRON, PATRICIA FERRER, BENNY HOLMES, ZACKOWITZ MORGAN, on behalf of themselves and all others similarly situated, THE ARC OF TEXAS, INC., and COALITION OF TEXANS WITH DISABILITIES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>RICK PERRY, Governor, in his official capacity, THOMAS SUEHS, Executive Commissioner of Texas Health and Human Services Commission, in his official capacity, CHRIS TRAYLOR, Commissioner of the Texas Department of Aging and Disability Services, in his official capacity,<br><br>Defendants. | |
| | Case No. 5:10-cv-1025-OLG |
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff-Intervenor<br><br>v.<br><br>THE STATE OF TEXAS,<br><br>Defendants. | |

**UNITED STATES' COMPLAINT IN INTERVENTION**

The United States alleges that the State of Texas ("State") discriminates against individuals with developmental disabilities[1] by unnecessarily institutionalizing them in nursing facilities. As set forth more fully below, the State is in violation of title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"). The State continues to fund institutional care for individuals with developmental disabilities in nursing facilities while effectively denying them care in community-based alternatives in violation of the ADA and the Rehabilitation Act. The alleged discrimination goes to the heart of the ADA and Congress' intent to eliminate the segregation and isolation of individuals with disabilities. As Congress stated in the findings and purposes of the ADA: "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this action under title II of the ADA, 42 U.S.C. §§ 12131-12132, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a, and 28 U.S.C. §§ 1331 and 1345. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201 and 2202.

---

[1] Throughout this complaint, the United States uses the term "developmental disabilities" to refer to individuals with intellectual disabilities (mental retardation) and individuals with "related conditions" as defined by 42 C.F.R. § 483.102(b)(3) and 42 C.F.R. § 435.1010.

2

2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391, given that a substantial part of the acts and omissions giving rise to this action occurred in the Western District of Texas. 28 U.S.C. § 1391(b).

## PARTIES

3.  Plaintiff-Intervenor is the United States of America.

4.  Defendant State of Texas is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104, and is therefore subject to title II of the ADA, 42 U.S.C. § 12131 *et seq.*

5.  At all times relevant to this action, the State of Texas, has been a "recipient" of "federal financial assistance," including Medicaid funds, and is therefore subject to the Rehabilitation Act, 29 U.S.C. § 794.

6.  The proposed Plaintiff class consists of:

    > [A]ll Medicaid-eligible persons over twenty-one years of age with mental retardation and/or a related condition in Texas who currently or will in the future reside in nursing facilities, or who are being, will be, or should be screened for admission to nursing facilities pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. § 483.112 *et seq.*

    (Complaint ¶ 25, December 20, 2010, ECF No. 1.)

7.  Each of the individually named Plaintiffs and members of the Plaintiff class has impairments that substantially limit one or more major life activities. Each class member is an individual with a disability, as defined by the ADA and Rehabilitation Act.

## BACKGROUND

A. *The Americans with Disabilities Act and the Rehabilitation Act*

8. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

9. Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

10. For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

11. Congress directed the Attorney General to issue regulations implementing title II of the ADA. 42 U.S.C. § 12134.

12. The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ." 28 C.F.R. § 35.130(d), App. A.

4

13. Regulations implementing title II of the ADA prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3); *accord* 45 C.F.R. § 84.4(b)(4) (Rehabilitation Act).

14. The Supreme Court held that title II prohibits the unjustified segregation of individuals with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 596 (1999).

15. The Supreme Court explained that the *Olmstead* holding "reflects two evident judgments." *Id.* at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

16. Discrimination on the basis of disability is also prohibited by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a):

> No otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity...

17. The Rehabilitation Act's implementing regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting

appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d); *see also* 45 C.F.R. § 84.4.

18. Texas has numerous statutes, regulations and executive orders that strongly favor integrated community services and supports. *See* TEX. HEALTH & SAFETY CODE §§ 591.002(d), 592.013(3), 591.005, 592.032; 40 TEX. ADMIN. CODE § 4.107(2); Executive Order GWB 99-2 (Sept. 28, 1999); Executive Order RP 13 (Apr. 18, 2002).

