Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ERIC STEWARD, by his next friend and mother, Lillian Minor; | § § § | |
| LINDA ARIZPE, by her next friend and guardian, Rudy Arizpe; | § § § | |
| ANDREA PADRON, by her next friend and guardian, Rosa Hudecek; | § § § | |
| PATRICIA FERRER, by her next friend and mother, Petra Ferrer; | § § § | |
| BENNY HOLMES, by his next friend and guardian, Priscilla Holmes; | § § § | Case No. 5:10-CV-1025 |
| ZACKOWITZ MORGAN, by his next friend and guardian, Sharon Barker, | § § § | |
| MARIA HERNDANEZ, by her next friend and guardian, Diane Hernandez | § § § | |
| VANISONE THONGPHANH, by his next friend, Paul Mastin | § § § | |
| MELVIN OATMAN, | § § | |
| RICHARD KRAUSE, by his next friend and guardian, Lenwood Krause | § § § | |
| MICHAEL MC BURNEY, by his next friend Estelle Le Master | § § § | |
| LEON HALL | § § | |
| LEONARD BAREFIELD | § § | |
| TOMMY JOHNSON | § § | |
| JOHNNY KENT | § § | |
| JOSEPH MORRELL | § § | |



on behalf of themselves and all others §
similarly situated, and §
§
§
THE ARC OF TEXAS, INC. and §
§
COALITION OF TEXANS WITH §
DISABILITIES, INC. §
§
§
               Plaintiffs, §
v. §
§
RICK PERRY, Governor of the State of Texas, §
§
JON WEIZENBAUM, Commissioner of §
the Texas Department of Aging and Disability §
Services, and §
§
 KYLE L. JANEK, M.D., §
 Executive Commissioner §
of the Texas Health and Human Services §
Commission, §
§
        all in their official capacities, §
§
          Defendants. §
_____ §
§
THE UNITED STATES OF AMERICA, §
          Plaintiff-Intervenor, §
§
    v. §
§
§
THE STATE OF TEXAS, §
        Defendant. §

## SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

## I.     INTRODUCTION

1.     Eric Steward, Linda Arizpe, Andrea Padron, Patricia Ferrer, Benny Holmes,

Zackowitz Morgan, Maria Hernandez, Vanisone Thongphanh, Melvin Oatman, Richard Krause,

Michael Mc Burney, Leon Hall, Leonard Barefield, Johnny Kent, Tommy Johnson and Joseph

Morrell (hereafter the "Individual Plaintiffs") are adult persons with mental retardation or other related conditions (hereafter referred to as "developmental disabilities"). Each of these individuals is qualified for the Defendants' system of community-based services and supports for individuals with developmental disabilities. Each is able and would prefer to reside in a more integrated, community-based placement. Nevertheless, the Individual Plaintiffs and thousands of similarly situated individuals in Texas are unnecessarily institutionalized and segregated in nursing facilities because of the Defendants' decision to exclude them from any meaningful access to Texas's system of community-based services and supports which they need to be able to reside in the community.

2. The Defendants, by their actions and inactions in violation of federal law, have caused the Individual Plaintiffs and the class they seek to represent to live in institutional nursing facilities isolated from their family and friends. The Individual Plaintiffs and the class are not able to leave the nursing facility to work, attend day habilitation programs or prevocational activities, and are deprived of the right to attend social, recreational or religious activities outside of the nursing home. Instead, they have no option but to remain in nursing facilities in order to receive Medicaid-funded services.

3. Despite their ability to benefit from Texas's system of community-based supports that are available to other individuals with disabilities, all of the Individual Plaintiffs and the class they seek to represent are experiencing or will experience unnecessary and prolonged institutionalization in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 *et seq*., and Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794 *et seq*.

4.    To avoid the inappropriate institutionalization of individuals with developmental disabilities in nursing facilities, Congress enacted the Nursing Home Reform Amendments (NHRA) to the Medicaid Act, 42 U.S.C. § 1396r(e).  These Amendments require that before admission to a nursing facility, an individual with developmental disabilities must be screened by a mental retardation professional to determine whether their needs could be met in the community or other less restrictive placement.  These Amendments also require that the Defendants provide individuals with developmental disabilities who are placed in nursing facilities with specialized services and active treatment, designed to enable the individual to function as independently and with as much self determination as possible, and to prevent regression and loss of abilities.

5.    Despite the requirements of the NHRA, the Defendants have failed to conduct pre-admission screening and assessments that comply with the requirements of the NHRA and have failed to provide all needed specialized services to the Individual Plaintiffs and the class. As a result, the Individual Plaintiffs and class members have been inappropriately placed in nursing facilities and, while there, have frequently suffered significant regression or stagnation that could have been avoided through the provision of specialized services, required by federal law.

6.    Plaintiffs and the class seek declaratory and injunctive relief against the Defendants to require the provision of adequate community-based services and supports to enable them to transition from their current nursing facility placements to more integrated community placements as required by the ADA, 42 U.S.C. § 12101 *et seq*.; the Rehabilitation Act, 29 U.S.C. § 794; the NHRA, 42 U.S.C. § 1396r(e); the federal Medicaid Act and the regulations implementing these statutes.  They also seek additional declaratory and injunctive

4

relief requiring the Defendants to comply with the pre-admission screening and resident review (PASRR) requirements of the NHRA, including the provision of specialized services and active treatment to class members while residing in nursing facilities.

## II.    JURISDICTION AND VENUE

7.    This is a civil action authorized by 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights, privileges and immunities guaranteed by federal laws and the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and 1343(4).

8.    This action is also brought pursuant to Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  The Defendants are all public entities subject to Title II of the ADA and receive federal financial assistance to operate their Medicaid program and to cover the cost of nursing facility care and the provision of community-based services and supports.  This Court has jurisdiction over the claims under the ADA and § 504 pursuant to 42 U.S.C. § 12133 and 29 U.S.C. § 794a.

9.    Plaintiffs' request for declaratory relief is brought pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983 and Rule 65 of the Federal Rules of Civil Procedure.

## III.    PARTIES

*A.    Individual Plaintiffs*

10.    Plaintiff Eric Steward is a 44 year-old man with developmental disabilities including mental retardation and the related condition of infantile cerebral palsy.  He resides at Buena Vida Nursing & Rehabilitation Center of San Antonio, 5027 Pecan Grove, San Antonio, Texas.  He brings this action through his next friend and mother, Lillian Minor.

11.     Plaintiff Linda Arizpe is a 40 year-old woman.  She has mental retardation.  She resides at 30836 Olympus, Bulverde, Texas.  She brings this action by and through her father and legal guardian, Rudy Arizpe.

12.     Plaintiff Andrea Padron is 26 years old. She has mental retardation and a head injury.  She resides at 16506 Fox Den, San Antonio, Texas.  She brings this action by and through her mother and legal guardian, Rosa Hudecek.

13.     Plaintiff Patricia Ferrer is a 46 year-old woman with mental retardation who currently resides at 7312 Boisenberry Lane. Dallas, Texas.  She brings this action through her mother and next friend, Petra Ferrer, who lives at 814 N. Barnett Avenue, Dallas, Texas 75211

14.     Plaintiff Benny Holmes is a 31 year-old man with mental retardation and cerebral palsy who currently resides at 7404 Clover Glen, Dallas, Texas.  He brings this action through his mother and legal guardian, Priscilla Holmes, who lives at 3404 Bellville Drive, Dallas, Texas.

15.     Plaintiff Zackowitz Morgan is a 40 year-old man with a developmental disability who currently resides in the Silver Springs Healthcare Center, a nursing facility located at 12350 Wood Bayou Drive, Houston, Texas.  Mr. Morgan also has diagnoses of cerebral palsy, obesity, hypertension, hypothyroidism, glaucoma, and peripheral vascular disease, congestive heart failure and a seizure disorder.  He brings this action through his guardian and next-friend, Sharon Barker who was appointed his legal guardian by the Harris County Probate Court on August 20, 2008.  Sharon Barker lives at 118 St. Finans Way, Houston, Texas.

16.     Plaintiff Maria Hernandez is a 22 year-old woman with a developmental disability who currently resides at Meridian Care, a nursing facility located at 8181 Crestway Drive, San

Antonio, Texas.  She brings this action by and through her mother and legal guardian, Diane Hernandez.  Diane Hernandez lives at 1829 Waverly, San Antonio, Texas

17.    Plaintiff Vanisone Thongphanh is a 34 year-old man with a developmental disability who currently resides at the Arlington Residence Rehabilitation Center, a nursing facility located at 405 Duncan Perry, Arlington, Texas.  He brings this action by and through his next friend, Paul Mastin.  Paul Mastin lives at 2304 Rushing Springs, Fort Worth, Texas.

18.    Plaintiff Melvin Oatman is a 49 year-old man with a condition related to a developmental disability who currently resides at the Renaissance at Kessler Park, a nursing facility located at 2428 Bahama Drive, Dallas, Texas.

19.    Plaintiff Richard Krause is a 32 year-old man with a condition related to a developmental disability who currently resides at River City Care Center, a nursing facility located at 921 Nolan Street, San Antonio, Texas.  He brings this action by and through his father and legal guardian, Lenwood Krause.  Lenwood Krause lives at 211 Sylvia Street, Victoria, Texas.

20.    Plaintiff Michael Mc Burney is a 29 year-old man with a developmental disability who currently resides at River City Care Center, a nursing facility located at 921 Nolan Street, San Antonio, Texas.  He brings this action by and through his next friend, Estelle Le Master. Estelle Le Master lives at 173 W. Ligustrum, San Antonio, Texas.

21.    Plaintiff Leon Hall is a 59 year-old man with a developmental disability who currently resides at the Terrace West Nursing & Rehabilitation, L.C., a nursing facility located at 2800 Midland Drive, Midland, Texas.

22.     Plaintiff Leonard Barefield is a 68 year-old man with a developmental disability who currently resides at the Terrace West Nursing & Rehabilitation, L.C., a nursing facility located at 2800 Midland Drive, Midland, Texas.

23.     Plaintiff Thomas Johnson is a 60 year-old man with a developmental disability who currently resides at the Terrace West Nursing & Rehabilitation, L.C., a nursing facility located at 2800 Midland Drive, Midland, Texas.

24.     Plaintiff John Kent is a 63 year-old man with a developmental disability who currently resides at the Terrace West Nursing & Rehabilitation, L.C., a nursing facility located at 2800 Midland Drive, Midland, Texas.

25.     Plaintiff Joseph Morrell is a 69 year-old man with a developmental disability who currently resides at the Terrace West Nursing & Rehabilitation, L.C., a nursing facility located at 2800 Midland Drive, Midland, Texas.

B.     *Organizational Plaintiffs*

26.     The Arc of Texas, Inc. is a statewide non-profit membership organization comprised of persons with mental retardation, their parents and friends, and mental retardation professionals.  Members of the Arc of Texas and its local chapters include individuals with developmental disabilities who reside in nursing facilities or the families of such residents.  They also include individuals with developmental disabilities who are at risk of placement in nursing facilities due to the Defendants' failure to provide them access to the supports and services they need to live safely in the community.

27.     The Arc of Texas is dedicated to ensuring that all citizens with developmental disabilities in Texas are afforded appropriate services and supports in the most integrated, home-like setting possible, and that all persons with developmental disabilities and their families have

8

meaningful choices about the nature and location of those services. The Arc of Texas, as a statewide advocacy organization, has long monitored the actions of the Defendants in order to ensure that persons with developmental disabilities receive the services to which they are entitled. In this capacity, the Arc of Texas has served as an organizational plaintiff in other federal court litigation against many of the same state agencies.

28.     The Arc of Texas brings this action on its own behalf and on behalf of its members who are directly affected by the actions and inactions of the Defendants at issue in this case.

29.     The Coalition of Texans with Disabilities, Inc. (CTD) is a statewide cross-disability advocacy organization. CTD is a membership organization with both individual and organizational members. Its individual members include persons with developmental disabilities and the parents, guardians and caretakers of such persons. CTD also has over 80 member organizations representing some 3 million unduplicated individuals with all types of disabilities, including developmental disabilities, their families, friends and caretakers.

30.     CTD's mission is to ensure that people with disabilities may live, learn, work, play and participate fully in their community of choice. In line with this mission, CTD advocacy focuses on full inclusion in all aspects of community living.

31.     CTD brings this action on behalf of itself and its members with developmental disabilities who are residing or are at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

C.     *Defendants*

32.     Governor Rick Perry is the chief executive officer of the State of Texas. He is responsible for directing, supervising, and controlling the executive departments of state

government as well as for seeking funds from the legislature to implement the programs and deliver the services of those executive agencies.  Defendant Perry appoints the Executive Commissioner of the Health and Human Services Commission, and approves the appointment of the Commissioner of the Department of Aging and Disability Services.  He is sued in his official capacity.

33.     Kyle L. Janek, M.D. , Executive Commissioner of the Health and Human Services Commission ("HHSC"), is responsible for the oversight, supervision, and control of the health and human services departments within the executive branch, including the Department of Aging and Disability Services.  He is responsible for appointing the Commissioner of the Department of Aging and Disability Services.  Defendant Janek is also responsible for the supervision, direction and oversight of the Texas Medicaid Program, including the various waiver programs and other services designed to enable the named plaintiffs and members of the plaintiff class to reside in community-based settings and, if in a nursing facility, to receive specialized services and active treatment.  He is sued in his official capacity.

34.     John Weizenbaum, Commissioner of the Department of Aging and Disability Services ("DADS"), is the chief executive officer of DADS, which is responsible for admissions to, provision of specialized services in, and the funding, licensing, and monitoring of nursing facilities.  Defendant Weizenbaum is also charged with the responsibility for ensuring compliance with PASRR requirements of the NHRA, as well as providing information about, and determining eligibility for, an array of home and community-based services that would enable class members to live safely and productively in the community.  He is sued in his official capacity.

## IV.     CLASS ACTION ALLEGATIONS

35.     Pursuant to Rules 23(a)(1)-(4) and (b)(2) of the Federal Rules of Civil Procedure, plaintiffs bring this action as a class action on behalf of all Medicaid-eligible persons over twenty-one years of age with mental retardation and/or a related condition (collectively referred to as persons with developmental disabilities) in Texas who currently or will in the future reside in nursing facilities, or who are being, will be, or should be screened for admission to nursing facilities pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. § 483.112 *et seq*.

36.     The size of the class is so numerous that joinder of all members is impracticable. There are approximately 4,500 adult residents with developmental disabilities in nursing facilities throughout Texas, plus thousands more individuals with developmental disabilities who are at risk of being institutionalized in these nursing facilities.  Joinder is also impracticable because the class is dynamic and because the absent class members lack the knowledge, sophistication, and financial means to maintain individual actions.

