IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ERIC STEWARD, *et al.,* | § | |
| Plaintiffs | § | |
| v. | § | |
| | § | |
| GREG ABBOTT, | § | |
| Governor of the State of Texas, *et al.,* | § | |
| *Defendants* | § | |
| | § | Case No. 5:10-CV-1025-OG |
| | § | |
| THE UNITED STATES OF AMERICA, | § | |
| *Plaintiff-Intervenor* | § | |
| v. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| *Defendant* | § | |

**STATE OF TEXAS' MOTION TO DISMISS THE CLAIMS OF THE
UNITED STATES OF AMERICA**

| | |
|---|---|
| KEN PAXTON<br>Attorney General of Texas | NANCY K. JUREN<br>Assistant Attorney General<br>Attorney in Charge<br>Texas Bar No. 11059300 |
| CHARLES E. ROY<br>First Assistant Attorney General | ANDREW B. STEPHENS<br>Assistant Attorney General<br>Texas Bar No. 24079396 |
| JAMES E. DAVIS<br>Deputy Attorney General for Civil Litigation | THOMAS A. ALBRIGHT<br>Assistant Attorney General<br>Texas Bar No. 00974790 |
| ANGELA COLMENERO<br>Chief, General Litigation Division | MICHAEL PATTERSON<br>Assistant Attorney General<br>State Bar No. 24074868<br>NATALEE B. MARION<br>Assistant Attorney General<br>State Bar No. 24075362<br>General Litigation Division<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>Phone No.: (512) 463-2120<br>Fax No.: (512) 320-0667 |
| November 19, 2015 | *Attorneys for Defendants* |

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

    I.      Title II of The ADA Does not Confer Standing on the United States. ...................3

          A.      The Enforcement Provision of Title II Does Not Even Mention the Attorney General. ...................................................4

          B.      The United States Is Not a "Person" Authorized to Sue Under Title II. ........................................................................5

          C.      Title II's Incorporation of the Remedies of the Rehabilitation Act Illustrates Congressional Intent Not to Authorize Enforcement Suits. .........................................................................9

    II.     Title VI of the Civil Rights Act—the Ultimate Source of Enforcement Mechanisms Under Title II of the ADA—Does Not Independently Authorize Federal Enforcement Actions. ............................................13

ALTERNATIVE REQUEST FOR CERTIFICATION AS INTERLOCUTORY APPEAL ...........................................................................................................27

CONCLUSION.....................................................................................................27

## TABLE OF AUTHORITIES

**Cases**

*A.R. v. Dudek*, 31 F.Supp.3d 1363, (S.D.Fla. 2014) .................................................... 26

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ............................................................ 26

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002) ........................................... 8

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) ................................................. 12

*Bryan v. United States*, 524 U.S. 184 (1998) ........................................................... 24

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) ............................................. 10, 20

*Consol. Cos. v. Union Pac. R.R. Co.*, NO. 98-1804 L-O, 2006 U.S. Dist. LEXIS 21556
(W.D. La. Apr. 11, 2006)...................................................................................... 27

*Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984)................................................. 10

*Dir. v. Newport News Shipbuilding & Dry Dock Co.,* 514 U.S. 122 (U.S. 1995*)* ............ 4, 7, 9, 16

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News
Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995) ................................................. 1

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)................................................................ 12

*Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186 (1974).................................... 17

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995) .................................................... 7

*In re Griffith*, 206 F.3d 1389 (11th Cir. 2000) .......................................................... 5

*Int'l Primate Prot. League v. Admin. of Tulane Educ. Fund*, 500 U.S. 72 (1991) ......... 5

*Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564 (Fed. Cir. 1993)................................... 2

*Marshall v. Gibson's Prods., Inc. of Plano*, 584 F.2d 668 (5th Cir. 1978)......... *passim*

*Moore v. Am. Fed. of Television & Radio Artists*, 216 F.3d 1236 (11th Cir. 2000) ...... 17

*NAACP v. Civiletti*, 609 F.2d 514 (D.C.Cir. 1979)...................................................... 15

*National Black Police Association, Inc. v. Velde*, 712 F.2d 569 (D.C. Cir. 1983) ......... 24, 25

*New York v. United States*, 505 U.S. 144 (1992)....................................................... 12

*Olmstead v. Zimring*, 527 U.S. 581 (1999) ............................................................... 8

*Parker v. Los Angeles County*, 338 U.S. 327 (1949) ................................................ 12

*Penn. Dep't of Corr. v. Yeskey,* 524 U.S. 206 (1998) .................................................... 12

*Reickenbacker v. Foster*, 274 F.3d 974 (5ᵗʰ Cir. 2001) ................................................. 13

*Russello v. United States*, 464 U.S. 16 (1983) ............................................................. 8

*SEC v. Sloan*, 436 U.S. 103 (1978) ............................................................................. 22

*Smith v. City of Philadelphia*, 345 F. Supp. 2d 482 (E.D. Pa. 2004) ........................... 26

*Smith v. Dearborn Fin. Servs., Inc.*, 982 F.2d 976 (6th Cir. 1993) .............................. 22

*United States v. Arkansas*, No. 4:09-cv-33 (E.D. Ark. filed Jan. 16, 2009) ................. 12

*United States v. Arkansas*, No. 4:10-cv-327 (E.D. Ark. filed May 6, 2010) ................. 12

*United States v. Baylor University Medical Center*, 736 F.2d 1039 (5th Cir. 1984) .............. 10, 20

*United States v. Bonanno Organized Crime Family of La Cosa Nostra,*  879 F.2d 20
   (2d Cir. 1989) ........................................................................................... 4, 5, 6, 16

*United  States v. City & County of Denver*, 927 F. Supp. 1396 (D. Colo. 1996) .................. 11, 25

*United States v. City of Baltimore*, No. 09-1049 (D. Md. filed  Apr. 23, 2009) .......................... 12

*United  States v. City of New Orleans*, No. 2:12-cv-2011 (E.D. La. filed Aug. 6, 2012).............. 11

*United States v. Cooper Corp.*, 312 U.S. 600 (1941) ............................................ 5, 6, 11

*United States v. ICC*, 337 U.S. 426 (1949) ................................................................. 10

*United States v. Jin Fuey Moy*, 241 U.S. 394 (1916) ................................................... 12

*United States v. Julian*, 633 F.3d 1250 (11th Cir. 2011) ............................................... 7

*United States v. Marion County School District*, 625 F.2d 607 (5th Cir. 1980) .................... 23, 25

*United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979) ............................................... 20

*United States v. N. Ill. Special Rec. Ass'n*, No. 12-C-7613 (N.D. Ill. filed Sep. 24,
   2012).......................................................................................................................... 11

*United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977) ............................................ 20

*United States v.  Virginia*, No. 3:12-cv-59 (E.D. Va. filed Jan. 26, 2012) .................... 11

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ................ 5

*Zuber v. Allen*, 396 U.S. 168 (1969) ............................................................................ 22

## Statutes

12 U.S.C § 1292(b) .................................................................................................. 27

29 U.S.C. § 794a(a)(2) ...................................................................................... 2, 9, 13

29 U.S.C. 794a, *et seq.* ..................................................................................... *passim*

42 U.S.C. § 12132, *et seq.* ................................................................................ *passim*

42 U.S.C. § 12133 ............................................................................................. 2, 5, 13

42 U.S.C. § 12133(a) ................................................................................................. 7

42 U.S.C. § 1973a(a) ............................................................................................... 11

42 U.S.C. § 2000a-6(a) ............................................................................................ 15

42 U.S.C. § 2000d-1 .......................................................................................... 15, 25

42 U.S.C. §§ 12117(a) ..................................................................................... *passim*

42 U.S.C. §§ 12188(b) ..................................................................................... *passim*

42 U.S.C. §2000e ............................................................................................. *passim*

42 U.S.C. 2000d *et seq.* ................................................................................... *passim*

## Rules

FED. R. CIV. P. 12(b)(1) ............................................................................................. 1

FED. R. CIV. P. 12(c) ................................................................................................. 1

## Regulations

10 C.F.R. § 4.46 ...................................................................................................... 22

