**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ERIC STEWARD, *et al.,* | § | |
| *Plaintiffs* | § | |
| v. | § | |
| | § | |
| GREG ABBOTT, | § | |
| Governor of the State of Texas, *et al.,* | § | |
| *Defendants* | § | |
| | § | Case No. 5:10-CV-1025-OG |
| | § | |
| THE UNITED STATES OF AMERICA, | § | |
| *Plaintiff-Intervenor* | § | |
| v. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| *Defendant* | § | |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA COLMENERO
Chief, General Litigation Division

NANCY K. JUREN
Assistant Attorney General
Attorney in Charge
Texas Bar No. 11059300
ANDREW B. STEPHENS
Assistant Attorney General
Texas Bar No. 24079396
THOMAS A. ALBRIGHT
Assistant Attorney General
Texas Bar No. 00974790
MICHAEL PATTERSON
Assistant Attorney General
State Bar No. 24074868
NATALEE B. MARION
Assistant Attorney General
State Bar No. 24075362
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone No.: (512) 463-2120
Fax No.: (512) 320-0667
*Attorneys for Defendants*

November 19, 2015

*Defendants' Motion to Dismiss
Plaintiffs' Second Amended Complaint*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

    The Plaintiffs and Their Claims ...........................................................................3

    The Defendants and Their Roles in the Texas Medicaid Program ........................6

    Overview of the Medicaid Act and Medicaid Waivers ........................................9

SUMMARY OF ARGUMENT ..........................................................................................14

ARGUMENT AND AUTHORITY ....................................................................................18

    I.  This Court Lacks Jurisdiction Over Plaintiffs' Claims...............................18

        A. Standards of Review..........................................................................18

            1.  Standard for Dismissal under 12(b)(1) ...................................18

            2.  Elements of Standing ...............................................................20

            3.  Justiciability ............................................................................21

        B. Organizational Plaintiffs Lack Standing. ..........................................21

        C. Plaintiffs Lack Standing to Assert ADA and Rehab. Act Claims ..........23

            1.  Plaintiffs living in the community cannot show injury in fact and therefore lack standing to assert ADA and Rehab. Act claims.............24

            2.  Plaintiffs lack standing to seek the overly broad remedy they request. ....................................................................................25

            3.  Plaintiffs lack standing to seek injunctive relief that is unenforceable as a matter of law. .....................................................................26

        D. Plaintiffs Lack Standing to Assert "Freedom of Choice" Claims Under 42 U.S.C. §§ 1396n(c)(2)(B) and (C)...............................................28

    II.  Plaintiffs Have Failed to State a Claim Upon Which Relief May Be Granted.....................................................................................................30

        A. Standard for Dismissal Under Rule 12(b)(6) ........................................30

        B. Plaintiffs Fail to Allege a Violation of the ADA and Rehab. Act............31

            1.  Plaintiffs have not alleged that services are available in institutions but not in the community. .........................................................31

            2.  Plaintiffs have failed to state a claim based on DOJ regulations regarding eligibility criteria. .................................................33

            3.  Plaintiffs have failed to state a claim based on DOJ regulations regarding criteria or methods of administration............................36

        C. Plaintiffs Have No Right of Action Under 42 U.S.C. § 1983 to Redress Alleged Violations of the Medicaid Act....................................................37

            1.  Plaintiffs have no "rights" under any section of the Medicaid Act. .....................37

2. Plaintiffs' Medicaid Act Claims Fail Under the *Blessing* test. ...............................41

   a. The NHRA creates no rights enforceable by Plaintiffs. .................................42

      i. NHRA provisions are not intended to benefit Plaintiffs. ........................43

      ii. NHRA §§ 1396r(b)(3)(F) and 1396r(f)(8) impose no obligations on Defendants ..........................................................................44

      iii. NHRA's remedial scheme precludes individual judicial remedies against the State. ..........................................................................45

   b. Sections 1396a(a)(8) and 1396a(a)(10)(B) ..................................................47

   c. Sections 1396n(c)(2)(B) and (C), relating to state waiver applications, confer no privately enforceable rights. ......................................49

D. Plaintiffs Also Cannot Proceed In Equity Under *Ex Parte Young*. ...........................51

E. Even if the Medicaid Act Creates Rights Enforceable by Plaintiffs, Plaintiffs Have Failed to State a Cognizable Claim. ...................................................54

   1. Plaintiffs state no cognizable NHRA claim. ..................................................54

      a. Plaintiffs state no § 1396r(b)(3)(F) or § 1396r(e) claim. ...............................54

      b. Plaintiffs state no violation of the "active treatment" regulations. ..................................................................................................55

   1. Plaintiffs state no cognizable § 1396a(a)(8) claim. ..............................................57

      a. Plaintiffs have failed to state a cognizable § 1396a(a)(8) "specialized services" claim for alleged delay in providing services not required under the NHRA. ..................................................58

      b. Plaintiffs have failed to state a cognizable § 1396a(a)(8) "community placement" claim where, as here, the waiver is full and Plaintiffs have not been determined to be eligible. ................................58

   2. Plaintiffs state no cognizable § 1396n(c)(2)(B) or (C) claim. ...............................61

   3. Plaintiffs state no cognizable claim under 42 U.S.C. §§ 1396a(a)(10)(B) (i) and (ii). ..................................................................63

III. The Governor Should Be Dismissed Under Rules 12(b)(1) and (6). ............................66

A. Plaintiffs Lack Standing to Sue the Governor ...........................................................67

   1. The Governor did not, and could not, cause Plaintiffs any injury. .......................67

   2. Plaintiffs' injuries, if any, are not redressable through the Governor. 69

B. Eleventh Amendment Immunity Bars Plaintiffs' Claims, Even Under Ex parte Young ..........................................................................................................71

C. Plaintiffs Have Failed to State a Claim Against the Governor ...................................74

CONCLUSION ..................................................................................................................74

# TABLE OF AUTHORITIES

## Cases

*1st Westo Corp. v. School Dist. of Philadelphia*, 6 F.3d 108 (3d Cir. 1993)............................. 70

*Abbey v. Rowland*, 359 F.Supp.2d 94 (D. Conn. 2005)............................................... 72

*Alexander v. Sandoval*, 532 U.S. 275 (2001)............................................... 44, 52

*Anderson v. Jackson*, 556 F.3d 351 (5th Cir. 2009) ................................................ 44

*Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615 (9th Cir. 2005) ............................................ 59

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015)................................. 51, 52, 53

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 30, 31, 36

*Assoc. of Cmty. Orgs. For Reform Now v. Fowler*, 178 F.3d 350 (5th Cir. 1999) ................ 21, 22

*Bagley v. Blagojevich,* 646 F.3d 378 (7th Cir. 2011), *cert. denied,* 2011 WL 4534022
(Oct. 3, 2011)............................................................................... 72

*Banks v. Dallas Housing Auth.*, 271 F.3d 605 (5th Cir. 2001) ................................... 44

*Barrera–Montenegro v. United States,* 74 F.3d 657 (5th Cir.1996)................................ 18

*Baum v. Northern Dutchess Hosp.*, --- F.Supp.2d ---, 2011 WL 240196 (N.D.N.Y.
January 24, 2011).......................................................................... 47

*Beckwith v. Kizer*, 912 F.2d 1139 (9th Cir. 1990)**.** ...................................... 58

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................ 30

*Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452 (7th Cir. 2007)................................ 51, 62, 63

*Bertulli v. Indep. Ass'n of Cont. Pilots*, 242 F.3d 290 (5th Cir. 2001) ....................... 20

*Blancahrd v. Forrest*, 71 F.3d 1163 (5th Cir. 1996),.......................................... 47

*Blessing v. Freestone*, 520 U.S. 329 (1997) ............................................... 39, 41, 42, 49

*Boudreau ex rel. Boudreau v. Ryan*, No. 00-C-5392, 2001 WL 840583 (N.D. Ill. May
2, 2001) .................................................................................. 60

*Boulet v. Celucci*, 107 F.Supp.2d 61 (D.Mass. 2000)........................................... 49, 60

*Brogdon ex rel Cline v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322 (N.D. Ga. 2000)............. 47

*Bruggerman ex rel. Bruggerman*, 324 F.3d 906 (7th Cir. 2003). ................................. 60

*Bryson v. Shumway*, 308 F.3d 79 (1st Cir. 2002) ................................................... 49, 60

*Casas v. American Airlines Inc.*, 304 F.3d 517 (5th Cir. 2002.................................... 42

*Cash v. Smith*, 231 F.3d 1301 (11th Cir. 2000) ....................................................... 24, 32

*Cf. Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001) ........................ 48

*Children's Healthcare Is A Legal Duty, Inc. v. Deters*, 92 F.3d 1412 (6th Cir. 1996)............... 72

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) ...................................................... 21

*Confederated Tribes & Bands of the Yakama Indian Nation v. Locke*, 176 F.3d 467
   (9th Cir. 1999)....................................................................................................... 72

*Daughtery v. I-Flow, Inc.*, No. 3:09-CV-2120-P, 2010 WL 2034835 (N.D. Tex. April
   29, 2010) ................................................................................................................ 20

*Day v. Sebelius*, 376 F.Supp.2d 1022 (D. Kan. 2005) ............................................... 72

*Doe v. Judicial Nominating Com'n for Fifteenth Judicial Circuit of Florida*, 906 F.
   Supp. 1534 (S.D. Fla. 1995) ................................................................................. 35

*Douglas v. Indep. Living Ctr.*, 132 S. Ct. 1204 (2012)............................................. 54

*Duncan v. Johnson-Mathers Health Care, Inc.*, Civ. A. No. 5:09-CV-00417-KKC,
   2010 WL 3000718 (E.D. Ky. July 28, 2010)...................................................... 44, 47

*Edelman v. Jordan*, 415 U.S. 651 (1974) ................................................................ 71

*Emery v. Caravan of Dreams, Inc.*, 879 F. Supp. 640 (N.D. Tex. 1995), *aff'd*, 85 F.3d
   622 (5th Cir. 1995)............................................................................................. 34, 35

*Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697 (5th Cir. 2007)................... 40

*Estate of Ayres v. Beaver*, 48 F.Supp.2d 1335 (M.D. Fla. 1999)................................ 47

*Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908 (5th Cir. 2000) ......... 39

*Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175 (10th Cir. 2003) ................... 32

*Fitts v. McGhee*, 172 U.S. 516 (1899) .................................................................... 71

*Florida Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehabilitative
   Servs.*, 225 F.3d 1208 (11th Cir. 2000).................................................................. 27

*Frazar v.Gilbert*, 300 F.3d 530 (5th Cir. 2002) ...................................................... 50

*Frew ex rel. Frew v. Hawkins*, 124 S.Ct. 299 (2004) .............................................. 50

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC)*, 528 U.S. 167 (2000) ........ 20

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330 (5th Cir. 2012) ......... 23

*Garcia v. Copenhaver, Bell & Assoc., M.D.'s P.A.*, 104 F.3d 1256 (11th Cir.1997) .................. 19

*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989) .................................... 37

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ....................................................................... passim

*Grammer v. John J. Kane Reg'l Ctrs-Glen Hazel.*, 570 F.3d 520 (3rd Cir. 2009) ...................... 44

*Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383 (5th Cir.2003) ................................... 51

*Grant v. Gilbert*, 324 F.3d 383 (5th Cir. 2003) ........................................................................... 21

*Greenstein by Horowitz v. Bane*, 833 F.Supp 1054 (S.D. N.Y. 1993) ....................................... 64

*Greer v. Richardson Independent School District*, 752 F.Supp.2d 746 (N.D. Tex. 2010), *aff'd*, 472 Fed. Appx. 287 (5th Cir. 2012) .................................................................... 31

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................................ 21, 22

*Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006 (5th Cir.1998) .............................................................................................................................. 20

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) .............................................. 23

*International Longshoremen's Assoc. v. Philadelphia Marine Trade Assoc.*, 389 U.S. 64 (1967) .............................................................................................................................. 27

*La. ACORN Fair Housing v. LeBlanc*, 211 F.3d 298 (5th Cir. 2000) ......................................... 22

*Lewis v. Casey*, 518 U.S. 343 (1996) .................................................................................... 25, 26

*Lewis v. N.M. Dept. of Health*, 275 F. Supp. 2d 1319 (D.N.M. 2003) ........................................ 60

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................... 20, 21

*M.A.C. v. Betit*, 284 F.Supp.2d 1298 (D. Utah 2003) .......................................................... 49, 51

*M.K. ex rel. Mrs. K. v. Sergi*, 554 F.Supp.2d 175 (D. Conn. 2008) ............................................ 35

*Makin v. Hawaii*, 114 F.Supp.2d 1017 (D. Haw. 1999) ............................................................. 63

*Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464 (5th Cir. 2004) ................................................................................................................................. 30

*McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407 (5th Cir.2004) ........................................... 71

*McCarthy, ex rel. Travis v. Hawkins*, Cause No. A-03-CA-231-SS (W.D. Tex. May 23, 2003) ................................................................................................................................ 60

*Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507 (5th Cir. 1980) ....................................... 19, 20

*Meyer v. Brown & Rood Constr. Co.*, 661 F.2d 369 (5th Cr. 1981) ............................................ 27

*Middlesex County Sewerage Authority v. Nat. Sea Clammers Assoc.*, 453 U.S. 1 (1981).................................................................................................................. 42

*Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3rd Cir.1977) ................................. 19

*N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233 (5th Cir. 2010) .................................... 22

*Nat'l Fed'n of Indep. Business v. Sebelius*, 132 S.Ct. 2566, 2601–2608 (2012)......................... 38

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ...................................................... 23

*Nichols v. St. Luke Ctr.*, 800 F.Supp. 1564 (N.D. Ohio 1992) .................................... 47

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (*en banc*) ................................. passim

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)............................................... 32

*Payne v. Travenol Labs, Inc.*, 565 F.2d 895 (5th Cir. 1978) ........................................ 26

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) ............................... 71

*Prince v. Dicker*, 29 Fed. Appx. 52 (2nd Cir. 2002).................................................. 47

*Quern v. Jordan*, 440 U.S. 332 (1979) ...................................................................... 71

*Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004) ................................................ 33

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001)............................. 18, 19, 20

*Rivera v. Wyeth-Ayerst Lab.*, 283 F.3d 315 (5th Cir. 2002) ....................................... 20

*Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999)...................................... 64

*Rolland v. Cellucci*, 198 F.Supp.2d 25 (D. Mass. 2002) ............................................ 56

*Romano v. Greenstein*, 721 F.3d 373 (5th Cir. 2013)................................................. 40

*S.D. v. Hood*, 391 F.3d 581 (5th Cir. 2004)......................................................... 40, 41

*Schweiker v. Hogan*, 457 U.S. 569 (1982).................................................................. 64

*Scott v. Taylor*, 405 F.3d 1251 (11th Cir. 2005) ....................................................... 72

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) .......................................... 23

*Skandalis v. Rowe*, 14 F.3d 173 (2d Cir. 1994) .................................................... 10, 59

*Sparr v. Berks County*, No. CIV. A. 02-2576, 2002 WL 1608243 (E.D. Pa. July 18, 2002) ...................................................................................................................... 47

*State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71 (2d Cir. 2007).............. 72

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)...........................................................20

*Stewart v. Bernstein*, 769 F.2d 1088 (5th Cir. 1985) ....................................................47

*Susan J. v. Riley*, 254 F.R.D. 439 (M.D. Ala. 2008)........................................................60

*Suter v. Artist M.*, 503 U.S. 347 (1992) ......................................................39

*Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003) .......................................................33

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996)........................................................23

*United States v. Juvenile Male*, --- U.S. ----, 131 S.Ct. 2860 (2011)...........................................21

*Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316 (4th Cir. 2001) ..................................72

*Wilder v. Va. Hosp. Assoc.*, 496 U.S. 498 (1990)....................................................39, 41

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir.1981) ....................................................19

*Women's Emergency Network v. Bush*, 323 F.3d 937 (11th Cir. 2003) ....................................70

*Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418 (1987),.....................39

*Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030 (5th Cir.1981) .........................................21

**Statutes**

5 U.S.C. § 701 *et seq*.........................................................................47

28 U.S.C. § 12132......................................................................26

29 U.S.C. § 794.........................................................................*passim*

42 U.S.C. § 12132 *et seq*...............................................................*passim*

42 U.S.C. § 12134(a) ..................................................................28

42 U.S.C. § 1396, *et seq*..............................................................8, 32

42 U.S.C. § 1396a, *et seq*.............................................................*passim*

42 U.S.C. § 1396c ......................................................................32

42 U.S.C. § 1396d(a) ..................................................................52, 59

42 U.S.C. § 1396n......................................................................52

42 U.S.C. § 1396n(c) ..................................................................*passim*

42 U.S.C. § 1396r .....................................................................*passim*

42 U.S.C. § 1437f(e) ..................................................................38

42 U.S.C. § 1437p ........................................................................................................... 38

42 U.S.C. § 1983 ..................................................................................................... *passim*

TEX. ADMIN. CODE § 17.102 ........................................................................................ 50

TEX. ADMIN. CODE § 17.102(41) ................................................................................. 50

TEX. ADMIN. CODE § 19.2703(19) ............................................................................... 50

TEX. ADMIN. CODE § 353.601–603 .............................................................................. 12

TEX. ADMIN. CODE § 353.603(g) .................................................................................. 53

TEX. ADMIN. CODE § 357.3(a) ...................................................................................... 40

TEX. ADMIN. CODE § 9.155 ........................................................................................... 53

TEX. GOV'T CODE § 316.009 ........................................................................................... 7

TEX. GOV'T CODE § 316.021 ........................................................................................... 8

TEX. GOV'T CODE § 401.0445 ......................................................................................... 7

TEX. GOV'T CODE § 418.001, *et seq* ............................................................................. 8

TEX. GOV'T CODE § 421.002 ........................................................................................... 8

TEX. GOV'T CODE § 531.001(4) ....................................................................................... 6

TEX. GOV'T CODE § 531.001, *et seq* .......................................................................... 6, 8

TEX. GOV'T CODE § 531.002 ........................................................................................... 5

TEX. GOV'T CODE § 531.005 ......................................................................................... 61

TEX. GOV'T CODE § 531.005(a) ...................................................................................... 6

TEX. GOV'T CODE § 531.0055(b)(1) ............................................................................ 6, 7

TEX. GOV'T CODE § 531.0056 ............................................................................... 7, 8, 61

TEX. GOV'T CODE § 531.021(a) ..................................................................................... 6, 7

TEX. GOV'T CODE § 531.021(b)(1) ........................................................................... 63, 67

TEX. GOV'T CODE §§ 531.0055 (e) .................................................................................. 6

TEX. GOV'T CODE ANN. § 531.019 ............................................................................... 40

TEX. HUM. RES. CODE § 32.031 .......................................................................... 6, 63, 67

TEX. HUM. RES. CODE § 161.051(a) ............................................................................... 7

TEX. HUM. RES. CODE § 161.071 *et seq.* ........................................................................... 7


**Other Authorities**

Ron Beal, *Power of the Governor:  Did the Court Unconstitutionally Tell the Governor to Shut Up?*, 62 BAYLOR L. REV. 72, 81–88 (2010) ................................................. 62

TEX. CONST. art IV, § 1 ...................................................................................................... 7

TEX. CONST., art. IV, § 12 ................................................................................................... 8

**Rules**

FED. R. CIV. P. 12(b)(1) ............................................................................................... *passim*

FED. R. CIV. P. 12(b)(6) ............................................................................................... *passim*

FED. R. CIV. P. 65(d) ......................................................................................................... 21

**Regulations**

28 C.F.R. § 35.130 ....................................................................................................... 24, 32

28 C.F.R. § 35.130(b)(3) ..................................................................................................... 36

28 C.F.R. § 35.130(b)(8) ......................................................................................... 34, 35, 36

28 C.F.R. § 35.130(d) ............................................................................................. 24, 27, 31

28 C.F.R. § 41.3(d) ........................................................................................................... 73

28 C.F.R. § 41.51 ....................................................................................................... 24, 32

28 C.F.R. § 41.51(a) ......................................................................................................... 73

28 C.F.R. 35.130(b)(7) ..................................................................................................... 27

42 C.F.R. § 430.25(b) ....................................................................................................... 11

42 C.F.R. § 430.25(d)(2) ................................................................................................... 11

42 C.F.R. § 431.10(b)(1) ..................................................................................................... 7

42 C.F.R. § 431.10(e)(1)(ii) (a)(5 ..................................................................................... 70

42 C.F.R. § 435.1010 ..................................................................................................... 3, 5

42 C.F.R. § 440.150 ......................................................................................................... 65

42 C.F.R. § 440.180 ......................................................................................................... 11

42 C.F.R. § 440.210 ......................................................................................................... 65

42 C.F.R. § 440.230(d) ........................................................................... 48

42 C.F.R. § 440.240 ........................................................................... 64, 65

42 C.F.R. § 440.40 ........................................................................... 65

42 C.F.R. § 441.300 *et seq.* ........................................................................... 61

42 C.F.R. § 441.301 (b)(1)(iii) ........................................................................... 11

42 C.F.R. § 441.301(b)(3) ........................................................................... 58

42 C.F.R. § 441.302 ........................................................................... 50

42 C.F.R. § 441.302(d) ........................................................................... 53, 63

42 C.F.R. § 441.303(f)(6) ........................................................................... 11

42 C.F.R. § 441.305(a) ........................................................................... 11, 12

42 C.F.R. § 483.100, *et seq.* ........................................................................... 42

42 C.F.R. § 483.120(2) ........................................................................... 56

42 C.F.R. § 483.120(a)(2) ........................................................................... 58

42 C.F.R. § 483.1–483.138 ........................................................................... 65

42 C.F.R. § 483.204 ........................................................................... 46

42 C.F.R. § 483.400–.480 ........................................................................... 65

42 C.F.R. § 483.440(a) ........................................................................... 55, 56

42 C.F.R. § 483.440(a)(1) ........................................................................... 58

42 C.F.R. § 483.440(a)–(f) ........................................................................... 66

42 C.F.R. § 483.5 ........................................................................... 65

C.F.R. § 430.25(h)(3)(ii) ........................................................................... 12

C.F.R. § 440.180 ........................................................................... 12

C.F.R. § 440.250(j) ........................................................................... 12

C.F.R. § 441.301(b)(3) ........................................................................... 12

C.F.R. § 441.303(f)(6) ........................................................................... 12

**TO THE HONORABLE JUDGE ORLANDO L. GARCIA**:

Defendants Greg Abbott, in his official capacity as Governor of The State of Texas ("Governor"), Chris Traylor, in his official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"), and Jon Weizenbaum, in his official capacity as Commissioner of the Texas Department of Aging and Disability Services ("DADS") (collectively, "Defendants"), move this Court pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss all of Plaintiffs' claims, for the reasons stated herein. In support, Defendants provide jurisdictional evidence, attached hereto as Exhibits 1, and 2[1] and provided as referenced in publicly-available governmental sources, and the following arguments and authorities.