   B. *The Nursing Home Reform Amendments to the Medicaid Act*

19. The federal Nursing Home Reform Act requires that states develop and implement a Preadmission Screening and Resident Review ("PASRR") program for all Medicaid-certified nursing facilities. 42 U.S.C. § 1396r(e)(7); 42 C.F.R. §§ 483.100 to 483.138.

20. All persons seeking admission to a nursing facility who have a developmental disability must be assessed to determine, *inter alia*, whether "the individual's total needs are such that his or her needs can be met in an appropriate community setting" (42 C.F.R. § 483.132(a)(1)), and "[i]f specialized services are recommended, [the evaluation must] identif[y] the specific mental retardation . . . services required to meet the evaluated individual's needs." 42 C.F.R. § 483.128(i)(5); *see also* 42 C.F.R. § 483.136. This evaluation is referred to as the Level II PASRR review. 42 C.F.R. § 483.128(a).

21. For individuals with developmental disabilities in nursing facilities, "specialized services means the services specified by the State which, combined with services provided by the [nursing facility] or other service providers," results in a specialized services treatment program, "which includes aggressive, consistent implementation" of

6

services "that [are] directed toward [both] (i) [t]he acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and (ii) [t]he prevention or deceleration of regression or loss of current optimal functional status." *See* 42 C.F.R. § 483.120(a)(2) (defining specialized services and referencing 42 C.F.R. § 483.440(a)(1)); *see also* 42 U.S.C. § 1396r(e)(7)(G)(iii).

22. If an individual in a nursing facility requires specialized services, then "[t]he State must provide or arrange for the provision of the specialized services needed by the individual while he or she resides in the [nursing facility]." 42 C.F.R. § 483.116(b)(2); *see also* 42 C.F.R. § 483.126.

23. The nursing facility "must provide [developmental disability] services which are of a lesser intensity than specialized services to all residents who need such services." 42 C.F.R. § 483.120(c).

## FACTUAL ALLEGATIONS

### A. Plaintiffs are Unnecessarily Institutionalized in Nursing Facilities

24. The five individually named Plaintiffs who remain in nursing facilities and many of the proposed Plaintiff class are unnecessarily institutionalized in nursing facilities and are not being served in the most integrated setting appropriate to their needs.

**Patricia Ferrer**

25. Plaintiff Patricia Ferrer is 47 years-old and has an intellectual disability and epilepsy. For 44 years, Ms. Ferrer lived at home with her parents. She was independent in the community and required little additional assistance. While she lived at home with

7

her family, she worked as a hotel housekeeper. Ms. Ferrer wants to leave the nursing facility and explore the possibility of returning to work.

26.     With the appropriate supports, Ms. Ferrer could live in the community.

27.     Ms. Ferrer is currently confined in a nursing facility that resembles a hospital-like setting. It is large and houses unrelated individuals with disabilities. Ms. Ferrer rarely leaves the nursing facility. Other than occasional visits with family and the nursing facility staff, Ms. Ferrer has little opportunity to interact with individuals without disabilities.

28.     Ms. Ferrer has not received a Level II PASRR review and thus she was not evaluated to determine whether she needs specialized services and whether she could be served in the community instead of a nursing facility. Ms. Ferrer has not received appropriate specialized services while in the nursing facility.

**Eric Steward**

29.     Plaintiff Eric Steward is 45 years-old and is currently confined in a nursing facility. Mr. Steward has epilepsy and cerebral palsy. He uses a wheelchair for mobility, but with the appropriate physical therapy, he may be able to walk.

30.     Mr. Steward wants to move into the community. He wants to enjoy activities such as shopping, bowling, eating out with friends and family and watching movies. He also enjoys woodworking and wants to pursue employment. He pursued these interests prior to his admission into the nursing facility.