37.     There are questions of law and fact common to the class, including *inter alia*:

    a.  whether Defendants are violating the ADA and Section 504 by:  (i) failing to offer and provide community support services to nursing facility residents with developmental disabilities that would enable them to live in the most integrated setting appropriate to their needs; (ii) failing to offer community services to individuals with developmental disabilities who are at risk of admission to nursing facilities, in order to divert the unnecessary admission of those individuals who could be appropriately served in a community or alternative setting; and (iii) utilizing eligibility criteria and methods of administration that have the effect of excluding the named plaintiffs and

members of the plaintiff class from access to the services and supports that they need to reside in integrated, community-based settings;

b.  whether Defendants are violating the NHRA by:  (i) failing to establish a screening program that accurately determines if persons with developmental disabilities who apply for admission to a nursing facility can be appropriately served in a less restrictive community setting; (ii) failing to conduct professionally acceptable assessments to determine what specialized services these individuals require; and (iii) failing to provide an array of specialized services to all persons with developmental disabilities in nursing facilities who need them, in a manner that satisfies the federal standard for active treatment; and

c.  whether Defendants are violating the federal Medicaid program by:  (i) failing to provide necessary rehabilitative services to the members of the plaintiff class with reasonable promptness;  (ii) denying class members a choice between receiving medically necessary supports and services in a segregated nursing facility or an integrated community-based setting, including failing to provide them with relevant information necessary to exercise this choice, and (iii) failing to afford them meaningful access to community-based services.

38.    The plaintiffs' claims are typical of the claims of the class.

39.    The representative parties will fairly and adequately protect the interests of the class.  Plaintiffs will vigorously represent the interests of the unnamed class members, and all members of the proposed class will benefit by the efforts of the named plaintiffs.  The interests of the proposed class and those of the named plaintiffs are identical.

40.      Defendants, their agents, employees, and predecessors and successors in office have acted or will act on grounds generally applicable to the plaintiff class, thereby making appropriate injunctive or declaratory relief with respect to the class as a whole.

## V.      STATEMENT OF FACTS

     A.      *Texas's Community Service Programs for Persons with Developmental Disabilities*

        (1)      <u>The Americans with Disabilities Act and the Rehabilitation Act</u>

41.      On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101 *et seq*., (ADA), establishing the most important civil rights laws for persons with disabilities in our nation's history.

42.      Congress stated in its findings that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).

43.      Congress found that "discrimination against individuals with disabilities persists in . . . institutionalization . . . and access to public services."  42 U.S.C. § 12101(a)(3).  Congress found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion . . . , segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. § 12101(a)(5).

44.      Congress further concluded that "[i]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting

from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U.S.C. § 12101(a)(7).

45.     A major purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities, and to provide clear, strong, consistent and enforceable standards addressing discrimination against individuals with disabilities.  42 U.S.C. § 12101(b)(1)&(2).

46.     "Discrimination" under the ADA includes the segregation of persons with disabilities from society as a result of unnecessary institutionalization.  As the Supreme Court stated in *Olmstead v. L.C.*, 527 U.S. 581 (1999), "unjustified institutional isolation of persons with disabilities is a form of discrimination" because "[i]n order to receive needed medical services, persons with mental disabilities, because of those disabilities, relinquish participation in community life…."  527 U.S. at 600-601.

47.     The regulations implementing the ADA require that:  "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

48.     Discrimination on the basis of disability is also prohibited by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  Section 504's implementing regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

49.     The ADA and § 504 regulations prohibit the differential treatment of individuals with disabilities or any class of individuals with disabilities with respect to their opportunity to participate in or access the full range of aids, benefits or services in any program operated by a

public entity.  *See* 28 C.F.R. §§ 35.130(b)(1)(ii) & (b)(1)(iv), 41.51(b)(1)(ii) & (b)(1)(iv); 45 C.F.R. §§ 84.4(b)(1)(ii) & (b)(1)(iv).

50.     The ADA and § 504 regulations prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary institutionalization or "that have the purpose or effect of substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  *See* 28 C.F.R. §§ 35.130(b)(3), 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

51.     The ADA regulations further specify that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program or activity unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8).

52.     Both the ADA and § 504 also require that public entities must make reasonable modifications in their policies, practices or procedures when necessary to avoid discrimination on the basis of disability, including the unnecessary segregation or institutionalization of such individuals, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program or activity.  42 U.S.C. §§ 12131, 12132; 29 U.S.C. § 794; 28 C.F.R. § 35.130(b)(7).

(2)     Texas's Implementation of the ADA's Integration Mandate

53.     Although Texas provides care, treatment and services to persons with developmental disabilities in large state supported living centers, nursing facilities, private intermediate care facilities for individuals with mental retardation (ICF/MR's), and home and

community-based settings, it has enacted laws, promulgated regulations, issued policies, conducted studies, written reports, and developed programs that strongly favor integrated community services and supports.

54.     In Texas, the Persons with Mental Retardation Act ("PMRA") preserves and promotes the rights of individuals with mental retardation "to live in the least restrictive setting appropriate to the person's individual needs and abilities and in a variety of living situations, including living: (1) alone; (2) in a group home; (3) with a family; or (4) in a supervised, protective environment." Tex. Health & Safety Code § 592.013(3).

55.     The PMRA expressly guarantees an individual's right to receive services in "(1) the available program or facility that is the least confining for the client's condition; and (2) … that is provided in the least intrusive manner reasonably and humanely appropriate to the person's needs." *Id.* at § 591.005.  Furthermore, "[e]ach client has the right to live in the least restrictive habilitation setting and to be treated and served in the least intrusive manner appropriate to the client's individual's needs." *Id.* at § 592.032.

56.     In addition the PMRA ensures that "[e]ach person with mental retardation has the right to receive for mental retardation adequate treatment and habilitative services that:  (1) are suited to the person's individual needs; (2) maximize the person's capabilities; (3) enhance the person's ability to cope with the person's environment; and (4) are administered skillfully, safely, and humanely with full respect for the dignity and personal integrity of the person." *Id.* at § 592.017; *see also* 40 Tex. Admin. Code § 4.107(2).

57.     Moreover, in 2001, the Texas legislature, in response to the United States Supreme Court's *Olmstead* decision, passed SB 367, which codified one of the earliest "Money

Follows the Person" ("MFP") initiatives in the country that was designed to transition persons in institutional settings to community-based services.

58.     Shortly after the *Olmstead* decision, former Governor George W. Bush issued Executive Order GWB 99-2 (Sept. 28, 1999) declaring that "[t]he State of Texas is committed to providing community-based alternatives for people with disabilities… ."

59.     Similarly, Defendant Perry issued Executive Order RP 13 (Apr. 18, 2002); in which he said that "the State of Texas is committed to providing community-based alternatives for people with disabilities and recognize that such services and supports advance the best interests of Texans."   He further proclaimed that "it is imperative that consumers and their families have a choice from among the broadest range of supports to most effectively meet their needs in their homes, community settings, state facilities or other residential settings," and "that people with disabilities have the opportunity to enjoy full lives of independence, productivity and self-determination."

60.     Texas agencies and commissions have conducted studies and issued reports and plans that confirm that most individuals with developmental disabilities benefit from living in the community, rather than in institutional settings.   The Texas Health and Human Services Commission recently issued the 2008 Revised Texas Promoting Independence Plan.   The Plan recognizes that the *Olmstead* decision "requires states to provide individuals an opportunity to live in the most integrated setting in order to receive their long-term services and supports" and, therefore, establishes as a top priority "full-funding for community-based services and elimination of all interest [waiting] lists."

61.     In its State Plan for Individuals with Developmental Disabilities: Fiscal Years 2002-2006, the Texas Council on Developmental Disabilities noted that "individuals with

developmental disabilities should have access to opportunities and the supports needed to be included in community life, have interdependent relationships, live in homes and communities, and make contributions to their families, communities, the state, and the nation."

62.     Texas has developed an array of community-based programs, services and supports that provide habilitation and support to individuals with developmental disabilities in their homes, in adult foster care settings, and in residential homes.  These programs are funded through both federal and state resources and implemented through a complex blend of federally-approved programs.  However, these programs, services and supports are largely unavailable to adult individuals with developmental disabilities residing in Texas nursing facilities.

(3)     Texas's Discriminatory Administration of Its Community Programs

63.     Despite this statutory, regulatory, and policy commitment to integration, Texas has not created a program for adult persons with developmental disabilities in nursing facilities that will allow them to transition to integrated community settings.  Instead, it has developed, implemented, and administered its community service programs in a manner that systemically or effectively denies adult nursing facility residents with developmental disabilities access to these community service programs.

64.     The Individual Plaintiffs and the majority of the class could reside in integrated, community-based settings if they were able to access the full array of community-based programs, services, and supports that the Defendants provide for other individuals with developmental disabilities who are not in nursing facilities.

65.     For persons with developmental disabilities residing in nursing facilities or at risk of nursing home placement, the key services and supports that they need in order to safely transition to the community are residential assistance services and habilitation services.

18

66.    Adult persons with developmental disabilities residing in nursing facilities or at risk of placement in a nursing facility are denied to access residential assistance services or necessary community-based habilitation services by the policies and methods of administration of the Defendants that systemically or effectively restrict access to those services to individuals with developmental disabilities who live in their state-supported living centers and private intermediate care facilities for the developmentally disabled (generally referred to as ICF/MRs). As a result, the named plaintiffs and members of the plaintiff class remain unnecessarily institutionalized in segregated nursing facilities, often for decades.

67.    Adult persons with developmental disabilities residing in nursing facilities or at risk of placement in a nursing facility are relegated to placing their names on a Home and Community-Based Services (HCS) waiting list, which, as of July 31, 2010, contained 45,756 individuals.

68.    On the other hand, persons with physical disabilities in nursing facilities are able to access the array of community-based services and supports designed to meet their needs immediately, without having to go on a lengthy, slow moving waiting list.

69.    Texas agencies and commissions have conducted studies that confirm that individuals with developmental disabilities are not able to access the community-based services and supports that they require to avoid institutional placements with reasonable promptness and, as a result, are deprived of their right to obtain services in the least restrictive setting appropriate to their individual needs.

70.    Pursuant to Section 531.0235 of the Texas Government Code, the Texas Council for Developmental Disabilities and the Office for the Prevention of Developmental Disabilities are required to prepare a joint biennial report on the state of services to persons with disabilities

19

in Texas.  In their 2008 Biennial Report, these agencies reported that "Texas ranks 49th out of the 50 states in providing community-based services to individuals with developmental disabilities." It then concluded that "[p]eople with MR/RC [mental retardation or a related condition] do not have access to services with reasonable promptness" because "Texas significantly and chronically underfunds its service system."  The Report's second major finding is that "[m]any people with intellectual and developmental disabilities (I/DD) do not receive services within the least restrictive setting appropriate to their needs….  In fact, the discrepancy in Texas's investment in institutions compared to its investment in community services is extraordinary."

71.     The findings of the 2008 Biennial Report largely mirror the conclusions reached by the Human Services Research Institute in its 2008 report, Closing the Gap in Texas: Improving Services for People with Intellectual and Developmental Disabilities.  The "Closing the Gap" report found that "in Texas the gap between present capacity and unmet needs means Texas does not operate its system in a manner that ensures that individuals will receive services promptly."  The report also concluded that "Texas relies on large congregate care facilities to serve people with mental retardation and related conditions to an extraordinary extent. Opportunities for individuals to receive services in the most integrated setting are abridged."

B.     *Texas's Nursing Facilities*

72.     The Medicaid Act defines a nursing facility as an institution which primarily provides:  (1) skilled nursing care; (2) rehabilitation services for those who are sick, injured or disabled; and (3) health related care and services to individuals who, because of their mental or physical condition, require care and services which can only be provided in an institutional setting.  42 U.S.C. § 1396r(a)(1)(A-C).

73.     Nursing facilities' services are defined as "services which are ... required to be given an individual who needs ... on a daily basis nursing care (provided by or requiring the supervision of nursing personnel) or other rehabilitation services which as a practical matter can only be provided in a nursing facility on an inpatient basis." 42 U.S.C. § 1396d(f).

74.     A basic condition for state payment and federal reimbursement of Medicaid-funded nursing facilities is that community-based services do not meet the person's needs and that the care that the individual needs can only be provided in an institutional setting.

(1)     The Nursing Home Reform Amendments to the Medicaid Act

75.     The Nursing Home Reform Amendments (NHRA) of 1987 to the Medicaid Act, 42 U.S.C.§ 1396r(e), are part of a comprehensive remedial statute designed to address the widespread problem of warehousing people with developmental disabilities in the Nation's nursing facilities.   Congress enacted the Pre-Admission Screening and Resident Review (PASRR) provisions of the NHRA to prevent and remedy the unnecessary admission and confinement of people with psychiatric and developmental disabilities in nursing facilities.

76.     The PASRR provisions of the NHRA require a careful screening of all individuals being considered for admission to a nursing facility to determine if they may have a developmental disability.   This is referred to as the Level I PASRR screen.   42 C.F.R. § 483.128(a).

77.     All persons seeking admission to a nursing facility whose Level I PASRR screen indicates that they may have a developmental disability must then be assessed and evaluated to determine if they do in fact have a developmental disability, whether they satisfy the nursing facility level of care criteria, whether their needs could be met in the community through the provision of appropriate services and supports, and whether they could benefit from the

21

provision of specialized services designed to maximize their ability for self-determination and independence. This part of the PASRR process is referred to as the Level II PASRR review. 42 C.F.R. §§ 483.128(a), 483.132.

78.     The Level II review must include a psychosocial evaluation, which analyzes current living arrangements and medical and social supports. The review also must include a functional assessment of the individual's ability to engage in activities of daily living and must document the level of support that would be needed to assist the individual to perform these activities while living in the community. 42 C.F.R. § 483.134(b)(5). The assessment must determine whether it would be possible to meet the individual's needs through the provision of services and supports in the community as an alternative to nursing facility placement.

79.     If the Level II PASRR review determines that a resident does not require nursing facility services, but instead requires specialized services in a non-institutional setting, Defendants have a mandatory duty to provide or arrange for the provision of these services to the resident in an appropriate community setting. 42 U.S.C. § 1396r(e)(7)C)(i); 42 U.S.C. § 1396r(e)(7)(C)(ii); 42 C.F.R. § 483.118(c); 42 C.F.R. § 483.120(b).

80.     The PASRR reviewers are obligated to explain to the individual involved and, where applicable, his or her legal representative the results of the Level II PASRR evaluation, including information regarding the individual's ability to reside in a less restrictive community placement, and must provide the individual and legal representative with a copy of the PASRR report. 42 CFR §§ 483.128(k), 483.130(l)(3).