13 C.F.R. § 112.11(a)(2) .......................................................................................... 22

14 C.F.R. § 1250.107(a) ........................................................................................... 22

15 C.F.R. § 8.11(a) .................................................................................................. 22

18 C.F.R. § 1302.8(a) .............................................................................................. 22

18 C.F.R. § 705.8(a) ................................................................................................ 22

22 C.F.R. § 141.7(a) ................................................................................................ 22

22 C.F.R. § 209.8(a) ................................................................................................ 22

24 C.F.R. § 1.8(a) .................................................................................................... 22

24 C.F.R. § 8.57(a) ................................................................................................... 22

25 C.F.R. § 273.42 ................................................................................................... 22

28 C.F.R. § 42.108(a) ............................................................................................... 22

28 C.F.R. § 50.3 ....................................................................................................... 22

29 C.F.R. § 31.8(a) ................................................................................................... 22

32 C.F.R. § 195.9(a) ................................................................................................. 22

34 C.F.R. § 100.8(a) ................................................................................................. 22

38 C.F.R. § 18.546(a)(2) .......................................................................................... 22

38 C.F.R. § 18.8(a) ................................................................................................... 22

42 C.F.R. § 17.7(a) ................................................................................................... 22

43 C.F.R. § 17.335(a) ............................................................................................... 22

45 C.F.R. § 1203.8(a) ............................................................................................... 22

45 C.F.R. § 611.8(a) ................................................................................................. 22

45 C.F.R. § 80.8(a) ................................................................................................... 22

49 C.F.R. § 21.13(a) ................................................................................................. 22

5 C.F.R. § 900.408(a)(1) .......................................................................................... 22

6 C.F.R. § 21.13(a) ................................................................................................... 22

7 C.F.R. § 15.8(a) ..................................................................................................... 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ERIC STEWARD, *et al.,* | § | |
| *Plaintiffs* | § | |
| v. | § | |
| | § | |
| GREG ABBOTT, | § | |
| Governor of the State of Texas, *et al.,* | § | |
| *Defendants* | § | |
| ———————————————— | § | Case No. 5:10-CV-1025-OG |
| | § | |
| THE UNITED STATES OF AMERICA, | § | |
| *Plaintiff-Intervenor* | § | |
| v. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| *Defendant* | § | |

**STATE OF TEXAS' MOTION TO DISMISS THE CLAIMS OF THE
UNITED STATES OF AMERICA**

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and (c), Defendant, the State of Texas (the "State"), moves this Court to dismiss the claims of the United States of America.

## INTRODUCTION

This motion presents a single, dispositive question of law:  Has Congress authorized the Attorney General to sue under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq*. ("ADA") and under the Rehabilitation Act, 29 U.S.C. 794a, *et seq*.?

The answer is no.  "[W]hen an agency in its governmental capacity is meant to have standing, Congress says so." *Dir.*, *Office of Workers' Comp. Programs*, *Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995) (emphasis omitted).  Title II does not say that the United States is meant to have standing.  Neither does Title VI of the Civil Rights Act, whose enforcement provisions Title II incorporates.  The United States can cite no express authorization—an absolute requirement—for enforcement actions under Title II.

Page **1**

The silence of these statutes is clear and pointed.  Congress explicitly authorized the Attorney General to sue under Titles I and III of the ADA—but not under Title II.  In the same manner, Congress explicitly authorized the Attorney General to sue under Titles II, III, IV, and VII of the Civil Rights Act—but not under Title VI.  Congress knows how to confer standing  on the United States.  It often does, clearly and purposely.  When it does not, it means it.  Because the United States lacks standing to sue  under Title II, the Court should dismiss its claims thereunder.

## ARGUMENT

Whether Congress has authorized the Attorney General to sue under Title II of the  ADA presents a question of statutory interpretation.  "Agencies do not automatically have standing to sue for actions that frustrate the purposes of their statutes." *Newport News*, 514 U.S.  at 132; *see also Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993) ("An  agency is but a creature of statute.  Any and all authority pursuant to which an agency may act  ultimately must be grounded in an express grant from Congress.").  "[C]ongress is cognizant of the need to set forth explicitly the authority of an administrator or agency to seek enforcement  relief in federal court." *Marshall v. Gibson's Prods.*, *Inc. of Plano*, 584 F.2d 668, 675 (5th Cir.  1978).

The claims of the United States in this case implicate three statutes.  Title II of the ADA incorporates enforcement  provisions of the Rehabilitation Act,[1] which in turn incorporate the enforcement provisions of  Title VI of the Civil Rights Act.[2]  None of these provisions sets forth explicitly the authority of  the Attorney General to sue—and this fact alone is conclusive, both as

---

[1] *See* 42 U.S.C. § 12133 (ADA) ("[t]he remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.").

[2] 29 U.S.C. § 794a(a)(2) (Rehab Act) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.").

to the ADA Title II claim and the Rehabilitation Act claim.  But the evidence is even more compelling.  Considered severally or in combination, each statute in this chain makes clear that Congress did not authorize the Attorney General to seek enforcement relief under Title II or the Rehabilitation Act.

**First**, Title II of the ADA makes no mention of enforcement actions by the United States, while Titles I and III authorize such actions in express terms.  While Title II authorizes suits by "any person alleging discrimination," the United States is presumed not to be a "person."  And, in direct contrast to Title II, Title I confers standing on "any person alleging discrimination" ***and*** "the Attorney General."  Title III likewise confers standing on the Attorney General, who "may commence a civil action in any appropriate United States district court."  Congress knew how to empower the Attorney General:  it did so in both  neighboring titles of the ADA.  The omission in Title II is presumed deliberate and meaningful.

**Second**, even if the ADA's own limitations on standing can be ignored, the Attorney General can find no authority for this action (both the ADA Title II claim and the Rehabilitation Act claim) in Title VI of the Civil Rights Act—the ultimate  source of the enforcement mechanisms available under Title II of the ADA.  The plain meaning,  legislative history, and contemporaneous interpretations of Title VI prove that, while Congress   expressly authorized litigation by the Attorney General under other titles of the Civil Rights Act,   it made the deliberate choice not to authorize federal enforcement actions directly under Title VI.

## I.   TITLE II OF THE ADA DOES NOT CONFER STANDING ON THE UNITED STATES.

Title II of the ADA prohibits discrimination by reason of disability in the provision of services, programs, or activities by public entities.  42 U.S.C. § 12132.[3]  It also includes an

---

[3] The ADA's prohibitions of discrimination against persons with disabilities are  contained principally in three titles.

enforcement provision that makes no mention of federal enforcement actions, but grants a cause of action to "any person alleging discrimination on the basis of disability." *Id.* § 12133.

As courts have long recognized, Congress does not authorize federal enforcement  actions by implication—nor do general references to "any person" sweep in the federal  government. Because the Attorney General can cite no language in Title II of the ADA that  confers standing on the federal government, no authority to initiate enforcement actions exists.

### A.   The Enforcement Provision of Title II Does Not Even Mention the Attorney General.

When it authorizes enforcement actions, Congress speaks explicitly.  The "United States Code displays throughout that when an agency in its governmental capacity is meant to have standing, Congress says so." *Newport News*, 514 U.S. at 129 (emphasis omitted).  Citing numerous examples throughout the United States Code, courts have consistently noted the long-standing practice of Congress to authorize federal enforcement actions in clear and unambiguous  terms.  *See id.* at 129--30; *United States v. Bonanno Organized Crime Family of La Cosa Nostra*,  879 F.2d 20, 22 (2d Cir. 1989); *Marshall*, 584 F.2d at 674-75 & n.7.  Given the gravity of any  decision to empower the federal executive, Congress has long appreciated the need for precision.

The silence of Title II is dispositive.  Unlike scores of provisions scattered throughout  the United States Code that authorize the federal government to enforce scores of congressional enactments, Congress made no provision for litigation by the Attorney General under Title II. Accordingly, Congress did not authorize the Attorney General to sue under Title II of the ADA.

---

Title I prohibits discrimination in employment, *see* 42 U.S.C. §§ 12111-12117, Title II prohibits discrimination in the services, programs, or activities of  governmental entities, *see id.* §§ 12131-12165, and Title III sets forth prohibitions against  discrimination in public accommodations provided by private entities, *see id.* §§ 12181-12189.