## INTRODUCTION

In the five years this case has been pending, Plaintiffs have filed three complaints, asserting the identical facts and claims in each complaint, except the specific facts regarding the named Individual Plaintiffs.[2] Yet in those five years, Texas has made significant changes in its Medicaid program that diminish Plaintiffs' claims. First, beginning with the 2014–15 biennium, the Texas Legislature provided funding for a significant expansion of the Medicaid waiver that Plaintiffs assert they all seek—the Home and Community-based Services ("HCS") waiver.[3] And, as of September 1, 2013, the HCS eligibility criteria were expanded to include a target group for persons with intellectual disabilities and related conditions residing in or at imminent risk of entering a

---

[1] The slip opinion for *McCarthy, ex rel. Travis v. Hawkins*, Cause No. A-03-CA-231-SS (W.D. Tex. May 23, 2003) is attached at Exhbit 3.

[2] *Compare, e.g.,* Doc. 1 ¶¶ 31–135, 210–238 *with* Doc. 173.

[3] General Appropriations Act, S.B. 1, 83rd Leg., Reg. Session, 2013, Special Provisions Related to All Health and Human Services Agencies, Section 60(a)(5), page II-139, found at http://www.lbb.state.tx.us/BudgetDocs.aspx?Session=83 (2014-15 State Budget (2014-15 General Appropriations Act).

*Defendants' Motion to Dismiss*
*Plaintiffs' Second Amended Complaint*                                                                                  1

nursing facility.[4] As a result, this target population—which includes all the named Plaintiffs with IDD—may now bypass the interest list for the HCS waiver and move directly to the community, once suitable arrangements are made. Significantly, all but one of the current named Plaintiffs with IDD who have expressed a desire to live in the community are now enrolled and receiving services in the HCS waiver.[5]  For the 2016–17 biennium, the Texas Legislature appropriated $84,541,298 to fund an additional 1,300 HCS slots for this target group.[6]  Also of significance to Plaintiffs' claims and known, but ignored, by Plaintiffs, Texas has expanded the array of specialized services it provides.[7]  Plaintiffs are fully aware of these changed circumstances, yet have refused to correct their outdated pleadings.  Because these basic facts cannot go ignored in light of the grave accusations Plaintiffs persist in making and the sweeping relief they still seek, Defendants have provided this information for the Court's consideration in determining its jurisdiction.

This motion—Defendants' third motion to dismiss Plaintiffs' claims—seeks dismissal of all of Plaintiffs claims as set out in their live pleading, the Second Amended and Supplemental Complaint (Doc. 173). Defendants' first motion to dismiss (Docs. 30, 32)[8] was denied as moot in the Courts' order of July 23, 2012 (Doc. 107) because in October 2011, before ruling on the first motion, the Court granted Plaintiffs' motion to lift the stay then in effect[9] and allowed Plaintiffs

---

[4] https://www.dads.state.tx.us/providers/hcs/waivers.html: HCS Waiver Application (2013-2018) at 3 (Brief Waiver Description), (defining this group as an HCS target group), 50 (defining Level of Care I and VIII, and explaining the state's reserve capacity for this target group).

[5] See Ex. 2, Blevins Decl.  Ms. Hernandez and her team are still working on a suitable living arrangement; her move to the community has been delayed for medical reasons.  *Id.*

[6] See http://www.lbb.state.tx.us/Documents/Budget/Session_Code_84/HB1-Conference_Committee_Report_84.pdf (Conf. Comm. Report H.B. 1) at 124/154, Rider 31.c.

[7] 40 Tex. Admin. Code § 17.102(41) (effective July 7, 2015); *see* 40 Tex. Admin. Code §§ 19.2703(19) (LIDDA) & (27) (NF); *see also* 40 Tex. Reg. 4365 (adopted May 17, 20132013) (rule in effect when Plaintiffs filed their 2d Am. Complaint).

[8] Defendants' first motion to dismiss (Docs. 30, 32) was filed on March 8, 2011, in response to Plaintiffs' December 20, 2010 Original Complaint (Doc. 1). Plaintiffs responded on April 18 (Doc. 40), and Defendants replied on June 1, 2011 (Doc. 51).

[9] The stay was imposed by the Court's order of September 27, 2011 (Doc. 58) (stating that that the "stay will be lifted after the Court determines how this case should proceed.").  Plaintiffs waited less than a week to move to lift the stay.

to file an Amended and Supplemental Complaint (Doc. 63), which Defendants then moved to dismiss on November 4, 2011 (Doc. 67).[10] A hearing on Defendants' second motion to dismiss (and other then-pending motions) was held on September 12, 2012. However, in March 2013, before there was a ruling on the second motion, Plaintiffs again moved for leave to amend their complaint (Doc. 162). On July 19, 2013, the Court granted Plaintiffs' motion and filed Plaintiffs' Second Amended and Supplemental Complaint (Doc. 173) ("2d Am. Complaint").

On July 25, 2013, the Court issued an order (Doc. 175) staying the case and denying all pending motions, including Defendants' then-pending second motion to dismiss (Doc. 67), to allow for settlement of the case. Thereafter, the case was stayed until September 30, 2015, in connection with private and court-ordered settlement negotiations (Docs. 175, 179, 208, 220). This motion is filed pursuant to the Court's scheduling order of October 15, 2015 (Doc. 230).

### The Plaintiffs and Their Claims

Plaintiffs are twelve individual named plaintiffs ("Individual Plaintiffs")[11] who claim they are adults with intellectual disabilities or related conditions[12] and two organizational plaintiffs, The ARC of Texas, Inc., and the Coalition of Texans with Disabilities, Inc. ("Organizational Plaintiffs"). 2d Am. Complt. ¶¶ 1, 10–25, 26–31. Plaintiffs are suing on behalf of themselves and a purported class,[13] claiming inappropriate segregation in nursing facilities ("NFs") and exclusion from community-based services as a result of the eligibility criteria and "methods of

---

[10] Plaintiffs' responded on November 23 (70), and Defendants replied on December 12, 2011 (Doc. 76).

[11] Plaintiffs' 2d Am. Complaint names sixteen individual Plaintiffs. (Doc. 173). However, four of those individuals are now deceased. *See* Docs. 171 (Michael McBurney), 185 (Andrea Padron), and 190 (Benny Holmes). Defendants are also aware that Leon Hall is deceased, although Plaintiffs have not filed a notice regarding Mr. Hall.

[12] Specifically, Plaintiffs describe themselves as adult persons with "mental retardation or other related conditions," which they refer to as "developmental disabilities." meaning 2d Am. Complaint ¶ 1. More commonly, the term "intellectual disability" refers to mental retardation, and "developmental disability" refers to "related conditions," as defined by 42 C.F.R. § 435.1010. For purposes of this motion, Defendants use the term "intellectual disability" to mean mental retardation, "related condition" to mean the conditions set out in 42 C.F.R. § 435.1010, and "intellectual or developmental disability" ("IDD") to mean an intellectual disability, a related condition, or both.

[13] The Organizational Plaintiffs also sue on behalf of their members. 2d Am. Complaint ¶¶ 28, 31.

administration" of the State's community-based Medicaid waivers.  2d Am. Complaint ¶¶ 1–5, 379–83, 389–90, 393–96, 398, 399, 403-405.  Plaintiffs also complain that the State has allegedly failed to timely and appropriately conduct pre-admission screening and assessments ("PASRR" [14] reviews) before NF placement; provide all needed specialized services; assess the appropriateness of alternative, less restrictive settings; and advise of and timely provide a choice of community-based services and supports. *Id.* Plaintiffs assert that Defendants have violated their rights under the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504" or "Rehab. Act"), and several sections of Title XIX of the Social Security Act, 42 U.S.C. § 1396a, *et seq.* ("Medicaid Act"), including the 1987 Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. § 1396r ("NHRA"). Plaintiffs bring their claims under 42 U.S.C. § 1983 ("§1983"). As relief, Plaintiffs seek expansive, far-reaching declaratory and injunctive relief touching virtually every aspect of Texas's Medicaid program for PASRR-eligible persons with intellectual or developmental disabilities ("IDD"). 2d Am. Complaint at 84–86.

Of the surviving twelve named Individual Plaintiffs, all but one of the Plaintiffs with IDD who desire to live in the community are now living in the community and receiving Texas' Home and Community-based Services ("HCS") waiver services. *See* Ex. 2, Declaration of Mirenda Blevins ("Blevins Decl.").[15]  At least two of the named Plaintiffs—Linda Arizpe and Patricia Ferrer—had already been offered slots in the HCS waiver and had moved into the community at the time Plaintiffs filed their Second Amended Complaint. 2d Am. Complaint ¶¶ 171, 201. Of the six Individual Plaintiffs who are eligible for the HCS waiver but were not participating in that

---

[14] "PASRR" (formerly known as "PASARR") means "Pre-Admission Screening and Resident Review," as set out in the NHRA, 42 U.S.C. § 1396r (e)(7).
[15] Ms. Hernandez and her team are still working on a suitable living arrangement; her move to the community has been delayed for medical reasons.  *Id.*

waiver when the Second Amended Complaint was filed, all of them—Leonard Barefield, Maria Hernandez, Richard Krause,[16] Zachowitz Morgan, Eric Steward, and Vanisone Thongphan—have since been provided an HSC waiver and all but Ms.  Hernandez have moved into the community. *See* Ex.2, Blevins Decl. Three of the Individual Plaintiffs (Tommy Johnson, Johnny Kent, and Joseph Morrell) are on the interest list for the HCS waiver, 2d Am. Complaint ¶¶ 342 (Johnson), 358 (Kent), and 373 (Morrell), but have not started the process of admission to the waiver, and have stated that they are not interested in moving into a waiver. *See* Ex. 1, Declaration of Luizama Botello ("Botello Decl.").

Separately, Plaintiffs allege that Melvin Oatman "does not have an intellectual disability," but that he has "a condition related to a developmental disability" (*i.e.*, a related condition).  However, Plaintiffs have neither identified Oatman's "related condition" outright nor pled facts demonstrating that he actually has a related condition within the meaning of 42 CFR § 435.1010.[17] Instead, Plaintiffs assert only that Oatman has AIDS, as well as "impaired speech, glaucoma, problems with coordination, and seizure disorder, among other medical conditions," none of which constitutes a "related condition," as a matter of law.  2d Am. Complt. ¶¶ 18, 265, 272.  Accordingly,

---

[16] Plaintiffs pled that Krause was not eligible for an HCS waiver. 2d Am. Complaint ¶ 287. However, Krause has since moved to the community in the HCS waiver.  *See* Ex. 2, Blevins Decl.

[17] Medicaid regulations define "person with related conditions" as follows:

> Persons with related conditions means individuals who have a severe, chronic disability that meets all of the following conditions:
> (a) It is attributable to—(1) Cerebral palsy or epilepsy; or (2) Any other condition, other than mental illness, found to be closely related to Intellectual Disability because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and requires treatment or services similar to those required for these persons.
> (b) It is manifested before the person reaches age 22.
> (c) It is likely to continue indefinitely.(d) It results in substantial functional limitations in three or more of the following areas of major life activity:(1) Self-care.(2) Understanding and use of language.(3) Learning.(4) Mobility.(5) Self-direction.(6) Capacity for independent living.

42 C.F.R. § 435.1010.  DADS maintains a list of conditions which may qualify an individual as having a related condition as described in federal and state law.   *See*  http://www.dads.state.tx.us/providers/guidelines/icd-9-cm_diagnostic_codes.pdf.

Plaintiffs' allegations related to individuals with IDD do not apply to Mr. Oatman, and he is not eligible for the HCS waiver, because the HCS waiver is available only for individuals with intellectual or developmental disabilities (*i.e.* a related condition).[18]  Further, Defendant DADS is not the appropriate defendant for a claim of violation of rights of individuals with mental illness; DADS has no remedy for individuals with mental illness.  Mr. Oatman has no standing to assert claims against DADS based on his mental illness, nor does he have standing to assert claims based on a violation of the rights of individuals with IDD.

In summary, all named Plaintiffs with IDD—the exception of Ms. Hernandez—who have responded favorably to information and inquiries about living in the community and have chosen to do so have now established residences in the community, supported by Texas waiver services.[19]  *See* Ex.2, Blevins Decl.

### The Defendants and Their Roles in the Texas Medicaid Program

The Texas Medicaid Program is a state and federally funded program that provides health benefits to more than 4 million low-income, elderly, and disabled Texans.[20]  Chris Traylor, as the Executive Commissioner of HHSC, and Jon Weizenbaum, as the Commissioner of DADS, are the state officials who head the two state agencies responsible for administering those parts of the Texas Medicaid Program targeted by this lawsuit, namely, the provision of Medicaid services to Medicaid-eligible persons meeting the medical necessity requirement for admission to a nursing facility ("NF") who also have IDD.

---

[18]   http://www.dads.texas.gov/providers/hcs/HCS_Waiver_Amendment6.pdf at 4 (Amend. No. TX.0110.R06.06, effective 8-31-15).

[19] This leaves only Mr. Oatman, who does not have IDD, and Tommy Johnson, Johnny Kent, and Joseph Morrell, who have indicated they are not interested in moving from their NF.  *See* Ex 1, Botello Decl.

[20] Final Texas Medicaid Full-Benefit Caseload, December 2014, available at:
 http://www.hhsc.state.tx.us/research/MedicaidEnrollment/docs/Medicaid-Final-Caseload.xls).

HHSC is the state agency with primary responsibility for ensuring the delivery of health and human services in Texas in a manner that: (1) uses an integrated system to determine client eligibility; (2) maximizes the use of federal, state, and local funds; and (3) emphasizes coordination, flexibility, and decision-making at the local level. TEX. GOV'T CODE § 531.002. In that role, HHSC provides oversight and strategic direction to the state agencies that make up the health and human services system in Texas. TEX. GOV'T CODE § 531.001(4); *see generally* TEX. GOV'T CODE § 531.001, *et seq*. HHSC is governed by an executive commissioner, now Chris Traylor, who is appointed by the Governor with the advice and consent of the Senate. TEX. GOV'T CODE § 531.005(a); *see* 2d Am. Complaint ¶¶ 32, 33.[21] HHSC's executive commissioner adopts rules and policies for the operation and provision of health and human services by the health and human services agencies, and manages and directs the operations of each health and human services agency. TEX. GOV'T CODE §§ 531.0055 (e) and (e)(2); *see* 2d Am. Complaint ¶ 33.

Specifically, HHSC "supervise[s] the administration and operation of the Medicaid program," TEX. GOV'T CODE § 531.0055(b)(1), and is the single state agency designated to administer federal medical assistance funds.[22] TEX. GOV'T CODE § 531.021(a). Accordingly, HHSC plans and directs the Medicaid program in each agency that operates a portion of the Medicaid program, including DADS. *Id*. § 531.021(b)(1). HHSC also receives and distributes federal Medicaid funds to the health and human services agencies which administer the Texas Medicaid program. TEX. HUM. RES. CODE § 32.031. As specifically related to this lawsuit, HHSC is responsible for the administration of the PASRR program in Texas.

---

[21] Plaintiffs' 2d Am. Complaint names as defendant Kyle Janek, M.D., former Executive Commissioner of HHSC. 2d Am. Complaint ¶ 33.

[22] The Medicaid Act and its implementing regulations allow States to receive Medicaid funding only if they designate a "single State agency … to administer or supervise the administration of the (state Medicaid) plan."  42 C.F.R. § 431.10(b)(1); *see* 42 U.S.C. § 1396a (5). In Texas, HHSC is that agency.

DADS is the state agency responsible for administering human services programs for the aging and persons with disabilities, including: (1) administering and coordinating programs to provide community-based care and support services to promote independent living for populations that would otherwise be institutionalized; (2) providing institutional care services, including services through convalescent and nursing homes and related institutions; (3) providing and coordinating programs and services for persons with disabilities, including programs for the treatment, rehabilitation, or benefit of persons with developmental disabilities or an intellectual disability; and (4) performing all licensing and enforcement activities and functions related to nursing homes and related institutions.  TEX. HUM. RES. CODE § 161.071 (1)–(3), (6); *see* 2d Am. Complaint ¶ 34. The DADS Commissioner, is appointed by the Executive Commissioner of HHSC, with the approval of the Governor, and serves at the pleasure of the Executive Commissioner. TEX. GOV'T CODE § 531.0056; TEX. HUM. RES. CODE § 161.051(a), (b); *see* 2d Am. Complaint ¶ 32, 33, 34.

The Governor of Texas is the chief executive officer of the State. TEX. CONST. art IV, § 1; *see* 2d Am. Complaint ¶ 32. However, Texas law does not imbue the Governor with any direct responsibilities for development, administration, or funding of the state's Medicaid program. Specifically, the Governor is not "responsible for directing, supervising, and controlling" the Texas Medicaid program, as Plaintiffs allege. 2d Am. Complaint ¶ 32. To the contrary, the Texas Legislature has specifically designated HHSC as the state agency to "supervise the administration and operation of the Medicaid program," TEX. GOV'T CODE § 531.0055(b)(1), and as the single state agency designated to administer federal medical assistance funds, TEX. GOV'T CODE § 531.021(a). Nor is the Governor "responsible for … seeking funds from the legislature to implement … programs and deliver … services."  2d Am. Complaint ¶ 32. While it is true that the

Governor is required to submit a biennial budget to the Legislature, TEX. GOV'T CODE § 401.0445, and that he is permitted to submit a proposed general appropriations bill to the Legislature, TEX. GOV'T CODE § 316.009, the Governor has no authority to appropriate state funds for the Texas Medicaid program. Instead, only members of the Legislature are authorized to file a general appropriations bill, and only the Legislature can appropriate state funds. TEX. GOV'T CODE § 316.021. Finally, the Governor's authority to appoint the Executive Commissioner of HHSC, subject to the advice and consent of the Senate, TEX. GOV'T CODE § 531.005, and to approve the appointment of the Commissioner of DADS, TEX. GOV'T CODE § 531.0056, does not give him the authority to administer or operate Texas's Medicaid program, which by law is administered and operated by HHSC and other health and human services agencies, including DADS.[23]

## *Overview of the Medicaid Act and Medicaid Waivers*

Congress created the Medicaid program in 1965 by adding Title XIX to the Social Security Act, 42 U.S.C. § 1396, *et seq*. The program authorizes federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons. In order to qualify for federal reimbursement under Medicaid, a State must have a plan for medical assistance that meets certain statutorily defined requirements, 42 U.S.C. § 1396a(a), and that is approved by the Secretary of Health and Human Services ("Secretary"), 42 U.S.C. § 1396a(b). A "State Plan" defines the categories of individuals eligible for benefits, 42 U.S.C. § 1396a(a)(10), and the specific kinds of medical services that are covered, 42 U.S.C. § 1396d(a). States cannot qualify for federal Medicaid funds unless they provide coverage to certain groups, and are given the option to extend coverage to various other groups. The line between mandatory and optional coverage is

---

[23] By contrast, the Governor does have authority to:  appoint state and district offices, TEX. CONST., art. IV, § 12 direct homeland security in Texas and develop a statewide homeland security strategy, TEX. GOV'T CODE § 421.002; declare a state of disaster and meet the dangers to the state and people presented by disasters, TEX. GOV'T CODE § 418.001, *et seq.*

primarily drawn in § 1396a(a):  mandatory coverage is specified in § 1396a(a)(10)(A)(i), and the state options are set forth in subsection 1396a(a)(10)(A)(ii). *Skandalis v. Rowe*, 14 F.3d 173 (2d Cir. 1994). States receive federal Medicaid funds only if they provide coverage to the required groups of the "categorically needy"[24] and, at the state's option, may also cover one or more optional "categorically needy" groups. 42 U.S.C. § 1396a(a)(10)(A)(ii).[25]  These categories are determined based on financial eligibility standards. 42 U.S.C. § 1396a (a)(10)(A). Federal law does not condition federal reimbursement on a State's decision to provide all services and devices covered by the statute. Rather, Congress has set a basic minimum standard for any state Medicaid program; a state need only provide financial assistance for certain specified medical treatment to receive Medicaid funds. *Id.*

In 1981, Congress amended the Medicaid Act by adding 42 U.S.C. § 1396n(c) to allow the Secretary of Health and Human Services, through the Health Care Finance Administration (now the Centers for Medicare & Medicaid Services ("CMS")), to waive certain statutory criteria for Medicaid reimbursement, and to allow participating states, upon the state's application, to use federal and state funds to provide home and community-based services as alternatives to funding care for Medicaid-eligible individuals in hospitals, nursing facilities or intermediate care facilities for individuals with intellectual disability ("ICFs-IID") under the State Plan. 42 U.S.C. § 1396n(c);

---

[24] The required "categorically needy" groups include individuals eligible for cash benefits under the Temporary Assistance for Needy Families (TANF) program; the aged, blind, or disabled individuals who qualify for supplemental security income (SSI) benefits; and other low-income groups such as pregnant women and children entitled to poverty-related coverage. 42 U.S.C. § 1396a (a)(10)(A)(i); *see Pharm. Research & Mfrs. of America v. Walsh*, 538 U.S. 644, 651 (2003).