31.     With the appropriate supports, Mr. Steward could live in the community.

32. Mr. Steward shares a room with an assigned roommate. The nursing facility is large, it houses unrelated individuals with disabilities, and resembles a hospital-like setting. Other than visits from his family and the nursing facility staff, Mr. Steward has limited opportunities to interact with individuals without disabilities.

33. Mr. Steward has never received a Level II PASRR evaluation, despite having been admitted to two different nursing facilities. He does not receive appropriate specialized services or any consideration for community placement.

**Zackowitz Morgan**

34. Plaintiff Zackowitz Morgan is 41 years-old and has been confined in the nursing facility since January 2008, but previously lived in the community. Mr. Morgan has an intellectual disability. He has regressed since living in the nursing facility and has gained significant weight. He wants to live once again in the community. He wants to go to picnics with his family, attend church, play basketball and go to the park. He does not have the opportunity to engage in these activities in the nursing facility.

35. With the appropriate supports, Mr. Morgan could live in the community.

36. The nursing facility is large, houses unrelated individuals with disabilities and resembles a hospital-like setting. Mr. Morgan rarely leaves the facility. Mr. Morgan and his roommate share a room together without a built-in divider. His roommate, as of March 2011, is not able to engage in a conversation because of his severe dementia. Other than visits from his family and the nursing facility staff, Mr. Morgan has limited opportunities to interact with individuals who do not have disabilities.

37. In March 2009, Mr. Morgan's treatment team determined that a nursing facility was not an appropriate placement for Mr. Morgan. Nevertheless, Mr. Morgan remains in the nursing facility and the State has not taken steps to transition him into the community.

38. Mr. Morgan first received his Level II PASRR review in January 2009 – nearly a year after his admission to a nursing facility. His PASRR assessment indicated that he was appropriate for specialized services. However, there is no indication that Mr. Morgan has actually received appropriate specialized services while in the nursing facility.

**Linda Arizpe**

39. Plaintiff Linda Arizpe is 42 years-old and has a developmental disability and a visual impairment. She is currently confined in a nursing facility. She is unable to walk and cannot talk, but she is responsive, particularly to her parents.

40. With the appropriate supports, Ms. Arizpe could live in the community.

41. Ms. Arizpe has very little social interaction at the nursing facility and rarely has the opportunity to leave the nursing facility to engage in community activities. The nursing facility where Ms. Arizpe is confined is large, houses unrelated individuals with disabilities and resembles a hospital-like setting. She shares a room with a roommate and only a curtain separates their beds. Other than visits from her family and the nursing facility staff, Ms. Arizpe has limited opportunities to interact with individuals without disabilities.

42. Ms. Arizpe's parents want her to move to a community-based setting and do not want Ms. Arizpe to live the rest of her life in a nursing facility.

43.     Ms. Arizpe never received a Level II PASRR evaluation and thus was not considered for community placement or specialized services while in the nursing facility. Ms. Arizpe does not receive appropriate specialized services in the nursing facility.

**Andrea Padron**

44.     Andrea Padron is 26 years-old. Ms. Padron has quadriplegia and a developmental disability, both of which resulted from a severe head injury from a car accident when she was a child. She has been confined to a nursing facility since she was 16 years-old.

45.     Prior to her placement in the nursing facility, Ms. Padron lived at home with her mother, Rosa Hudeck. Ms. Padron attended public school and received habilitative services, including aqua therapy. She was able to use a wheelchair at home. Although Ms. Padron is nonverbal, when she was at home, she was able to communicate with her family with verbal cues.

46.     Since her placement at the nursing facility, Ms. Padron has regressed. She is less communicative and she no longer uses the wheelchair she used at home because her limbs have become significantly more rigid. She also experiences skin breakdowns, which Ms. Hudeck attributes to the nursing facility's failure to appropriately reposition Ms. Padron.