81.     If the individual is admitted to a nursing facility, periodic reviews must be conducted whenever there is a change in the person's condition to determine whether the individual continues to need a nursing level of care and to require confinement in a nursing

facility. The initial and periodic PASRR Level II evaluations must also determine whether specialized services are necessary to provide habilitation and active treatment. 42 U.S.C. §§ 1396r(b)(3)(F)(i), 1396r(e)(7)(A)&(B); 42 C.F.R. §§ 483.128, 483.132, 483.134, & 483.136.

82.     Specialized services consist of an active and continuous treatment program which includes aggressive, consistent implementation of specialized and generic training, treatment, and health services that are aimed at allowing the individual to function as independently and with as much self-determination as possible, and services designed to prevent or decelerate regression and loss of abilities. 42 C.F.R. §§ 483.120, 483.440(a).     If the individual requires specialized services, under federal law the state must provide those services with the frequency, intensity, and duration that meet the federal standard for active treatment. 42 C.F.R. §§ 440(a)-(f).

83.     If the PASRR review determines that an individual admitted to a nursing facility needs specialized services, it must then be determined if the nursing facility can provide all needed specialized services and active treatment. If the review concludes the facility cannot, the individual cannot be admitted to that nursing facility. 42 C.F.R. § 483.126.

(2)     Texas's Implementation of the NHRA and PASRR Requirements

84.     Texas's PASRR program does not adequately screen applicants to nursing facilities to determine if they may have a developmental disability. As a result, many individuals with developmental disabilities are admitted to nursing facilities without being accurately identified and are never provided a Level II PASRR evaluation and determination, as required by federal law.

85.     Texas's PASRR program does not adequately or appropriately assess whether an individual with a developmental disability can be served in the community prior to admission to a nursing facility, as required by federal law.

86.     Texas's PASRR program does not assess whether the individual who needs an institutional level of services can be served in another specialized facility for persons with developmental disabilities, as required by federal law.

87.     Texas's PASRR program does not adequately or appropriately assess whether an individual needs any specialized habilitative services and, if so, what those specific needs and services are.

88.     Texas's PASRR program does not allow for the delivery of the full scope of specialized services required by federal law.

89.     Rather than providing the full array of specialized services necessary to allow class members to function as independently and with as much self-determination as possible, the Defendants have, by regulation and in violation of federal law, arbitrarily restricted the scope of specialized services to only "physical, occupational, and speech therapy evaluations and services."  40 Tex. Admin. Code § 19.1303.

90.     Not only does the Texas Administrative Code restrict the scope of specialized services in violation of federal law, but also DADS has even further constrained the scope of such services in its MRA OBRA Handbook (Revision 10-0, Oct. 26, 2009).  It has only provided nursing facility residents with developmental disabilities two specialized services – vocational training and alternate placement services – even though it provides similarly situated persons who live in ICF/MRs with a wide range of habilitative services and supports.

91. Without any change to either its regulations or the MRA OBRA Handbook, DADS issued Information Letter 10-50 to nursing facility providers on April 15, 2010. Information Letter 10-50 stated that nursing facility residents who have had a PASRR Level II review that indicates that they need specialized services may qualify for a customized manual wheelchair or other specified durable medical equipment as a specialized services benefit.

92. National experience demonstrates that where PASRR reviews are properly performed, approximately 80% of individuals with developmental disabilities who are referred for or temporarily admitted to a nursing facility placement are determined to be able to reside in the community with appropriate services and supports and should, therefore, be diverted to a more integrated community placement prior to or shortly after admission to the nursing facility.

93. Of the approximately 4,500 class members with developmental disabilities who are confined in nursing facilities, most should have been diverted to a more integrated community placement if their PASRR reviews had been performed properly.

94. Of these 4,500 class members who remain in nursing facilities, most of them could be appropriately transitioned to the community, with appropriate supports.

95. The overwhelming majority of class members would, if properly assessed during the PASRR review, be identified as needing and qualifying for specialized services.

96. In Massachusetts, where the state was required by court order to conduct comprehensive PASRR reviews of all individuals with developmental disabilities residing in nursing facilities, more than 90% of those individuals were found to need specialized services.

97. Due to the failure of the Defendants to ensure that PASRR reviews are properly and professionally completed, compounded by Defendants' failure to provide a full array of

specialized services, less than 1% of the persons with developmental disabilities who are currently residing in nursing facilities are receiving any specialized services.

98.     The Defendants' failure to conduct PASSAR reviews in a complete, comprehensive and professional manner and their failure to provide the necessary specialized services, including appropriate habilitation services, to persons with developmental disabilities has resulted in their inappropriate placement in institutional nursing facilities where their habilitation needs are largely ignored, all in violation of the NHRA, the ADA and the Rehabilitation Act.

99.     DADS licenses nursing facilities in Texas.  Because these facilities participate in the federal Medicaid program, DADS is required to review and certify these facilities pursuant to the federal requirements for nursing facilities under 42 C.F.R. §§ 483.1 - 483.75.  As part of its responsibility for surveying, inspecting, and certifying nursing facilities, DADS is required to identify and/or correct any lack of compliance with the PASRR provisions of the NHRA and its implementing regulations.  42 U.S.C. § 1396r(e)(7) and 42 C.F.R. §§ 483.100-138.

100.     Given the systemic failure of Texas's PASRR program to adequately screen, divert, and assess individuals with developmental disabilities, as well as the failure to provide specialized services which meet the federal standard for active treatment, DADS is not fulfilling its responsibilities under federal law.

101.     The federal government apparently agrees.  In 2007, the Office of the Inspector General (OIG) of the United States Department of Health and Human Services conducted an audit of Texas and four other states to determine the extent of compliance with the PASRR requirements of federal law.  The OIG found that Level I PASRR screens to determine whether

an applicant or resident has a developmental disability were performed only 88% of the time, and 25% of those that were performed were completed late.

102.    Moreover, the OIG found that 52% of the reviewed files did not contain either a Level II PASRR evaluation or a Level II determination.  Even when Level II evaluations were performed, 22% of those evaluations did not contain evidence that the evaluator assessed whether the individual's needs could be met in a community setting.

103.    The OIG found that the state agencies responsible for oversight and enforcement of PASRR requirements conducted limited, if any, oversight.

104.    Upon information and belief, the Center for Medicare and Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS) has identified deficiencies in DADS design and implementation of its PASRR process.  DADS is in the process of developing a proposal to CMS regarding changes to its PASRR process.

105.    Upon information and belief, any changes resulting from the redesign of its PASRR process will not take effect until September 2012 and will not remedy the major flaws in its current practices.

106.    Despite being alerted by the attorneys for the plaintiffs and the OIG Report, DADS has not corrected the pervasive problems that exist regarding the timeliness, accuracy and quality of PASRR Level I screens and Level II reviews, the resulting inappropriate admission of class members to nursing facilities, the failure to comprehensively assess class members' need for specialized services, and the total failure to provide specialized services that meet the federal active treatment standard.

107.    The defendants are required to ensure that individuals who are eligible for and may require nursing facility services and may be eligible for HCBS waiver services are evaluated regarding their need for nursing facility services.  42 U.S.C. § 1396n(c)(2)(B).

108.    Following the evaluation required by 42 U.S.C. § 1396n(c)(2)(B), the defendants must ensure that "individuals who are determined to be likely to require the level of care provided in a … nursing facility ... are informed of the feasible alternatives, if available under the [HCBS] waiver, at the choice of such individuals, to the provision of … nursing facility services…." 42 U.S.C. § 1396n(c)(2)(C).

109.    State regulations require that DADS "must provide to each long-term care client; to the client's legally authorized representative (LAR) …; and, if the LAR is not a member of the client's family and it is possible, to at least one family member, information about all long-term care and long-term support options appropriate to the client's needs that are currently available. The information must be provided before the agency allows the client to be placed in a care setting, including a nursing home, ….  The information must be provided in a manner designed to maximize the client's understanding of all available options. The information must include community-based options and other options available through other agencies and providers and must be easily understood by the client, the client's family member, or the client's LAR."  1 Tex. Admin. Code § 351.15(b)

110.    Despite these statutory and regulatory requirements, DADS fails to provide or ensure the provision of information to class members regarding the options available to them to access services in a less restrictive setting than a nursing facility.  As a result, class members who would prefer to reside in a less restrictive, more integrated community placement are not

even aware that they may be eligible for community-based services and supports or for a small ICF/MR placement, or how to apply for such services.

111.    Not surprisingly, few members of the class have applied for community-based services and supports or for admission to a small ICF/MR.

112.    Many persons with developmental disabilities, including the named plaintiffs and members of the plaintiff class, have unnecessarily been admitted to, or remain segregated in, nursing facilities.  Many class members who reside in nursing facilities do not need intensive nursing services that can only be provided in a nursing facility, nor do they require an institutional setting.  Moreover, virtually all class members do not receive those specialized services or supports which constitute active treatment, as required by the NHRA and its regulations.

113.    The plaintiffs and members of the plaintiff class could live and function in an integrated community setting if they were informed of and provided with support services appropriate to their needs, such as the habilitative services and residential assistance services operated and funded by the Defendants through their HCS waiver or their ICF/MR program described below.

(3)    <u>Conditions in Texas's Nursing Facilities for Class Members</u>

114.    Nursing facilities are largely institutional.  They are not real homes and or even home-like.  Nursing facilities are segregated and house large numbers of unrelated persons, most of whom are either elderly or disabled.

115.    Most residents of nursing facilities are neither integrated into nor part of the communities in which they live.  Class members in nursing facilities have limited access to the

community.  The vast majority of the plaintiffs and plaintiff class members do not participate in community activities, nor are they active members of civic clubs and churches.

116.    Many class members who are confined in nursing facilities never have the opportunity to leave the facility — not because their condition precludes it, but simply because there are few opportunities and limited means to do so.

117.    Many nursing facility residents never receive visitors.

118.    Class members in nursing facilities are denied access to meaningful employment and education opportunities by virtue of the environments in which they live and the limited supports that they are provided.

119.    Most nursing facilities resemble hospitals — they have nurses' stations and "escape guards" posted at the front doors to monitor persons leaving and entering the facility. Some have locked doors.  There are large common areas or day rooms for congregating.

120.    There is little, if any, privacy for class members in nursing facilities.  Individuals often share rooms with up to five other residents whom they did not know previously and with whom they did not choose to live.  Nursing facility residents are often not free to close the door to their rooms.

121.    Many nursing facilities are stark environments where residents have a minimal number of personal possessions.  Most class members do not have their own telephones, televisions or furniture.

122.    Most class members in nursing facilities have little, if any, choice regarding what to eat or when to eat.

123.    Nursing facilities do not provide active treatment or habilitation designed to meet the needs of class members with developmental disabilities.  The care that the nursing facilities

provide is primarily custodial. There is often a shortage of direct-care staff and trained professionals.

124.    The operating philosophy of most nursing facilities is to care for people rather than to have them care for themselves. Consequently, individuals with developmental disabilities in nursing facilities often regress and deteriorate, losing basic skills and competencies as a result of their inappropriate confinement.

125.    As a result of these institutional conditions, class members suffer harm from unnecessary confinement in these segregated facilities and rarely, if ever, receive the level of habilitative care and active treatment that is required by federal law.

    C.    *Texas's Intermediate Care Facilities for the Mentally Retarded (ICF/MR)*

    (1)    <u>Federal ICF/MR Requirements</u>

126.    The ICF/MR Program is an optional Medicaid service authorized by Title XIX of the Social Security Act. 42 U.S.C. § 1396d(a)(15). The program is also known as Intermediate Care Facilities for the Developmentally Disabled. ICF/MRs provide residential, health, and rehabilitative services for individuals with developmental disabilities.

127.    In 1971 Congress passed legislation, P.L. 92-223, that provides Medicaid reimbursement for institutions for persons with developmental disabilities who need long term care. An ICF/MR is defined as an institution for four or more persons with mental retardation or related conditions. Its primary purpose is to provide health or rehabilitative services consistent with standards prescribed by the Secretary of HHS. 42 U.S.C. § 1396d(d).

128.    Federal law permits, but does not require, a state to provide ICF/MRs as part of its Medicaid program. Once a state elects to provide such optional services, they become part of the

state Medicaid plan and are subject to the requirements of federal Medicaid law. These services must be available to any Medicaid recipients for whom they are medically necessary.

129.    Persons residing in ICF/MRs must receive "active treatment."  The HHS regulations governing ICF/MRs define active treatment as a continuous active treatment program, which includes aggressive, consistent implementation of specialized and generic training, treatment, health services and related services that is directed at:

    a.  the acquisition of behaviors necessary for the client to function as independently and with as much self-determination as possible, and

    b.  the prevention or deceleration of regression or loss of current functional status.  42 C.F.R. § 483.440(a).

130.    Active treatment in ICF/MRs means an individualized program of habilitative services and supports that is provided throughout the day – from the time the individual wakes up until the time she retires.  It must be provided in a consistent manner across all settings and parts of the facility or other locations where the individual is served.  It must be designed by a qualified professional and implemented by competent staff trained in developmental disabilities. It must be based upon a comprehensive assessment of the individual's needs and delivered pursuant to an individualized plan of care that includes measurable goals, timelines, and persons or providers with assigned responsibilities.  The plan must be reviewed periodically and modified as the individual attains the stated goals or when the individual's needs change. Finally, the plan must be evaluated for effectiveness and improved when needed.  42 C.F.R. § 483.440(a)-(f).

131.    Federal statutes and regulations require that individuals in ICF/MRs receive active treatment, which includes habilitative services, vocational services, occupational therapy, speech

therapy, physical therapy, speech and language therapy, assistive technology, auxiliary aides, adaptive equipment, case management, and community integration activities. *See* 42 U.S.C. § 1396d(d); 42 C.F.R. § 440(a)-(f).

132.    The type, level and intensity of services must be individually tailored and appropriate to meet the individual's needs, as determined by an Interdisciplinary Team. The Interdisciplinary Team includes several disability professionals from various disciplines who are required to conduct an individualized assessment of each individual's needs and to develop a habilitation plan to provide each individual the services and supports necessary to meet his/her identified needs.

(2)    Texas's ICF/MR Program

133.    Texas has chosen to provide the optional ICF/MR service. HHSC has delegated the operation and administration of Texas's ICF/MR program to DADS. Texas delivers ICF/MR services through thirteen state-operated supported living centers and numerous privately run facilities licensed by DADS.

134.    The thirteen state-operated ICF/MR schools are large institutions serving from 75 to over 600 individuals with developmental disabilities. The average census per state-operated ICF/MR is 498.

135.    The privately operated facilities range in size from 4 beds to over 200 beds, with most facilities serving from 6 to 13 residents.

136.    All ICF/MRs are required to provide active treatment to their residents. The cost of active treatment is built into their Medicaid payment rate and is a condition of licensure.

137.    Thus, while persons with developmental disabilities who reside in the ICF/MR programs which DADS licenses, monitors, and funds receive active treatment through a wide

array of habilitative services, persons with the same developmental disabilities who reside in nursing facilities receive almost no habilitative services and no active treatment.