This conclusion becomes more evident when Title II is compared to Titles I and III of the ADA.  In direct contrast to Title II, both Title I and Title III *expressly* authorize the Attorney General to sue.  42 U.S.C. §§ 12117(a), 12188(b).  The omission is significant.  Congress is not presumed to do implicitly what elsewhere—and especially in the same act—it does explicitly.  When "Congress knows how to say something but chooses not to, its silence is controlling."  *In  re Griffith*, 206 F.3d 1389, 1394 (11th Cir. 2000) (en banc).  Thus, in *Bonanno* and *Marshall*, in concluding that Congress had not authorized federal enforcement actions, the courts observed  that Congress had conferred standing in express terms throughout the United States Code, and  even in the same acts.  *Bonanno*, 879 F.2d at 22; *Marshall*, 584 F.2d at 673-74.  Congress did not  confer *implicitly* in Title II of the ADA the authority which, in the neighboring titles, it conferred *explicitly*.

### B.        The United States Is Not a "Person" Authorized to Sue Under Title II.

Without express statutory authorization to sue, the Attorney General might seek shelter  in the right of action granted to "any person alleging discrimination on the basis of disability."  42 U.S.C. § 12133.  The United States is not, however, a "person alleging discrimination" within  the meaning of the ADA.  Courts apply a "longstanding interpretive presumption that 'person'  does not include the sovereign."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000).  This presumption rests upon the plain and ordinary meaning of the word:  "As we have often noted, in common usage, the term 'person' does not include the sovereign,  and statutes employing the word are ordinarily construed to exclude it."  *Int'l Primate Prot.  League v. Admin. of Tulane Educ. Fund*, 500 U.S. 72, 82-83 (1991) (internal marks omitted).

This presumption has been applied to statutes that confer standing.  For example, in  *United States v. Cooper Corp.*, 312 U.S. 600 (1941), the Court held that the United States was   not a "person" and therefore not authorized to sue for treble damages under the Sherman Act.  Reading

the "statutory language in its ordinary and natural sense," the Court explained that "the  phrase 'any person' is insufficient to authorize an action by the Government."  *Id*. at 605-06.  In fact, "if the purpose was to include the United States, the ordinary dignities of speech would  have led to its mention by name."  *Id*. at 606 (internal marks omitted).  The Court examined the  context of the act, and found no reason to depart from the ordinary sense of the word.  *Id*. at 614.

Similarly, in *Bonanno*, the Court held that a provision of the Racketeer Influenced and Corrupt Organizations ("RICO") Act conferring standing on any "person injured in his business  or property" did not include the United States.  The Court explained that Congress ordinarily expresses its intention to render a statute applicable to the United States "by explicit reference to the United States in the operative language of the statute or by explicit inclusion of the United  States in the statutory definition of the object or objects affected by the law."  879 F.2d at 22.  Even within RICO, the Court found express reference to the United States or Attorney General in  other enforcement sections, confirming the conclusion that the sovereign is not a "person."  *Id*.

For the same reasons, the United States is not a "person" authorized to sue under Title II. And, as in *Cooper* and *Bonanno*, indications of congressional intent arising from different  sections of the same act confirm the strong presumption in favor of the natural sense of the word.  The same phrase—"person alleging discrimination on the basis of disability"—appears in  both Title I and Title II.  In Title I, it forms  part of an enumeration that also contains a separate, explicit reference to "the Attorney General."  *Id*. § 12117(a).  Title I grants standing "to the [Equal Employment Opportunity] Commission, to   the Attorney General, or to any person alleging discrimination on the basis of disability."  *Id*.

Title I thus demonstrates that the Attorney General is not a "person alleging discrimination," because if the Attorney General were a "person alleging discrimination," a separate

reference to the Attorney General in the same enumeration would be redundant.  This  Court must construe statutes to ensure that "no clause, sentence, or word shall be superfluous,  void, or insignificant."  *United States v. Julian*, 633 F.3d 1250, 1255 (11th Cir. 2011).  The only  sound reading—the only reading that does not needlessly attribute sloppy drafting to Congress—  is that Congress did not consider the Attorney General to be a "person alleging discrimination" for purposes of Title I.[4]

If, therefore, the Attorney General is not a "person alleging discrimination" under Title I, then the Attorney General is not a "person alleging discrimination" under Title II.  It is  axiomatic that "identical words used in different parts of the same act are intended to have the  same meaning." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995).  Accordingly, in  *Cooper*, the Court derived support for its conclusion that the United States was not a "person" from other sections of the same statute, which used the same word in a manner that necessarily  excluded the United States.  312 U.S. at 606-07.  It was "fair to assume" that Congress employed  the word "'person' . . . throughout the Act in the same, and not in different, senses."  *Id.* at 607.

In Title II, the phrase "person alleging discrimination" stands alone.  42 U.S.C. § 12133(a). Congress' use of the phrase "person alleging discrimination" in Title II, divorced from  any mention of the Attorney General, is conclusive evidence that Congress did not authorize suit by the Attorney General under Title II.  When "Congress includes particular language in one  section of a statute but omits it in another section of the same Act, it is generally presumed that  Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Barnhart v.  Sigmon Coal Co.*,

---

[4] The Supreme Court applied this reasoning in *Newport News*.  There, the Court held   that a federal official lacked standing under a provision of the Longshore and Harbor Workers'  Compensation Act ("LHWCA") that authorized any "person adversely affected or aggrieved" to   seek review of compensation awards to injured workers.  The Court noted that the Occupational Safety and Health Act ("OSHA"), which served as the model for the LHWCA, authorized review *both* by any "person adversely affected or aggrieved" *and* by the Secretary of Labor, and inferred   that the Secretary "would *not* be considered 'adversely affected or aggrieved.'"  514 U.S. at 130.

*Inc.*, 534 U.S. 438, 452 (2002) (quoting *Russello v. United States*, 464 U.S. 16,  23 (1983)).  The Attorney General's inclusion in Title I and omission from Title II confirms that   the Attorney General is not a "person alleging discrimination" under Title II of the ADA.[5]

The Supreme Court appears to have adopted the same interpretation, and to have understood the phrase "person alleging discrimination" to mean private parties.  In its seminal interpretation of Title II, the Supreme Court stated that "a ***person alleging discrimination*** on the basis of disability in violation of Title II may seek to enforce its provisions by commencing a ***private lawsuit***."  *Olmstead v. Zimring*, 527 U.S. 581, 592 n.5 (1999) (emphasis added).  The  Court then proceeded to review the enforcement provisions of Title I and Title III, explaining  that "the EEOC, the Attorney General, and persons alleging discrimination on the basis of  disability in violation of Title I may enforce its provisions," and that "the Attorney General and  persons alleging discrimination on the basis of disability in violation of Title III may enforce its  provisions." *Id*.  In this exhaustive review of the ADA's enforcement provisions, the Court  distinguished between "the Attorney General" and "persons alleging discrimination."  It equated   the phrase "person alleging discrimination" with private lawsuits, and never hinted that the   Attorney General may sue under Title II.  *Id*.  The Court's description of enforcement methods   offered by the ADA is powerful evidence that the authority now claimed is without foundation.

Congress' decision to confer standing on the United States under Title I and Title III—  but not Title II—makes perfect sense.  Title I prohibits discriminatory employment decisions.    It

---

[5] The difference in language between Titles I and II is strictly correct and meaningful,   given the different enforcement provisions that those titles incorporate.  Title I incorporates the   enforcement provisions of Title VII of the Civil Rights Act, which expressly authorize suits by   the Attorney General.  Logically, Title I authorizes enforcement by the Attorney General *or* "any person alleging discrimination."  By contrast, Title II borrows the enforcement provisions of Title VI of the Civil Rights Act, which do not authorize action by the Attorney General.  *See  infra* Part II.  Thus, Title II logically authorizes suits by "any person alleging discrimination on   the basis of disability"—not the Attorney General.  Congress understood the decisions it made.

ordinarily applies to private employers, and seldom or never implicates government services. Title III regulates public accommodations provided exclusively by private entities. Title II, however, regulates services, programs, and activities offered by state and local governmental entities. Thus, even actions by private parties under Title II impose *some* federalism costs. *Id.* at 610 (Kennedy, J., concurring) ("This danger is in addition to the federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts."); *id.* at 624 (Thomas, J., dissenting) ("I fear that the majority's approach imposes significant federalism costs, directing States how to make decisions about their delivery of public services."). Congress might reasonably have concluded that these costs would be unduly compounded if the decisions of States in matters of traditional state concern were scrutinized in federal court at the instance of the federal executive.