[25] A state, at its option, may also cover the "medically needy."  *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650–51 (2003); *Atkins v. Rivera*, 477 U.S. 154, 154 (1986). The "medically needy" are individuals who meet the nonfinancial eligibility requirements for inclusion in one of the groups covered under Medicaid, but whose income or resources exceed the financial eligibility requirements for categorically needy eligibility. § 1396a (a)(10)(C); *see id.* at 650-51. Texas has a program for the "medically needy," but that program does not include the aged, blind, or disabled. *See* http://www.hhsc.state.tx.us/medicaid/about/state-plan/docs/basic-state-plan-attachments.pdf.  (State Plan) at p.76.

42 C.F.R. § 440.180; § 441.301 (b)(1)(iii). As its name suggests, a waiver relieves states from complying with certain federal reimbursement criteria that ordinarily must be met to receive federal Medicaid funding under the State Plan.[26] The statute specifically provides that the criteria of statewideness, comparability of services, and single standard for income and resource eligibility may be waived. 42 U.S.C. § 1396n(c)(3); 42 C.F.R. § 430.25(d)(2).

Unlike ICF-IID or NF services, which must be made available to all individuals who are categorically eligible for Medicaid services in conformance with the Medicaid Act, there is no statutory entitlement to waiver services. In other words, not all people who are eligible for these "waiver" services are entitled to receive them. In fact, the Medicaid Act and applicable regulations expressly require participating states to limit the number of persons who may receive waiver services. 42 U.S.C. §§ 1396n(c)(9), (10); 42 C.F.R. §§ 441.303(f)(6), 441.305(a). Moreover, an approved cap is binding on the state.[27] Defendants are prohibited from increasing the number of waiver slots unless they request amendment to their waiver applications and receive necessary approval from CMS. Nothing in federal Medicaid law or regulation requires a participating state to increase the number of persons served in its waiver programs. Additionally, a participating state

---

[26] The federal Medicaid regulations describe the purpose of a Medicaid waiver program as follows:
> Waivers are intended to provide the flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular areas or groups of recipients. Waivers allow exceptions to State plan requirements and permit a State to implement innovative programs or activities on a time-limited basis, and subject to specific safeguards for the protection of recipients and the program.

42 C.F.R. § 430.25(b). To qualify for a waiver, a state must demonstrate that rendering home and community-based services to qualified individuals would not result in overall expenditures in excess of those that would be incurred if those individuals received services in the traditional institutional program. 42 U.S.C. § 1396n(c)(2).

[27] Specifically, the regulations provide that a state seeking a waiver:
> must indicate the number of unduplicated beneficiaries to which it intends to provide waiver services in each year of its program. This number will constitute a limit on the size of the waiver program unless the State requests and the Secretary approves a greater number of waiver participants in a waiver amendment.

42 C.F.R. § 441.303(f)(6); *see* 42 C.F.R. § 441.305(a). In fact, the statute expressly contemplates that waiver programs may be limited to as few as 200 individuals. 42 U.S.C. § 1396n(c)(10).

has wide latitude to define the types of services that it will offer under the waiver, to limit the geographical areas where waiver services are offered and the target groups to whom the services are offered, and to make waiver services available in an amount, duration and scope that differs from the amount, duration, and scope of services provided to other Medicaid recipients. 42 U.S.C. §§ 1396n(c)(3), (4), (9), 1396n(c)(10); 42 C.F.R. §§ 430.25(h)(3)(ii), 440.180, 441.301(b)(3), (6), 441.303(f)(6), 440.250(j), (k), (l), 441.305(a).

As permitted by 42 U.S.C. § 1396n(c), HHSC has obtained approval from CMS to offer home and community-based services to a specified number of individuals who require the level of care provided in ICFs-IID. As Plaintiffs acknowledge, the HCS waiver is one such program. 2d Am. Complaint ¶ 67. Texas's HCS waiver provides community-based services and supports to—

> individuals with intellectual and developmental disabilities or a related condition living in a variety of residential settings including an individual's own home, family home, a host home/companion care setting, or a three or four person group home setting.

*See, e.g.,* https://www.dads.state.tx.us/providers/hcs/waivers.html: HCS Waiver Application 2013-2018) at 3 (Brief Waiver Description).  The most recent HCS waiver renewal approved by CMS,[28] covering the 5-year period beginning September 1, 2013, includes a target group for persons with intellectual disabilities (Level of Care I) and related conditions (Level of Care VIII) residing in or at imminent risk of entering a nursing facility. *Id.* at 39 (defining this group as an HCS target group), 50 (defining Level of Care I and VIII, and explaining the state's reserve

---

[28]  CMS approval is reflected at https://www.cms.gov/outreach-and-education/american-indian-alaska-native/aian/ltss-roadmap/resources/state-federal-relationships/1915c-Waivers-by-State.html#texas (TX HCBS Program (0110.R06.00)).

capacity for this target group).[29]  For the 2016–17 biennium, the Texas Legislature appropriated $84,541,298 to fund an additional 1,300 HCS slots for this target group.[30]

The HCS waiver program has a limited number of slots[31] and, as Plaintiffs' acknowledge, there was an interest list of approximately 45,756 persons, as of July 31, 2010,[32] who are waiting for HCS waiver services to become available. 2d Am. Complaint ¶ 67.  However, as of September 1, 2013, persons with IDD (i.e., an intellectual disability or related condition)[33] living in or at imminent risk of entering a NF need not access the HCS waiver through the interest list, but may bypass the interest list and enroll in HCS directly from the NF (or from the community if being diverted from an NF).  HCS Waiver Application 2013-2018) at 3, 39, 50.  Accordingly, the length of the HCS interest list does not affect any *Steward* plaintiff's ability to enter the HCS waiver.

Texas also offers a statewide community-based alternative for persons age 21 and over requiring a NF level of care.  Such care was provided in some areas of the state through the Community Based Alternatives ("CBA") waiver[34] until September 1, 2014, and in other areas through the managed-care equivalent to CBA, the "STAR+PLUS" waiver.[35]  Effective September 1, 2014, the CBA waiver program was replaced statewide by the STAR+PLUS waiver program.[36]

---

[29]  *See also* DADS Access and Intake Services Community Options Booklet (January 2015), http://www.dads.state.tx.us/providers/community_options.pdf at 74 (Service Description), 76 (Additional Criteria, showing eligibility to include persons with a related condition residing in or at imminent risk of entering a NF).

[30]  *See* http://www.lbb.state.tx.us/Documents/Budget/Session_Code_84/HB1-Conference_Committee_Report_84.pdf (Conf. Comm. Report H.B. 1) at 124/154, Rider 31.c.

[31]  The number of unduplicated individuals approved by CMS for the HCS waiver for the state fiscal year ending August 31, 2016, is 24,464.  *See* http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/Downloads/TX0110.zip (CMS website containing the approved HSC waiver (2013) and the subsequent amendments). The current amendment (8/31/2015) is TX 0110.R06.06.  The information on unduplicated individuals is found in Section B-3 of the amendment.

[32]  As of July 31, 2015, the HCS interest list had 73,597 persons on it. http://www.dads.state.tx.us/services/interestlist/archive/.

[33]  This would include all of the Individual Plaintiffs except Mr. Oatman.

[34]  *See* http://cfoweb.dads.state.tx.us/ReferenceGuide/guides/FY11ReferenceGuide.pdf  p. 32 (CBA is alternative to NF); *see* http://www.dads.state.tx.us/providers/CBA/CBAWaiver.pdf (CBA waiver application) at 3 (showing waiver as alternative to care in a NF as described in 42 C.F.R. § 440.40 and 42 C.F.R. § 440.155), 4 (describing waiver as alternative to NF care).

[35]  *See* 1 TEX. ADMIN. CODE § 353.601–603 (showing STAR+PLUS as alternative to NF care).

[36]  http://www.hhsc.state.tx.us/medicaid/managed-care/mmc.shtml.

No Plaintiff has pleaded facts showing she has even attempted to apply for a CBA or STAR+PLUS waiver slot, or any other waiver other than HCS. 2d Am. Complaint ¶¶ 157, 167, 178, 184, 197, 207, 236, 237, 252, 262, 272, 287, 297, 312, 327, 342, 358, 373.

## SUMMARY OF ARGUMENT

### *Dismissal Under Rule 12(b)(1)*

There are several grounds upon which this Court may dismiss the Plaintiffs and their claims under Rule 12(b)(1) based on Plaintiffs' lack of standing.  The Organizational Plaintiffs should be dismissed entirely for lack of standing because they not alleged any facts showing an injury-in-fact either to the organizations themselves or to any member as a result of Defendants' alleged violations of law.

This Court lacks jurisdiction over all of Plaintiffs' ADA and Rehab. Act claims, for several reasons.  First, the eligibility criteria for the HCS waiver have changed as described above, and the beneficiary Plaintiffs having IDD who have expressed an interest in enrolling in the HCS waiver have done so or are in the process of finding an appropriate living arrangement; thus, the claims that Defendants' eligibility criteria and methods of administration bar them from being served in the community are moot and Plaintiffs lack standing to raise them.  Further, no Plaintiff has identified the specific rule, policy, or eligibility criterion that has allegedly caused them harm; because Plaintiffs fail to identify the cause of their alleged harm, the system-wide injunctive relief that Plaintiffs seek is not limited to the inadequacy that produced the alleged harm.  The Court also lacks jurisdiction over Plaintiffs' ADA and Rehab. Act claims because the injunctive relief that Plaintiffs seek is unenforceable as a matter of law.

As for the Medicaid Act claims, Plaintiffs lack standing to assert claims under the "Freedom of Choice" provisions of the Act, 42 U.S.C. § 1396n(c)(2)(B) and (C), because they

have not alleged any injury from Defendants' alleged failure to comply with those provisions. They have not asserted a failure to evaluate whether they require the level of care provided in a NF, which is § 1396n(c)(2)(B)'s requirement, nor can they show any injury in connection with § 1396n(c)(2)(C)'s informational requirement because all the Plaintiffs with IDD who have chosen to enter the HCS waiver have done so. For these same reasons, the Organizational Plaintiffs lack standing to assert § 1396n(c)(2)(B) or (C) claims on behalf of their members.

### *Dismissal Under Rule 12(b)(6)*

Even assuming the Court has jurisdiction over Plaintiffs and their claims, the Court should nevertheless dismiss Plaintiffs' ADA and Rehab. Act claims under Rule 12(b)(6) because Plaintiffs have not alleged that services are available in institutions but not in the community, have not identified eligibility criteria that screen out or tend to screen out individuals with IDD from gaining access to or enjoying community-based services and supports, and have failed to allege any methods of administration that exclude individuals with IDD from community-based programs by reason of their disability.

Likewise, all of Plaintiffs' Medicaid Act claims should be dismissed under Rule 12(b)(6).

*First*, § 1983 is not available to enforce the Medicaid Act because the Act, as spending legislation, imposes legal obligations only on the Secretary of Health and Human Services—to reimburse a State for Medicaid expenses only if he concludes the State's Medicaid program satisfies certain criteria for such funding—and does not require the States to maintain Medicaid programs that qualify for federal funds; therefore, the State cannot "violate" the Act.

*Second*, even under a traditional section-by-section *Blessing* analysis, Plaintiffs' NHRA claims fail because these statutes create no individual "rights" that can be vindicated under § 1983 (in particular, §§ 1396r(b)(3)(F) and 1396r(f) impose no obligations on the State), and the NHRA's

remedial scheme precludes individual judicial remedies.  Likewise, the "reasonable promptness" provision (§ 1396a(a)(8)) and the "comparability" provision (§ 1396a(a)(10)(B)) create no privately-enforceable right where the desired waiver is full.  Finally, the two provisions relating to a State's application for a Medicaid waiver—§ 1396n(c)(2)(B), requiring a State seeking a Medicaid waiver to assure the Secretary that it will evaluate a waiver applicant's eligibility for the relevant type of institutional care; and § 1396n(c)(2)(C), requiring that states seeking a Medicaid waiver assure that eligible individuals will be informed of the "feasible alternatives" to ICFs-IID "if available under the waiver"—do not contain the type of rights-creating language required by *Gonzaga*.

*Third*, the United States Supreme Court has made clear that Plaintiffs cannot proceed in equity to secure the far-reaching relief they seek because Congress has foreclosed such relief by (1) providing an exclusive remedy for a State's failure to meet the Act's requirements for funding (the withholding of funds), and (2)  purposefully enacting statutes lacking judicially administrable standards.  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015).  Further, the appropriate recourse for the Secretary's decisions approving Texas' State Plan is through the federal Administrative Procedure Act, and this lawsuit interferes with the Secretary of HHS's exclusive power to enforce the statutes at issue here.

*Fourth*, even if this Court finds that the Medicaid Act provisions at issue confer privately-enforceable rights, Plaintiffs nevertheless fail to state viable Medicaid Act claims. Specifically, Plaintiffs have asserted violations of § 1396r(b)(3)(F) (NF requirements for PASRR), when that section is directed to nursing facilities, not the State, and neither that section nor § 1396r(e) (State requirements for PASRR) contain the requirements Plaintiffs attribute to them.

Moreover, in alleging that Defendants violate the specialized services provisions of the Act by defining what specialized services the State will provide rather than offering what Plaintiffs call "the full array" of such services, without limitation, Plaintiffs fabricate standards nowhere appearing in the Act and ignore the authority recognizing the State's ability to designate what specialized services it will provide.  Because Plaintiffs seek redress for an alleged failure to provide specialized services other than to the limited extent required by the statute (§ 42 C.F.R. § 483.120(a)(2)) and regulation (42 C.F.R. § 483.440(a)(1)), they have failed to state a cognizable claim.

Relatedly, Plaintiffs' § 1396a(a)(8) claim ("Reasonable Promptness") fails as applied to the claim that an unlimited, "full array" of specialized services are not being provided with "reasonable promptness."  Likewise, the § 1396a(a)(8) claim regarding "community placement" fails to state a viable claim because a state may properly limit a waiver program's size and scope, and "reasonable promptness" does not apply to community placement when the community-based waiver they seek is full, as the HCS waiver is here.

Plaintiffs' claims under 42 U.S.C. § 1396a(a)(10)(B) ("Comparability") should be dismissed because the Medicaid Act outlines distinct programs and services, and does not require that all services provided to categorically needy recipients in an ICF-IDD must also be provided in the same amount, duration, and scope to categorically needy recipients in a NF; moreover, Plaintiffs seek to impose a duty under § 1396a(a)(10)(B) to provide specialized services, active treatment, or other services to individuals in a NF that exceed the requirements of the Act.

Lastly, Plaintiffs fail to state a claim under 42 U.S.C. §§ 1396n(c)(2)(B) and (C) ("Freedom of Choice") because the statutory text contains none of the requirements that Plaintiffs create from whole cloth and then claim Defendants fail to satisfy. Instead, these statutory

provisions afford a right of information only for waiver applicants at the time the individual is actually being assessed for and offered a waiver placement, and Plaintiffs acknowledge that the HCS waiver is full and there is no slot available for them at this time. In short, Plaintiffs have failed to plead any actionable Medicaid Act claim.

### *Dismissal of the Governor*

Finally, Governor Abbott should be dismissed under Rule 12(b)(1) for lack of standing because Plaintiffs pled no facts showing that the Governor caused Plaintiffs' injuries or that he could redress those injuries. Similarly, the Governor of Texas is entitled to Eleventh Amendment immunity because the Governor lacks the requisite "connection" to the Texas Medicaid Program. Alternatively, Plaintiffs' claims against the Governor should be dismissed under Rule 12(b)(6) for failure to state a viable claim, since the Governor did not cause any deprivation of Plaintiffs' rights and cannot provide the relief Plaintiffs seek.

## ARGUMENT AND AUTHORITY

### I.   This Court Lacks Jurisdiction Over Plaintiffs' Claims.

#### A.   Standards of Review

##### 1.   Standard for Dismissal under 12(b)(1)

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject matter jurisdiction of the district court to hear a case. FED. R. CIV. P. 12(b)(1). Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir.1996)).

In deciding a Rule 12(b)(1) motion, a federal court may consider facts in the record, whether disputed or undisputed. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981). *See also Ramming*, 281 F.3d at 161 ("In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute."). But, a Rule 12(b)(1) motion based on evidence in the record, also termed a factual attack, does not accept as true the factual allegations in the live complaint. *Williamson*, 645 F.2d at 413. Factual attacks challenge "the existence of subject matter in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Garcia v. Copenhaver, Bell & Assoc., M.D.'s P.A.*, 104 F.3d 1256, 1261 (11th Cir.1997) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir.1977)). *See also Williamson*, 645 F.2d at 413 (explaining federal court "may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction"); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (A factual attack "challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."). Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion is not converted to a summary judgment when a court considers matters outside the complaint. *Williamson*, 645 F.2d at 412. This is true because:

> [A]t issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as the existence of tis power to hear the case. In short, *no presumptive truthfulness* attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating the merits of jurisdictional claims.

*Id.* at 413 (quoting with approval *Mortensen*, 549 F.2d at 891 (emphasis added)). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to

relief. *Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir.1998)).  Moreover, a "factual attack" under Rule 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist.  *Menchaca*, 613 F.2d at 511.

### 2.      Elements of Standing

A federal court lacks subject-matter jurisdiction over a matter when the plaintiff lacks standing to bring suit. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish his or her own standing to sue, a plaintiff must make a three-pronged showing of:  (1) an "injury in fact" that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of that is fairly traceable to the challenged action of the defendant; and (3) redressability—it must be likely, not merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 560–61. "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998).  Failure to establish any one element deprives the federal courts of jurisdiction to hear the suit. *Id.* at 103. Standing is a threshold jurisdictional issue that the Court must evaluate before addressing the merits of Plaintiffs' action.[37]  *See Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC)*, 528 U.S. 167, 180 (2000).

---

[37] Furthermore, Plaintiffs must establish their own standing before addressing class certification because "[s]tanding is an inherent prerequisite to the class certification inquiry."  *Bertulli v. Indep. Ass'n of Cont. Pilots*, 242 F.3d 290, 294 (5th Cir. 2001); *see also Rivera v. Wyeth-Ayerst Lab*., 283 F.3d 315, 319 (5th Cir. 2002) ("Even though the certification inquiry is more straightforward, we must decide standing first, because it determines the court's fundamental power to hear the suit."). If a plaintiff fails to establish standing to pursue claims for the named plaintiff's personal injuries, the class claim based on those injuries will also fail. *Daughtery v. I-Flow, Inc*., No. 3:09-CV-2120-P, 2010 WL 2034835, at *2 (N.D. Tex. April 29, 2010).

3.       **Justiciability**

"It is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'"  *United States v. Juvenile Male*, --- U.S. ----, 131 S.Ct. 2860, 2864 (2011).  *See also City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal citation omitted) (case becomes moot when issues presented are no longer "live" or when the parties lack a "legally cognizable interest in the outcome.").  Further, "a justiciable case must continue at each stage of the litigation . . . to be urged before the court by parties who have a 'personal stake' in that controversy."  *Grant v. Gilbert*, 324 F.3d 383, 389 (5th Cir. 2003) (Plaintiff concedes that move to a community-based waiver program renders his § 1396n(c)(2)(C) claim moot).  Moreover, "[a]s a general rule, 'a purported class action becomes moot when the personal claims of all named plaintiffs are satisfied and no class has been properly certified.'"  *Id.* (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1045 (5th Cir.1981)).

B.       **Organizational Plaintiffs Lack Standing.**

Organizational Plaintiffs Arc of Texas and Coalition of Texans with Disabilities, Inc. have asserted claims on behalf of both themselves and their members.  2d Am. Compl. ¶¶ 28, 31.  However, they have not alleged facts entitling them to standing in either capacity.