47.     The nursing facility where Ms. Padron is confined resembles a hospital-like setting. It is large and houses unrelated individuals with disabilities. Ms. Padron shares her room with a roommate and only a curtain divides their beds. Other than the staff and visits from family, Ms. Padron has little opportunity to interact with individuals without

11

disabilities. Ms. Padron rarely leaves the nursing facility and for the past year, has barely left her room in the nursing facility.

48.     Ms. Hudeck does not oppose Ms. Padron's placement in the community with the appropriate supports and Ms. Padron is able to live in the community.

49.     Ms. Padron has never received a Level II PASRR review and thus was not considered for community placement or assessed for specialized services while in the nursing facility. As a result, Ms. Padron does not receive appropriate specialized services in the nursing facility.

   B. *Texas Unnecessarily Segregates Individuals with Developmental Disabilities in Nursing Facilities*

50.     Nursing facilities are institutions and are not integrated settings. They provide little opportunity for individuals with disabilities to interact with individuals without disabilities.

51.     The individually named Plaintiffs and the proposed Plaintiff class are able to live in the community with the appropriate services and supports.

52.     The individually named Plaintiffs and many of the proposed Plaintiff class do not oppose living in the community instead of a nursing facility.

53.     The State already offers an array of community-based services to individuals with developmental disabilities, including residential assistance services and habilitation services which, if offered to the Plaintiffs, would enable them to live in the community. 40 TEX. ADMIN. CODE §§ 48.2103, 9.553(34), 711.3(20).

54.     The State has not given nursing facility residents with developmental disabilities the opportunity to have their needs for residential and habilitation services met in the

community rather than a nursing facility. In order to access these community-based services, Plaintiffs must first place their names on the Home and Community Based Services (HCS) waiting list that has, as of March 31, 2011, over 50,000 names for approximately 22,800 slots, all of which are currently filled. *See* 40 TEX. ADMIN. CODE § 9.157. According to a November 2009 report by the State, individuals enrolling in the HCS program had been on the waiting list for an average of nearly nine years.[2]

55. Plaintiffs who presently live in the community are unable to access residential and habilitation services in a manner to prevent their unnecessary institutionalization in nursing homes because they must first place their names on the HCS waitlist list and wait for approximately nine years before receiving services.

56. The State's policies effectively limit timely access to community-based services for individuals with developmental disabilities to residents of Intermediate Care Facilities ("ICFs") and individuals in state-supported living centers ("SSLCs") who want to move into the community because these individuals do not have to place their names on the lengthy waitlist for community services. ICFs and SSLC are institutions for which only individuals with developmental disabilities are eligible. 1 TEX. ADMIN. CODE § 358.103 (47), (87).

57. Pursuant to Section 531.0235 of the Texas Government Code, the Texas Council for Developmental Disabilities and the Office for the Prevention of Developmental Disabilities are required to prepare a joint biennial report on the state of services to persons with disabilities in Texas. In their 2008 Biennial Report, these agencies

---

[2] The report is available at http://www.sao.state.tx.us/reports/main/10-014.pdf.

concluded that "[p]eople with MR/RC [mental retardation or related conditions] do not have access to services with reasonable promptness" because "Texas significantly and chronically underfunds its service system." The Report's second major finding is that "[m]any people with intellectual and developmental disabilities (ID/DD) do not receive services within the least restrictive setting appropriate to their needs . . . In fact, the discrepancy in Texas's investment in institutions compared to its investment in community services is extraordinary."[3]

58. The findings of the 2008 Biennial Report largely mirror the conclusions reached by the Human Services Research Institute in its 2008 report, *Closing the Gap in Texas: Improving Services for People with Intellectual and Developmental Disabilities*. The *Closing the Gap* report found that "the gap between present capacity and unmet needs means Texas does not operate its service system in a manner that ensures that individuals will receive services promptly" and that because individuals must wait significantly for community based services, "their situation may deteriorate and caregivers can buckle under the stress of longterm unassisted care giving."[4]

59. The failure of the State's PASRR program further results in the unnecessary institutionalization of individuals with developmental disabilities in nursing facilities. Individuals with developmental disabilities are often admitted to nursing facilities without being appropriately assessed for whether they can be served in the community.