D.    *Texas's Medicaid Programs for Persons with Developmental Disabilities*

(1)    The Federal Medicaid Program

138.    Medicaid is a jointly funded state and federal program that provides medical services to low-income persons pursuant to Title XIX of the Social Security Act.  42 U.S.C. §§ 1396 *et seq*.

139.    State participation in the Medicaid program is optional.  States choosing to receive federal matching funds for their Medicaid program must comply with the requirements of the federal Medicaid Act and with the federal regulations governing state Medicaid programs promulgated by the U.S. Department of Health and Human Services.  42 U.S.C. § 1396, 42 C.F.R. §§ 430 *et seq*.

140.    As a condition of participating in the federal Medicaid program, states must submit to HHS a state Medicaid plan that fulfills the requirements of the Medicaid Act. 42 U.S.C. § 1396a(a).

141.    Medicaid funded services for persons with developmental disabilities include mandated and optional state plan services, the PASRR program, the ICF/MR program, and various community programs funded through federal waivers, pursuant to 42 U.S.C. § 1396n.

(2)    Texas's Medicaid Program

142.    Texas has chosen to participate in the Medicaid program.  It has prepared a state plan which HHS has reviewed and approved.

143.    HHSC and its Executive Commissioner, Defendant Janek, are responsible for the overall administration of the Medicaid program.  They have delegated to DADS and its

34

Commissioner, Defendant Weizenbaum, responsibility for the delivery of Medicaid and other services and supports to elderly and disabled Medicaid recipients, including plaintiffs and the class. Nevertheless, DADS and Defendant Weizenbaum are subject to HHSC's oversight and control, and HHSC and Defendant Janek remain responsible for the actions and inactions of DADS, its officers and agents.

144. DADS and Defendant Weizenbaum are responsible for ensuring that individuals with developmental disabilities are appropriately screened prior to or immediately after admission to a nursing facility to determine whether a nursing facility is an appropriate placement or whether the individual's needs could be met in a more integrated community setting.

145. If a community placement is appropriate, DADS and Defendant Weizenbaum are responsible for ensuring that appropriate habilitative and other services and supports are provided in the community. If a nursing facility placement is the most appropriate setting for meeting the individual's needs, DADS and Defendant Weizenbaum are responsible for ensuring that the individual is comprehensively assessed to determine his or her need for specialized services. Finally, for persons needing specialized services, DADS and Defendant Weizenbaum are responsible for ensuring that those specialized services are in fact provided at the level, frequency, and intensity necessary to satisfy the federal standard for active treatment.

146. The Governor, Defendant Perry, is responsible for ensuring that the State submits a State Medicaid Plan which conforms to federal law, and that Texas's Medicaid program is administered consistent with that Plan, relevant federal statutes, and federal regulations.

147. Defendants Perry, Janek, and Weizenbaum have failed to ensure that plaintiff class members, who are categorically eligible for Medicaid services, are provided those

medically necessary services to which they are entitled under the Plan and pursuant to Title XIX of the Social Security Act.

148.    Defendants Perry, Janek, and Weizenbaum also have failed to develop plans and budgets which are designed to provide class members with developmental disabilities with the services and supports needed to reside safely in the community.  These defendants have also failed to offer class members who require care in a nursing facility the specialized services and active treatment necessary to ensure that they reach their full potential for self-determination and independence and do not suffer regression.

       E.     *The Individual Plaintiffs*

       (1)     <u>Eric Steward</u>

149.    Eric Steward is a 44 year-old man with developmental disabilities including mental retardation and the related condition of infantile cerebral palsy.  Since birth, Mr. Steward has also had a diagnosis of quadriplegia.  He uses a power scooter for mobility, can stand with assistance, is verbal and has receptive language skills.  Mr. Steward is very friendly and likes meeting and talking with other people.

150.    Mr. Steward has resided at the Buena Vida Nursing & Rehabilitation Center of San Antonio since November 2007.  Mr. Steward has lived in nursing facilities since 2002.  His first nursing facility admission occurred subsequent to surgery for a seizure disorder.  Despite residing in two different nursing facilities, Mr. Steward has never received either a Level I PASRR screen or Level II PASRR assessment.

151.    Before his placement in the first nursing facility, Mr. Steward lived in a small community-based ICF/MR for approximately 4 years.  Mr. Steward's ICF/MR provided him,

and the other seven individuals with disabilities who resided in the facility, with the opportunity to live in a home-like setting in a residential section of San Antonio.

152.    As an ICF/MR resident, Mr. Steward shared a bedroom in a home where he had access to all living and dining areas.  Mr. Steward also had opportunities to work and participate in community-based activities, including going to movies, dining out, attending sporting events, engaging in sports related activities such as bowling, and participating in Special Olympics.  In addition, Mr. Steward also received active treatment, including the opportunity to engage in skill-based activities, such as day habilitation, vocational training, and employment-related activities.  Living in an ICF/MR also helped Mr. Steward develop independent living skills.  He learned about meal preparation, money management, and doing laundry.

153.    However, in 2002 following surgery and hospitalization for his seizure activity, Mr. Steward lost his ICF/MR placement, resulting in his admission to a nursing facility where he has remained for the past eight years.

154.    According to Mr. Steward's nursing facility medical records, his mental state has declined.  He has increasing periods of what the nursing facility characterizes as "persistent sad mood," and a decline in functioning.   According to Buena Vida's own professionals, Mr. Steward has deteriorated since his last assessment.

155.    Nursing facility notes also indicate that Mr. Steward's communication deficits adversely affect his ability to interact with others.  However, there is no indication in Mr. Steward's chart that he has been evaluated for any form of assistive communication or speech therapy, even though such supports and services are available under the state Medicaid plan and required as part of a program of active treatment.

156.    There is nothing in the Buena Vida medical records indicating that he has never received a PASRR evaluation.  In fact, the nursing facility's own data indicates that it is unknown whether or not Mr. Steward ever received a PASRR determination.  As a result, there has been no determination or assessment from DADS or the local mental health mental retardation authority regarding his need for specialized services or alternate placement options. Consequently, Mr. Steward does not receive any specialized services, any active treatment, or any consideration for community living.  Because Mr. Steward lives in a nursing facility, he has very few, if any, meaningful opportunities to go anywhere, to work, or to receive the habilitation and other supportive services he needs to avoid further regression.

157.    In late July 2011 Mr. Steward applied for the HCS waiver and was placed on the interest list.  Based upon the current length of the HCS interest list, Mr. Steward does not expect to be offered a HCS waiver slot until 2017 or later.

158.    Mr. Steward wants to live in the community.  He very much wants the opportunity to work, develop independent living skills and once again have the opportunity to engage in an array of community-based living activities.  Living in a community-based setting would enable him to live and interact with individuals much closer to his age.

(2)    Linda Arizpe

159.    Linda Arizpe is a 41 year-old woman with a significant developmental disability. She is unable to walk and cannot talk, although she does have good receptive communication abilities and is particularly responsive to her parents.   She also has a significant visual impairment.

160.    Ms. Arizpe was initially admitted to Rosewood Care Center in November 2005 with anoxic brain damage.  Ms. Arizpe was admitted to Rosewood from the hospital where,

while being treated for a leg injury, she was overmedicated and stopped breathing, resulting in a brain injury. Ms. Arizpe lived at Meridian Care Nursing Facility in San Antonio since January 2008. On February 28, 2013, Ms. Arizpe moved home to live with her parents at 30836 Olympus, Bulverde, Texas.

161.    Prior to her admission to Rosewood, Ms. Arizpe attended public schools where she participated in special education classes including pre-vocational activities.

162.    When Ms. Arizpe was not in school, she traveled extensively with her family. She also participated in a variety of community-based activities including shopping, swimming, hiking and especially dining out.

163.    While Ms. Arizpe needs assistance with many of her activities of daily living including eating, dressing, and hygiene related activities, she is able to follow directions, dress and care for herself.

164.    Ms. Arizpe was considerably younger than most of the other residents at the nursing facility, and further because of her developmental disability, other nursing facility residents do not interact with her. For instance, Ms. Arizpe's roommate was well over 70 and has significant physical and mental disabilities that result in extremely limited opportunities for social interaction.

165.    While living at Meridian, Ms. Arizpe did not participate in any of the community-based activities she previously enjoyed. Moreover, she received none of the habilitation services that would enable her become more independent and socially engaged.

166.    Despite her longstanding diagnosis of a developmental disability, Ms. Arizpe's Level I PASRR form at the nursing facility indicates that she does not have such a disability. As a result, she was not identified as requiring a Level II PASRR assessment, and no evaluation has

been made to determine (a) the type of community-based placement she may be eligible for and/or (b) the type and intensity of specialized services she could benefit from.

167.    In 2001, Ms. Arizpe applied for a HCS waiver and was placed on the HCS interest list.  She has not yet been offered a HCS waiver slot despite being on the interest list for a decade.

168.    Neither Ms. Arizpe nor her parents were informed of any feasible alternatives to a nursing home placement at or about the time of her admission to the nursing facility in 2008.

169.    Ms. Arizpe's family, and, in particular, her elderly parents, want to ensure that she is not forced to spend the rest of her life in a nursing facility without the habilitative services she needs to avoid regression and to be as independent as she can be.

170.    Ms. Arizpe and her parents wanted to have her transferred to a small community-based setting where she could receive all of the needed services, supports, and therapies which she needs and also interact with the outside world.

171.    On February 28, 2013, this wish was finally realized, when she moved from the nursing facility to her new home in the community.  Nevertheless, because of her significant disabilities and medical needs, she remains at risk of re-institutionalization in a nursing facility.

(3)    Andrea Padron

172.    Andrea Padron is 26 years old. She resided at Meridian Care in San Antonio since 2001.  On February 10. 2013, Ms. Padron moved to 16506 Fox Den, San Antonio, Texas.

173.    When Ms. Padron was ten years old, she suffered a severe head injury from a car accident.  Since the accident, Ms. Padron has required extensive care and habilitation.  Her diagnosis includes quadriplegia and quadriparesis, esophageal reflux, mental retardation, and

epilepsy.   In addition, Ms. Padron is nonverbal, although she appears to have good receptive language skills.  Her treating doctor indicates that her rehabilitation potential is fair.

174.     Until she was 16, Ms. Padron lived at home.   There she received a range of habilitative services and therapies.  She attended public school.  She was able to use a wheelchair and, on occasion, to stand with the use of a standing table.  She also participated in aqua-therapy, as well as arts and crafts classes in the community.

175.     In or about 1995, Andrea's mother, Rosa Hudecek, applied for a HCS waiver slot for Andrea and she was placed on the HCS interest list at that time.

176.      In or about May 2001, Andrea's eligibility for the supplemental security income program was terminated. Because Ms. Hudecek could no longer afford to care for Andrea at home, she placed her in a nursing facility -- believing she would get the care and attention she needed.  In December 2004, Ms Hudecek, who was on active military duty with the United State Army, was deployed to Iraq.

177.     In or about September 2005, Andrea reached the top of the HCS interest list and was offered a HCS waiver slot.  At that time, Ms. Hudecek was deployed to Iraq, and the HCS waiver slot was not accepted.

178.     Although Ms. Hudecek did not accept the HCS waiver for Andrea in 2005, she continued to want to obtain the services and supports that would enable Andrea to leave the nursing facility and live in a more integrated community setting.   As a result, Ms. Hudecek promptly reapplied for a HCS waiver slot for Andrea.  Andrea has been on the HCS interest list since late 2005 and remained on the interest list, waiting to reach the top and be offered a HCS slot.

179.     When Ms. Hudecek returned from her deployment to Iraq in February 2007, Ms. Hudecek reports that Andrea could no longer even sit in her wheelchair.  She attributes this to the nursing facility's failing to get Andrea out of bed regularly.  As a result, Andrea has regressed.  She is no longer able to stand or use her wheelchair.  She no longer receives aqua-therapy or participates in recreational or social activities.

180.     Following Ms. Hudecek's return from Iraq and her re-involvement with her daughter, the nursing facility staff began to assist Andrea into her wheelchair.  However, the nursing facility staff often left Andrea sitting in her chair for long periods of time unattended, resulting in skin breakdown and sores.

181.     To address both the skin breakdown and sores and to enable Andrea to continue to use her wheelchair, Ms Hudecek purchased Roho cushions.  These cushions are designed to more evenly distribute a patient's body weight, significantly reducing the chances for skin breakdown.  However, over the past two years, nursing facility staff have failed to regularly use these cushions.  As a result, Ms. Padron is no longer using her wheelchair.

182.     A review of Ms. Padron's nursing home record at Meridian indicates that her Level I PASRR screening form was completed incorrectly; erroneously stating that Ms. Padron does not have a developmental disability.  As a result, Ms. Padron was not referred for a Level II assessment and no assessment of her ability to reside in a community-based setting and/or her need for specialized services has ever been done by the local mental health mental retardation authority.  Consequently, she received no specialized services, no active treatment, and no consideration for community living.

183.     Ms. Hudecek wanted Andrea moved to an integrated, community-based setting where she can get the care and habilitation needed to recover lost skills related to mobility,

where she can enhance and further develop the skills needed to maximize her ability to function with as much self-direction and independence as possible, and where she will have much greater opportunities to participate in community-based activities.

184.    On February 10, 2013, this wish was finally realized, when she moved from the nursing facility to her new home in the community.  Nevertheless, because of her significant disabilities and medical needs, she remains at risk of re-institutionalization in a nursing facility.

(4)    Patricia Ferrer

185.    Plaintiff Patricia Ferrer is an individual with developmental disabilities, specifically mental retardation and the related condition of epilepsy.

186.    Plaintiff Patricia Ferrer resided at ManorCare Health Services nursing facility since September 2008, when her elderly mother, Petra Ferrer, no longer was able to provide for her care.  On or about December 20, 2012, Ms. Ferrer moved from the nursing facility to her new home in the community located at 7312 Boisenberry Lane, Dallas, Texas.

187.    Ms. Ferrer has few physical limitations and is quite mobile.  In addition to her intellectual disability, she has epilepsy which is poorly controlled by medication.

188.    For the first forty-four years of her life, Ms. Ferrer lived at home with her parents. She attended public schools, graduating from Adamson High School in Dallas.

189.    After graduation from high school, Ms. Ferrer worked full-time as a chamber maid for a hotel chain for approximately four years.  She then obtained a position in the security department at Love Field in Dallas, where she worked for approximately two years.

190.    Ms. Ferrer ultimately had to leave her employment at Love Field when her epilepsy became more active and difficult to control.  In order to control her epilepsy, Ms. Ferrer must take medication periodically throughout the day.

191.    During the more than forty years that Ms. Ferrer lived in the community with her parents she was very independent and active.  She required no assistance with activities of daily living.  In fact, she sometimes prepared simple meals for the family and would regularly assist in meal preparation.