### C.   Title II's Incorporation of the Remedies of the Rehabilitation Act Illustrates Congressional Intent Not to Authorize Enforcement Suits.

Though not essential to the analysis, the fact that Title II incorporates the rights and remedies set forth in Section 505 of the Rehabilitation Act lends additional support to the conclusion that Title II does not authorize federal enforcement actions. Section 505 authorizes litigation by "any person aggrieved" by certain violations of the Rehabilitation Act. 29 U.S.C. § 794a(a)(2). The Supreme Court has unanimously concluded that precisely such language does *not* include federal government agencies litigating in their governmental capacities.

In *Newport News*, the Court held that the federal official charged to administer the LHWCA was not a "person adversely affected or aggrieved" and was therefore not entitled to seek judicial review of administrative orders that award compensation to injured workers. The Court explained that the terms "'adversely affected' and 'aggrieved,' alone or in combination, have a long history in federal administrative law," and that no court had ever held that an agency "in its regulatory or

policy-making capacity" is "adversely affected or aggrieved." 514 U.S. at 126-27. The Court found support for its conclusion that "an agency in its governmental capacity is not 'adversely affected or aggrieved'" in the prevalence of provisions in the United States Code that expressly confer standing on federal agencies, *id*. at 129-30, and in the Administrative Procedure Act, which reflects "the general legislative pattern of administrative and judicial relationships" and excludes agencies from the meaning of the word "person," *id*. at 130 (quoting *United States v. ICC*, 337 U.S. 426, 433-34 (1949)). The mere frustration of an agency's "policy interest" does not transform the agency into an aggrieved person. *Id*. at 129.

Added in 1978, Section 505 of the Rehabilitation Act was "designed to enhance the ability of handicapped individuals to assure compliance with" the substantive provisions of the Rehabilitation Act. *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635 (1984) (quoting S. Rep. No. 95-890, at 18 (1978)). It incorporates the enforcement provisions of Title VI of the Civil Rights Act, which, long before 1978, had definitively been construed to imply a private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-98 & nn.20-21 (1979) (collecting cases). Thus, when Congress set about to "enhance the ability of handicapped individuals to assure compliance" with enactment of the Rehabilitation Act, it was logical to borrow a familiar, private right of action, and to extend its remedies to persons "aggrieved" by violations of the act.

The language of the Rehabilitation Act is indistinguishable from the language that nine Justices agreed does not include agencies.[6] The fact that, in defining the rights and remedies

---

[6] *United States v. Baylor University Medical Center*, 736 F.2d 1039 (5th Cir. 1984), has been cited as authority for the proposition that the United States has standing under Section 505 of the Rehabilitation Act. But *Baylor* involved a "contractual assurance that [the defendant] would comply with" the Rehabilitation Act, which the agency, as a contracting party, of course had standing to enforce. *Id*. at 1041. The question presented in *Baylor*, moreover, was whether the agency was authorized to *investigate* the defendant, *id*. at 1050—not sue it. And *Baylor* was decided before the Supreme Court held in *Newport News* that phrases such as "person adversely affected" and "person aggrieved" exclude the government litigating in its governmental capacity.

available under Title II of the ADA, Congress chose to reference Section 505 of the Rehabilitation Act—not any number of provisions that clearly and distinctly authorize federal enforcement actions—merely corroborates the already compelling evidence that Congress did not intend to authorize federal enforcement actions under Title II of the ADA.[7]

In *Cooper*, the Court noted that the dearth of federal enforcement actions under Section 7 of the Sherman Act weighed against the position that Congress had authorized them. *See* 312 U.S. at 613-14 ("It is significant that . . . no action has ever been brought by the United States under [Section 7] in the fifty years during which the statute has been in force until the present action was instituted."). The same is true here. Until recently, the United States almost never purported to initiate actions under Title II. The State has identified *one case* prior to 2009 in which the United States attempted to raise claims under Title II, otherwise than as an intervenor or *amicus curiae*— and that case was brought primarily under Title I. *See United States v. City & County of Denver*, 927 F. Supp. 1396 (D. Colo. 1996). During this nineteen-year period, actions to enforce Title II were brought by aggrieved parties, as Congress intended all along. *See* U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIVISION, ADA ENFORCEMENT, *available at* http://www.ada.gov/enforce_archive.htm#TitleII (collecting cases). A conviction that Congress did not confer standing, rather than a "supine neglect" to employ all available remedies, better explains the dearth of actions initiated by the United States. *See Cooper Corp.*, 312 U.S. at 614.[8]

---

[7] Civil-rights laws make a consistent distinction between "aggrieved persons" and the Attorney General. Examples are the Voting Rights Act, *see* 42 U.S.C. § 1973a(a) ("Whenever the Attorney General or an aggrieved person institutes a proceeding . . . ."); *id.* § 1973b(a)(5) ("The court shall . . . reopen the action upon motion of the Attorney General or any aggrieved person . . . ."); the Civil Rights Act, *see id.* § 2000a-3(a) ("[A] civil action . . . may be instituted by the person aggrieved and . . . the court may, in its discretion, permit the Attorney General to intervene . . . ."); *id.* § 2000e-5(f) ("Civil action by Commission, Attorney General, or person aggrieved . . . ."); and the Fair Housing Act, *see id.* § 3612(o)(1) ("[T]he Attorney General shall commence and maintain, a civil action on behalf of the aggrieved person . . . .").

[8] Actions by the United States purportedly under Title II have recently multiplied. *See United States v. N. Ill. Special Rec. Ass'n*, No. 12-C-7613 (N.D. Ill. filed Sep. 24, 2012); *United States v. City of New Orleans*, No. 2:12-cv-2011 (E.D. La. filed Aug. 6, 2012); *United States v. Virginia*, No. 3:12-cv-59 (E.D. Va. filed Jan. 26, 2012); *United States*

Finally, it has been a longstanding rule of constitutional jurisprudence that:  "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score."  *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916).  *See also, Parker v. Los Angeles Count*y, 338 U.S. 327, 333 (1949)("The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity.")  In light of the clear lack of authority (as demonstrated above) in the Attorney General to enforce Title II of the ADA or the Rehabilitation Act by suit, including, as here, by mandatory injunction, to infer such authority would raise grave concerns as to the constitutionality of Title II of the ADA and the Rehabilitation Act.  The Constitution "has never been understood to confer on Congress the ability to require the States to govern according to Congress' instructions."  *New York v. United States*, 505 U.S. 144, 162 (1992).  Thus, "even where Congress has the authority under the Constitution to pass laws requiring certain acts, it lacks the power directly to compel States to require or prohibit those acts."  *Id.* at 166.  "[P]rotection of the States against intrusive exercises of Congress' . . . powers" therefore requires that the Court be "absolutely certain that Congress intended such an exercise."  *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991); *see BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994)("To displace traditional state regulation . . . , the federal statutory purpose must be clear and manifest." (internal quotation marks omitted)); *cf., Penn. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210 (1998)(holding that *Ashcroft's* plain-statement rule is satisfied with respect to private-party Title II enforcement in connection with benefits programs at state prisons).  Unlike enforcement of Title II by private parties, direct Attorney General enforcement is akin to federal control over state programs; yet there is no express statutory authority for Attorney

*v. Arkansas*, No. 4:10-cv-  327 (E.D. Ark. filed May 6, 2010); *United States v. City of Baltimore*, No. 09-1049 (D. Md. filed   Apr. 23, 2009); *United States v. Arkansas*, No. 4:09-cv-33 (E.D. Ark. filed Jan. 16, 2009).