**No standing in their own right.** "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Assoc. of Cmty. Orgs. For Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)).  Accordingly, an organization must show that it has suffered a direct injury-in-fact that is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable judgment.  *Id.*; *see Lujan*, 560 U.S. at 560-61.

Plaintiffs' 2d Am. Complaint wholly fails to allege any injury directly suffered by the Organizational Plaintiffs themselves. *See id*. ¶¶ 63–64, 66–67, 69, 784–90, 893–95, 97–98, 100, 106,110–113, 125, 137, 147–48, 377, 379, 381, 383, 389–90, 393–94, 396, 398–99, 403–05.  For example, the Organizational Plaintiffs' assertions that, among other things, they operate to ensure that "persons with developmental disabilities receive the services to which they are entitled" and that "people with disabilities may live, learn, work, play and fully participate in their community of choice" fail to describe any injury whatsoever. *See id*. at ¶¶ 27, 30.  Moreover, even allegations of a mere setback to an organization's social interests—had the Organizational Plaintiffs pled such facts, which they did not—are insufficient to establish the organization's standing on its own behalf. *Assoc. of Cmty. Orgs. For Reform Now*, 178 F.3d at 357-58 (quoting *Havens Realty*, 455 U.S. at 379).  Nor does a diversion of an organization's resources, alone, establish an injury-in-fact. *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). "The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *La. ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000).  Thus, having wholly ailed to show an injury-in-fact of their own, the Organizational Plaintiffs lack standing to assert claims on their own behalf, and *all claims* brought by the Organizational Plaintiffs on their own behalf should be dismissed.[38]

**No standing on behalf of members.**   For an organization to maintain associational standing on behalf of its members, it must satisfy a three-pronged standing test:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

---

[38] This would include the ADA and Rehabilitation Act claims as well as the Medicaid Act claims.

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). "The first prong requires that at least one member of the association have standing to sue in his or her own right." *National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012); *see also Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 343-44 (5th Cir. 2012) ("in order to satisfy the first prong of the Hunt test, 'an organization suing as representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association'" (quoting *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996))); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976) (An "association 'can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right.'").  In the instant case, the Organizational Plaintiffs have not identified any member with standing to present, in his or her own right, the claims pleaded by the association. *Funeral Consumers All., Inc.*, 695 F.3d at 343–44. Further, both Organizational Plaintiffs assert they are comprised of numerous individual members with "developmental disabilities," but they plead no facts alleging any injury suffered by any member. *See* 2d Am. Complaint ¶¶ 26–31, and especially ¶¶ 28, 31.  Again, because the Organizational Plaintiffs wholly failed to allege facts showing an injury-in-fact suffered by their members, they lack standing to assert claims on behalf of such members, and all such claims should be dismissed.

### C.      Plaintiffs Lack Standing to Assert ADA and Rehab. Act Claims

Plaintiffs allege that by denying them access to existing community programs, and by requiring them to be confined in segregated institutional settings in order to receive the care they require, Defendants discriminate against them on the basis of their disability in violation of the

ADA and the Rehab. Act. 2d Am. Complaint ¶ 379 (citing 42 U.S.C. § 12132[39] and 28 C.F.R. § 35.130(d)[40]), 389 (citing 29 U.S.C. § 794(a)[41]).  But the Plaintiffs' factual allegations and the jurisdictional facts undermine their alleged "injury in fact," and therefore all of their ADA and Rehab. Act claims should be dismissed for lack of standing. [42]

       1.       **Plaintiffs living in the community cannot show injury in fact and therefore lack standing to assert ADA and Rehab. Act claims.**

As discussed in the Introduction, *supra* at 4–5, all of the Individual Plaintiffs who have IDD[43] and who have expressed a desire to live in the community[44] and receive their services through the HCS waiver program have been provided an HCS slot and are living in the community. It is uncontestable that the "eligibility criteria" and "methods of administration" of Texas's Medicaid waivers do not bar these Individual Plaintiffs—or other similarly situated persons with IDD living in or at risk of entering nursing facilities—from accessing the HCS waiver directly, without waiting on an interest list.  See discussion *supra* at pp. 9–13.  Therefore, Plaintiffs can

---

[39] "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. 12132.

[40] "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d))

[41] 29 U.S.C. § 794(a) states, in pertinent part,

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C, § 794(a).

[42] Section 504 of the Rehabilitation Act contains a prohibition of discrimination similar to that of the ADA.  *Compare* 29 U.S.C. § 794a *with* 28 U.S.C. § 12132.  Likewise, the regulations implementing Section 504 are similar to those implementing the ADA.  *Compare* 28 C.F.R. § 41.51 *with* 28 C.F.R. § 35.130.  Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases and can be analyzed interchangeably.  *See Cash v. Smith*, 231 F.3d 1301, 1305, n.2 (11th Cir. 2000).  Therefore, the analysis of Plaintiffs' ADA claims in this motion applies equally to the Rehabilitation Act claims.

[43] As explained above and as admitted by Plaintiffs, Melvin Oatman has neither an intellectual disability nor a related condition, as that term is used in federal Medicaid law.  *See supra* at 5–6.  Accordingly, Mr. Oatman is not eligible for the HCS waiver.

[44] As noted above, Tommy Johnson, Johnny Kent, and Joseph Morrell have continuously refused the idea of moving out of their nursing home and into the community.  *See* Ex. 1, Botello Decl.

show no ongoing injury in fact resulting from Defendants' alleged failure to provide individuals with IDD transitioning or diverting from nursing facilities with services and supports in the community.   Alternatively, Plaintiffs' claims that they were excluded from the HCS waiver program are now moot—both because they in fact are enrolled in the HCS waiver and living in the community, and because the HCS eligibility criteria do not disadvantage persons with IDD living in or diverting or transitioning from NFs.

2.  **Plaintiffs lack standing to seek the overly broad remedy they request.**

The requirements of Article III standing necessarily limit the scope of the remedy that a federal plaintiff may seek.  The Supreme Court has recognized that standing is "a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches," and that the "actual-injury" requirement of standing "would hardly serve the purpose . . . of preventing courts from undertaking tasks assigned to the political branches [] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (emphasis in original).  Accordingly, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.*

Here, Plaintiffs allege that they have been confined to nursing facilities, in violation of their rights under Title II of the ADA and Section 504 of the Rehabilitation Act, as a result of Defendants' decision to deny them access to Texas's system of community-based services and supports which they need to be able to reside in the community, namely, the HCS waiver.[45]   2d Am. Complaint ¶¶ 1–3, 379, 383.  To remedy this alleged harm, Plaintiffs seek a sweeping, non-specific, system-wide injunctive relief that goes much further than simply remedying the alleged

---

[45] HCS is the only waiver to which Plaintiff have shown interest. 2d Am. Complaint ¶¶ 157, 167, 178, 184, 197, 207, 236, 237, 252, 262, 272, 287, 297, 312, 327, 342, 358, 373.

failure of Defendants to provide the named Plaintiffs with access to the HCS waiver. *Id*. at p. 84 (VII (a)-(e)).[46]   However, the 2d Am. Complaint fails to identify any specific rule, policy, eligibility criterion, or method of administration that has resulted in their alleged injury and therefore Plaintiffs have not identified the "inadequacy that produced the injury in fact." *See Lewis*, 518 U.S. at 357. Because the relief Plaintiffs seek is not "limited to the inadequacy that produced the injury in fact," the Plaintiffs lack standing to prosecute the ADA/Rehab. Act claims alleged in the complaint. *See Lewis*, 518 U.S. at 357.   Accordingly, the Court must dismiss Plaintiffs' ADA/Rehab. Act claims pursuant to FED. R. CIV. P. 12(b)(1) for lack of subject matter jurisdiction.

### 3.   Plaintiffs lack standing to seek injunctive relief that is unenforceable as a matter of law.

In addition, the Individual Plaintiffs lack standing to seek injunctive relief that is unenforceable as a matter of law because it is nothing more than an injunction that would instruct Defendants to obey the law.  FED. R. CIV. P. 65(d) requires specificity in injunctions and "[the] command of specificity is a reflection of the seriousness of the consequences which may flow from a violation of an injunctive order." *Payne v. Travenol Labs, Inc.*, 565 F.2d 895, 897 (5th Cir. 1978) (invalidating injunction that prohibited defendant from violating Title VII in its employment decisions).   An injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law. *See Meyer*

---

[46] Plaintiffs seek to enjoin Defendants from (a) failing to provide appropriate integrated community services and supports for all class members, consistent with their individual needs; (b) failing to make reasonable modifications to the rules and requirements regarding the eligibility for and administration of Defendants' community based services, supports and programs; (c) failing to provide equal access to medically necessary community-based habilitative mental retardation and developmental disability services to all eligible class members based on their individual needs; (d) discriminating against plaintiff class members by failing to provide medically necessary habilitation services and support in the most integrated setting appropriate to their needs; and (e) failing to provide medically necessary community-based habilitation services and supports with reasonable promptness and in a comparable manner to all eligible class members. *Id.*

*v. Brown & Rood Constr. Co.*, 661 F.2d 369, 373 (5th Cr. 1981) (citing *International Longshoremen's Assoc. v. Philadelphia Marine Trade Assoc.*, 389 U.S. 64, 76 (1967)); *Florida Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehabilitative Servs.*, 225 F.3d 1208, 1222-23 (11th Cir. 2000) (injunction unenforceable because failed to identify how to perform obligations such as "adequately reimbursing providers of care" and "comply[ing] with the substantive requirements of" the Medicaid Act).

The injunction Plaintiffs seek in this case differs little from an "obey the law" order because it fails to identify with adequate detail and precision how Defendants are to comply with its terms. The injunction Plaintiffs seek merely recites language from DOJ regulations promulgated under the ADA without identifying how Defendants are to comply with those regulations.  For example, Plaintiffs request an injunction restraining Defendants from "(a) failing to provide appropriate integrated community services and supports for all class members, consistent with their individual needs"  and from "(d) discriminating against plaintiff class members by failing to provide medically necessary habilitation services and support in the most integrated setting appropriate to their needs." 2d Am. Complaint at VII (a), (d).  These requests are nothing more than requests for an injunction requiring Defendants to comply with DOJ regulations set forth in 28 C.F.R. 35.130(d) which states that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Likewise, Plaintiffs request an injunction restraining Defendants from "(b) failing to make reasonable modifications to the rules and requirements regarding the eligibility for and administration of Defendants' community based services, supports and programs." *Id.* at VII (b). This is a request for an injunction requiring Defendants to comply with DOJ regulations set forth in 28 C.F.R. 35.130(b)(7), which states that "a public entity shall make reasonable modifications

in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability…."  Plaintiffs' requests for injunctive relief for alleged violations of the ADA fail to identify with adequate detail and precision how Defendants are to comply with the terms of the injunction.  *See* 2d Am. Complaint at VII (a)–(e).  Thus, because the injunctive relief sought by the named Plaintiffs is unenforceable as a matter of law, the named Plaintiffs lack standing to prosecute the claims alleged in the complaint.  Accordingly, the Court should dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) for lack of subject matter jurisdiction.

### D.     Plaintiffs Lack Standing to Assert "Freedom of Choice" Claims Under 42 U.S.C. §§ 1396n(c)(2)(B) and (C).

Plaintiffs lack standing to assert a challenge to Defendants' compliance with the "freedom of choice" provision of the Medicaid Act, 42 U.S.C. § 1396n(c)(2)(B) and (C), because they do not allege an injury-in-fact from Defendants' alleged failure to comply with those provisions.

**Section 1396n(c)(2)(B) (evaluation).** Section 1396n(c)(2)(B) requires a state to give the Secretary of HHS assurances (in an application for a Medicaid waiver) that persons who are determined to be likely to require the level of care provided in a hospital, NF, or ICF-IDD will be given an evaluation of the need for in-patient hospital services, NF services, or services in an ICF-IDD. 42 U.S.C. § 1396n(c)(2)(B). Here, no Plaintiff has claimed that s/he does not require a level of care provided by a NF, or that s/he was not administered an assessment tool (known as the "MDS 3.0") to determine whether s/he meets the medical necessity standard for a NF. [47]  Instead,

---

[47] For persons such as Plaintiffs entering a NF, a nursing home assessment tool (known as the "MDS 3.0") is used to determine whether the individual meets the medical necessity standard for a NF. *See* https://www.dads.state.tx.us/providers/mds/. The MDS ("Minimum Data Set") 3.0 is a "standardized collection of demographic and clinical information that describes a person's overall condition. All licensed nursing facilities in Texas are required to submit MDS assessments for all residents admitted into their facility." *Id.* The MDS 3.0 was the result of a CMS-initiated a national project developed by a joint RAND/Harvard team. *See* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/NursingHomeQualityInits/NHQIMDS30.html (RAND MDS 3.0 Final Study Report and Appendices 2008, MDS Final Report, p. ix).

Plaintiffs assert that their medical needs could and should be met elsewhere than in a NF. Accordingly, Plaintiffs have no standing to bring a claim under § 1396n(c)(2)(B) because they have asserted no failure to be evaluated for requiring a NF level of care, and therefore no § 1396n(c)(2)(B) injury.

**Section 1396n(c)(2)(C) (information/choice).** Section 1396n(c)(2)(C) provides that the Secretary of Health and Human Services shall not grant a waiver under the Medicaid Act unless the state seeking the waiver provides assurances that "individuals who are determined to be likely to require the level of care provided in a . . . nursing facility . . . are informed of the feasible alternatives, *if available under the waiver*, *at the choice of such individuals*, to the provision of . . . nursing facility services . . . ." 42 U.S.C. § 1396n(c)(2)(C) (emphasis added). According to CMS—which provides the criteria for evaluating states' waiver applications—the informational requirement for which the state must give § 1396n(c)(2)(C) assurances arises at the time the individual is actually being offered a waiver slot and being assessed for the waiver program. CMS Technical Guide, p. 99, App. B-7 (Freedom of Choice). Specifically, CMS requires that "[t]he "individual's choice must be documented during entrance into the waiver program." *Id*. The "feasible alternatives" under the waiver mean the services within a waiver program that could meet the needs of the individual, and are determined during consideration for entrance into the waiver program. *Id*. Accordingly, CMS's State Medicaid Manual reflects that—"Feasible alternatives may only be determined after the assessment of an individual's care needs and an evaluation of level of care."[48]

---

[48] *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/P45_04.ZIP (State Medicaid Manual), Ch. 4, p. 4-456, § 4442.7.

*Defendants' Motion to Dismiss*
*Plaintiffs' Second Amended Complaint*

Again, as discussed in the Introduction, *supra* at 3–6, all of the Individual Plaintiffs who have IDD and who have expressed a desire to live in the community[49] and receive their services through the HCS waiver program have been provided an HCS slot and are living in the community. Therefore, Plaintiffs either necessarily were informed of the alternatives available to them under a Texas Medicaid waiver, or else they suffered no injury from the lack of such information because they are, in fact, residing in and receiving services and supports in the community.

## II.    Plaintiffs Have Failed to State a Claim Upon Which Relief May Be Granted.

### A.    Standard for Dismissal Under Rule 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir. 2004). To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.  Pleadings that are "no more than conclusions[] are not entitled to the assumption of truth," and "legal conclusions…must be supported by factual allegations."  *Id*. at 679.

---

[49] Melvin Oatman has neither an intellectual disability nor a related condition, as that term is used in federal Medicaid law.  *See supra* at 5–6.  Accordingly, Mr. Oatman is not eligible for the HCS waiver.  Tommy Johnson, Johnny Kent, and Joseph Morrell have continuously refused the idea of moving out of their nursing home and into the community.  *See* Ex. 1, Botello Decl.

**B.     Plaintiffs Fail to Allege a Violation of the ADA and Rehab. Act.**

There are three elements of a *prima facie* case of discrimination under the ADA: (1) the plaintiff is a qualified individual within the meaning of the ADA; (2) the plaintiff is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination is because of the plaintiff's disability. *Greer v. Richardson Independent School District*, 752 F.Supp.2d 746, 753 (N.D. Tex. 2010), *aff'd*, 472 Fed. Appx. 287 (5th Cir. 2012).   To survive a motion to dismiss, the plaintiff must plead the three prima facie elements of a cause of action for discrimination under the ADA and the plaintiff must "plead [] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *Iqbal*, 129 S.Ct. at 1949.   Here, Plaintiffs have failed to satisfy these elements for their ADA/Rehab. Act claims.   Therefore, all such claims should be dismissed pursuant to Rule 12(b)(6).

**1.     Plaintiffs have not alleged that services are available in institutions but not in the community.**

Title II of the Americans with Disabilities Act (42 U.S.C. 12131 *et seq.*) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12131.  The ADA is implemented in regulations promulgated by the Department of Justice ("DOJ").  42 U.S.C. § 12134(a).  The DOJ regulations provide, among other things, that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. 35.130(d).

Section 504 of the Rehabilitation Act contains a prohibition of discrimination similar to that of the ADA.  *Compare* 29 U.S.C. § 794a *with* 28 U.S.C. § 12132.  Likewise, the regulations implementing Section 504 are similar to those implementing the ADA.  *Compare* 28 C.F.R. § 41.51 *with* 28 C.F.R. § 35.130.  Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases and can be analyzed interchangeably.  *See Cash v. Smith*, 231 F.3d 1301, 1305, n.2 (11th Cir. 2000).  Therefore, the analysis of Plaintiffs' ADA claims in this motion applies equally to the Rehabilitation Act claims.

In 1999, the Supreme Court addressed the question "whether the proscription of discrimination" found in the ADA "may require placement of persons with mental disabilities in community settings rather than in institutions."  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999).  The Court held that the answer was "a qualified yes."  *Id.*  "Such action is in order when the State's treatment professionals have determined that a community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  *Id.*

Subsequent to the Supreme Court's decision in *Olmstead*, the federal courts have interpreted this qualified integration requirement to mean that the ADA was violated when a state Medicaid program offers services in an institution, but *not* in the community.   In *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1182 (10th Cir. 2003), the Tenth Circuit found that where the state's Medicaid program made medically-necessary prescription benefits available without limits to recipients in institutional settings, but not to recipients in the community, a claim was stated under the ADA because the program did "not allow the plaintiffs to receive services for which they are qualified unless they agree to enter a nursing home."  In *Radaszewski ex rel.*

*Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004), the Seventh Circuit found that a claim was stated under the ADA where funding caps did not permit the provision of the number of private duty nursing hours required for a recipient in the community, but where that level of service was available in an institution.  In *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003), the Ninth Circuit reversed the district court's grant of summary judgment in favor of the state's Medicaid agency where the state made community-based care available for those recipients deemed "categorically needy," but only provided institutional care for recipients deemed "medically needy."

The common theme in each of these cases, and across the spectrum of *Olmstead* case law, is the existence of some kind of policy that makes services available in institutions but not in the community.  In this case, the Plaintiffs have failed to allege the existence of any policy that makes services available only in institutional settings.   Unlike the states in all of the cases cited above, Texas offers residential assistance services and habilitation services, and those services are available in the community for recipients with developmental disabilities.  In fact, Plaintiffs' complaint acknowledges that certain of the named Plaintiffs have received community placements in the State's community-based waivers, and the jurisdictional facts submitted with this motion show that all of the Individual Plaintiffs with IDD who desire community living in the HCS waiver have been accepted into the waiver (although Ms. Hernandez has not yet found a suitable home). Thus, because Plaintiffs' have not alleged that services available in institutions are not available in the community, they have failed to state a cognizable ADA/Rehab. Act claim.

2.      **Plaintiffs have failed to state a claim based on DOJ regulations regarding eligibility criteria.**

The Individual Plaintiffs allege that Defendants have developed and implemented eligibility criteria for their community-based support services for individuals with IDD that screen out or tend to screen out such individuals who are residing in Texas nursing facilities from gaining

access to or enjoying those community programs, in violation of the ADA. 2d Am. Complaint ¶ 381 (citing 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(8)).  Title II of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  The ADA authorizes the Attorney General to issue regulations to implement Title II of the ADA.  42 U.S.C. § 12134(a). The federal regulation upon which Plaintiffs rely for their "eligibility criteria" claim, 28 C.F.R. § 35.130(b)(8), was promulgated pursuant to this authority and states that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."

"Criteria," within the meaning of the section of the ADA regarding discrimination through imposition or application of eligibility "criteria" that screen out or tend to screen out individuals with disabilities, implies the necessity of making a judgment; therefore, this section of the ADA applies only to those rules or policies that are or could be used to make a specific or conscious decision as to whether or not to permit an individual or individuals to have access to services which are being offered by the public entity.  *See Emery v. Caravan of Dreams, Inc.*, 879 F. Supp. 640, 643 (N.D. Tex. 1995), *aff'd*, 85 F.3d 622 (5th Cir. 1995).  The DOJ commentary on the regulations implementing this section states that 28 C.F.R. § 35.130(b)(8) "prohibits overt denials" of equal treatment of individuals with disabilities, or establishment of exclusive or segregative criteria that would bar individuals with disabilities from participation in services benefits, or activities. 28

C.F.R. Ch. 1, Pt. 35, App. A, Analysis of § 35.130(b)(8) (July 1, 1994 ed.).[50]  Each of these decisions would involve a conscious decision directed at who will have access to the services offered by the public entity.  *See Emery v. Caravan of Dreams, Inc.*, 879 F. Supp. 640, 643 (N.D. Tex. 1995).  However, under the "necessity exception," public entities may utilize reasonable, narrowly drawn criteria that screen out, or tend to screen out, individuals with a disability if the criteria are necessary to insure the operation of the program.  28 C.F.R. § 35.130(b)(8); *Doe v. Judicial Nominating Com'n for Fifteenth Judicial Circuit of Fla.*, 906 F. Supp. 1534 (S.D. Fla. 1995).