60. The State's PASRR program does not adequately or appropriately assess whether an individual with a developmental disability needs specialized services. Due to the

---

[3] The report is available at http://www.txddc.state.tx.us/resources/publications/biennial_report/2010biennial/2010biennialreport.pdf.
[4] This report is available at http://www.txddc.state.tx.us/public_policy/gaprpt.pdf

State's failure to ensure that appropriate PASRR reviews are conducted and to provide needed specialized services, according to the State, only 1% of the individuals with developmental disabilities who are confined in Texas nursing facilities receive specialized services.

61.   On June 1, 2011, the United States sent notice to counsel for the State, Assistant Attorney General Nancy Juren, advising the State that it has failed to comply with the requirements of the Americans with Disabilities Act and the Rehabilitation Act by unnecessarily segregating individuals with developmental disabilities in nursing facilities and placing individuals with developmental disabilities living in the community at risk of placement in nursing facilities. The United States further advised the State of its intention to intervene in this matter to remedy the violations.

62.   On June 15, 2011, the United States provided the State additional factual information regarding its determination that the State is in violation of the Americans with Disabilities Act and the Rehabilitation Act, including the remedies that the United States seeks in this action.

63.   The Department of Justice has determined that the State's compliance with the Americans with Disabilities Act and the Rehabilitation Act cannot be secured by voluntary means at this point.

## COUNT I

### TITLE II OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12131 *et. seq.*

64. The allegations of Paragraphs 1 through 63 of the Complaint in Intervention are hereby realleged and incorporated by reference.

65. The State of Texas discriminates against "qualified individual[s] with a disability" within the meaning of the ADA by administering programs and services for individuals with developmental disabilities in a manner that denies individuals the opportunity to receive services in the most integrated settings appropriate to their needs.

66. The State's actions constitute discrimination in violation of title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. § 35.130.

## COUNT II

### SECTION 504 OF THE REHABILITATION ACT
### 29 U.S.C. § 794

67. The allegations of Paragraphs 1 through 66 of the Complaint in Intervention are hereby realleged and incorporated by reference.

68. The State of Texas, which is a recipient of federal financial assistance, discriminates against "qualified individual[s] with a disability" within the meaning of the Rehabilitation Act by administering programs and services for individuals with developmental disabilities in a manner that denies individuals the opportunity to receive services in the most integrated setting appropriate to their needs.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that the Court:

A.   Grant judgment in favor of the United States on its Complaint in Intervention and declare that the Defendant has violated title II of the ADA, 42 U.S.C. §12131 *et seq*. and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

B.   Enjoin Defendant from:

   1.   failing to provide appropriate, integrated community services and supports for all class members, consistent with their individual needs;

   2.   discriminating against Plaintiff class members with developmental disabilities by failing to provide services and supports in the most integrated setting appropriate to their needs;

C.   Issue a declaratory judgment declaring that:

   1.   Defendant has violated title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by failing to make reasonable modifications to programs for persons with developmental disabilities to enable Plaintiffs and members of the class to obtain the services and supports they require to reside in the most integrated setting appropriate to their needs; and

D.   Order such other appropriate relief as the interests of justice may require.

Respectfully submitted,

*(signature)*

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
Principal Deputy Assistant Attorney General
Civil Rights Division

JOHN WODATCH
Acting Deputy Assistant Attorney General
Civil Rights Division

ALISON BARKOFF, Special Counsel for
*Olmstead* Enforcement
Civil Rights Division

*(signature)*

ALLISON NICHOL, Section Chief
KATHLEEN WOLFE, Acting Special Legal Counsel
RENEE M. WOHLENHAUS, Deputy Chief
REGAN RUSH, Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - NYA
Washington, D.C. 20530
Telephone: (202) 307-0663
Facsimile: (202) 307-1197
Regan.Rush@usdoj.gov

*Counsel for Plaintiff-Intervenor*
*United States of America*