192.    Until her epilepsy became more active and unpredictable, Ms. Ferrer was able to use public transportation and would often go to the mall, movies, or visit a friend.  After her epilepsy became more active, Ms. Ferrer was not allowed by her parents to take the bus on her own.  Nevertheless, she continued to go out to the movies, shopping, and restaurants, and to visit friends when accompanied by a family member or friend.

193.    Approximately three years ago, Ms. Ferrer's father was diagnosed with Parkinson's disease.  Ms. Ferrer's mother, who is in her seventies and the sole care provider in the household, then had to provide care for both her husband and her daughter.  Ultimately, Mrs. Ferrer realized that she lacked the physical ability to provide both her husband and Patricia with the care and support they needed.

194.    Because of her inability to properly care for her daughter, Patricia, while also attending to the medical needs of her husband, Mrs. Ferrer reluctantly decided to place Patricia in a nursing facility.

195.    When Ms. Ferrer was admitted to ManorCare in September 2008, her admitting records indicated that she was a person with mental retardation.  Nevertheless, her Level 1 PASRR screen indicated that she did not have mental retardation or any other developmental disability.

196.    Because Ms. Ferrer was not identified on the Level 1 PASRR screen as an individual with a developmental disability, she was never evaluated to determine if her needs could appropriately be met in the community or if she could benefit from specialized services.

197.    On or about September 7, 2010, Ms. Ferrer applied for and was placed on the interest list for an HCS waiver slot.  Based upon the current length of the interest list, she does not anticipate that she will be provided with HCS waiver services until 2018 or later.

198.    Neither at the time she was admitted to a nursing facility in 2008 nor when she applied for the HCS waiver program in September 2010 were Ms. Ferrer or her parents provided with information on feasible alternatives to nursing facility care.

199.    Since being placed in ManorCare, Ms. Ferrer's condition has deteriorated.  She has become less communicative, cries frequently, has developed behavioral issues requiring medication, and spends most of her waking hours sitting in a chair by the nurses' station.

200.    There was no reason for Ms. Ferrer to be confined in a segregated nursing facility. She is very independent and able to take care of most of her daily living needs.  She would like to live in an integrated community setting where she could meet new people, go to the movies, go shopping, and otherwise interact with the outside world.  She is also interested in obtaining the training and support so that she could go back to work.

201.    On December 20, 2012 her wish was finally realized, when she moved from the nursing facility to her new home in the community.  Nevertheless, because of her disabilities, she remains at risk of re-institutionalization in a nursing facility.

(5)    Benny Holmes

202.    Plaintiff Benny Holmes is an individual with developmental disabilities, specifically mental retardation and the related condition of cerebral palsy.

203.    Mr. Holmes resided at the Renaissance at Kessler Park nursing facility from January 2009 when he was discharged from a local hospital following an admission for treatment related to his epilepsy, weight loss, and hydration issues until late December 2010.

204.    Until Mr. Holmes was a young adult, he lived at home and attended public high school.  Not only did he attend school regularly, but he also participated in school-related activities, including frequently going to school athletic events and attending his senior prom.

205.    Mr. Holmes continued to receive special educations services from the Dallas Independent School District until he was 21 years old.  He lived at home with his mother and legal guardian, Priscilla Holmes, during this period.

206.    Mr. Holmes mother, who is a single parent, had to work to support herself and her son.  When Mr. Holmes' special education services terminated, his mother was not able to both work and care for him during the day.  As a result, Mr. Holmes was placed at the Dallas Health and Rehabilitation Center, where he remained for approximately one year.

207.    After about one year at the Dallas Health and Rehabilitation Center, the local Mental Retardation Authority in Dallas determined that Mr. Holmes' needs could be more appropriately met in a community-based setting.  He was provided with a HCS-waiver slot which enabled him to transfer from the nursing facility to a three bedroom home in the community where he lived for approximately nine years.

208.    During the nine years that Mr. Holmes resided in the community, he attended day habilitation programming, went to the movies, and participated in other community outings. While he is unable to talk, he could and did communicate with others using sounds and gestures. He is also not able to walk.  While in the community, he had a wheelchair which provided him with the ability to move around.

209.    After successfully residing in the community for approximately nine years, Mr. Holmes was admitted to a local hospital because of problems he was having with his epilepsy, hydration, and weight loss.  Following his treatment at the hospital, he was not discharged back to his community residence, but rather was transferred in January 2009 to the Renaissance at Kessler Park nursing facility.

210.    Shortly after his admission, a preadmission screening and resident review (PASRR) form was filled out regarding his admission.  That Level I PASRR screen indicated that Mr. Holmes did not have a developmental disability, even though the Renaissance's own admission form indicates that he has a history of mental retardation and cerebral palsy.  That PASRR form also indicated that Mr. Holmes did not need specialized services.

211.    Because the Level I PASRR screen incorrectly indicated that Mr. Holmes did not have a developmental disability, no Level II PASRR assessment of Mr. Holmes was undertaken by either DADS or the local Mental Retardation Authority to determine his interest in and ability to reside in a less restrictive community setting, or his need for and interest in specialized services.

212.    While Mr. Holmes had a HCS-waiver slot when he was admitted to Renaissance and could have used that waiver slot to move back to a community-based setting, neither he nor his mother was advised by the defendants or anyone else of feasible alternatives to placement in a nursing facility.

213.    Not only did no one advise Mr. Holmes or his mother – and legal guardian – of the options available to him under the HCS waiver and other available Medicaid programs and services to avoid a nursing facility placement, but Renaissance nursing facility staff repeatedly

informed Mr. Holmes' mother that a community-based waiver program would not be appropriate for him.

214.    Renaissance staff told Mr. Holmes' mother that a community-based placement was not appropriate without ever contacting the local mental retardation authority, the agency responsible for determining whether or not a community-based alternative would be appropriate. This was never done in part because Renaissance failed to conduct a Level II PASRR assessment, as required by federal law.

215.    The Renaissance nursing facility staff also told Mr. Holmes' legal representatives from Advocacy, Incorporated that he was not appropriate for a community-based placement. When representatives from Advocacy, Incorporated suggested that Mr. Holmes could possibly qualify for and benefit from a HCS Medicaid waiver slot, Renaissance nursing facility staff continued to assert that a community placement was inappropriate, notwithstanding having never contacted a Medicaid waiver provider for information about community-based alternatives.

216.    On information and belief, Mr. Holmes' initial HCS provider, Dallas MetroCare, contacted the Renaissance nursing facility regarding the possibility of Mr. Holmes moving to a small residential home in the community with his HCS-waiver slot, which they were still holding for him.  Dallas MetroCare was told by the Renaissance nursing facility that Mr. Holmes was not appropriate for such a setting.

217.    On information and belief, Renaissance nursing facility staff told MetroCare that Mr. Holmes' mother never visited her son, despite the fact that she regularly visited him. In addition, in response to requests from MetroCare for Ms. Holmes' telephone number, Renaissance never provided Dallas MetroCare with a working phone number for Ms. Holmes.

218.    Upon information and belief, these statements regarding Mr. Holmes' appropriateness for community-based care and the frequency of Ms. Holmes' visits were made to MetroCare in order to discourage MetroCare from further pursuing the possibility of providing Mr. Holmes with support and services in the community through the HCS waiver.

219.    As a result of the statements by Renaissance, Dallas MetroCare planned to give Mr. Holmes' HCS-waiver slot to another applicant on the interest list.  However, before this occurred, Advocacy, Incorporated learned that Mr. Holmes' had previously resided in the community through the HCS-waiver program and contacted Dallas MetroCare, providing them with Ms. Holmes' phone number and informing them that, contrary to the nursing facility's claim, Ms. Holmes frequently visits her son at the nursing facility.

220.    Dallas MetroCare contacted Ms. Holmes and, after being informed of the community-based options that were available for her son, Ms. Holmes advised MetroCare that she would like to retain the HCS-waiver slot for her son and develop a plan to transition him back to the community.

221.    In response to the information provided by Dallas MetroCare, Ms. Holmes had Mr. Holmes evaluated by an HCS-waiver provider in Dallas in late 2010.  That HCS provider determined that it could meet all of Mr. Holmes health and habilitation needs in a community setting and recommended a placement is a four bedroom home in a quiet residential neighborhood, where Mr. Holmes would have his own room and live with three other residents.

222.    Mr. Holmes moved out of the Renaissance nursing facility to his new residential placement at 7404 Clover Glen, Dallas, Texas in late December 2010.

223.    While Mr. Holmes was not evaluated by a speech or language pathologist or therapist to determine if he could benefit from any form of assistive augmentative

49

communication device or therapy during his time at the Renaissance nursing facility, he is now scheduled to receive such an evaluation at his new community-based group home.

224.    After being admitted to the Renaissance nursing facility, Mr. Holmes' condition deteriorated markedly.  At the time Mr. Holmes was admitted to the Renaissance nursing facility, he was described as alert, able to follow commands, and an active participant in treatment.  But, after only six months at the nursing facility, medical notes indicated that Mr. Holmes rarely, if ever, understands commands from others and no longer is an active participant in his treatment.

225.    During the course of his stay at the Renaissance nursing facility, Mr. Holmes became withdrawn and depressed. While he used to be active and participate in community activities, Mr. Holmes spent his days at Renaissance confined to his bed or in a wheelchair in front of the television.

226.    Since moving to the community-based group home, Mr. Holmes' condition has markedly improved.  He has gained a significant amount of weight and is much more engaged with his parent and caregivers.  He also now gets out into the community on a regular basis.

227.    Because of his cerebral palsy and epilepsy, Mr. Holmes remains at significant risk of a flare up of these conditions which would require hospitalization and a subsequent discharge to a nursing facility in the future.

(6)    Zackowitz Morgan

228.    Plaintiff Zackowitz Morgan is a 40 year-old man with developmental disabilities. Mr. Morgan has diagnoses of mental retardation, cerebral palsy, obesity, hypertension, hypothyroidism, glaucoma, and peripheral vascular disease, congestive heart failure and a seizure disorder.

229.    Mr. Morgan has been in living in a nursing facility since January 2008, following his discharge from a hospital where he was treated for a leg infection.  Mr. Morgan was admitted into the Katyville Healthcare Center (nursing facility) on January 25, 2008.  Upon his admission, Mr. Morgan did not receive a PASRR screen or a comprehensive assessment for specialized services.

230.    On January 27, 2009, more than a year after being admitted into his nursing facility placement, Mr. Morgan finally received a PASRR screening.  That screening simply indicated that he was appropriate for specialized services.

231.    On March 18, 2009, an Inter-Disciplinary Team (IDT) meeting was held at Katyville Healthcare Center.  Participants included representatives from the nursing facility, Mr. Morgan's guardian, and his legal counsel.  There was no representative from Harris County Mental Health and Mental Retardation Authority (MHMRA), the county branch of the state agency responsible for providing specialized services and community services.  The IDT determined that Katyville Healthcare could not meet Mr. Morgan's specialized services needs related to his mental retardation.  In addition, the IDT also determined that a nursing facility was not an appropriate placement for him.

232.    In July 2009, Mr. Morgan was transferred to the Silver Springs Healthcare Center at the request of his guardian.

233.    Almost nine months after Mr. Morgan's IDT meeting, a Harris County Mental Health and Mental Retardation Authority (MHMRA) service coordinator finally visited him at Silver Springs Healthcare Center to perform a needs assessment.  That September 16, 2009 assessment determined Mr. Morgan had "…a moderate need for service coordination."

However, there is no indication that Mr. Morgan has ever received any specialized services, and he is not aware of having received any. He clearly does not receive active treatment.

234. Despite the IDT determination that a nursing facility was not an appropriate placement for Mr. Morgan, the Defendants have not undertaken any steps to assist him in locating an alternative, more integrated setting in which his habilitation and residential assistance needs could be met.

235. Upon information and belief, prior to his nursing home placement, Mr. Morgan lived in a small ICF-MR with three other individuals.

236. In or about 1996, Mr. Morgan applied for and was put on the interest list for a HCS waiver slot. He remained on the HCS interest list until 2001, at which time he was removed from the interest list. Neither he nor his guardian, Sharon Barker, know why he was removed from the HCS interest list in 2001.

237. In or about June 2009, Mr. Morgan again applied for a HCS waiver slot and was put on the HCS interest list on or about June 5, 2009. He requested that his position on the interest list be adjusted to reflect the five years he had already been on the interest list between 1996 and 2001, but was told that such an adjustment was not possible. As a result, in June 2009 he was placed at the bottom of the interest list and, based upon the length of that list, is not likely to be provided a HCS waiver slot until sometime in 2017 or later.

238. Neither Mr. Morgan nor his guardian was advised by the defendants or anyone else of feasible alternatives to placement in a nursing facility in 2008 when he was admitted to Katyville Healthcare Center.

239.    Neither Mr. Morgan nor his guardian was advised by the defendants or anyone else of feasible alternatives to placement in a nursing facility in July 2009 when he was transferred to Silver Springs Healthcare Center.

240.    Mr. Morgan is an individual with an extremely outgoing personality.  Living in the community would afford him a variety of opportunities that institutional living precludes, including meeting and socializing with people and pursuing his desire to work.  Prior to his nursing home placement, Mr. Morgan participated regularly in a vocational workshop operated by EduCare of Texas.

241.    Since moving to a nursing facility placement, Mr. Morgan has regressed.   He is no longer participating in EduCare workshops.  He has gained a significant amount of weight, and is no longer ambulatory and now uses a wheelchair.  In terms of daily living activities, Mr. Morgan can no longer self-transfer or self-toilet, tasks that he could perform prior to his nursing facility placement.  He now must wear diapers.

242.    Mr. Morgan is both frustrated and depressed about the deterioration of his health, his inability to participate in social activities outside of the nursing facility, and his goal of being employed.  At the nursing facility he receives no vocational support or training.  He spends all of his waking hours in institutional rooms with little to do or engage him.

(7)    Maria Hernandez

243.    Maria Hernandez is a 22 year-old woman with developmental disabilities, specifically mental retardation and the related condition of epilepsy, as well as a number of medical conditions.

244.    Although she cannot speak, Ms. Hernandez can communicate by making sounds and facial expressions.  She is not able to walk and therefore uses a wheelchair for mobility.  She can manipulate objects with her left hand.

245.    Ms. Hernandez resides at Meridian Care, a nursing facility located in San Antonio, Texas.  Prior to living at Meridian Care, she lived at Esperanza, an intermediate care facility for children with intellectual and developmental disabilities, in Austin, Texas.  She was admitted to Meridian Care in 2007 after Esperanza closed.

246.    Prior to being admitted to Esperanza, Ms. Hernandez lived at home with her mother and her siblings.  As Ms. Hernandez got older, her mother determined that she could no longer meet Ms. Hernandez's complex medical needs at home and admitted her to Esperanza.  When Esperanza closed, her mother was not able to care for her at home, and, therefore, reluctantly admitted Ms. Hernandez to Meridian.