General enforcement of Title II.  Moreover, the Attorney General's reading of Title II presents additional grave constitutional doubts under *Reickenbacker v. Foster*, 274 F.3d 974, 983 (5th Cir. 2001)(holding that Title II's accommodation obligations are not a congruent and proportional exercise of Section 5 of the 14th Amendment).  Accordingly, the Court should avoid interpreting Title II as permitting federal enforcement in the manner sought by the Attorney General.

**II.   TITLE VI OF THE CIVIL RIGHTS ACT—THE ULTIMATE SOURCE OF ENFORCEMENT MECHANISMS UNDER TITLE II OF THE ADA—DOES NOT INDEPENDENTLY AUTHORIZE FEDERAL ENFORCEMENT ACTIONS.**

If Title II were broad enough to include the United States (which it is not), the Court would next determine whether Title VI of the Civil Rights Act—the ultimate source of  enforcement mechanisms available under Title II of the ADA and under the Rehabilitation Act—authorizes federal enforcement actions.

Title II of the ADA confers on "any person alleging discrimination" the "remedies, procedures, and rights" contained in Section 505 of the Rehabilitation Act.  42 U.S.C. § 12133.  Thus, Title II imports the enforcement mechanisms contained in the Rehabilitation Act.  The Rehabilitation Act, in turn, incorporates the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act."  29 U.S.C. § 794a(a)(2).  As explained below, Title VI of the Civil  Rights Act does not, standing alone, authorize federal enforcement actions.  Accordingly, such  actions are not among the "remedies, procedures, and rights" authorized by Title II of the ADA or by the Rehabilitation Act.

Title VI prohibits discrimination on the ground of race, color, or national origin in  programs or activities that receive federal financial assistance.  42 U.S.C. § 2000d.  It requires  each federal department and agency that extends federal financial assistance to adopt "rules,   regulations, or orders of general applicability" barring discrimination by fund recipients, and    empowers the

departments and agencies to effect compliance with the requirements so adopted:

> (1) by the termination of or refusal to grant or to continue assistance under such  program or activity to any recipient as to whom there has been an express finding  on the record, after opportunity for hearing, of a failure to comply with  such requirement . . . , or
>
> (2) by any other means authorized by law . . . .

*Id*. § 2000d-1.  In either event, the department or agency may take no action until it has advised  the appropriate person and has determined that voluntary means cannot secure compliance.  *Id.*

Title VI does not, therefore, mention the Attorney General or federal enforcement actions, and it stands in clear contrast to Titles II, III, IV, and VII of the Civil Rights Act, which  expressly authorize the Attorney General to sue.  Title II, which combats discrimination in public accommodations, contains a detailed enforcement provision that authorizes suits by the Attorney General.  *See id*. § 2000a-5.  Title III, which promotes desegregation of public facilities, likewise contains an explicit grant of authority to the Attorney General to enforce compliance by   litigation. *See id*. § 2000b.  Title IV, which secures desegregation in public education, authorizes   litigation by the Attorney General in elaborate terms.  *See id*. § 2000c-6.  And Title VII, which  prohibits discrimination in employment, contains similar, unmistakable grants of authority to the   Attorney General to sue if necessary for enforcement purposes.  *See id*. §§ 2000e-5(f), 2000e-6.

Title VI contains no similar provision.  The title of the Civil Rights Act  states that the Act "authorize[s] the Attorney General to institute suits to protect constitutional rights in public facilities and  public education," but does not mention suits related to federally-funded programs or activities—the subject of Title VI.  *See* Civil Rights Act of 1964, Pub. L. No. 52, 78 Stat. 241 (1964).  Similarly, while the committee reports that accompanied the  Civil Rights Act discussed the authority of the Attorney General to bring litigation under other  titles, none made any mention of any such authority under Title VI.  *See* H.R. Rep. No. 88-914  (1963), *reprinted in* 1964

U.S.C.C.A.N. 2391, 2395-99; *cf. NAACP v. Civiletti*, 609 F.2d 514,  519 (D.C.Cir. 1979) (finding the silence of congressional committee reports as to abrogation of sovereign  immunity "significant," as "some discussion of the matter . . . might have been expected").

Congress knew how to authorize enforcement actions by the Attorney General, and it  did so deliberately in other titles of the Civil Rights Act.  In Title VI, it did not.  "Where Congress has consistently made express its delegation of a particular power, its silence is  strong evidence that it did not intend to grant the power."  *Marshall*, 584 F.2d at 676 (holding  that Congress did not authorize suits by the Secretary of Labor to enforce Section 8(a) of OHSA,  where OSHA contained several other provisions that expressly authorized enforcement actions).

Thus, in the Civil Rights Act, as in the ADA, Congress explicitly prescribed the authority of the Attorney General where such authority was intended.  Just as Title II of the ADA  stands in clear contrast to Titles I and III, which explicitly authorize enforcement by the Attorney General, Title VI of the Civil Rights Act stands in direct contrast to Titles II, III, IV, and VII for the same reason.

Indeed, Titles II, III, IV, and VII of the Civil Rights Act not only authorize federal enforcement actions in express terms, but each explicitly confers jurisdiction on federal district courts to entertain such actions.  *See* 42 U.S.C. § 2000a-6(a) (Title II); *id*. § 2000b(a) (Title III);  *id*. § 2000c-6(a) (Title IV); *id*. § 2000e-5(f)(3) (Title VII).  Title VI does not.  It is implausible  that Congress would leave to implication the Attorney General's authority to sue, as well as the jurisdiction of federal courts, so attentively provided wherever enforcement power was granted.

The United States claims, however, that its standing and this Court's jurisdiction are implied in the phrase "other means authorized by law."  42 U.S.C. § 2000d-1.  The natural sense of the words, the practice of Congress to authorize suits expressly, the legislative history and  early

interpretations of Title VI, and long-standing administrative practice refute this suggestion.

Plain English suggests that the phrase "any other means authorized by law" does not, by itself, authorize any specific course of action or means of enforcement.  It does not purport to create an independent cause of action.  It does not delineate the means that are authorized or the means that are unauthorized.  It no more authorizes the United States to sue than it authorizes the United States to issue cease-and-desist orders or to seize bank accounts to recover federal funds.  It either authorizes all means the mind can conceive, or it refers to enforcement mechanisms that find expression in extant law outside of Title VI.  The latter is the only plausible interpretation.

Thus, the plain meaning of the phrase "any other means authorized by law" requires the government to identify some existing, authorized means of enforcement available under the circumstances, *i.e.*, to point to another provision of law that authorizes the proposed action.  This interpretation is consistent with the natural, unsophisticated meaning of the words—which do not authorize specific means, but ask what means are authorized—and with judicial recognition  that Congress does not authorize enforcement actions in less than explicit terms.  *See Newport  News*, 514 U.S. at 129-30; *Bonanno*, 879 F.2d at 22; *Marshall*, 584 F.2d at 674-75 & n.7.  Here,  the Attorney General can point to no other law authorizing the United States to bring this action.

The legislative history of Title VI confirms this understanding of the phrase "other  means authorized by law."  The initial legislative draft of Title VI conferred express authority  upon the Attorney General to enforce Title VI through litigation.  It provided that compliance  with the anti-discrimination regulations adopted by departments and agencies may be effected:

> (1)  *by suit under section 703 of this title*,
>
> (2)  by the termination of or refusal to grant or to continue assistance upon an  express finding that there has been a failure to comply with such requirement, *or*
>
> (3)  *by any other means authorized by law* . . . .

Civil Rights Act of 1963, H.R. 7152, 88th Cong. § 702 (1963) (emphases added).

Section 703, in turn, provided in full:

> Any requirement adopted pursuant to section 702, whether by rule, regulation, order, agreement, or otherwise, shall be enforceable in the district courts of the United States by means of a civil action or other proper proceeding, including an application for a permanent or temporary injunction, restraining order, or other order, brought by or on behalf of the United States or any agency or officer thereof expressly authorized to bring suits by Act of Congress.

As introduced, therefore, the bill expressly authorized suits by the United States under Title VI. The House Judiciary Committee deleted Section 703 in its entirety, together with the reference in Section 702(1) to suits under Section 703. *See* H.R. Rep. No. 88-914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2425-26. The deletion of a provision that expressly authorized the Attorney General to litigate "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 200 (1974); *accord Moore v. Am. Fed. of Television & Radio Artists*, 216 F.3d 1236, 1246 (11th Cir. 2000).