To state an ADA claim under 28 C.F.R. § 35.130(b)(8), a plaintiff must identify eligibility criteria not necessary for the provision of the service or program being offered that were employed by a defendant to screen out, or that tend to screen out, the plaintiff from fully and equally enjoying such service or program.  *M.K. ex rel. Mrs. K. v. Sergi*, 554 F.Supp.2d 175, 197 (D. Conn. 2008).  There is no precedent for alleging an ADA claim under 28 C.F.R. § 35.130(b)(8) where the plaintiff fails to identify the specific eligibility criteria that allegedly screen out or tend to screen out disabled individuals from participating in services or programs.

Here, Plaintiffs fail to identify any eligibility criteria that screen out or tend to screen out individuals with IDD from gaining access to or enjoying community-based services and supports.  Rather, Plaintiffs merely recite the language from the DOJ regulation (28 C.F.R. § 35.130(b)(8)), without any factual allegations regarding eligibility criteria employed by Defendants to screen out, or that tend to screen out, individuals with IDD in violation of the ADA.  Moreover, the Plaintiffs fail to allege how any such eligibility criteria caused them or any other disabled individual to be

---

[50] The DOJ commentary further states that it would violate 28 C.F.R. § 35.130(b)(8) to "bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater, or limit the seating of individuals with Down's syndrome to only particular areas of a restaurant.  28 C.F.R. Pt. 26, App. B, p. 605.

denied access to community-based services and supports.  Plaintiffs have failed to plead factual content that would allow the Court to draw the reasonable inference that Defendants have employed eligibility criteria that violate the ADA.  *See Iqbal*, 129 S. Ct. at 1949.  The mere possibility that Defendants have acted unlawfully is insufficient to survive a motion to dismiss. *Id.*  Therefore, pursuant to Rule 12(b)(6), the Court should dismiss Plaintiffs' ADA claims under 28 C.F.R. § 35.130(b)(8) because Plaintiffs have failed to state a claim.

### 3.      Plaintiffs have failed to state a claim based on DOJ regulations regarding criteria or methods of administration.

Plaintiffs allege that Defendants have developed and utilize criteria and methods of administering Texas's long-term care system for persons with IDD that have the tendency and effect of subjecting them to unnecessary and unjustified segregation on the basis of their disability in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(3).  2d Am. Complaint ¶ 383.

The federal regulation upon which Plaintiffs rely for their "methods of administration" claim, 28 C.F.R. § 35.130(b)(3), states that "a public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration: (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating of substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities …."  Here, Plaintiffs have not alleged that they were excluded from participation in or denied benefits of Defendants' community-based programs, by reason of their disability, that are available to individuals who do not have IDD.  Therefore, Plaintiffs have failed to allege facts leading to a plausible inference that would satisfy the third element of a prima facie disability discrimination case under 28 C.F.R. § 35.130(b)(3).

### C.      Plaintiffs Have No Right of Action Under 42 U.S.C. § 1983 to Redress Alleged Violations of the Medicaid Act.

Plaintiffs allege that Texas's Medicaid program departs from the criteria for federal reimbursement specified in the Medicaid Act. *See* 2d Am. Complaint ¶¶ 80–84. But the Medicaid statute does not create a private right of action, and Plaintiffs cannot rely on 42 U.S.C. § 1983, because the statutory provisions of the Medicaid Act fail to establish an "unambiguously conferred right." *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). Plaintiffs thus fail to state a claim on which relief can be granted with respect to all of their Medicaid Act claims.

### 1.      Plaintiffs have no "rights" under any section of the Medicaid Act.

Plaintiffs mistakenly assume that § 1983 provides a cause of action for their Medicaid Act claims. Section 1983 applies only when state officials violate a plaintiff's federal *rights*; it does not provide a remedy for a mere violation of federal law. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989) ("Section 1983 speaks in terms of 'rights, privileges, or immunities,' not violations of federal law."). And nothing short of an "unambiguously conferred right" can support a cause of action under § 1983. *See Gonzaga*, 536 U.S. at 283.

The Medicaid statutes that Plaintiffs invoke do not confer *any* federal "rights" on the Plaintiffs, let alone an "unambiguously conferred" right. The Medicaid statutes impose legal obligations *only* on the Secretary of Health and Human Services, who may reimburse a State for its Medicaid expenses only if he concludes that the State's Medicaid program satisfies the criteria enumerated in federal statutes. 42 U.S.C. § 1396c explains how this Spending Clause legislation works.  42 U.S.C. § 1396c.[51] Two features of this statutory scheme have particular relevance for

---

[51] 42 U.S.C. § 1396c provides as follows:

> If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds–

this litigation. First, the statute *permits* States to establish Medicaid programs that will not qualify for federal funds. Even after accepting federal funds, 42 U.S.C. § 1396c recognizes the State's continuing prerogative to alter its Medicaid program. Any State that administers a program that deviates from the criteria for federal funding will run the risk that the Secretary will turn off the funding spigot, but this remains a lawful option for the State under the statute. Plaintiffs cannot possibly have a federally protected "right" to state Medicaid services when the statutes do nothing more than supply criteria for federal reimbursement.

Second, the statute withdraws funding only after *the Secretary* has determined that a State's Medicaid program fails to satisfy the criteria in the federal Medicaid statutes. The Secretary—not the federal courts—determines whether a State's Medicaid program is worthy of federal funds. The Secretary's decision is of course subject to judicial review under the arbitrary-and-capricious standard. *See Walsh*, 538 U.S. at 675 (Scalia, J., concurring). But allowing Plaintiffs to pursue a § 1983 action would empower the federal courts to conduct a *de novo* review of the State's Medicaid program, undermining the Administrative Procedure Act's efforts to protect the decision-making autonomy of federal administrative officials.

Although the Supreme Court has permitted at least one provision of the federal Medicaid Act to be enforced under § 1983, that fact does not assist Plaintiffs here. *See Wilder v. Va. Hosp.*

---

(1) that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or

(2) that in the administration of the plan there is a failure to comply substantially with any such provision;

the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure).

42 U.S.C. § 1396c.  In *Nat'l Fed'n of Indep. Business v. Sebelius*, the United States Supreme Court found § 1396c unconstitutional as applied. 132 S.Ct. 2566, 2601–2608 (2012). Specifically, the Supreme Court stated "the Secretary cannot apply § 1396c to withdraw existing Medicaid funds for failure to comply with requirements set out in the expansion." *Id.* at 2607.

*Assoc.*, 496 U.S. 498 (1990) (allowing hospitals to sue under § 1983 to enforce the "Boren Amendment," which required participating States' Medicaid programs to reimburse providers at "reasonable and adequate" rates), *superseded by statute as discussed in Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908, 919 n.12 (5th Cir. 2000) (recognizing Congressional repeal of Boren Amendment to preclude private right of action). *Gonzaga* limited *Wilder*'s holding to provisions in the Medicaid Act that "explicitly confer[] specific *monetary* entitlements upon the plaintiffs."   536 U.S. at 280 (emphasis added). *Gonzaga* also noted that "[o]ur more recent decisions . . . have rejected attempts to infer enforceable rights from Spending Clause statutes." *Id.* at 281 (noting that in *Suter v. Artist M.*, 503 U.S. 347 (1992) and *Blessing v. Freestone*, 520 U.S. 329 (1997), the Court rejected attempts to infer enforceable rights from Spending Clause statutes analyzed in those suits); *see Blessing*, 520 U.S. at 349 (Scalia J., concurring, joined by Kennedy, J.) (questioning the notion that "§ 1983 *ever* authorizes the beneficiaries of a federal-state funding and spending agreement . . . to bring suit"). And *Gonzaga* quoted with approval the following passage from *Pennhurst*:

> In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is *not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State*.

536 U.S. at 280 (quoting *Pennhurst*, 451 U.S. at 28) (emphasis added). After *Gonzaga*, *Wilder* cannot stand for the proposition that *any* provision of the Medicaid statute can be enforced via § 1983. If anything, *Gonzaga* indicates that *Wilder* and *Wright v. Roanoke Redevelopment and Housing Authority*, 479 U.S. 418 (1987), represent only narrow exceptions to a general principle that excludes spending legislation from judicial enforcement. *See Gonzaga*, 536 U.S. at 280 ("Since *Pennhurst*, only twice have we found spending legislation to give rise to enforceable rights.").

The Fifth Circuit has also recognized that *Gonzaga* limits the ability of Medicaid recipients to bring § 1983 claims.  In *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697 (5th Cir. 2007), the court refused to allow Medicaid recipients to sue under § 1983 to enforce the "equal access" provisions of the Medicaid statute—even though an earlier-decided case had allowed such a claim to proceed.

> We may no longer, as we did in *Evergreen* [*Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908 (5th Cir. 2000)], resolve the ambiguities of *Blessing*, *Wilder*, and the Equal Access provision in favor of finding a Congressional intent to authorize Medicaid recipients to bring Equal Access provision suits under § 1983. We are forced by *Gonzaga* to abjure the notion that anything short of an unambiguously conferred private individual 'right,' rather than the broader or vaguer 'benefits' or 'interests,' may be enforced under § 1983.

*Equal Access*, 509 F.3d at 704. To the extent that other Fifth Circuit decisions allow Medicaid recipients to sue to enforce provisions other than those that secure specific *monetary* entitlements to the party bringing suit,[52] those rulings should be limited to the specific provisions of the Medicaid Act at issue in those cases. The Supreme Court's ruling in *Gonzaga* signals a shift away from earlier rulings allowing § 1983 to be used to enforce conditions in federal spending legislation.

The claims Plaintiffs bring under the Medicaid Act also fail to state a claim that the Defendants have violated federal law, let alone invaded Plaintiffs' federally protected "rights." State officials cannot violate the Medicaid provisions cited by Plaintiffs because they impose no affirmative obligation on States accepting federal reimbursement to preserve their state Medicaid programs in any particular manner. More specifically, the Medicaid statutes allow Texas officials to cease complying with the statutory criteria for federal reimbursement at any moment. If this

---

[52] *See S.D. v. Hood*, 391 F.3d 581, 604 (5th Cir. 2004) (addressing early and periodic screening, diagnostic, and treatment (EPSDT) services for persons under the age of twenty-one and relying on pre-*Gonzaga* case law from other circuits); *Romano v. Greenstein*, 721 F.3d 373, 377–380 (5th Cir. 2013) (relying on *S.D. v. Hood* to support its conclusion that "§ 1396a(a)(8) creates a right enforceable under § 1983.").

were to happen, the *Secretary* would then decide whether to cut off the State's federal funds.  But no State, and no state official, violates federal law by administering a Medicaid program that fails to qualify for federal reimbursement.  Nor would they violate federal law by provoking the Secretary to withhold federal funds.  The proper understanding of the Act recognizes that it is the Secretary who could violate the Act—by approving federal reimbursement for a state program that fails to satisfy the criteria listed in 42 U.S.C. § 1396a.  Accordingly, Plaintiffs' Medicaid Act claims are not judicially enforceable.

### 2.     Plaintiffs' Medicaid Act Claims Fail Under the *Blessing* test.

Even applying the Supreme Court's three-pronged analysis to the Medicaid Act sections at issue here, there is no right of enforcement conferred upon Plaintiffs either by the Medicaid Act or § 1983.  In *Blessing v. Freestone*, the Supreme Court applied a three-part test to determine whether legislation creates a federal *right* redressable under § 1983:  (1) Congress must have intended the provision in question to benefit the plaintiff, (2) the plaintiff must demonstrate that the right allegedly protected by the statutes is not so "vague and amorphous" that its enforcement would strain judicial competence, and (3) the statute must unambiguously impose a binding obligation on the States. 520 U.S. at 340–41; *see also Wilder*, 496 U.S. at 509–10; *S.D.*, 391 F.3d at 602. Basically, "the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms." *Blessing*, 520 U.S. at 341. The burden rests on the plaintiff to show that the statute created an enforceable right. *Id*. In *Gonzaga,* the Supreme Court clarified that nothing short of an "unambiguously conferred *right*" can support a cause of action under § 1983. 536 U.S. at 283.[53]   Finally, even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983,

---

[53] The Court noted that some courts had misinterpreted the first *Blessing* factor as permitting a § 1983 action whenever the plaintiff fell within the general "zone of interests" protected by the statute at issue. It does not. *Id*. at 283.

and dismissal is nevertheless proper if Congress "specifically foreclosed a remedy under § 1983." *Blessing*, 520 U.S. at 341. "Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.*[54]

Plaintiffs assert claims under various provisions of the Medicaid Act and accompanying regulations. 2d Am. Complaint ¶¶ 392–405. Unquestionably, neither these statutory provisions nor any of the Act's implementing regulations provides any express private right of action for these Plaintiffs to enforce the Act.[55]  Therefore, if this Court considers Plaintiffs' Medicaid Act claims at all, it must find that each section of the Act under which Plaintiffs claim unambiguously confers a federal right enforceable by these Plaintiffs. *See Gonzaga*, 536 U.S. at 274.

Certainly, the Medicaid Act does not unambiguously confer rights on associational plaintiffs to assert claims *on their own behalf*. For this reason alone, the Organizational Plaintiffs' Medicaid Act claims brought on behalf of themselves should be dismissed.

### a.  The NHRA creates no rights enforceable by Plaintiffs.

Plaintiffs allege that Texas violates the NHRA and its implementing regulations, 42 C.F.R. § 483.100, *et seq.*, in several ways related to Texas's PASRR process[56] and its administration of specialized services.[57]  Plaintiffs assert their claims under various provisions within three subparts

---

[54] A "comprehensive remedial scheme is "a scheme that itself provid(es) for private actions and le(aves) no room for additional private remedies under Section 1983." *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 423 (1987); *see also Middlesex County Sewerage Authority v. Nat. Sea Clammers Assoc.*, 453 U.S. 1, 14-15 (1981).

[55] Medicaid Act regulations cannot invoke a private right of action where the statute itself does not. "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not.... (I)t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). Therefore, the proper inquiry is whether a particular statutory provision creates a privately enforceable right, not whether its implementing regulations do. *Casas v. American Airlines Inc.*, 304 F.3d 517, 520 (5th Cir. 2002).

[56] *See* 2d Am. Complaint ¶¶ 63, 65, 84-86, 106, 398, 399.

[57] *See* 2d Am. Complaint ¶¶ 37(b), 82, 87-89, 97, 106, 402-405.

of the NHRA—42 U.S.C. §§ 1396r(b), (e), and (f)[58]—none of which provides any express private right of action. 2d Am. Complaint ¶¶ 398, 399, 403, 404, 405. Under the three-factor *Blessing* test, applied in light of *Gonzaga*'s strong limitation on finding privately enforceable rights under federal Spending Clause statutes, Plaintiffs' cited provisions of the NHRA do not confer any enforceable rights. Here, as with the statute in *Gonzaga*, the NHRA lacks the necessary "unambiguous intent."

### i.    NHRA provisions are not intended to benefit Plaintiffs.

The context of the cited NHRA provisions, coupled with the absence of rights/benefits-granting language, evidences intent to establish institutional policy and practice, not to benefit the Plaintiffs. The NHRA is entitled "Requirements for nursing facilities."   42 U.S.C. § 1396r. Subparts (b)–(d) set forth requirements a nursing facility must meet in providing services and activities for NF residents in order to maintain funding and certification. 42 U.S.C. § 1396r(b)–(d). Subpart (e) sets out the provisions a State must include in its state plan in order to secure the Secretary's approval of the plan for administering federal funds to nursing facilities. 42 U.S.C. § 1396r(e). Subpart (f) outlines the Secretary's duties and responsibilities for developing and enforcing requirements for provision of care in nursing facilities. 42 U.S.C.§ 1396r(f). Subpart (g), containing the "survey and certification" process for nursing facilities, provides for both the Secretary and the State to investigate and monitor nursing facilities for compliance with subparts (b), (c), and (d). 42 U.S.C. § 1396r(g). Subpart (h) provides for an "enforcement" mechanism authorizing action by the State or the Secretary to deny nursing facility payments, assess civil penalties, and appoint temporary management to improve or close a facility. 42 U.S.C. § 1396r(h). "The [NHRA] does not have an 'unmistakable focus' on the rights of individual nursing home

---

[58] Specifically, Plaintiffs assert claims under 42 U.S,C. §§ 1396r(b)(3)(F), 1396r(e)(7)(A), (B), & (C), and 1396r(f)(8). 2d Am. Complaint ¶¶ 397-405. Plaintiffs also cite the following regulations:  42 C.F.R. §§ 483.112(b, .114(b)(2), .116(b)(2), .118, .120(a)(2) and (b), .128, .132(a), and .440. *Id.* at ¶¶ 397-405.

residents, but instead focuses on requirements that the nursing homes must meet in order to become and remain eligible for funding." *Duncan v. Johnson-Mathers Health Care, Inc.*, Civ. A. No. 5:09-CV-00417-KKC, 2010 WL 3000718, at *7–8 (E.D. Ky. July 28, 2010) (citing *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001). Both the text and structure of the NHRA show that the focus of this statute is the "nursing homes—not the nursing home residents." *Id.* at *8. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289.[59] For these reasons, Plaintiffs' cited provisions of the NHRA do not evidence Congressional intent to benefit Plaintiffs.

> **ii.** **NHRA §§ 1396r(b)(3)(F) and 1396r(f)(8) impose no obligations on Defendants.**

While Plaintiffs' cited NHRA sections do contain requirements for the parties/entities to whom they are directed, sections 1396r(b)(3)(F) and 1396r(f)(8) do not.[60]

**Section 1396r(b)(3)(F)**—to which Plaintiffs cite as the basis for their claimed rights related to specialized services and to screening, assessment, and placement, 2d Am. Complaint ¶¶ 397, 398, 403—is directed to nursing facilities and sets out which new residents such a facility can admit.[61]   This section imposes an obligation on the *nursing facility*—not on the *State*—not to

---

[59] Fifth Circuit precedent establishes that when a statute imposes conditions on a regulated entity for its receipt of federal funds, those conditions are focused on the regulated entity and do not evidence congressional intent to confer rights on individuals. *See Anderson v. Jackson*, 556 F.3d 351, (5th Cir. 2009) (applying *Gonzaga* to find that the United States Housing Act, 42 U.S.C. § 1437p, does not unambiguously confer a federal right); *Banks v. Dallas Housing Auth.*, 271 F.3d 605, 609-10 (5th Cir. 2001) (conditions imposed for receipt of federal funds under the United States Housing Act, 42 U.S.C. § 1437f(e), are focused on the regulated agency and were not intended to benefit the plaintiff residents); *see also Grammer v. John J. Kane Reg'l Ctrs-Glen Hazel.*, 570 F.3d 520, 532 (3rd Cir. 2009) (Stafford, J., dissenting) (noting that the NHRA is Spending Clause legislation, and concluding that the NHRA does not evidence any intent of Congress to confer federal right on nursing home residents).

[60] The NHRA, set out in 42 U.S.C. § 1396r, is entitled "Requirements for nursing facilities." *See* 42 U.S.C. § 1396r.

[61] Plaintiffs allege that Defendants violated 42 U.S.C. § 1396r (b)(3)(F)(i), which dictates to nursing facilities which new residents with *mental illness* can be admitted to a NF. 2d Am. Complaint ¶¶ 397, 398. Because Plaintiffs make no claims in this lawsuit on behalf of persons with mental illness, Defendants construe each citation referencing § 1396r(b)(3)(F)(i) to be intended to reference § 1396r(b)(3)(F)(ii), which is the section that dictates to nursing facilities which new residents with *mental retardation* can be admitted to a NF.

admit residents before certain determinations are made by the state mental retardation or developmental disability authority. 42 U.S.C. § 1396r (b)(3)(F).

**Section 1396r(f)** sets forth the "[r]esponsibilities *of the Secretary* relating to nursing facility requirements."   42 U.S.C. § 1396r (f) (emphasis added). Subsection (f)(8)—cited by Plaintiffs as one of the NHRA provisions Defendants allegedly violate by limiting specialized services—specifically directs *the Secretary* to develop minimum criteria for states to use in making determinations related to preadmission screening and resident reviews, and in permitting individuals adversely affected to appeal such determinations. *See* 42 U.S.C. § 1396r(f)(8); *see also* 2d Am. Complaint ¶ 403. It further directs *the Secretary* to "monitor" states through case reviews for their compliance with NHRA. 42 U.S.C. § 1396r(f)(8)(B).   This provision does not unambiguously impose a binding obligation on the State because this statutory requirement is solely directed to the Secretary.