247.    In spite of her long-standing diagnosis of mental retardation and cerebral palsy, the Level I PASRR screens in Ms. Hernandez's records contain inconsistent information.  In many cases the screens are inaccurate, incomplete, or left blank.

248.    Because Ms. Hernandez has not been consistently accurately identified as an individual with a developmental disability, she was never given a PASRR Level II assessment to determine whether her needs could be properly met in the community or if she could benefit from specialized services, and if so, the type and intensity of these services.

249.    Since being placed at Meridian Care, Ms. Hernandez has deteriorated.  For example, while at Meridian, her spine began to curve and impair her ability to breathe.  She had surgery to straighten her back to enable her to breathe more easily.  Following the surgery,

however, she was not been provided the necessary follow-up therapy, and consequently, her spine began to again curve to the side and she again having problems breathing.

250.    Since she has been at Meridian Care, Ms. Hernandez has been neglected.  On a number of occasions, the Meridian staff members failed to provide her with adequate assistance with her activities of daily living.  Consequently, she was sent to school without proper bathing and wearing dirty clothing.  The Meridian staff also neglected her further by failing to keep the area where her G-tube is inserted clean.  This resulted in the development of an infection for which she needed hospitalization.

251.    As a result of being at her nursing facility, Ms. Hernandez is needlessly segregated and isolated from the community.  She has no regular activities at her nursing facility, and she is no longer eligible to attend school in the local school district, as she is now 22 years-old.  With the exception of occasionally attending church and visiting with her family, Ms. Hernandez spends the vast majority of her time either confined to her bed or in a chair in her room watching television.

252.    In 2007, Ms. Hernandez applied for HCS waiver and was placed on the HCS interest list.  She is number 1,219 on the list and she has not yet been offered a HCS waiver slot.

253.    Ms. Hernandez and her mother and legal guardian, were not informed of any feasible alternatives to a nursing home placement at or about the time of her admission to her nursing facility.

254.    Ms. Hernandez and her mother would like for Ms. Hernandez to live in an integrated community placement where she could more readily see her family, participate in community activities, and otherwise interact with the outside world.

(8)    Vanisone Thongphan

255.    Vanisone Thongphanh is a 34 year-old man with significant developmental disabilities, including mental retardation and cerebral palsy.  He also has medical conditions including diabetes, dysphyagia, and acute pulmonary edema, among others.

256.    Because Mr. Thongphanh is unable to walk, he uses a wheelchair for mobility. Although he cannot talk, Mr. Thongphanh does not like to be isolated and enjoys socializing and participating in activities with others.  He especially enjoys going to parties and listening to music.  His former HCS community provider is active in his life and visits him regularly at his nursing facility.

257.    Mr. Thongphanh was admitted to the Arlington Residence Rehabilitation Center in November of 2007 from a hospital where had been treated for aspiration and pneumonia.  It was initially expected that he would remain at the nursing facility for a short period of rehabilitation immediately following his hospitalization, and then return to his HCS-funded community placement.  Because he remained on a ventilator longer than was anticipated and had to stay at the nursing facility for an extended period of time, Mr. Thongphahn lost his HCS waiver slot.

258.    In spite of his long standing diagnosis of developmental disabilities, including mental retardation and cerebral palsy, Mr. Thongphanh's PASRR Level I screens have inconsistently identified him as: 1) not having a developmental disability and not in need of specialized services; 2) having a developmental disability and not needing specialized services; and as 3) having a developmental disability and needing specialized services.

259.    Because Mr. Thongphanh has not been consistently or accurately identified as an individual with a developmental disability, he was never given a PASRR Level II assessment to

determine whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services.

260.    Except for the receipt of a specialized wheelchair, Mr. Thongphanh has not been provided with any of the other specialized services that he needs.  These services include physical therapy, occupational therapy, and speech therapy.

261.    When Mr. Thongphanh lived in the community, he participated in a day habilitation program every weekday.  He also regularly attended dinners with his fellow group home residents and participated in weekly community activities, including going to baseball games, fairs and taking walks.  Since moving to the nursing facility, Mr. Thongphanh has been segregated and isolated from the community.  His activities are limited to nursing facility-related activities, including watching television and going outside to spend time on facility property.  He has almost no opportunity to interact with individuals outside of his nursing facility.

262.    In 2011, Mr. Thongphanh applied for HCS waiver and was placed on the HCS interest list.  He has not yet been offered a HCS waiver slot.

263.    Mr. Thongphanh was not informed of any feasible alternatives to a nursing home placement at or about the time of his admission to his nursing facility.

264.    Mr. Thongphanh's next friend, Paul Mastin would like Mr. Thongphan to move to the community so that he can do the things that he was able to do when he lived in the community before living at his nursing facility and so that he can interact with the overall community.

(9)    <u>Melvin Oatman</u>

265.    Melvin Oatman is a 49 years-old.  Mr. Oatman has a disability (AIDS) which he contracted before the age of 22.  Mr. Oatman also has impaired speech, glaucoma, problems with coordination, and seizure disorder, among other medical conditions.

266.    Mr. Oatman can walk independently and perform his activities of daily living with minimal assistance.  Mr. Oatman has a high school diploma and has previous work experience as a janitor.  He is friendly and enjoys socializing with others.

267.    Mr. Oatman currently resides at the Renaissance at Kessler Park Nursing Facility in Dallas, Texas.  He has resided there since October of 2007.  Mr. Oatman was homeless prior to living at the nursing facility.  He then became ill and was hospitalized.  Following his hospitalization in October of 2007, Mr. Oatman was admitted to the nursing facility as a hospice patient, as he was only expected to live for up to six months.  Since that time, however, his health has improved and he is no longer a hospice patient.

268.    Mr. Oatman's PASRR Level I screens incorrectly indicate that Mr. Oatman does not have a related condition to a developmental disability and that he does not need specialized services.

269.    Because he has never been correctly identified as having a condition related to developmental disability, he has never been given a PASRR Level II assessment to determine his whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services.

270.    Mr. Oatman is extremely bored at his current nursing facility.  He is confined to the nursing facility most days, with the exception a once a month trip to Wal-Mart.

271.    Mr. Oatman would like a job so that he can have money to spend on social activities in the community, such as eating in restaurants.  Prior to moving to his nursing facility, he would like to do similar work to his prior employment as a janitor.

272.    Because he does not have an intellectual disability, Mr. Oatman does not qualify for Texas HCS waiver program.  Additionally, the Texas Medicaid waivers for which he does qualify are insufficient to meet his needs, because they do not include a housing component which he needs in order to move to the community.

273.    Mr. Oatman did not receive any information about feasible alternatives to a nursing home placement at or about the time of his initial admission to his nursing facility.

274.    He has not received any discharge planning from his nursing facility.

275.    Mr. Oatman would like to move to the community to live near his cousin.  He would also like to get a job and participate daily in the community activities of his choosing.

(10)    Richard Krause

276.    Richard Krause is a 32 year-old man with a traumatic brain injury resulting from a car accident that occurred when he was 21.  He has a seizure disorder, chronic liver disease, and other medical and psychiatric conditions.

277.     Although his speech is impaired, Mr. Krause can express his thoughts and wishes.  He can participate in different activities.  He can perform some of his activities of daily living, with assistance of others.  Mr. Krause was a good student and has a high school diploma. He is also a talented artist.

278.    Mr. Krause was hospitalized following his car accident.  After hospitalization, he was briefly admitted to a nursing facility in Victoria, Texas.  Because this facility was not able to meet his treatment needs, Mr. Krause was admitted to a rehabilitation facility, Warm Springs

Rehabilitation, a rehabilitative hospital in Victoria Texas. While at Warm Springs, Mr. Krause received extensive rehabilitative therapies including physical, occupational and speech therapy. As a result, he was able to independently perform his activities of daily living, his speech improved, and he was able to walk with the assistance of the walker. Due to his significant rehabilitation, Mr. Krause was discharged to live with his parents in their home in Victoria, Texas.

279.    While living with his parents, he attended an adult day care program during the week days and regularly participated in a variety of community activities with his family. He was able to attend to most of his ADLs with minimal assistance, was able to speak, and could walk using a walker.

280.    Mr. Krause lived with his family until his father could no longer take care of Mr. Krause due to his own health problems and the demands of his employment. His father reluctantly admitted Mr. Krause to Amber Oaks Assisted Living, a nursing facility in San Antonio, Texas. He resided there for approximately eight years.

281.    While at Amber Oaks, Mr. Krause began to languish and was not given the appropriate medications. Mr. Krause's father grew concerned about his health and safety and transferred him to the Retama Manor South, a nursing facility in Pleasanton, Texas.

282.    Mr. Krause resided at the Retama Manor South for approximately three months. While at Ratama Manor South, Mr. Kruase again languished and was overmedicated. Mr. Krause's father then transferred him to Southeast Nursing and Rehabilitation, another nursing facility in San Antonio. After two months, Southeast Nursing and Rehabilitation administrators determined that they would no longer care for Mr. Krause. He was then transferred to the River City Care Center in San Antonio, Texas, where he has resided since September of 2011.

283.    Mr. Krause's PASRR Level I screens incorrectly indicate that he does not have a related condition to a developmental disability and that he does not need specialized services.

284.    Because he has never been correctly identified as having a condition related to a developmental disability, he has never been given a PASRR Level II assessment to determine whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services.

285.    Although Mr. Krause has received some speech, occupational, and physical therapy since his admission to the River City Care Center, this therapy was insufficient to meet Mr. Krause rehabilitative needs.  Consequently, Mr. Krause has physically and cognitively deteriorated.  He is no able longer to walk with his walker and must now use a wheelchair.  He is also no longer able to feed himself because his left arm has grown unsteady; his speech has become more impaired; his short term memory has declined; and he has become depressed.

286.    Mr. Krause is isolated and segregated from the community.  He is rarely given opportunities to leave his nursing facility to participate in community activities.  He spends most of his time in his room.  For the vast majority of the time, the only socialization that he is afforded is with other residents in the nursing facility who are substantially older than he.

287.    Because he has a developmental disability but not an intellectual disability, he does not qualify for Texas HCS waiver program.  Additionally, the Texas Medicaid waivers he qualifies for are insufficient to meet his needs because they do not include a housing component which he needs in order to move to the community.

288.    Neither Mr. Krause, nor his father received any information about feasible alternatives to a nursing home placement at or about the time of his initial admission to his first nursing facility or at or about the time of his admission to subsequent nursing facilities.

61

289.    Mr. Krause has not received any discharge planning from his nursing facility.

290.    Mr. Krause and his father would like Mr. Krause to move to the community so that he could participate in various activities in the community such as going to sporting events and socializing with others his age.  He would like to get a job.  By moving to the community, Mr. Krause could also receive all of the therapies in sufficient amount, scope and duration that he needs in order to avoid or prevent further deterioration of his mental and physical conditions.

(11)    Michael Mc Burney

291.    Michael Mc Burney is a 29 year old man with a developmental disability, schizophrenia, anxiety, blindness, and a number of medical conditions including aphasia, hypertension, tachycardia, among others.

292.    Mr. Mc Burney is eligible to receive services for individuals with intellectual and developmental disabilities from the Alamo Local Authority.  He has limited verbal abilities but can nod his head in responses to yes or no questions.  He is able to walk on his own and enjoys walking outside.

293.    Mr. Mc Burney currently resides at the River City Care Center located in San Antonio Texas.  He was admitted to the River City Care Center in February of 2013 from the Retama South Manor, a nursing facility in Pleasanton, Texas, after residing there for several weeks.  He was transferred to River City Care Center because the Retama South Manor administrators determined that they would no longer serve him.  Before living at Retama South Manor, Mr. Mc Burney resided for approximately two days at Retama West Manor in Jourdanton, Texas.

294.    Prior to his admission to Ratama West Manor, Mr. Mc Burney resided in the community with his younger brother and his caretaker and next friend, Estelle Le Master.  He

lived with Ms. Le Master for nine years after his mother abandoned him and his brother in 2004. When Mr. Mc Burney lived in the community with Ms. Le Master, he attended school, enjoyed shopping, dancing, and participating in other community activities.

295.    Mr. Mc Burney became ill in December of 2012 as a result of having what his doctors believe was a stroke.  At this time, Mr. Mc Burney lost his ability to see and soon thereafter lost other skills, including the ability to talk and to dress and groom himself.  He also became incontinent.  Because of Mr. Mc Burney's increasing support and supervision needs, Ms. Le Master determined that she could no longer care for him at her home and felt that she had no choice but to admit him into a nursing facility.

296.    Although his PASRR Level I has identified him as having a developmental disability, Mr. Mc Burney has not been given a PASRR Level II assessment to determine whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services.

297.    In 2013, Mr. Mc Burney applied for HCS waiver and was placed on the HCS interest list.  He has not yet been offered a HCS waiver slot.

298.    Neither Mr. Mc Burney, nor his former care provider and next friend, Ms. Le Master, were informed of any feasible alternatives to a nursing home placement at or about the time of his admission to his nursing facility.

299.    He has received no discharge planning from his current nursing facility.

300.    Mr. Mc Burney is unhappy at his nursing facility and would very much like to return to live in the community.

(12)    <u>Leon Hall</u>

301.    Leon Hall is a 59 year-old man with moderate mental retardation, depression, and a number of chronic medical conditions, including obstructive chronic bronchitis, asthma, and other problems.

302.    Mr. Hall is able to walk and can communicate his thoughts, feelings and needs verbally.  He is able to independently perform most of his activities of daily living, except that he needs some assistance with bathing because of his need for intermittent oxygen.  He enjoys socializing with others and attending church.

303.    Mr. Hall currently resides at Terrace West Nursing & Rehabilitation, a nursing facility in Midland, Texas where he has resided since June of 2010.  Prior to living at Terrace West, Mr. Hall resided at the Parks Methodist Retirement Village ("Park Methodist"), a nursing facility in Odessa.

304.    Before being admitted to Parks Methodist, Mr. Hall resided at "Henry's Turkey Service" — a now-closed a turkey farm and processing plant— in Atalissa, Iowa.

305.    While at Henry's Turkey Service, Mr. Hall was subjected to approximately 30 years of abuse, neglect, and forced labor at grossly substandard wages processing turkeys and doing chores at a "bunkhouse," where he lived with approximately 20 other men with intellectual disabilities.  These other men also worked for Henry's Turkey Service.  The "bunkhouse" was a dilapidated old school with faulty wiring and boarded windows that was poorly heated, had a leaky roof, and was infested with roaches and mice.

306.    While living at Henry's Turkey Service, Mr. Hall was segregated and isolated from the community.  Virtually the only social interaction that he had for approximately the 30 years that he was at Henry's Turkey Service was with the other men with intellectual and

developmental disabilities with whom he lived and worked, other workers at Henry's Turkey Services, and his abusers.