Even so, the opponents of the Civil Rights Act feared that the phrase "other means authorized by law" would be construed to include suits by the Attorney General. They were unpersuaded that Congress' removal of express litigation authority from Title VI would in fact deny standing to the Attorney General. In a portion of a House committee report authored by members in the minority, the opponents argued that the phrase "other means authorized by law" would include "the right to bring a suit," and charged that the "purported 'moderation' or 'watering down'" was "neither a 'moderation' nor a 'watering down,'" but instead a "patent attempt to bemuse the opposition and to mislead the citizens of the United States and Members of Congress." H.R. Rep. No. 88-914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2454-55.

The supporters of the Civil Rights Act made certain to set the record straight, and to explain the purpose and legal effect of the phrase "any other means authorized by law." They explained that, either through piecemeal congressional action, executive orders, or individual agency initiatives, some agencies already possessed the means, at least under some programs, to combat discrimination by the recipients of federal funds. *See*, *e.g.*, 110 Cong. Rec. 6544-46, 7058, 7062, 7065-67 (1964). The authorization to employ "any other means authorized by law" ensured that the stringent remedy created by Title VI—a termination of federal funds—would not be construed to displace or supplant other, perhaps milder but nonetheless effective remedies already available to agencies to combat discriminatory practices, and that agencies may continue to avail themselves of those "other means" as an alternative to a sudden termination of funds.

Thus, when asked to explain the meaning of the phrase "any other means authorized by law," Senator John Pastore of Rhode Island, a leading supporter of the legislation, explained:

> Mr. PASTORE: There is existing law which sets out certain restrictions and certain conditions. This language means that there shall be no repeal of laws which Congress has already enacted.
>
> Mr. STENNIS. Is the only purpose of that phrase to show that there is no repeal of existing law?
>
> Mr. PASTORE: Yes. . . .
>
> . . . .
>
> *This phrase does not confer any new authority*. It simply makes clear that Federal departments and agencies may carry out the purposes of Title VI by using the powers they now have under the laws creating them or authorizing particular assistance programs.

*Id*. at 7060 (emphasis added). The supporters offered examples of "other means" that might be available to agencies. An agency might, for example, include the nondiscrimination mandate in its contracts with fund recipients, and then bring contract actions under its common-law right to sue

for breach of contract.[9]  Or an agency might find authority in its own enabling statute, or in the statutes that create the programs it administers, to seek redress against fund recipients.[10]

Or the circumstances of the case might support an action under other titles of the Civil Rights Act—such as Titles III, IV, and VII—that expressly authorize litigation by the United States.[11]  Or, given its particular charge, an agency might have other, more specific means at its disposal, for example,  an "agency with power to approve or disapprove construction plans or standards could refuse to  approve for aid any facilities which would be segregated."  *Id.* (statement of Sen. Pastore).

Supporters of the Civil Rights Act in Congress never suggested, however, that federal enforcement actions might be brought directly under Title VI.  To them, the words "other means authorized by law" did "not confer any new Federal authority."  *Id.* at 6546 (statement of Sen. Humphrey).  Enforcement measures "*would have to be based on powers conferred on the agency by some other law than Title VI.*"  *Id.* at 7060 (statement of Sen. Pastore) (emphasis added).[12]

---

[9] *See* 110 Cong. Rec. 7060 ("[I]f an agency's nondiscrimination requirement is  embodied in a contractual commitment, the agency might be able to bring suit to enforce its  contract.") (statement of Sen. Pastore); *id*. at 7066 ("[T]he most effective way for an agency to  proceed would be to adopt a rule that made the nondiscrimination requirement part of a contractual obligation on the part of the recipient.  Then the violation of such a requirement  would normally give the agency the right to bring a lawsuit to enforce its own contract.")  (statement of Sen. Ribicoff); *id*. at 8979 ("[One form of compliance action] might be a suit to  enforce the terms of a grant or loan agreement.") (statement of Sen. Humphrey).

[10] *See* 110 Cong. Rec. 7060 ("Federal departments and agencies may carry out the  purposes of Title VI by using the powers they now have under the laws creating them or  authorizing particular assistance programs.") (statement of Sen. Pastore); *id*. at 7066 ("[I]n the   absence of a technical contract, the agency would have authority to sue to enforce compliance  with its own regulations.") (statement of Sen. Ribicoff).

[11] *See* 110 Cong. Rec. 6545 ("In this area there is some overlap between title VI and  title VII. . . . If [voluntary] methods fail, then the department or agency administering a Federal  assistance program would consider the availability of suit under title VII . . . .") (statement of Sen. Humphrey); *id*. at 7060 ("Perhaps the best example of this relates to school lunches or other  assistance to segregated schools.  Cutoff of the lunches or other assistance will obviously impose  a severe hardship upon students who are intended to be benefited.  The way to avoid such a  hardship will be for the Attorney General to institute a desegregation suit under Title IV, rather   than to terminate the assistance.") (statement of Sen. Pastore); *id*. at 7061 ("[O]nce title VI was  enacted, in that particular case it would still be proper for the Attorney General under other titles   of this bill, if he were asked to do so, to step in.") (statement of Sen. Pastore); *id*. at 7066 ("Looking first to the 'other means authorized by law,' the agency could, for example, ask the   Attorney General to initiate a lawsuit under title IV, if the recipient were a school district or   public college . . . .") (statement of Sen. Ribicoff); *id*. at 8979 ("One typical form of compliance   action would be a referral to the Department of Justice for legal action.  Such action might be a   suit for desegregation of public schools or public facilities under title III or IV . . . .") (statement  of Sen. Humphrey).

[12] In construing Title VI, courts have relied on the comments of Senators Pastore,  Ribicoff, and Humphrey, who were

Page **19**

The phrase "any other means provided by law" not only ensured that Title VI would  not supersede other, existing means of enforcement, but applied the procedural safeguards of  Title VI to those existing enforcement mechanisms.  In a section of his remarks entitled "NO NEW FEDERAL AUTHORITY IN TITLE VI," Senator Hubert Humphrey observed that while  some agencies already had enforcement powers under their own statutes, those powers were not  confined by the "procedural safeguards" that Title VI would impose on them:  specifically, that  no enforcement actions may be pursued unless the appropriate person is advised and voluntary  means are found unavailing.  Rather than confer new authority, Title VI "merely states how the  authority conferred by other laws is to be administered."  *Id*. at 6546; *accord id*. at 5254 ("[Title   VI's enforcement provisions] represent no new power.  They represent a procedural limitation   on the power of an affected agency to enforce existing powers.") (statement of Sen. Humphrey).  Senator Humphrey squarely rejected the charge that Title VI grants "sweeping new authority, of  undefined scope, to Federal departments and agencies.  In fact, the opposite is the case."  *Id*. at  6546.

The legislative history of Title VI makes two further points of significance.  First, the  supporters of Title VI recognized that in some instances no other "means" might be available  and that a cutoff of federal funds might be the only alternative.[13]  This point illustrates that Title VI does

---

"closely involved" in the passage of the Civil Rights Act.  *See Cannon*, 441 U.S. at 693 n.14, 706 n.38, 712 nn.48-49, 716 nn.50-51; *Baylor Univ. Med.  Ctr.*, 736 F.2d at 1044-45 & n.14.  Courts have often considered legislative history in assessing  whether the Attorney General has standing to sue.  *See United States v. Mattson*, 600 F.2d 1295,  1299-1300 (9th Cir. 1979); *United States v. Solomon*, 563 F.2d 1121, 1125 n.4 (4th Cir. 1977).