>            iii.    **NHRA's remedial scheme precludes individual judicial remedies against the State.**

The NHRA's comprehensive remedial scheme related to preadmission screening, resident reviews, and specialized services evidences clear intent to preclude remedies for Medicaid recipients under § 1983.  The statute could have, but did not, confer upon Medicaid recipients the right to directly enforce § 1396r(b)(3)(F) through judicial means. Instead, the only remedy provided for "individuals adversely affected by" a PASRR review described under §§ 1396r(e)((7)(A) or (B) (which references § 1396r(b)(3)(F)) is an appeals process which a State must develop "as a condition of approval of its plan."  42 U.S.C. § 1396r (e)(7)(F); *see also* 42

C.F.R. § 483.204 (requiring states to provide an appeal process to nursing facility residents adversely affected by preadmission screening and resident reviews).[62]

The "enforcement" subpart of the NHRA, 42 U.S.C. § 1396r(h), provides for enforcement actions against nursing facilities brought by the Secretary, the States, or both, including both specifically-enumerated remedies and remedies otherwise available against nursing facilities under state or federal law. 42 U.S.C. § 1396r(h)(8).[63]   The NHRA also states that the remedies provided under subsection (h)—all of which are directed against nursing facilities—are "in addition to those otherwise available under State or Federal law and shall not be construed as limiting such other remedies, including any remedy available to an individual at common law." 42 U.S.C. § 1396r(h)(8).

Thus, apart from the ability to appeal the results of a PASRR review, the only remedies contemplated for individuals under the NHRA are those otherwise available to the individual as against a nursing facility. The remedies specified in the NHRA, directed at different parties and for different purposes, together, evidence Congress's intent to preclude judicial remedies for individuals under § 1983.

For all of these reasons, the NHRA confers no federal right on Plaintiffs, and their NHRA claims should be dismissed. A number of courts that have considered whether the NHRA confers

---

[62] In Texas, the appeals process for preadmission screening and resident reviews is set out in the Texas Health and Human Services Commission's fair hearing rules. *See* 1 TEX. ADMIN. CODE §§ 357.3(a) (fair hearing rules govern Medicaid-funded services), (b)(1)(D) (clients of Medicaid funded services are entitled to appeal adverse determinations regarding preadmission screening and resident reviews), (b)(2)(B) (the client has within 90 days of the later of the date on the notice of agency action or the effective date of agency action to appeal a determination); 357.5(c)(3)(D) (fair hearing officer issues a final order), 357.703 (a)-(c) (client may request an administrative review of fair hearing officer's final order and then seek judicial review of that final determination); *see also* TEX. GOV'T CODE ANN. § 531.019  (setting out administrative remedies and right to judicial review for a party who is aggrieved by a final order of a fair hearing officer).

[63] *See* 42 U.S.C. § 1396r (h)(1)–(2) (specifying state enforcement actions for remedying a NF's deficiencies), (3) (outlining the Secretary's authority and specified enforcement actions for remedying a NF's deficiencies), (4) (the Secretary or the state must find a NF in "substantial compliance" before a finding to deny payment may be terminated), (5) (grounds for a state or the Secretary to immediately terminate a NF's participation), and (6) (special rules to apply when a state and the Secretary do not agree on a NF's compliance status).

an enforceable private right have reached the same conclusion—there is no such right.[64]  This issue has not been determined in the Fifth Circuit.[65]

### b.      Sections 1396a(a)(8) and 1396a(a)(10)(B)

Plaintiffs claim that Defendants' limits on specialized services and community-based services violate the "reasonable promptness" provision of the Medicaid Act, 42 U.S.C. § 1396a (a)(8), and that Defendants violate the "comparability" requirement of § 1396a (a)(10)(B) by failing to provide the same level of "active treatment" in NFs as is provided in ICFs-IID. 2d Am. Complaint ¶¶ 392–93, 395–96.

The Fifth Circuit has not ruled on the question whether § 1396a(a)(10)(B) creates a privately-enforceable right.[66]  But even were § 1396a(a)(10)(B) to be determined to create rights

---

[64] *See Prince v. Dicker*, 29 Fed. Appx. 52 (2d Cir. 2002) (finding no privately enforceable right under Section 1396r against a private nursing home); *Schwердtfeger v. Alden Long Grove Rehabilitation and Health Care Center, Inc.*, No. 13–cv–8316, 2014 WL 1884471 at *3-4 (N.D. Ill. May 12, 2014) (post-*Gonzaga* decision holding NHRA does not contain sufficiently explicit rights-creating language); *Terry v. Health and Hosp. Corp. of Marion Cnty.*, No. 10–cv–607 (S.D. Ind. Mar. 29, 2012), slip op. at 15-16 (post-*Gonzaga* decision finding NHRA does not create federal rights enforceable under § 1983); *Baum v. N. Dutchess Hosp.*, 764 F. Supp. 2d 410 (N.D.N.Y. 2011) (post-*Gonzaga* decision finding no privately enforceable right under Section 1396r because the NHRA does not articulate a clear and unambiguous intent to confer individual federal rights on nursing home residents); *Duncan v. Johnson-Mathers Health Care, Inc.*, Civ. A. No. 5:09-CV-00417-KKC, 2010 WL 3000718 (E.D. Ky. July 28, 2010) (post-*Gonzaga* decision finding no privately enforceable right against a nursing home under Section 1396r); *Sparr v. Berks County*, No. CIV. A. 02-2576, 2002 WL 1608243 (E.D. Pa. July 18, 2002) (post-*Gonzaga* decision finding no private right of action under Section 1396r against a nursing facility); *Brogdon ex rel Cline v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322, 1330–32 (N.D. Ga. 2000) (holding "(e)ven if plaintiffs enjoy certain federal rights, however, they may not necessarily possess a private cause of action to enforce those rights," and concluding "that Congress did not intend to create such a remedy" under 42 U.S.C. § 1396r); *Estate of Ayres v. Beaver*, 48 F.Supp.2d 1335, 1339–40 (M.D. Fla. 1999) (finding that "Congress has not, statutorily, provided any private federal right of action or remedy under the Medicare or Medicaid Acts" and "Congress did not intend to provide a private right of action under the Medicare or Medicaid Acts"); *Nichols v. St. Luke Ctr.*, 800 F.Supp. 1564, 1568 (N.D. Ohio 1992) (pre-*Gonzaga* decision finding no privately enforceable right under Section 1396r because "the statute is silent on its face asa to any private remedy" and there is "no other objective indication that Congress intended to create a private cause of action".).

[65] Although the Fifth Circuit has not addressed this precise issue, it has considered similar issues. *See, e.g., Stewart v. Bernstein*, 769 F.2d 1088, 1092–93 (5th Cir. 1985) (finding that Congress did not grant nursing home residents an implied cause of action to enforce Medicaid's standards but did "contain numerous provisions short of judicial enforcement that are designed to redress recipients' grievances").

[66] In *Blanchard v. Forrest*, 71 F.3d 1163 (5th Cir. 1996), the Fifth Circuit analyzed a Section 1396a(10)(B) claim against Louisiana, but did not address whether that section of the Act provides a private right of action. The Fifth Circuit's ruling in *S.D. v. Hood*—that § 1396a(a)(10)(A) creates a right to enforce the provision of early and periodic screening, diagnostic, and treatment services ("EPSDT") for eligible individuals under the age of twenty-one—is not controlling here because the court's analysis in *S.D.* was limited to the specific language of the Act providing for EPSDT services.  *See, e.g., S.D. v. Hood*, 391 F.3d at 603–04 (explaining that § 1396d(a)(4)(B) (EPSDT) is specifically covered by § 1396a(a)(10)(A)'s provision for making medical assistance available).

enforceable by Plaintiffs with regard to the provision of specialized services in nursing facilities,[67] it confers no such rights in connection with the provision of community-based waiver services, such as the HCS waiver. 2d Am. Complaint ¶¶ 149–376.  Plaintiffs allege they are entitled to "specialized services and active treatment" which is "comparable to the services provided to similarly-situated individuals such as categorically needy persons who reside in [ICF-IDDs]."  2d. Am. Complaint ¶ 396.  Plaintiffs bear the burden of establishing an unambiguously conferred right under § 1983.  *Gonzaga*, 536 U.S. at 283.  If Congress had intended to compel a state to provide any and all "specialized services" and "active treatment" to the Individual Plaintiffs residing in NF comparable to the services provided to "categorically needy persons who reside in [ICFs-IID],", it would have done so in clear language.  *Cf. Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").[68]  Section 1396a(a)(10)(B) does not unambiguously confer a right of the nature claimed by plaintiffs.  *See* 42 C.F.R. § 440.230(d) ("The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.").[69]

In June 2013, the Fifth Circuit ruled that § 1396a(a)(8) created a private right of action enforceable by a Medicaid beneficiary under § 1983.  *Romano*, 721 F.3d at 377–380.  However, to the extent that Plaintiffs persist in asserting delay in accessing HCS waiver services because of a lengthy HCS wait list—an argument that is simply inapplicable now that the HCS waiver criteria designate individuals with IDD living in NFs or at risk of entering an NF as a target group that can

---

[67] The Third and Ninth Circuits have found a privately enforceable right of action under § 1983 for a violation of 1396a(a)(10)(B).  *See Watson v. Weeks*, 436 F.3d 1152, 1159-60 (9th Cir. 2006); *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180 (3d Cir.2004). These decisions are not binding on this Court.

[68] *See Casillas v. Daines*, 580 F.Supp.2d 235, 243-245 (S.D.N.Y. 2008) (post-*Gonzaga* case finding no privately enforceable right of action under § 1983 for a violation of § 1396a(a)(10)(B)).

[69] "[W]hen an agency invokes its authority to issue regulations, which then interpret ambiguous statutory terms, the courts defer to its reasonable interpretations." *Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 395 (2008) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 843-845 (1984)).

bypass the HCS interest list—their § 1396a(a)(8) argument fails where, as with HCS, the desired waiver is full.  It is settled that the Medicaid Act provides no right to enforce § 1396a(a)(8) with regard to claims that community-based services and supports  are not being provided with reasonable promptness when the desired waiver is full.[70]

c.   **Sections 1396n(c)(2)(B) and (C), relating to state waiver applications, confer no privately enforceable rights.**

Plaintiffs claim that Defendants violate 42 U.S.C. §§ 1396n(c)(2)(B) and (C) by failing to provide NF residents with IDD with notice and opportunity to access community-based services, an assessment of their eligibility for such services, and a meaningful choice between institutional and community-based services. 2d Am. Complaint ¶ 394. Sections 1396n(c)(2)(B) and (C) provide that the Secretary shall not grant a *waiver* under the Medicaid Act unless the State seeking the waiver provides the Secretary with certain assurances. The Fifth Circuit has not ruled on the private enforceability of sections 1396n(c)(2)(B) or (C).  However, under *Blessing* and *Gonzaga*, the assurances provisions of § 1396n(c)(2), including the "freedom of choice" provision of § 1396n(c)(2)(C), create no privately enforceable rights for waiver applicants.

Certainly, the text of § 1396n(c)(2) is not phrased "in terms of the persons benefitted." *Gonzaga*, 536 U.S. at 283. Rather, § 1396n(c) and the implementing regulations set forth the

---

[70] *See, e.g., Boulet v. Celucci*, 107 F.Supp.2d 61, 76–80 (D.Mass. 2000) ("As a practical matter, the statute can best be read to mandate that, once a state chooses to implement a waiver program and chooses the eligibility requirements, a cap is simply another eligibility requirement for that program …. Individuals who apply after the cap has been reached are not eligible, or alternatively, the waiver services are not "feasible" for them until the cap has risen to include them.); *M.A.C. v. Betit*, 284 F.Supp.2d 1298, 1308 (D. Utah 2003) (plaintiffs had no private right of action to enforce § 1396a(a)(8) because they were not "eligible individuals" under that provision where waiver slots were not available; § 1396a(a)(8) does not contain the unambiguous rights-creating language required by *Gonzaga*); *Boulet*, 107 F.Supp.2d at 76–80 ("As a practical matter, the statute can best be read to mandate that, once a state chooses to implement a waiver program and chooses the eligibility requirements, a cap is simply another eligibility requirement for that program …. Individuals who apply after the cap has been reached are not eligible, or alternatively, the waiver services are not "feasible" for them until the cap has risen to include them.); *McCarthy,* slip op. at 14–16 (Congress did not intend to create in 42 U.S.C. § 1396a (a)(8) an individual right enforceable under § 1983 for individuals who apply for Medicaid waiver services after the waiver ceiling has been met or surpassed) *cf. Bryson v. Shumway*, 308 F.3d 79, 88 (1st Cir. 2002) ("(t)hose patients who are on the waiting list *and for whom slots are available* are, we think, 'eligible' under the statute such that they are entitled to reasonable promptness") (emphasis added).

guidelines by which the Secretary determines whether to grant or deny a state's request for waiver. §§ 1396n(c)(2)(B) (C); 42 C.F.R. § 441.302. Nor does § 1396n(c) explicitly and unambiguously grant a private right to the "particular class of persons" that Plaintiffs purport to represent. *See* 42 U.S.C. § 1396n(c); *Gonzaga*, 536 U.S. at 282, 283. The literal text of § 1396n(c) unquestionably focuses on the duties of the Secretary and of the states—"the person regulated"—rather than "the individuals protected," and thus demonstrates no intent to confer rights on the beneficiaries of the Act. *Gonzaga*, 536 U.S. at 287 (citing *Sandoval*, 532 U.S. 289). The result of a failure to comply with §§ 1396n(c)(2)(B) and (C) is that a state's request for a waiver may be denied, or a waiver already granted may be terminated. §§ 1396n(c)(2)(B), (C) 42 C.F.R. § 441.302.

**§ 1396n(c)(2)(B)** Furthermore, the assurance required under § 1396n(c)(2)(B) (referencing an evaluation of the need for NF level of services), arising as it does in the context of the requirements for approval of a state's waiver application, and taking into account the high costs of care of persons with medical needs requiring a NF level of care, may be considered as much a focus on general cost-saving measures as a focus on the individual. That is, a state applying for a NF waiver must assure the Secretary that only persons confirmed to require a NF level of care will be eligible for a home or community-based NF waiver. Thus, this section creates no right of enforcement for Plaintiffs. *See Frazar v.Gilbert*, 300 F.3d 530, 545 (5th Cir. 2002) (state's failure to meet a system-wide performance standard does not give rise to individual rights actionable under § 1983), *rev'd on other grounds sub nom. Frew ex rel. Frew v. Hawkins*, 124 S.Ct. 299) (2004).

**§ 1396n(c)(2)(C).** Section 1396n(c)(2)(C) requires only that states seeking a Medicaid waiver assure the Secretary that eligible individuals will be informed of the "feasible alternatives" to ICFs-IID "if available under the waiver." 42 U.S.C. § 1396n(c)(2)©. Defendants agree with

other courts that have held that "the freedom of choice provisions do not contain the unambiguous rights-creating language of *Gonzaga*, and consequently, there is no private right of action based on these provisions." *M.A.C. v. Betit*, 284 F.Supp.2d 1298, 1307 (D. Utah 2003) (addressing § 1396n(c)(2)(C).[71]

### D.   Plaintiffs Also Cannot Proceed In Equity Under *Ex Parte Young*.

Just as the Plaintiffs cannot sue pursuant to an implied private right of action under § 1983, nor can they proceed with a suit in equity.  But the private Plaintiffs cannot proceed in equity under *Ex Parte Young* because Congress has foreclosed such equitable relief here.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) (holding that Congress foreclosed equitable relief under section 30(A) of the Medicaid Act); *Ex. Parte Young*, 209 U.S. 123 (1908).  The Court in *Exceptional Child Center* provides two guideposts for recognizing when Congress has foreclosed a suit in equity.

First, the Court asks whether Congress already has elsewhere provided an exclusive remedy for "a State's failure to comply with Medicaid's requirements." *Id.*  Here, Congress has already provided an exclusive remedy; in fact, it is the very same exclusive remedy identified in *Exceptional Child Center*:  "[T]he withholding of Medicaid funds by the Secretary of Health and Human Services [("HHS")]." *See id.* at 1385 (describing the Secretary of HHS's withholding of funds under 42 U.S.C. § 1396c as "the sole remedy" for "the State's breach").  Likewise, Congress has already provided an exclusive remedy for a State's or a nursing facility's failure to comply with the NHRA.  *See* 42 U.S.C. § 1396r(h) (providing for denial of payment or civil penalties); *id.* § 1396r(e) (empowering the Secretary to disapprove the state plan if the State does not comply

---

[71] *See Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 459 (7th Cir.2007) (explaining that this subsection does not mandate the state to offer any particular option but "just requires the provision of information about options that are available"); *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 388 (5th Cir.2003) ("[A]t most, the plain language of § 1396n(c)(2)(C) affords a right of information only for waiver applicants.").

with the statutes).  Congress's decision to vest these statutory remedies in the Secretary of HHS forecloses a suit in equity by private plaintiffs.  *See Exceptional Child Ctr.*, 135 S. Ct. at 1385 (*quoting Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)) ("[E]xpress provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.")  *See id.*

Second, Congress has demonstrated its intent to foreclose private equitable relief through the Medicaid Act's and NHRA's lack of judicially administrable standards.  As the Court explained in *Exceptional Child Center,* much of the Medicaid Act demands that States and providers comply with broad and nonspecific requirements.  *Exceptional Child Ctr.*, 135 S. Ct. at 1385.   Congress purposefully chose such "judgment-laden standard[s]," the Court explained, because Congress "wanted to make the agency remedy that it provided exclusive," thereby achieving "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking," and avoiding "the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action." *Id.* (quoting *Gonzaga*, 536 U.S. at 292 (2002) (Breyer, J., concurring in judgment)).  The Court observed that "it is difficult to imagine" a requirement "broader and less specific" than the Medicaid Act's requirement that state plans provide for payments that are "consistent with efficiency, economy, and quality of care," while "safeguard[ing] against unnecessary utilization of ... care and services." *Exceptional Child Ctr.*, 135 S. Ct. at 1385.

The statutory standards upon which the private Plaintiffs rely here are equally broad and nonspecific.  Their claims invoke statutory language demanding that medical assistance be "furnished with reasonable promptness," 42 U.S.C. § 1396a(a)(8); that such assistance cannot differ among Medicaid beneficiaries in "amount, duration, and scope,"  *id.*  § 1396a(a)(10)(B);

and that Medicaid beneficiaries are entitled to freedom of choice where "feasible," *id.* 1396n(c)(2); 42 C.F.R. § 441.302(d).  Finally, the term "specialized services" lacks precise definition.  Even the Secretary of HHS has repeatedly refused to define what services constitute "specialized services," and instead expressly delegated the job to the States:

> Since enactment of OBRA '90, we have been asked by some members of the interested public to develop lists of services which are considered to be specialized services which the State would be responsible for providing. . . .  As a practical matter, we find that we cannot list certain discrete services as separate and distinct from nursing facility services. . . .  We are leaving it open to States to craft a list of services which they believe are "specialized services," if they so choose. . . .  Such a list could serve as a fixed menu from which specific choices could be made for each individual. . . .  Since mental health and mental retardation services delivery systems vary form [sic] State to State, *we believe it is preferable to allow States the flexibility to define specialized services within the context of their own systems* rather than prescribing a uniform national list of what these services should be.

57 Fed. Reg. 56,473 (Nov. 30 1990) (emphasis added) (Definition of Specialized Services for Mental Illness); *see id*. at 56,475–76 (Definition of Specialized Services for Mental Retardation) (referring to the previous section and noting that "we are allowing State[s] the option of developing . . . a list [of specialized services]").  The Secretary of HHS, who has at her disposal a staff of thousands of Medicaid experts, has explained in the Federal Register that "[a]s a practical matter" she "cannot list certain discrete services" that would constitute "specialized services."  When faced with such broad and non-specific language, *Exceptional Child Center* cautions against exactly that sort of misadventure by a court.

Further, there is a third reason not discussed in *Exceptional Child Center* why the Court should decline to proceed in equity here.  Plaintiffs' lawsuit directly interferes with the Secretary of HHS's exclusive power to enforce the statutes at issue.  The NHRA, for example, instructs the Secretary to refuse to approve the state plan if the State does not comply with statutory

requirements.  42 U.S.C. § 1396r(e).  Here the Secretary already has approved the state plan,[72] in a decision that presumably was accompanied by all the "expertise, uniformity, widespread consultation, and resulting administrative guidance" that usually attend such decisions. *Exceptional Child Ctr.*, 135 S. Ct. at 1385.  The Secretary's rejection or approval of the state plan is the exclusive remedy provided by Congress.  If private Plaintiffs object to the Secretary's decision, their recourse is to seek review of the Secretary's determination under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*., rather than sue Texas in equity.  *See Douglas v. Indep. Living Ctr.*, 132 S. Ct. 1204, 1210–11 (2012) (refusing to decide whether Medicaid providers may maintain a cause of action under the Supremacy Clause to enforce a federal Medicaid provision because the Secretary of HHS approved the state plan while the case was pending in the Supreme Court).

> **E.** **Even if the Medicaid Act Creates Rights Enforceable by Plaintiffs, Plaintiffs Have Failed to State a Cognizable Claim.**

Should this Court find that the Medicaid Act creates rights enforceable by Plaintiffs under § 1983, Plaintiffs' Medicaid Act claims should nevertheless be dismissed for failure to state a legally cognizable claim.