307.    Mr. Hall was moved from Henry's Turkey Service to Texas and placed in the Parks Methodist nursing facility on or about August of 2008, and resided there until June of 2010.  He was then transferred to Terrace West.  The nephew of the owner of Henry's Turkey Service is the administrator of Terrace West.

308.    Although his initial PASRR Level I has identified him as having a developmental disability, Mr. Hall's subsequent PASRR Level I screens have inconsistently identified him as: 1) not having a developmental disability and not in need of specialized services; 2) having a developmental disability and not needing specialized services; and as 3) having a developmental disability and needing specialized services.

309.    Because Mr. Hall has not been consistently or accurately identified as an individual with a developmental disability he did not receive a PASRR Level II assessment to determine whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services.

310.    Since his admission to Terrace West, Mr. Hall has not received any specialized services that he needs to improve his functioning and prevent his deterioration.

311.    As a result of his placement at his nursing facility, Mr. Hall is isolated and segregated from the community.  Mr. Hall is not provided with regular opportunities to socialize with others outside of the nursing facility.  He rarely leaves the nursing facility, except for occasional outings under the supervision of nursing facility staff.  He attends nursing facility activities and spends most of his time in his room with his roommate watching television.  He has no family living in the area near his nursing facility and almost never receives any visitors.

312.    In 2013, Mr. Hall applied for HCS waiver and was placed on the HCS interest list. He has not yet been offered a HCS waiver slot.

313.    Mr. Hall was not informed of any feasible alternatives to a nursing home placement at or about the time of his admission to the Parks Methodist or Terrace West nursing facilities.

314.    Mr. Hall has received no discharge planning from the Parks Methodist or Terrace West nursing facilities.

315.    Mr. Hall would like to move from his nursing facility to live in the community. He would like to receive supported living services and live in an apartment with a friend who lives with him at his nursing facility, so that he could have the freedom to go and come from his apartment as he pleases and participate in community activities of his choosing, including attending sports events, going to movies and shopping, attending church and interacting generally with the community.

(13)    Leonard Barefield

316.    Leonard Barefield is a 68 year-old man with a developmental disability, depression and other mental health conditions, high blood pressure and other medical conditions. Mr. Barefield also has a hearing impairment for which he uses a hearing aide.  He also has significantly impaired speech.

317.    Mr. Barefield can read, write and drive a truck.  He can walk and perform all of his activities of daily living independently.  He is friendly and enjoys socializing with others.

318.    Mr. Barefield currently resides at Terrace West Nursing & Rehabilitation, a nursing facility in Midland, Texas.   Before being admitted to Terrace West, Mr. Barefield

resided at "Henry's Turkey Service" — a now-closed turkey farm and processing plant— in Atalissa, Iowa.

319.    While at Henry's Turkey Service, Mr. Barefield was subjected to approximately 30 years of forced labor at grossly substandard wages processing turkeys.  He was also abused and neglected at Henry's Turkey Service.  He was forced to live in a "bunkhouse" with approximately 20 other men with intellectual disabilities who also worked for Henry's Turkey Service.  The "bunkhouse" was a dilapidated old school with faulty wiring and boarded windows that was poorly heated, had a leaky roof, and was infested with roaches and mice.

320.    While living at Henry's Turkey Service, Mr. Barefield and was segregated and isolated from the community.  Virtually the only social interaction that he had for approximately the 30 years that he was at Henry's Turkey Service was with the other men with intellectual and developmental disabilities with whom he lived and worked, other workers at Henry's Turkey Service, and his abusers.

321.    Mr. Barefield was moved from Henry's Turkey Service to Texas and placed in the Terrace West nursing facility in December of 2008.  He has continued to reside at Terrace West since that time.  The nephew of the owner of Henry's Turkey Service is the administrator of Terrace West.

322.    Although his initial PASRR Level I has identified him as having a developmental disability, Mr. Barefield's subsequent PASRR Level I screens have inconsistently identified him as: 1) not having a developmental disability and not in need of specialized services; 2) having a developmental disability and not needing specialized services; and as 3) having a developmental disability and needing specialized services.

323.    Because Mr. Barefield has not been consistently or accurately identified as a person with a developmental disability, Mr. Barefield has not been given a PASRR Level II assessment to determine whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services.

324.    Since his admission to Terrace West, Mr. Barefiled has not received the specialized services that he needs to improve his functioning and prevent his deterioration.  For example, although Mr. Barefield has severely impaired speech, he has not been provided with speech therapy to help him speak more clearly.

325.    Since his admission to Terrace West, Mr. Barefield has also developed an unsteady gait and is now experiencing difficulty walking.  He has not been provided with any specialized services to assist him in addressing this problem or to prevent his mobility skills from deteriorating .

326.    As a result of his placement at his nursing facility, Mr. Barefield is isolated and segregated from the community.  He is not provided with regular opportunities to socialize with others outside of his nursing facility.  He rarely leaves the nursing facility, except for occasional outings under the supervision of nursing facility staff.  He has no family living near him and almost never receives any visitors.

327.    In 2013, Mr. Barefield applied for HCS waiver and was placed on the HCS interest list.  He has not yet been offered a HCS waiver slot.

328.    Mr. Barefield was not informed of any feasible alternatives to a nursing home placement at or about the time of his admission to his nursing facility.

329.    Mr. Barefield has received no discharge planning from his nursing facility.

330.    Mr. Barefield would like to move from his nursing facility to live in his own apartment with supported living services in the community so that he could have the freedom to go and come from his home as he pleases.  He would also like to participate in community activities, including attending sports events, going to movies and going shopping, among other community activities and interact with the community.

(14)    Tommy Johnson

331.    Tommy Johnson is 60 year-old man with a developmental disability, dementia, mental health conditions, and cataracts.  Mr. Johnson also has impaired speech.

332.    Although Mr. Johnson has problems with his speech, he is able to articulate his thoughts, feelings, needs and desires.   He is able to walk and perform all of his activities of daily living independently.

333.    Mr. Johnson currently resides at Terrace West Nursing & Rehabilitation, a nursing facility in Midland, Texas.  Before being admitted to Terrace West, Mr. Johnson resided at "Henry's Turkey Service" — a now-closed a turkey farm and processing plant— in Atalissa, Iowa.

334.    While at Henry's Turkey Service, Mr. Johnson was subjected to approximately 30 years of forced labor at grossly substandard wages processing turkeys.  Mr. Johnson was physically and psychologically abused, including being handcuffed to a bed and beaten, and neglected at Henry's Turkey Service.   He was forced to live in a "bunkhouse" with approximately 20 other men with intellectual disabilities who also worked for Henry's Turkey Service.  The "bunkhouse" was a dilapidated old school with faulty wiring and boarded windows that was poorly heated, had a leaky roof, and was infested with roaches and mice.

335.    While living at Henry's Turkey Service, Mr. Johnson and was segregated and isolated from the community.  Virtually the only social interaction that he had for approximately the 30 years that he was at Henry's Turkey Service was with the other men with intellectual and developmental disabilities with whom he lived and worked, other workers for Henry's Turkey Services, and his abusers.

336.    Mr. Johnson was moved from Henry's Turkey Service to Texas and placed in the Terrace West nursing facility in December of 2008.  He has continued to reside at Terrace West since that time.  The nephew of the owner of Henry's Turkey Service is the administrator of Terrace West.

337.    Although his initial PASRR Level I identified him as having a developmental disability, Mr. Johnson's subsequent PASRR Level I screens have inconsistently identified him as: 1) not having a developmental disability and not in need of specialized services; 2) having a developmental disability and not needing specialized services; and as 3) having a developmental disability and needing specialized services.

338.    Because he was not consistently or accurately identified as having a developmental disability, Mr. Johnson has not been given a PASRR Level II assessment to determine whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services.

339.    Since his admission to Terrace West, Mr. Johnson has not received the specialized services that he needs to improve his functioning and prevent his deterioration.   For example, although Mr. Johnson has impaired speech, he has not been provided with speech therapy to help him speak more clearly.

340.    Since his admission to Terrace West, Mr. Johnson has developed maladaptive behaviors including rummaging in ashtrays and chewing on cigarette butts.  He has not, however, been provided with any specialized services to assist him in addressing these problems.

341.    As a result of his placement at his nursing facility, Mr. Johnson is segregated and isolated from the community.  Since the time he was admitted to Terrace West, Mr. Johnson has not been provided with regular opportunities to socialize with others outside of his nursing facility.  He rarely leaves the nursing facility, except for occasional outings under the supervision of nursing facility staff.  He has no family living near him and almost never receives any visitors.

342.    In 2013, Mr. Johnson applied for HCS waiver and was placed on the HCS interest list.  He has not yet been offered a HCS waiver slot.

343.    Mr. Johnson was not informed of any feasible alternatives to a nursing home placement at or about the time of his admission to his nursing facility.

344.    Mr. Johnson has received no discharge planning from his nursing facility.

345.    Mr. Johnson would like to move from his nursing facility to live in the community.  He would like to receive supported living services and share an apartment with his friend, who lives with him at his nursing facility.  He would also like to have the opportunity to make decisions about what he would like to do each day and to participate in community activities of his choosing.

(15)    Johnny Kent

346.    Johnny Kent is 63 year-old man with a developmental disability, dementia, and medical conditions including high blood pressure and arthritis.

347.    Mr. Kent also has impaired speech but is able to articulate his thoughts, feelings, needs and desires.  Mr. Kent is also able to walk and independently attend to most of his

71

activities of daily living, including eating, hygiene, and dressing.  He is friendly, likes to work, and enjoys socializing with others.

348.    Mr. Kent currently resides at Terrace West Nursing & Rehabilitation, a nursing facility in Midland, Texas.  Before being admitted to Terrace West, Mr. Kent resided at "Henry's Turkey Service" — a now-closed turkey farm and processing plant— in Atalissa, Iowa.

349.    While at Henry's Turkey Service, Mr. Kent was subjected to approximately 30 years of forced labor at grossly substandard wages processing turkeys.  Mr. Kent was abused and neglected at Henry's Turkey Service.   He was forced to live in a "bunkhouse" with approximately 20 other men with intellectual disabilities who also worked for Henry's Turkey Service.  The "bunkhouse" was a dilapidated old school with faulty wiring and boarded windows that was poorly heated, had a leaky roof, and was infested with roaches and mice.

350.    While living at Henry's Turkey Service, Mr. Kent and was segregated and isolated from the community.  Virtually the only social interaction that he had for approximately the 30 years that he was at Henry's Turkey Service was with the other men with intellectual and developmental disabilities with whom he lived and worked, other workers at Henry's Turkey Service, and his abusers.

351.    Mr. Kent was moved from Henry's Turkey Service to Texas and placed in the Terrace West nursing facility in December of 2008.   He has continued to reside at Terrace West since that time.  The nephew of the owner of Henry's Turkey Service is the administrator of Terrace West.

352.    Although his initial PASRR Level I identified him as having a developmental disability, Mr. Kent's subsequent PASRR Level I screens have inconsistently identified him as: 1) not having a developmental disability and not in need of specialized services; 2) having a

developmental disability and not needing specialized services; and as 3) having a developmental disability and needing specialized services.

353.    Because he was not consistently or accurately identified as having a developmental disability Mr. Kent has not been given a PASRR Level II assessment to determine whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services

354.    Since his admission to Terrace West, Mr. Kent has not received the necessary specialized services that he needs to improve his functioning and prevent his deterioration.  For example, although Mr. Kent has impaired speech, he has not received speech therapy necessary to help him speak more clearly.

355.    As a result of his placement at his nursing facility, Mr. Kent is isolated and segregated from the community.  Mr. Kent is not provided with regular opportunities to socialize with others outside of the nursing facility.  He rarely leaves the nursing facility, except for occasional outings under the supervision of nursing facility staff.  He has no family living in the area near his nursing facility and almost never receives any visitors.

356.    Mr. Kent is bored at his nursing facility.  He spends most of the day sitting at the front door in a chair greeting people who are entering the facility.

357.    Mr. Kent likes to work.  At his nursing facility, he helps the facility staff clear the dining tables after each meal.  Mr. Kent would like to have a paying job in the community.

358.    In 2013, Mr. Kent applied for HCS waiver and was placed on the HCS interest list.  He has not yet been offered a HCS waiver slot.

359.    Mr. Kent was not informed of any feasible alternatives to a nursing home placement at or about the time of his admission to his nursing facility.

73

360.    Mr. Kent has received no discharge planning from his nursing facility.

361.    Mr. Kent would like to move from his nursing facility to live in the community with supported living services with his friend who lives at his nursing facility.  He would like to live in the community so that he could go and come to and from his home as he pleases, get a paying job, and participate in community activities such as attending sports events, going to movies and shopping, among other community activities of his choosing

(16)    Joseph Morrell

362.    Joseph Morrell is a 69 year-old man with a developmental disability and glaucoma.  Mr. Morrell has wounds on his legs for which he has recently needed medical treatment due to infection.

363.    Mr. Morrell can walk and independently perform his activities of daily living. Additionally, although his speech is somewhat impaired, he is able to articulate his thoughts, feelings, and needs.

364.    Mr. Morrell currently resides at Terrace West, a nursing facility in Midland, Texas where he has been residing since January of 2013.  Prior to his admission to Terrace West, he resided at the Parks Methodist, a nursing facility in Odessa, Texas from on or about December of 2008 until January of 2013.  The nephew of the owner of Henry's Turkey Service is the administrator of Terrace West.

365.    Before being admitted to Parks Methodist, Mr. Morrell resided at "Henry's Turkey Service" — a now-closed turkey farm and processing plant— in Atalissa, Iowa.

366.    While at Henry's Turkey Service, Mr. Morrell was subjected to approximately 30 years of forced labor at grossly substandard wages processing turkeys.  Mr. Morrell was also physically and psychologically abused and neglected at Henry's Turkey Service.  He was forced

to live in a "bunkhouse" with approximately 20 other men with intellectual disabilities who also worked for Henry's Turkey Service.  The "bunkhouse" was a dilapidated old school with faulty wiring and boarded windows that was poorly heated, had a leaky roof, and was infested with roaches and mice.

367.    While living at Henry's Turkey Service, Mr. Morrell and was segregated and isolated from the community.  Virtually the only social interaction that he had for approximately the 30 years that he was at Henry's Turkey Service was with the other men with intellectual and developmental disabilities with whom he lived and worked, other workers at Henry's Turkey Service, and his abusers.

368.    Mr. Morrell was moved from Henry's Turkey Service to Texas and placed in the Parks Methodist nursing facility on or about August of 2008.  Recently, while at Parks Methodist the wounds on his lower legs and ankles were improperly treated and became infected.  Mr. Morrell was hospitalized as a result.  In January of 2013, following his discharge from the hospital, he was transferred to Terrace West where he currently resides.  The nephew of the owner of Henry's Turkey Service is the administrator of Terrace West.