[13] *See* 110 Cong. Rec. 6544 ("In general, cutoff of funds would not be consistent with the objectives of the Federal assistance statute if there are available other effective means of  ending discrimination.") (statement of Sen. Humphrey); *id*. at 6545 ("Cutoff of funds . . .   would not occur so long as other means of achieving compliance were available.") (statement of   Sen. Humphrey); *id*. at 6546 ("[T]itle VI is drafted on the theory that cutoff of funds should be  avoided if racial discrimination can be ended by other means.") (statement of Sen. Humphrey);   *id*. ("Title VI would require that funds be refused or terminated if other methods of ending   discrimination are not available . . . .") (statement of Sen. Humphrey); *id*. at 7060 ("This alternative is designed to permit the agency to avoid a fund cutoff if some other means of ending  discrimination is available.") (statement of Sen. Pastore); *id*. at 7066 ("[W]ithholding of funds  [would generally be] a last resort, to be used only when other means authorized by law were  unavailable or ineffective.") (statement of Sen. Ribicoff); *id*. ("If 'other means authorized by  law' were unavailable or ineffective, then withholding the assistance might be necessary.")   (statement of Sen. Ribicoff).

not confer standing on the Attorney General.  If it did, enforcement by "other means"  would never be "unavailable," and it would be nonsense to suggest, as the legislative history so  frequently does, that a cutoff of funds might be unavoidable if "other means" were unavailable.

Second, the legislative history continually suggests that agencies would be required to  be resourceful to identify "any other means" to enforce Title VI.[14]  Thus, the supporters of Title  VI suggested various "other means" of enforcement:  enforcement under Titles III, IV, and VII,  where appropriate; enforcement by contract actions; enforcement by means provided in statutes that create agencies or programs—indeed, "every other possible means to persuade or influence."  *Id.* at 7066 (statement of Sen. Ribicoff).  Yet the legislative history is devoid of any suggestion  that the Attorney General might simply sue at pleasure.  Needless to say, it would be unnecessary  to find creative "means" of enforcement if a direct action by the Attorney General were at hand.

Soon after passage of the Civil Rights Act, departments and agencies began to adopt regulations to enforce Title VI.  These regulations essentially follow the same model, and not  one of them suggests the availability of an enforcement action under Title VI.  In the standard formulation, these regulations—many of which were adopted in 1964 and 1965—define "any  other means authorized by law" to include "(1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce *any rights of the United  States under any law of the United States (including other titles of the Act),* or any assurance or  other contractual undertaking, and (2) any applicable proceeding *under State or local law.*" (emphasis

---

[14] *See* 110 Cong. Rec. 6544 ("And section 602, by authorizing the agency to achieve  compliance 'by any other means authorized by law,' encourages agencies to find ways to end   racial discrimination without refusing or terminating assistance.") (statement of Sen. Humphrey);   *id*. at 6546 ("It encourages Federal departments and agencies to be resourceful in finding ways of   ending discrimination voluntarily without forcing a termination of funds . . . .") (statement of Sen.  Humphrey); *id*. at 7063 ("Section 602, by authorizing the agency to achieve compliance 'by any  other means authorized by law,' encourages agencies to find ways to end racial  discrimination without refusing or terminating assistance.") (statement of Sen. Pastore).

added).[15]   Rather than provide simply that the Attorney General may sue under Title   VI, these regulations required the Attorney General to find "any rights" that might be enforced   under "any law," and they specifically recommended other titles of the Civil Rights Act, contract   actions, and actions under state or local law.  None suggests the existence of a Title VI action.[16]

In 1966, the Department of Justice followed with the promulgation of guidelines for the enforcement of Title VI.  The guidelines discuss, among other alternatives, the alternative of   court enforcement.  The guidelines state  that "[p]ossibilities of judicial enforcement" include:

> (1) a suit to obtain specific enforcement of assurances, covenants running with  federally provided property, statements of compliance or desegregation plans filed  pursuant to agency regulations, (2) a suit to enforce compliance with other titles  of the 1964 Act, other Civil Rights Acts,   or   constitutional   or   statutory   provisions   requiring nondiscrimination, and (3) initiation of, or intervention or other participation in, a suit for other relief designed to secure compliance.

28 C.F.R. § 50.3.  Like the regulations, these guidelines recommend (1) contract actions; actions under other titles of the Civil Rights Act or other, unspecified laws; and (3) actions   "for other relief designed to secure compliance," which resembles the reference in agency   regulations to actions "under State and local law."  Of course, if Title VI had conferred standing  of its own force, it would have been needless supererogation to specify such varied  "possibilities."  The guidelines would succinctly have stated that the Attorney General may  initiate enforcement actions directly under Title VI, and there would have been no reason to hunt  up alternative bases to support legal action.

---

[15] *See* 5 C.F.R. § 900.408(a)(1); 6 C.F.R. § 21.13(a); 7 C.F.R. § 15.8(a); 10 C.F.R. § 4.46; 13 C.F.R. § 112.11(a)(2); 14 C.F.R. § 1250.107(a); 15 C.F.R. § 8.11(a); 18 C.F.R. § 705.8(a); 18 C.F.R. § 1302.8(a); 22 C.F.R. § 141.7(a); 22 C.F.R. § 209.8(a); 24 C.F.R. § 1.8(a); 24 C.F.R. § 8.57(a); 25 C.F.R. § 273.42; 28 C.F.R. § 42.108(a); 29 C.F.R. § 31.8(a); 32 C.F.R. § 195.9(a); 34 C.F.R. § 100.8(a); 38 C.F.R. § 18.8(a); 38 C.F.R. § 18.546(a)(2); 42 C.F.R. § 17.7(a); 43 C.F.R. § 17.335(a); 45 C.F.R. § 80.8(a); 45 C.F.R. § 611.8(a); 45 C.F.R. § 1203.8(a); 49 C.F.R. § 21.13(a).

[16] An agency's contemporaneous interpretation of its own enabling legislation may be "one input in the interpretational equation."  *SEC v. Sloan*, 436 U.S. 103, 120 (1978) (quoting  *Zuber v. Allen*, 396 U.S. 168, 192 (1969)).  "However, federal regulations cannot themselves   create a cause of action," and a "grant of federal rulemaking power is not authority to create  federal jurisdiction."  *Smith v. Dearborn Fin. Servs., Inc.*, 982 F.2d 976, 979 (6th Cir. 1993).  Thus, in *Marshall*, the Court described as "patently paralogistic" the Secretary of Labor's claim  that the agency's regulations authorized it to initiate litigation.  *See* 584 F.2d at 677-78 & n.16.

But the guidelines, like the legislative history and the regulations, do not suggest the availability of an action under Title VI alone.  Rather, the guidelines require the Attorney General to be resourceful and look to means of enforcement  authorized by "some other law than Title VI."  110 Cong. Rec. 7060 (statement of Sen. Pastore).

*United States v. Marion County School District*, 625 F.2d 607 (5th Cir. 1980), aptly illustrates an appropriate enforcement action "authorized by law."  There, a school district had furnished the federal government "contractual assurances of compliance" with Title VI, and the United States instituted a contract action for performance of those assurances.  The Court held  that the United States had standing because "it is well established that the government's right to  sue to enforce its contracts exists as a matter of federal common law, without the necessity of a  statute." *Id*. at 611.  The Court observed that, under Title VI, "other means of action, even if not  mentioned in the Act, are to be preserved." *Id*. at 612.  Among those means were (1) informal  administrative efforts; (2) fund termination proceedings under Title VI; (3) suits by the Attorney   General under Title IV; (4) intervention by the Attorney General under Title IX; and (5) the right  to sue for breach of contracts. *Id*. at 611-12.  The legislative history and regulations recognized  that contract actions were means of enforcement "authorized by law." *Id*. at 612-13 & nn.12, 13.

The Court never suggested that Title VI provides an independent cause of action.  In  fact, while the United States' complaint had identified the suit as "an action not only to compel  specific performance of the contractual assurances, but to enforce Title VI and the Fourteenth  Amendment," the United States had subsequently clarified that its claims under Title VI and the   Fourteenth Amendment were "not intended to be asserted as independent causes of action, only  as subsidiary to the contract claim." *Id*. at 609 n.3.  The action in *Marion County* was precisely  what Congress intended:  the government found a basis in existing law to enforce compliance.

Several cases suggest in *dicta* that the United States has standing to sue under Title VI of the Civil Rights Act, but each is easily distinguished. In *National Black Police Association*, *Inc. v. Velde*, 712 F.2d 569 (D.C. Cir. 1983), an action against federal officials, the plaintiffs alleged that Title VI required the termination of federal funds to law enforcement agencies that engaged in discrimination, and that the federal officials were not entitled to qualified immunity because Title VI imposed a "clearly established" duty to terminate funds. The Court held that, because Title VI affords an alternative between a termination of funds and enforcement by "any other means authorized by law," the defendants did not violate a clearly established duty to terminate funds. *Id*. at 575. In a single sentence of *dicta*, the Court noted as one possible means of enforcement "referral of cases to the Attorney General, who may bring an action against the recipient." *Id*.