> **1.** **Plaintiffs state no cognizable NHRA claim.**

> > **a.** **Plaintiffs state no § 1396r(b)(3)(F) or § 1396r(e) claim.**

Plaintiffs' claims for violations of screening, assessment, placement, and specialized services requirements are brought under 42 U.S.C. §§ 1396r(b)(3)(F) and 1396r(e)(7)(A), (B)(ii), and (C). 2d Am. Complaint ¶¶ 397–99, 403, 405. However, as discussed above at pp. 44–45, § 1396r(b)(3)(F) imposes a requirement on nursing facilities, not on the states. Accordingly,

---

[72]    http://www.medicaid.gov/State-Resource-Center/Medicaid-State-Plan-Amendments/Medicaid-State-Plan-Amendments.html?filterBy=Texas.

Plaintiffs' claims, which are directed against the defendant state governmental entities, fail under Rule 12(b)(6). Further, sections 1396r(b)(3)(F) and 1396r(e)(A), (B), and (C) simply do not contain the requirements Plaintiffs attribute to them. *See* 2d Am. Complaint ¶¶ 397–99, 403, 405. Therefore, Plaintiffs' related allegations of Defendants' failures under these sections state no viable claim.

> **b.      Plaintiffs state no violation of the "active treatment" regulations.**

This Court should dismiss Plaintiffs' claim that Defendants do not provide specialized services in a manner that meets the federal active treatment standard required in an ICF-IDD as measured by 42 C.F.R. § 483.440(a)–(f). *See* 2d Am. Complaint ¶¶ 37(b), 82, 106, 401–04. While Defendants do not dispute that the implementing regulations of the NHRA require specialized services to provide active treatment, active treatment in a nursing facility is measured by 42 C.F.R. § 483.440(a)(1) and not the other subparts of § 483.440, as Plaintiffs claim. *See id.* at ¶ 82, 402, 403. Specialized services are defined differently for different categories of residents. *See* 42 C.F.R. § 483.120(a). For NF residents with intellectual disabilities, specialized services means "the services specified by the State which, combined with services provided by the [NF] or other service providers, result in treatment which meets the requirements of § 483.440(a)(1)."[73]  42 C.F.R. § 483.120 (a)(2). Accordingly, § 483.440(a)(1), and no other subpart of § 483.440, constitutes the yardstick by which the provision of specialized services in a NF can be measured.

---

[73] Section 483.440(a)(1) provides that

> Each client must receive a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services, and related services described in this subpart, that is directed toward--
>> (i)  The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and
>> (ii)  The prevention or deceleration of regression or loss of current optimal functional status.

42 C.F.R. § 483.440(a)(1).

The First Circuit Court of Appeals—the only circuit court to have considered whether active treatment is required in NFs—agrees. In *Rolland v. Romney*, the appellate court affirmed the district court's ruling that the defendant state had only to comply with the active treatment standard set out at 42 C.F.R. § 483.440(a)(1) in providing specialized services to mentally retarded NF residents. 318 F.3d 42, 57 (1st Cir. 2003).[74]  In so doing, the appellate court clarified that the regulations do not "impose on states, when serving mentally retarded nursing home residents, the considerable onus of complying with *every* obligation placed on them in their broader role in *ICF-IDD*s." *Id.* (emphasis added).  Accordingly, Plaintiffs' claim for violation of the NHRA based on Defendants' alleged failure to provide specialized services constituting active treatment as measured by 42 C.F.R. § 483.440(a)–(f), fails to state a claim for which relief can be granted and should be dismissed.

Moreover, in alleging that Defendants violate the specialized services provisions of the Act by defining what specialized services the State will provide rather than offering what Plaintiffs call "the full array" of such services, without limitation, *see, e.g.,* 2d Am. Complaint ¶¶ 89, 403, Plaintiffs fabricate standards nowhere appearing in the Act itself, including the specific provisions cited in support of their claim.  To the contrary, as the NHRA regulations make quite clear, the states are free to specify the specialized services that will be offered.  42 C.F.R. § 483.120(2) (defining specialized services for "mental retardation" as "the services *specified by the State* which, combined with services provided by . . . other service providers, results in treatment which meets the requirements of § 483.440(a)(1) (emphasis added)); *Rolland v. Romney*, 318 F.3d at 53 ("[f]or mental retardation, specialized services means the services specified by the State.") (citing 42 C.F.R. § 483.120(a)(2)).

---

[74] The appeals court affirmed *Rolland v. Cellucci*, 198 F.Supp.2d 25, 46 (D. Mass. 2002) (citing only 42 C.F.R. § 483.440(a)(1) and not subparts (b)–(f) in setting forth standard to be met in NF).

Furthermore, as a matter of law, Plaintiffs' assertion that Defendants offer only three specialized services is incorrect, as Plaintiffs well know. The specialized services offered by Texas are set out in the Texas Administrative Code, and include, in addition to physical therapy, occupational therapy, and speech therapy, many other services, including, durable medical equipment, service coordination (including alternate placement assistance), employment assistance, supported employment, day habilitation, independent living skills training, and behavioral support. 40 Tex. Admin. Code § 17.102(41);[75] *see* 40 Tex. Admin. Code §§ 19.2703(19) (LIDDA) & (27) (NF).

For all of these reasons, Plaintiffs' claim that Defendants have failed to provide the array of specialized services contemplated by the NHRA, at the "intensity, duration and frequency" required of ICFs-IID, fails to state a cognizable claim, and their specialized services claim should be dismissed.

### 1.      Plaintiffs state no cognizable § 1396a(a)(8) claim.

Plaintiffs' twofold Section 1396a(a)(8) claim is that Defendants' limits on community-based services and supports, as well as Defendants' limits on specialized services, violate the "reasonable promptness" provision  of the Medicaid Act, 42 U.S.C. § 1396a (a)(8). 2d Am. Complaint ¶¶ 392–93. The "reasonable promptness" provision requires that state Medicaid plans "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

---

[75] This rule became effective on July 7, 2015. However, even before Plaintiffs filed their 2d Am. Complaint, Defendants' rule included customized adaptive aids, service coordination (including alternate placement), and vocational training. 40 Tex. Admin. Code § 17.102 (adopted May 17, 2013); 40 Tex. Reg. 4365 (2013), available at http://texreg.sos.state.tx.us/public/regviewer$ext.RegPage?sl=R&app=1&p_dir=&p_rloc=269465&p_tloc=&p_ploc=&pg=1&p_reg=269465&ti=40&pt=1&ch=17&rl=102&issue=05/17/2013&z_chk=.

a.   **Plaintiffs have failed to state a cognizable § 1396a(a)(8) "specialized services" claim for alleged delay in providing services not required under the NHRA**.

The "specialized services" prong of Plaintiffs' "reasonable promptness" claim is that Defendants "limit … medically necessary specialized services, result[ing] in extended delays and the outright denial of medically necessary care." 2d Am. Complaint ¶ 393. To the extent Plaintiffs assert delay or denial of specialized services that are not required to be provided as part of NF care, they fail to state a cognizable claim under § 1396a(a)(8). Plaintiffs fail to identify any specialized services, as specified by the State, which they have been allegedly denied. Thus, Plaintiffs' § 1396a(a)(8) claims relating to anything but the failure to provide the specialized services required by 42 C.F.R. § 483.120(a)(2)  and 42 C.F.R. § 483.440(a)(1) must be dismissed for failure to state a claim. See discussion *supra* at pp. 47–49.

b.   **Plaintiffs have failed to state a cognizable § 1396a(a)(8) "community placement" claim where, as here, the waiver is full and Plaintiffs have not been determined to be eligible.**

The "community placement" prong of Plaintiffs' "reasonable promptness" claim is that Defendants "limit the provision of medically necessary community-based services and supports, … result[ing] in extended delays and the outright denial of medically necessary care."  2d Am. Complaint ¶ 393. This claim fails for several reasons.

First, Plaintiffs' claim that Defendants' limit on the provision of community-based waiver programs (as compared to state plan entitlement programs) results in delays and denials of care, this claim is untenable because the very nature of a Medicaid waiver program is that the state may limit its scope and size. *See* 42 U.S.C. § 1396n; 42 C.F.R. § 441.301(b)(3); *Skandalis v. Rowe*, 14 F.3d 173, 181 (2d Cir. 1994); *Beckwith v. Kizer*, 912 F.2d 1139, 1143-44 (9th Cir. 1990).[76]

---

[76] Under the Act, states are specifically allowed to set their own eligibility requirements for waiver services. *See* 42 U.S.C. § 1396n(c); *Skandalis*, 14 F.3d at 181; *Beckwith*, 912 F.2d at 1143-44. States have the option to provide waiver

"Congress intended for states to have maximum flexibility in operating their waiver programs," *Skandalis*, 14 F.3d at 181 (quoting the Department of Health and Human Services at 50 Fed. Reg. 10,013, 10,021 (Mar. 13, 1985)), and States are permitted to make seemingly harsh distinctions when offering waiver services, even if those distinctions appear to result in disparate treatment, *id.* at 181. Section 1396n(c) does not expressly guarantee waiver slots or the availability of a waiver at all to any group of individuals, *id.* ("Certainly no broad or categorical entitlement can be deemed secured under a program that allows a state to impose a limit of as few as 200 people on the total number of participants."), and the "reasonable promptness" section of the Medicaid Act is not a tool for forcing a state to expand its waiver program. *See Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 619 (9th Cir. 2005). Specifically, Texas is permitted under federal law to place a limitation on the number of waiver slots that are available and to set additional eligibility requirements.[77]   42 U.S.C. § 1396n(c)(10); 42 C.F.R. § 441.301(b)(3) (permits states to define groups or subgroups who can receive waiver services); 42 C.F.R. § 441.303(b); *see also Skandalis*, 14 F.3d at 181-82; *Beckwith*, 912 F.2d at 1143-44. Consequently, Plaintiffs' argument that the State violates § 1396a(a)(8) when it creates waivers with specific eligibility criteria that may not include Plaintiffs, or that waiver services are delayed because of the limited number of waiver slots available, fails to state a cognizable § 1396a(a)(8) claim.

Second, § 1396a(a)(8)'s "reasonable promptness" provision applies only to "*eligible* individuals." 42 U.S.C. § 1396a (a)(8) (emphasis added). Courts have recognized that "the cap on the number of waiver recipients functions as 'a constraint on eligibility,' and '[i]ndividuals who

---

services to "any group or groups of individuals" who qualify for medical assistance under 42 U.S.C. § 1396d(a) 42 U.S.C. §§ 1396a(a)(10)(A)(ii)(VI), 1396n(c); *Skandalis*, 14 F.3d at 179-81.
[77] Each Medicaid waiver has its own eligibility criteria. *See* 42 C.F.R. § 441.301(b)(3) (waiver request must describe groups to be served); 40 TEX. ADMIN. CODE §§ 9.155 (eligibility requirements for HCS), 45.201 (eligibility requirements for CLASS), and 48.6003 (eligibility requirements for CBA), 1 TEX. ADMIN. CODE § 353.603(g) (eligibility requirements for STAR+PLUS waiver).

apply after the cap has been reached are not eligible.'"  *McCarthy, ex rel. Travis v. Hawkins*, Cause No. A-03-CA-231-SS (W.D. Tex. May 23, 2003) ("slip op.") at 15 (quoting *Boulet v. Cellucci*, 107 F.Supp.2d 61, 77 (D. Mass. 2000). In fact, the overwhelming body of case law addressing the "reasonable promptness" provision has held that where a waiver is full, there can be no § 1396a(a)(8) claim.[78]   Only those individuals who are eligible for waiver services have a § 1396a(a)(8) claim, and one is not eligible for waiver services until all requirements for the waiver program are met and an open spot in a waiver program is available. *Boulet*, 107 F.Supp.2d at 77-78; *see also Lewis v. N.M. Dept. of Health*, 275 F. Supp. 2d 1319, 1340 (D.N.M. 2003); *McCarthy*, slip op. at 15–16. "Plaintiffs who are not either actually in a Waiver slot or entitled to one have no legal basis to support their claim for the provision of assistance with reasonable promptness." *Susan J. v. Riley*, 616 F.Supp.2d 1219, 1241 (M.D. Ala. 2009). No court has held that reasonable promptness applies to waiver slots when, as with the HSC waiver, the waiver is full.[79]

In this case, even disregarding the fact that all of the Individual Plaintiffs with IDD who want to live in the community are enrolled in the HCS waiver (or, in the case of Ms. Hernandez, are arranging for a suitable living situation), the Individual Plaintiffs who pled they are on the interest list for the HCS waiver also state that there is no waiver slot available for them.[80]  2d Am. Complaint ¶¶ 157, 167, 178, 184, 197, 237, 252, 262, 297, 312, 327, 342, 358, 373. Accordingly, these Plaintiffs have failed to state an actionable claim under § 1396a(a)(8).

---

[78] The cap is essentially an additional eligibility requirement to fully qualify for waiver services because it establishes an additional subclassification and thus limits the number of individuals who are eligible for waiver services. *Boulet*, 107 F.Supp. 2d at 77; *Susan J. v. Riley*, 254 F.R.D. 439, 454 (M.D. Ala. 2008). The cap on the number of individuals who may receive a waiver slot is also considered a constraint on eligibility for waiver services. *Boulet*, 107 F. Supp. 2d at 76-77.

[79] A claim under section 1396a(a)(8) has only been recognized in a waiver context with individuals on waiting lists when there are remaining waiver slots that are unfilled. *See Bryson v. Shumway*, 308 F.3d 79, 88-89 (1st Cir. 2002); *Boudreau ex rel. Boudreau v. Ryan*, No. 00-C-5392, 2001 WL 840583, at *10 (N.D. Ill. May 2, 2001), *vacated in part on other grounds sub nom. Bruggerman ex rel. Bruggerman*, 324 F.3d 906 (7th Cir. 2003).

[80] Individual plaintiffs Melvin Oatman and Richard Krause assert they do not qualify for the Texas HCS waiver program, but fail to allege whether they have applied for any other waiver program. 2d Am. Complaint ¶¶ 272, 287.

### 2.      Plaintiffs state no cognizable § 1396n(c)(2)(B) or (C) claim.

Even assuming that Plaintiffs have a right to sue under § 1983 to enforce §§ 1396n(c)(2)(B) and (C),[81] Plaintiffs' claims under these sections are not cognizable and should be dismissed. Specifically, Plaintiffs assert that Defendants have violated these provisions of the Medicaid Act by failing to provide residents of nursing facilities with—(1) notice of and equal opportunities to apply for and access medically necessary community-based services; (2) an assessment of their eligibility for such services; and (3) meaningful choice between institutional and community-based services. 2d Am. Complaint ¶ 394. But Plaintiffs have overstated the intent and meaning of § 1396n(c)(2), and thus have failed to state a cognizable claim.

To begin with, section 1396n(c)(2) falls within the portion of the Act that sets out the requirements for applying for and obtaining approval for home and community-based waivers.  42 U.S.C. § 1396n(c); 42 C.F.R. § 441.300 *et seq.* (describing "what the Medicaid agency must do to obtain a waiver.").  In particular, subsection 1396n(c)(2) "prescribes what states must include in their waiver applications to receive approval by the Secretary of Health and Human Services." *McCarthy*, slip op. at 13.

---

[81] Sections 1396n(c)(2)(B) and (C) of the Medicaid Act prohibit the Secretary of Health and Human Services from granting a waiver unless the state provides assurances that—

> (B) the State will provide, with respect to individuals who—
>
> (i) are entitled to medical assistance for inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded under the State plan,
>
> (ii) may require such services, and
>
> (iii) may be eligible for such home or community-based care under such waiver,
>
> *for an evaluation of the need for inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded*;
>
> (C) such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded *are informed of the feasible alternatives, if available under the waiver*, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded….

42 U.S.C. § 1396n(c)(2) (emphasis added).

**Section 1396n(c)(2)(B).** Section 1396n(c)(2)(B) prohibits the Secretary of HHS from granting the state a Medicaid waiver unless the state assures the Secretary that persons who are entitled to in-patient hospital services, NF services, and services in an ICF-IDD, who may require such services, and who may be eligible for home or community-based care under the waiver program, be given an evaluation of the need *for in-patient hospital services, NF services, or services in an* ICF-IID. It does *not* require an assessment of eligibility for waiver services, *per se*, as Plaintiffs assert, 2d Am. Complaint ¶ 394, but of eligibility for, in this case, NF services. According to CMS, such an evaluation is for the purpose of determining whether the individual may be eligible for a particular waiver program because "[o]nly individuals who are determined to require the institutional level of care specified for the waiver may be enrolled in the waiver." CMS Instructions, Technical Guide and Review Criteria, Version 3.5 (January 2015) ("CMS Technical Guide"), p. 92, App. B-6 (Overview).[82]  Here, no Plaintiff has claimed that s/he does not require a level of care provided by a NF, or that s/he was not administered an assessment to determine whether s/he meets the medical necessity standard for a NF.[83]  Instead, Plaintiffs assert that their medical needs could and should be met elsewhere than in a NF. Accordingly, Plaintiffs have failed to state a claim under § 1396n(c)(2)(B).

**Section 1396n(c)(2)(C).** Section 1396n(c)(2)(C) is an informational requirement. *See Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 459 (7th Cir. 2007) (subsection C "does not

---

[82]    *See*   http://www.medicaid.gov/medicaid-chip-program-information/by-topics/waivers/downloads/technical-guidance.pdf.

[83] For persons such as Plaintiffs entering a NF, a nursing home assessment tool (known as the "MDS 3.0") is used to determine whether the individual meets the medical necessity standard for a NF. *See* https://www.dads.state.tx.us/providers/mds/.   The MDS ("Minimum Data Set") 3.0 is a "standardized collection of demographic and clinical information that describes a person's overall condition. All licensed nursing facilities in Texas are required to submit MDS assessments for all residents admitted into their facility."  *Id.*  The MDS 3.0 was the result of a CMS-initiated a national project developed by a joint RAND/Harvard team. *See* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/NursingHomeQualityInits/NHQIMDS30.html (RAND MDS 3.0 Final Study Report and Appendices 2008, MDS Final Report, p. ix).

make any particular option 'available' to anyone. It just requires the provision of information about options that are available."); *Grant*, 324 F.3d at 388 ("[A]t most, the plain language of § 1396n(c)(2)(C) affords a right of information only for waiver applicants.").  Specifically, it says that the Secretary may not grant a waiver—that is, the particular waiver for which the state is applying[84]—unless the state assures that individuals who are determined to be likely to require the level of care provided in a NF "are informed of the *feasible alternatives* to such services, *if available under the waiver*."  42 U.S.C. § 1396n(c)(2)(C) (emphasis added); *see also* 42 C.F.R. § 441.302(d).  Contrary to Plaintiffs' embellished interpretation, it does not require "equal opportunities to apply for and access medically necessary community-based services," or "a meaningful choice between 'institutional' and community-based services."  *See Bertand, supra*.

It is well established that when waiver caps have already been met, waiver services are no longer "feasible" or "available" for purposes of § 1396n(c)(2)(c)  *See, e.g., Makin v. Hawaii*, 114 F.Supp.2d 1017, 1027–28 (D. Haw. 1999).  Finally, Plaintiffs Steward and Padron make no allegation that they were not informed of alternative to an NF, and therefore, have stated no § 1396n(c)(2)(B) claim.  2d Am. Complaint ¶¶ 149–58, 172–84. For all of these reasons, Plaintiffs' have failed to state a § 1396n(c)(2) claim.

### 3.    Plaintiffs state no cognizable claim under 42 U.S.C. §§ 1396a(a)(10)(B)(i) and (ii).

Plaintiffs assert that § 1396a(a)(10)(B) requires that persons with IDD residing in nursing facilities be provided the same services as those residing in ICFs-IID. 2d Am. Complaint ¶¶ 395–96. Plaintiffs' claim fails to state a cognizable claim for four reasons:  first, the Act contains no such requirement, and Plaintiffs' interpretation would lead to absurd results not contemplated by

---

[84] In the case of a person "determined to be likely to require the level of care provided in a…nursing facility," the referenced "waiver" would be the state's waiver program providing a community-based alternative to services and care in a NF. In Texas, that would be the STAR+PLUS waiver.

the Act; second, Plaintiffs do not allege facts showing they are being deprived of ICF-IDD services or that they are receiving NF services in an amount, duration or scope less than other NF residents; third, even if Plaintiffs have otherwise stated a § 1396a(a)(10)(B) claim, there is no cognizable claim for failure to provide specialized services that are not required to be provided to NF residents; and fourth, Texas has no program for the "medically needy" that covers disabled persons,[85] and Plaintiffs do not compare themselves to the "medically needy," so § 1396a(10)(B)(ii) simply does not apply to the facts as pled in this case.