369.    In spite of his long standing diagnosis of developmental disabilities, including mental retardation and Down's Syndrome, Mr. Morrell's PASRR Level I screens have inconsistently identified him as: 1) not having a developmental disability and not in need of specialized services; 2) having a developmental disability and not needing specialized services; and as 3) having a developmental disability and needing specialized services.

370.    Because he has not been consistently or accurately identified as having a developmental disability, Mr. Morrell has not been given a PASRR Level II assessment to

determine whether his needs could be properly met in the community or whether he could benefit from specialized services, and if so, the type and intensity of such services.

371.    Since his admission to Parks Methodist and Terrace West, Mr. Morrell has not received the specialized services that he needs to improve his functioning and prevent his deterioration.

372.    As a result of his admission to the Parks Methodist and Terrace West nursing facilities, Mr. Morrell has been isolated and segregated from the community.  He has not been provided with regular opportunities to socialize with others outside of either nursing facility.  He rarely leaves Terrace West, except for occasional outings under the supervision of nursing facility staff.  He has no family living near him and almost never receives any visitors.

373.    In 2013, Mr. Morrell applied for HCS waiver and was placed on the HCS interest list.  He has not yet been offered a HCS waiver slot.

374.    Mr. Morrell was not informed of any feasible alternatives to a nursing home placement at or about the time of his admissions to his nursing facilities.

375.    Mr. Morrell has received no discharge planning from his nursing facility.

376.    Mr. Morrell would like to move from his nursing facility to live in an apartment with a friend who lives with him at Terrace West and receive supported living services in the community.  He would also like to participate in community activities including attending sports events—especially football games, going to movies and shopping, among other community activities.

## VI.    LEGAL CLAIMS

### First Claim for Relief
### The Americans with Disabilities Act

A.    *Violation of the ADA's Integration Mandate*

76

377.    The plaintiffs and the members of the plaintiff class are qualified individuals with disabilities within the meaning of the ADA.  42 U.S.C. § 12131(2).

378.    Title II of the ADA requires that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  Defendants Janek and Weizenbaum, acting in their official capacities, are public entities within the meaning of the ADA.

379.    The Individual Plaintiffs and plaintiff class members qualify for and would benefit from community support services available from the Texas Medicaid program.  Although community programs are the most integrated setting appropriate to meet their needs, the plaintiffs remain institutionalized in nursing or rehabilitation facilities, or at imminent risk of such institutionalization.  By denying plaintiffs and the class access to existing community programs, and by requiring them to be confined in segregated institutional settings in order to receive the care they require, Defendants discriminate against the plaintiffs and class on the basis of their disability in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d).

B.    *Eligibility Criteria*

380.    Regulations implementing Title II of the ADA specify that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

381.    The Defendants have developed and implemented eligibility criteria for their community-based support services for individuals with developmental disabilities that screen out or tend to screen out the class of individuals with developmental disabilities who are residing in

77

Texas nursing facilities from gaining access to or enjoying those community-based habilitative services and supports in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(8).

C.       *Methods of Administration*

382.    Regulations implementing Title II of the ADA provide that "a public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration:  (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities ...."  28 C.F.R. § 35.130(b)(3).

383.    The Defendants have developed and utilize criteria and methods of administering Texas's long-term care system for persons with developmental disabilities that have the tendency and effect of subjecting the plaintiffs and the class to unnecessary and unjustified segregation on the basis of their disability by, *inter alia*, failing to inform them of the services, supports and programs that would enable them to reside in a less restrictive, more integrated setting, failing to assess them for such services, supports and programs, failing to offer them a choice of such community-based services, supports and programs, and failing to afford them equal access to such services, supports and programs with other institutionalized individuals on the basis of the nature of their disability and placement, all in violation of 42 U.S.C. § 12132 and 28 U.S.C. § 35.130(b)(3).

384.    It would not fundamentally alter the Defendants' programs, services, or activities to provide the plaintiffs and the class with the services necessary to allow them to live in the community.

**Second Claim for Relief**
**Section 504 of the Rehabilitation Act**

385.    The plaintiffs are qualified individuals with disabilities under Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a).

386.    Defendants receive federal financial assistance to operate the Medicaid Program and other related programs and services designed to provide medically necessary services and supports to the plaintiff class.

387.    The regulations accompanying Section 504 provide that:   "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

388.    These regulations further prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration ... (i) [t]hat have the effect of subjecting handicapped persons to discrimination on the basis of handicap; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b).

389.    The Individual Plaintiffs and plaintiff class members qualify for and would benefit from community support services provided by the Defendants.  Although the community is the most integrated setting appropriate to meet their needs, the plaintiffs remain institutionalized in nursing and rehabilitation facilities, or at risk of such institutionalization.  By denying them access to existing community programs, and by requiring that plaintiffs and class members be confined in segregated institutional settings in order to receive needed rehabilitative services, the Defendants violate Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

390.    The Defendants' criteria and methods of administering their system of long-term services for persons with developmental disabilities subject plaintiffs and the class to illegal

79

discrimination and unnecessary segregation in violation of § 504 of the Rehabilitation Act and its implementing regulations.

391.    It would not fundamentally alter the Defendants' programs, services, or activities to provide the plaintiffs and the class with the services necessary to allow them to live in the community.

**Third Claim for Relief**
**Title XIX of the Social Security Act**

A.    *Reasonable Promptness*

392.    Title XIX of the Social Security Act requires states to provide Medicaid benefits to all eligible persons with reasonable promptness and for as long as medically necessary.  42 U.S.C. §§ 1396a(a)(8); 1396a(a)(10)(A).  Provision of services must not be delayed by the agencies' administrative procedures.  42 C.F.R § 435.930(a).

393.    The Defendants' arbitrary policies, which limit the provision of medically necessary community-based services and supports, as well as medically necessary specialized services, result in extended delays and the outright denial of medically necessary care to the plaintiffs and members of the plaintiff class.  The residential support, habilitation and other specialized services that the plaintiff class needs are not provided with reasonable promptness, in violation of 42 U.S.C. §§ 1396a(a)(8).

B.    *Freedom of Choice*

394.    The Defendants have failed to provide residents of nursing facilities with developmental disabilities with:  1) notice of and equal opportunities to apply for and access medically necessary community-based services; 2) an assessment of their eligibility for such services; and 3) meaningful choice between institutional and community-based services, in violation of 42 U.S.C. § 1396n(c)(2)(B) & (C).

80

C.    *Comparability*

395.    Under federal Medicaid law, persons, like plaintiffs and the class, who are "categorically eligible" for Medicaid benefits based upon their disability and income must be provided with assistance which shall not be less in amount, duration and scope than the medical assistance made available to another "categorically eligible" recipient and shall not be less in amount, duration and scope than the medical assistance made available to other recipients in the program.  42 U.S.C. § 1396a(a)(10)(B)(i) and (ii); 42 C.F.R. § 440.240.

396.    By failing to provide Medicaid services, including specialized services and active treatment, to Individual Plaintiffs and members of the plaintiff class who reside in nursing facilities which are comparable to the services provided to similarly-situated individuals such as categorically needy persons who reside in ICF/MRs, the Defendants violate the comparability requirement of the Social Security Act.  42 U.S.C. § 1396a(a)(10)(B).

**Fourth Claim for Relief**
**Nursing Home Reform Amendments**

A.    *Screening, Assessment and Placement*

397.    The federal NHRA requires that states develop and implement a PASRR program for all applicants to, and residents of, Medicaid-certified nursing facilities. 42 U.S.C. § 1396r(e)(7); 42 C.F.R. § 483.100 to 483.138.  Each state's PASRR program must identify all individuals who are suspected of having mental illness or developmental disabilities and must determine whether nursing facility services and other specialized services are necessary.  42 U.S.C. §§ 1396r(b)(3)(F)(i), 1396r(e)(7)(A)&(B); 42 C.F.R. § 483.128.

398.    The Defendants have failed to develop and implement a PASRR program that timely and appropriately screens nursing home applicants for developmental disabilities, assesses whether the needs of individuals with developmental disabilities could be met in an alternative,

less restrictive setting than a nursing facility, and advises the applicant or resident of the available alternatives to a nursing home placement in violation of 42 U.S.C. §§ 1396r(b)(3)(F)(i), 1396r(e)(7)(A) & (B) and 42 C.F.R. § 483.128.

399.    The Defendants' failure to appropriately screen all applicants for nursing facility admission for possible developmental disabilities and to then assess whether the needs of those so identified require nursing facility care or, instead, could be met in a more integrated community-based setting has resulted in the inappropriate placement and retention of plaintiffs and many members of the class in nursing facilities in violation of 42 U.S.C. §§ 1396r(e)(7)(B)(ii) & (C) and 42 C.F.R. § 483.132(a).

    B.    *Specialized Services*

400.    The Level II PASRR assessment must determine whether the applicant or resident requires specialized services and, if so, must provide those specialized services either in the nursing facility or in an alternative appropriate setting.  42 U.S.C. § 1396r(e)(7)(B)(ii)(II) & (C); 42 C.F.R. §§ 483.112(b), 483.114(b)(2), 483.116(b)(2), 483.118, 483.120(b).

401.    Specialized services for individuals with developmental disabilities must include all services which are needed to implement "a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services … that is directed toward—(i) The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and (ii) The prevention or deceleration of regression or loss of current optimal functional status."   42 C.F.R. § 483.440(a)(1), made applicable to nursing facility residents by 42 C.F.R. § 483.120(a)(2).

402.    The intensity, duration and frequency of specialized services must be sufficient to provide active treatment, using training and qualified staff, to each individual who needs such services.  42 C.F.R. § 483.440 (c) - (f).  The scope and breadth of specialized services cannot be arbitrarily curtailed or limited by the state.  42 C.F.R. § 483.440(c).  In addition, the process for planning, providing and monitoring those services must comply with 42 C.F.R. § 483.440 (c) - (f).

403.    The Defendants have failed to provide a program of active treatment to each resident of a nursing facility who needs specialized services, and have instead arbitrarily and illegally limited these services by regulation to only "physical, occupational, and speech therapy evaluations and services."   40 Tex. Admin. Code §§ 19.1303, 19.2500(e)(3).   Defendants' limitation of the scope of specialized services that they will authorize violates 42 U.S.C. § 1396r(b)(3)(F), (e)(7)(B)(ii), (f)(8) and 42 C.F.R. §§ 483.120(a)(2), 483.440.

404.    In addition to illegally limiting the scope of specialized services available to class members, the Defendants have failed to provide even those limited services to almost all members of the plaintiff class.  Contrary to the their obligation to provide specialized services, including active treatment, to the class, the Defendants have failed and refused to provide or ensure the provision of needed specialized services to all but 28 members of the class of approximately 4,500 nursing facility residents with developmental disabilities, despite the fact that experience in other states indicates that over 90% of the class are eligible for and in need of such services.

405.    The Defendants' failure to appropriately assess class members' need for specialized services, their failure to provide the full range of needed specialized services and active treatment to individual class members and members of the plaintiff class, and their failure

to ensure that plaintiffs and the class are not inappropriately placed or retained in nursing facilities, violates the NHRA, 42 U.S.C. § 1396r(e)(7) and its implementing regulations, 42 C.F.R. § 483.100 *et seq.*

## VII.   PRAYERS FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that this Court:

1.     Certify this case as a class action pursuant to Fed. R. Civ. P. 23;

2.     Issue preliminary and permanent injunctions restraining the Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them from:

(a)     Failing to provide appropriate, integrated community services and supports for all class members, consistent with their individual needs;

(b)     Failing to make reasonable modifications to the rules and requirements regarding the eligibility for and administration of Texas's community-based services, supports and programs which exclude plaintiffs and the class from the services and supports needed to reside safely in more integrated community-based settings;

(c)     Failing to provide equal access to medically necessary community-based habilitative mental retardation and developmental disability services to all eligible class members based on their individual needs and medical necessity, and without regard to arbitrary funding or service caps or waiting list requirements;

(d)     Discriminating against plaintiff class members with developmental disabilities by failing to provide medically necessary habilitation services and supports in the most integrated setting appropriate to their needs;

(e)    Failing to provide medically necessary community-based habilitation services and supports with reasonable promptness and in a comparable manner to all eligible class members;

(f)    Failing to conduct proper, comprehensive PASRR screens and assessments of class members to determine whether their needs could be appropriately met in a less restrictive setting than a nursing facility, and failing to inform class members of the results of their PASRR assessment;

(g)    Failing to assess class members' needs for specialized services;

(h)    Failing to provide the full array of needed specialized services, at the frequency, level, intensity, and duration needed to constitute active treatment, to class members as required by the NHRA; and

(i)    Arbitrarily restricting the scope of available specialized services.

3.    Issue a declaratory judgment declaring that:

(a)    the Defendants have violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act in their implementation and administration of the state Medicaid program and in their failure to make reasonable modifications to their community programs for persons with developmental disabilities to enable plaintiffs and members of the class to obtain the services and supports they require to reside in the most integrated setting appropriate to their needs;

(b)    the Defendants have violated the Medicaid Act including the comparability, reasonable promptness, and freedom of choice provisions of the Social Security Act governing Medicaid services; and

(c)    the Defendants have violated the Nursing Home Reform Amendments by failing to properly screen and assess class members' ability to reside in a less restrictive, more integrated setting than a nursing facility, by their inappropriate placement of class members in nursing facilities, by their failure to assess class members' need for specialized services, by their arbitrary restriction on the scope of available specialized services, and by their failure to provide members of the plaintiff class with specialized services, including active treatment;

4.    Award plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 & 12205 and 29 U.S.C. § 794a; and

5.    Grant such other relief which is necessary and proper to protect the federal rights of the plaintiffs and the class which they represent.

DATED this 12th day of March, 2013.

Respectfully submitted,

/s/ *Garth A. Corbett*
Garth A. Corbett
State Bar No. 04812300
Sean A. Jackson
State Bar No. 24057550
Disability Rights Texas
2222 West Braker Lane
Austin, Texas 78758
(512) 454-4816 (Telephone)
(512) 454-3999 (Facsimile)

Yvette Ostolaza
State Bar No. 00784703
Robert Velevis
*Admitted Pro Hac Vice*
State Bar No. 24047032
Casey A. Burton
*Admitted Pro Hac Vice*
State Bar No. 24058791

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
(214) 746-7700 (Telephone)
(214) 746-7777 (Facsimile)

Steven J. Schwartz
*Admitted Pro Hac Vice*
Deborah Dorfman
*Admitted Pro Hac Vice*
Bettina Toner
*Admitted Pro Hac Vice*
Center for Public Representation
22 Green Street
Northampton, Massachusetts 01060
(413) 586-6024 (Telephone)
(413) 586-5711 (Facsimile)

*Attorneys for Plaintiffs*