This observation does nothing to establish that Title VI alone supports enforcement actions. First, the Court did not state that Title VI creates an independent ground of action; like the authors of the Civil Rights Act, the Court might have envisioned actions under other titles of the Civil Rights Act, or other federal, state, or local laws. It simply did not distinguish. Second, the Court cited as support the portion of the committee report authored by the *opponents* of the Civil Rights Act, who feared that the words "other means authorized by law" would be construed to permit enforcement actions. *Id*. at 575 n.33 (citing H.R. Rep. No. 88-914, at 86 (1963)). The "fears and doubts of the opposition are no authoritative guide to the construction of legislation," however, *Bryan v. United States*, 524 U.S. 184, 196 (1998). "In their zeal to defeat a bill, they understandably tend to overstate its reach." *Id*. Finally, the Court's brief observation was *dicta* and unnecessary to its holding that, given the statutorily recognized alternative to pursue other means (whatever those means might be), termination of funds was not a clearly established duty.

Title VI does not, therefore, authorize enforcement actions by the Attorney General. It merely recognizes that the termination-of-funds provision of Title VI does not repeal other, available means of enforcement, and it applies to those means the procedural safeguards set forth in Title VI. The natural import of the words, the practice of Congress to authorize enforcement actions in express words, the legislative history, and contemporaneous regulations adopted under Title VI all dictate the conclusion that any legal action to enforce Title VI "would have to be based on powers conferred on the agency by some other law than Title VI." *See* 110 Cong. Rec. 7060 (statement of Sen. Pastore). And, because Title II of the ADA incorporates the rights and remedies of Title VI of the Civil Rights Act, any action by the United States to enforce Title II of the ADA must likewise find authorization in "some other law." The United States can cite none.

The United States has relied on cases that are unpersuasive. In *United States v. City & County of Denver*, 927 F. Supp. 1396 (D. Colo. 1996), in an action under Titles I and II of the ADA, the defendants argued that the United States had not satisfied the procedural prerequisites to any enforcement action—specifically, that it had neither advised the appropriate person of the violation nor determined that compliance cannot be secured by voluntary means. *See* 42 U.S.C. § 2000d-1. Though the defendants do *not* appear to have questioned the United States' authority to sue, the Court made the unnecessary statement that "[c]ourts have interpreted the words 'by any other means authorized by law' to mean that a funding agency . . . could refer a matter to the Department of Justice to enforce the statute's nondiscrimination requirement in court." 927 F. Supp. at 1400. The Court cited *Marion County*—a contract action in which the Court declined to consider whether Title VI authorizes enforcement actions—and *National Black Police Association*, which, as noted above, contained a single sentence of ambiguous *dicta*. *Id.*

In *Smith v. City of Philadelphia*, 345 F. Supp. 2d 482 (E.D. Pa. 2004), the United States filed a motion to intervene in support of a private action under Title II of the ADA. The defendant then moved for judgment on the pleadings, asserting that the statute of limitations barred the plaintiff's claim and that, if the action was time-barred, the United States' pending motion to intervene must be moot. Though the defendant never challenged the United States' statutory authority to sue, the Court stated that Title VI of the Civil Rights Act "authorizes the Attorney General to enforce compliance" by "filing an action in federal court," *id*. at 490, and, in support of this statement, merely cited *Marion County* and *National Black Police Association*.

Finally, in *A.R. v. Dudek*, 31 F.Supp.3d 1363, (S.D.Fla. 2014), the court held that the Attorney General may file suit to enforce Title II of the ADA. The holding was incorrect. In reaching it, the court relied on the cases that the State has distinguished above. The court also placed emphasis on the DOJ's own regulations that recognize a right to sue. This reasoning however, ignores the requirement that standing to sue must come from Congress, not from an agency bootstrapping its own standing by regulation. *Cf.*, *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001)("But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.").

These cases, under close analysis, are not persuasive authority for the proposition that Title VI of the Civil Rights Act—or, by extension, Title II of the ADA or the Rehabilitation Act—confers standing on the United States. Indeed, the plain language of Title VI, its legislative history, and its implementing regulations make clear that any federal enforcement action must be predicated on some other law than Title VI. Because it can cite no other law that authorizes this action against the State of Texas, the United States lacks standing.

**ALTERNATIVE REQUEST FOR CERTIFICATION AS INTERLOCUTORY APPEAL**

To the extent the Court issues an order denying this motion, Defendants respectfully request that the Court specially certify that order for discretionary interlocutory appeal pursuant to 12 U.S.C § 1292(b). That statute permits this Court to certify for interlocutory appeal an order that is not otherwise appealable if the Court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See id.*

The instant matter qualifies as an exceptional matter that should be certified under § 1292(b) because it raises important legal questions, over which there are grounds for substantial disagreement, that, as to the United States, would resolve this case in its entirety (and forego the burdensome litigation of an unnecessary action) if resolved in Defendants' favor. Similar controlling legal questions have been successfully certified by other district courts in this Circuit, and Defendants respectfully request the Court do so here. *See e.g.*, *Consol. Cos. v. Union Pac. R.R. Co.*, NO. 98-1804 L-O, 2006 U.S. Dist. LEXIS 21556 (W.D. La. Apr. 11, 2006) (interlocutory order certified under § 1292(b)) *aff'd by* 499 F.3d 382 (5th Cir. 2007); *see also id.* (certifying for interlocutory appeal order that ruled as to whether defendant's land constituted a "facility" under the RCRA because "the scope of the facility at issue is determinative of many of the substantive issues [in the case]…[was] an issue of first impression … [and the] Court's ruling on the issue fundamentally affects the quantity and quality of facts and issues in dispute as well as the potential relief available").

**CONCLUSION**

The United States lacks standing to sue under Title II of the ADA.  Unlike Titles I and  III, Title II makes no mention of federal enforcement actions.  Instead, it authorizes suit by     "any

person alleging discrimination." The United States, however, is not a "person," and Title I makes clear that the phrase "person alleging discrimination" excludes the United States. Further, the United States lacks standing because Title VI of the Civil Rights Act—the ultimate source of the enforcement mechanisms under Title II and the Rehabilitation Act—does not, unlike other titles of the same act, authorize federal enforcement actions. Its plain language, its legislative history, and its early interpretations confirm that Congress never authorized such actions under Title VI.

Accordingly, the Court should dismiss all claims of the United States.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

/s/ Nancy K. Juren
NANCY K. JUREN
Assistant Attorney General
Attorney in Charge
Texas Bar No. 11059300
ANDREW B. STEPHENS
Assistant Attorney General
Texas Bar No. 24079396
MARC RIETVELT
Assistant Attorney General
Texas Bar No. 24048399
MICHAEL PATTERSON
Assistant Attorney General
State Bar No. 24074868

General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone No.: (512) 463-2120
Fax No.: (512) 320-0667
***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of *State of Texas' Motion to Dismiss the Claims of the United States of America* was served by CM/ECF system on November 19, 2015, upon the following individuals at the listed addresses:

Garth A. Corbett
Sean A. Jackson
Disability Rights Texas
7800 Shoal Creek Blvd., #171-E
Austin, Texas 78757

Yvette Ostolaza
Robert Velevis
Casey A. Burton
Sidley Austin, L.L.P.
2001 Ross Avenue
Suite 3600
Dallas, Texas 75201

Steven J. Schwartz
Deborah A. Dorfman
Elizabeth F. Toner
Center for Public Representation
22 Green Street
Northampton, Massachusetts 01060

Benjamin O. Tayloe, Jr.
Alexandra L. Shandell
Jessica Polansky
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, J.W.-NYA
Washington, D.C. 20530

John F. Paniszczyn
Texas Bar No. 15443855
Assistant United States Attorney
United States' Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, TX 78216

/s/ Nancy K. Juren
NANCY K. JUREN

Page **29**