The purpose of the comparability provision of § 1396a(a)(10)(B) is "to ensure that recipients who qualify as categorically needy under one form of federal assistance should receive the same 'amount, duration, or scope' of assistance as those who qualify under another federal assistance program." *Greenstein by Horowitz v. Bane*, 833 F.Supp 1054, 1073 (S.D. N.Y. 1993) (referring to legislative history of the Act). Moreover, states may not provide benefits to some categorically needy individuals but not to others. 42 U.S.C. § 1396a(a)(10)(B)(i) *Rodriguez v. City of New York*, 197 F.3d 611, 615 (2d Cir. 1999) (citing *Schweiker v. Hogan*, 457 U.S. 569, 573 n. 6 (1982) ("In other words, the amount, duration, and scope of medical assistance provided to an individual who qualified to receive assistance for the aged could not be different from the amount, duration, and scope of benefits provided to an individual who qualified to receive assistance for the blind."). Thus, the comparison is between and among *financial eligibility categories*. That is, the amount, duration, and scope of available services cannot differ among Medicaid recipients based on how they became eligible for Medicaid. Nothing in § 1396a(a)(10)(B) requires that *all* of the specific services defined in § 1396d(a) must be provided to every person with IDD receiving services in a NF.[86]

---

[85] *See*  http://www.hhsc.state.tx.us/medicaid/StatePlanDocs/BasicStatePlanAttachments.pdf, p. 79.
[86] Nor is there any such requirement in the implementing regulation, 42 C.F.R. § 440.240, which provides:

Section 1396a(a)(10)(A), by reference to § 1396d(a), establishes the minimum care and services required for categorically needy recipients.[87]  The services required for the categorically needy are also set out in the regulations at 42 C.F.R. § 440.210.[88]  In both the statute and the regulations, NF services and ICF-IID services are listed as completely separate services. *Compare* 42 U.S.C. § 1396d(a)(4) and 42 C.F.R. § 440.40 (NF services) *with* 42 U.S.C. § 1396d(a)15) and 42 C.F.R. § 440.150 (ICF-IID services). Furthermore, NF services are required, but ICF-IID services are optional. *See* 42 U.S.C. § 1396a(a)(10)(A); 42 C.F.R. § 440.225 (governing optional services). The requirements for nursing facilities are completely separate from the requirements for ICFs-IID.[89]  *Compare*, 42 C.F.R. § 483.1–483.138 (requirements for nursing facilities, including PASRR) *with* 42 C.F.R. § 483.400–.480. In fact, ICFs-IID are specifically excluded from the definition of NFs. 42 C.F.R. § 483.5. Plaintiffs' claim that the care provided through one program's services (ICF-IID services) must necessarily be provided through another program's services (NF services) has no basis in law.

Moreover, Plaintiffs' novel view would produce an absurd result. It would mean that every Medicaid recipient in any program and in any type of facility must be provided the same care and

---

Except as limited in § 440.250.
(a) The plan must provide that the services available to any categorically needy recipient under the plan are not less in amount, duration, and scope than those services available to a medically needy recipient; and
(b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all recipients within the group:
    (1) The categorically needy.
    (2) A covered medically needy group.
42 C.F.R. § 440.240.
[87] Section 1396a(a)(10)(A requires state plans to provide for "making medical assistance available, including at least the care and services listed" in § 1396d(a)(1)-(5), (17), (21), and (28)
[88] 42 C.F.R. § 440.210 states that a state plan must specify that, at a minimum, categorically needy recipients are furnished the services defined in 42 C.F.R. §§ 440.10 - .50, .70 and, if authorized to practice under state law, §§ 440.165 and .166. With the exception of home health services, these are the same services referenced in 42 U.S.C. § 1396a(10)(B as the minimum required services for participating states; ICFs-IID are not required.
[89] Significantly, neither specialized services nor active treatment is listed or discussed as an independent service. *See* 42 C.F.R. Part 440, § 440.1, *et seq.* Therefore, these services need only be provided to the extent outlined in the requirements for other defined programs, *e.g.*, in NFs or ICFs-IID.

services as every other recipient. Were that what Congress or the Secretary intended, then there would be no need for the various specifically- and carefully-defined programs and services. In particular, there would be no need for the specific PASRR requirements for nursing facilities set out in 42 C.F.R. §§ 483.100–.138.

Plaintiffs also fail to state an actionable claim because they make no claim that they are being denied ICF-IID services in the same amount, duration, or scope as other Medicaid recipients receiving ICF-IID services (or that they are being denied NF services in the same amount, duration, or scope as other Medicaid recipients receiving NF services). And, for the same reasons discussed above at pages 47–49, Plaintiffs' § 1396a(a)(10)(B claims relating to the alleged failure to provide the specialized services required by 42 C.F.R. § 483.120(a) (2) and 42 C.F.R. § 483.440(a)–(f) must be dismissed for failure to state a cognizable claim.

Plaintiffs' asserted claim under § 1396a(a)(10)(B) (ii)—which requires that the assistance provided to the "medically needy" cannot not be greater in amount, duration, or scope than the assistance provided to the "categorically needy"[90]—fails for two reasons. First, Plaintiffs—who describe themselves as "categorically eligible" individuals, based on their disability and income— do not complain that they have received medical assistance different in amount, duration, or scope than "medically needy" individuals. *See* 2d Am. Complaint ¶¶ 395, 396. Furthermore, Texas has no program for the "medically needy" with which Plaintiffs can compare the provision of medical assistance.

## III.    The Governor Should Be Dismissed Under Rules 12(b)(1) and (6).

Plaintiffs' only allegation directed to the Governor specifically is that the Governor is responsible for ensuring that the State submits a State Medicaid Plan that conforms to federal law,

---

[90]  42 U.S.C. § 1396a(a)(10)(B) (ii); *Schweiker*, 457 U.S. at 573 n. 6.

and that the State's Medicaid program is administered "consistent with that Plan, relevant federal statutes, and federal regulations."   2d Am. Complaint ¶ 146.   Otherwise, Plaintiffs allege only generally that all three defendant officials failed to ensure that Plaintiffs and class members are provided "medically necessary services," failed to develop plans and budgets that account fully for persons with IDD who need to reside in the community, and failed to offer class members "specialized services and active treatment," *Id*. ¶¶ 147, 148.   These allegations fail to demonstrate Plaintiffs' standing to sue the Governor, and fail to state a claim against him.

### A.    Plaintiffs Lack Standing to Sue the Governor

To establish standing against the Governor for any of the claims asserted in this case, Plaintiffs must allege how the Governor "has caused, will cause, or could possibly cause any injury to them."   *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (*en banc*).   In addition, if the Governor does not have the power "to redress the injuries alleged, [Plaintiffs] have no case or controversy with [the Governor] that will permit them to maintain this action in federal court." *See id.* at 427.   Here, Plaintiffs have established neither injury caused by the Governor, nor the Governor's authority to redress their alleged injuries.

### 1.    The Governor did not, and could not, cause Plaintiffs any injury.

Even assuming for purposes of this standing analysis that Plaintiffs have suffered some injury-in-fact, no injury has been, or could be, caused by the Governor.   As discussed above, the portions of the Medicaid Act at issue in this lawsuit are administered by DADS and HHSC.   *See supra* at 6–14.   The Governor has no direct control over the operation of the Texas Medicaid Program; that function is clearly assigned to HHSC and its health services agencies.

The powers of the Governor with respect to HHSC and DADS are limited to appointing the HHSC Executive Commissioner and approving the DADS commissioner.   *See* 2d Am.

Complaint ¶ 32; *see also* TEX. GOV'T CODE §§ 531.005, 531.0056.  Plaintiffs do not allege that any of the Governor's actions in connection with those powers have caused Plaintiffs' alleged injuries, or that the Governor caused them injury by exercising more general executive powers, such as holding budget hearings, compiling a proposed biennial appropriations budget, or using his line-item veto authority.[91]  Indeed, Plaintiffs make no allegation that the Governor has any direct control over how the State administers Medicaid "services, programs and activities," such that he would have any responsibility for satisfying the integration mandate of the ADA or the Rehabilitation Act.  *See* 2d Am. Complaint ¶¶ 377, 387.  Similarly, Plaintiffs make no allegation that the Governor has any involvement in developing policies and procedures to ensure that the various statutory and regulatory requirements of the Medicaid Act and the NHRA are satisfied. For example, neither the Governor nor his office is alleged to be responsible for conducting pre-admission screening and assessments, providing specialized services, or providing community-based services and supports.  *See, e.g.*, 2d Am. Complaint ¶¶ 5, 393, 396, 398–399, 403–05.   In short, Plaintiffs do not allege that the Governor has done anything (or failed to do anything) that is within his constitutional power to do that has caused the injuries that Plaintiffs allege.

Article III jurisdiction is simply lacking where Plaintiffs sue a state official who is without power to take the complained-of action, and whose actions have not caused, or could not cause, any injury to them.  *See Okpalobi*, 244 F.3d at 426 (plaintiffs failed to satisfy Article III standing with respect to the Governor, who had no authority to enforce the allegedly-unconstitutional state statute).

---

[91] *See* Tex. Gov't Code § 401.041, 401.043, 401.0045, Tex. Const. art. IV, § 14.

### 2.     Plaintiffs' injuries, if any, are not redressable through the Governor.

In addition, the Governor cannot grant Plaintiffs any of the relief they seek.  *See* 2d Am.

Complaint ¶¶ 64–66.  The Governor does not adopt policies or procedures regarding the provision

of Medicaid services, nor does he have any direct control over such services.[92]  As described

above, the Governor's powers with regard to management and oversight of HHSC and DADS are

extremely limited, and Plaintiffs are not requesting injunctive relief requiring the Governor to

appoint an HHSC Executive Commissioner, approve an agency director for DADS, compile the

biennial appropriations budget, or use the line-item veto.  Consequently, the relief Plaintiffs seek

cannot be obtained by enjoining the Governor.  *See Okpalobi*, 244 F.3d at 427 ("a state official

cannot be enjoined to act in any way that is beyond his authority to act in the first place.").[93]

Because the Governor does not administer any of the federal-state programs complained of in

---

[92] Plaintiffs' complaint refers to two executive orders that the Governor issued in 1999 and 2002 regarding community-based services for people with disabilities.  2d Am. Complaint ¶¶ 58-59.  Under Article IV section 10 of the Texas Constitution, the Governor has power to give direction in all branches of the executive department in the form of executive orders.  But the Governor's power to enforce those orders is limited, and is based primarily on his constitutional appointment power.  Concomitant with his authority to appoint, the Governor has the power to refuse to reappoint the person as agency head.  However, unlike the federal President, he has no power to force the removal of the agency head prior to the termination of the agency head's appointed term, nor does he have absolute power to force an appointed agency head to carry out his orders.  *See* Ron Beal, *Power of the Governor:  Did the Court Unconstitutionally Tell the Governor to Shut Up?*, 62 BAYLOR L. REV. 72, 81–88 (2010).  Undoubtedly, the Governor has the power to issue executive orders and may exert his influence to see that they are carried out, but he has no constitutional or statutory duty to do either.  The limitations on his ability to enforce executive orders preclude the Governor from providing the relief that Plaintiffs seek in this case.  The Governor can refuse to reappoint the HHSC Executive Commissioner or refuse to approve the reappointment of the Commissioner of DADS in the event an executive order is not followed.  But Plaintiffs are not seeking an injunction requiring the Governor to refuse to reappoint the HHSC Executive Commissioner or the DADS Commissioner due to failure to follow executive orders.  Rather, they are seeking an injunction requiring actions that only HHSC and DADS (or, in the case of appropriations, the Legislature) can perform.  2d Am. Complaint ¶¶ 64-66.

[93] In *Okpalobi v. Foster*, the plaintiffs tried to enjoin enforcement of a Louisiana statute that made abortion providers liable in tort for any damages caused by abortion procedures, and named Louisiana's governor and attorney general as defendants in the lawsuit.  In an *en banc* opinion, the Fifth Circuit held that an injunction against the governor and the attorney general would be "utterly meaningless" because "[t]he governor and the attorney general have no power to redress the asserted injuries … Because these defendants have no powers to redress the injuries alleged, the plaintiffs have no case or controversy with these defendants that will permit them to maintain this action in federal court."  *Id.* at 427.  The same is true of Plaintiffs' claims against Governor Abbott in this lawsuit.

Plaintiffs' complaint, and therefore, has no authority to redress Plaintiffs' purported injuries, Plaintiffs also fail to satisfy the redressability prerequisite for Article III standing.

Plaintiffs conclusorily assert that the Governor "is responsible for ensuring that the State submits a State Medicaid Plan which conforms to federal law, and that Texas's Medicaid program is administered consistent with that Plan, relevant federal statutes, and federal regulations." 2d Am. Complaint ¶ 146. As an initial matter, this allegation is incorrect as a matter of law, since federal law mandates that a single state agency (not the governor) be responsible for "exercis[ing] administrative discretion in the administration or supervision of the [Medicaid state] plan" and for "issu[ing] policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(e)(1)(ii) (a)(5) (establishing single agency mandate for Medicaid). In Texas, HHSC is the state Medicaid agency. TEX. GOV'T CODE § 531.021(b)(1); TEX. HUM. RES. CODE § 32.031.

Moreover, such allegations of generalized executive enforcement powers are insufficient to establish standing over a governor or other state officer. *See Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) ("Where the enforcement of a statute is the responsibility of parties other than the governor … the governor's general executive power is insufficient to confer jurisdiction.") (affirming dismissal of governor); *1st Westo Corp. v. School Dist. of Philadelphia*, 6 F.3d 108, 113 (3d Cir. 1993) (dismissing claims against Secretary of Education and Attorney General; "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law."); *see also Okpalobi*, 244 F.3d at 416 (plurality op.) ("it is not merely the general duty to see that the laws of the state are implemented that substantiates the required 'connection,' but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.").

In short, Plaintiffs have failed to establish Article III standing for their Medicaid Act, NHRA, ADA, and Rehabilitation Act claims against the Governor.

**B.      Eleventh Amendment Immunity Bars Plaintiffs' Claims, Even Under Ex parte Young**

Plaintiffs' claims against the Governor fail for the additional reason that the Governor is immune from suit.  The Eleventh Amendment bars suits by private citizens against a state in federal court, irrespective of the nature of the relief requested, including suits against state officials in their official capacities.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984); *Edelman v. Jordan*, 415 U.S. 651, 663-69 (1974); *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir.2004).  Under the narrow *Ex parte Young* exception to this rule, "a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law."  *Pennhurst*, 465 U.S. at 102-103; *Quern v. Jordan*, 440 U.S. 332, 337 (1979).  However, as the Supreme Court made clear in *Ex parte Young*, a state officer named in suit seeking injunctive relief "must have some connection with the enforcement of the act" for sovereign immunity to be waived.  *Ex parte Young*, 209 U.S. 123, 153 (1908); *see also Fitts v. McGhee*, 172 U.S. 516, 530 (1899) (noting "neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional.").

The precise contours of this requirement have been subject to some debate, including whether a "special charge" of enforcement must be found in the statute.  *See Okpalobi*, 244 F.3d at 416-21 (plurality op.).[94]  However, to establish the connection required by *Ex parte Young*, there must be more than a general duty upon the state officer to enforce the laws of the state in order to

---

[94] The sovereign immunity holding in *Okpalobi* failed to garner sufficient votes to be a majority opinion not because the majority disagreed with its holding, but rather because two judges who joined in the holding on standing determined that the immunity issue need not have been addressed since the standing issue was determinative in any event.  *See Okpalobi*, 244 F.3d at 429 (Higginbotham, J., concurring, joined by King, J.).

dissolve the Eleventh Amendment bar.  *See Women's Emergency Network*, 323 F.3d at 949 ("A

governor's 'general executive power' is not a basis for jurisdiction in most instances."); *Waste

Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (dismissing governor);

*Confederated Tribes & Bands of the Yakama Indian Nation v. Locke*, 176 F.3d 467, 469-70 (9th

Cir. 1999) (dismissing governor); *Children's Healthcare Is A Legal Duty, Inc. v. Deters*, 92 F.3d

1412, 1416-18 (6th Cir. 1996) (dismissing attorney general); *Okpalobi*, 244 F.3d at 419 (plurality

opinion); *Day v. Sebelius*, 376 F.Supp.2d 1022, 1031 (D. Kan. 2005) (dismissing governor).

Here, the Governor has no connection to the administration of the Medicaid Act or the

ADA and Rehabilitation Act as it relates to the target population in this lawsuit.  Rather, the

Governor appoints the HHSC Executive Commissioner, approves the DADS commissioner, and

submits a biennial budget.  *See* 2d Am. Complaint ¶ 32.  Those separate state agencies (and their

commissioners, for purposes of *Ex parte Young*) are responsible for the direction and oversight of

the Texas Medicaid Program and ensuring that program complies with federal law.  *See* 2d Am.

Complaint ¶¶ 3–34.  Furthermore, the Legislature (not the Governor) appropriates funds, and the

Governor enjoys legislative immunity for his actions in connection with the budgeting process and

the use of line-item veto powers.  *See Bagley v. Blagojevich,* 646 F.3d 378, 394–95 (7th Cir. 2011),

*cert. denied,* 2011 WL 4534022 (Oct. 3, 2011) (applying legislative immunity to claims against

governor related to line-item veto); *Abbey v. Rowland*, 359 F.Supp.2d 94, 100 (D. Conn. 2005)

(applying legislative immunity to claims against governor related to budget process).[95]  In short,

the Governor of Texas lacks the requisite connection to the provision of Medicaid services to

---

[95] This is true even for claims seeking prospective injunctive relief.  *See State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 88 (2d Cir. 2007) (applying legislative immunity to claims for injunctive relief against state officials sued in their official capacity); *Scott v. Taylor*, 405 F.3d 1251, 1257 (11th Cir. 2005) (same).

individuals with IDD, whether in NFs or in the community as an alternative to NFs—to be a proper party under *Ex parte Young*, and is protected by sovereign immunity from Plaintiffs' claims.

Similarly, the Governor is not a proper defendant under the Rehabilitation Act because the Act applies to recipients of federal funds and the Governor neither receives nor distributes the Medicaid funds at issue in this lawsuit.  Section 504 of the Rehabilitation Act, which is designed to eliminate discrimination on the basis of handicap in any program or activity receiving federal financial assistance, 29 U.S.C. § 794(a),[96] applies to "recipients" of such financial assistance, including "the entity of…State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended…." 29 U.S.C. § 794(b)(1)([97]B); 28 C.F.R. § 41.3(d) (defining "recipient");[98] *see also* 28 C.F.R. § 41.51 (b)(1) (applying the prohibitions against discrimination on the basis of handicap to a "recipient" providing an aid, benefit, or service).  None of this implicates the Governor of Texas, who neither receives Medicaid funds, nor distributes those funds.  That responsibility falls to HHSC.  TEX. GOV'T CODE § 531.021(b)(1); TEX. HUM. RES. CODE § 32.031.

---

[96] Section 5 of the Rehab. Act provides:
> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination *under any program or activity receiving Federal financial assistance*….

29 U.S.C. § 794(a) (emphasis added).  *See also* 28 C.F.R. § 41.51(a) ("No qualified handicapped person, shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives or benefits from federal financial assistance.").

[97] Specifically, the Act applies to each recipient of federal financial assistance from the Department of Health and Human Services (*e.g.*, Medicaid funds) and to the program or activity that receives such assistance.  45 C.F.R. §§ 84.1, 84.2.

[98] "Recipient" means any State or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.  28 C.F.R. § 41.3(d).

**C.      Plaintiffs Have Failed to State a Claim Against the Governor.**

For the same reasons set out above in this section, Plaintiffs have failed to state a cognizable claim against the Governor upon which relief can be granted.  Even assuming Plaintiffs' claims of injury and deprivation to be true, they have not asserted claims establishing any action on the part of the Governor that caused, or could cause, their alleged deprivation, and the relief they seek cannot be effectuated through the Governor.  Accordingly, Plaintiffs' claims against the Governor should be dismissed under Rule 12(b)(6),[99] as well as under Rule 12(b)(1).

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court grant this motion, dismiss all of Plaintiffs' claims, and grant such further relief as is just and proper.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ANGELA V. COLMENERO
Chief, General Litigation Division

/s/ Nancy K. Juren
NANCY K. JUREN
Assistant Attorney General
Attorney in Charge
Texas Bar No. 11059300
ANDREW B. STEPHENS
Assistant Attorney General
Texas Bar No. 24079396
THOMAS A. ALBRIGHT
Assistant Attorney General
Texas Bar No. 00974790

---

[99] The standard of review of a Rule 12(b)(6) motion is discussed in the section immediately following this paragraph.

MICHAEL PATTERSON
Assistant Attorney General
State Bar No. 24074868
NATALEE B. MARION
Assistant Attorney General
State Bar No. 24075362
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone No.: (512) 463-2120
Fax No.: (512) 320-0667
***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of *Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint* was served by CM/ECF system on November 19, 2015, upon the following individuals at the listed addresses:

Garth A. Corbett
Sean A. Jackson
Disability Rights Texas
7800 Shoal Creek Blvd., #171-E
Austin, Texas 78757

Yvette Ostolaza
Robert Velevis
Casey A. Burton
Sidley Austin, L.L.P.
2001 Ross Avenue
Suite 3600
Dallas, Texas 75201

Steven J. Schwartz
Deborah A. Dorfman
Elizabeth F. Toner
Center for Public Representation
22 Green Street
Northampton, Massachusetts 01060

Benjamin O. Tayloe, Jr.
Alexandra L. Shandell
Jessica Polansky
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, J.W.-NYA
Washington, D.C. 20530

John F. Paniszczyn
Texas Bar No. 15443855
Assistant United States Attorney
United States' Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, TX 78216

/s/ Nancy K. Juren
NANCY K. JUREN