IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

June 17, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ NM _____

DEPUTY

| | |
|---|---|
| ERIC STEWARD, by his next friend and sister, Kelli Green; LINDA ARIZPE, by her next friend and guardian Alvera Arizpe; PATRICIA FERRER, by her next friend and mother Petra Ferrer; ZACKOWITZ MORGAN, by his next friend and guardian Sharon Barker; VANISONE THONGPHANH, by his next friend and guardian Vira Phetsavong; MELVIN OATMAN; RICHARD KRAUSE, by his next friend and guardian Lenwood Krause; LEONARD BAREFIELD; JOHNNY KENT; and JOSEPH MORRELL, on behalf of themselves and all others similarly situated; and <br><br> THE ARC OF TEXAS, INC. and COALITION OF TEXANS WITH DISABILITIES, INC. <br><br> Plaintiffs <br><br> v. <br><br> CECILE YOUNG, in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission <br><br> Defendant <br> _____ <br><br> THE UNITED STATES OF AMERICA <br><br> Plaintiff-Intervenor <br><br> v. <br><br> THE STATE OF TEXAS <br><br> Defendant | CIVIL ACTION NO. SA-10-CA-1025-OLG <br> A CLASS ACTION |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court has reviewed the evidence presented at the trial of this case as well as the post trial submissions. It has made determinations as to admissibility, assessed the credibility of the witnesses, and ascertained the probative value of the testimony and exhibits presented by the parties. After such consideration, the Court finds the following facts to have been proven by a preponderance of the evidence, and in applying the law, makes the following conclusions. To the extent that any findings of fact contain or express conclusions of law, they are also deemed to be conclusions of law. To the extent that any conclusions of law contain or express findings of fact, they are also deemed to be findings of fact.

## I.

## Jurisdiction, the class, named parties, and claims

0001.   The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court has the authority to declare the rights of the parties and grant other necessary or proper relief pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is proper in the Western District of Texas. *See* 28 U.S.C. § 1391(b).

0002.   This is a class action brought by individuals with intellectual or developmental disabilities (IDD).

0003.   Intellectual disability means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period. Tex. Health & Safety Code Ann. § 591.003 (7-a); 26 Tex. Admin. Code § 331.5 (20). Subaverage general intellectual functioning refers to measured intelligence on standardized general intelligence tests of two or more standard deviations below the age-group mean for the tests used. Texas Health & Safety Code § 591.003 (20); 26 Tex. Admin. Code 331.5 (39).

0004.   Developmental disability or related condition means a severe, chronic disability that (a) is attributable to cerebral palsy or epilepsy or any other condition, other than mental illness, found to be closely related to Intellectual Disability because the condition results in impairment of general intellectual functioning or adaptive behavior similar to that of persons with an intellectual disability, and requires treatment or services similar to those required for these persons; (b) is manifested before the individual reaches age twenty-two; (c) is likely to continue indefinitely; and (d) results in substantial functional limitations in three or more of the following major life activities: self-care, understanding and use of language, learning, mobility, self-direction, and capacity for independent living.  42 C.F.R. § 435.1010; 26 Tex. Admin. Code § 331.5 (34).

0005.   The Class is defined as:

> All Medicaid-eligible persons over twenty-one years of age with intellectual or developmental disabilities or a related condition in Texas who currently or will in the future reside in nursing facilities, or who are being, will be, or should be screened for admission to nursing facilities pursuant to 42 U.S.C. § 1396r(e)(7) and 42 C.F.R. § 483.112 *et seq*.

Docket no. 287, Order granting Second Amended Motion for Class Certification.[1]

---

[1]*Steward v. Janek*, 315 F.R.D. 472 (W.D. Tex. 2016), *discretionary review denied*, No. 16-90019 (5th Cir. 2016). The Court's decision to certify this case as a class action was appropriate then and remains appropriate today. *See Brown v. District of Columbia*, 928 F.3d 1070, 1083 (D.C. Cir. 2019) (finding class of disabled plaintiffs with ADA, Rehabilitation Act, and *Olmstead* claims satisfied Rule 23 because a single injunction would provide classwide relief). In stark contrast to *United States v. Mississippi*, 82 F. 4th 387 (5th Cir. 2023), this case involves actual institutionalization, not merely a risk of institutionalization. The class members include  approximately 3,600 individuals with IDD who *reside in* nursing facilities. Ninety-seven percent of individuals are not screened for IDD when admitted to a nursing facility; thus, diversion is not an option for them. The named plaintiffs were in nursing facilities for many years without the requisite screenings,  evaluations, assessments, specialized services, active treatment, and transition plans, including: Eric Steward (14 years), Linda Arizpe (8 years), Patricia Ferrer (4 years), Zackowitz Morgan (4 years), Maria Hernandez (11 years), Vanisone Thongphanh (5 years), Melvin Oatman  (9 years), Richard Krause (13 years), Leonard Barefield (7 years), Tommy Johnson (9 years), Johnny Kent (9 years), and Joseph Morrell (8 years). Individuals surveyed in the QSR ("the Nursing Facility Target Population") were institutionalized and the groups surveyed in client reviews were institutionalized. *Cf. United States v. Mississippi*, 82 F. 4th at 392 ("If a mentally disabled person is not currently institutionalized (as was the case with over 80 % of the individuals surveyed), he is not separated from the community . . ."). Thus, the claims in this case are "premised on actual violations, not statistical risks." *Id.* at 402 (Ho, J., concurring).

0006.  Plaintiffs also include the United States, The Arc of Texas, Inc., and Coalition of Texans with Disabilities. Docket no. 560, Plaintiffs' Third Amended and Supplemental Complaint; Docket no. 137, United States' Complaint in Intervention.

0007.  The Court has determined that all Plaintiffs have standing to assert the claims being considered herein. Docket no. 286, Order denying motions to dismiss based on standing.[2]

0008.  Defendants are the State of Texas and the Executive Commissioner of the Texas Health and Human Services Commission. Docket no. 290, Defendants' Answer and Affirmative Defense to Plaintiffs' Second Amended and Supplemental Complaint; docket no. 143, State of Texas' Answer and Affirmative Defenses to United States' Complaint in Intervention.

0009.  Plaintiffs' claims arise from alleged systemic failures in the State's implementation, utilization, and administration of long term care for these disabled individuals, in violation of the *Olmstead* integration mandate and other federal laws. Plaintiffs allege violations of Title II of the ADA, 42 U.S.C. § 12132 *et seq*.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Title XIX of the Social Security Act ("Medicaid Act"), 42 U.S.C. 1396a *et. seq.*; the Nursing Home Reform Amendments to the Medicaid Act ("NHRA"), 42 U.S.C. 1396r *et seq.*; and related regulations – including but not limited to the integration mandate. Plaintiffs bring their suit under 42 U.S.C. §1983, seeking declaratory relief, injunctive relief, and recovery of attorneys fees and costs. *See* docket no. 560, Plaintiffs' Third Amended and Supplemental Complaint; docket no. 137, United States' Complaint in Intervention.[3]

---

[2]*Steward v. Abbott*, 189 F. Supp. 3d 620 (W.D. Tex. 2016).

[3]The United States' claims are more limited in scope to Title II of the ADA, Section 504 of the Rehabilitation Act, and the integration mandate.

0010.    Defendants deny that Plaintiffs are entitled to the level of care that they are seeking; deny that they have failed to implement, utilize, and administer the requisite long term care for these disabled individuals; and deny that they have violated the *Olmstead* integration mandate or other federal law. Defendants also allege, in their pleading, that the relief Plaintiffs are seeking would "fundamentally alter the nature of Texas' services and programs." Docket nos. 143, 290.

## II.

### Overview of protections afforded under the law[4]

A.    Integration mandate

0011.    The Court starts with the ultimate goal: integration. This is not just a hope or desire; it is a mandate from Congress and the U.S. Supreme Court. *Olmstead v. L.C.*, 527 U.S. 581, 119 S. Ct. 2176 (1999); 42 U.S.C. § 12101(a) (the isolation and segregation of individuals with disabilities is a "serious and pervasive" form of discrimination). Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status. The ADA's integration mandate – to provide services "in the most integrated setting appropriate to the needs of qualified individuals with disabilities" – applies to all public entities. 28 C.F.R. § 35.130(d).

0012.    The issues in this case warrant repeating the Congressional findings that serve as the underpinning for relief afforded under the ADA:

(a) Findings

The Congress finds that –

(1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities

_____

[4]This overview is broader than the claims asserted herein. The Court mentions additional provisions to give context to the legal landscape of rights and responsibilities that protect the IDD population.

have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

(8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

(b) Purpose

It is the purpose of this chapter –

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the

fourteenth amendment and to regulate commerce, in order to address the major areas
of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101.

0013.    As the Supreme Court noted in *Olmstead*, "[i]n the ADA, Congress for the first time referred expressly to 'segregation' of persons with disabilities as a 'for[m] of discrimination,' and to discrimination that persists in the area of 'institutionalization.'" 527 U.S. at 589 n. 1 (citing 42 U.S.C. § 12101(a)(2),(3),(5)).

0014.    Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded  from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .". 29 U.S.C. § 794(a).

0015.    Title II, the public services mandate in the ADA, states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132.

0016.    Congruent with enactment of the Rehabilitation Act in 1973 and the ADA in 1990, Congress passed the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 15001, *et. seq.* The congressional findings, purpose, and policy statements in the Bill of Rights Act are consistent with and reinforce the findings and purpose statements set forth in the ADA. *Compare* 42 U.S.C. § 15001(a)-(c) *with* 42 U.S.C. § 12101. Section 504 of the Rehabilitation Act, the Bill of Rights Act, and the ADA, taken together, reflect a clear intent to provide broad support and assistance to individuals with intellectual or developmental disabilities to enable them to exercise self-determination, independence, productivity, integration, and inclusion in all facets of community life.

0017.    42 U.S.C. § 15009(a) enunciates the rights of individuals with developmental disabilities in

the context of publicly funded services, as follows:

(1)  Individuals with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities, consistent with section 15001(c) of this title.

(2) The treatment, services, and [habilitation] for an individual with developmental disabilities should be designed to maximize the potential of the individual and should be provided in the setting that is least restrictive of the individual's personal liberty.

(3)  The Federal Government and the States both have an obligation to ensure that public funds are provided only to institutional programs, residential programs, and other community programs, including educational programs in which individuals with developmental disabilities participate, that–

(A) provide treatment, services, and habilitation that are appropriate to the needs of such individuals; and

(B) meet minimum standards relating to–

(i) provision of care that is free of abuse, neglect, sexual and financial exploitation, and violations of legal and human rights and that subjects individuals with developmental disabilities to no greater risk of harm than others in the general population;

(ii) provision to such individuals of appropriate and sufficient medical and dental services;

(iii) prohibition of the use of physical restraint and seclusion for such an individual unless absolutely necessary to ensure the immediate physical safety of the individual or others, and prohibition of the use of such restraint and seclusion as a punishment or as a substitute for a habilitation program;

(iv) prohibition of the excessive use of chemical restraints on such individuals and the use of such restraints as punishment or as a substitute for a habilitation program or in quantities that interfere with services, treatment, or habilitation for such individuals; and

(v) provision for close relatives or guardians of such individuals to visit the individuals without prior notice.

(4)  All programs for individuals with developmental disabilities should meet standards–

(A) that are designed to assure the most favorable possible outcome for those served; and

(B)(i) in the case of residential programs serving individuals in need of comprehensive health-related, habilitative, assistive technology or rehabilitative services, that are at least equivalent to those standards applicable to intermediate care facilities for the mentally retarded, promulgated in regulations of the Secretary on June 3, 1988, as appropriate, taking into account the size of the institutions and the service delivery arrangements of the facilities of the programs;

(ii) in the case of other residential programs for individuals with developmental disabilities, that assure that–

(I) care is appropriate to the needs of the individuals being served by such programs;

(II) the individuals admitted to facilities of such programs are individuals whose needs can be met through services provided by such facilities; and

(III) the facilities of such programs provide for the humane care of the residents of the facilities, are sanitary, and protect their rights; and

(iii) in the case of nonresidential programs, that assure that the care provided by such programs is appropriate to the individuals served by the programs.

42 U.S.C. § 15009(a). These rights are "in addition to any constitutional or other rights otherwise afforded" to all such individuals. 42 U.S.C. § 15009(b).

0018.   To ensure equivalent standards and consistent services for individuals with intellectual and developmental disabilities, 28 C.F.R. § 35.130 (which implements Title II of the ADA and the ADA amendments), expressly provides, in relevant part:

(a)   No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(b)(1)   A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

9

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

(vi) Deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards;

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2)   A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

(3)   A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i)  That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii)  That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(7)(i) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(8)  A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria

can be shown to be necessary for the provision of the service, program, or activity being offered.

(c)  Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

(d)  A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e)(1) Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

(h)  A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

28 C.F.R. § 35.130(a)-(e)(1),(h).[5] *See also* 28 C.F.R. § 41.51 (implementing § 504 of the Rehabilitation Act).

0019.   It is undisputed that the named individual plaintiffs and the class members meet the definition of persons with a disability. *See* 42 U.S.C. §§ 12102, 12131(2); *see also* 28 C.F.R. § 35.101 ("the primary purpose of the ADA Amendments Act is to make it easier to for people with disabilities to obtain protection under the ADA. Consistent with the ADA Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of 'disability' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in ADA cases should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual

---

[5]"Taken together, these provisions are intended to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities. Consistent with these standards, public entities are required to ensure that their actions are based on facts applicable to individuals and not on presumptions as to what a class of individuals with disabilities can or cannot do." 28 C.F.R. Pt. 35, App. B, Subpart B.

meets the definition of disability.").

0020.   Public entities that receive federal financial assistance must comply with Section 504 and Title II. This expressly includes "any State or local government" and "any department, agency, . . . or other instrumentality of a State or local government." 42 U.S.C. § 12131(1); 29 U.S.C. § 794(b)(1); 28 C.F.R. § 35.104; 28 C.F.R. § 41.3(d). The State of Texas and the Texas Health and Human Services Commission (HHSC) are governmental entities that must comply with Section 504 of the Rehabilitation Act and Title II of the ADA. *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter"); 28 C.F.R. § 35.178 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this Act.").

0021.   Local IDD Authorities (LIDDAs) are recipients of federal financial assistance and instrumentalities of the State of Texas and HHSC. *See* Tex. Health & Safety Code Ann. § 531.002 (12) ("'Local intellectual and developmental disability authority' means an entity to which the executive commissioner delegates the executive commissioner's authority and responsibility within a specified region . . . for supervising and ensuring the provision of intellectual disability services to persons with IDD in the most appropriate and available setting to meet individual needs").

0022.   LIDDAs must comply with the same statutes and regulations that apply to the State and HHSC. *See* 29 U.S.C. § 794(b)(1)(A),(B) ("'Programs' or 'activity' means all of the operations of a department, agency, . . . or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government"); 28 C.F.R. § 41.3(d) ("Recipient means any State

or its political subdivision, any instrumentality of a State or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance").

0023.    For violations of Title II, Congress incorporated the same enforcement measures and legal or equitable remedies available under § 505 of the Rehabilitation Act. 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title"); 28 C.F.R. § 35.103 ("this part [which implements Title II of the ADA] shall not be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to that title"). For violations of § 504 of the Rehabilitation Act, § 505 of the Rehabilitation Act incorporates the remedies, rights, and procedures set forth in Title VI of the Civil Rights Act. *See* 29 U.S.C. § 794a(a)(2). Title VI, in turn, directs that compliance may be effected by the termination or denial of federal funds, or "by any other means authorized by law." 42 U.S.C. § 2000d-1. Thus, remedies both at law and in equity are available to redress violations of Title II and Section 504. *See* 42 U.S.C. § 2000d-7(a)(2); *Olmstead*, 527 U.S. at 590 n. 4; *see also* 28 C.F.R. § 35.178 ("In any action against a State for a violation of the requirements of this Act, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State").

0024.    Congress tasked the Attorney General with issuing regulations implementing Title II. *See* 42 U.S.C. § 12134. Congress directed that such regulations "shall be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations . . .

applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." 42 U.S.C. § 12134(b). As instructed by Congress, the Attorney General issued regulations, 28 C.F.R. pt. 35, consistent with the mandates under Title II and § 504.

0025.    Section 504 and Title II both provide integration mandates. The § 504 integration mandate states that "[r]ecipients [of federal financial assistance] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). Similarly, the Title II integration mandate states that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The most integrated setting appropriate to the needs of qualified individuals with disabilities means "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B.

0026.    Persons with disabilities must be provided with the option of accepting or declining a particular service, aid, accommodation, benefit, or opportunity. 42 U.S.C. § 12201(d); 28 C.F.R. pt. 35, App. B.

0027.    Persons with intellectual or developmental disabilities must be provided with the information and support they need to make informed choices and decisions about services, aids, accommodations, benefits, and opportunities. If disabled persons do not have the information and support they need to understand their option(s), they cannot make informed choices and decisions. 42 U.S.C. § 15001(a)(16)(A) ("the goals of the Nation properly include a goal of providing individuals with developmental disabilities with the information, skills, opportunities, and support to . . . make informed choices and decisions about their lives"); 42 U.S.C. § 1396n(c)(2)(C) ("a waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that . . . such individuals who are determined to be likely to require the level of care

provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded."); 42 C.F.R. § 483.10 (all nursing facility residents have right to be notified, the right to be informed, the right to make choices, the right to be treated with dignity, the right to participate in decisions, the right to self-determination).

0028.    Under § 504 and Title II, reasonable modifications in policies, practices, or procedures shall be required, unless an entity can demonstrate that making such modifications in policies, practices, or procedures would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations involved. *See Olmstead*, 527 U.S. at 603; *Brown v. District of Columbia*, 928 F.3d 1070, 1077 (D.C. Cir. 2019); 28 C.F.R. § 35.130(b)(7)(i).

0029.    In *Olmstead*, the Supreme Court unequivocally ruled that unjustified institutional isolation of people with disabilities is a form of unlawful discrimination. The Court explained:

> Recognition that unjustified institutional isolation of persons with disabilities is a form of discrimination reflects two evident judgments. First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life. Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

527 U.S. at 600-01 (internal citations omitted); *see Harrison v. Young*, 103 F. 4th 1132, 1135 (5th Cir. 2024) ("'unjustified institutional isolation of persons with disabilities is a form of discrimination' prohibited by [Title II and § 504 ]") (quoting *Olmstead*, 527 U.S. 581 at 599–600). Persons with disabilities, such as the class members in this suit, must be provided with treatment and services that will enable them to reach their potential in terms of maintaining their health and making them self-sufficient and independent. Community integration, rather than nursing home isolation, is the ultimate goal.

B.    Diversion from nursing facilities

0030.    One principle way to avoid segregation of individuals with disabilities in nursing facilities is to have an effective diversion process in place. If individuals with intellectual or developmental disabilities can be diverted from nursing facilities, they can avoid the segregation and isolation inherent in such facilities.[6] Service systems that unnecessarily rely on segregated settings like nursing facilities produce greater isolation. Thus, effective diversion is an important part of the process that must not be overlooked. Preadmission screening is an integral part of the diversion process, and is mandated for all persons with intellectual or developmental disabilities. 42 U.S.C. §§ 1396r(b)(3)(F)(ii), 1396r(e)(7)(A); 42 C.F.R. § 483.112.[7]

0031.    If persons with intellectual or developmental disabilities cannot be diverted from a nursing facility, the ultimate goal of community integration does not change. To achieve that goal, there are additional statutes and regulations that are designed to provide the care, treatment, and services that people with intellectual disabilities need to avoid regression or stagnation, attain independence, integrate back into the community, and avoid the isolation and segregation that comes with prolonged institutionalization.[8] The principle provisions are found in the Medicaid Act, the Nursing Home Reform Amendments to the Medicaid Act (NHRA), and the implementing regulations.[9]

C.    Long term care and treatment

0032.    The Medicaid Act (Title XIX of the Social Security Act), 42 U.S.C. § 1396, *et. seq.*, the Nursing Home Reform Amendments to the Medicaid Act (NHRA), 42 U.S.C. § 1396r, and the

---

[6] PI Tr. 89:21-90:4 (N. Weston) (explaining the effect of NF segregation and isolation); PPI X 666 at 12-13 (Charlot Report)(explaining "learned helplessness").

[7] PI Tr. 83:1-3 (N. Weston) (explaining diversion).

[8] *See* PI Tr. 96:21-97:1; 103:8-17 (N. Weston).

[9] As the Supreme Court in *Olmstead* explained, the notion that the Medicaid Act reflected a policy preference for institutional treatment over treatment in the community is a thing of the past. 527 U.S. at 583.

implementing regulations, 42 C.F.R. part 483, govern the implementation, utilization, and administration of long term care and treatment of persons with intellectual or developmental disabilities in skilled nursing facilities.[10]

0033.   The Medicaid Act provides, *inter alia*, that "[a] State plan for medical assistance must provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them." 42 U.S.C. § 1396a(a)(1). It must also "provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5). In Texas, the responsible State agency is the Health and Human Services Commission.

0034.   A State plan must furnish medical assistance to all eligible individuals "with reasonable promptness." 42 U.S.C. § 1396a(a)(8). The Medicaid Act requires that the "amount, duration, or scope" of medical assistance (care and services) provided to individuals under State plans "shall not be less" than what would be available to others. *See* 42 U.S.C. § 1396a(a)(10)(B),(C).

0035.   Medicaid benefits are available to intellectually or developmentally disabled individuals who are eligible for home and community-based services under the waiver provisions of State plans. *See* 42 U.S.C. § 1396a(a)(10)(A)(ii)(XXII); 42 U.S.C. § 1396n.

0036.   A waiver shall not be granted unless the State provides assurances that individuals with IDD who are determined to be likely to require the level of care provided in a nursing facility or ICF are informed of the feasible alternatives and given a choice. 42 U.S.C. § 1396n(c)(2)(C).

0037.   Responding to House and Senate Committee hearings on the care of individuals with IDD in nursing facilities, the General Accounting Office (GAO) issued a report that was designed to

---

[10]The parties do not challenge the regulations as invalid or exceeding congressional authorization. The parties' sole disagreement, with regard to the regulations, is the extent to which active treatment is required, which the Court addresses herein.

ascertain whether persons with IDD in nursing homes have the same access to needed services as their counterparts in other settings like ICF/MRs. *See* Report to the Secretary of Health & Human Servs. (HHS), Medicaid: Addressing the Needs of Mentally Retarded Residents Nursing Home Residents (1987) (hereafter GAO Report), cited in *Rolland v. Romney*, 318 F.3d 42, 45 (1st Cir. 2003) (discussing the history of the NHRA). The GAO Report found that states had routinely transferred individuals with IDD from state institutions, like ICF/MRs, to nursing facilities, where they were provided inadequate care. GAO Report at 11; *Rolland*, 318 F.3d at 45-46. The GAO Report recommended, among other things, that Congress require states to provide the necessary active treatment and services to all individuals with IDD in nursing facilities, and to include IDD professionals as members of all treatment teams. *Id.*

0038.   In response to the GAO Report, the House Energy and Commerce Committee proposed the initial version of the Nursing Home Reform Amendments (NHRA) to the Medicaid Act, requiring states: (1) implement a pre-admission screening program so as to avoid unnecessary admissions to nursing facilities, where services in an alternative setting could meet the needs of individuals with IDD, and (2) provide and pay for active treatment for individuals with IDD who are admitted to nursing facilities. *See* H. Rept. 100-391, pt. 1, H.R. 3545, Omnibus Budget Reconciliation Act of 1987, 1987 U.S.C.C.A.N. 231-1, 2313-279 to 2313-282; Conf. Rept. 133 Cong. Rec. H12103-02. Congress incorporated these requirements into the final version of the Pre-Admission Screening and Resident Review (PASRR, formerly PASARR) provisions of the NHRA, which were designed to prevent and remedy the unnecessary admission and confinement of people with IDD (and psychiatric disabilities) in nursing facilities. 42 U.S.C. § 1396r(e); Pub. L. No. 100-203, § 4211(C), 101 Stat. 1330-198 (1987); *see also Rolland*, 318 F.3d at 46 (describing legislative history and purpose of the NHRA); *Grammar v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 530-31 (3rd Cir. 2009) (citing with approval the legislative history from *Rolland*).

0039.   The NHRA requirements are part of a comprehensive remedial statute designed to address the warehousing of people in nursing facilities. *See* Rolland, 318 F.3d at 45-46 (explaining that Congress enacted the NHRA to address the pattern of States transferring individuals with IDD from Intermediate Care Facilities for Persons with Mental Retardation (ICF/MRs) to nursing facilities in order to save money and then not providing adequate care).

0040.   The State and its instrumentalities must comply with the provisions in the Nursing Home Reform Amendments to the Medicaid Act (NHRA), 42 U.S.C. § 1396r, and the implementing regulations, 42 C.F.R. part 483. These provisions include the PASRR (Preadmission Screening and Resident Review) requirements in 42 U.S.C. §§ 1396r and 42 C.F.R. part 483.

0041.   The Court has determined that the NHRA claims presented in this case are privately enforceable under 42 U.S.C. § 1983. *Steward v. Abbott*, 189 F. Supp. 3d 620, 634-39 (W.D. Tex. 2016); *see also Rolland*, 318 F.3d at 56; *Grammar*, 570 F.3d at 532; *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1314-18 (W.D. Wash. 2015); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 298-304 (E.D.N.Y. 2008); *Martin v. Voinovich*, 840 F. Supp. 1175, 1195-96, 1200-02 (S.D. Ohio 1993) (PASARR provisions of NHRA creates unambiguous enforceable obligations); *Ottis v. Shalala*, 862 F. Supp. 182, 185-87 (W.D. Mich. 1994) (same). *Accord Health & Hosp. Corp. of Marion County v. Talevski*, 599 U.S. 166, 192 (2023) (holding NHRA provisions enforceable under § 1983).

0042.   Congress' intent in creating the PASRR requirements was two-fold: (1) to ensure that only persons with mental disabilities who actually needed twenty-four hour nursing care and who could not be adequately cared for in other programs would be admitted to and retained in nursing facilities; and (2) to mandate that all persons with IDD who remained in nursing facilities would be provided the same special disability services which they otherwise would receive in state institutions or community programs. Cognizant of the well-established federal requirement to provide persons with IDD with a program of active treatment in institutions and community settings, Congress adopted

this same mandate for nursing facilities. *See* 135 Cong. Rec. S13057-03, *S13238, 1989 WL 195142 ("If a resident is found to be mentally ill or mentally retarded and requires nursing facility care, the individual may reside in a facility, but the State is required to provide active treatment if the individual is found to need it.").

0043.   Congress also instructed the Secretary of HHS to issue regulations that describe the details of the PASRR process as well as the mandate for active treatment, subsequently renamed "specialized services." Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4801(b)(8) (1990), codified as 42 U.S.C. § 1396r. These regulations are both consistent with Congress' purpose in enacting the NHRA and enforceable as an expression of Congress' directive to ensure the orderly implementation of the PASRR program. *Rolland*, 318 F.3d at 56-58 (discussing the Secretary's definition of specialized services as incorporating the federal active treatment standard).[11]

0044.   PASRR requirements and the provision of "specialized services" impose non-delegable duties on the State when it comes to the treatment and care of persons with intellectual or developmental disabilities. Federal regulations make clear that a State cannot delegate its "ultimate control and responsibility for the performance of [its] statutory obligations." 42 C.F.R. § 483.106(e).

0045.   When individuals with intellectual or developmental disabilities are not diverted from a nursing facility, compliance with PASRR requirements and provision of specialized services becomes crucial to eventual transition out of the institution. If there is a failure to comply, it is more likely that persons with intellectual and developmental disabilities – like the class members herein – will deteriorate both physically and mentally and their chances to integrate back into the

---

[11]The intent was to "preserve the original intent of emphasizing the mode and intensity of treatment rather than the separate and distinct nature of these specialized services." *Rolland*, 318 F.3d at 57 n. 12 (citing 57 Fed. Reg. 56450, 56472 (Nov. 30, 1992)).

community will diminish.

0046.    If PASRR requirements are followed, specialized services are provided, and individuals with intellectual or developmental disabilities receive the active treatment, care, and services to which they are entitled under the Medicaid Act, the NHRA, and related regulations, they are more likely to leave the nursing facility and transition back into the community.

0047.    "Nursing facilities" are institutions meant for persons who require skilled nursing care, rehabilitation, or health-related care and services on a regular basis that are only available to them through institutional facilities. 42 U.S.C. § 1396r(a). Unless individualized circumstances require institutionalization, nursing facilities are generally not the least restrictive environment for persons with intellectual or developmental disabilities.

1.    Rules that apply to long term care facilities

0048.    In addition to imposing non-delegable requirements on the states, the NHRA and implementing regulations impose requirements on long term care facilities, 42 C.F.R. part 483, subpart B. The claims in this lawsuit are based on the State's failure to carry out its non-delegable responsibilities, but the Court mentions these rules to give context to the care and treatment that is expected when persons with intellectual or developmental disabilities are admitted to a skilled nursing facility. These general requirements include the following:

a.    A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident. 42 U.S.C. § 1396r(b)(1)(A); 42 C.F.R. § 483.10(a)(1).

b.    The facility must provide equal access to quality care regardless of diagnosis, severity of condition, or payment source. A facility must establish and maintain identical policies and practices regarding transfer, discharge, and the provision of services under the State plan for all residents regardless of payment source. 42 C.F.R. § 483.10(a)(2).

c.    A nursing facility must provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care. 42 U.S.C. § 1396r(b)(2).

d.    Within 48 hours after admission, a nursing facility must develop and implement a baseline care plan for each resident with instructions for effective and person-centered care that sets initial goals and meets "professional standards of quality care." 42 C.F.R. § 483.21(a). This includes but is not limited to PASRR recommendations if the individual has intellectual or developmental disabilities. 42 C.F.R. § 483.21(a)(ii).

e.    Within 14 days after admission, a nursing facility must conduct a comprehensive functional assessment of each resident. 42 U.S.C. § 1396r(b)(3)(A); 42 C.F.R. § 483.20. Specifically, a nursing facility must conduct a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity, which describes the resident's capability to perform daily life functions and significant impairments in functional capacity, and identifies medical problems, needs, strengths, goals, and preferences. 42 U.S.C. § 1396r(b)(3)(A)(i),(iv); 42 C.F.R. § 483.20. Such assessments must be conducted promptly upon – but no later than 14 days after – admission to a nursing facility; promptly after – but no later than 14 days after – a significant change in the resident's physical or mental condition; and not less often than once every 12 months. 42 U.S.C. § 1396r(b)(3)(C)(i); 42 C.F.R. § 483.20(b)(ii)-(iii). The nursing facility must also assess each resident no less frequently than once every three months to ensure the continuing accuracy of the assessment. 42 U.S.C. § 1396r(b)(3)(C)(ii); 42 C.F.R. § 483.20(c). The results of such assessments shall be used in developing, reviewing, and revising the resident's comprehensive care plan. 42 U.S.C. § 1396r(b)(3)(D); 42 C.F.R. § 483.20(d); *see also* 42 C.F.R. § 483.21(b). These assessments must be "coordinated with" the preadmission screening and resident review (PASRR) process "to the extent practicable," but does not take the place of and is not a substitute for the PASRR process. 42 C.F.R.

§ 483.20(e); 42 C.F.R. § 483.108(c).

f.      Within seven days after completion of the comprehensive functional assessment, an interdisciplinary team must develop and implement a comprehensive person-centered care plan for each resident that includes measurable objectives and time frames to meet a resident's medical, nursing, and mental and psychosocial needs as identified in the comprehensive assessment. 42 C.F.R. § 483.21(b). The comprehensive care plan must describe, *inter alia*: the services required to attain or maintain the resident's highest practicable physical, mental, and psychosocial well-being; any specialized services or specialized rehabilitative services the nursing facility will provide as a result of PASRR recommendations; goals and desired outcomes; the resident's preference and potential for future discharge, including whether the resident's desire to return to the community was assessed and any referrals to local contact agencies for this purpose; and discharge plans. *Id.*

g.      The comprehensive care plan must be prepared, reviewed, and revised by the interdisciplinary team after each assessment, including both the comprehensive and quarterly review assessments. 42 C.F.R. § 483.21(b)(2)(ii)-(iii).

h.      Consistent with a resident's comprehensive assessment and plan of care, the nursing facility must provide or arrange for, *inter alia*, nursing and related services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident; medically-related social services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident; an ongoing program, directed by a qualified professional, or activities designed to meet the interests and the physical, mental, and psychosocial well-being of each resident; and treatment and services required by intellectually or developmentally disabled residents not otherwise provided or arranged for (or required to be provided or arranged for) by the State. 42 U.S.C. § 1396r(b)(4)(A); 42 C.F.R. § 483.24.

i.      The resident has the right to receive the services included in the plan of care. 42 C.F.R. § 483.10(c)(2)(iv). The services provided or arranged by the facility, as outlined by the comprehensive care plan, must meet professional standards and be provided by qualified persons in accordance with each resident's written plan of care. 42 U.S.C. 1396r(b)(4)(A), (B); 42 C.F.R. § 483.21(b)(3)(i) ("The services provided or arranged by the facility . . . must [m]eet professional standards of quality"); 42 C.F.R. § 483.25 ("quality of care is a fundamental principle that applies to *all* treatment and care provided to facility residents . . . in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices") (emphasis added). The facility must ensure that a resident is given the appropriate treatment and services to maintain or improve his or her ability to carry out the activities of daily living. 42 C.F.R. § 483.24(a)(1). The facility must ensure that a resident's abilities in activities of daily living do not diminish unless his/her clinical condition demonstrate that such diminution was unavoidable. *Id.*

j.      A nursing facility must protect and promote the rights of each resident, including self-determination and "free choice" – i.e., the right to be fully informed in advance about care and treatment and changes thereto, and the right to participate in planning care and treatment. 42 U.S.C. § 1396r(c)(1)(A)(i); 42 C.F.R. § 483.10(c),(d),(f).

k.      The resident's right to participate in the development and implementation of his or her person-centered plan of care includes involvement in the planning process; the right to identify other individuals involved and their roles; and the right to participate in establishing expected goals and outcomes of care, including the type, amount, frequency, and duration of care. 42 C.F.R. § 483.10(c).

l.      If rehabilitative services such as but not limited to physical therapy, speech-language pathology, occupational therapy, and rehabilitative services for intellectual disability are required in the comprehensive care plan, the facility must provide the services, including specialized

24

rehabilitation services, or obtain the required services from an outside source. 42 C.F.R. § 483.40(c). If specialized rehabilitative services such as but not limited to physical therapy, speech-language pathology, occupational therapy, respiratory therapy, and rehabilitative services for intellectual disability or services of a lesser intensity as set forth at § 483.120(c),[12] are required in the resident's comprehensive care plan, the facility must provide the required services or obtain the services from an outside source. 42 C.F.R. § 483.65(a).

m.      A discharge plan, as outlined in the comprehensive care plan, must be developed and implemented. An effective discharge planning process focuses on the resident's discharge goals, prepares the resident to be an active partner, and effectively transitions them to post-discharge care with the support needed to reduce factors that lead to preventable readmissions. 42 C.F.R. § 483.21(c)(1).

n.      The discharge planning process must ensure that the discharge needs of each resident are identified and result in the development of a discharge plan for each resident. The process includes regular re-evaluations to identify changes that require modification of the discharge plan. The interdisciplinary team must be involved in the "ongoing process" of developing the discharge plan. The discharge planning process must consider caregiver/support person availability and capability to perform required care; involve the resident and his/her representatives in the development of the discharge plan; address goals of care and treatment preferences; document that a resident has been asked about his/her interest in receiving information regarding returning to the community; if the resident indicates an interest in returning to the community, the facility must

---

[12] 42 C.F.R. § 483.120 relates to PASRR "specialized services" provided to those with intellectual or developmental disabilities, i.e., those services specified by the State which, combined with services provided by the nursing facility or other service providers, *results in an active treatment program*. Section 483.120 expressly adopts the Active Treatment standard in § 483.440(a)(1). Section 483.65(a) provides that a nursing facility must provide such specialized services even if a comprehensive care plan requires such services at a lesser intensity than the continuous, aggressive, consistent treatment that meets the PASRR Active Treatment standard.

document any referrals to local contact agencies or other entities for this purpose and update the comprehensive care plan and discharge plan in response to information received from such referrals. If discharge to the community is determined to not be feasible at any point, the facility must document who made the determination and why. All relevant resident information must be incorporated into the discharge plan to facilitate its implementation and to avoid unnecessary delays in the resident's discharge or transfer. 42 C.F.R. § 483.21(c)(1).

2. Non-delegable duties of the State

0049. In addition to imposing requirements on long term care facilities, the NHRA and implementing regulations impose non-delegable duties on the states. *See* 42 U.S.C. § 1396r(e)(7); 42 C.F.R. § 483.100 ("The requirements of §§ 483.100 through 483.138 govern[ ] the State's responsibility for preadmission screening and annual resident review [ ] of individuals with . . . intellectual disability"); *see generally* 42 C.F.R. part 483, subpart C. These non-delegable responsibilities were intended to provide additional needed protection for persons with intellectual or developmental disabilities. These are referred to as the PASRR requirements on preadmission screening, resident review, and specialized services.[13] These mandates must be satisfied by the State and "ultimate control and responsibility" for compliance is non-delegable. 42 U.S.C. § 1396r(e)(7); 42 U.S.C. § 1396r(b)(3)(F)(ii); 42 C.F.R. § 483.106(d)(2),(e)(1)(i),(2); 42 C.F.R. § 483.104 ("[a]s a condition of approval of the State plan, the State must operate a preadmission screening and annual resident review program that meets [these] requirements.").[14] These mandates on the states are in

---

[13]The PASRR requirements apply to the screening or reviewing of all individuals with intellectual or developmental disability who apply to *or* reside in Medicaid certified nursing facilities. 42 C.F.R. § 483.102(a) (emphasis added). Thus, a person with such disabilities who is not currently a nursing facility resident but might enter a facility are also afforded these legal protections, including preadmission screening.

[14]The State has ultimate "responsibility for both the evaluation and determination functions for individuals with [IDD]". Even if the State authorities delegate by subcontract or otherwise the evaluation and determination functions, the State retains "ultimate control and responsibility for the performance of their statutory obligations." 42 C.F.R. § 483.106(e)(1)(i),(2).

addition to – not in lieu of – the mandates which apply generally to the treatment and care of all nursing facility residents.

a.    <u>Preadmission Screening</u>: A nursing facility must not admit any new resident who has intellectual or developmental disabilities unless the State intellectual disability authority has first reviewed and determined *prior to admission* that (1) because of the individual's physical and mental condition, the individual requires the level of services provided by a nursing facility; *and*, if the individual requires nursing facility services, (2) whether the individual *also* requires specialized services for intellectual disability. 42 U.S.C. § 1396r(b)(3)(F)(ii); 42 C.F.R. § 483.106(a); 42 C.F.R. § 483.112(a),(b).[15] The State may not waive the special services determination – both determinations must be reached in the preadmission screening process. *See* 42 C.F.R. § 483.112(b); 42 C.F.R. § 483.130(i). State authorities *may not delegate* these responsibilities to a nursing facility. 42 U.S.C. § 1396r(b)(3)(F)(ii); 42 C.F.R. § 483.106(d)(2),(e)(iii). The State has ultimate responsibility for both the evaluation and determination functions, which must be based on a consistent analysis of the data. 42 C.F.R. § 483.106(e)(1)(i),(ii).

i.    The preadmission screening determination must be confirmed in writing within 7 to 9 working days of the evaluation. 42 C.F.R. § 483.112(c). If the State determines that an applicant for admission to a nursing facility does not require nursing facility services, the applicant cannot be admitted and nursing facility services will not be covered by Medicaid. 42 C.F.R. § 483.118(a); 42 C.F.R. § 483.126.

ii.    The preadmission screening requirement does not apply to the admission to a nursing

---

[15]This preadmission screening process begins with identification of individuals who are suspected of having intellectual or developmental disabilities (level I) and then proceeds to the evaluation and determination as to whether the individual requires the level of services provided by a nursing facility *and* whether the individual also requires specialized services for intellectual disability (level II). 42 C.F.R. § 483.128(a).

facility of an individual who is admitted to the facility direct from a hospital after receiving acute inpatient care at the hospital; requires nursing facility services for the condition for which the individual received care in the hospital; and whose attending physician has certified, before admission to the facility, that the individual is likely to require *less than 30 days* of nursing facility services. 42 U.S.C. § 1396r(e)(7)(A)(iii); 42 C.F.R. § 483.106(b)(2).

      iii.      The preadmission screening mandate has been in effect since January 1, 1989. 42 U.S.C. § 1396r(e)(7)(A)(i); 42 C.F.R § 483.106(a)(1). The states were given a window, until April 1, 1990, to comply with mandated PASARR program requirements for individuals with IDD who were already nursing facility residents when PASARR went into effect. 42 C.F.R. § 483.106(a)(2),(3). The State may not be relieved of the responsibility to have a preadmission screening program. 42 U.S.C. §1396r(e)(7)(A)(i).

      b.      <u>Resident Review</u>: After preadmission screening, if admitted to a nursing facility, the State is required to perform resident reviews for individuals with intellectual or developmental disabilities. 42 U.S.C. §1396r(e)(7)(B)(ii). For each resident of a nursing facility who has intellectual or developmental disabilities, the State authority must review and determine whether or not the resident, because of the resident's physical and mental condition, requires the level of services provided by a nursing facility or requires the level of services of an intermediate care facility; *and* whether or not the resident requires specialized services for intellectual disability. 42 U.S.C. § 1396r(e)(7)(B)(ii); 42 C.F.R. § 483.114(b). If there is a significant change in the resident's physical or mental condition, the State must conduct another review "promptly." 42 U.S.C. § 1396r(e)(7)(B)(iii). Again, the State *may not delegate* its responsibilities to conduct these reviews to a nursing facility. 42 U.S.C. § 1396r(e)(7)(B)(iv).

      i.      <u>PASRR evaluation criteria</u>: Evaluations must be adapted to an individual's culture, language, and ethnic origin and there must be (1) participation by the individual and legal

representative and family; (2) interdisciplinary coordination between evaluators; and (3) a comprehensive analysis of all data concerning the individual, including preexisting data, as long as the data is valid, accurate, and reflects the current functional status of the individual. The findings in the evaluation must correspond to the person's current functional status, as documented, and must be issued in the form of a written evaluative report. 42 C.F.R. § 483.128(a)-(h). The written evaluative report must identify the evaluators; provide a summary of medical and social history, including the positive traits or developmental strengths and weaknesses or developmental needs of the individual; identify the nursing facility services required to meet the individual's needs; if specialized services are not recommended, identify any specific intellectual disability services which are of a lesser intensity than specialized services that are required to meet the individual's needs; if specialized services are recommended, identify the specific intellectual disability services required to meet the evaluated individual's needs; and the bases for the report's conclusions. 42 C.F.R. § 483.128(i).

ii.    The State must follow certain criteria in making any determination as to whether nursing facility level of services and specialized services are needed and it must be based on an evaluation of data concerning the individual. 42 C.F.R. § 483.130(a); 42 C.F.R. § 483.136. A determination that specialized services are needed, or not needed, cannot be waived and it must be based on extensive individualized evaluations. 42 C.F.R. § 483.130(f )-(i).

iii.    For each applicant or resident who has intellectual or developmental disabilities, the evaluator must assess the individual's total needs and whether those needs can be met in a community setting (i.e., a less restrictive environment) or, if appropriate and desired, in a nursing facility. However, the nursing facility must be able to meet the individual's needs. 42 C.F.R. § 483.132(a). Placement of an individual with IDD in a nursing facility may be considered appropriate only when the individual's needs are such that he or she meets the minimum standards for admission

and the individual's needs for treatment do not exceed the level of services which can be delivered in the nursing facility to which the individual is admitted – either through nursing facility services alone or, where necessary, through nursing facility services supplemented by specialized services provided by or arranged for by the State. 42 C.F.R. § 483.126.

iv.    To evaluate and determine whether an individual with intellectual or developmental disabilities requires a *continuous specialized services program analogous to Active Treatment*, the evaluator(s) must review the individual's comprehensive history and physical examination and assess, at a minimum: the individual's medical problems; the level of impact these problems have on the individual's independent functioning; all medications and response thereto; ability to self-monitor health status, scheduling of medical treatment, and nutritional status; self-help development such as toileting, dressing, grooming, and eating; sensorimotor development, such as ambulation, positioning, transfer skills, gross motor dexterity, visual motor perception, fine motor dexterity, eye-hand coordination, and extent to which prosthetic, orthotic, corrective or mechanical supportive devices can improve the individual's functional capacity; speech and language (communication) development, such as expressive language (verbal and nonverbal), extent to which non-oral communications systems can improve the individual's functional capacity, auditory functioning, and extent to which amplification devices or a program of amplification can improve the individual's functional capacity; social development, such as interpersonal skills, recreation-leisure skills, and relationships with others; academic/educational development, including functional learning skills; independent living development, such as meal preparation budgeting and personal finances, survival skills, mobility skills, laundry, housekeeping, shopping, bedmaking, care of clothing, and orientation skills; academic and vocational development; affective development such as interests, and skills involved with expressing emotions, making judgments, and making independent decisions; and the presence of identifiable maladaptive or inappropriate behaviors of the individual based on systematic

observation. 42 C.F.R. § 483.136(a)-(b). Based on this information, the State authority must validate that the individual has intellectual or developmental disabilities and must determine whether specialized services are needed. In making this determination, the State authority must make a "qualitative judgment" on whether the individual needs "trained [intellectual disability] personnel . . . to teach the person functional skills." 42 C.F.R. § 483.136(c).

    v.    States have been mandated to perform initial and (at least) annual PASRR reviews since April 1, 1990. 42 C.F.R. § 483.106(a)(2),(3); 42 C.F.R. § 483.114(b)-(d).

    c.    <u>Response to Resident Review/Specialized Services and Discharge</u>: Pursuant to 42 U.S.C. § 1396r(e)(7)(C), after preadmission screening and every resident review, the State must respond appropriately, as follows:

    i.    If the State determines that a resident or applicant for admission to a nursing facility does require a nursing facility level of services, the nursing facility may then admit or retain the individual. 42 C.F.R. § 483.116(a); 42 C.F.R. § 483.130(m)(1),(3).

    ii.    If the State determines that a resident or applicant for admission requires both a nursing facility level of services *and* specialized services, the nursing facility may admit or retain the individual *and* the State *must provide* or arrange for the provision of specialized services needed by the individual while he or she resides in the nursing facility. 42 C.F.R. § 483.116(b); 42 C.F.R. § 483.130(m)(1).

    iii.    If the State determines that an applicant or resident requires neither the level of services provided by a nursing facility nor specialized services, regardless of the length of stay in the facility, the State must arrange for the safe and orderly discharge of the resident and prepare and orient the resident for discharge. 42 C.F.R. § 483.118(b); 42 C.F.R. § 483.130(m)(2),(6).

    iv.    If a resident does not require the level of services provided by a nursing facility but

31

does require *specialized services* for intellectual or developmental disabilities as defined in 42 C.F.R. § 483.120, and has continuously resided in a nursing facility for at least 30 months before the date of determination, the State must, in consultation with the resident's family or legal representative and care givers – (1) inform the resident of the institutional and noninstitutional alternatives covered under the State plan for the resident; (2) offer the resident the choice of remaining in the facility or of receiving covered services in an alternative appropriate setting; (3) clarify the effect on eligibility for services under the State plan if the resident chooses to leave the facility; *and* (4) *regardless of the resident's choice, provide for (or arrange for the provision of) specialized services.* 42 U.S.C. § 1396r(e)(7)(C)(i); 42 C.F.R. § 483.118(c)(1); 42 C.F.R. § 483.130(m)(4) ("*Whereever the resident chooses to reside, the State must meet his or her specialized services needs*").

v.   If the resident does not require the level of services provided by a nursing facility, but does require specialized services as defined in 42 C.F.R. § 483.120, and he/she has not continuously resided in a nursing facility for at least 30 months before the date of the determination, the State must, in consultation with the resident's family or legal representative and care givers – (1) arrange for the safe and orderly discharge of the resident from the facility; (2) prepare and orient the resident for such discharge; *and* (3) *provide for (or arrange for the provision of) specialized services.* 42 U.S.C. § 1396r(e)(7)(C)(ii); 42 C.F.R. § 483.118(c)(2); 42 C.F.R. §483.130(m)(5) (the individual "*must be discharged . . . to an appropriate setting where the State must provide specialized services*").

d.   The provision of specialized services: If a determination is made to admit or allow to remain in a nursing facility any individual who requires specialized services, the determination

must be supported by assurances that the specialized services that are needed can and will be provided or arranged for by the State while the individual resides in the nursing facility. 42 C.F.R. § 483.130(n).

i.     The State must provide or arrange for the provision of specialized services to all nursing facility residents with intellectual or developmental disabilities whose needs are such that *continuous supervision, treatment, and training* by qualified intellectual disability personnel is necessary, as identified by the screening and review process. 42 C.F.R. § 483.120(b).

ii.     Pursuant to 42 U.S.C. § 1396r(e)(7)(G)(iii), "[t]he term 'specialized services' has the meaning given such term by the Secretary in regulations, but does not include, in the case of a resident of a nursing facility, services within the scope of services which the [nursing] facility must provide or arrange for its residents under [42 U.S.C. § 1396r(b)(4)(A)]." In other words, specialized services does *not* mean nursing facility services.

iii.     The Secretary has defined "specialized services" to mean "the services specified by the State which, combined with services provided by the NF or other service providers*, results in treatment which meets the requirements of § 483.440(a)(1).*" 42 C.F.R. § 483.120(a)(2) (emphasis added); *see also* 42 C.F.R. § 483.136(a)-(b) (data used to determine whether an individual with intellectual disability requires specialized services, i.e. "a continuous specialized services program, which is analogous to active treatment"). Because the meaning given by the Secretary incorporates § 483.440(a)(1), *an Active Treatment program is required*. See 42 C.F.R. § 483.440(a)(1).

iv.     42 C.F.R. § 483.440(a), the Active Treatment standard, expressly provides:

(1) Each client must receive a continuous active treatment *program*, which includes aggressive, consistent implementation of a *program* of specialized and generic training, treatment, health services and related services . . . that is directed toward – (i) the acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and (ii) the prevention or deceleration of regression or loss of current optimal functional status.

42 C.F.R. § 483.440(a) (emphasis added).

    v.    The continuous active treatment *program* must be provided through an individual *program plan* (IPP or ISP) developed by an interdisciplinary team that represents the professions, disciplines or service areas relevant to identifying the client's needs, as described by the comprehensive functional assessments, and designing programs that meet those needs. 42 C.F.R. § 483.440(c).

    The comprehensive functional assessment must take into consideration the client's age and the implications for active treatment at each stage, and must –

    (i)    identify the presenting problems and disabilities and where possible, their causes;

    (ii)    identify the client's specific developmental strengths;

    (iii)    identify the client's specific developmental and behavioral management needs;

    (iv)    identify the client's need for services without regard to the actual availability of the services needed; and

    (v)    include physical development and health, nutritional status, sensorimotor development, affective development, speech and language development and auditory functioning, cognitive development, social development, adaptive behaviors or independent living skills necessary for the client to be able to function in the community, and as applicable, vocational skills.

42 C.F.R. § 483.440(c)(3).

    The interdisciplinary team (IDT) must prepare for each client an individual *program plan* that states the specific objectives necessary to meet the client's needs, as identified by the comprehensive assessment, and the planned sequence for dealing with those objectives. These objectives must –

    (i)    be stated separately, in terms of a single behavioral outcome;

    (ii)    be assigned projected completion dates;

    (iii)    be expressed in behavioral terms that provide measurable indices of performance;

      (iv)     be organized to reflect a developmental progression appropriate to the individual; and

      (v)     be assigned priorities.

42 C.F.R. § 483.440(c)(4).

Each written training *program* designed to implement the objective in the IPP must specify:

      (i)     the methods to be used;

      (ii)     the schedule for use of the method;

      (iii)     the person responsible for the program;

      (iv)     the type of data and frequency of data collection necessary to be able to assess progress toward the desired objectives;

      (v)     the inappropriate client behaviors(s), if applicable; and

      (vi)     provision for the appropriate expression of behavior and the replacement of inappropriate behavior, if applicable, with behavior that is adaptive or appropriate.

42 C.F.R. § 483.440(c)(5).

The individual *program plan* must also:

      (i)     describe the relevant interventions to support the individual toward independence;

      (ii)     identify the location where program strategy information (which must be accessible to any person responsible for implementation) can be found;

      (iii)     include, for those clients who lack them, training in personal skills essential for privacy and independence (including, but not limited to, toilet training, personal hygiene, dental hygiene, self-feeding, bathing, dressing, grooming, and communication of basic needs), until it has been demonstrated that the client is developmentally incapable of acquiring them;

      (iv)     identify mechanical supports, if needed, to achieve proper body position, balance, or alignment – the plan must specify the reason for each support, the situations in which each is to be applied, and a schedule for the use of each support;

      (v)     provide that clients who have multiple disabling conditions spend a major portion of each waking day out of bed and outside the bedroom area, moving about by various methods and devices whenever possible; and

> (vi)    include opportunities for client choice and self-management.

42 C.F.R. § 483.400(c)(6).

"As soon as the interdisciplinary team has formulated a client's IPP, each client must receive a *continuous active treatment program* consisting of needed interventions and services in sufficient number and frequency to support the achievement of the objectives identified in the [IPP]." 42 C.F.R. § 483.440(d)(1) (emphasis added). "The facility must develop an active treatment schedule that outlines the current active treatment program and that is readily available for review by relevant staff."  42 C.F.R. § 483.440(d)(2).

The IPP must be reviewed at least by qualified intellectual disability professional(s) and revised as necessary when the client –

> (i)    has successfully completed an objective;
>
> (ii)    is regressing or losing skills already gained;
>
> (iii)    is failing to progress toward identified objectives after reasonable efforts have been made; or
>
> (iv)    is being considered for training towards new objectives.

42 C.F.R. § 483.440(f).

At least annually, the comprehensive functional assessment of each client must be reviewed by the interdisciplinary team for relevancy and updated as needed, and the IPP must be revised, as appropriate, repeating the process. *Id.*[16]

---

[16] *See* PI Tr. 73:7-9; 79:19-82:8; 84:25-85:10 (N. Weston) (describing the Active Treatment standard, purpose, and process for carrying it out).

D.    Transition back into the community

0049a. The PASRR process, which includes the provision of specialized services that meet the Active Treatment standard, is an integral part of successful integration back into the community. Without it, transition from a nursing facility back to the community is difficult and sometimes impossible for individuals with intellectual or developmental disabilities. Because the State retains ultimate responsibility for this process, the ability of individuals with intellectual or developmental disabilities to transition back into the community is dependent upon the State's utilization of PASRR practices and procedures.

III.

Texas lacked a working PASRR program for decades[17]

0050.   Federal PASRR requirements for the long term care of persons with intellectual or developmental disabilities have been in effect since the late 1980s.[18] Twenty years later, Texas did not have a compliant PASRR program in place.

0051.   In January 2007, the HHS Office of Inspector General (OIG) notified the State of Texas that its PASRR system did not comply with Federal PASRR requirements. The OIG reported multiple PASRR compliance deficiencies that needed to be addressed to ensure that individuals with IDD are appropriately placed and receive necessary intellectual disability services. PPI X 998 at 6, 12.

0052.   In December 2009, the United States Centers for Medicare & Medicaid Services (CMS) notified the State of Texas that it was still failing to comply with Federal PASRR requirements and

---

[17]Plaintiffs' and United States' trial exhibits are cited as "PPI X" and Defendants' trial exhibits are cited as "DX." References to page numbers correspond to the exhibit's PDF page number, if submitted electronically; otherwise, the referenced page number corresponds to the paper copy of the exhibit.

[18]42 U.S.C. § 1396r(e)(7)(A)(i) ("Effective January 1, 1989, the State must have in effect a preadmission screening program . . .").

gave specific guidance on steps Texas could take toward compliance. PPI X 188.

0053.   This lawsuit was filed in December 2010. Docket no. 1.

0054.   In May 2011, HHSC responded in writing to CMS concerns, outlining a proposed redesign of the PASRR system. PPI X 189 (Letter from HHSC Associate Commissioner for Medicaid and CHIP to CMS Associate Regional Administrator dated May 25, 2011) (attached to email from Geri Willems, Oct. 7, 2014)).

0055.   Texas did not begin implementation of its PASRR "redesign" until May 2013. *See* PPI X 191, 496, 328-330, 361; Turner 30(b)(6) Dep. 24:8-25:18, Feb. 21, 2018.

0056.   There was a stay of this lawsuit from September 2011 through July 2012; a suspension of the proceedings in August 2012; another stay in September 2012; and an extended stay from August 2013 through October 2015.

0057.   In August 2013, after three postponements of hearings on preliminary injunctive relief, the parties entered into an Interim Settlement Agreement. Pursuant to the parties' agreement, and at their request, the Court stayed these proceedings for two years to allow the State time to implement measures to address the disputed issues herein. Docket nos. 177, 179-180, 188-189. The implementation of the parties' interim agreement coincided with the State's first proposals for substantive PASRR rules in Texas. *See* 38 Tex. Reg. 1063, 1128-1137 (proposed Feb. 22, 2013); *see also* 38 Tex. Reg. 2921, 3060-3067 (filed May 17, 2013).

0058.   Defendants' characterization of this implementation process as the State's PASRR "redesign" is a generous description because a redesign implies that a working program previously existed. The State was not utilizing a working PASRR program until initial steps were taken in 2013 – three years after the inception of this lawsuit. When the State began its PASRR implementation, it did not even

know which individuals in nursing facilities had intellectual and developmental disabilities.[19] Many of those identified in this implementation process had been residing in nursing facilities for many years without ever undergoing a PASRR evaluation by the State. These newly identified individuals – 3,859 of them – could not have been receiving PASRR services to which they were entitled under federal law because there was no discernible process in place. In fact, the State did not begin to utilize PASRR specialized services until 2015 – five years after this lawsuit was initiated and 26 years after the mandates were imposed on the states.[20]

0059.    In June 2015, after small signs of progress but prior to the expiration of the parties' interim agreement, Texas moved to vacate the agreement. Docket no. 199. Defense counsel informed the Court that Texas was unwilling to "memorialize the programmatic changes" or "enter into a settlement agreement entered as an order of this court." Docket no. 210, pp. 16-17.[21] At approximately the same time, Texas adopted its first PASRR regulations. *See* 40 Tex. Reg. 1923, 1947-1958 (proposed April 3, 2015); 40 Tex. Reg. 4263, 4365-4378 (adopted July 3, 2015); *see also* 40 Tex. Reg. 4489, 4543-4555 (proposed July 17, 2015); 40 Tex. Admin. Code §§ 19.2701-19.2756 (2015); 40 Tex. Admin. Code §§ 17.101-17.503 (2015), *repealed and replaced by* 26 Tex. Admin. Code §§ 303.101-303.801 (2019), *amended by* 26 Tex. Admin. Code §§ 303.101-303.913 (2021).

---

[19]*See* PI Tr. 29:4-14, June 15, 2017 (OAG explained, on the record, that "in May of 2013 the State of Texas rolled out its PASRR redesign . . . [this] required Texas to ascertain . . . whether any of the 60,000 individuals living in nursing facilities at the time had indications in their medical records of IDD . . . [by] August of 2014 defendants had determined that 3,859 people with IDD lived in nursing facilities").

[20]*See* PI Tr. 40:13-18, June 15, 2017 (OAG explained, on the record, that "there was an expanded service array in 2015. So the State actually added specialized services . . . it was just new. So it just took folks time to get used to those").

[21]Defense counsel later argued, at the PI hearing, that "even though the State felt like they had done a really good thing by adding these specialized services, it looked – we got – were concerned that we got dinged, and it made us actually look bad in that report." PI Tr. 40:19-22. However, specialized services have been mandated under federal law for decades, so the State's "really good thing" was only the first of many steps toward compliance.

Generally, the state PASRR regulations adopted during the pendency of this lawsuit delegate certain responsibilities to LIDDAs and specified coordinators, while federal PASRR laws and regulations impose broader mandates on the states.

0060.    The litigation resumed in late 2015 after Texas' withdrawal from the interim agreement and an unsuccessful mediation with a court-appointed special master. In 2016, the class was certified and dispositive motions were addressed. Docket nos. 286-287.[22] In March 2017, the Court issued a new scheduling order and provided guidance on disclosures and discovery. Docket nos. 310-311. Due to the ever-changing circumstances in this lengthy litigation and to ensure orderly trial management, the Court also imposed a fact cut off date of September 1, 2017. Docket nos. 310, 617.[23]

0061.    In April 2017, Plaintiffs again moved for preliminary injunctive relief, asserting that interim progress had been lost and there was a clear regression in the State's efforts to comply with federal mandates, resulting in injury to the class members. Docket no. 317. Preliminary injunctive relief requires imminent harm, so the Court instructed the parties to focus their preliminary injunction evidence on systemic deficiencies from 2015 to the date of the hearing. Docket no. 339. The Court held a preliminary injunction hearing in June 2017 and took the matter under advisement.

0062.    The Court had not ruled on preliminary injunctive relief as the trial date approached and decided to carry the motion to trial on the merits. Docket no. 534; *see* PI Tr. 34:14-17 (Defense counsel urged the Court "not rule on this issue until afer we've had an opportunity to present the case at a full trial on the merits"). A three week non-jury trial was held in October 2018. Pursuant to Fed. R. Civ. P. 65(a)(2), and to the extent cited herein, the Court has considered evidence presented at the

---

[22]*See also* docket no. 534.

[23]During this litigation the State continued changing its systems, procedures, processes, and practices; the health and welfare of the named plaintiffs continued to change and notices of death were filed; the named governor changed once; the named commissioner changed seven times; and state agencies that handled programs and services for the IDD population in years past were dissolved. *See* docket nos. 310, 617 (explaining why a fact cut off was imposed).

preliminary injunction hearing as part of the trial record. However, the evidence presented at the three day preliminary injunction hearing was far more limited in scope than the evidence presented during the three week trial. The evidence presented at the preliminary injunction hearing related only to PASRR deficiencies from 2015 to mid 2017. The evidence at trial on the merits relates to alleged violations of the ADA, Section 504, the Medicaid Act, the NHRA, and related federal regulations over the course of many years. In determining the merits, the Court has considered facts prior to 2015 because, unlike temporary injunctive relief, the scope of inquiry at trial on the merits is much broader than the question of whether imminent harm is occurring. On the other hand, the Court has not considered facts after September 1, 2017, the fact cut off, for purposes of determining liability. *See* docket nos. 311, 364, 377, 551, 598-99, 604, 607, 611, 617.[24]

IV.

The administration of IDD care in Texas[25]

A.    Texas HHSC

0063.    Texas participates in the federal Medicaid program. Texas receives federal funding that it uses to fund a portion of its Medicaid program. Docket no. 517. Texas HHSC is the State agency responsible for providing benefits and services to Texans with IDD. *See* PPI X 8, 177.

0064.    Texas HHSC is responsible for ensuring that individuals with IDD receive services in the

---

[24]Although Defendants challenged the fact cut off on day 16 of trial – one year and seven months after it was imposed – the Court has not and will not set aside the fact cut off for purposes of determining liability. *See* docket no. 617. The fact cut off was imposed on all parties long before the close of discovery and the beginning of trial, and trial/post trial efforts to offer facts arising after the cut off date is a clear violation of the Court's numerous orders.

[25]Unless stated otherwise, all statements in the present tense are as of September 1, 2017, the fact cutoff. As previously ordered, the Court has not considered exhibits that relate to facts after September 1, 2017. Before witnesses testified at deposition or trial, they were instructed to limit their testimony to facts on or before September 1, 2017.

most integrated setting consistent with their choice. Jalomo 30(b)(6) Dep. 66:9-24, Nov. 2, 2017.[26]

0065.  Texas HHSC is also responsible for ensuring that individuals with IDD in nursing facilities receive specialized services needed to maintain their level of functioning and increase their independence. Jalomo 30(b)(6) Dep. 66:25-67:4, Nov. 2, 2017.[27]

B.    LIDDAs

0066.   Texas HHSC regulates, oversees, and funds 39 Local Intellectual Developmental Disability Authorities (LIDDAs), which are statutorily created, quasi-public entities. Webster testimony, Tr. 1206:5-9; Jalomo 30(b)(6) Dep. 28:4-30:16, Nov. 2, 2017; Snyder Dep. 60:20-61:3, Nov. 16, 2017; Gaines Dep. 32:1-33:2, Feb. 27, 2018.[28]

0067.   Although the State retains ultimate authority and responsibility for its obligations under federal law, Texas HHSC has delegated to the LIDDAs the duty to provide services to individuals with IDD. *See* PPI X  1575 at 2 (FY18-19 LIDDA Performance Contract);[29] PPI X 410/1488 at 2 (FY16-17 LIDDA Performance Contract); Jalomo 30(b)(6) Dep. 28:4-17, Nov. 2, 2017; Southall 30(b)(6) Dep. 103:7-104:25, Oct. 4, 2017 (testifying that HHSC delegates certain functions to

---

[26]The Court heard 23 days of live testimony (PI and trial proceedings combined). Due to the length of this non-jury trial, and pursuant to Fed. R. Civ. P. 32, the Court notified the parties prior to trial that they could designate deposition testimony for the Court's consideration. *See* docket no. 590.

[27]Anthony Jalomo is Texas HHSC's Director of IDD services and PASRR services. Jalomo 30(b)(6) dep. 7:4-7, Nov. 2, 2017.

[28]Randall Webster has extensive experience in the IDD field and is one of Plaintiffs' experts. *See* Tr. 1194:12-1206:4. Jami Snyder is Texas HHSC's Associate Commissioner for Medicaid and CHIP Services. Snyder Dep. 18:13-20. Sonja Gaines is Texas HHSC's Associate Commissioner for Intellectual Developmental Disabilities and Behavioral Health Services. Gaines Dep. 9:5-9; 12:24-13:14.

[29]The FY 18-19 contract went into effect on September 1, 2017, the day of the fact cut off.

LIDDAs); *see also* PPI X 1762 at 6 (Webster Report);[30] PPI X 1578 at 21, 22, 55 (Sawyer Report).[31]

0068.  Under Texas rules, a LIDDA's designated role is to serve as "the single point of access to certain publicly funded services and supports for the residents within the LIDDA's local service area." 26 Tex. Admin. Code § 330.7. LIDDAs are responsible for ensuring the delivery of service coordination to certain individuals within their service area, including individuals in a nursing facility who are eligible for specialized services for an intellectual disability or related condition. *Id*.

0069.  The LIDDA Performance Contract is the contractual agreement between the State and the LIDDA, setting forth specific requirements of the LIDDA, including some performance measures and outcome targets. Remedies and sanctions to enforce compliance are included as a part of the contract. PPI X 410/1488 at 14-18 (FY16-17 LIDDA Performance Contract, Art. IV); PPI X 1575 at 126-132 (FY18-19 LIDDA Performance Contract, Attach. D, Art. III, "Remedies and Sanctions"); Jalomo 30(b)(6) Dep. 28:18-29:12, Nov. 2, 2017 (testifying that the Performance Contract is "one source of requirements that govern LIDDA practices"); *see also* PPI X 1578 at 53 (Sawyer Report).

0070.  LIDDAs must comply with the State's relevant regulations. *See* PPI X 410/1488 at 9 (FY16-17 LIDDA Performance Contract); PPI X 1575 at 134 (FY18-19 LIDDA Performance Contract).

0071.  LIDDAs are also tasked with implementing portions of the federally mandated Preadmission Screening and Resident Review (PASRR) requirements. PPI X 535 at 2-3 (February 2017 Amendment to FY 16-17 LIDDA Performance Contract, Attachment G); PPI X 1762 at 6 (Webster Report).

---

[30]The Court advised the parties that it would consider the contents of expert reports to the extent the expert testifies live and is subject to cross examination, the expert adopts the statements in the report under oath, and the statements therein are relevant and reliable.

[31]Kathy Sawyer, one of Plaintiffs' experts, has extensive experience in serving the IDD population, including but not limited to her experience as Commissioner of Alabama's mental health system. Tr. 2108:2 - 2114:11.

0072.   HHSC is responsible for ensuring that LIDDAs comply with Texas Administrative Code requirements. Jalomo 30(b)(6) Dep. 29:3-6, Nov. 2, 2017.

0073.   HHSC is responsible for ensuring that LIDDAs comply with the Performance Contract requirements. Jalomo 30(b)(6) Dep. 28:18-29:12, Nov. 2, 2017.

0074.   Texas HHSC remains responsible for ensuring that LIDDAs divert individuals with IDD from nursing facilities consistent with their choice and facilitate transitions consistent with individuals' choice. Gaines Dep. 38:7-21, 39:20-40:1, Feb. 27, 2018. HHSC also retains responsibility for ensuring compliance with PASRR regulations and the authorization and delivery of specialized services. Docket no. 317-3 at ¶ D (Weston PI Report); PPI X 1906 at 7-8 Weston Report).[32]

0075.   Federal regulations make clear that a state cannot delegate its statutory obligations or its ultimate responsibility to comply with the Nursing Home Reform Act to the LIDDAs. 42 C.F.R. § 483.106(e)(1)(i),(2) (the State "retain[s] ultimate control and responsibility for the performance of [its] statutory obligations").

C.    Medical and Social Services Division

0076.   Within HHSC, Medical and Social Services Division (MSS) is tasked with the responsibility of directing, overseeing, and monitoring LIDDA practices concerning individuals with IDD. Adams 30(b)(6) Dep. 20:17-30:5; 32:7-11, Mar. 12, 2018.[33]

0077.   MSS is also responsible for submitting the legislative funding or authorization request for Home and Community-based Services waiver slots. Adams 30(b)(6) Dep. 110:18-25, Mar. 12, 2018.

0078.   MSS is comprised of four departments: Intellectual and Developmental Disabilities and

---

[32]Nancy Weston has many years' experience with the Department of Developmental Services (DDS) in Massachusetts, including but not limited to her experience as Director of PASRR. *See* PPI X 1906 at 5-6.

[33]Christopher S. Adams III serves as Texas HHSC's Deputy Executive Commissioner for System Support Services. Adams 30(b)(6) Dep. 9:11-17, Mar. 12, 2018; PPI X 8.

Behavioral Health Services (IDD/BHS); Access and Eligibility Services; Medicaid and CHIP Services; and Health, Developmental, and Independence Services. PPI X 8; PPI X 469 at 14.

      1.     IDD Services and LIDDA Oversight

0079.  IDD/BHS directs, oversees, and monitors LIDDA practices. Adams 30(b)(6) Dep. 29:22-30:10, Mar. 12, 2018.

0080.  Ms. Sonja Gaines is the IDD/BHS Associate Commissioner. PPI X 8 (September 1, 2017 HHS organizational chart); Gaines Dep. 12:24-13:7, Feb. 27, 2018. Ms. Gaines reports to the MSS Deputy Executive Commissioner. PPI X 8; Gaines Dep. 20:18-25, Feb. 27, 2018.

0081.  As the State IDD Authority, IDD/BHS is responsible for compliance with all PASRR requirements. *See* 42 C.F.R. § 483.106(e)(1)(i),(2) (ultimate control and responsibility is nondelegable).

0082.  Within IDD/BHS is the IDD Services Unit, which Deputy Associate Commissioner Haley Turner oversees. Ms. Turner reports to IDD/BHS Associate Commissioner Gaines. PPI X 178; Gaines Dep. 17:14-18:24, 32:1-8, Feb. 27, 2018.

0083.  The IDD Services Unit is responsible for contracting, overseeing, and monitoring the LIDDAs. Gaines Dep. 32:1-17, Feb. 27, 2018. This includes the responsibility for ensuring that LIDDAs comply with their HHSC contracts and for implementing and enforcing sanctions or corrective action plans when LIDDAs do not comply with contract requirements. Gaines Dep. 32:1-33:2. Feb. 27, 2018; Southall testimony, Trial Tr. 2898:19-21 (testifying that if LIDDAs do not meet their obligations, the State can impose penalties).[34]

0084.  Mr. Anthony Jalomo is the Director of the IDD Services Unit and reports to Ms. Turner. PPI X 178 (HHSC organizational chart); PPI X 177 (HHSC IDD Services organizational chart); Jalomo

---

[34] Judy Southall is Manager of the Contract Accountability and Oversight (CAO) Unit. Trial Tr. 2814:5-12.

30(b)(6) Dep. 7:1-7, 26:11-27:4, Nov. 2, 2017.

0085.    Mr. Jalomo oversees the five IDD Services sub-units: Contract Accountability and Oversight (CAO), PASRR Services, LIDDA Training Services, Performance Contracts, and Local Procedure and Development and Support (LPDS). PPI X 177 (HHSC IDD Services organizational chart); PPI X 178 (HHSC organizational chart); Jalomo 30(b)(6) Dep. 7:1-7, 26:11-27:4, Nov. 2, 2017.

0086.    The Contract Accountability and Oversight (COA) Unit, managed by Ms. Southall, has primary responsibility for ensuring LIDDA compliance with the performance contract and law. Weston testimony, Trial Tr. 1433:17-23; Jalomo 30(b)(6) 44:11-44:22, Nov. 2, 2017; Reece testimony, Trial Tr. 2966:18-25.[35]

0087.    The Performance Contract Unit also manages the LIDDA contracts. In particular, its responsibilities include ensuring that LIDDAs timely provide all deliverables in the contract and can issue sanctions for noncompliance. Sawyer testimony, Trial Tr. 2332:8-11; Turner testimony, Trial Tr. 3719:18-3720:13.[36]

0088.    The PASRR Unit is managed by Geri Willems. Trial Tr. 2414:4-8; PPI X 177, 178. This unit is responsible for PASRR policy, rule projects related to PASRR, creating State Plan amendments that support the PASRR program, issuing information letters, authorizing nursing facility specialized services, training nursing facilities on forms for the Texas Medicaid Healthcare Partnership Long Term Care Portal, providing technical assistance to providers, and doing some quality monitoring of PASRR forms. Willems testimony, Trial Tr. 2414:10-2415:1; *see also* Jalomo 30(b)(6) Dep. 44:23-44:9, Nov. 2, 2017 (testifying that the PASRR Unit is responsible for monitoring the completion of PASRR evaluations).

0089.    The LPDS Unit is managed by Stacy Lindsey. PPI X 177, 178. This unit is responsible for

---

[35]Debbie Reece is a Program Specialist with CAO. Trial Tr. 2905:1-5.

[36]Lona Carter managed the Performance Contract Unit until September 1, 2017. PPI X 177, 178.

the procedures for releasing and requesting HCS and TxHmL waiver slot offers and managing the HCS and TxHmL interest lists. Cochran Dep. 36:13-37:1, 38:11-17, 51:3-52:3, 55:5-21, 81:12-82:4, Sept. 14, 2017.[37] LPDS also has a role in monitoring designated measures in the LIDDA Performance Contract regarding enrollment. Trial Tr. 1433:4-16, Oct. 22, 2018 (Weston); Cochran Dep. 43:13-44:12, 81:14-82:4, Sept. 14, 2017.

2.      The Medicaid and CHIP Services Department

0090.   Medicaid and CHIP Services is another department in the MSS Division. PPI X 8; PPI X 469 at 14. Ms. Jami Snyder was the Associate Commissioner of this department beginning in 2016 through September 1, 2017. PPI X 470; Snyder Dep. 18:13-20, 41:5-6, 44:5-11, Nov. 16, 2017. The department determines client eligibility, oversees provider and health plan contracts, and submits Medicaid State Plan amendments and waivers to the federal Centers for Medicare and Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS). Snyder Dep. 64:2-24, Nov. 16, 2017.

0091.   Medicaid and CHIP Services includes the Quality & Program Improvement Section (QPI), which Deputy Associate Commissioner Andy Vasquez oversees. PPI X 470.

0092.   A subsection of QPI is the Quality Monitoring Program. PPI X 470, 543. Ms. Michelle Dionne-Vahalik oversees the Quality Monitoring Program. PPI X 470; Dionne-Vahalik testimony, Trial Tr. 2522:16-18. Within Ms. Dionne-Vahalik's unit are the Quality Service Review (QSR), Quality Monitoring Program (QMP), and Program Development and Innovation. Dionne-Vahalik 30(b)(6) Dep. 10:8-10, 18:5-8, 21:10-24, Oct. 12, 2017; Weston testimony, Trial Tr. 1434:18-21.

0093.   QMP monitors nursing facilities regarding minimum standards and care practices. The program has a monitoring, not a compliance function. Dionne-Vahalik testimony, Trial Tr. 2508:24-

---

[37]Jennifer Cochran is Program Specialist VI for the LPDS Unit. Cochran Dep. 9:21-25, Sept. 14, 2017.

2509:12; Dionne-Vahalik 30(b)(6) Dep. 21:25-22:9, Oct. 12, 2017.

0094.   The Quality Service Review (QSR) Unit reviews data related to individuals who are determined under PASRR to have IDD or DD (PASRR-positive individuals) and may have received nursing facility services within the past year. Dionne-Vahalik 30(b)(6) Dep. 32:7-16, Oct. 12, 2017. Dr. Martha Diase is the director of the Quality Service Review Unit. Diase Dep. 12:11-23, Nov. 1, 2017.

D.    The Regulatory Services Division

0095.   Regulatory Services is another HHSC division. It includes the Long-Term Care Regulation Unit, formerly known as Consumer Rights and Services. PPI X9, at 2; Adams 30(b)(6) Dep. 41:15-22, 70:18-71:6, Mar. 12, 2018; Dionne-Vahalik Dep. 32:4-8, Dec. 19, 2017. Associate Commissioner Mary Henderson manages the Long-Term Care Regulation Unit. Adams 30(b)(6) Dep. 70:18-71:6, Mar. 12, 2018; Henderson Dep. 18:16-19:2, Nov. 14, 2017. The work has not changed since the unit transferred from DADS to HHSC. *See* PPI X 1040; Henderson Dep. 18:23-20:3, Nov. 14, 2017.

0096.   Long-Term Care Regulation has responsibility for the direction, oversight, and monitoring of nursing facilities in connection with individuals with IDD who reside there. Adams 30(b)(6) Dep. 70:18-24, Mar. 12, 2018. It has responsibility for developing and providing community living information. Adams Dep. 30(b)(6) 169:3-15, Mar. 12, 2018. The unit licenses, certifies, inspects, surveys, investigates, and enforces laws, rules, and regulations that govern long-term care facilities. Henderson Dep. 20:23-23:16, Nov. 14, 2017.

0097.   Also within the Regulatory Services Division is the Survey and Certification Enforcement Unit, which conducts enforcement reviews of long-term care providers. Mills Dep. 17:17-18:16, Oct. 19, 2017; Henderson Dep. 22:1-8, Nov. 14, 2007. Deborah Mills is the manager of the Survey and Certification Enforcement Unit. Mills Dep. 17:17- 18:3, October 19, 2017.

E.      The Transformation

0098.    Before its dissolution, the Texas Department of Aging and Disability Services (DADS) was the Texas agency responsible for providing community services, licensing and certifying long-term care, as well as long-term services and supports settings, including nursing facilities. PPI X 436 at 23-24, 26-27 (stating that the Legislature created DADS "[a]s the State's single long-term care agency" and that it contracts with LIDDAs and licenses and regulates long-term care facilities).[38]

0099.    During this litigation, the State's IDD system underwent a transformation in which DADS sections were transitioned to HHSC and DADS was abolished as an agency. The full transformation was complete on September 1, 2017. PPI X 436, Sunset Review/Report, at p. 8 (transfers DADS' functions to HHSC by September 1, 2017 and abolishes the agency); Sawyer testimony, Trial Tr. 2125:16-21; PPI X 1578 at 21 (Sawyer Report); Cochran Dep. 40:9-17, Sept. 14, 2017; Vasquez Dep. 180:13-19, Jan. 12, 2018.

0100.    Prior to the transformation, when DADS still existed, Mr. Jon Weizenbaum was the DADS Commissioner and had responsibilities related to the direction, oversight, and monitoring of LIDDA practices as they relate to individuals with IDD. PPI X 1040; Adams 30(b)(6) Dep. 50:20-25, 75:22-76:14, Mar. 12, 2018. As the Agency Commissioner, he would be responsible "for decisions related to program implementation, direction, [and] organizational structure." Adams 30(b)(6) Dep. 51:24-52:5, Mar. 12, 2018.

F.      The Home and Community-based Services Waiver

0101.    The HCS waiver is the primary vehicle for individuals with IDD to transition or divert from nursing facility placement. Trial Tr. 2131:10-14, Oct. 26, 2018 (Sawyer); Trial Tr. 4107:9-15, Nov.

---

[38]PPI X 436, Sunset Advisory Commission Review/Report (July 2015).

14, 2018 (Piccola);[39] Trial Tr. 2765:24-2767:14, Nov. 1, 2017 (Williamson) (testifying that the Texas' 2017 Promoting Independence Plan discusses no other waivers as vehicle(s) for diverting this population);[40] PPI X 1579 at 16 (Sawyer Report); PPI X 45 at 22; DX 1065 at 22 (Shea-Delaney Report) (describing the HCS waiver as the "primary vehicle for nursing facility transitions and diversions for people with IDD").[41]

0102.   The HCS waiver is a 1915(c) waiver program that provides services to people with a diagnosis of intellectual disability or a related condition. A 1915(c) waiver program provides a package of community-based services as an alternative to institutional care, funded under Medicaid pursuant to Section 1915 of the Social Security Act, 42 U.S.C. § 1396n. Services provided under the HCS waiver include adaptive aids, behavioral support, minor home modifications, therapies, nursing, residential assistance, respite, day habilitation, and supported employment. Trial Tr. 2132:11-16, Oct. 26, 2018 (Sawyer); Trial Tr. 1096:4-9, Oct. 19, 2018 (Preskey);[42] PPI X 446 at slide 3; PPI X 457 at 41-47;[43] PPI X 533 at 5; Trial Tr. 3326:1-17, Nov. 6, 2018 (Shea-Delaney); DX 1065 at 25 (Shea-Delaney Report); DX 712 at 40-46 (Texas Long-Term Services and Supports Waiver Programs, Aug. 14, 2017); DX 665 at 4.

0103.   The HCS waiver program "is the most comprehensive waiver in terms of the types of services that it avails to this population." Trial Tr. 2132:17-24, Oct. 26, 2018 (Sawyer).

---

[39]Kyle Piccola is chief government and community relations officer for ARC of Texas. Trial Tr. 4039:3-6.

[40]Dana Williamson is part of the Texas HHSC Medicaid and CHIP policy and program area and is responsible for the waiver programs. Trial Tr. 2707:12-2708:14.

[41]Eleanor Shea-Delaney is Defendants' expert. She worked in various agencies in Massachusetts state government and is now employed by a small firm that focuses on healthcare policy. Trial Tr. 3291:1-21.

[42]Theresa Preskey is a provider of home and community based services for persons with IDD in the Dallas/Ft. Worth area. Trial Tr. 1095:4-25.

[43]*See also* DX 712.

0104.   HHSC has noted that HCS, or Promoting Independence, waiver slots are cost-effective. PPI X 62 at 2-3 (HHSC Executive Commissioner Charles Smith Feb. 28, 2017 email); PPI X 529 at 4 (Haley Turner Mar. 1, 2017 email); Cook Dep. 225:22-226:19;[44] *see also* PPI X 2210 at 2 (Elizabeth Jones Mar. 17, 2017 email).

0105.   The HCS waiver provides a variety of residential options, including receiving services in the individual's own home, a group home, or a host home. Trial Tr. 1098:1-1099:23, Oct. 19, 2018 (T. Preskey); *see also* Trial Tr. 2069:10-14, 2071:21-2072:10, Oct. 25, 2018 (S. Rideout) (describing HCS residential services that community services provider, Reaching Maximum Independence, offers to individuals with IDD, including group homes and supported apartments);[45] PPI X 533 at 5 (HCS Waiver Slot Enrollment Plan for FY18-19).[46]

0106.   The State's expert Ms. Eleanor Shea-Delaney concluded that "[t]he residential options are key in [the HCS] waiver." DX 1065 at 23 (Shea-Delaney Report). If there is no viable residential option, the named plaintiffs and class members herein cannot divert or transition from a nursing facility.

0107.   Group homes are community-based homes that community providers rent or own. Up to four individuals with IDD can live in each house, and the individuals receive services and care from their provider. Trial Tr. 1098:7-12, Oct. 19, 2018 (Preskey); *see also* Trial Tr. 2076:25-2080:21, Oct. 25, 2018 (S. Rideout) (describing typical HCS group home provided through Reaching Maximum Independence).

0108.   Host homes are community-based settings where an individual with IDD lives in a home in

---

[44]David Cook is Deputy CFO at HHSC. Cook Dep. 17:8-19, Feb. 1, 2018.

[45]Sara Rideout is Director of Operations for a provider of home and community based services for persons with IDD in the San Antonio area. Trial Tr. 2069:10-2070:10.

[46]The FY 18-19 HCS enrollment plan was in existence on September 1, 2017, the day of the fact cut off.

a family environment. Community providers contract with individuals or families to provide care for individuals with IDD in their home, and individuals with IDD are integrated into the family and community. Trial Tr. 357:13-359:2, 366:2-13, 367:23-25, Oct.16, 2018 (Carrasco);[47] Trial Tr. 1098:23-1099:7, 1100:22-1101:7, Oct. 19, 2018 (Preskey) (testifying that individuals living in host homes often go to day habilitation or a competitive job in the community during the day, "[a]nd based on what the activities that their family has planned, that's what they do for the evening"); Trial Tr. 2073:24-2074:9, Oct. 25, 2018 (Rideout) (testifying that a host home is "more of a family-type situation. So even if that's not their family, they function as a family. So they live there, they go on vacations together, they take them to their doctors' appointments, they, you know, hang out and – you know, like a family unit.").

0109.   Individuals can also live in their own home or apartment and receive HCS services. Trial Tr. 1099:8-23, Oct. 19, 2018 (Preskey); Trial Tr. 2072:19-2073:6, Oct. 25, 2018 (Rideout) (describing people living in supported apartments and receiving HCS services through Reaching Maximum Independence).

0110.   HCS Diversion and Transition slots provide an opportunity for an individual to enroll in the HCS waiver program. Jalomo 30(b)(6) Dep. 205:1-7, 210:22-211:8, Nov. 2, 2017; Jalomo Dep. 87:23-88:23, Nov. 3, 2017. These are reserved slots that can be authorized and released for individuals who are determined under PASRR to have IDD and are at risk of entering a nursing facility or want to transition out of a nursing facility and back into the community. Trial Tr. 1453:13-1454:13, Oct. 22, 2018 (Weston); Trial Tr. 2131:7-2132:24, Oct. 26, 2018 (Sawyer); Trial Tr. 3426:20-3427:10, Nov. 6, 2018 (Belliveau) (explaining general process and requirements for a person with IDD to be eligible for a diversion slot); PPI X 585 at 5 (PASRR 101 for Nursing

---

[47]Darla Carrasco is Director of Consumer Services and host home provider of home and community based services for persons with IDD in the Lubbock area. Trial Tr. 356:14-21; 360:12.

Facilities) ("If an individual diagnosed with ID or DD elects community placement instead of NF placement, a waiver slot will be used to transition that individual into the community rather than admission into the NF"). "The very purpose of these [HSC] waivers [is] to prevent institutionalization." Trial Tr. 1453:24-1454:13, Oct. 22, 2018 (Weston).

0111.  Other 1915(c) waiver programs in the State have limitations, including a lack of residential services, restrictive eligibility criteria, low cost caps, or long waiting lists. *See* PPI X 1579 at 16-19 (Sawyer Rebuttal Report); *see also* PPI X 446 at slides 6-19 (describing eligibility, services, and cost caps for 1915(c) waiver programs); PPI X 457 at 2-11 (noting eligibility criteria and services provided in 1915(c) waivers); PPI X 445 at 2-11 (same).

0112.  For example, the TxHmL waiver, another 1915(c) waiver, is a "smaller program" in which individuals can receive "some services, not too many." Trial Tr. 1096:10-20, Oct. 19, 2018 (Preskey). There is a $17,000 yearly cost cap, and no residential services. *Id.*; PPI X 456 at 7-8. Additionally, TxHmL releases were discontinued in October 2015. PPI X 51 at 2.

0113.  Non-1915(c) waiver programs are also limited. They are not designed to serve people with IDD, do not provide residential services, or do not provide additional funding for transition. *See* PPI X 1579 at 19-22 (Sawyer Rebuttal Report); PPI X 457 at 2-11 (noting eligibility criteria and services provided in the STAR+PLUS program); PPI X 445 at 2-11 (same); PPI X 446-A at slides 27-32 (describing eligibility and services for non-1915(c) programs).

0114.  For example, Community First Choice (CFC) services include only personal assistance, habilitation, emergency response, and support management services. Trial Tr. 1096:23-1097:8, Oct. 19, 2018 (Preskey); PPI X 452 at 8. It does not provide residential services. PPI X 1579 at 19-20 (Sawyer Rebuttal Report).

0115.  Money Follows the Person (MFP), another non-1915(c) program, does not provide any additional waiver slots to transition people from institutional settings. Trial Tr. 2133:3-23, Oct. 26,

2018 (Sawyer); *see also* Trial Tr. 3362:19-24, Nov. 6, 2018 (Shea-Delaney) (acknowledging that MFP does not create any additional waiver slots).

0116.   Because of these limitations, only the HCS waiver can adequately support the needs of most people with IDD transitioning out of nursing facilities or diverting from admission. Trial Tr. 2133:24-2134:17, Oct. 26, 2018 (Sawyer); *see* PPI X 1579 at 22 (Sawyer Rebuttal Report).

V.

Statewide Quality Service Review [48]

A.   Purpose of the Quality Service Review

0117.   HHSC's Quality Service Review (QSR), implemented after this lawsuit was filed, is an evaluation of the services that individuals with IDD are receiving or have received in the past. Diase Dep. 13:2-8, Nov. 1, 2017; Dionne-Vahalik 30(b)(6) Dep. 32:7-16, 64:24-66:1, Oct. 12, 2017; Vasquez Dep. 156:2-9, Jan. 12, 2018.

0118.   The QSR's basic purpose is to evaluate the State's efforts to meet PASRR requirements and standards under the Americans with Disabilities Act (ADA) and to comply with the Steward Interim Settlement Agreement, which itself was designed to meet PASRR and ADA requirements. As Ms. Kathryn du Pree – the Expert Reviewer and then HHSC consultant who was jointly selected to conduct the QSR – explained, the QSR's central purpose was to measure compliance with PASRR and the ADA, as well as professional standards. Trial Tr. 103:18-24, Oct. 15, 2018 (du Pree); Trial Tr. 234:15-25, 236:7-20; 240:11-16, 242:2-3, 246:15-21, Oct. 16, 2018 (du Pree) (QSR outcomes reflect federal requirements); *see* Vasquez Dep. 156:2-9, Jan. 12, 2018; PPI X 116 at 2 (HHSC

---

[48]Defendants objected to the admissibility of a number of exhibits relied upon by the experts, including the State's own records. Unless noted otherwise, the exhibits are admissible under Fed. R. Evid. 703, 801(d)(2), 803(6),(8),(10), and 807. Defendants have not shown that their own records, the records of the local authorities and nursing facilities, and other records relied upon by the experts – which constitute the bulk of the evidence in this case – lack indicia of trustworthiness. *See* Fed. R. Evid. 703, 801(d)(2), 803(6),(8),(10), and 807.

memorandum describing QSR as a tool to "assess how well the state is complying with federal PASSR requirements"); PPI X 2060 at 2 (memo to LIDDA from Ms. Dionne-Vahalik stating that QSR is conducted to review "implementation of federal PASRR and ADA requirements"); D X 340-A at 11 (HHSC presentation to Texas Health Care Association stating that the "purpose of QSR" is to "[e]nsure that individuals with [IDD] are receiving the federally required [PASRR] screening and evaluation; services in the most integrated residential settings consistent with their choice; and if residing in a nursing facility, the services, including specialized services, needed to maintain their level of functioning and increase their independence"); Jordan 30(b)(6) Dep. 36:23-37:1, 37:13-22, Mar. 16, 2018 (former DADS Deputy Commissioner's understanding was that the QSR's purpose was to serve as an evaluative tool of the State's efforts to meet PASRR requirements, and a database (PIRM) was established for the information gathered in the review process).[49]

0119.  Each QSR component and standard reflects and is necessary to meet PASRR and ADA requirements. Trial Tr. 123:9-19, 124:2-18, 275:25-277:19, Oct. 16, 2018 (du Pree); PPI X 2040 at 5 (2014 letter on DADS letterhead describing QSR as review of implementation of federal requirements relating to PASRR and ADA); PPI X 2059 at 2 (August 2017 letter from K. du Pree on HHSC letterhead describing QSR as review of the State's implementation of federal requirements relating to PASRR and ADA).

0120.  The QSR is a reliable process and generates accurate findings concerning the State's compliance with PASRR, the ADA, and professional standards. Trial Tr. 257:14-17, Oct. 16, 2018 (du Pree). The State embraced the QSR and was committed to achieving the QSR's outcomes and outcome measures. PPI X 121 at 8 (2015 QSR Compliance Report discussing challenges from 2015 review).

---

[49]PIRM refers to PASRR Individual Review Matrix.

B.     The Expert Reviewer and HHSC consultant who developed and implemented the QSR

0121.   With the State's consent, Ms. du Pree was selected in 2013 as the Expert Reviewer. Trial Tr. 115:9-14, Oct. 15, 2018 (du Pree) ("I was jointly selected"); du Pree Dep. 17:25-18:2, Feb. 6, 2018.

0122.   Ms. du Pree has extensive experience developing, implementing, evaluating, and overseeing services for individuals with IDD as a state official for the IDD agencies in New York, Massachusetts, and Connecticut.  Trial Tr. 105:15-18; 106:18-107:1, 107:20-24; 108:9-109:14, Oct. 15, 2018 (du Pree). As an IDD professional and state official/employee with more than thirty years of experience, she is extensively familiar with federal requirements and nationally recognized professional standards on Active Treatment, informed choice, home and community-based waivers, and quality of service for the IDD population. Trial Tr. 112:23-115:8, Oct. 15, 2018 (du Pree); *see* Vasquez Dep. 215:3-20, Jan. 12, 2018 (HHSC Deputy Associate Commissioner of Quality & Program Improvement, Mr. Vasquez, agreed that Ms. du Pree is a subject matter expert on PASRR and that she is "very knowledgeable, knows her stuff and has been very helpful" to HHSC.).

0123.   During her tenure as Deputy Commissioner of the Department of Developmental Services in Connecticut, which served the IDD population in that state, Ms. du Pree ran a statewide Quality Service Review (QSR) to review Connecticut's regulatory system. Trial Tr. 108:12-109:14, Oct. 15, 2018 (du Pree). The same federal standards govern all states, including the states where she gained her experience. *See* Trial Tr. 111:24-112:6; 112:23-113:15; Oct. 15, 2018 (du Pree).

0124.  Ms. du Pree designed the Texas QSR process with State executive staff, Assistant Commissioner Eliza Garza, Deputy Commissioner Chris Adams, and the Director for the Center for Policy and Innovation. PPI X 214 at 2 (questionnaire completed by Deputy Commissioner Adams to prepare HHSC 30(b)(6) deponent Ms. Kristi Jordan for her deposition, stating that "[t]he QSR

instrument was designed by Kathryn du Pree with input from the parties to the Steward litigation").[50]

Dionne-Vahalik 30(b)(6) Dep. 79:22-80:20, 64:24-66:1, 69:22-25; 83:13-85:21, 105:23-106:11, Oct. 12, 2017 (K. du Pree incorporated feedback and guidance from the executive leadership on the methodology for the QSR). DADS senior managers, as well as HHSC legal representatives, the Attorney General's Office, and the Governor, all agreed to and endorsed the QSR outcomes, outcome measures, indicators, sampling methodology, and compliance standards.  Trial Tr. 122:2-8, 123:9-124:15, 126:11-16, 126:25-127:6, Oct. 15, 2018; Trial Tr. 281:7-282:6, Oct. 16, 2018 (du Pree); PPI X 101 (stating "DADS sent an introductory letter to the NF and HCS administrators to explain the QSR Pilot and sanction the review by the Independent Reviewers"); PPI X 220 (description of QSR pilot, including that results of pilot reviews would be shared with DADS to identify any gaps); *see* Jordan 30(b)(6) Dep. 46:4-48:1, 102:11-103:24, Mar.16, 2018 (testifying that DAS agreed to the pilot process; during and after the QSR pilot, DADS would have had opportunity to provide feedback and propose changes).

0125.   In 2015, after Ms. du Pree ended her role as the Interim Settlement Agreement's Expert Reviewer, DADS, and then HHSC, retained her as an independent consultant to continue to conduct the QSR in substantially the same form as she did previously, and as agreed to by the State. Trial Tr. 116:8-117:4, Oct. 15, 2018 (du Pree); du Pree Dep. 17:25-18:22, Feb. 6, 2018; Jordan 30(b)(6) Dep. 63:1-6, Mar. 16, 2018 (After the Interim Agreement expired, DADS continued the QSR process and continued to work with Ms. du Pree to implement the QSR.).

0126.   Ms. du Pree served as a consultant to DADS/HHSC pursuant to annual contracts that began in October 2015 and were renewed annually through at least September 1, 2017, the fact cut off. Trial Tr. 117:5-118:15, Oct. 15, 2018 (du Pree); PPI X 909, 910 (FY16-17 and FY17-18 contracts

---

[50] *See* Jordan 30(b)(6) Dep. 18:22-25, 23:17-20, 45:19-25, 46:4-48:1, Mar. 16, 2018 (adopting the statements of Deputy Commissioner Adams).

with Crosswinds Consulting). Pursuant to those consulting contracts with HHSC, Ms. du Pree was required to conduct the QSR on HHSC's behalf, to evaluate the State's compliance with PASRR and diversion, and to train State reviewers eventually to take over the QSR. Trial Tr. 117:12-118:4, 118:16-21, 119:10-11, Oct. 15, 2018 (du Pree); PPI X 909 at 3. As HHSC's consultant, she met regularly with HHSC officials, had the authority to certify State employees as qualified QSR reviewers, had access to HHSC databases, and maintained an email account on the HHSC server. Trial Tr. 117:12-120:24, 129:4-16, 130:7-131:9, Oct. 15, 2018 (du Pree); *see* PPI X 938 (email from Ms. du Pree to HHSC officials regarding the QSR Workgroup meeting agenda) *see also* PPI X 913 (power point presentation on QSR process and PIRM including du Pree contact information at DADS/HHSC for any questions/problems).

0127.   According to HHSC officials, the State decided to continue working on the QSR with Ms. du Pree because the State thought it was "headed in the right direction with what she was doing." Jordan 30(b)(6) Dep. 52:7-13, Mar. 16, 2018.

0128.   The QSR continued to use the same protocol instrument to which the State previously agreed. du Pree Dep. 20:9-21:9, 27:3-9, Feb. 6, 2018; Jordan 30(b)(6) Dep. 90:3-92:12, Mar. 16, 2018 (HHSC did not change the QSR protocol and methodology after the Interim Agreement ended). Ms. du Pree trained LIDDA staff, nursing facilities, and providers on the QSR process. *See* PPI X 913 (Power Point training that noted the QSR was designed to measure compliance with PASRR and the ADA and predicted "it will take between 2-6 years for the State to achieve Compliance across all of the Outcomes").

0129.   HHSC continued to use the same QSR outcomes and outcome measures after the Interim Settlement Agreement expired. Jordan 30(b)(6) Dep. 90:3-92:12, Mar. 16, 2018 (HHSC did not change the QSR protocol and scoring methodology after the Interim Settlement Agreement ended).

0130.   HHSC regularly sent a letter to nursing facilities, providers, and LIDDAs to notify them

about the QSR. The letter described the QSR's purpose as assessing implementation of federal requirements relating to PASRR and the ADA. Ms. du Pree drafted the letter, and HHSC approved it. Trial Tr. 155:21-156:18, Oct. 15, 2018 (du Pree); du Pree Dep. 93:23-94:23, Feb. 6, 2018; PPI X 117 (letter stating "[d]uring 2016, [QSRs] of the implementation of federal requirements relating to [PASRR] and the [ADA] will be conducted").

0131.   In addition, HHSC issued an Information Letter for all providers, nursing facilities, and LIDDAs regarding the QSR that stated that the QSR's purpose was to ensure that individuals with IDD were receiving: (1) federally required PASRR screening and evaluations; (2) services in the most integrated residential settings consistent with their choice; and (3) if residing in nursing facilities, the specialized services needed to maintain their level of functioning and increase their independence. Trial Tr. 158:20-159:1, Oct. 15, 2018 (du Pree); PPI X 539 (HHSC Information Letter No. 17-14, dated July 3, 2017 and signed by the Associated Commissioner of Regulatory Services, Deputy Associate Commissioner of IDD & BH Services, and Deputy Associate Commissioner of Quality and Program Improvement); du Pree Dep. 92:16-94:23, Feb. 6, 2018; Jalomo 30(b)(6) Dep. 65:19-66:17, Nov. 2, 2017; Turner Dep. 200:19-201:4, Feb. 23, 2018; Vasquez Dep. 156:2-23, Jan. 12, 2018.

C.     QSR standards for measuring performance: Outcomes, Outcome Measures, and Indicators

0132.   The QSR's client review component includes three levels of standards: outcomes, outcome measures, and indicators. These standards, as well as interpretative guidance to reviewers for making their professional judgments and findings, are set forth in the PASRR Individual Review Matrix (PIRM). PPI X 114 (2016 PIRM Report).

0133.   The parties developed the outcomes and included them in the Interim Settlement Agreement. Trial Tr. 121:19-23, Oct. 15, 2018 (du Pree). At no time while Ms. du Pree conducted the QSR as either the Expert Reviewer or HHSC's consultant did an outcome ever change or did HHSC ever

request to change an outcome. Trial Tr. 124:12-18, Oct. 15, 2018 (du Pree).

0134.    The QSR measures performance in six outcomes covering: 1) diversion, 2) nursing facility specialized services, 3) transition, 4) community services, 5) service coordination, and 6) service planning. PPI X 318 (2016 PASRR QSR Compliance Status Interim Report describing the QSR process, findings, and recommendations from Ms. du Pree for the QSR's client review portion); PPI X 121 (PASRR QSR 2015 Annual Report of Compliance, describing the process, findings, and recommendations for the QSR's client review and state data reports components).

0135.    Within each outcome are outcome measures, which are standards for determining that outcome's achievement. The outcome measures assessed the State's achievement of the outcomes and compliance with PASRR, the ADA, and professional standards. Trial Tr. 103:18-24, 115:18-116:7, 123:20-124:11, Oct. 15, 2018 (du Pree). The outcomes were never changed and the only instance when any outcome measure changed was when HHSC modified its definition of diversion. Trial Tr. 124:12-125:1, Oct. 15, 2018 (du Pree).

0136.    Ms. du Pree assisted the parties in developing the outcome measures. Trial Tr. 122:2-8, Oct. 15, 2018 (du Pree); Dionne-Vahalik 30(b)(6) Dep. 105:23-106:11, Oct. 12, 2017; du Pree Dep. 37:10-38:11, Feb. 6, 2018. The State, including representatives of the Governor, HHSC, and the Attorney General's Office, negotiated and agreed to the outcome measures. du Pree Dep. 37:10 -38:11, Feb. 6, 2018. The State assented to those outcome measures and has no further plans to change them. Dionne-Vahalik 30(b)(6) Dep. 122:11-24, Oct. 12, 2017; du Pree Dep. 41:4-6, Feb. 6, 2018. In Ms. du Pree's professional judgment, the outcomes and outcome measures are consistent with federal requirements and professional standards that govern services for individuals with IDD, including ADA and PASRR requirements, community waivers, and Active Treatment. Trial Tr. 123:9-124:11, Oct. 15, 2018 (du Pree); du Pree Dep. 40:14-42:6, 43:16-53:14, Feb. 6, 2018.

0137.    The QSR includes indicators used to assess compliance with the outcome measures. Trial

Tr. 125:15-19, Oct. 15, 2018 (du Pree); du Pree Dep. 35:8-22, 36:12-20, 112:4-20, 113:8-15, Feb. 6, 2018. HHSC officials agreed to all of the indicators, most of which were required by federal law. Trial Tr. 126:11-127:6, Oct. 15, 2018; 283:16-19, Oct. 16, 2018 (du Pree); du Pree Dep. 110:13-113:15, Feb. 6, 2018; Dionne-Vahalik 30(b)(6) Dep. 64:24-66:1, 69:22-25, 79:22-80:20, 84:14-85:21, 105:23-106:11, Oct. 12, 2017.

0138.    Ms. du Pree repeatedly informed HHSC officials that, based upon her experience with Active Treatment, PASRR, the ADA, and professional standards, she believed the QSR outcomes, outcome measures, and indicators were required by, consistent with, and appropriate for evaluating compliance with PASRR and the ADA. Trial Tr. 115:25-116:7, 123:17-124:11, 126:11-23, Oct. 15, 2018 (du Pree); Trial Tr. 234:15-25, 236:7-20, 240:11-12, 283:16-19, Oct. 16, 2018 (du Pree).

0139.    Ms. du Pree drafted interpretative guidance to assist the QSR reviewers in rating the indicators. The State did not object to any specific indicator or interpretive guideline once they were finalized. Trial Tr. 125:9-127:6, Oct. 15, 2018 (du Pree).

0140.    In developing the methodology for conducting the QSR, State executive leadership gave guidance to Ms. du Pree as to what they hoped to accomplish through the QSR. Ms. du Pree incorporated that guidance and feedback into the QSR methodology. Dionne-Vahalik 30(b)(6) Dep. 83:13-84:11, Oct. 12, 2017.

D.    The QSR Outcomes and Outcome Measures reflect federal requirements under PASRR and the Americans with Disabilities Act (ADA)

0141.    Ms. Elin Howe, former Commissioner of the New York and Massachusetts state IDD agencies, reviewed the QSR outcomes, outcome measures, and reports. Ms. Howe has extensive experience with IDD services, Active Treatment, nursing facilities, waiver programs, and transitioning individuals with IDD from facilities to the community. She served as a court expert in New Jersey, California, and Kentucky, and as a consultant to the states of Texas, Indiana, Iowa, New

Mexico, Tennessee, Utah, Washington, and Maryland. Trial Tr. 3904:18-3914:24, Nov. 13, 2018 (Howe); PPI X 976 at 5-6 (Howe Rebuttal Report).

0142.   In addition, Ms. Howe was a defendant in several federal lawsuits challenging the conditions of confinement of persons with IDD in public and private institutions, including nursing facilities. Trial Tr. 3904:18-3914:24, Nov. 13, 2018 (Howe); PPI X 976 at 5-6 (Howe Rebuttal Report). Most recently, she was one of the defendants and the senior state official responsible for complying with the federal court orders in *Rolland v. Patrick*, a case similar to this litigation that involved individuals with IDD in nursing facilities who were not provided specialized services, Active Treatment, and services in the most integrated setting. Trial Tr. 3914:22-3915:24, 3916:16-3917:14, Nov. 13, 2018 (Howe); PPI X 976 at 6-7 (Howe Rebuttal Report).

0143.   Ms. Howe's forty-five years of experience as a state employee/official, consultant, expert, court monitor, and IDD professional, and her work for IDD government agencies in over fifteen states provides the foundation for her opinions. She has administered, evaluated, and managed numerous institutions, including nursing facilities, which are required to provide Active Treatment under CMS rules. She relied upon this experience, as well as her knowledge of the federal PASRR and Active Treatment regulations, the ADA and Olmstead requirements, CMS guidance and evaluation instruments for Active Treatment and community integration, the standards of national IDD bodies like the American Association of Intellectual and Developmental Disabilities, and various court decisions and orders in forming her opinions in this case. Trial Tr. 3934:3-10, 3975:25-3976:7, 3978:4-13, 3993:24-3995:17, 4009:25-4010:22, Nov. 13, 2018 (Howe); PPI X at 6-7 (Howe Rebuttal Report).

0144.   Outcome 1 of the QSR deals with diversion and states, "Individuals in the target population will be appropriately identified, evaluated and diverted from admission to nursing facilities." PPI X 318 at 5 (2016 PASRR QSR Compliance Status Interim Report). Ms. Howe concluded that Outcome

1 is a basic standard for determining if the State has an effective and compliant program with PASRR. It also is the very first item that the PASRR evaluator must determine – whether the individual can live and be served in the community rather than a nursing facility. Trial Tr. 3934:14-3935:6, Nov. 13, 2018 (Howe).

0145.   Outcome 1 has eleven measures, a number of which mirror specific requirements in the federal PASRR regulations and are necessary to administer, implement, and monitor an adequate PASRR program. PPI X 976 at 8-9 (Howe Rebuttal Report). The outcome is intended to measure whether people are appropriately identified, evaluated, and diverted from admission to nursing facilities. Jordan 30(b)(6) Dep. 78:5-22, Mar. 16, 2018. Outcome Measures 1-1 through 1-11 go to the core of an adequate and effective PASRR program. PPI X 976 at 9 (Howe Rebuttal Report).

0146.   According to Ms. du Pree, HHSC's consultant, Outcome 1 is "one of the basic requirements of PASRR." She told HHSC officials that Outcome 1 is necessary to comply with PASRR and professional standards. Trial Tr. 132:6-18, Oct. 15, 2018 (du Pree).

0147.   Outcome Measure 1-3 determines if there is an appropriate PASRR evaluation (PE) that considers alternative placement and determines the need for specialized services. Ms. du Pree drafted it to incorporate PASRR requirements. In her view, satisfying this outcome measure is necessary to comply with federal PASRR requirements. Trial Tr. 139:1-16, Oct. 15, 2018 (du Pree). Ms. Howe also concluded that Outcome Measure 1-3 is a basic standard for determining if a state's diversion program is effective and compliant with PASRR and the ADA. Trial Tr. 3935:7-23, Nov. 13, 2018 (Howe).

0148.   Outcome Measure 1-9 determines if services have been identified and provided that would allow the individual to avoid nursing facility admission and remain in the community. Ms. du Pree drafted it to incorporate PASRR requirements. In her view, satisfying this outcome measure is necessary to comply with PASRR. Trial Tr. 140:2-7, 141:5-12, Oct. 15, 2018 (du Pree).

0149.   Outcome 2 deals with specialized services and states that "Individuals in the Target Population in nursing facilities will receive specialized services with the frequency, intensity and duration necessary to meet their appropriately identified needs, consistent with informed choice." PPI X 318 at 5 (2016 PASRR QSR Compliance Status Interim Report). It measures whether individuals with IDD in nursing facilities receive specialized services with the frequency, intensity, and duration necessary to meet their needs. PPI X 976 at 9-10 (Howe Rebuttal Report); Jordan 30(b)(6) Dep. 78:5-79:13, Mar. 16, 2018.

0150.   According to Ms. du Pree, HHSC's consultant, Outcome 2 is "critical to the implementation of PASRR." She told HHSC officials that Outcome 2 is necessary to comply with federal PASRR requirements and professional standards. Trial Tr. 132:19-133:4, 134:3-9, Oct. 15, 2018 (du Pree). Ms. Howe similarly concluded that this outcome is a basic standard for determining if a state's nursing facility program is effective and compliant with PASRR. Trial Tr. 3935:25-3936:7, Nov. 13, 2018 (Howe).

0151.   Within Outcome 2 are 13 outcome measures that reflect PASRR requirements and other professionally accepted standards for service delivery to individuals with IDD in nursing facilities. These outcome measures are necessary to have an effective specialized services program and to ensure that individuals with IDD receive appropriate assessments, coordinated service planning and delivery, nursing facility and other services, and Active Treatment. They also determine if individuals have meaningful opportunities to make an informed choice about transition. PPI X 318 at 12-15 (2016 PASRR QSR Compliance Status Interim Report); PPI X 976 at 9-10 (Howe Rebuttal Report) ("each of these Measures are basic, necessary criteria").

0152.   Outcome Measure 2-4, which determines if all needed assessments were done in a timely manner and are used to determine services that should be provided, was drafted by Ms. du Pree to incorporate PASRR requirements. In her view, satisfying this outcome measure is necessary to

comply with PASRR. Trial Tr. 141:13-142:15, Oct. 15, 2018 (du Pree); PPI X 318 at 13 (2016 PASRR QSR Compliance Status Interim Report).

0153.   Outcome Measure 2-5, which determines if all needed services are actually provided, was drafted by Ms. Du Pree to incorporate PASRR requirements. Satisfying this outcome measure is necessary to comply with PASRR. Trial Tr. 143:8-25, 144:23-145:3, Oct. 15, 2018 (du Pree).

0154.   Outcome Measures 2-6 and 2-7, which determine if an individual has been provided with information and experiences to make an informed choice about where to live, was drafted by Ms. du Pree to incorporate PASRR and ADA requirements. Trial Tr. 147:1-12, Oct. 15, 2018 (du Pree). Ms. Howe found that Outcome Measure 2-6 is a basic standard for determining if a state's program is effective and compliant with PASRR and the ADA. Trial Tr. 3936:8-3937:4, Nov. 13, 2018 (Howe).

0155.   Outcome Measure 2-8, which determines if the nursing facility plan of care and the LIDDA Individual Service Plan (ISP) include all needed services, and are consistent, integrated, and coordinated for delivery of services, was drafted by Ms. du Pree to incorporate PASRR requirements. Trial Tr. 149:25-150:18, 151:15-152:23, Oct. 15, 2018 (du Pree). Ms. Howe also concluded that this outcome measure was essential for an effective and compliant PASRR program because coordination between the two plans is needed to ensure that Active Treatment is actually provided. Trial Tr. 3937:5-25, Nov. 13, 2018 (Howe); PPI X 318 at 14 (2016 PASRR QSR Compliance Status Interim Report).

0156.   Outcome Measure 2-9, which determines if the nursing facility team believes the person should stay in the nursing facility and whether barriers to placement are adequately considered, reflects PASRR requirements. In 2016, the QSR found that "there are very few people in any of the samples where it was the nursing home team who was recommending continued stay in the nursing home." Trial Tr. 153:9-154:11, Oct. 15, 2018 (du Pree); PPI X 318 at 2 ("There were only five

individuals for whom the [service planning team] recommended continued placement in the NF.").

0157.   Outcome 3 deals with transition and states that "[i]ndividuals in the Target Population in nursing facilities who are appropriate for and do not oppose transition to the community will receive transition planning, transition services, and placements in the most integrated setting necessary to meet their appropriately identified needs, consistent with informed choice." PPI X 318 at 5 (2016 PASRR QSR Compliance Status Interim Report). It is intended to measure whether individuals with IDD in nursing facilities who are appropriate for and do not oppose transition to the community receive transition planning, transition services, and placements in the most integrated setting.  Jordan 30(b)(6) Dep. 79:24-80:5, Mar. 16, 2018. Meeting Outcome 3 and its eleven outcome measures, which either mirror PASRR requirements or evaluate professionally accepted transition processes, is necessary to have an effective transition program and to ensure that individuals with IDD receive appropriate transition planning, coordination, and services to make a successful transition from the nursing facility to the community. PPI X 976 at 10 (Howe Rebuttal Report) ("Each and all of the[se] measures are the very foundation of ensuring effective and appropriate transitions of individuals with IDD from segregated settings, like nursing facilities, to integrated settings in the community.").

0158.   According to Ms. du Pree, Outcome 3 "reflects the expectations of both the ADA and PASRR." She told HHSC officials that Outcome 3 is necessary to comply with the ADA and PASRR. Trial Tr. 134:10-23, 123:9-19, 124:2-8, Oct. 15, 2018 (du Pree). Ms. Howe also opined that Outcome 3 is a basic standard for determining if a state has an effective and compliant PASRR and ADA program. Trial Tr. 3938:6-9, Nov. 13, 2018 (Howe). Outcome 3 is necessary for ensuring that individuals and/or family members have sufficient information, experiences, and opportunities to make an informed choice. In Howe's experience, this factor was critical in accomplishing transitions for those individuals (or their family members) in Massachusetts who initially resisted the idea of leaving nursing facilities. Trial Tr. 3938:1-3939:1, Nov. 13, 2018 (Howe).

66

0159.   Outcome 4 deals with community services and states "Community Members will receive services in the most integrated setting, with the frequency, intensity and duration necessary to meet their appropriately identified needs, consistent with their informed choice." PPI X 318 at 5 (2016 PASRR QSR Compliance Status Interim Report). Outcome 4 is intended to measure whether individuals with IDD who live in the community receive services in the most integrated setting with the frequency, intensity, and duration necessary to meet their needs. Jordan 30(b)(6) Dep. 80:6-80:19, Mar. 16, 2018.

0160.   According to Ms. du Pree, Outcome 4 is necessary to allow an individual with IDD to live in the community – the least restrictive setting – after a diversion or transition. She told HHSC officials that Outcome 4 is necessary to meet ADA requirements and professional standards. Trial Tr. 134:24:135:16, Oct. 15, 2018 (du Pree).

0161.   Outcome 5 deals with service coordination and states "[i]ndividuals in the Target Population who do not refuse service coordination will receive coordination from trained service coordinators with the frequency necessary to meet the individual's appropriately identified needs, consistent with their informed choice." PPI X 318 at 6 (2016 PASRR QSR Compliance Status Interim Report). Outcome 5 measures whether individuals with IDD receive service coordination from trained service coordinators with the frequency necessary to meet their needs. Jordan 30(b)(6) Dep. 80:20:81:11, Mar. 16, 2018. Meeting Outcome 5 and Outcome Measures 5-1 through 5-9, which either mirror PASRR requirements or evaluate professionally accepted service coordination processes, is necessary to determine if individuals with IDD are provided appropriate service coordination. It is also necessary to ensure that individuals with IDD receive appropriate diversion, nursing facility, specialized services, and transition planning services. PPI X 976 at 11 (Howe Rebuttal Report).

0162.   According to Ms. du Pree, Outcome 5 is necessary to achieve Active Treatment. "From all of my experience having to implement Active Treatment and respond to federal concerns about how

that is implemented, I would say no, [Active Treatment] is not possible without service coordination." Trial Tr. 136:6-11, Oct. 15, 2018 (du Pree). Ms. du Pree communicated to HHSC officials that service coordination is necessary to comply with PASRR and the ADA. Trial Tr. 132:12-22, Oct. 15, 2018 (du Pree). Ms. Howe concurred that service coordination, as required by Outcome 5, is a basic standard for evaluating if a state's program is effective and compliant with PASRR and is an essential element of Active Treatment. Trial Tr. 3939:2-14, 4011:17-4012:2, Nov. 13, 2018 (Howe).

0163.    Outcome Measure 5-3, which evaluates whether the service coordinator leads the planning team, monitors the services, and ensures that all needed specialized services are provided is a basic standard for determining if a state has an effective and compliant PASRR program and provides Active Treatment. Trial Tr. 3939:17-3940:13, Nov. 13, 2018 (Howe).

0164.    Outcome 6 deals with service planning and states "[i]ndividuals in the Target Population will have a service plan, developed by an interdisciplinary service planning team through a person-centered process that identifies the services and supports necessary to meet the individual's appropriately identified needs, achieve the desired outcomes, and maximize the person's ability to live successfully in the most integrated setting consistent with their informed choice." PPI X 318 at 7 (2016 PASRR QSR Compliance Status Interim Report). It is intended to measure whether individuals with IDD have a service plan that is developed by an interdisciplinary service planning team through a person-centered process, which identifies all services and supports necessary to meet their needs, achieve their desired outcomes, and maximize their ability to live successfully in the most integrated setting. Jordan 30(b)(6) Dep. 81:12-82:15, Mar. 16, 2018. Meeting Outcome 6 and Outcome Measures 6-1 through 6-10, which either mirror PASRR requirements or evaluate professionally accepted service planning processes, is necessary to determine if individuals with IDD are provided appropriate service planning. It is also necessary to ensure that individuals with IDD

receive appropriate diversion, nursing facility, specialized, and transition services. PPI X 976 at 12 (Howe Rebuttal Report).

0165.   According to Ms. du Pree, Outcome 6 is necessary to ensure Active Treatment, consistency in service delivery, and meeting the needs of individuals with IDD. Ms. du Pree told HHSC officials that Outcome 6 is necessary to meet ADA requirements and professional standards. Trial Tr. 136:23-138:2, Oct. 15, 2018 (du Pree). Ms. Howe stated service planning was "absolutely essential to individuals getting their specialized and Active Treatment services [and also] ensuring that those services are properly monitored over time." Trial Tr. 3940:14-3941:10, Nov. 13, 2018 (Howe).

0166.   Outcome Measure 6-5 evaluates whether the nursing facility's interdisciplinary team and the LIDDA's service planning team are consistent, coordinated, and recommend all necessary specialized services. Ms. Howe concluded that this measure was essential for determining if a state's service planning program is effective and compliant with PASRR. A service planning team is a basic requirement for the provision of Active Treatment. Trial Tr. 3941:11-3942:10, Nov. 13, 2018 (Howe).

0167.   Outcome 7 deals with a quality assurance and management system. This outcome is important to safeguarding individuals with IDD and for identifying trends and patterns indicating areas requiring quality improvement, in order to achieve health and safety outcomes for individuals who are served. Although HHSC officials agreed to this Outcome, it could not be evaluated without data and information from the State. HHSC failed to provide the QSR reviewer with the data and information to review performance in this area. Thus, Outcome 7 was not included in the 2015 or 2016 QSR reports. PPI X 1578 at 47-48 (Sawyer Report).

0168.   Plaintiffs' and the United States' IDD Systems expert, Ms. Kathy Sawyer, who has more than forty years of experience operating and administering IDD systems in Alabama and in the District of Columbia, including, but not limited to, quality assurance and improvement systems, opined that

the State's failure to follow through with Outcome 7 was "extremely alarming." Specifically, Ms. Sawyer stated that, based on her extensive experience and knowledge, "incident management and prevention systems that are integrated with the IDD services systems are considered critical components of an effective quality assurance and management plan. These systems are important for vulnerable populations as they require the immediate reporting and investigation of any and all alleged incidents of abuse, neglect, and mistreatment of persons served. Further, these systems require that corrective and preventative actions are promptly taken to reduce and, if possible, eliminate the occurrence of such incidents to ensure the safety and general well-being of persons with IDD." PPI X 1578 at 47-48 (Sawyer Report).

0169.    The QSR outcomes and outcome measures set forth the federal requirements and professional standards a state should meet for an effective diversion, specialized services, and transition program. In sum, they measure compliance with the law. Trial Tr. 115:9-116:12, 123:9-124:11, 131:10-132:18, 132:19-134:9, 134:10-23, 134:24-135:16, 135:17-136:22, 136:23-138:10, Oct. 15, 2018 (du Pree); PPI X 116, 117, 539; Dionne-Vahalik 30(b)(6) Dep. 79:9-13, Oct. 12, 2017 ("they measure . . . compliance with law as well as best practice").

0170.    Meeting all QSR outcomes and outcomes measures is necessary to have an effective diversion, specialized services, and transition program that satisfies PASRR and ADA requirements. PPI X 976 at 8 (Howe Rebuttal Report) ("complying with these federal requirements involves implementation of policies and practices that match requirements in the federal statute and regulation as well as implementation of professional standards and programmatic standards designed to achieve the purpose of those federal requirements.").

0171.    Meeting the QSR outcomes and outcome measures is necessary to accurately identify and adequately evaluate and serve the needs individuals with IDD who are referred to nursing facilities, which is the basic purpose of the PASRR process. PPI X 976 at 8 (Howe Rebuttal Report) ("[t]hese

[m]easures go to the very core of an adequate and effective PASRR program, including that it ensures that individuals with IDD can live in the most integrated setting appropriate to their needs").

E.    The QSR process

0172.    The QSR process includes a review of a random sample of three groups of Medicaid-eligible individuals with IDD who are age twenty-one and older: (1) those who currently reside in a nursing facility (the Nursing Facility Target Population); (2) those who have been diverted from admission to a nursing facility into a community-based, Medicaid program (the Diversion Target Population); and (3) those who have transitioned from a nursing facility into a community-based, Medicaid program (the Transition Target Population). Trial Tr. 161:1-14, Oct. 15, 2018 (du Pree); PPI X 915 at 2 (describing agreed-upon random sampling methodology, sample size, target populations, and margin of error); du Pree Dep. 96:24-98:3, Feb. 6, 2018; *see also* PPI X 115 (describing the QSR sampling methodology for 2017); PPI X 1849 (describing the protocol used by QSR reviewers to interview nursing facility residents and/or their legally authorized representatives).

0173.    Ms. du Pree and HHSC's statistician developed the process for sampling individuals in the Nursing Facility, Diversion, and Transition Target Populations. HHSC approved of the sampling methodology. Trial Tr. 161:15-162:11, Oct. 15, 2018 (du Pree); du Pree Dep. 151:24-152:16, Feb. 6, 2018. Dr. Diase, an employee of the State, conducted a validation to determine the statistically proportionate and appropriate sample size for review years 2016 and 2017. Dionne-Vahalik 30(b)(6) Dep. 129:17-131:3, Oct. 12, 2017.

0174.    The sampling methodology has not changed from the time it was first created in 2014. Trial Tr. 162:8-20, Oct. 15, 2018 (du Pree); Dionne-Vahalik 30(b)(6) Dep. 129:17-131:3, 133:11-134:1, Oct. 12, 2017; du Pree Dep. 153:3-5, Feb. 6, 2018; Jordan 30(b)(6) Dep. 90:3-91:3, Feb. 13, 2018.

0175.    Although Defendants' trial expert challenged the sampling methodology for the QSR, he acknowledged that he had not reviewed the State's database and was unaware what information it

contained. Trial Tr. 3249:2-23, Nov. 6, 2018 (Warren) (not aware that database contained individual scores for each indicator or for each individual person). He was similarly unaware that HHSC and its statistician had not only agreed to the QSR methodology, but had participated in its formulation. Trial Tr. 3249:24-3250:5, Nov. 6, 2018 (Warren).

0176.    Ms. du Pree selected the initial reviewers to conduct the QSR with the input and approval of both parties. Trial Tr. 164:15-24, Oct. 15, 2018 (du Pree); du Pree Dep. 158:21-24, 159:20-160:4, Feb. 6, 2018. All of the QSR reviewers were trained in the same manner and utilized the same protocol and guidelines. PPI X 915 (describing training and the review process using indicators, interpretive guidelines, interview guides, observation protocols, and review protocol); PPI X 1849 (describing the protocol used by QSR reviewers to interview nursing facility residents and/or their legally authorized representatives); Trial Tr. 166:2-167:11, Oct. 15, 2018 (du Pree). QSR reviewers were expected to make professional judgments about the strengths, needs, and choices of each individual in the sample based on the responses received and records reviewed. Trial Tr. 167:15-168:17, Oct. 15, 2018 (du Pree).

0177.    The QSR reviewers' professional judgments often differed from the opinions and recommendations of the teams or service coordinators about whether assessments were needed, whether needed assessments were conducted, whether specialized services were needed, whether specialized services were provided, and whether the person wanted to remain in the nursing facility. Trial Tr. 168:15-169:12, Oct. 15, 2018 (du Pree).

0178.    Subsequently, the State identified State employees who Ms. du Pree trained and certified to conduct the QSR. Dionne-Vahalik 30(b)(6) Dep. 74:20-77:7, Oct. 12, 2017. QSR staff employed by HHSC began working independently to conduct QSRs in the spring or summer of 2017. du Pree Dep. 28:5-14, 159:20-160:4, Feb. 6, 2018.

0179.    The QSR's client review component is similar to what CMS uses in evaluating federal

Medicaid programs, like nursing facilities and Intermediate Care Facilities (ICFs). For the client review component, QSR staff reviewed LIDDA and nursing facility records, interviewed the individual, guardian, and staff, and observed individuals with IDD in their environment. Trial Tr. 154:14-25, Oct. 15, 2018 (du Pree); *see* du Pree Dep. 163:11-164:7, Feb. 6, 2018.

F.      The QSR scoring methodology and compliance goals

0180.   In addition to the client review of a random sample of individuals, the QSR process includes a review of HHSC and LIDDA reports. Trial Tr. 160:3-6, Oct. 15, 2018 (du Pree); du Pree Dep. 96:24-98:3, Feb. 6, 2018; *see generally* PPI X 96 (describing the DADS and LIDDA reports required as part of QSR process and methodology); PPI X 1074 (email attaching examples of LIDDA reports for 2015).

0181.   According to the agreed upon scoring methodology, an outcome measure score is calculated for each individual in the sample based on the number of "Met" and "Not Met" indicators in that review. PPI X 97 at 2 (PIRM Scoring Methodology). HHSC maintains the data from the QSR individual reviews in its PASRR Individual Review Monitoring (PIRM) database. Trial Tr. 130:21-131:9, Oct. 15, 2018 (du Pree); du Pree Dep. 178:2-23, Feb. 6, 2018.

0182.   Each individual score is averaged across the target population sample to produce an "Individual Measure Percentage." This score is based on all individuals reviewed in the relevant target populations. The final outcome measure performance may be calculated from a combination of the Individual Measure Percentage and, if applicable, the "Individual Report Metric Percentage." This score is based on HHSC and/or LIDDA reports. Some outcome measures are based only on the individual sample reviews, while others are adjusted to account for information in the HHSC and LIDDA reports, and some are based only on an HHSC or LIDDA report score. *See generally* PPI X 96 (Methodology for combining findings from the client review and state data components), PPI X 97 at 2 (PIRM Scoring Methodology).

0183.   The State agreed to the scoring methodology used by Ms. du Pree to make numerical compliance findings in the QSR. du Pree Dep. 165:3-168:3, Feb. 6, 2018.

0184.   Ms. du Pree developed a compliance standard of eighty-five percent, based on a review of CMS standards and compliance standards in other cases. To achieve compliance with an outcome, eighty-five percent of individuals reviewed had to have achieved that outcome, based upon findings of the relevant indicators and outcome measures. In addition, no outcome measure score could be lower than seventy percent. Trial Tr. 174:1-9, 174:23-24, 175:3-11, Oct. 15, 2018 (du Pree).

0185.   The State agreed to the eighty-five percent compliance standard and the seventy percent floor for each QSR outcome. Senior managers from DADS, as well as legal representatives of HHSC, the Attorney General's Office, and the Governor endorsed the compliance standards as well as the compliance time periods. Trial Tr. 175:3-14, 258:8-17, 260:5-25, 281:7-282:6, Oct. 16, 2018 (du Pree); du Pree Dep. 168:4-170:10, Feb. 6, 2018; *see* PPI X 544 at 13 (stating DADS' goal is to achieve 85 % compliance with all Outcomes by the end of calendar year 2019).

0186.   The indicators and outcome measures have remained consistent for each review year so that scores can be compared across years. Dionne-Vahalik 30(b)(6) Dep.173:25-176:3, Oct. 12, 2017 ("[T]he indicators are exactly the same, the measures are exactly the same.").

0187.   HHSC did not plan to change the scoring methodology for the 2017 review from the methodology that Ms. du Pree previously used to score the outcomes and outcome measures in prior years. Dionne-Vahalik 30(b)(6) Dep. 122:11-24, Oct. 12, 2017; Vasquez Dep. 229:1-3, 231:10-232:16, Jan. 12, 2018.

G.   The QSR reviewers and reports

0188.   Although it was projected that certified State reviewers would complete the QSR during 2017, this did not occur. As of September 1, 2017, there still was not a full complement of certified State reviewers. du Pree Dep. 28:5-14, 159:20-160:6, Feb. 6, 2018.

0189.    QSR reports were written by Ms. du Pree based upon QSR individual data and other information provided by the State. Her reports included both results and recommendations. The State did not object or challenge any of the findings or recommendations of the 2015 QSR reports. *See* PPI X 918 (May 12, 2016 letter from HHSC to Ms. du Pree suggesting mostly formatting changes to 2015 QSR Report); du Pree Dep. 204:18-22, Feb. 6, 2018 (the State did not object to the findings and indicated that they were fully committed to continuing with this review process now and in the future).

0190.    In response to HHSC's criticisms of the methodology used in the 2016 QSR, which was sent the day before the preliminary injunction hearing, Ms. du Pree pointed out that the findings of the QSR report probably overstated the State's actual performance. PPI X 123 at 2-3 (letter from du Pree to HHSC, dated July 7, 2017); du Pree Dep. 264:11-15, Feb. 6, 2018 (testifying about PPI X 123).

0191.    The 2016 QSR Interim Report contains all of the data and findings from the QSR client review component and is final and complete with respect to these findings. Trial Tr. 185:10-25, Oct. 15, 2018 (du Pree); PPI X 318 (2016 PASRR QSR Compliance Status Interim Report).

0192.    Because HHSC managers failed to provide Ms. du Pree with several of the necessary State reports on a timely basis, despite multiple requests, Ms. du Pree was unable to finalize the 2016 QSR report, as had been expected, in June 2017. Trial Tr. 184:22-186:18, Oct. 15, 2018 (du Pree); *see* PPI X 2111 at 11; PPI X 318 at 1; du Pree Dep. 97:14-98:19, 100:21-101:2, Feb. 6, 2018.

0193.    The 2016 QSR Interim Report does not contain the information from the LIDDA and HHSC required reports. Rather, it is based on the data derived from the 300 individual reviews that were conducted, rated, and reviewed for the 2016 QSR Compliance Report. PPI X 318 (2016 PASRR QSR Compliance Status Interim Report).

0194.    Subsequently, Ms. du Pree issued a report that summarized the findings from the 2016 LIDDA and statewide reports that she received prior to September 1, 2107. PPI X 2111 (2016 QSR

Compliance Report). Because HHSC did not provide sufficient statewide data, as it had promised, Ms. du Pree could not make findings concerning the reasons for admission to nursing facilities, the barriers to diversion and transition, reasons for transition delays, the capacity of the community system to serve individuals with complex medical needs, provider capacity, or system gaps. Trial Tr. 204:2-206:5, Oct. 15, 2018 (du Pree); PPI X 2111 (2016 QSR Compliance Report, Section 2).

0195.   Ms. du Pree is not aware of the State taking action to address every recommendation in her reports. du Pree Dep. 201:23-202:8, Feb. 6, 2018.

0196.   Plaintiffs' and the United States' expert Michael Neupert, a data processing and data analysis expert, calculated the QSR outcome and outcome measure percentages for 2017 based on PIRM data that was available through August 31, 2017. Trial Tr. 286:11-13, 294:21-295:1, 296:6-9, Oct. 16, 2018 (Neupert). Mr. Neupert used the PIRM Scoring Methodology to identify the steps needed to calculate the QSR outcome and outcome measure percentages. Trial Tr. 297:3-298:9, Oct. 16, 2018 (Neupert) (describing how the PIRM scoring methodology was used to calculate 2017 QSR scores); *see* PPI X 97 (PIRM Scoring Methodology); PPI X 1075 at 2 (email from OAG providing answer key for PIRM database field). Mr. Neupert also used the 2016 PASRR QSR Compliance Status Interim Report to confirm that the methodology used to calculate the 2017 QSR scores conformed to the methodology used for the 2016 report. Trial Tr. 295:11-296:2, Oct. 16, 2018 (Neupert); *see* PPI X 318 (2016 PASRR QSR Compliance Status Interim Report).  Mr. Neupert validated the 2017 QSR scores that he calculated by performing the calculations in different platforms, using different coding and formulas to confirm the results, and by calculating the 2015 and 2016 QSR scores using his methodology to compare to the results from the 2016 QSR report. Trial Tr. 303:23-304:11, 306:5-18, 308:6-18, Oct. 16, 2018 (Neupert).

0197.   Mr. Neupert testified that his calculations of the overall 2017 outcome and outcome measure percentages, as well as the outcome and outcome measures broken out by population type and

LIDDA, were accurate, based on data he received through August 31, 2017. Trial Tr. 302:3-11, 304:21-25, 305:5-15, 306:24-307:3, 307:10-17, 308:24-309:3, Oct. 16, 2018 (Neupert) (describing PPI X 253-255 and his opinions about them); *see* PPI X 253 (overall 2017 outcome and outcome measure percentages); PPI X 254 (2017 outcome and outcome measure percentages broken out by population type); PPI X 255 (2017 outcome and outcome measure percentages broken out by LIDDA).

H.     The QSR findings for 2015, 2016, and 2017

0198.   The State's goal was to achieve eighty-five percent compliance with all outcomes by the end of calendar year 2019, and to sustain that level of compliance for a full year (2020). Several outcomes had earlier deadlines – "some of the outcomes would take four to five years, others would take two to three years." For example, eighty-five percent compliance with the diversion outcome (Outcome 1) was expected by 2016. Trial Tr. 260:5-25, 281:7-282:6, Oct. 16, 2018 (du Pree).

0199.   In the 2015 QSR Report, Ms. du Pree concluded that the Community Living Options process was not comprehensive, was not individualized, and did not address barriers to transition and diversion. Trial Tr. 182:13-17, Oct. 15, 2018 (du Pree); PPI X 121 at 43.

0200.   In the 2015 QSR Report, Ms. du Pree concluded that the State failed to collect and analyze data on the reasons for admission to nursing facilities. Trial Tr. 182:21-183:19, Oct. 15, 2018 (du Pree); PPPI X 121 at 56; *see* PPI X 2038 at 4 (July 2016 workgroup minutes reporting that it was still not possible for diversion coordinator to collect reasons for admissions into nursing facilities and this would require an update on reporting requirements).

0201.    In the 2015 QSR Report, Ms. du Pree concluded that the State failed to collect and analyze data on the barriers to transition from nursing facilities. Trial Tr. 183:20-184:13, Oct. 15, 2018 (du Pree); PPI X 121 at 59.

0202.   The 2016 QSR Report showed significant regression for Outcomes 2, 3, 5, and 6.

Particularly concerning to Ms. du Pree was the decline in scores related to specialized services. She concluded that the PE was not identifying needed specialized services, the nursing facility teams were not recommending needed assessments, and needed services were not being provided. Trial Tr. 190:16-19, 191:19-25, 192:24-193:16, Oct. 15, 2018 (du Pree); PPI X 318 at 27-30; *see* PPI X 320/1078-A (showing QSR scores at the indicator level for 2015 (full year), Q1 2016, and 2016 (full year)).

0203.  With respect to the 2017 QSR report, information available as of September 1, 2017 indicated that there was no progress in achieving the requirements of Outcome 2, no significant progress toward implementing changes the State proposed to meet PASRR requirements, no progress in service coordinators fulfilling required functions, no progress in nursing facility teams recommending specialized services, no progress in PASRR evaluators preventing unnecessary admissions, no progress in service plans having meaningful goals, and no progress in individuals visiting community programs or learning about transition opportunities. Trial Tr. 209:24-210:8, 210:25-212:11, Oct. 15, 2018 (du Pree).

0204.  The QSR findings for the Nursing Facility Target Population under Outcome 2 – which measures whether individuals with IDD in nursing facilities receive specialized services with the frequency, intensity, and duration to meet their individual needs – *decreased* over the three years that the QSR has been conducted. In 2015, the State's overall compliance with this requirement was 36 %. In 2016, the State's overall compliance with this requirement was 28 %. In 2017, the State's overall compliance with this requirement was 32 %. PPI X 318 at 7; PPI X 254 at 3.

0205.  The QSR findings for Outcome 3 – which measures whether individuals with IDD in nursing facilities receive transition services consistent with informed choice – *steadily decreased* over the three years that the QSR has been conducted. In 2015, the State's overall compliance with this requirement was 40 %. In 2016, the State's overall compliance with this requirement was 35 %. In

2017, the State's overall compliance with this requirement was 28 %. PPI X 318 at 7; PPI X 254 at 3.

0206.    The QSR findings for Outcome 5 – which measures whether individuals with IDD in nursing facilities receive needed service coordination – *steadily decreased* over the three years that the QSR has been conducted. In 2015, the State's overall compliance with this requirement was 49 %. In 2016, the State's overall compliance with this requirement was 45 %. In 2017, the State's overall compliance with this requirement was 37 %. PPI X 318 at 7; PPI X 254 at 3.

0207.    The QSR findings for Outcome 6 – which measures whether individuals with IDD in nursing facilities receive needed service planning – *decreased* in 2016 and remained consistently low over the three years that the QSR has been conducted. In 2015, the State's overall compliance with this requirement was 29 %. In 2016, the State's overall compliance with this requirement was 22 %. In 2017, the State's overall compliance with this requirement was 31 %. PPI X 318 at 8; PPI X 254 at 3.

0208.    The 2015, 2016, and 2017 QSR findings demonstrate that the State is not meeting crucial outcomes and outcome measures, which are necessary for effective/ compliant diversion, specialized services, and transition programs. PPI X 976 at 13-14. For Outcome 2, where many of the scores were in the twenty percent range, only one in five individuals with IDD in nursing facilities was receiving PASRR compliant services. Trial Tr. 3948:18-24; 3949:9-3950:5, Nov. 13, 2018 (Howe).

0209.    The 2015, 2016, and 2017 QSR findings indicate that the State is not making progress in achieving compliance with QSR standards or meeting federal standards for effective and compliant PASRR and ADA programs. Trial Tr. 3950:3-5, 3951:2-10, Nov. 13, 2018 (Howe); PPI X 976 at 13-14 (Howe Rebuttal Report).

0210.    HHSC official Mr. Andy Vasquez acknowledged that, while HHSC's goal was eighty-five percent compliance with all QSR outcomes by calendar year 2019, the trend of QSR scores is not

on track for HHSC to meet that goal. Vasquez Dep. 180:20-181:01, 191:14-192:25, 195:20-197:8, 203:9-204:8, 205:20-206:7, Jan. 12, 2018; *see* Trial Tr. 2160:12-24, Oct. 26, 2018 (Sawyer) (testifying that "[m]ost of the [QSR] scores were far below that 85 percent threshold that had been apparently agreed to by the parties in that there was, in many of those outcomes, the measures just had declined, a significant decline in performance").

I.      The State's criticisms of the QSR

0211.    The State's embrace of the statewide QSR turned to criticism as the results were unfavorable, trial drew near, and litigation strategy took over. The criticisms offered at trial are unsupported, unreliable, and do not diminish the relevancy or reliability of the process, the outcomes, or Ms. du Pree's findings. The State's retained expert, Don Warren, criticized the QSR methodology but he was not aware of what the QSR measures; he ignored the fact that the State agreed to the methodology; he was not aware that the State's own statistician developed the sampling methodology; he did not look at the State's database which contains all of the underlying data for the QSR results; and he was not aware that CMS uses similar methods to measure compliance with federal law. He conceded that his report provides no evidence that the State's IDD system is working well or that positive outcomes are being achieved for individuals with IDD in nursing facilities. Additionally, Defendants' expert did not recalculate the QSR scores using a revised methodology or show that the results would have been any different using a revised methodology. Trial Tr. 3243:10-12, 3249:7-9, 3249:24-3250:5, 3253:7-3254:4, 3254:21-25, 3255:2-8, Nov. 6, 2018 (Warren); DX 1062.

0212.    The State's only witness who addressed the outcomes or outcome measures of the QSR, Ms. Jennifer Burnett, submitted a report on March 30, 2018 that barely exceeded one page in which she summarily concludes in one paragraph that certain QSR outcome measures, which had been designated as "core measures," are explicitly required by PASRR regulations. Trial Tr. 3146:6-17,

3148:7-12, 3170:18-22, Nov. 5, 2018 (Burnett); DX 1060. Her opinion was based on a review of two Texas HHSC documents – the PIRM protocol instrument (DX 186) and only the first page of a PIRM report dated April 2017 (DX 181). The rest of the April 2017 PIRM report contains findings for various outcome measures that were never shown to or considered by her in forming the conclusion in her report. Trial Tr. 3168:12-3170:10, Nov. 5, 2018 (Burnett); *see* PPI X 978 (2017 PIRM Monitoring Report). Burnett's report is not based on any analysis and the sole reason she was retained was to look at a list and give a legal opinion on whether the outcome measures on the list are required by federal law. Trial Tr. 3119:17-20, 3120:15-17, 3148:7-12, 3151:16-20, 3168:12-16, 3170:18-25, Nov. 5, 2018 (Burnett). As the Court noted in its order prior to trial, "[i]f an expert offers nothing more than a legal conclusion, the Court will disregard it." Docket no. 513.

0213.    On April 30, 2018, the deadline for submitting expert *rebuttal* reports, Ms. Burnett submitted a second report. DX 1061. She never read, considered, addressed, or sought to rebut any of the twelve reports or opinions presented by the Plaintiffs' and United States' experts on March 30, 2018. Trial Tr. 3150:11-15, 3151:5-15, 3152:18-3153:9, Nov. 5, 2018 (Burnett) (testifying that she never considered or even knew about plaintiffs' experts or their reports). Instead, according to Ms. Burnett's own written and verbal description, this report was designed to "supplement" her first report and she sought to "rebut" the State's own monitoring tool – without knowing whether any of the plaintiffs' experts even addressed the monitoring tool. Trial Tr. 3149:2-17, 3150:7-3151:15, Nov. 5, 2018 (Burnett).

0214.    After reviewing the record, it is clear that the State mischaracterized Burnett's supplemental report. It was not a rebuttal report and Burnett is not a rebuttal expert. Plaintiffs moved to strike her untimely supplemental report on that basis, and renewed their objection during trial. Docket no. 464; Trial Tr. 3118:5-8. After further review, the Court sustains the renewed objection and has disregarded the second/supplemental report.

0215.   Other than reviewing the two PIRM documents and some HHSC websites, the only other source of information that Ms. Burnett considered in forming her opinions about the QSR was a conversation with Ms. Haley Turner, the assistant deputy director of HHSC. Ms. Turner never told Ms. Burnett about the Interim Settlement Agreement in this case, which incorporated the QSR purpose and requirements, never told her about Expert Reviewer Kathryn du Pree, who created the QSR, never told her that Ms. du Pree created the terms "core" versus "enhanced" outcome measures, and never told her that HHSC uses the QSR as a quality evaluation tool. Trial Tr. 3158:21-3159:18, Nov. 5, 2018 (Burnett). As a result, Ms. Burnett's opinions on the QSR did not reflect or consider any of this information.

0216.   Ms. Burnett never talked with Ms. du Pree, never read her deposition, and never talked with anyone at HHSC responsible for implementing the QSR. Trial Tr. 3159:19-3160:7, Nov. 5, 2018 (Burnett). As a result, Ms. Burnett was not aware of what Ms. du Pree had intended in creating the distinction between "core" and "enhanced" outcome measures that Ms. Burnett sought to evaluate. Whereas Ms. du Pree was simply using terms to denote management priorities, Ms. Burnett wrongly assumed that "core" meant a federal requirement of PASRR. Trial Tr. 3165:10-3166:13; 3175:5-11, Nov. 5, 2018 (Burnett); Trial Tr. 3946:5-11, Nov. 13, 2018 (Howe) (du Pree stated clearly in her deposition and the 2016 QSR report that all outcome measures were important and had to be satisfied, regardless of the terminology she used to help the State focus its priorities and improve its performance on the QSR).

0217.   In forming her opinions about the QSR, Ms. Burnett did not consider the federal requirements for Active Treatment, even though the PASRR regulations, 42 C.F.R. § 483.120(b), explicitly cross-reference federal Active Treatment requirements. Trial Tr. 3186:5-3187:6, Nov. 5, 2018 (Burnett).

0218.    Although Ms. Burnett was aware of the comments from the Secretary of the U.S. Department of Health and Human Services on the PASRR regulations, published in the Federal Register, Ms. Burnett was not aware that those comments deal extensively with the PASRR requirements on Active Treatment. Trial Tr. 3188:3-3189:24, 3189:25-3190:21, Nov. 5, 2018 (Burnett); PASRR Final Rule, 57 Fed. Reg. 56,450 (Nov. 30, 1992) (codified at 42 C.F. R. § 483.120(a)(2)).

0219.    Similarly, Ms. Burnett did not know that Active Treatment requires service coordination and an interdisciplinary service planning team. Trial Tr. 3190:22-3191:6, Nov. 5, 2018 (Burnett). As a result, she failed to consider these necessary for a compliant PASRR program.

0220.    While working at CMS, Ms. Burnett was responsible for funding CMS' PASRR Technical Assistance Center (PTAC). PTAC provides official guidance, training, and assistance to states for the operation of their PASRR programs. Ms. Burnett claimed that she frequently collaborated with CMS's PASRR specialists on PTAC trainings and webinars. But Ms. Burnett was not aware of the PTAC webinar presented by the University of Massachusetts Medical School on the PASRR requirements for Active Treatment, service planning, service teams, and service coordination. Trial Tr. 3191:15-3194:4, Nov. 5, 2018 (Burnett).

0221.    Although Ms. Burnett agrees that the PASRR evaluator is required to determine if the individual's needs best can be met in an alternative setting to a nursing facility, she stated that the evaluator is not required to provide the individual or the guardian with any information about that alternative setting so that they can decide whether or not to go to that setting. Trial Tr. 3195:2-3196:16, Nov. 5, 2018 (Burnett).

0222.    The PASRR evaluator is also required to determine if the individual needs specialized services and if the nursing facility to which the person is being admitted can provide those specialized services. Trial Tr. 3196:17-3197:18, 3198:12-25, 3199:18-3200:11, Nov. 5, 2018 (Burnett); DX 290 (CMS PTAC Webinar on the state's responsibilities under PASRR to consider

alternative placement in lieu of nursing facility admission and the specific duties of the PASRR evaluator).

0223.   Ms. Kathi Bruni, Defendants' PASRR expert, disregarded the QSR findings in their entirety, despite their clear relevance to any determination of whether HHSC is compliant with PASRR. Trial Tr. 2703:23-2704:7, Nov. 1, 2018 (Bruni).

## VI.

## The Client Reviews

A.    The initial client review conducted in conjunction with the preliminary injunction motion

0224.   An initial client review was conducted in 2017 in conjunction with the Plaintiffs' Motion for Preliminary Injunction. Docket no. 317. This review was a follow up of the QSR with a subgroup of individuals from the larger group reviewed in the QSR, with more focus on the provision of Specialized Services and Active Treatment. The initial client review included twenty-seven individuals who were randomly selected from all individuals in nursing facilities who were evaluated in the 2015 and 2016 QSR. PPI X 1298 at 5 (Pilarcik Pre-Filed Direct Test.); PPI X 1299 at 3 (Coleman Pre-Filed Direct Test.).[51]

0225.   The initial client review determined whether adults with IDD in nursing facilities were receiving a comprehensive functional assessment of their habilitative strengths, needs, and preferences; whether they were receiving all of the specialized services they require to address those needs; whether they were receiving a program of Active Treatment; and whether they were experiencing any harm due to a lack of services or Active Treatment.  PPI X 1298 at 6 (Pilarcik Pre-Filed Direct Test.).

0226.   Plaintiffs' research expert Dr. Sally Rogers developed a set of procedures and a methodology

---

[51]The Court considered the pre-filed direct testimony and related reports to the extent the witness testified live and was subject to cross examination, the witness adopted the statements in the pre-filed testimony and report under oath, and the statements are relevant and reliable.

for drawing a random and representative sample of PASRR-eligible adults with IDD residing in nursing facilities in Texas for the initial client review. Dr. Rogers is an expert with almost forty years of experience designing and conducting research involving human subjects, particularly individuals with disabilities. Dr. Rogers is a Research Professor at Sargent College of Health and Rehabilitation Sciences at Boston University, and serves as the executive director of the Center for Psychiatric Rehabilitation, an institution that has been recognized nationally and internationally as a center of excellence in research, technical assistance, and program evaluation involving individuals with disabilities. *See generally* Trial Tr. 1831:23-1836:10, Oct. 24, 2018 (Rogers) (The Center is "looked at as a national resource and a national expert on helping programs and people [with disabilities] live more meaningful lives in the community . . ." and has received designations by the World Health Organization and HHS; *see also* PPI X 423 (Rogers Curriculum Vitae); PPI X 1365 at 6-7 (Rogers Report).

0227.   Dr. Rogers has been engaged in the design and implementation of numerous studies assessing the clinical and service needs and outcomes of individuals with disabilities, including individuals with IDD, and assessing whether they were receiving state services. *See generally* Trial Tr. 1837:4-1840:10, Oct. 24, 2018 (Rogers); PPI X 423 at 2-6, 27-28 (Rogers Curriculum Vitae). Dr. Rogers has overseen the sampling process in studies to ensure that study results can be generalized to the larger population of interest and has designed and conducted clinical reviews, including client reviews. Trial Tr. 1839:17-1841:11, Oct. 24, 2018 (Rogers) (Dr. Rogers served as a litigation expert to create methodology for client reviews in Oregon, New Hampshire, and Florida); PPI X 1365 at 6-7 (Rogers Report).

0228.   Dr. Rogers' methodology and credentials have been approved by federal courts in cases involving similar clinical reviews. Trial Tr. 1841:12-13, Oct. 24, 2018 (Rogers); *Kenneth R. v. Hassan*, 293 F.R.D. 254, 261-62 (D.N.H. 2013) (relying on Dr. Rogers' conclusions in determining

that findings from client review could be reasonably generalized to the broader population of people with serious mental illness where Dr. Rogers selected the sample of individuals to be included in client review); *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 51 (D. Mass. 2006) (relying on Dr. Rogers' analysis in deciding to credit the client review and making liability findings in class action lawsuit involving mental health services for children with Serious Emotional Disturbance).

0229.   Dr. Rogers drew a sample from the individuals in nursing facilities whom Ms. du Pree, the expert reviewer, had previously assessed as part of the QSR. This approach allowed for a client review that built upon the unbiased and mutually agreed upon QSR, but analyzed in more depth the current adequacy of services as well as the provision of Active Treatment at the time. PPI X 1300 at 3-4 (Rogers Pre-Filed Direct Test.).

0230.   Although the findings from the initial client review were not entirely generalizable to all individuals with IDD in nursing facilities with the same degree of reliability as the methodology used by Ms. DuPree, the findings could be generalized to individuals included in the 2015 and 2016 QSRs. PPI X 1300 at 4, 9 (Rogers Pre-Filed Direct Test.).

0231.   For the initial client review, two IDD experts reviewed the medical and clinical records from nursing facilities and LIDDAs for each of these twenty-seven individuals, met with them and their guardian or Legal Authorized Representative (LAR), when available, spoke with nursing facility and service coordinator staff responsible for their care, and observed the individual's living environment and program areas. PPI X 1298 at 5-6 (Pilarcik Pre-Filed Direct Test.); PPI X 1299 at 4 (Coleman Pre-Filed Direct Test.).

0232.   These two professionals concluded that, with respect to the twenty-seven individuals in the initial client review: (a) none had received a comprehensive functional assessment; (b) none were receiving all needed specialized services; (c) none were receiving Active Treatment; and (d) all but one were experiencing harm as a result of the lack of specialized services and Active Treatment. PPI

X 1298 at 11-14 (Pilarcik Pre-Filed Direct Test.); PPI X 1299 at 6-9 (Coleman Pre-Filed Direct Test.).[52]

B.    The second client review conducted in conjunction with the trial

0233.   A second client review was conducted in 2017 in conjunction with trial on the merits. This review's purpose was to determine whether or not adults with IDD in Texas nursing facilities: (1) had received a comprehensive functional assessment of all habilitative areas that accurately identified all of the individual's strengths, needs, and preferences; (2) were receiving all needed specialized services with the appropriate intensity, frequency, and duration to address all need areas; (3) were receiving Active Treatment; (4) had a professionally appropriate Individual Service Plan and transition plan that was developed based upon a comprehensive person-centered assessment and that includes all needed services and supports to successfully transition to the community; (5) were appropriate for and would benefit from living in an integrated setting with appropriate community services and supports; and (6) had made an informed and meaningful choice to remain in a segregated nursing facility. Trial Tr. 452:6-454:24, Oct. 17, 2018 (Pilarcik); Trial Tr. 1602:9-19, Oct. 23, 2018 (Russo); Trial Tr. 1732:22-1733:10, Oct. 24, 2018 (Charlot); Trial Tr. 855:20-856:5, Oct. 18, 2018 (Coleman); PPI X 1280 at 8 (Pilarcik Report); PPI X 1400 at 5 (Russo Report); PPI X 777 at 5 (Charlot Report); PPI X 802 at 5 (Coleman Report).

0234.   Dr. Rogers selected the sample for the second client review. The second client review sample was comprised of Medicaid-eligible individuals with IDD, age twenty-two and older, residing in nursing facilities that were within eighty miles of eight major metropolitan areas in Texas. The sample frame represented seventy-one percent of all Medicaid-eligible individuals, age twenty-two

---

[52]Of those Dr. Coleman reviewed, twenty percent of PASRR evaluations were not completed until 8 to 14 years after admission. PPI X 1299 at 6. Of those Ms. Pilarcik reviewed, some individuals had just begun to receive independent living skills (ILS) services after years of confinement in a nursing facility. PPI X 1298 at 12.

and older, with IDD residing in nursing facilities in Texas and included individuals living in urban, suburban, and rural areas. Trial Tr. 1857:8-24, 1859:18-23, 1861:2-1862:6, Oct. 24, 2018 (Rogers); PPI X 419 (spreadsheet of 2,474 individuals); PPI 1365 at 7-8 (Rogers Report).

0235.    The geographic limitations in the client review sample comport with the professional standards of human-subjects research. Trial Tr. 1860:18-1862:6, Oct. 24, 2018 (Rogers) ("I think a very thoughtful and proactive decision was made to represent 71 percent of all individuals with IDD living in nursing facilities and to exclude individuals who lived outside of the 80-mile radius, understanding that even within 80 miles we would be tapping urban, suburban, and even rural areas, just not remote areas. . . . Virtually all the studies that we do have geographic limitations.").

0236.    Resource constraints are always a limitation in human-subjects research. Trial Tr. 1847:20-1848:1, Oct. 24, 2018 (Rogers). Although Dr. Rogers' research has always been limited to certain geographic areas, the findings from her research typically are applied beyond those geographic areas. Trial Tr. 1843:6-17, 1848:2-1849:4, Oct. 24, 2018 (Rogers).

0237.    Dr. Rogers "oversampled" to pull a list of 200 individuals, and developed guidance about how to use the list to try to obtain consent from individuals for participation in the client review and release of nursing facility and LIDDA records, to ensure the sample remained random and unbiased. Trial Tr. 1864:6-1865:25, Oct. 24, 2018 (Rogers); PPI X 1365 at 8-9, 12 (Rogers Report). To obtain consent, Plaintiffs sent a letter to all individuals on the list, made telephone calls to legally authorized representatives, and made in-person visits to individuals. Trial Tr. 1866:1-16, Oct. 24, 2018 (Rogers) (characterizing efforts to obtain consent here as "extraordinary measures"); PPI X 1365 at 9 (Rogers Report). Plaintiffs moved down the list sequentially until they secured the needed number of consents. Trial Tr. 1865:18-25, 1890:24-1891:15, Oct. 24, 2018 (Rogers).

0238.    It is a standard part of human-subjects research to obtain consent from the individuals in a study. Trial Tr. 1846:7-1847:2, Oct. 24, 2018 (Rogers). There are challenges in obtaining consent,

particularly from individuals with disabilities, and nonresponse is inevitable in studies that require consent. Trial Tr. 1847:3-19, 1867:6-1868:22, Oct. 24, 2018 (Rogers); PPI X 1365 at 11(Rogers Report). Although Defendants' statistical experts both noted that there were individuals who did not respond to requests to consent to participate in the client review, they both conceded that obtaining consent is required in human-subjects research. Trial Tr. 3415:20-3416:12, Nov. 6, 2018 (Salzberg) (Salzberg did not have direct experience with studies where consent was necessary and had never dealt with obtaining consent from individuals with IDD); Trial Tr. 3231:21-3232:7, Nov. 5, 2018 (Warren) ("Q: And it's required in a scientific study to get the consent of human subjects when interviewing them? A: Yes, it is. . . . Q: If one of the individuals with IDD did not consent to participating in Dr. Rogers' client review, Dr. Rogers could not have forced that individual to participate; could she? A: No, she could not.").

0239.   There was no indication that the individuals who did not respond to attempts to obtain consent impacted the findings of the client review. Trial Tr. 1869:15-1870:11, Oct. 24, 2018 (Rogers).

0240.   Fifty-four randomly selected individuals were assessed in the second client review, which yielded a ninety percent confidence interval and 11.07 % margin of error. PPI X 1365 at 10 (Rogers Report); Trial Tr. 1863:10-1864:2, 1874:8-19 Oct. 24, 2018 (Rogers) (confidence level of ninety percent was "very meaningful and can yield important information"); Trial Tr. 1866:25-1867:3, Oct. 24, 2018 (Rogers) (The individuals selected for the client review came from Dr. Rogers' list of 200 individuals.).

0241.   Some of the reviews that were originally planned did not occur because individuals had moved, passed away, or were no longer eligible after they provided consent, or because of the impact of hurricanes Harvey and Irene. PPI X 1365 at 10-11 (Rogers Report); Trial Tr. 1871:2-19, 1874:19, Oct. 24, 2018 (Rogers) (Although some reviews did not occur that were set to occur during or

immediately after the hurricanes, this did not invalidate the results of the client review).

0242.   The client review sample was obtained consistent with professional research sampling standards. Procedures and methods were designed to ensure a random, unbiased, and representative sample that could be used to generalize confidently the findings of the review to the larger population of Medicaid-eligible residents of nursing facilities, age twenty-two and older, with IDD in Texas. PPI X 1365 at 7-12 (Rogers Report) ("Reviewing everyone in a sampling frame is deemed by researchers to be unnecessary as long as a random, representative sample can be drawn that is free from systematic biases."); Trial Tr. 1856:21-1857:11, 1862:24-1863:9, Oct. 24, 2018 (Rogers) (Dr. Rogers' role was "to ensure that an unbiased, random sample was used" for the client review and that the sample was random and representative).

0243.   The client review findings can be generalized to the population of Medicaid-eligible individuals with IDD, ages twenty-two and older, who live in Texas nursing facilities. Trial Tr. 1881:6-19, Oct. 24, 2018 (Rogers) ("I feel confident that we can generalize certainly to the 71 percent [of the population who live within eighty miles of eight major metropolitan areas in Texas]. And I have no reason to believe that we couldn't generalize even further because there is no reason to think that those 29 percent that live more remotely are in any way different."); Trial Tr. 1883:20-22, Oct. 24, 2018 (Rogers); PPI X 1365 at 12-13 (Rogers Report). The  consistency in findings of the first and second client reviews and the statewide QSR lend greater credibility to the findings and overall reliability in terms of generalizing the findings to the population of Medicaid-eligible individuals with IDD, ages twenty-two and older, who live in Texas nursing facilities.

0244.   Defendants' statistician who challenged Dr. Rogers' sampling does not have experience with clinical studies involving individuals with disabilities and does not have specific knowledge about the State's system for serving individuals with disabilities. Trial Tr. 3409:24-3410:1, 3411:7-19,

Nov. 6, 2018 (Salzberg).

0245.   Defendants' statistician who criticized the client review sample was unaware whether individuals in nursing facilities in suburban or rural areas were included in the sample, whether there are differences between the State's nursing facilities in areas that were included in the sample versus those nursing facilities that were not, or whether nursing facilities throughout the State are subject to the same policies and oversight. Trial Tr. 3414:4-17, 3415:1-4, Nov. 6, 2018 (Salzberg). He had no reason to believe that people with IDD in nursing facilities who were not part of the client review sample received better care than individuals who were part of the sample, and he was not asked to assess that. Trial Tr. 3415:5-15, Nov. 6, 2018 (Salzberg).

0246.   While one of Defendants' statistical experts criticized Dr. Rogers' use of the term "representative sample," Trial Tr. 3210:19-3211:22, Nov. 5, 2018 (Warren) ("to statisticians it basically means, just trust me, I did a good job"), Defendants' other statistical expert, who Defendants moved to qualify "as an expert in the field of statistics and statistical sampling," has used that term in his professional work, including in a study he authored in a peer-reviewed journal. Trial Tr. 3397:6-8, 3417:1-11, 3418:8-18, Nov. 6, 2018 (Salzberg).

0247.   Although the State challenged Plaintiffs' and the United States' client review, neither of the experts it retained designed, sampled, or conducted a client review for the State. Trial Tr. 3236:5-13, Nov. 5, 2018 (Warren); Trial Tr. 3411:24-3412:7, Nov. 6, 2018 (Salzberg).

0248.   Neither the State nor its experts conducted their own random sample of individuals with IDD in nursing facilities to assess their needs, services, or preferences. Nor did Defendants' statistical experts have any evidence that the client review findings are incorrect or that individuals with IDD in the State's nursing facilities are receiving needed services. Trial Tr. 3419:18-3420:6, 3420:15-18, Nov. 6, 2018 (Salzberg) ("Q: [Y]ou agree that your report does nothing to demonstrate that anyone in Texas is receiving the services that they are entitled to; does it? A: I don't think it does, no."); Trial

91

Tr. 3255:24-3256:23, 3257:1-17, Nov. 6, 2018 (Warren) (Dr. Warren's report provides no evidence whether individuals with IDD in Texas nursing facilities or the 54 individuals in the client review specifically are receiving professionally appropriate service plans, Active Treatment, or comprehensive functional assessments).

0249.   For the second client review, four IDD experts, Ms. Barbara Pilarcik, RN, Dr. Vickey Coleman, Ph.D., Dr. Lauren Charlot, Ph.D., and Ms. Natalie Russo, RN, reviewed the medical and clinical records from nursing facilities and LIDDAs for each of the fifty-four individuals, met with them and their guardian or LAR, when available, spoke with nursing facility and service coordinator staff responsible for their care, and observed the individual's living environment and program areas. Trial Tr. 455:25-456:7, Oct. 17, 2018 (Pilarcik); Trial Tr. 1730:25-1731:2, 1733:12-1734:5, Oct. 24, 2018 (Charlot); Trial Tr. 854:6-855:19, Oct. 18, 2018 (Coleman); PPI X 1280 at 7 (Pilarcik Report); PPI X 777 at 7-8 (Charlot Report); PPI X 802 at 7-8 (Coleman Report).

0250.   Ms. Pilarcik was the review's lead coordinator. Trial Tr. 457:10-20, Oct. 17, 2018 (Pilarcik). Ms. Pilarcik is a registered nurse and has over thirty-six years of experience as an IDD professional. For thirty-two years, she worked for the Association for Community Living (the Association), a large provider agency that serves individuals with IDD, and was the executive director of the Association for eight years. Trial Tr. 441:10-20, Oct. 17, 2018 (Pilarcik); PPI X 1298 at 2-3 (Pilarcik Pre-Filed Direct Test.); PPI X 1280 at 5-6, 85-90 (Pilarcik Report).

0251.   The Association operated several community ICFs. Ms. Pilarcik supervised these facilities, which served individuals with complex medical needs, and was directly responsible for ensuring that all ICF residents received Active Treatment. The Association, through Ms. Pilarcik's direct involvement, transitioned a significant number of individuals from nursing facilities in Massachusetts to community living arrangements as part of the *Rolland* nursing facility initiative. Trial Tr. 444:6-15, Oct. 17, 2018 (Pilarcik); PPI X 1298 at 3-4 (Pilarcik Pre-Filed Direct Test.); PPI

X 1280 at 6-7 (Pilarcik Report).

0252.    Ms. Pilarcik has conducted clinical reviews of hundreds of individuals with IDD for courts and court monitors in Massachusetts, Georgia, Virginia, and the District of Columbia, and served as a clinical reviewer with Ms. du Pree on the State's QSR. Trial Tr. 445:14-446:23, Oct. 17, 2018 (Pilarcik); PPI X 1298 at 4 (Pilarcik Pre-Filed Direct Test.); PPI X 1280 at 7 (Pilarcik Report).

0253.    Dr. Coleman has more than twenty-five years of experience as an IDD professional and has served in multiple senior roles in Tennessee's IDD system. She currently serves as the State Director of the Office of Civil Rights and Customer-Focused Services of the Tennessee Department of Intellectual and Developmental Disabilities and was appointed to those positions by the Commissioner. Dr. Coleman led Tennessee's effort to review individuals with IDD in nursing facilities to determine whether they could transition to community settings. She was responsible for overseeing the supports and services for approximately 500 individuals with IDD in or at risk of institutional placement in the Arlington class as the Senior Associate to the federal court monitor. In that role and others, she has conducted many hundreds of client reviews of individuals with IDD, and has trained and supervised staff who conducted client reviews. Dr. Coleman has facilitated the successful transition of many individuals with IDD out of intermediate care facilities and nursing facilities. Dr. Coleman has worked with individuals with IDD in a variety of settings, including at large state-run ICFs and in community programs, where she was responsible for identifying individuals' needs, developing and monitoring the implementation of their individual service plans, and ensuring that they received Active Treatment. Dr. Coleman has particular expertise involving individuals with dual diagnoses of IDD and mental illness. Trial Tr. 841:15-853:9, Oct. 18, 2018 (Coleman); PPI X 802 at 6-7 (Coleman Report); PPI X 52 at 1-3 (Coleman Curriculum Vitae).

0254.    Ms. Russo is a registered nurse with over thirty years of experience working in the field of behavioral health and IDD. During her career, she has directly delivered health care, supervised the

delivery of health care services, assessed and evaluated the outcomes of service delivery, conducted systemic and person-centered reviews of the care and treatment of individuals with disabilities, and developed and implemented risk management and quality management programs to oversee health care and case management services to individuals with disabilities. She has conducted client reviews of individuals in nursing facilities and other institutions for federal oversight agencies and courts in the District of Columbia, New York, Mississippi, Louisiana, Pennsylvania, Tennessee, and Virginia, including reviews in Texas for individuals in the state-operated institutions (SSLCs) for individuals with IDD. Trial Tr. 1598:17-1599:11, 1599:16-1560:6, Oct. 23, 2018 (Russo); PPI X 1400 at 5-6, 59-65 (Russo Report).

0255.   Dr. Charlot is a licensed clinical social worker and holds a doctorate in developmental and educational psychology. She has over thirty years of experience as an IDD professional and she focuses on working with people with IDD who have significant behavioral challenges. Dr. Charlot trains clinicians to conduct assessments of individuals with IDD, teaches physicians strategies for working with individuals with IDD, and evaluates individuals with IDD with complex needs and for whom there has been diagnostic confusion. Dr. Charlot has conducted reviews of individuals with IDD in institutions as a federal court monitor in Pennsylvania and Washington and has assessed individuals through her other work in numerous other states. Dr. Charlot has published original research and lectured internationally on the care of individuals with IDD. Her publications include authoring chapters in the Diagnostic Manual for Individuals with Intellectual Disability, the companion to the DSM-5. Trial Tr. 1721:9-1728:12; Oct. 24, 2018 (Charlot); PPI X 777 at 5-7, 77-87 (Charlot Report).

0256.   Ms. Pilarcik, with input and agreement from the other three IDD professionals who conducted the client review (Ms. Russo, Dr. Charlot, and Dr. Coleman), developed six overarching questions for the client review to address. The sixth question on informed choice was further divided

into five subsidiary inquiries. These six questions and subsidiary inquiries framed the client review, and each professional documented the answers to the questions for each individual in the client review. Trial Tr. 457:10-20, Oct. 17, 2018 (Pilarcik); Trial Tr. 1612:14-18, Oct. 23, 2018 (Russo); Trial Tr. 1732:22-1733:10, 1733:12-1734:5, Oct. 24, 2018 (Charlot); Trial Tr. 855:20-856:5, 856:19-24, Oct. 18, 2018 (Coleman); PPI X 1280 at 7 (Pilarcik Report); PPI 777 at 5, 14-16 (Charlot Report).

0257.   To ensure consistency, reliability, and accuracy in answering the six questions and subsidiary inquiries, Ms. Pilarcik, with input and agreement from the other three IDD professionals, developed a set of considerations and factors that were used as a guide for collecting and analyzing information, as well as making their findings. The considerations and factors reflect CMS rules and standards, federal regulations, and accepted professional standards. Trial Tr. 457:21-458:10, 498:17-22, Oct. 17, 2018 (Pilarcik); Trial Tr. 1612:22-1613:7, Oct. 23, 2018 (Russo); Trial Tr. 1733:12-1734:5, Oct. 24, 2018 (Charlot); Trial Tr. 903:19-904:4, Oct. 18, 2018 (Coleman); PPI X 1280 at 7-15 (Pilarcik Report); PPI X 1400 at 6-7 (Russo Report); PPI X 777 at 7-8 (Charlot Report); PPI X 802 at 7-9 (Coleman Report).

0258.   Ms. Pilarcik conducted two training sessions for the other three IDD professionals in order to ensure consistency, clarity, and inter-rater reliability throughout the review. These sessions covered the methodology for conducting the review, the sequence and material to be read before the onsite visits, the process to be used during the visits, the sequence and persons to be interviewed, and the inspection of the physical environment. Following the trainings, Ms. Pilarcik conducted a brief inter-rater reliability test using model client examples. Based on the findings of this test, Ms. Pilarcik was confident that each IDD professional would conduct their review in a consistent, reliable, and accurate manner. Trial Tr. 458:11-460:3, Oct. 17, 2018 (Pilarcik); Trial Tr. 1613:14-23, Oct. 23, 2018 (Russo); Trial Tr. 1733:12-1734:5, Oct. 24, 2018 (Charlot); PPI 1280 at 7-8 (Pilarcik Report);

PPI X 1400 at 6 (Russo Report); PPI X 777 at 7-8 (Charlot Report); PPI X 802 at 7-8 (Coleman Report).

0259.    Ms. Pilarcik found the questions and inquiries, factors and considerations, training, and inter-rater reliability test, combined with each IDD professional's extensive experience conducting similar client reviews in other jurisdictions, sufficient to ensure that all reviewers considered the same issues, collected similar information, and made findings consistently for each individual. Trial Tr. 459:15-460:3, 456:24-457:5, Oct. 17, 2018 (Pilarcik).

0260.    Each IDD professional endorsed and approved the review methodology and determined that it was consistent with professional standards and their experience in prior reviews. They each stated that the client review standards, guidance, trainings, and implementation enabled them consistently and reliably to make findings for each individual they reviewed. Trial Tr. 448:12-23, 498:23-499:6, 499:19-21, Oct. 17, 2018 (Pilarcik); Trial Tr. 1599:12-15, 1601:1-8, 1616:14-22, Oct. 23, 2018 (Russo); Trial Tr. 1733:12-1734:14, Oct. 24, 2018 (Charlot); Trial Tr. 854:20-856:19, Oct. 18, 2018 (Coleman); PPI X 1280 at 7 (Pilarcik Report); PPI X 777 at 7-8 (Charlot Report); PPI X 802 at 7-8 (Coleman Report).[53]

0261.    In consultation with the other IDD professionals, and based on her experience conducting client reviews in Texas and other jurisdictions, Ms. Pilarcik determined the necessary nursing facility and LIDDA records that each IDD professional should review and developed a process for obtaining these documents. She instructed counsel for Plaintiffs and the United States to request two years of nursing facility and LIDDA records for each individual and place them in a secure, online portal for each expert. Each IDD professional reviewed all of these documents prior to their onsite visits to each individual and then read additional nursing facility records while at the facility. Finally, after

---

[53]Ms. Pilarcik testified that the reviewers "gather[ed] the information similarly to the way [they] had gathered information in the QSR" – a process the State agreed to when the QSR was conducted. Trial Tr. 499:19-21, Oct. 17, 2018 (Pilarcik).

the onsite visits were completed, each IDD professional reviewed additional, recent records up to and including September 1, 2017, that were part of a second record collection. Trial Tr. 460:6-461:18, Oct. 17, 2018 (Pilarcik); Trial Tr. 1613:8-18, Oct. 23, 2018 (Russo); Trial Tr. 1733:12-1735:9, Oct. 24, 2018 (Charlot); Trial Tr. 904:17-905:2, Oct. 18, 2018 (Coleman); PPI X 1280 at 8 (Pilarcik Report); PPI X 1400 at 6 (Russo Report); PPI X 777 at 7-8 (Charlot Report);  PPI 802 at 7 (Coleman Report).

0262.   As agreed to and directed by Ms. Pilarcik, each IDD professional created a two to four page narrative for each individual that included findings for all of the six questions and five subsidiary inquiries on informed choice. These individual client narratives describe in detail the facts, records, assessments, services, meetings, observations, and conversations on which each IDD professional based their findings. These narratives were based on their review of the records, their notes from the in-person visits, follow up telephone calls as necessary, and the considerations for each finding. Trial Tr. 499:7-18, Oct. 17, 2018 (Pilarcik); Trial Tr. 1616:18-1617:2, Oct. 23, 2018 (Russo); PPI X 1280 at 23-79 (Pilarcik Report); PPI X 1400 at 12-57 (Russo Report); PPI X 777 at 17-74 (Charlot Report); PPI X 802 at 13-23 (Coleman Report).

0263.   In determining whether individuals in the second review had a comprehensive functional assessment, all of the IDD professionals used the same standard – whether there were detailed and current assessments which identified the individual's specific developmental strengths and developmental and behavioral needs in ten habilitative areas, and which identified the individual's needs for services without regard to the actual availability of those services. *See* 42 C.F.R. § 483.440(c)(3); Trial Tr. 464:13-465:5, Oct. 17, 2018 (Pilarcik); Trial Tr. 1736:9-20, Oct. 24, 2018 (Charlot); Trial Tr. 854:20-855:10, Oct. 18, 2018 (Coleman); PPI X 1280 at 9 (Pilarcik Report); PPI X 1400 at 7 (Russo Report); PPI X 777 at 8-10 (Charlot Report); PPI X 802 at 9 (Coleman Report).

0264.   In determining whether individuals in the second review received all needed specialized

services, all of the IDD professionals used the same standard – whether they were receiving all of

the nursing facility and LIDDA specialized services with the intensity, frequency, and duration that

were required to meet their habilitative needs. *See* 42 C.F.R. § 483.120(b); Trial Tr. 1736:9-20, Oct.

24, 2018 (Charlot); Trial Tr. 854:20-855:10, Oct. 18, 2018 (Coleman); PPI X 1280 at 10 (Pilarcik

Report); PPI X 1400 at 7 (Russo Report); PPI X 777 at 9-10 (Charlot Report); PPI X 802 at 9-10

(Coleman Report).

0265.    In determining whether individuals in the second review had adequate service planning, all

of the IDD professionals used the same standard –  whether there was a current ISP, prepared by an

interdisciplinary team and based on appropriate assessments, that includes specific and measurable

goals and objectives; that describes all services necessary to meet those goals with the requisite

frequency, intensity, and duration of the services; and that includes a method for monitoring services

and measuring progress.  42 C.F.R. § 483.440(c)(4); Trial Tr. 482:16-483:8, Oct. 17, 2018 (Pilarcik);

Trial Tr. 1736:9-20, Oct. 24, 2018 (Charlot); Trial Tr. 854:20-855:10, Oct. 18, 2018 (Coleman); PPI

X 1280 at 10 (Pilarcik Report); PPI X 1400 at 7 (Russo Report); PPI X 777 at 8-10 (Charlot Report);

PPI X 802 at 9-10 (Coleman Report).

0266.    In determining whether individuals in the second review received Active Treatment, all of

the IDD professionals used the same standard – whether individuals receive a continuous, aggressive,

consistent program of specialized and generic training, treatment, health services, and related

services, delivered by trained staff, that is directed toward the acquisition of the behaviors necessary

for the person to function with as much self-determination and independence as possible; and the

prevention or deceleration of regression or loss of current optimal functional status. Active

Treatment must be carried over to all elements of the individual's life and settings where they live

and receive services. *See* 42 C.F.R. § 483.120(a)(2),(b); 42 C.F.R. § 483.440(a); Trial Tr.

478:15-481:11, 481:19-482:13, Oct. 17, 2018 (Pilarcik); Trial Tr. 1736:9-20, Oct. 24, 2018

(Charlot); Trial Tr. 844:9-20, 854:20-855:10, 864:11-865:19, 866:6-22, Oct. 18, 2018 (Coleman);

PPI X 1280 at 11 (Pilarcik Report); PPI X 1400 at 7 (Russo Report); PPI X 777 at 8-10 (Charlot

Report); PPI X 802 at 8-10 (Coleman Report).

0267.   In determining whether individuals in the second review received appropriate transition

planning, all of the IDD professionals used the same standard – whether the ISP describes the

relevant interventions to support the individual toward independence including the specific services

necessary to support the individual to live successfully in the community and a description of

concrete community living options. 42 C.F.R. § 483.440(c)(6)(i); Trial Tr. 488:6-15, Oct. 17, 2018

(Pilarcik); Trial Tr. 1736:9-20, Oct. 24, 2018 (Charlot); Trial Tr. 854:20-855:10, Oct. 18, 2018

(Coleman); PPI X 1280 at 12 (Pilarcik Report); PPI X 1400 at 7 (Russo Report); PPI X 777 at 8-10

(Charlot Report); PPI X 802 at 9-10 (Coleman Report).

0268.   In determining whether individuals in the second review were appropriate for and would

benefit from transition to the community, all of the IDD professionals used the same standard –

whether, based upon their professional experience and accepted professional standards, other

individuals with similar needs were successfully living in the community. Trial Tr. 489:20-491:3,

Oct. 17, 2018 (Pilarcik); Trial Tr. 1736:9-1738:9, Oct. 24, 2018 (Charlot); Trial Tr. 854:20-855:10,

878:20-879:20, 880:19-881:2, 881:17-882:9, Oct. 18, 2018 (Coleman); PPI X 1280 at 11-12

(Pilarcik Report); PPI X 1400 at 7 (Russo Report); PPI X 777 at 10-11 (Charlot Report); PPI X 802

at 10 (Coleman Report).

0269.   In determining whether individuals in the second review received information and

opportunities to make an informed choice whether to remain in the nursing facility, all of the IDD

professionals used the same standard – whether individuals received relevant information about

community options, presented in a manner that reflects and accommodates their disabilities, and

allows for opportunities to receive specialized services in the community, participate in community

activities, visit community programs, and experience community living. Trial Tr. 492:14-493:15,
Oct. 17, 2018 (Pilarcik); Trial Tr. 1672:4-1673:7, Oct. 23, 2018 (Russo); Trial Tr. 1736:9-20,
1738:24-1741:14, Oct. 24, 2018 (Charlot); Trial Tr. 854:20-855:10, 885:25-887:21, Oct. 18, 2018
(Coleman); PPI X 1280 at 12-13 (Pilarcik Report); PPI X 1400 at 8 (Russo Report); PPI X 777 at
11-14 (Charlot Report);  PPI X 802 at 10 (Coleman Report).

0270.    The standards applied by the client review experts have been professional standards in the
field for decades. As Dr. Charlot explained, many of these standards are what gave rise to federal
law and regulations, including *Olmstead*. Trial Tr. 1736:23-1738:6, 1738:20-1739:15,
1780:13-1781:2, 1783:17-1784:20, Oct. 24, 2018 (Charlot) (explaining the evolution of the research
and understanding in the IDD field regarding the harm of institutionalization and the benefits of
integration contributed to *Olmstead* and federal regulations ensuring that people with IDD have
choices).

0271.    The client review experts found that the nursing facility and LIDDA records were frequently
internally inconsistent and in conflict with what they learned during their in-person reviews. Trial
Tr. 540:3-12, Oct. 17, 2018 (Pilarcik), 4183:19-25, Nov. 14, 2018 (Pilarcik), PPI X 777 at 16
(Charlot Report), *see, e.g.*, PPI X 802 at 13-14, 19-20 (Coleman Report) ("BL's records provide
conflicting information on whether he would like to return to living in the community;" although BL
and his mother reported that he wants to go home, "BL's records indicated that he has expressed
satisfaction with the nursing facility and wants to continue to live there.").

0272.    The second client review conducted by Ms. Pilarcik, Dr. Coleman, Ms. Russo, and Dr.
Charlot was significantly more thorough, complete, and accurate than the defense experts' limited
paper reviews. *Compare* PPI X 1280 (Pilarcik Report), with DX 1057 (Bruni Report), and DX 1059
(Partridge Report).

0273.    Each of the four experts who conducted this client review presented aggregate findings in

their reports. The lead reviewer, Ms. Pilarcik, consolidated the findings for all fifty-four individuals in the second client review to generate state and system-wide findings. Trial Tr. 544:1-545:9, Oct. 17, 2018 (Pilarcik).

0274.    The consolidated findings show that none of the fifty-four individuals received a comprehensive functional assessment. Without a comprehensive functional assessment, there is no basis for planning and delivering necessary specialized services. The result is a service plan that often fails to address basic habilitative needs and fails to identify needed services. It also results in a plan that has low expectations, lack of clear direction, fragmentation, and lost opportunities for maintenance or growth of skills in independent living and self-determination. Trial Tr. 545:20-21, Oct. 17, 2018 (Pilarcik); Trial Tr. 1618:17-21, Oct. 23, 2018 (Russo); Trial Tr. 858:16-21, 858:25-860:3, Oct. 18, 2018 (Coleman); Trial Tr. 1744:9-12, Oct. 24, 2018 (Charlot); PPI X 1280 at 15 (Pilarcik Report); PPI X 1400 at 8 (Russo Report); PPI X 777 at 14 (Charlot Report); PPI X 802 at 11 (Coleman Report).

0275.   None of the fifty-four individuals were receiving all necessary specialized services. Every individual reviewed was denied opportunities to increase skills, avoid deterioration, and maximize independence and self-determination. Specialized services are a core component of Active Treatment. Trial Tr. 545:25-546:1, Oct. 17, 2018 (Pilarcik); Trial Tr. 1622:7-12, Oct. 23, 2018 (Russo); Trial Tr. 1749:13-16, Oct. 24, 2018 (Charlot); Trial Tr. 860:4-864:10, Oct. 18, 2018 (Coleman); PPI X 1280 at 11, 15 (Pilarcik Report); PPI X 1400 at 8 (Russo Report); PPI X 802 at 11 (Coleman Report); PPI X 777 at 14 (Charlot Report).

0276.   None of the fifty-four individuals were receiving Active Treatment. Without Active Treatment, none of the fifty-four individuals were receiving a program that meets the federally mandated standard of care and that is directed toward the acquisition of behaviors necessary for the individual to function with as much self-determination and independence as possible. Trial Tr. 546:4,

Oct. 17, 2018 (Pilarcik); Trial Tr. 1629:12-22, Oct. 23, 2018 (Russo); Trial Tr. 864:11-866:15, Oct.

18, 2018 (Coleman); Trial Tr. 1754:25-1755:2, Oct. 24, 2018 (Charlot); PPI X 1280 at 15-16

(Pilarcik Report); PPI X 1400 at 9 (Russo Report); PPI X 802 at 11-12 (Coleman Report); PPI X 777

at 14 (Charlot Report).

0277.  Only one of the fifty-four individuals had a professionally appropriate ISP and only two

included a specific description of transition options. Without this, individuals do not have a plan that

contains goals for transition, a plan for the individual to make an informed choice about the

community, an individualized description of the community options, or strategies to address barriers

to community living. Trial Tr. 546:5-8, Oct. 17, 2018 (Pilarcik); Trial Tr. 869:18-872:18, Oct. 18,

2018 (Coleman); Trial Tr. 1758:10-12, Oct. 24, 2018 (Charlot); PPI X 1280 at 16 (Pilarcik Report);

PPI X 1400 at 9-10 (Russo Report); PPI X 802 at 12 (Coleman Report); PPI X 777 at 15 (Charlot

Report).

0278.  Fifty-three of fifty-four individuals are appropriate for and would benefit from living in the

community. Trial Tr. 546:12-14, Oct. 17, 2018 (Pilarcik); Trial Tr. 1636:9-13, Oct. 23, 2018

(Russo); Trial Tr. 878:12-879:20, Oct. 18, 2018 (Coleman); Trial Tr. 1760:23-1761:2, Oct. 24, 2018

(Charlot); PPI X 1280 at 16 (Pilarcik Report); PPI X 1400 at 10 (Russo Report); PPI X 802 at 12

(Coleman Report);  PPI X 777 at 15 (Charlot Report). As the Supreme Court stated in *Olmstead*,

institutional placement "perpetuates the unwarranted assumptions that persons so isolated are

incapable or unworthy of participating in community life." 527 U.S. at 583. It is a widespread

professional principle that persons with IDD thrive best living in and experiencing the normal

rhythms of everyday community living.

0279.  Forty-six of fifty-four individuals or their guardians have not made an informed choice to

remain in a nursing facility. As a result, they remain unnecessarily institutionalized in these

segregated settings. Trial Tr. 546:25-547:1, Oct. 17, 2018 (Pilarcik); Trial Tr. 883:17-25, Oct. 18,

2018 (Coleman); Trial Tr. 1764:10-12, Oct. 24, 2018 (Charlot); PPI X 1280 at 16 (Pilarcik Report);

PPI X 1400 at 11 (Russo Report); PPI X 802 at 12 (Coleman Report); PPI X 777 at 15-16 (Charlot

Report).

0280.    Only two of fifty-four individuals, or four percent, had an ISP that included a specific

description of transition options in Phase II of Section 9. Trial Tr. 548:7-11, Oct. 17, 2018 (Pilarcik);

Trial Tr. 1639:19-24, Oct. 23, 2018 (Russo); Trial Tr. 887:22-25, Oct. 18, 2018 (Coleman); Trial Tr.

1766:23-1767:2, Oct. 24, 2018 (Charlot); PPI X 1280 at 16 (Pilarcik Report); PPI X 1400 at 11

(Russo Report); PPI X 802 at 12 (Coleman Report); PPI X 777 at 16 (Charlot Report).

0281.    Only one individual or their guardian – two percent – had visited community living or

support providers. Trial Tr. 548:12-14, Oct. 17, 2018 (Pilarcik); Trial Tr. 1639:25-1640:2, Oct. 23,

2018 (Russo); Trial Tr. 888:1-3, Oct. 18, 2018 (Coleman); Trial Tr. 1767:5-9, Oct. 24, 2018

(Charlot); PPI X 1280 at 16 (Pilarcik Report); PPI X 1400 at 11 (Russo Report); PPI X 802 at 12

(Coleman Report); PPI X 777 at 16 (Charlot Report).

0282.    Only three individuals – six percent – had barriers to living in the community addressed.

Trial Tr. 548:15-18, Oct. 17, 2018 (Pilarcik); Trial Tr. 1640:3-5, Oct. 23, 2018 (Russo); Trial Tr.

888:4-6, Oct. 18, 2018 (Coleman); Trial Tr. 1767:25-1768:11, Oct. 24, 2018 (Charlot); PPI X 1280

at 17 (Pilarcik Report); PPI X 1400 at 11 (Russo Report); PPI X 802 at 12 (Coleman Report); PPI

X 777 at 16 (Charlot Report).

0283.    Despite the lack of specialized services to address habilitative needs, Active Treatment to

maximize independence and self-determination, individualized transition planning, concrete steps

to address barriers, adequate information about community options, and actual community

experience, at the time of the second client review: (a) Seventy-two percent of individuals

(thirty-nine) expressed an interest in learning more about the community (Trial Tr. 548:19-23, Oct.

17, 2018 (Pilarcik); Trial Tr. 1638:25-1639:6, Oct. 23, 2018 (Russo); Trial Tr. 888:7-17, Oct. 18,

2018 (Coleman); Trial Tr. 1766:1-22; Oct. 24, 2018 (Charlot); PPI X 1280 at 17 (Pilarcik Report);

PPI X 1400 at 11 (Russo Report); PPI X 802 at 12 (Coleman Report); PPI X 777 at 16 (Charlot

Report)) and (b) Fifty-two percent of individuals (twenty-eight) were interested in transitioning to

the community (Trial Tr. 548:24-549:1, Oct. 17, 2018 (Pilarcik); Trial Tr. 1639:7-9, Oct. 23, 2018

(Russo); Trial Tr. 888:18-889:2, Oct. 18, 2018 (Coleman); Trial Tr. 1766:1-22, Oct. 24, 2018

(Charlot); PPI X 1280 at 17 (Pilarcik Report); PPI X 1400 at 11 (Russo Report); PPI X 802 at 12

(Coleman Report); PPI X 777 at 16 (Charlot Report)).

0284.   The client review findings are strong, consistent, and make a powerful statement. Trial Tr.

1876:15-21, 1877:10-1878:1, Oct. 24, 2018 (Rogers); *see* PPI X 422 (client review aggregate

findings). The consistency of the client review findings increased Dr. Rogers' confidence in the

findings, especially because multiple independent reviewers came to similar conclusions. Trial Tr.

1880:13-1881:5, Oct. 24, 2018 (Rogers).

0285.   Very few individuals with IDD in nursing facilities are receiving comprehensive functional

assessments, specialized services, and Active Treatment. Factoring in the margin of error, the client

review demonstrates that somewhere between zero and 11.07 % of all individuals with IDD in

nursing facilities have received a comprehensive functional assessment, specialized services, and/or

Active Treatment. Trial Tr. 1878:5-1879:5, Oct. 24, 2018 (Rogers).

0286.   Similarly, zero to 13.07 % of all individuals have a professionally appropriate ISP. Trial Tr.

1879:6-17, Oct. 24, 2018 (Rogers).

0287.   The vast majority of individuals are appropriate for community living. Applying the margin

of error, between 87 % to 100 % of all individuals are appropriate for community living. Trial Tr.

1879:18-1880:2, Oct. 24, 2018 (Rogers).

0288.   Applying the confidence interval and margin of error to the final finding of the client review,

between 74 % and 96 % of all individuals did not make an informed choice to remain in a nursing

facility. Trial Tr. 1880:3-12, Oct. 24, 2018 (Rogers).

0289.   The findings in the QSR and the Client Reviews are relevant, reliable, and probative of the issues in this case. Defendants' arguments against these consistent, compelling findings as representative of the class are without merit. As the Supreme Court noted in *Tyson Food, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016):

> [P]etitioner and various of its amici maintain that the Court should announce a broad rule against the use in class actions of what the parties call representative evidence. A categorical exclusion of that sort, however, would make little sense. A representative or statistical sample, like all evidence, is a means to establish or defend against liability. Its permissibility turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action. *See* Fed. Rules Evid. 401, 403, and 702.
>
> It follows that the Court would reach too far were it to establish general rules governing the use of statistical evidence, or so-called representative evidence, in all class-action cases. Evidence of this type is used in various substantive realms of the law. [  ] Whether and when statistical evidence can be used to establish classwide liability will depend on the purpose for which the evidence is being introduced and on "the elements of the underlying cause of action," *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809, 131 S.Ct. 2179 (2011).
>
> In many cases, a representative sample is "the only practicable means to collect and present relevant data" establishing a defendant's liability. MANUAL OF COMPLEX LITIGATION § 11.493, p. 102 (4th ed. 2004).

*Tyson Food, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-455, 136 S.Ct. 1036, 1046 (2016).

VII.

The State fails to comply with the PASRR and Reasonable
Promptness Provisions of Title XIX of the Social Security Act

A.    The State's PASRR redesign fails to remedy noncompliance identified by the Federal Government

0290.   The State was on notice as early as January 2007 that it was not complying with PASRR.

That month, based on a sample drawn from Texas and four other states, the HHS Office of Inspector General (OIG) reported multiple PASRR compliance "deficiencies that should be addressed to

ensure that individuals with [intellectual disabilities] are appropriately placed and receive necessary [intellectual disability] services." PPI X 998 at 6, 12 (U.S. Dep't of Health and Human Servs., Office of Inspector Gen., PASRR for Younger Nursing Facility Residents with Mental Retardation, Jan. 2007). Nearly three years later, in December 2009, CMS notified HHSC that HHSC's PASRR system still did not comply with PASRR. PPI X 188 (Letter from CMS Associate Regional Administrator Bill Brooks to HHSC Associate Commissioner for Medicaid and CHIP Chris Traylor, Dec. 10, 2009). CMS identified systemic problems, including nursing facilities completing the PASRR evaluation (PE), failure to complete the PE before nursing facility admission, and the PE not including evaluation of need and specialized services recommendations. PPI X 188. In May 2011, HHSC responded in writing to CMS concerns, outlining a proposed "redesign" of the PASRR system. PPI X 189 (Letter from HHSC Associate Commissioner for Medicaid and CHIP Billy Millwee to CMS Associate Regional Administrator Bill Brooks, May 25, 2011) (attached to email from Geri Willems, Oct. 7, 2014). Texas did not begin implementing the PASRR redesign until May 2013. *See* PPI X 191 (Texas Redesigned Pre-Admission Screening and Resident Review Program, stating that 2009 CMS notice was impetus for redesign and setting out timeline confirming implementation of redesigned PASRR system occurred in May 2013); PPI X 496 (Timeline for implementing PASRR redesign, beginning in 2009 with notice of noncompliance from CMS and ending in rollout in May 2013); PPI X 328 (HHSC (DADS) Information Letter No. 12-72 to Nursing Facilities re PASRR process changing, Aug. 2, 2012); PPI X 329 (HHSC (DADS) Information Letter No. 12-84 to Nursing Facilities re PASRR process changing, Oct. 31, 2012); PPI X 330 (HHSC (DADS) Information Letter No. 13-07 to Local Authorities re PASRR process changing, Feb. 11, 2012); PPI X 361 (2013 CMS/PTAC findings on state performance under PASRR with Texas on notice that it was one of four lowest performing states); Turner 30(b)(6) Dep. 24:8-25:18, Feb. 21, 2018.

0291. As provided in more detail below, HHSC's 2013 redesign of its PASRR system has not produced compliance with PASRR. *See* PPI X 620 (Provider Letter No. 16-33, Top Non-compliance Trends with the PASRR Requirements, Aug. 31, 2016). In fact, the PASRR redesign has resulted in bypassing the PE process for ninety-seven percent of all admissions to nursing facilities, thereby undermining a core purpose of PASRR – to prevent unnecessary admissions to nursing facilities. Trial Tr. 3839:18-3840:18, Nov. 9, 2018 (Turner); PPI X 585 (HHSC webinar training "PASRR 101," June 22, 2017); PPI X 511 (listing recurring problems and proposed enhancements to the TMHP portal for 2017 that "are necessary to comply with PASRR"); Turner 30(b)(6) Dep. 71:13-21, Feb. 21, 2018 (there is no evidence that the PASRR redesign resulted in any increase in the number of diversions).

B.   The Program Review and PASRR Review conducted by Plaintiffs' and the United States' experts

0292. Plaintiffs' experts Mr. Randall Webster and Ms. Nancy Weston conducted a Program Review of LIDDA practices and processes in seven areas relevant to compliance with PASRR and Title II of the ADA. Trial Tr. 1214:17-1215:7, Oct. 22, 2018 (Webster) (testifying that to ensure consistency, he and Ms. Weston developed seven probes or "topics that ought to be looked into with respect to the implementation of PASRR and compliance with the ADA Title II"); *see also* PPI X 1762 at 5-6 (Webster Report) (describing the purpose of the Program Review and the seven probes developed by him and Ms. Weston). The Program Review experts focused on the LIDDAs' practices because the State has tasked the LIDDAs with implementing these practices within each of the thirty-nine service areas. PPI X 1762 at 6-16. As Mr. Webster explains, the LIDDAs are "the intermediary between the policies and procedures that are developed by the [S]tate . . . HHSC, and the individuals who were served." Trial Tr. 1206:10-16, Oct. 22, 2018 (Webster). Mr. Webster and Ms. Weston also reviewed information related to community service providers because they are "one of the primary

sources for the provision of services for individuals who would be transitioning or who need specialized services." Trial Tr. 1213:16-25, Oct. 22, 2018 (Webster).

0293.   Specifically, Mr. Webster and Ms. Weston reviewed whether the LIDDAs were (1) properly identifying, screening, evaluating, and diverting people with IDD; (2) making professionally adequate determinations of the need for specialized services that were based on a comprehensive functional assessment of all relevant habilitative need areas; (3) providing, or ensuring that nursing facilities provided, all needed specialized services with the frequency, intensity, duration, and continuity to constitute a program of Active Treatment; (4) providing professionally adequate service planning, coordination, and monitoring of services in nursing facilities; (5) providing professionally adequate transition planning; and (6) providing adequate, individualized information and meaningful options, in order to allow the individual with IDD to make an informed choice about whether to enter or remain in the nursing facility, and were successful in transitioning individuals out of nursing facilities into the community. Finally, the experts reviewed whether the sampled provider network has the ability to meet the identified service needs of individuals in nursing facilities and capacity to provide residential services to people who choose to live in the community. Trial Tr. 1216:7-1217:8, Oct. 22, 2018 (Webster); Trial Tr. 1428:22-1429:11, Oct. 22, 2018 (Weston); PPI X 1762 at 6 (Webster Report). Combined, Mr. Webster and Ms. Weston conducted interviews with staff at twenty-six of the thirty-nine LIDDAs, and fifteen providers. Trial Tr. 1209:17-24, 1213:11-1214:11 Oct. 22, 2018 (Webster). They also conducted an extensive review of documents about HHSC's oversight of LIDDAs and LIDDA actual performance, including the LIDDAs' Performance Contract with HHSC; HHSC instructions, forms, and other guidance; LIDDA Quarterly Reports; QSR reports and data; and a survey of additional providers. PPI X 1762 at 7-8, 54-63 (Webster Report); PPI X 1906 at 8-10 (Weston Report).

0294.   Ms. Weston also conducted a PASRR system review, "looking at the [S]tate's ability to

ensure compliance with these key principles of PASRR." In conducting this review, Ms. Weston reviewed State documents and policies, regulations, deposition testimony, and data from the State and LIDDAs. Trial Tr. 1409:6-13, 1429:12-1435:10, Oct. 22, 2018 (Weston); *see also* PPI X 1906 at 7, 70-92 (Weston Report).

0295.  Mr. Webster has more than forty years of experience in the field of IDD services, which he relied on when conducting his Program Review. This includes twenty-three years as the Director of an Area Office for the Department of Developmental Disabilities (DDS) in Massachusetts. As the Area Office Director, he managed the provision and procurement of services to individuals with IDD. In that role, he oversaw the functions of the DDS service coordination program, which is available to every individual in the service area, including individuals receiving services in the community and individuals with an IDD diagnosis who are placed in nursing facilities through the PASRR process. Trial Tr. 1194:12-1195:21, 1213:3-10, Oct. 22, 2018 (Webster) ("I also relied on my 40 years of experience"). Mr. Webster utilized a number of strategies to oversee the service coordination program, including regular meetings with service coordinators and their supervisors, and data review. Trial Tr. 1195:22-1196:18, Oct. 22, 2018 (Webster); PPI X 1762 at 6-7, 41 (Webster Report).

0296.  Subsequently, as Assistant Commissioner for Field Operations from 2010 to 2014, Mr. Webster was responsible for general statewide oversight, service design and delivery, and policy development to ensure that any citizen with IDD in Massachusetts was either placed into a community setting from a nursing facility or, if remaining in a nursing facility, was receiving services that met the standard for Active Treatment. PPI X 1762 at 7-8, 41 (Webster Report).

0297.  Mr. Webster also had a lead role in promoting and achieving substantial compliance with the federal court order in *Rolland v. Patrick*, a case in Massachusetts that required the timely placement of individuals who lived in nursing facilities into the community and/or the provision of Active

Treatment to those who remained. Trial Tr. 1197:6-25, 1202:3-1203:1, Oct. 22, 2018 (Webster) (describing his responsibilities with respect to *Rolland* as Area Director and Assistant Commissioner, respectively); PPI X 1762 at 7, 41 (Webster Report).

0298.   Ms. Weston has more than seventeen years of experience as the statewide Director of PASRR in Massachusetts. She designed, developed and manages a statewide PASRR program that a vendor previously managed. Ms. Weston is responsible for daily oversight and implementation of the PASRR process and its consistent administration by regional and central office PASRR evaluators. She has developed and provided annual statewide PASRR trainings to maximize nursing facility compliance. PPI X 1906 at 5-6 (Weston Report).

0299.   Ms. Weston restructured the Massachusetts PASRR system to effectively reduce nursing facility lengths of stay and ensure that people with IDD do not inappropriately remain in nursing facilities. Through this effort, the Massachusetts statewide nursing facility census of individuals with IDD markedly decreased from more than 1600 in 2001 to approximately 200 mostly short-term nursing facility residents in 2018. Trial Tr. 1409:14-1417:17, Oct. 22, 2018 (Weston); PPI X 1906 at 6 (Weston Report).

0300.   Ms. Weston is also Director of Nursing Facility Operations, which includes oversight of a highly skilled Active Treatment team dedicated to ensuring the appropriate delivery of specialized services and the provision of Active Treatment in nursing facilities, consistent with 42 C.F.R. §§ 440(a)-(f). The Active Treatment team ensures that each person with IDD in nursing facilities receives a comprehensive functional assessment within thirty days of admission. The Department of Public Health, including members of the DDS Quality Enhancement teams, annually reviews compliance with this Active Treatment standard through nursing facility surveys. Trial Tr. 1409:14-1417:2, Oct. 22, 2018 (Weston); PPI X 1906 at 6 (Weston Report).

0301.   Similar to the Program Review LIDDA interviews, as Director of PASRR and Nursing

Facility Operations, Ms. Weston meets with the PASRR and Active Treatment teams to review PASRR compliance issues and to discuss concerns. In overseeing a statewide system that complies with PASRR and delivers Active Treatment to people with IDD in nursing facilities, Ms. Weston relies on her regular meetings with the Active Treatment and PASRR teams and on review of individual and aggregate data. Trial Tr. 1409:14-1412:24, Oct. 22, 2018 (Weston).

0302. Because of these efforts to comply with PASRR and deliver Active Treatment, and independent findings that all recommended residents of nursing facilities were receiving Active Treatment, the United States District Court found that the Commonwealth of Massachusetts and DDS were in substantial compliance with its orders in *Rolland v. Patrick*, 946 F. Supp. 2d 226 (D. Mass. 2013), and dismissed that case. Since the dismissal, Ms. Weston has continued to ensure PASRR compliance and delivery of Active Treatment. Trial Tr. 1417:3-1428:14, Oct. 22, 2018 (Weston); PPI X 1906 at 17 (Weston Report).

C.    The State of Texas fails to conduct appropriate and timely screenings and evaluations as required by PASRR

0303. PASRR is a federal requirement, applicable to all states, to help ensure that individuals with IDD are not inappropriately placed in nursing facilities for long-term care. Trial Tr. 1443:20-1444:13, Oct. 22, 2018 (Weston).

0304. PASRR is "an important tool for states to use in rebalancing services away from institutions and towards supporting people in their homes, and to comply with the Supreme Court decision, *Olmstead . . .*".  PPI X 1762 at 10-11 (Webster Report) (incorporating Preadmission Screening and Resident Review, https://www.medicaid.gov/medicaid/ltss/institutional/pasrr/index.html); Trial Tr. 1443:11-1444:13, Oct. 22, 2018 (Weston); PPI X 1906 at 12-13 (Weston Report); DX 300 at 2 ("PASRR considers community services first, before institutional options.  It is an effective element in state rebalancing efforts.").

0305.   According to CMS guidance, "[s]tates cannot adequately meet their *Olmstead* objectives without leveraging the powers of PASRR." PPI X 363 at 11. There are "special protections under PASRR in Medicaid law to ensure that long term services and supports are provided in the most integrated setting that meets the individual's needs and preferences . . . which align with state obligations under the Americans with Disabilities Act (ADA) and the Supreme Court's decision in *Olmstead* to serve people in the most integrated setting appropriate." PPI X 363 at 4.

0306.   PASRR's overarching goals are to prevent inappropriate nursing facility placement of individuals with IDD, and to ensure they receive all necessary specialized services if they are admitted. Trial Tr. 1443:20-1444:8, Oct. 22, 2018 (Weston). To accomplish these goals, PASRR requires evaluation of all applicants to a Medicaid-certified nursing facility to determine if they have a serious mental illness and/or intellectual disability or related condition; need an institutional level of care that cannot be provided in a range of alternative settings; need specialized services to provide a program of Active Treatment; and can obtain those specialized services in the nursing facility to which they seek admission. Trial Tr. 1444:9-1445:4, Oct. 22, 2018 (Weston); PPI X 1762 at 10 (Webster Report); PPI X 1906 at 11 (Weston Report) (citing 42 C.F.R. §§ 483.132(a)(1)-(4)); *see also* Trial Tr. 3983:21-3984:5, 3996:18-4000:12, 4027:18-4028:5, Nov. 13, 2018 (Howe) (diversion is one of the primary goals and core purposes of PASRR); Trial Tr. 3423:5-13, Nov. 6, 2018 (Belliveau) (one of PASRR's main objectives is "to assure that individuals are appropriately placed," which includes diversions and transitions from nursing facilities). Texas HHSC has acknowledged the important relationship between PASRR and *Olmstead*. *See* PPI X 125 at 62 (HHSC training, stating that PASRR is "Key to ADA and *Olmstead* Compliance").

0307.   PASRR requires a two level screening and evaluation process: Level I is an identification process and Level II is an evaluation. The Level I component (referred to as the PL1 in Texas) identifies a suspicion of ID or DD. The Level II component (referred to as the PASRR Evaluation

or PE in Texas) is an evaluation to determine whether nursing facility level of services and specialized services are needed, determine the appropriate placement, and inform an individual's plan of care. These determinations must be made based on an analysis of data concerning the individual's strengths and needs. A qualified IDD professional must complete the PASRR Level II (or PE) review. Trial Tr. 1444:14-1447:8, Oct. 22, 2018 (Weston); Trial Tr. 3985:24-3986:24, Nov. 13, 2018 (Howe); Trial Tr. 2416:20-2417:1, 2423:21-2424:8, Oct. 31, 2018 (Willems) (describing purpose of PL1 and PE); Trial Tr. 1218:6-10, Oct. 22, 2018 (Webster) (a PASRR Level I screening must be conducted for every individual referred to a nursing facility to determine whether or not there is a suspicion of IDD); Trial Tr. 1218:11-23, Oct. 22, 2018 (Webster) (a PASRR Level II is a process that confirms whether or not an individual has IDD, determines whether an individual meets a nursing facility level of care, considers whether their needs can be met in the community rather than a nursing facility, and recommends specialized services); PPI X 1906 at 11 (Weston Report) (citing 42 C.F.R. §§ 483.130, 483.132, 483.136); PPI X 159 (PASRR Process flowchart); PPI X 1212 at 4 (Detailed Item by Item Guide for Completing the PE); PPI X 689 at 4 (Detailed Item by Item Guide for Completing the PL1); PPI X 1762 at 11 (Webster Report).

0308.   According to CMS guidance, the Level II must not simply determine whether an individual with IDD needs a nursing facility level of care. It must also determine whether the particular nursing facility can meet the particular person's total needs. In addition, the Level II must identify the services the individual would need to live in the community, even if the nursing facility is the most practical option at the time. PPI X 1884 at 4 ("Whether individuals have MI or ID is never enough by itself to warrant admission into a NF. . . . The question that PASRR must address is not just whether an individual needs NF level of care, but whether *this* NF can meet the person's *total needs* – their medical needs and their MI/ID needs. The Level II must also determine whether the individual's needs would be better met by living in the community *whether or not those services are*

*currently available*. Even if NF placement is ultimately the most practical option, the Level II should identify the services the individual would need to live in the community, even if those services do not exist or are inaccessible . . .".); *see also* Trial Tr. 1475:3-1477:6, Oct. 23, 2018 (Weston) (discussing her reliance on this guidance in directing nursing facility operations under PASRR).

0309.   For individuals needing nursing or inpatient care, states are required to explore other alternatives that could more appropriately meet the individual's needs, including community-based waiver services. Medicaid guidance requires that individuals with IDD must be offered the most appropriate setting in which to receive services and should receive needed services in that setting. PPI X 1906 at 12 (Weston Report).

      1.      Level I Screenings (PL1s) are not completed as required

0310.   An analysis of Texas data demonstrates that the PL1 is rarely completed as intended. In particular, Sections E and D of the PL1, which are critical to meeting PASRR's purpose of avoiding inappropriate nursing facility placement, are rarely completed. Trial Tr. 1447:12-23, 1449:3, 1451:10-12, Oct. 22, 2018 (Weston); Willems 30(b)(6) Dep. 66:1-5, Oct. 16, 2017 (HHSC's PASRR unit does not routinely track whether PL1s are received from referring entities at admission).

0311.   Four questions in Section E of the PL1 form relate to where the individual would like to live. The first includes multiple choice answer options: "alone with support," "a place where there is 24 hour care," "a group home," a "family home," "other," and "unknown." Another question with multiple choice answer options identifies with whom the individual would like to live, and two fill-in-the-blank questions allow for comments about these issues. Trial Tr. 1447:24-1448:23, Oct. 22, 2018 (Weston); PPI X 1367 at 11 (PASRR Level 1 Screening Form).

0312.   Dr. Darlene O'Connor led a team of researchers and programmers from Westat, formerly JEN Associates, Inc., in analyzing data collected in Texas from September 1, 2016, to September 1, 2017, through the PASRR Level 1 Screening and PASRR Evaluation for adults whose most recent

PASRR Evaluation confirmed IDD. Dr. O'Connor analyzed the utilization of certain questions or fields on those forms as recorded in the data produced by Texas. For the PL1 forms, Dr. O'Connor analyzed results for all forms completed during the time period as well as the first form completed during the period. For the PASRR Evaluation, Dr. O'Connor analyzed all forms as well as the most recent form completed in the time period. Trial Tr. 971:25-974:11, Oct. 19, 2017 (O'Connor); PPI X 1208 at 6-8, 10-12 (O'Connor Rebuttal Report); PPI X 647 at tabs 1, 2.

0313.    Dr. O'Connor has approximately thirty-five years' experience in the long-term supports and services field, including work at the local level, for state agencies, for the federal government, and at universities. Her work has included managing home and community-based services, a state's PASRR program, and research, and most of her career has involved data analysis relating to long-term services and supports. Trial Tr. 942:15-943:1, Oct. 18, 2018 (O'Connor). Dr. O'Connor's work as a Senior Study Director at Westat focuses on analyzing health data to inform policy and evaluate programs in the area of long-term services and supports. Trial Tr. 943:15-22, Oct. 18, 2018 (O'Connor). Dr. O'Connor oversaw the state of Connecticut's PASRR screening and evaluation process as part of her role with the state's Medicaid agency. She also served on the board of the National Association of PASRR Professionals for six years and has conducted research studies related to PASRR in her role with the University of Massachusetts. Trial Tr. 945:18-946:12, Oct. 18, 2018 (O'Connor). Dr. O'Connor's team has extensive experience analyzing health assessments, claims, encounters, and other forms of administrative health data. Trial Tr. 943:9-945:5, Oct. 18, 2018 (O'Connor); PPI X 1207 at 6, 27-36 (O'Connor Report).

0314.    To conduct all of their data analyses, Dr. O'Connor led her research team in their standard approach of reviewing relevant documentation to understand the State's data, applying a data quality and completeness process, identifying relevant data sources, fields, and variables, and linking and analyzing the data. Trial Tr. 940:10-24, 943:23-944:10, 948:11-951:22, Oct. 18, 2018 (O'Connor)

(describing methodology for preparing data for analysis); Trial Tr. 960:10-16, 961:9-962:18, Oct.
19, 2018 (O'Connor) (explaining that the process for analyzing the State's data was "very consistent"
with analyses done for other clients and describing the methodology for selection and review of
data); PPI X 1207 at 7-10 (O'Connor Report); PPI X 1208 at 6-8 (O'Connor Rebuttal Report).

0315.   Dr. O'Connor found that Section E of the PL1 Screening is rarely utilized to identify alternate
living options for people being screened for nursing facility admission. Ninety-nine percent of
individuals with IDD who received a PASRR Level 1 Screening between September 1, 2016, and
September 1, 2017, did not have an answer recorded for the question "Where would this individual
like to live now?" or for the question about living arrangements on the screening form. Trial Tr.
977:1-23; Oct. 19, 2018 (O'Connor) (explaining that fields E0100 and E0300 were missing for
ninety-nine percent of people who had a PL1 screen); PPI X 1208 at 11 (O'Connor Rebuttal Report);
PPI X 647 at tab 1. Dr. O'Connor concluded that Section E of the PL1 Screening is rarely utilized
to identify alternate living options for people being screened for nursing facility admission.  PPI X
1208 at 11 (O'Connor Rebuttal Report).

0316.   This failure to complete Section E of over ninety-nine percent of the PL1 forms is significant
because it means that the overwhelming majority of individuals being screened for nursing facility
admission are not provided the opportunity to say where they want to live prior to admission. Trial
Tr. 1448:24-1449:8, Oct. 22, 2018 (Weston); PPI X 1907 at 7 (Weston Rebuttal Report) (citing
data).

0317.   The manager of HHSC's PASRR Unit agreed with the data and further agreed that "[i]t is
a problem" that data shows that Section E of the PL1 was not completed ninety-nine percent of the
time. Trial Tr. 2481:13-2482:25, Oct. 13, 2018 (Willems). Consistent with the data, Section E of the
PL1 was not completed for twenty individuals reviewed by Ms. Pilarcik in her initial client review.
Trial Tr. 4225:19-4226:2, Nov. 14, 2018 (Pilarcik). The paper PL1 screening forms that were

collected for the client review shows that of forty individuals, many of whom had multiple PL1 screening forms completed, only three had a PL1 form where Section E was completed. PPI X 2225 *passim*.

0318.   Section D of the PL1 Screen requires a certification from the admitting nursing facility that it is willing and able to serve the individual. This is a substantive requirement for a determination of whether or not the nursing facility can meet the person's specialized needs in order to prevent admissions where needed specialized services will not be available. Trial Tr. 1449:9-17, Oct. 22, 2018 (Weston); Trial Tr. 2662:12-21, Nov. 1, 2018 (Bruni).

0319.   However, 62.1 percent of individuals with IDD who received a PL1 Screen between September 1, 2016, and September 1, 2017 did not receive the certification required in Section D. For those individuals who stayed in the nursing facility for more than ninety days, 57.8 percent did not receive this certification. Trial Tr. 976:9-25, Oct. 19, 2018 (O'Connor) (explaining that field D0100N was missing for sixty-two percent of people who had a PL1 screen); PPI 1208 at 12 (O'Connor Rebuttal Report); PPI X 647 at tab 1;  Trial Tr. 1449:9-24, Oct. 22, 2018 (Weston).

0320.   QSR results corroborate this data. QSR Outcome Measure 2-13 seeks to confirm that individuals who need specialized services only are admitted to a nursing facility if the need for specialized services can be met by the nursing facility, LIDDA, or both. Performance on this measure for the Nursing Facility and Transition Target Populations dramatically declined from 75 % in 2015 to 39 % in 2016 and to 33 % in 2017 and even further to 32 % just for the Nursing Facility Target Population in 2017. *See* Trial Tr. 192:3-13, Oct. 15, 2018 (du Pree); PPI X 318 at 16 (2016 PASRR QSR Compliance Status Interim Report); PPI X 253 at 5; PPI X 254 at 8; Diase Dep. 161:19-163:13, 180:19-181:22, Nov. 1, 2017 (acknowledging that nursing facilities in the sample did not certify that they can provide needed specialized services and that this failure to ensure the certification is complete amounts to a lack of oversight by HHSC); Dionne-Vahalik Dep. 173:1-175:4, Dec. 19,

2017 (attesting that people were entering nursing facilities without any indication that the nursing facility could meet the their needs).

0321.   The State's own records similarly show that between June 2016 and March 2017, approximately 715 individuals were admitted to nursing facilities without a nursing facility certification that it could meet their needs. DX 630-C at tab 1; *see* Trial Tr.1449:25-1451:12, Oct. 22, 2018 (Weston); PPI X 516 at 4; Turner 30(b)(6) Dep. 176:1-9, 176:22-177:4, 177:22-178:1, 178:20-179:8, Feb. 21, 2018; *see also* Trial Tr. 2472:11-2473:4, Oct. 31, 2018 (Willems) (referencing PPI X 516 and 1683 and confirming that nursing facility certifications that needs can be met were only completed for approximately thirty-five percent of admissions).

0322.   Based on all available data, nursing facilities in Texas routinely fail to determine and certify that they can provide all needed specialized services. This systemic failure to ensure nursing facilities complete the required certification enables the admission and continued stay in nursing facilities without any determination that the nursing facility can meet the person's needs, and is directly contrary to PASRR's purpose. Trial Tr. 976:13-25, Oct. 19, 2018 (O'Connor) (explaining that field D0100N was missing for sixty-two percent of people who had a PL1 screen); Trial Tr. 1451:15-1452:3, Oct. 22, 2018 (Weston); PPI X 1208 at 12 (O'Connor Rebuttal Report); PPI X 647 at tab 1; PPI X 318 at 16 (2016 QSR Report showing that Outcome Measure 2-13 drops by fifty percent from 2015 to 2016); PPI X 1907 at 7-8 (Weston Rebuttal Report).

0323.   Ms. Turner erroneously testified that there is no requirement in the federal PASRR regulations for a determination that the nursing facility can provide all needed specialized services. Trial Tr. 3747:8-14, Nov. 9, 2018 (Turner). In fact, 42 C.F.R. § 483.132(a)(3) requires that the PASRR evaluator determine if the nursing facility can provide all needed specialized services, and 42 C.F.R. § 483.126 requires that the state only authorize the admission of an individual with IDD to a specific nursing facility if the state determines that that facility can provide all needed

specialized services. These regulatory requirements are based on federal law, not Texas state rules, as Ms. Turner asserted. Trial Tr. 3842:23-3844:24, Nov. 9, 2018 (Turner).

0324.    Defendants' PASRR expert Ms. Kathi Bruni acknowledged that it is "important" for an admitting nursing facility to say that it can meet the needs of the person being admitted. Trial Tr. 2665:12-19, Nov. 1, 2018 (Bruni). But she also testified that, even if she assumes that Section D's "important" certification is not completed fifty percent of the time and that Section E is not completed ninety-nine percent of the time, her conclusion that HHSC's PASRR system was "compliant" was not affected. The credibility of Ms. Bruni's opinion of compliance is undermined by her disregard for uncontroverted data showing HHSC's continued failure to ensure compliance with PASRR. *See* Trial Tr. 2698:7-2700:6, Nov. 1, 2018 (Bruni).

0325.    One of the central features of HHSC's PASRR system redesign included automation of the Level I and Level II PASRR processes in the Texas Medicaid and Healthcare Partnership (TMHP) portal. Trial Tr. 3731:12-3732:13, Nov. 9, 2018 (Turner); *see* PPI X 778 at 8 (document prepared by HHSC staff for a 30(b)(6) deposition, including a description of TMHP database). But these automation efforts do not correct HHSC's systemic failures to prevent and minimize nursing facility stays where possible. PPI X 1907 at 16-17 (Weston Rebuttal Report). Moreover, several aspects of this automation process were implemented improperly, and were not corrected as of September 1, 2017. Trial Tr. 3765:8-25, Nov. 9, 2018 (Turner) (nursing facility did not have access to be able to enter data into Section E of the PL1 form in the portal); Trial Tr. 3754:24-3756:10, Nov. 9, 2018 (Turner) (nursing facilities were improperly filling the LIDDA representative name on the LAR line of the Interdisciplinary Team form); Trial Tr. 3809:7-3810:7, Nov. 9, 2018 (Turner) (the problem was discovered in 2016 but, as of September 1, 2017, Section E on the PL1 form was still grayed out); PPI X 511 (listing proposed enhancements to the THMP portal for 2017, many of which are identified by HHSC as "required" for compliance with PASRR).

0326.   Ms. Turner opined that these systemic deficiencies in one of HHSC's key PASRR improvements did not cause any harm. Trial Tr. 3752:8-16, 3761:22-3762:3, Nov. 9, 2018 (Turner).

0327.   Ms. Turner's unsupported conclusion regarding harm ignores the facts and disregards the *per se* harm caused by noncompliance with federal Medicaid law. Her testimony lacks credibility, especially in light of the evidence showing that most of the individuals who did not receive needed specialized services suffered harm.

0328.   The harm caused by the failure to meet individual needs was evident throughout the client review. For example, the social worker for RB told client reviewer Ms. Russo that RB did not belong in the nursing facility because the nursing facility was unable to meet her needs. Trial Tr. 1628:1-3, Oct. 23, 2018 (Russo) ("The social worker at the facility was very clear, she stopped me dead in my tracks and said 'look it, she doesn't belong here, we cannot bring the care she needs here.'"). RB had lived in the nursing facility for five years. She was not provided the specialized services that she needed and that her son and guardian requested. She did not have a needed customized wheelchair. Without it, she had experienced falls and responded to her fear of falling with loud outbursts. A communication device was purchased, but habilitative Speech Therapy to assist RB with the acquisition of skills to use the device was not provided. As a result, the communication device was useless. Although her guardian had requested Physical Therapy, Occupational Therapy, Speech Therapy, and ILST, RB was receiving none of these habilitative services. Trial Tr. 1623:11-1628:24, Oct. 23, 2018 (Russo); PPI X 1400 at 41-42 (Russo Report).

0329.   AH provides another example of harm from the failure to complete PL1s accurately. AH was admitted to a nursing facility on June 6, 2014 from an acute care hospital. She was not identified as having IDD or a mental illness for almost a year after she was admitted to the nursing facility, despite her history of intellectual disability during her school years, her history of receiving HCS Waiver services, and her diagnosis of schizophrenia. It was not until the PE finally was completed

almost a year later, on April 28, 2015, that she was identified as having an intellectual disability. Because she was not identified as having IDD, she did not receive any specialized services for the first year she was in the nursing facility. PPI X 1280 at 42-43 (Pilarcik Report).

2.    Level II Evaluations (PEs) are not completed appropriately

0330.    In HHSC's PASRR process, the PE is the primary tool for determining which specialized services will be recommended. Section B of the PE, which HHSC uses to determine specialized services, identifies only some of the federally required areas for specialized services, and specifically omits key areas like self-monitoring of health status, inappropriate behaviors, and the impact of medical problems on the individual's independent functioning. HHSC's PE form and process do not meet the federal PASRR requirement that all habilitative need areas are assessed adequately and comprehensively. Assessments are conducted, if at all, *after* a specialized service has been identified in the PE. PPI X 1906 at 28 (Weston Report).

0331.    The State fails to ensure that the PE is completed appropriately to meet its intended objectives. HHSC's Contract Accountability and Oversight Unit, which oversees LIDDA performance, does not assess whether PEs determine the services an individual needs to live in the community or the specialized services the individual needs. Southall Dep. 339:20-340:15, 341:13-18, Nov. 7, 2017.

0332.    First, the PE must accurately identify those people who do have IDD, but it is likely that in Texas many people with IDD are not being identified correctly. In August 2015, Ms. du Pree conducted a review of a sample of the PEs that were negative – in other words, the evaluations that concluded that the people evaluated did not have IDD. Of 181 negative PEs, she found that nearly two-thirds were not supported by sufficient information to verify the negative finding. Deputy Commissioner Jordan, the State's 30(b)(6) witness on the QSR process, testified that this could result in not identifying people who have IDD. There is no evidence that the State has ever

conducted another such review to determine whether this problem was corrected, and Deputy Commissioner Jordan had never heard of one. PPI X 102 at 2-3; Jordan 30(b)(6) Dep. 109:9-112:1, Mar. 16, 2018.

0333.   The PE should include a review of the individual's clinical and service history (including prior IDD services and programs); a consideration of all medical, nursing, and service records; interviews with the individual, LAR if any, relevant professionals, and family members; and a careful consideration of the individual's habilitation needs. For each identified need, the Level II PASRR evaluator, who must be a qualified IDD professional, should indicate on the evaluation form if specialized services would be beneficial, or if a further, in-depth assessment would be helpful. PPI 1906 at 15 (Webster Report).

0334.   Fifteen data points related to habilitative need areas must be assessed in the PE to determine if specialized services are needed. The data points include information concerning medical, nursing, cognitive, communication, physical, behavioral, vocational, educational, and decision-making issues, and the level of impact any identified needs have on the individual's independent functioning. PPI X 1906 at 11 (Weston Report) (citing 42 C.F.R. § 483.136); PPI X 1762 at 11 (Webster Report); PPI X 160 (PASRR Evaluation Form, September 2017).

0335.   The State's PE omits some of the fifteen areas of need required by PASRR for identification of level of habilitative needs, including self-monitoring of health status, inappropriate behaviors, and the impact of medical problems on the individual's independent functioning. PPI X 1907 at 10 (Weston Rebuttal Report); PPI X 1762 at 25 (Webster Report) (PASRR reviewers do not evaluate all habilitative areas required by the PASRR Rules.).

0336.   QSR Outcome Measure 3-3 evaluates whether for individuals in nursing facilities the PE "appropriately assesses whether the needs of the individual can be met in the community and identifies the specialized services the individual needs." HHSC's compliance on this measure for the

Nursing Facility and Transition Target Populations dropped from 34 % in 2015, to 20 % in 2016, to 16 % in 2017, and even further to just 9 % for the Nursing Facility Target Population in 2017. PPI X 318 at 16; PPI X 253 at 5; PPI X 254 at 8.

0337.    QSR Outcome Measure 1-3 measures whether the PE confirms IDD, appropriately assesses whether the needs of the individual can be met in the community and accurately identifies, based on the information available, the specialized services the person needs if he or she is admitted to a nursing facility for individuals who have been diverted from nursing facility admission. Performance on this measure for the Diversion Target Population declined from 41 % in 2015 to 29 % in 2016 and 32 % in 2017. PPI X 318 at 11; PPI X 254 at 5.

0338.    HHSC has chosen to document referrals to alternate placements in their PE form. Trial Tr. 2603:19-24, 2605:16-18, Nov. 1, 2018 (Bruni); PPI X 176. An analysis of the State's data reveals that only 1.8 % of individuals with IDD who received a PE between September 1, 2016 and September 1, 2017 received any referral information for community services. Similarly, only 2 % of those who had affirmatively stated they wished to return to the community and who had no barriers to doing so received referral information, based on the reported data. Evaluators left the question asking where an individual would like to live now blank for 48.6 % of individuals with IDD who received a PE between September 1, 2016 and September 1, 2017. Trial Tr. 977:24-978:10, Oct. 19, 2018 (O'Connor) (explaining that field F1000 was "virtually not used" to provide referral information); PPI X 1208 at 12 (O'Connor Rebuttal Report); PPI X 647 at tabs 2-3; T. Hernandez 30(b)(6) Dep. 99:20-100:19, Oct. 5, 2017.

0339.    Ms. Pilarcik found that many PEs recommended no specialized services, despite a clear need for these services. PPI X 1280 at 23, 29, 52, 58, 66, 75 (Pilarcik Report) (describing CB, SB, CN, JM, AS, and BH). Ms. Russo found that nine of sixteen PEs did not recommend any nursing facility specialized services. PPI X 1400 at 8 (Russo Report).

0340.   The second client review included numerous individuals who did not receive a PE until years after their admission, including WD and SS who waited thirteen years; BH who waited ten years; DP who waited eight years; SB who waited seven years; JM who waited more than five years; RB who waited over four years; and JM and RS who waited two years before finally receiving the mandatory PE. Trial Tr. 517:22-518:1, Oct. 17, 2018 (Pilarcik); Trial Tr. 1624:3-5, Oct. 23, 2018 (Russo); PPI X 1280 at 26, 29, 58, 64, 69, 72, 75 (Pilarcik Report describing DP, SB, JM, TS, WD, SS, BH, and RS); PPI X 777 at 44, 64-65 (Charlot Report describing JM and RS); PPI X 1400 at 41-42 (Russo Report describing RB).

D.      The State fails to divert from admission to a Nursing Facility those people with IDD whose needs can be met in the community

0341.   Diversion refers to the prevention of an unnecessary institutional placement, such as a nursing facility placement. Trial Tr. 1219:2-10, Oct. 22, 2018 (Webster) (diversion involves identifying someone at risk of being placed in a nursing facility and providing supports in the community so that nursing facility placement is unnecessary).

0342.   To meet the definition of a "nursing facility diversion" in Texas, an individual at risk of nursing facility admission must be "diverted" to community-based services before an admission ever occurs. Trial Tr. 1453:6-10, Oct. 22, 2018 (Weston); PPI X 238 at 64 (PASRR and Service Coordination Instructor Guide); Turner 30(b)(6) Dep. 60:1-11, Feb. 21, 2018; Jalomo 30(b)(6) Dep. 199:24-201:6, Nov. 2, 2017; du Pree Dep. 43:16-44:13, Feb. 6, 2018.

0343.   The early identification of individuals with IDD at risk of nursing facility admission and the provision of in-home supports and services that enable them to remain in the community is critical to avoiding unnecessary institutionalization. *See* PPI X 1906 at 9 (Weston Report). Once an individual enters a nursing facility, it is much more challenging to transition them back into the community, often because their prior living arrangement or HSC waiver slot is lost. Ms. Pilarcik

testified, "[t]he longer the person spends in an institution, the less likely it is that they're going to be able to understand the concept of community living." It is much easier to divert an individual from admission than to wait months or years after the admission to transition them to the community. Trial Tr. 493:7-494:25, Oct. 17, 2018 (Pilarcik).

0344.   Successful diversion depends on an early awareness of the needs of individuals living in the community; the identification of people who are at risk of nursing facility admission; the early identification of medical supports needed to continue serving them in the community; the proactive initiation of supports and services; and ensuring that discharge planning to return to the community begins shortly after a hospital admission. Trial Tr. 1443:11-1444:13, Oct. 22, 2018 (Weston); PPI X 1906 at 12-13 (Weston Report).

0345.   QSR Outcome 1 and related QSR Outcome Measures reflect several diversion requirements. They measure, for example, whether each LIDDA has a Diversion Coordinator who is experienced in coordinating and/or providing community services to people with IDD, including people with complex medical needs. Additionally, the QSR measures proper evaluation and confirmation of whether an individual has IDD; an appropriate assessment of whether the individual's needs can be met in the community; an accurate identification of the specialized services the person needs if admitted to a nursing facility; and the identification and provision of all supports and services needed to avoid nursing facility placement. Outcome Measure 1-10 reflects the requirement that the individual and LAR must be informed about community options that will meet the individual's needs. PPI X 318 at 12, 16 (Outcome Measure 1-10, Outcome Measure 2-13); PPI X 254 at 5; PPI X 976 at 8-9 (Howe Rebuttal Report); PPI X 1762 at 13 (Webster Report).

0346.   Outcome 1 and Outcome Measures 1-1 through 1-11 mirror PASRR requirements and other professionally accepted diversion processes, which are necessary to have an effective diversion program and to ensure that individuals with IDD avoid unnecessary or inappropriate nursing facility

placements. Trial Tr. 3991:4-7, 3993:18-3994:6, Nov. 13, 2018 (Howe); PPI X 976 at 8-9 (Howe Rebuttal Report). Overall, HHSC did not achieve its goal of reaching 85 % compliance on this outcome by 2016. Performance on QSR Outcome 1 (Diversion) was 67 % in 2015, 74 % in 2016, and 73 % in 2017. PPI X 318 at 5; PPI X 254 at 3. This outcome applies only to the relatively few individuals who were successfully diverted from nursing facility admission, yielding significantly higher scores than outcomes that include the nursing facility or transition population.

0347.   QSR data reflect the failures in HHSC's diversion process. Texas' compliance with QSR Outcome Measure 1-9, which assesses whether "[f]or members of the Target Population living in the community who can be diverted from NF admission, the SC or other LIDDA staff identify, arrange, and coordinate all community options, services, and supports for which the individual may be eligible and that are necessary to enable the individual to remain in the community and avoid admission to a NF," and whether "[s]ervices and supports will be consistent with an individual's or [legally authorized representative's] informed choice," dropped precipitously from 56 % compliance in 2015 to 34 % compliance in 2016 and 33 % compliance in 2017. PPI X 318 at 12; PPI X 254 at 5.

      1.      The State's PASRR program allows almost all adults with IDD to be admitted to nursing facilities before a PASRR Evaluation is conducted, meaning their opportunity for diversion is eliminated

0348.   PASRR requires the State to evaluate individuals with an intellectual disability or a related condition who are considered for nursing facility placement so that, if they are admitted, the specialized services they need can be identified and offered to them, and so that a determination also can be made whether it is possible to continue to support them in the community. du Pree Dep. 61:19-63:1, Feb. 6, 2018.

0349.   An effective PASRR screening program will ensure that individuals presenting to a nursing facility for admission have the opportunity to be diverted if they could otherwise be served in a less

restrictive setting. Trial Tr. 1443:11-1444:13, Oct. 22, 2018 (Weston); PPI X 363 at 11 (PASRR requires states to "consider community placement first, and nursing facility placement only if appropriate . . . ."); *see also* Trial Tr. 2875:23-2876:20, Nov. 2, 2018 (Southall) (testifying that it is important that diversion happens); Trial Tr. 1219:17-23, Oct. 22, 2018 (Webster) (testifying that the PASRR screening and evaluation "really aid in diverting people" because "you have to know who the person is . . . [and] what their circumstances are" in order to intervene).

0350.   PASRR regulations generally require a PASRR Level II or PE for all individuals with IDD who apply as new admissions to Medicaid nursing facilities. 42 C.F.R. § 483.106(b)(2); PPI X 1907 at 8-9 (Weston Report).

0351.   One of the PE's purposes is to determine if nursing facility placement is appropriate, facilitate diversion, and avoid unnecessary nursing facility admissions. Trial Tr. 2428:12-19, Oct. 31, 2018. (Willems) (testifying that Sections D and E of the Texas PE "capture medical necessity for nursing facility care prior to admission to determine whether or not there [is] a need for nursing facility care"); Jalomo 30(b)(6) Dep. 200:5-13, 221:10-222:16, Nov. 2, 2017 (testifying that one purpose of the PE is to ensure that the individual is appropriate for placement in a nursing facility and is offered an opportunity to divert); Turner 30(b)(6) Dep. 28:14-20, Feb. 21, 2018 ("It's important to identify specialized services to assist individuals with options around diversion . . . .").

0352.   To determine whether nursing facility placement is appropriate, it is important that the PE determine individuals' full range of needs and identify the specialized services individuals require to meet their needs in the least restrictive setting. du Pree Dep. 61:19-63:1, 88:9-89:3, Feb. 6, 2018; Turner 30(b)(6) Dep. 28:14-20, Feb. 21, 2018 (It is important to identify specialized services before a person is admitted to a nursing facility in order to assist individuals with options around diversion, although HHSC does not require this.).

0353.   If the PE does not correctly identify the services that a person needs to live in the community,

it could mean that the person's potential to live in the community is not identified. Schultz Dep. 134:20-135:5, 135:15-23, Dec. 18, 2017.

0354.   "Pre-admission screening and evaluation is essential to allowing an individual to make an informed choice between a community setting or nursing facility." PPI X 1762 at 22 (Webster Report).

0355.   The State's policy and planning documents demonstrate that it understands the importance of diversion in preventing unnecessary segregation and that PASRR is essential to accomplishing this objective. *See* Trial Tr. 1454:14-25, Oct. 22, 2018 (Weston); PPI X 206 at 5, 22 (identifying "Diversion Strategies for Persons with Intellectual and Developmental Disabilities" as part of its Promoting Independence Plan, which is a "direct response to the . . . *Olmstead* ruling"); PPI X 535 at 3-4 (February 2017 Amendment to LIDDA Performance Contract Attachment G) (requiring that during the PE, each LIDDA identify, arrange, and coordinate access to community options, services, and supports "in order to avoid admission to a nursing facility, wherever possible and consistent with an individual's informed choice"); PPI X 1906 at 14, 20 (Weston Report).

0356.   The PASSR process is Texas' primary mechanism for diverting individuals with IDD from nursing facilities, and the PE is the State's assessment tool for nursing facility diversion and its method for determining whether someone qualifies for a diversion slot. *See* PPI X 585 at 5 (PASRR 101 for Nursing Facilities); Jalomo 30(b)(6) Dep. 200:5-13, Nov. 2, 2017.

0357.   To qualify for a diversion slot in Texas, the individual must have a completed PE that confirms he or she has IDD and is appropriate for community placement. A diversion plan is not prepared until the PE is completed. Trial Tr. 1446:3-8, Oct. 22, 2018 (Weston); PPI X 602 (Form 1047, Request for Targeted Nursing Facility HCS Diversion Slot); PPI X 1906 at 23 (Weston Report); PPI X 535 at 3-4 (February 2017 Amendment to LIDDA Performance Contract Attachment G); Jalomo 30(b)(6) Dep. 204:18-24, 221:10-222:16, Nov. 2, 2017; *see also* Trial Tr.

3426:19-3427:10, Nov. 6, 2018 (Belliveau) (explaining that in order to be eligible for an HCS diversion slot, an individual must first become involved in the PASRR process, including the completion of a PE); Trial Tr. 3506:5-10, Nov. 6, 2018 (Blevins). The PE is also the State's mechanism for explaining community living options prior to a nursing facility admission. PPI X 535 at 4 ("When conducting a PASRR Evaluation, the LIDDA must inform the individual referred for admission to a nursing facility, their family, and the legally authorized representative (LAR) of the community options, services, and supports for which the individual may be eligible."); *see* PPI X 1906 at 23 (Weston Report) ("The PE is essential to diversion, both to identify an individual's service needs, and as a means for ensuring community living options are explained, identified and made available prior to admission.").

0358.   There is an exception to the PE requirement for individuals who are transferring from an acute care hospital to a nursing facility for short-term convalescent care. A PE is not required for these "exempt admissions" unless and until it is determined that the individual must stay for more than 30 days. 42 C.F.R. § 483.106(b)(2); PPI X 1907 at 8-9 (Weston Rebuttal Report); PPI X 363 at 17 (PTAC 2015 PASRR National Report).

0359.   States may elect to make PE advance group categorical determinations regarding the need for nursing facility level of service and specialized services. *See* 42 C.F.R. § 483.130 (allowing "advance group determinations . . . by category that take into account that certain diagnoses, levels of severity of illness, or need for a particular service clearly indicate that admission to or residence in a [nursing facility] is normally needed, or that the provision of specialized services is not normally needed"); PPI X 1907 at 8-9 (Weston Rebuttal Report).

0360.   The State has elected to implement seven of these categorical determinations that result in expedited admission. PPI X 597; PPI X 1907 at 8-9 (Weston Rebuttal Report) (citing 42 C.F.R. § 483.106(b)(2) and 42 C.F.R. § 483.130(c)); PPI X 1906 at 23 (Weston Report).

0361.   The State's data demonstrates that the vast majority of people with IDD who seek admission to a nursing facility are admitted as one of the expedited admission categories, or as exempted hospital discharges, under which a PE does not take place until after admission. *See* PPI X 600; PPI X 601. HHSC indicated that expedited admissions account for approximately 90 % of all PASRR admissions in Texas. Exempted hospital discharges account for another 7 % of admissions. PPI X 585 at 8-9; Trial Tr. 1224:22-1227:11, Oct. 22, 2018 (Webster) (discussing PPI X 585); PPI X 1906 at 23 (Weston Report); PPI X 1208 at 11 (O'Connor Rebuttal Report); PPI X 647 at tab 1.

0362.   State officials affirm this data. Trial Tr. 2419:8-19, Oct. 31, 2018 (Willems) (testifying that 90 % of nursing facility admissions are expedited admissions, 7 % of nursing facility admissions are exempted admissions, and only 3 % are preadmissions).

0363.   Similarly, Dr. O'Connor's analysis of the State's data shows that from September 1, 2016 to September 1, 2017, the vast majority of individuals were admitted to nursing facilities on an exempt or expedited basis. Sixty-seven percent were admitted with an expedited admission exemption. And almost everyone in the expedited admission group – 61.5 % – are admitted for "convalescent care," which, according to the State's own definition, may not require nursing facility placement. Trial Tr. 974:14-975:12, 976:9-12, Oct. 19, 2018 (O'Connor) (describing the rate of utilization of exempted hospital discharge and expedited admission categories from September 1, 2016 to September 1, 2017 based on the State's data); PPI X 1208 at 11 (O'Connor Rebuttal Report); PPI X 647 at tab 1; PPI X 600 (Convalescent care "[r]efers to a range of health services designed to help people recover from serious illness, surgery, or injury" for which services "can be delivered in a variety of settings, including rehabilitation hospitals, inpatient therapy sites, skilled nursing facilities and patient's homes.").

0364.   During that time, 13.3 % of individuals with IDD who received a PASRR Level 1 Screen were admitted to nursing facilities with the 30-day exemption from PASRR evaluation. Similarly,

13.2 % of individuals with nursing facility stays of 90 days or more were admitted with an exemption. PPI X 1208 at 11 (O'Connor Rebuttal Report); PPI X 647 at tab 1.

0365.   This indicates that people with IDD who were supposed to be admitted to a nursing facility to recuperate from a condition and then return to their homes were not returning to their homes. Instead, they "were staying 13.2 percent of the time long-term in nursing facility settings." Trial Tr. 1457:21-1458:1, Oct. 22, 2018 (Weston).

0366.   Illustratively, named Plaintiffs Mr. Leonard Barefield, Mr. Johnny Kent, and Mr. Joseph Morrell were admitted under exempt admissions. Each man spent more than seven years in a nursing facility until they became named plaintiffs. Trial Tr. 4225:13-23, Nov. 14, 2018 (Pilarcik).

0367.   The majority of individuals in the second client review also were admitted under an exempted or expedited admission type. Even though these categorical admissions are supposed to be short term – usually less than thirty days – most of these individuals have stayed in a nursing facility for years, some for decades. Almost none received a PE until after admission. Without a PE prior to admission, they were denied all opportunities for diversion. PPI X 1400 at 12, 18, 21, 24, 44 (Russo Report).

0368.   Because the vast majority of people with IDD who seek admission to a nursing facility are admitted in one of the expedited categories or as exempted hospital discharges, the PE is rarely completed prior to nursing facility admission. PPI X 1907 at 8-9 (Weston Report); *see, e.g.*, PPI X 1400 at 12, 18, 21, 24, 44 (Russo Report) (finding that almost none of individuals in the client review who were admitted under an exempted or expedited admission received a PE until after admission); Trial Tr. 3658:19-21, Nov. 8, 2018 (Terbush) (about ninety-five percent of nursing facilities admissions in Betty Hardwick's service area are expedited admissions). The State's use of the PE to facilitate diversions is only applicable for those people who have preadmission status – a mere three percent of nursing facility admissions. Trial Tr. 1224:2-19, Oct. 22, 2018 (Webster);

*see* Trial Tr. 2419:14-16, Oct. 31, 2018 (Willems) (testifying that three percent of nursing facility admissions are preadmissions).

0369.   Where the PE is not done before somebody moves into a nursing facility, the person cannot be diverted. Trial Tr. 3506:5-10, Nov. 6, 2018 (Blevins).

0370.   Thus, Texas has chosen to set up a system where the possibility for diversion is rare. *See* PPI X 1762 at 22-23 (Webster Report); PPI X 1906 at 23 (Weston Report) ("[A]s a result of HHSC planning and design of its PASRR program, almost all admissions bypass the diversion process.").

0371.   Most admissions to nursing facilities occur without any notice to, involvement of, or screening by the LIDDA PASRR coordinators. PPI X 1762 at 20 (Webster Report).

0372.   The second client review found that many individuals and their families received no information about alternatives to the nursing facility prior to admission, making a decision about whether to enter the nursing facility a moot point. For example, neither LD nor his sister received information about alternatives to the nursing facility prior to his admission. Trial Tr. 1698:18-1699:1, Oct. 23, 2018 (Russo). RM was admitted to the nursing facility when his group home refused to take him back after a short hospitalization, and neither he nor his sister received information about alternatives to nursing facility admission. PPI X 1400 at 15 (Russo Report).

0373.   By contrast, in states that choose not to bypass the pre-admission PE, the PE frequently is conducted prior to admission, affording opportunities for diversion that do not exist in the Texas system. Trial Tr. 1452:6-1453:5, Oct. 22, 2018 (Weston); PPI X 1906 at 24 (Weston Report); *see also* Trial Tr. 1224:2-19, Oct. 22, 2018 (Webster) (explaining that PEs should be conducted in the community, in a place that is familiar to the individual, because this setting may impact what the evaluator is able to learn about the person).

      2.    Outreach and coordination with referring entities and service providers rarely occur

0374.   The referring entity (RE) is defined as the first entity that proposes nursing facility admission

for an individual. An RE can be, for example, a hospital social worker or discharge planner, nursing facility social worker, a nurse, a physician, a family member, law enforcement, elder service provider, residential and day provider, or community IDD service coordinator. As the State acknowledges, communication and collaboration between the RE, LIDDA, and nursing facility is "essential" for individuals to receive the most appropriate services. *See* 26 Tex. Admin. Code § 303.201; Trial Tr. 2416:8-12, Oct. 31, 2018 (Willems) (describing examples of referring entities); Trial Tr. 1452:6-1453:2, Oct. 22, 2018 (Weston); PPI X 1762 at 11-12 (Webster Report); PPI X 1906 at 34-35 (Weston Report); PPI X 585 at 7.

0375.   Continuous engagement and education with REs or those who commonly refer individuals with IDD to nursing facilities is critical to diversion efforts. Outreach and education to referral sources support the early identification of individuals at risk of admission by ensuring referral sources understand the PASRR process for identifying such individuals and the availability of meaningful community supports as an alternative to nursing facility placement. PPI X 1906 at 12-13 (Weston Report); *see* Trial Tr. 1452:6-1453:5, 1454:14-1455:4, Oct. 22, 2018 (Weston); Trial Tr. 1220:6-1222:21, Oct. 22, 2018 (Webster) (describing strategies for identifying individuals at risk of entering a nursing facility – including connections with advocacy groups, doctors, hospitals, and schools, and an awareness at the service coordinator level of individuals living at home or in residential programs who are starting to need extra support – and testifying that connections with REs play an important role in diversion).

0376.   The State's rules, policies, and quality assurance processes acknowledge the importance of these practices. For example, HHSC's Performance Contract with each LIDDA mandates educational activities for referring entities, as well as service coordinators and other LIDDA staff, about available community services and strategies to avoid nursing facility placement. PPI X 535 at 3-4 (February 2017 Amendment to LIDDA Performance Contract Attachment G); *see* PPI X 1762

at 12 (Webster Report); Trial Tr. 3432:11-16, Nov. 6, 2018 (Belliveau).

0377.   In Texas, the prevalence of expedited and exempted admissions makes the LIDDAs' connection to REs essential to the early identification of individuals at risk of nursing facility admission. PPI X 1762 at 12 (Webster Report); *see* Trial Tr. 1452:6-1453:2, Oct. 22, 2018 (Weston); PPI X 1906 at 35 (Weston Report).

0378.   HHSC recognizes the need to increase the education and competency of REs, and launched a training initiative for this purpose.  However, the RE training material explains the PASRR process at a very basic level, barely touches on diversion, and does not adequately explain community alternatives in a way that will educate REs about the importance of accessing community supports in order to prevent unnecessary institutionalization. Further, the training did not begin until June of 2017, and there has been no effort on the part of HHSC to evaluate the effectiveness of this limited effort. Turner 30(b)(6) Dep. 71:13-21, 81:12-82:18, Feb. 21, 2018 (Ms. Turner did not know of any data indicating that the RE training led to more diversions); PPI X 1906 at 25 (Weston Report).

0379.   There is no evidence of a systematic approach of outreach to the entities that refer most people with IDD to nursing facilities, including hospitals, medical service providers, elder service agencies, and general revenue service coordinators. Trial Tr. 1460:6-13, Oct. 22, 2018 (Weston); PPI X 1906 at 35 (Weston Report); *see* Trial Tr. 3665:23-3666:5, 3667:3-5, Nov. 8, 2018 (Jones) (failing to mention any specific work done with REs when asked whether Austin Integral Care LIDDA works with REs to divert people).

0380.   The State's limited connections with REs increases the likelihood that people will be unnecessarily admitted into a nursing facility. Trial Tr. 1223:18-21, Oct. 22, 2018 (Webster); *see* DX-1065 at 31 (Shea-Delaney Report) ("Approximately ninety-five percent of individuals with IDD come from the hospital and if LIDDAs do not have the information about plans for an individual with IDD prior to nursing facility admission, they are unable to divert."); *see also* PPI X 1907 at 8

(Weston Rebuttal Report).

0381.   Another common diversion strategy is through proactive interventions, medical crisis plans, and flexible support resources for individuals currently served in HCS residential programs who have, or might have, a serious medical condition that puts them at risk of hospitalization or nursing facility admission. PPI X 1907 at 21 (Weston Rebuttal Report); *see* Trial Tr. 1459:24-1460:5, Oct. 22, 2018 (Weston); PPI X 1762 at 20 (Webster Report); Trial Tr. 1220:22-1221:11, Oct. 22, 2018 (Webster) (explaining that because such residential providers contract with the state, the state should be notified when individuals in these programs have changing needs, and are at risk of entering a nursing facility).

0382.   Dr. O'Connor's analysis of Texas data shows that more than twenty percent of individuals admitted to nursing facilities in Fiscal Year 2017 who had IDD confirmed on their last PE had already been receiving services through the Home and Community-based Services or TxHmL waiver programs in the approximately six-month period prior to admission. PPI X 1208 at 15 (O'Connor Rebuttal Report); PPI X 649. All of these individuals would have had a service coordinator or case manager from the LIDDA while they were receiving waiver services. Thus, at least with respect to this twenty percent, LIDDA staff should have been aware of these individuals' needs, and should have – or at least could have – planned for and arranged supports well before a nursing facility admission. PPI X 1907 at 8 (Weston Rebuttal Report); PPI X 1208 at 15, 16 (O'Connor Rebuttal Report).

0383.   The fact that a significant percentage of the long-term population of people with IDD in nursing facilities came from waiver programs is an indicator that community service providers in Texas have a limited ability to keep serving and avoid nursing facility placement for individuals with IDD whose medical needs change. Trial Tr. 1458:9-1459:14, Oct. 22, 2018 (Weston).

0384.   LIDDAs do not appear to have a process in place to identify these individuals. Instead,

diversion usually occurs only in instances where the individual with IDD or his or her guardian or LAR affirmatively takes steps to seek assistance from the LIDDA. Trial Tr. 3423:18-3424:23, 3426:10-3428:8, Nov. 6, 2018 (Belliveau).

0385.   Many LIDDAs have little awareness of the extent of the present or future support needs of the individuals with IDD in their service area, and who are, or might be at risk of, admission to a nursing facility. With a few exceptions, there is little effort to educate and coordinate with local hospitals, health care facilities, medical professionals, or other likely REs for nursing facility admission. PPI X 1762 at 20 (Webster Report).

0386.   For some LIDDAs, a large number of all nursing facility admissions are of individuals who were living in HCS residential settings, were hospitalized, and then were discharged to nursing facilities, all without the provider's active involvement or the LIDDA's knowledge. Trial Tr. 1223:1-17, Oct. 22, 2018 (Webster) (finding that a large number of people referred to nursing facilities were coming from residential providers); PPI X 1762 at 20-21 (Webster Report).

0387.   The client review provided further evidence of these issues. For example, RM, a 53-year-old man, previously lived in a group home. RM enjoyed community life and functioned independently in most aspects of his activities of daily living. He participated in home-based chores and activities, going out into the community on shopping and leisure excursions, singing, laughing, and talking to others. He was admitted to the nursing facility in 2013 after his group home provider "refused to take [RM] back." RM now spends his days behind the locked doors of the "Generations Unit" in a nursing facility, pacing up and down the hallway, taking and holding as many items as he can in order to try to satisfy the sensory input he craves. PPI X 1400 at 15 (Russo Report).

0388.   CB's records contained no information regarding his previous residential placements. Neither the service coordinator nor the nursing facility staff were knowledgeable about his prior placements or community homes, even though this information is vital for his service coordinator to have a full

understanding of his community experiences. CB's sister visits every week and could have provided this information, if asked. PPI X 1280 at 23 (Pilarcik Report).

E.      The State fails to conduct Comprehensive Functional Assessments

0389.   There must be an accurate, reliable, and professionally acceptable method for assessing all habilitative needs of people with IDD. It is essential that trained staff consistently use a standardized assessment instrument and process to determine functional strengths and needs in all habilitative areas. A comprehensive functional assessment process, implemented by trained IDD professionals, is the well-accepted standard in IDD systems. Trial Tr. 2128:2-8, Oct. 26, 2018 (Sawyer); PPI X 1578 at 16 (Sawyer Report).

0390.   A comprehensive functional assessment should be conducted by an interdisciplinary team (IDT) of professionals and include an evaluation of an individual's physical development and health, nutritional status, sensorimotor development, affective development, speech and language development, auditory functioning, cognitive development, social development, adaptive behaviors or independent living skills necessary for the individual to function in the community, and, as applicable, vocational skills. Trial Tr. 3989:25-3990:6, Nov. 13, 2018 (Howe); Trial Tr. 1421:23-1424:3, Oct. 23, 2018 (Weston); Trial Tr. 464:17-465:2, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 9 (Pilarcik Report); PPI X 464 at 2 (email from State employee stating that "a functional assessment needs to have some observed performance components"); Schultz Dep. 193:2-16, Dec. 18, 2017.

0391.   A comprehensive functional assessment may include a number of separate evaluations performed by different, qualified professionals, provided that they are completed within thirty days of admission and result in an identification of each habilitative need area and a description of a program of specialized services that will meet the individual's identified needs and build upon their strengths. Trial Tr. 468:25-469:2, Oct. 17, 2018 (Pilarcik); Trial Tr. 1228:15-25, Oct. 22, 2018

(Webster) (defining a comprehensive functional assessment as "an amalgamation of assessments that are done by a variety of IDD specialists," which "combine into a picture of who the person is and . . . what kinds of needs the individual has"); Trial Tr. 1421:23-1424:3, Oct. 23, 2018 (Weston); PPI X 1280 at 9 (Pilarcik Report).

0392.   A comprehensive functional assessment is the foundation of all service planning. The assessment identifies habilitative needs and determines the specialized services required to address those needs. Without this foundation, the nursing facility-led IDT and the LIDDA-led service planning team (SPT) have no basis for a service plan that includes habilitative goals directed towards the acquisition of skills, identification of individualized, specialized services based on habilitative need areas, and specifications of the frequency, intensity, and duration of the services. Trial Tr. 142:17-143:3, Oct. 15, 2018 (du Pree) (testifying that a comprehensive functional assessment is very important for planning and service delivery); Trial Tr. 1229:1-3, Oct. 22, 2018 (Webster) (A comprehensive functional assessment "form[s] the basis for service planning."); Trial Tr. 1246:2-9, Oct. 22, 2018 (Webster) (testifying that without a comprehensive functional assessment the service coordinator is unable to do his or her job effectively); Turner 30(b)(6) Dep. 94:6-20, Feb. 21, 2018 (agreeing that a comprehensive functional assessment is important to inform the service planning process); Snyder Dep. 81:1-22, Nov. 16, 2017.

0393.   A comprehensive functional assessment must be provided to every individual with IDD to determine the individual's habilitative needs, what services are required to address these needs, and how these services should be delivered. The comprehensive functional assessment is an essential foundational requirement for providing habilitation services that constitute Active Treatment. Trial Tr. 452:20-23, Oct. 17, 2018 (Pilarcik); PPI X 1906 at 15-16, 27-28 (citing 42 C.F.R. § 483.440) (Weston Report).

0394.   "Unless there is a comprehensive assessment of all habilitative needs, there cannot be an

appropriate delivery of specialized services. This is especially true for the program models of Day Habilitation or Independent Living Skills Training (ILST), which require both an individualized program directed to specific habilitative need areas, with carryover and consistency in other settings and services, like nursing facilities." PPI X 1762 at 25 (Webster Report).

0395.    HHSC has acknowledged that a comprehensive functional assessment is important to inform the service planning process in its PASRR program, and it retained the University of Massachusetts to evaluate and provide feedback on various assessment tools that HHSC might implement. However, HHSC has not adopted any of its consultants' recommendations nor operationalized any other comprehensive functional assessment process. PPI X 1906 at 28-29 (Weston Report); Turner 30(b)(6) Dep. 94:6-20, Feb. 21, 2018. HHSC has also ignored its internal working groups' recommendations to adopt assessment tools. *See, e.g.,* PPI X 518 at 2-3 (April 10, 2017 IDD PASRR QA/QI Specialized Services Workgroup minutes identifying need for standardized functional assessment and checklist).

0396.    The University of Massachusetts had considerable experience in evaluating and meeting the needs of individuals with IDD in nursing facilities given their leadership role in the *Rolland* nursing facility initiative. Trial Tr. 3784:19-3785:17, Nov. 9, 2018 (Turner). Based upon that experience, HHSC contracted with the University of Massachusetts to assist it with various aspects of the State's PASRR program. Trial Tr. 3786:4-16, Nov. 9, 2018 (Turner); PPI X 230 (University of Massachusetts' proposal listing PASRR deficiencies identified by HHSC leadership); PPI X 1709 (scope of services attachment to contract between HHSC and the University of Massachusetts noting one task was to help HHSC address the challenge of hitting legislative targets for diversion and transition); PPI X 233 (June 2017 agenda for meeting between HHSC and University of Massachusetts).

0397.    HHSC decided to pilot another assessment instrument for individuals with IDD in nursing

facilities, called the ICAP, which HHSC used in its HCS waiver program. But HHSC later decided to abandon this instrument as an assessment instrument for people with IDD in nursing facilities. As of September 1, 2017, the State still had not adopted any instrument to conduct a comprehensive functional assessment. Trial Tr. 3788:17-3789:17, Nov. 9, 2018 (Turner); PPI X 1707 (minutes of May 17, 2017 Specialized Services Workgroup meeting that recommended use of ICAP as a comprehensive functional assessment).

0398.    To determine specific need areas and the range of specialized services required to address identified needs, an IDT uses comprehensive functional assessments to determine the exact type, amount, intensity, and durations of specialized services. The team must develop a detailed service plan that includes goals, timetables, providers, and the amount, intensity, and durations of specialized services. A qualified IDD professional must coordinate and monitor these services, modify the plan as needed, review and update it annually, and ensure that all identified services are provided. Trial Tr. 1421:4-1425:13, Oct. 23, 2018 (Weston); PPI X 1906 at 27 (Weston Report) (citing 42 C.F.R. §§ 483.120 and 483.440); PPI X 1280 at 9-10 (Pilarcik Report).

0399.    Ms. Weston, long-time director of a statewide PASRR program who also directs delivery of Active Treatment statewide, described the method she uses to confirm that PASRR-compliant comprehensive functional assessments are being done and that Active Treatment is being delivered for people with IDD in nursing facilities. Using data from an annual Active Treatment survey completed for people with IDD in nursing facilities in Massachusetts, Ms. Weston confirms that all required assessments have been completed for each person with IDD in a nursing facility and that these assessments are used to develop plans for service delivery amounting to Active Treatment. Using this methodology, compliance with PASRR's requirements for comprehensive functional assessments and delivery of Active Treatment is ensured. This methodology has enabled her to reduce the Massachusetts statewide census of people with IDD in nursing facilities. Trial Tr.

1415:17-1428:14, Oct. 22, 2018 (Weston).

      1.    The Minimum Data Set is not a comprehensive functional assessment for individuals with IDD

0400.  The Minimum Data Set (MDS), a nursing facility assessment tool, is a point-in-time reflection of standardized data collected for *all* people who enter a Medicare- or Medicaid-certified nursing facility. The MDS is *not* a comprehensive functional assessment; it is *not* designed to meet PASRR requirements; and it is *not* tailored to or focused on people with IDD and their unique conditions. The MDS does not address many habilitative need areas, is not completed by an IDD professional, and is not based upon a review of IDD history, records, or relevant information. Trial Tr. 1478:4-1479:15, Oct. 23, 2018 (Weston); Trial Tr. 262:24-263:6, Oct. 16, 2018 (du Pree); Trial Tr. 1603:13-16, Oct. 23, 2018 (Russo) (testifying that the MDS is not tailored to individuals with IDD); Trial Tr. 465:20-23, Oct. 17, 2018 (Pilarcik) (testifying that the MDS is not specific to people with IDD); Trial Tr. 811:18-21, Oct. 18, 2018 (Pilarcik) (discussing 42 C.F.R. § 483.440(c)); Trial Tr. 2564:8-10, 2564:19-2567:16, Oct. 31, 2018 (Dionne-Vahalik) (testifying that the MDS, which is used for nursing facility residents at large, does not identify or recommend the services a person with IDD needs, does not identify all habilitative needs, and is not completed by an IDD professional); Trial Tr. 3504:6-3505:5, Nov. 6, 2018 (Blevins) (MDS is a nursing facility assessment.); PPI X 1906 at 29 (Weston Report).

0401.  The University of Massachusetts' analysis of assessment instruments revealed that the MDS only evaluated approximately half of the habilitative areas measured by CMS's instrument for its Balancing Incentives Program. Trial Tr. 3787:10-3788:16, Nov. 9, 2018 (Turner); PPI X 1710.

0402.  The MDS does not identify all of an individual's developmental strengths, developmental needs, and behavior management needs. The MDS is completed by a nurse, typically, but there is no requirement that the nurse have any training specific to the assessment of needs of people with

IDD. Trial Tr. 1478:21-1479:6, Oct. 23, 2018 (Weston); Trial Tr. 811:7-17, Oct. 18, 2018 (Pilarcik); Trial Tr. 3504:18-3505:5, Nov. 6, 2018 (Blevins).

0403.    The MDS is not adequate to identify all service needs for individuals with IDD. Trial Tr. 467:22-25, Oct. 17, 2018 (Pilarcik). The MDS does not identify an individual's needs for habilitative services without regard to the availability of those services, as required by federal Active Treatment regulations. Trial Tr. 811:18-21, Oct. 18, 2018 (Pilarcik) (discussing 42 C.F.R. § 483.440(c)).

0404.    Ms. Dionne-Vahalik testified that HHSC's Regulatory Services Division conducts a survey to determine whether nursing facilities complete the MDS form and that the Office of the Inspector General reviews utilization to determine that reimbursement is accurate and is completed by the appropriate person, but Ms. Dionne-Vahalik did not testify that there is any substantive oversight to determine whether nursing facilities are accurately completing the MDS in areas such as functional abilities and interest in speaking to someone about moving to the community (Section Q). Trial Tr. 2497:10-2498:13, Oct. 31, 2018 (Dionne-Vahalik).

       2.       The PASRR Level II Evaluation is not a comprehensive functional assessment, even when combined with the MDS

0405.    The PASRR Level II Evaluation is an inadequate method for assessing all habilitative needs. It does not constitute a comprehensive functional assessment. Trial Tr. 1229:15-24, Oct. 22, 2018 (Webster) (A PE is not a comprehensive functional assessment. It is an "indicator of what assessments might be necessary for the person," rather than the assessments themselves). There is no requirement in HHSC trainings, manuals, or rules that the assessment portion of the PE form (Section E), or any other section in the PE form, embody assessments conducted by professionals in the corresponding disciplines. As implemented, LIDDA staff conduct the PE, and it is not based on the observation and clinical judgment required for assessments. Trial Tr. 1478:1-13, Oct. 23, 2018 (Weston); Trial Tr. 469:22-470:1, Oct. 17, 2018 (Pilarcik) (The PE is not a comprehensive functional

assessment.); PPI X 1907 at 10 (Weston Rebuttal Report).

0406.  The MDS in combination with the PE does not satisfy PASRR requirements for a comprehensive functional assessment. Trial Tr. 1478:10-13, Oct. 23, 2018 (Weston).

0407.  Neither the PE nor subsequent nursing facility evaluation processes constitute a comprehensive functional assessment of all habilitative need areas. PPI X 1907 at 10 (Weston Rebuttal Report); PPI X 1762 at 25 (Webster Report).

0408.  HHSC acknowledges that when the PE indicates a habilitative need, subsequent assessments should be conducted to determine the intensity, frequency and duration of services to address that need. However, the State's PASRR program has no standardized assessment process or instrument for this purpose. PPI X 1906 at 28 (Weston Report); *see* Trial Tr. 2982:22-2983:12, Nov. 1, 2018 (Reece); Lindsey Dep. 43:9-24, Feb. 8, 2017; Blevins Dep. 31:10-23, 44:13-16, 49:1-50:16, 87:14-18, 113:12-20, 116:12-22, 118:15-120:6, Feb. 7, 2017 (PASRR subject matter expert for LPDS who is responsible for providing technical assistance to LIDDA service coordinators is unfamiliar with term "comprehensive functional assessment" and is unaware of any requirement to assess needs of people with IDD in nursing facilities); Miller Dep. 260:20-25, 272:2-6, 277:19-23, 279-5-25, Oct. 13, 2017 (HHSC trainer on PASRR indicates that PE determines specialized services and does not know of any training for the IDT on which services should be authorized; nor is there guidance on how to collect information from the PE assessments and MDS); Southall Dep. 100:1-6, Nov. 7, 2017 (CAO staff do not review for whether assessments are completed in reviewing LIDDA performance); T. Hernandez Dep. 56:16-57:1, Jan. 9, 2018 (IDT decides what assessments are conducted); Jalomo 30(b)(6) Dep. 228:21-229:8, 229:15-230:8, Nov. 2, 2017 (testifying that there is no standardized assessment tool required to determine need for Physical Therapy or ILST).

3.    Comprehensive functional assessments are not conducted as required and people with IDD are not receiving the assessments they need

0409.  Ms. Weston used her knowledge and experience overseeing a statewide annual survey of comprehensive functional assessments for the delivery of Active Treatment to inform her program review of LIDDAs in Texas. Ms. Weston determined that, among other aspects of non-compliance with PASRR, in Texas there were no comprehensive functional assessments conducted by the LIDDAs whose staff she interviewed. Trial Tr. 1480:18-22, Oct. 23, 2018 (Weston); *see also* Trial Tr. 1229:10-14, Oct. 22, 2018 (Webster) (finding that people were not receiving comprehensive functional assessments). Additionally, there was little understanding of the importance of conducting a comprehensive functional assessment, or evaluating all habilitative needs, which then limits any understanding of needed specialized services and the ability to determine the frequency, intensity, and duration of such services. Trial Tr. 1229:25-1230:3, Oct. 22, 2018 (Webster) (LIDDAs interviewed during the program review had "no familiarity" with comprehensive functional assessments.); PPI X 1762 at 26 (Webster Report).

0410.  HHSC has not effectively communicated PASRR requirements to identify and assess habilitative needs, either internally to the IDD Services Unit, or externally to the LIDDAs, who have the contractually delegated responsibility for implementing HHSC's PASRR program. This fundamental lack of understanding of PASRR is reflected directly in poor outcomes for individuals and the pervasive failure to provide all needed specialized services and Active Treatment. PPI X 1906 at 29 (Weston Report).

0411.  HHSC trainers do not provide adequate guidance to LIDDA staff about how to identify and assess habilitative needs. Trial Tr. 1479:16-20, Oct. 23, 2018 (Weston); PPI X 1906 at 29 (Weston Report).

0412.  HHSC's CAO Unit, responsible for evaluating compliance with the LIDDA contract and

holding LIDDAs accountable for their delegated PASRR duties, does not consistently review whether LIDDAs are appropriately assessing and recommending needed services. Trial Tr. 1479:21-24, Oct. 23, 2018 (Weston); PPI X 1906 at 29 (Weston Report); *see also* Southall Dep. 100:1-6, Nov. 7, 2017 (CAO staff do not review for whether assessments are completed in reviewing LIDDA performance).

0413.   Appropriate assessments usually are not conducted and needed services usually are not recommended for the PASRR population in nursing facilities. Trial Tr. 1478:1-1480:22, Oct. 23, 2018 (Weston); PPI X 1906 at 29-30 (Weston Report); PPI X 56 (HHSC report to state legislature on costs of PASRR contains no reference to cost for assessment of need except for cost of conducting PE); Cook 30(b)(6) Dep. 65:19-66:24, 75:21-76:8, Nov. 15, 2017.

0414.   Qualified IDD professionals do not perform comprehensive functional assessments at any stage of planning, either during the PE or resulting from the nursing facility IDT meeting. Most LIDDA staff do not demonstrate an understanding of the purpose of comprehensive functional assessments of all habilitative need areas. There is little evidence that LIDDAs conducted separate assessments for most of the LIDDA specialized services, like Day Habilitation, ILST, or Vocational Services, or became meaningfully involved with any nursing facility assessments. Trial Tr. 1480:18-22, Oct. 23, 2018 (Weston); PPI X 1906 at 35-36 (Weston Report); *see* Trial Tr. 1232:17-1234:5, 1235:4-6; Oct. 22, 2018 (Webster) (testifying that the State's performance on QSR Outcome Measure 2-4 confirmed his finding that LIDDAs were not making professionally adequate determinations of the needs for specialized services based on comprehensive functional assessments); PPI X 318 at 14.

0415.   In 2015, the QSR found only 30 % compliance for the Nursing Facility and Transition Target Populations with Outcome Measure 2-4, which assesses whether the Individual Service Plan "is based on assessments of the person's needs that appropriately identify these needs and recommend

services and supports to address them," and whether "assessments are completed by licensed and qualified staff within the timeframes established by the SPT" and "include assessments of the medical, nursing, nutritional management, psychiatric, behavioral, therapy, independent living, community participation and the integrated day activity needs of the individual." Compliance with this Outcome Measure increased to only 40 % in 2016, and decreased again to 38 % in 2017. PPI X  318 at 14; PPI X 253 at 5.

0416.    QSR Outcome Measure 3-3 evaluates whether the "PASRR Level II evaluation appropriately assesses whether the needs of the individual can be met in the community and identifies the specialized services the individual needs." HHSC's overall compliance on this measure for individuals in the Nursing Facility Target Population in 2017 was 9 %. PPI X 254 at 8.

0417.    Significantly, in 2016 the score on Indicator 54, which measures whether assessments were completed in a timely manner, was only 7 %. Trial Tr. 196:17-24, Oct. 15, 2018 (du Pree); PPI X 320. The score on Indicator 59, which measures whether assessments accurately reflect the individual's needs, was only 12 %. Trial Tr. 197:6-14, Oct. 15, 2018 (du Pree); PPI X 320. And the score on Indicator 63, which measures whether assessments are used to develop the ISP and to recommend specialized services, was only 3 %. Trial Tr. 197:17-22, Oct. 15, 2018 (du Pree); PPI X 320.

0418.    None of the twenty-seven individuals in the initial client review received a comprehensive functional assessment. For instance, for the first nineteen months of NT's stay, the nursing facility did not recognize NT had the ability to comprehend and communicate whether she had appropriate supports. PPI X 1298 at 11, 15 (Pilarcik Pre-Filed Direct Test.).

0419.    Many of the ten individuals evaluated by Dr. Coleman as part of the initial client review needed specialized services but did not have those needs properly assessed and identified in their PE. Only three of the ten individuals' PEs recommended nursing facility specialized services, such as

146

therapies and Durable Medical Equipment, and none recommended any specialized services that would be provided by the LIDDA, such as ILST, Day Habilitation, or Supported Employment. In the few instances when PEs recommended specialized services, they recommended an incomplete or inadequate array of specialized services. PPI X 1299 at 6 (Coleman Pre-Filed Direct Test.).

0420.  For instance, DM, a 58-year-old man reviewed by Dr. Coleman during the initial client review, had a primary diagnosis that included spastic quadriplegic cerebral palsy and several significant specialized services needs, including specialized Occupational Therapy, Physical Therapy, and Speech Therapy, but appropriate assessments of his needs and strengths had not been done. His PE recommended only Service Coordination and no other nursing facility or LIDDA specialized services. PPI X 1299 at 9-11 (Coleman Pre-Filed Direct Test.).[54]

0421.  None of the 54 individuals in the second client review had a comprehensive functional assessment. Trial Tr. 545:20-21, Oct. 17, 2018 (Pilarcik); Trial Tr. 500:14-17, Oct. 17, 2018 (Pilarcik) (testifying that none of the twenty individuals Ms. Pilarcik reviewed had received a comprehensive functional assessment); Trial Tr. 1618:17-21, Oct. 23, 2018 (Russo) (testifying that none of the sixteen people Ms. Russo reviewed had received a comprehensive functional assessment); Trial Tr. 858:11-13, Oct. 18, 2018 (Coleman) (testifying that none of the four people Dr. Coleman reviewed had received a comprehensive functional assessment); Trial Tr. 1744:9-12, Oct. 24, 2018 (Charlot) (testifying that none of the fourteen people Dr. Charlot reviewed had received a comprehensive functional assessment); PPI X 1280 at 15, 17 (Pilarcik Report); PPI X 1400 at 8 (Russo Report); PPI X 802 at 11 (Coleman Report); PPI X 777 at 14 (Charlot Report).

0422.  BL, who has had multiple psychiatric admissions and documented behavioral challenges, has never received a comprehensive functional assessment that included an assessment of his psychiatric

---

[54]The irony in having a Service Coordinator without providing any services that would need to be coordinated was a glaring gap in PASRR compliance.

and behavioral support needs. Trial Tr. 867:13-868:1, Oct. 18, 2018 (Coleman); PPI X 802 at 18 (Coleman Report).

0423.    CB, whom Dr. Charlot reviewed, had never received a comprehensive functional assessment that included an assessment of his behavioral support needs. Such an assessment would have resulted in a positive behavior support plan, which could have assisted him to accept needed Occupational Therapy services, which he was refusing, and to address his behavior of entering other people's rooms and going through their possessions. Likewise, CB had never received an assessment related to his vision and ability to maneuver in his environment, which could have helped him be more independent in navigating to his room and other locations of his choice. Trial Tr. 1744:13-1747:4, Oct. 24, 2018 (Charlot); PPI X 777 at 33 (Charlot Report).

0424.   Individuals did not receive comprehensive functional assessments even after significant changes in their status. LD had experienced a clear decline in his physical functioning, lost the ability to perform activities of daily living, was refusing to participate in therapies, and was in pain. He did not receive a comprehensive functional assessment to address these changes. Even though he was being medicated with psychotropic drugs to control behavioral symptoms, LD never was provided a behavioral plan or even a behavioral assessment. Trial Tr. 1619:18-25, Oct. 23, 2018 (Russo); PPI X 1400 at 26 (Russo Report).

F.    The State fails to provide adequate Service Planning and Service Coordination

0425.   Service planning and service coordination are critical to compliance with federal laws on serving people with IDD and related conditions in the most integrated setting to meet their needs, including the ADA. Service planning teams and service coordination are also critical components of Active Treatment. Trial Tr. 4006:15-20, 4011:17-4012:2, Nov. 13, 2018 (Howe).

0426.   As Plaintiffs' expert Mr. Webster explains, service planning is accepted by IDD professionals as an essential component for serving individuals with IDD. The essential elements of a

148

well-constructed service plan begin with an individually driven vision that is descriptive of the individual's aspirations and forms a framework of understanding and responding to the person in the Individual Service Planning process. This approach, often called Person-Centered Planning, is now the accepted foundation and approach to all service planning for individuals with IDD and is required by federal regulation for all people in nursing facilities. PPI X 1762 at 17 (Webster Report).

0427.  The service planning process must be coordinated and led by one individual, and the specifics of the service plan should be based upon clinically-assessed needs, including health and safety risk factors, as well as personally-expressed preferences. These are then incorporated into an individualized document that identifies relevant short-term and long-term goals, with measurable objectives, services, and service delivery strategies that complement the individual's vision and address the individual's assessed needs and preferences. The plan must describe the frequency, intensity, duration, location, and provider of each service, and how well it will achieve the plan's goals and objectives. PPI X 1762 at 17-18 (Webster Report); *see also* Trial Tr. 1223:6-17, 1245:8-24, Oct. 22, 2018 (Webster); Trial Tr. 2123: 7-9, 2127:18-2128:25, Oct. 26, 2018 (Sawyer); Trial Tr. 3358:19-23, Nov. 6, 2018 (Shea-Delaney) ("Q. You would agree with me that it's important to make sure that not only that these meetings happen but the appropriate representatives from the LIDDAs attend the meetings; is that right? A. Yes."); PPI X 1578 at 10, 13 (Sawyer Report).

1.    The nursing facility Interdisciplinary Team (IDT) and the LIDDA Service Planning Team (SPT) do not include relevant professionals, staff, the individual, and LAR, and do not develop professionally appropriate Individual Service Plans (ISPs)

0428.  In Texas nursing facilities, there is no unified multidisciplinary team and no single, unified plan that is known and carried out by all team members who work with the person who has IDD. Two separate and distinct teams exist, with separate purposes, separate documentation, separate services, and even separate, although overlapping, membership. There is no merging or blending of these two service plans into a single plan, or even well-coordinated and consistent dual plans.

Moreover, the service coordinator, who is responsible for ensuring that all needed services are provided, has a limited role in the Individual Disciplinary Team and even more limited ability to affect services provided by, and in, the nursing facility. Trial Tr. 1483:3-18, Oct. 23, 2018 (Weston); PPI X 1907 at 11 (Weston Rebuttal Report); PPI X 648 at tab 1; Willems 30(b)(6) Dep. 234:6-18, Jan. 11, 2018; *see* PPI X 689 at 9-23 (Detailed Item by Item Guide to Completing the PASRR Level I Screening Form and IDT Form).

0429.    HHSC's service planning and delivery structure – with its separation of IDT and SPT teams with their two distinct plans – creates a significant risk that the nursing facility and LIDDA specialized services are not properly planned and coordinated, and that the services, methods, and strategies of each are not properly communicated, provided or understood.  Trial Tr. 1481:2-1482:10, Oct. 23, 2018 (Weston); PPI X 1906 at 31 (Weston Report); *see also* PPI X 974 at 3-8 (many nursing facility providers have questions about, and, do not understand, specialized services).

0430.    The SPT may discuss the need for a particular nursing facility specialized service, but the nursing facility therapist and/or nursing facility staff ultimately determine whether the specialized service will be provided and, if it is requested, the service must then be authorized by DADS/HHSC before the service can be provided, which has resulted in delays and even rejections by the state agency. Service planning and delivery decisions should be made by the interdisciplinary team charged with creating a comprehensive individualized service plan, rather than the judgment of nursing facility specialized services clinician(s) – who may not be part of the team – and could be distant from the discussions and decisions of the SPT. PPI X 1762 at 28 (Webster Report).

0431.    The IDT and SPT meetings do not occur with the frequency dictated by HHSC policy. Instead, based on the State's data, of the 2,296 individuals with IDD who had a PE between September 1, 2016, and September 1, 2017, only 1,772 (77 %) had an IDT meeting and only 1,430 (62 %) had an SPT meeting during that year. Trial Tr. 982:18-983:10, Oct. 19, 2018 (O'Connor);

PPI X 1208 at 13 (O'Connor Rebuttal Report); PPI X 666. Nursing facility IDTs and LIDDA SPTs do not include all relevant persons, do not plan services based upon needed assessments, and do not plan services based upon person-centered principles. Although HHSC policy requires that a LIDDA representative participate in the IDT meeting, based on the State's data, the LIDDA did not attend 40.6 % of the most recent IDT meetings held for individuals with IDD during the year from September 1, 2016, to September 1, 2017. Trial Tr. 980:11-981:15, Oct. 19, 2018 (O'Connor) (explaining that 41 % of people did not have LIDDA participation at their most recent IDT meeting); PPI X 1208 at 14, 16 (O'Connor Rebuttal Report); PPI X 648 at tab 1. When all meetings in the time period were reviewed, the number increases slightly to 49.6 % of meetings where the LIDDA was not recorded as attending. PPI X 648 at tab 1.

0432.   HHSC's PASRR Unit does not monitor whether mandatory participants are present at IDT meetings. Trial Tr. 2462:25-2463:13, Oct. 31, 2018 (Willems). Ms. Willems, the head of HHSC's PASRR Unit, admitted that LIDDAs play a critical role in service planning and delivery for individuals with IDD in nursing facilities, and play a critical role in diversion and transition efforts for these individuals, and that it would be a significant concern and violation of Texas' rule for a LIDDA representative not to be present at an IDT meeting. The failure of the LIDDA to attend the IDT creates a risk that habilitative needs will not be met and that there will be confusion and misunderstanding among the teams. This creates a fragmented planning process. Trial Tr. 1483:3-10, 1584:25-1585:18, Oct. 23, 2018 (Weston); Trial Tr. 2463:21-2465:15; Oct. 31, 2018 (Willems) (testifying that "[a]nytime there's not a LIDDA at an IDT meeting, that is a problem"); PPI X 648 at tab 1; PPI X 618; PPI X 367.

0433.   Outcome Measure 2-1 measures whether all "individuals in the Target Population (TP) have a Service Planning Team (SPT), convened and facilitated by the Service Coordinator (SC). The SPT meets with the individual at least quarterly to develop, review, and revise the Individual Service Plan

(ISP) as indicated by the individual's changing needs and the SPT's assessment of the adequacy of the services and supports provided to the person to meet his/her needs. The SC facilitates the coordination of services and supports the individual receives." Performance on this measure for the Target Population was 36 % in 2015, 35 % in 2016, and 36 % in 2017. Performance for the Nursing Facility Population in 2017 was nearly identical (35 %), meaning that two-thirds of all nursing facility residents with IDD lacked adequate service coordination to ensure that they receive needed services.  PPI X 318 at 13; PPI X 254 at 7; PPI X 253 at 4; *see also* PPI X 1762 at 32 (Webster Report).

0434.  For Outcome Measure 2-2, which assesses whether the SPT includes all necessary professionals and the individual, the QSR scores for the Nursing Facility and Transition Target Populations went from 35 % in 2015, to 33 % in 2016, to 37 % in 2017, but stayed at 35 % for just the Nursing Facility Target Population. PPI X 318 at 13; PPI X 253 at 4; PPI X 254 at 7; *see* Trial Tr. 1247:19-1248:4, Oct. 22, 2018 (Webster) (testifying that the performance on QSR Measures 2-1 and 2-2 is "very significant because . . . it indicates that the service planning team isn't as effective as it needs to be to address changing needs of individuals, modify service plans, make sure that service plans are relevant and kept up to the assessed needs of the individual, and that not all appropriate members of the team are available or participating"). For Outcome Measure 6-1, which evaluates whether the teams meet quarterly, as required, the scores declined from 38 % in 2015, to 31 % in 2016, to 29 % in 2017. PPI X 318 at 24; PPI X 253 at 9.

0434a. Ms. Pilarcik found that guardians and involved family members were often not included in service planning meetings. Trial Tr. 525:12-23, Oct. 17, 2018 (Pilarcik). The majority of individuals reviewed by Ms. Pilarcik had only two or three people attend their IDT meetings, including the individual and the service coordinator. PPI X 1280 at 20 (Pilarcik Report); PPI X 1281 at 13-14 (Pilarcik Rebuttal Report). Dr. Charlot observed that the ISP meeting for BT, for example, was held

without his guardian mother present. Trial Tr. 1759:6-12, Oct. 24, 2018 (Charlot); *see also* Trial Tr. 3657:3-12, Nov. 8, 2018 (Terbush) (The Betty Hardwick LIDDA reported to HHSC that its staff spend approximately fifteen minutes on initial and quarterly SPT meetings); *see also* Trial Tr. 3654:21-3656:4, Nov. 8, 2018 (Terbush) (discussing the decisions made at service planning team meetings and agreeing that it is a "very important meeting").

2.    The nursing facility comprehensive care plan and the LIDDA ISP do not include appropriate goals, outcomes, and services, and do not address transition and discharge issues

0435.   ISPs should include (1) basic information about an individual, (2) that person's goals, objectives, needs, and services, (3) a vision statement for what the individual's life in the community would look like, and (4) practical, individualized living options and goals for the individual. It is a well-established professionally accepted standard in the field that ISPs must be individually driven and formulated through the person-centered planning approach. Trial Tr. 2151:14-2152:4, Oct. 26, 2018 (Sawyer); Trial Tr. 3619:21-3620:6, Nov. 8, 2018 (Phillips) (LIDDA official testimony that it is important for an ISP to be individualized and list goals, outcomes, and services); PPI X 1578 at 13, 19 (Sawyer Report).

0436.   An adequate ISP, developed through a person-centered planning process, must include individualized goals, objectives, services to be provided (described in terms of the frequency, intensity, and duration of each service), and the professionals responsible for providing each service. There must be a planned sequence for dealing with each of the objectives. Objectives must be stated separately, in terms of a single behavioral outcome; assigned a projected completion date; expressed in behavioral terms that provide measurable indices of performance; organized to reflect a developmental progression appropriate to the individual; and assigned priorities. 42 C.F.R §§ 483.440(c)(4)(i-v); Trial Tr. 482:16-483:8, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 10-11 (Pilarcik Report).

153

0437.   As required by HHSC rules, policies, and contracts, the ISP is a foundational document that should accurately reflect the individual's strengths, needs, and preferences; should be developed based upon the discovery process and person-centered planning; should have measurable goals and outcomes; and should include all needed specialized services. Trial Tr. 3818:25-3819:18, Nov. 9, 2018 (Turner). Section 9 of the ISP should be completed for all individuals with IDD in nursing facilities, and if the box is checked "Remain in nursing facility," then the barriers to placement should be identified in the next box, with a plan to address them. Trial Tr. 3819:22-3821:7, Nov. 9, 2018 (Turner). Under State rules, a transition plan in Phase II of Section 9 should be completed for every individual who has expressed an interest in transition, as reflected in the PE, the MDS, or otherwise. And completing Phase II can be helpful in making an informed choice of whether to remain in the nursing facility or transition to the community. *See* 26 Tex. Admin. Code § 303.201(b)(4); Trial Tr. 3821:8-3822:12, 3823:19-25, 3825:17-24, Nov. 9, 2018 (Turner); Trial Tr. 3531:23-25, 3532:1-4; Nov. 8, 2018 (McDonald) (testifying that people are identified for transition "based on their opinion of saying . . . I want to transition").

0438.   Within thirty days of admission, the SPT is required to develop an ISP, based on the comprehensive functional assessment, that must include overall goals focused on the person's identified needs and must be directed toward self-determination and independence, and with timetables, providers, and the amount, intensity, and duration of specialized services based on needs identified on the comprehensive functional assessment. PPI X 1906 at 16 (Weston Report).

0439.   The ISP must be a single, coherent plan, which is consistent and coordinated with the nursing facility's care plan, prepared by most of the same professionals, based upon most of the same assessments, and reflecting most of the same goals, objectives, and services. PPI X 1280 at 10-11 (Pilarcik Report).

0440.   The ISP must identify the person's strengths, preferences, and psychiatric, behavioral,

nutritional management, and support needs; identify desired outcomes; describe the specialized services to be provided (including the amount, intensity, and frequency of each service); and identify the services and supports to meet the individual's needs, achieve the desired outcomes, and maximize the person's ability to live successfully in the most integrated setting possible. PPI X 1762 at 14 (Webster Report).

0441.   The second client review identified deficiencies with the development of appropriate outcomes in ISPs. PPI X 1280 at 19-20 (Pilarcik Report) (only one person had adequate goals that addressed their identified needs); PPI X 422 at 2 (concluding that only two percent of the people reviewed had a professionally appropriate ISP).

0442.   Even though LIDDAs have asked for training on how to write outcomes, as of September 1, 2017, HHSC did not have such a training because of an internal conflict about how outcomes should be drafted. Bishop Dep. 160:16-163:14, Mar. 13, 2018.

0443.   QSR Outcome Measure 2-5 measures whether the individual "has an ISP that includes all of the services and supports, including integrated day activities, s/he needs to achieve his/her goals, maximize his/her potential, and participate in community activities. The [Nursing Facility] Member receives all of the specialized services identified in the ISP, including transition services and opportunities to learn about community options such as opportunities to visit community programs, in the frequency, intensity, and duration specified in the ISP. The SPT monitors the provision of specialized services." According to the 2015 QSR, only 19 % of individuals with IDD in the Nursing Facility and Transition Target Populations had an appropriate ISP; in 2016, the percent dropped to 14 %. In 2017, this figure was still only 16 %. PPI X 318 at 14; PPI X 253 at 5. Put another way, in 2017, 84 % of all nursing facility residents with IDD did *not* have a service plan that identified all needed services and that resulted in the provision of specialized services with the appropriate frequency, intensity, and duration. PPI X 1762 at 27, 28, 32 (Webster Report).

0444.   Ms. Dionne-Vahalik testified that the nursing facility plan of care, or comprehensive care plan, should include all specialized services offered by the nursing facility and the LIDDA as well as all other unique preferences and needs for care and services to be provided to the person and how those needs will be met. She also explained that the ISP and IDT should be used to develop and should be integrated into the nursing facility plan of care. Trial Tr. 2530:13-2531:13, 2533:1-15, 2547:1-8; 2563:12-24, Oct. 31, 2018 (Dionne-Vahalik).

0445.   On the critical measure (Outcome Measure 2-8) that evaluates whether the nursing facility plan of care and the LIDDA ISP include all needed specialized services, whether the plans are consistent and coordinated, and whether the plans are actually implemented, the scores dropped from 27 % in 2015, to 25 % in 2016, to 19 % in 2017. PPI X 318 at 15; PPI X 253 at 5. And on the related Outcome Measure 6-5, which determines if the individual has an ISP that includes all needed services, and whether these services are actually implemented, the scores were an alarming 19 % in 2015, 11 % in 2016, and only 16 % in 2017. PPI X 318 at 25; PPI X 253 at 9.

0446.   Moreover, when viewed at the indicator level, these deficiencies were even more dramatic. For Indicator 74, which measures whether the nursing facility plan of care reflects the goals and services of the ISP, the score in 2016 was only 4 %. Trial Tr. 199:4-12, Oct. 15, 2018 (du Pree); PPI X 320. For Indicator 281, which evaluates whether the ISP includes all specialized services, the score in 2016 was only 5 %. Trial Tr. 199:13-22, Oct. 15, 2018 (du Pree); PPI X 320. For Indicator 179, which determines if the recommended specialized services are provided with the requisite intensity, frequency, and duration, the score was only 4 %. Trial Tr. 199:23-200:7, Oct. 15, 2018 (du Pree); PPI X 320. Thus, 95 % of all individuals with IDD in nursing facilities did *not* have a minimally acceptable ISP that included all needed specialized services and were *not* receiving these services as required. Trial Tr. 200:8-15, Oct. 15, 2018 (du Pree); PPI X 320.

0447.   Only one of the 54 individuals in the second client review had a professionally appropriate,

person-centered ISP that was developed based upon a comprehensive functional assessment and that included all needed services and supports to successfully transition to the community. Trial Tr. 546:5-8, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 16 (Pilarcik Report); Trial Tr. 869:18-872:18, Oct. 18, 2018 (Coleman); PPI X 802 at 12 (Coleman Report); Trial Tr. 1758:10-12; Oct. 24, 2018 (Charlot) (testifying that none of the fourteen individuals she reviewed had a professionally adequate ISP); PPI X 777 at 15 (Charlot Report); PPI X 1400 at 9 (Russo Report).

0448.   For example, BH's ISP contains no goals, and she is not working toward gaining any skills that would increase her independence and self-determination. There is very little information that discusses her strengths, needs and preferences. Her ISP does not include a transition plan that discusses barriers to community living, there is no description of what the community would look like for BH, and Section 9 Phase II is blank. PPI X 1280 at 77 (Pilarcik Report).

0449.   DP does not have a professionally appropriate ISP. Her plan was developed with only the service coordinator, one person from the nursing facility, and DP. The service coordinator has never spoken with DP's family despite the fact that they visit her each week and that her brother is her legal guardian. In fact, the service coordinator was unaware that DP's brother was her guardian until the day before the expert reviewer met with DP. Additionally, no one from the therapy departments attended or was consulted in the development of the ISP. Trial Tr. 518:6-8, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 16, 27 (Pilarcik Report).

0450.   TM's service coordinator acknowledged that TM has expressed a clear desire to move to the community, but TM had not received individualized transition planning, and her ISP does not document the services she would need to move to the community. Her ISP identifies mental and physical health concerns as barriers to moving to the community, although services to address both should be available in the community. Also, her ISP meeting was held without her because the nursing facility's Hoyer lifts were both broken. Trial Tr. 1758:13-1759:5, Oct. 24, 2018 (Charlot);

PPI X 777 at 26 (Charlot Report).

0451.   Ms. Pilarcik found that most ISPs contained few, if any, goals. Many "goals" actually were statements of basic rights like "be appropriately dressed" or "attend activities of [their] choosing," or "making sure I am hydrated." PPI X 2162A at 8 ("Section 7: Individual's Desired Outcomes; Outcome 1: I want to be properly dressed with all of my undergarments"); Trial Tr. 874:1-875:6, Oct. 18, 2018 (Coleman) (testifying that the goal to be dressed with undergarments is not an appropriate habilitative goal, which should be an outcome teaching a skill); Trial Tr. 869:6-14, Oct. 18, 2018 (Coleman) (BL had no habilitative outcomes that would help him develop new skills or activities.); PPI X 1280 at 73 (Pilarcik Report); PPI X 1400 at 13 (Russo Report). Very few ISPs had goals that would help individuals acquire more skills and increase their self-determination. When goals or outcomes were listed, ISPs frequently did not identify the services and supports needed to meet these goals. Sections of the ISP often were left blank or did not accurately reflect the individual's strengths and needs. Trial Tr. 520:4-8, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 20, 24 (Pilarcik Report).

0452.   AS did not have an appropriate ISP. Although his family is extremely involved and visits every day, they were not included in the creation of the ISP. AS's family would like him to leave, but his service coordinator had never spoken to them, and so has taken no actions to facilitate a transition. AS's sister was adamant that the family was unhappy with the care AS was receiving in the nursing facility, and was hoping that he could return to the community with appropriate supports and services. The first goal in AS's ISP – "to have the opportunity to participate in social activities" – is actually a basic right, and his second goal – to live in the nursing facility – directly contradicts the preference of his LAR and other family members. No outcomes were listed, no specialized services were recommended, the historical section was blank, and no information about community options was included. Trial Tr. 520:18-524:23, Oct. 17, 2018 (Pilarcik); PPI X 1274; PPI X 1280

at 66-68 (Pilarcik Report).

3.   Service coordinators do not regularly participate on the IDT, do not oversee the development of appropriate service plans, do not monitor service plans, and do not ensure the coordination and implementation of service plans

0453.   The State's PASRR rules require referring entities to conduct the Level I screening, LIDDAs to conduct the PE, and the LIDDAs' service coordination program to organize and lead service planning teams that develop an ISP. PPI X 1762 at 14 (Webster Report).

0454.   The LIDDA service coordinators are responsible for monitoring the plan and ensuring that all needed specialized services are provided in a timely and consistent manner. The LIDDA Performance Contract, Texas Administrative Code, and related HHSC policies and procedures establish the State standards for this program. PPI X 1762 at 14 (Webster Report); *see e.g.,* PPI X 535 (February 2017 Amendment to LIDDA Performance Contract Attachment G); PPI X 265 at 22-23.

0455.   The LIDDA service coordinators lead the SPT, which develops the ISP, but they have a limited role in the IDT, which directs all services in the nursing facility. Because of the lack of coordination and integration between the ISP and the nursing facility plan of care, the IDT and SPT meetings do not result in an integrated, coherent, comprehensive, relevant, and coordinated ISP that is the basis for the provision of all needed specialized services and a program of Active Treatment. PPI X 1762 at 31 (Webster Report).

0456.   Outcome Measure 2-11, which requires monthly meetings with service coordinators, was met 46 % of the time in 2015, 39 % of the time in 2016, and only 31 % of the time in 2017. PPI X 318 at 15; PPI X 253 at 5. Outcome Measure 5-2, which assesses if the service coordinator facilitates the service planning team and actually coordinates the provision of needed services, remained low at 38 % in 2015, 31 % in 2016, and 29 % in 2017. PPI X 318 at 22; PPI X 253 at 8.

0457.   According to the State's QSR review, KP is an example of someone who did not receive

adequate service coordination and service planning. Although she experienced a significant change in status – loss of her ability to walk – the service coordinator failed to convene the service planning team to address this problem. PPI X 89 at 3-4.

0458.   Because of high staff turnover, many service coordinators at several LIDDAs have a limited understanding of the PASRR program and some lack knowledge of the specific strengths and needs of the individuals they serve. Many service coordinators do not demonstrate an understanding that the individuals they serve, and particularly those who have been institutionalized for years, could benefit from community placement. PPI X 1906 at 39 (Weston Report); *see* Trial Tr. 1124:13-1125:1, Oct. 19, 2018 (Preskey) (testifying that "[s]ervice coordinators, although I believe most of them have really good intentions, there is a high turnover, so oftentimes they don't have the opportunity to get to know the consumer quite as well as what they need to or should" and this can lead to a delay of services); Trial Tr. 2053:14-15, 2057:11-2058:1, Oct. 25, 2018 (Meisel) (testifying that she had four service coordinators in four years and that she found them to be unhelpful); Miller Dep. 263:11-14; 276:10-18, Oct. 13, 2017 (HHSC does not provide training on the difference between habilitative and rehabilitative therapy or how to resolve disagreements within the SPT on specialized services service needs, or how to ensure that services are provided consistently across all settings.).

0459.  For instance, Ms. Maria Rocha is a PASRR service coordinator for Tropical Texas Behavioral Health, a LIDDA that contracts with HHSC to administer Service Coordination and other specialized services to eligible individuals in its geographic catchment area. Ms. Rocha provides LIDDA PASRR services to a number of individuals. PI Tr. 552:17-553:1, June 19, 2017 (Rocha). Despite contacting numerous state offices, Ms. Rocha received no guidance from the State about how to access assessments and services that her clients desperately needed. PI Tr.  558:13-559:12, June 19, 2017 (Rocha).

G.    The State fails to provide needed Specialized Services

0460.    The PASRR regulations mandate that the State (not the nursing facility or any other entity) provide or arrange for the provision of specialized services to all nursing facility residents with IDD who need these services. Specialized services for IDD are defined by 42 C.F.R. § 483.120(a)(2) as ". . . the services specified by the [S]tate which, combined with services provided by the [nursing facility] or other service providers, results in treatment which meets the requirements of 483.440(a)(1) [Active Treatment definition]." PPI X 1762 at 13 (Webster Report); Diase Dep. 179:18-180:18, Nov. 1, 2017; *see* PPI X 5 at 5 (DADS Overview of FY16-17) (Exceptional Item Request, which noted that "Provision of specialized services for nursing facility residents with IDD is an expectation of the federal PASRR requirements"); PPI X 1770 at 6 (email from Mr. Chris Adams, then Deputy Commissioner for DADS, explaining that "[t]o meet federal PASRR requirements, the state must ensure provision of all identified specialized services in the state Medicaid plan . . .").

0461.    Specialized services should be based on highly individualized goals, objectives, and strategies to address all of an individual's needs, as described in the comprehensive functional assessment, and must be implemented through a program of Active Treatment as defined in federal regulations, 42 C.F.R. § 483.440(a)-(f). Each individual's ISP must contain a planned sequence of training and habilitation to meet the individual's needs and objectives, as identified using a comprehensive functional assessment. The plan must identify all habilitative need areas, list goals and timelines for addressing these need areas, describe the specialized services (including the amount, duration, and scope of such services) that will be provided to meet all identified need areas, and identify the providers responsible for offering and delivering these services. Trial Tr. 1234:12-25, Oct. 22, 2018 (Webster) (the purpose of specialized services is to implement the goals and objectives that are developed based on assessments and service planning team meetings); PPI

X 1762 at 13-14 (Webster Report).

0462.   Habilitation refers to a process aimed at helping individuals with IDD attain, keep, or improve skills and functioning for daily living. It can include Physical, Occupational, and Speech Therapy and various services such as Behavioral Support, Independent Living Skills Training, and social integration. Rehabilitation refers to regaining skills, abilities, or knowledge that have been lost or compromised as a result of a disability or due to a change in one's disability or circumstances. Trial Tr. 476:17-21, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 9 (Pilarcik Report); Lindsey Dep. 47:23-48:8, Feb. 8, 2017 (explaining that the purpose of specialized services for adults with IDD in nursing facilities is to be as independent as possible).

0463.   Specialized services ensure that individuals with IDD in nursing facilities receive a program of Active Treatment and have maximum opportunities for community activities and engagement. Without LIDDA specialized services, individuals with IDD in nursing facilities miss opportunities to participate in community activities and spend time away from nursing facilities. Ms. Turner and HHSC recognize the importance of specialized services in teaching individuals with IDD in nursing facilities about community activities, and the benefits of community living. One of the elements of HHSC's contract with the University of Massachusetts Medical School was to teach nursing facilities about how specialized services can be an important gateway to community transition. Turner 30(b)(6) Dep. 84:18-85:7, Feb. 21, 2018.

0464.   Texas has limited the specialized services that it will provide to certain therapies and medical equipment provided by nursing facilities in the facility and certain community services provided by or through the LIDDAs, typically outside of the facility. PPI X 1762 at 14 (Webster Report).

0465.   Nursing facilities routinely offer physical therapy, occupational therapy, and speech therapy designed to rehabilitate a condition (like a fall) for a time-limited period, as part of their basic nursing program and as included in the nursing facility's daily rate. For individuals with IDD who

require these same therapies, or a customized wheelchair, on an ongoing basis for habilitative purposes – to maintain existing functioning or learn new skills – the facility is supposed to provide them as specialized services and is paid an additional rate, after approval by the State. PPI X 1762 at 14 (Webster Report).

0466.   People with IDD often require Physical Therapy, Speech Therapy, and Occupational Therapy for habilitative purposes: to maintain existing functioning or to learn new skills. Habilitative nursing facility services are essential to PASRR, are not part of the nursing facilities' regular service array for all residents, and are reimbursed separately by the State outside of the nursing facility's daily rate. PPI X 1906 at 15 (Weston Report).

0467.   Texas LIDDAs must provide one specialized service – Service Coordination – unless the individual refuses, and must make available, as needed, Day Habilitation, Independent Living Skills Training, Employment Assistance, Supported Employment, and/or Behavior Support through its network of community provider agencies, subject to approval by the State. PPI X 831 (State Plan Amendment regarding LIDDA specialized services, Aug. 1, 2017). The LIDDA Performance Contract, Texas Administrative Code, and HHSC specialized services policies and procedures establish the state standards for specialized services, but do not provide a method for monitoring the actual receipt of LIDDA specialized services. PPI X 1713 (minutes of April 2017 HHSC specialized services workgroup meeting discussing proposals to improve monitoring and reporting of LIDDA specialized services). In contradiction to federal requirements, state standards on specialized services never mention and apparently do not require a program of Active Treatment. PPI X 1762 at 14 (Webster Report); PPI X 1906 at 18 (Weston Report).

0468.   Even though specialized services would give individuals opportunities to experience community settings, these services are significantly underutilized. *See* PPI X 61 at 2 (HHSC underutilizes the array of specialized services for people with IDD in nursing facilities, particularly

Day Habilitation and Independent Living Skills Training); Cook Dep. 205:11-206:14, Feb. 1, 2018. In its August 1, 2017 proposed State Plan Amendment to CMS seeking approval to expand habilitative services, HHSC projected that seventy percent of individuals with IDD in nursing facilities will utilize either Day Habilitation or Independent Living Skills Training, which are LIDDA specialized services. Although HHSC's submission to CMS misrepresented that this projection was based on actual utilization, HHSC has acknowledged that it used a projection based on utilization in the HCS waiver instead of the current underutilization of habilitative specialized services such as Day Habilitation and Independent Living Skills Training. Turner 30(b)(6) Dep. 121:6-25, Feb. 21, 2018. *Compare* PPI X 61 (HHSC fiscal impact calculation used for the proposed state plan amendment), *with* PPI X 831 at 3 (State Plan Amendment regarding LIDDA specialized services).

0469.   Although CMS clearly states that specialized services are not a category of service but, instead, whatever each individual needs, Ms. Turner stated that HHSC does not have a position or necessarily agree with CMS's instruction. Trial Tr. 3792:25-3795:12, Nov. 9, 2018 (Turner); DX 300 at Slide 8 (PTAC Webinar presented by CMS officials describing the state's responsibilities under federal law, and stating that what "is specialized for one person may not be specialized for another." States are responsible for providing whatever services an individual with IDD needs). Similarly, Ms. Turner does not agree with CMS that whatever specialized service the PE deems necessary must be provided. Trial Tr. 3795:14-3796:15, Nov. 9, 2018 (Turner); DX 300 at Slide 15 (PTAC Webinar presented by CMS officials).

0470.   HHSC has also ignored the multiple recommendations of its internal working groups, like the Specialized Services Workgroup and the PASRR unit, on how to comply with PASRR. PPI X 353 at 2 (HHSC analysis of 2015 survey of nursing facilities with respect to PASRR shows that HHSC has been aware of problems in nursing facilities for years); PPI X 521 at 13 (minutes of May 2017 workgroup meeting discussing proposed actions when nursing facilities do not provide needed

specialized services); PPI X 1712 at 3 (stating that the rejection of IDT's specialized service recommendations by nursing facilities' therapists is "a cause for concern").

0471.   Outcome 2 and Outcome Measures 2-1 through 2-13 in the QSR reflect PASRR requirements and professionally accepted standards for service delivery to individuals with IDD in nursing facilities, which are necessary to have an effective specialized services program, and to ensure that individuals with IDD receive appropriate assessments, coordinated service planning and delivery, nursing facility and other services, and Active Treatment. PPI X 976 at 9-10 (Howe Rebuttal Report).

0472.   The QSR results for the Nursing Facility and Transition Target Populations for Outcome Measure 2-13, whether individuals who need specialized services are only admitted to a nursing facility if their needs for specialized services can be met by the nursing facility, LIDDA, or both, dropped from 75 % in 2015, to 39 % in 2016, and to 33 % in 2017, and 32 % for just the Nursing Facility Target Population. PPI X 318 at 16; PPI X 253 at 5; PPI X 254 at 8.

0473.   The large portion of expedited admissions in Texas nearly eliminates the possibility that specialized services are considered prior to admission. Thus, HHSC's admission process directly undermines one of PASRR's core goals of ensuring that individuals with IDD are not admitted to nursing facilities that cannot provide all needed specialized services. PPI X 1907 at 9 (Weston Rebuttal Report).

      1.      The State fails to ensure specialized services are recommended consistent with individuals' needs, goals, and PASRR evaluations

0474.   PASRR reviewers do not evaluate all of the habilitative areas required by PASRR. Rarely do the PASRR Level II evaluations consider vocational, educational, social, independent living, and affective needs. PPI X 1906 at 36 (Weston Report).

0475.   The QSR findings for the Nursing Facility and Transition Target Populations on Outcome

Measure 3-3, which measures whether individuals with IDD in nursing facilities received a Level II PE that appropriately identified needs and specialized services, found that in 2015 only 34 % had a professionally appropriate PE. In 2016, this dropped to 20 %. In 2017, it decreased even further to 16 % and even further to 9 % for just the Nursing Facility Target Population. PPI X 253 at 5; PPI X 254 at 8; PPI X 318 at 16.

0476.   The State fails to track what specialized services are actually delivered, or the amount, intensity and frequency that these services are actually provided. Trial Tr. 1496:3-10, Oct. 23, 2018 (Weston); Trial Tr. 2483:16-2484:3, Oct. 31, 2018 (Willems) (testifying that the PASRR Unit monitors requests for nursing facility specialized services authorization, not delivery of those services, and that she does not know of a way to track information about delivery of specialized services); PPI X 1906 at 30 (Weston Report); PPI X 1907 at 12-13 (Weston Rebuttal Report); PPI X 2212 at 2 (HHSC's PASRR Unit does not report on the number of specialized services received by individuals with IDD in nursing facilities); Southall Dep. 95:7-96:3, Nov. 7, 2017 (CAO receives data report on LIDDA specialized services identified on the PASRR form but does not receive reports on whether services delivered); Cook 30(b)(6) Dep. 54:7-22, 131:2-21, Nov. 15, 2017 (HHSC does not have reliable data on LIDDA specialized services utilization); T. Hernandez Dep. 19:25-20:10, 127:14-128:2, Jan. 9, 2018 (HHSC does not track how many specialized services have actually been delivered); T. Hernandez 30(b)(6) Dep. 177:17-20, Oct. 5, 2017 (the PASRR Unit does not have procedures for monitoring utilization of specialized services); Jalomo Dep. 197:16-199:18; 237:1-238:1, Nov. 3, 2017 (admitting that he does not know of any tracking or reporting on actual delivery of specialized services); Schultz Dep. 238:19-239:13, Dec. 18, 2018 ("[T]he infrequent implementation of specialized services was more the norm than not" and data is not collected on the percentage of individuals that receive Physical Therapy or other specialized services.).

0477.   Ms. Turner said that there is no single report showing what specialized services are

recommended and actually received. Turner 30(b)(6) Dep. 158:2-5, Feb. 21, 2018. Although Ms. Turner indicated that a CAO staff member looks at encounter data to see if LIDDA specialized services are provided, Ms. Turner's deposition testimony goes against the testimony of all other HHSC witnesses, cited above, that there is no tracking of actual delivery of specialized services. Specifically, the head of CAO, Ms. Southall, testified to the contrary – that CAO does not track specialized service delivery. Southall Dep. 95:7-96:3, Nov. 7, 2017 (CAO receives data report on LIDDA specialized services identified on the PASRR form but does not receive reports on whether services delivered). Even Ms. Turner conceded that, as of September 1, 2017, any reporting of encounter analysis was still "in the development phase," Turner 30(b)(6) Dep. 173:6-21, Feb. 21, 2018, and, in response to Ms. du Pree's recommendations based on QSR outcomes, Ms. Turner stated, "[specialized services] delivery info may not be available," PPI X 25 at 3.

0478.   The instructions and forms for specialized services remained problematic more than a year after the Director of the QSR Unit recommended systemic improvements. PPI X 1989 at 3 (programmatic email from the QSR Unit director).

0479.   Ms. Turner acknowledged that what really matters is whether specialized services are supported by an assessment and then actually provided, unless refused by the individual. Trial Tr. 3746:8-24, Nov. 9, 2018 (Turner). She also agreed that it was important to provide all needed specialized services with the requisite intensity, frequency, and duration that are recommended, unless the individual refuses. Trial Tr. 3789:22-3790:4, Nov. 9, 2018 (Turner). Even though she heard the testimony of all Plaintiffs' experts and fact witnesses, she erroneously stated that no expert or fact witness had testified that specialized services that were supported by assessments were not actually provided. Trial Tr. 3746:18-24, Nov. 9, 2018 (Turner). Ms. Turner did not address consistent testimony of four IDD professionals who conducted the client review, as well as the findings of Outcome Measure 2-4 of the QSR, which concluded that assessments necessary to

recommend specialized services were frequently not completed.

0480.   Further, CAO does not do anything to ensure that the appropriate specialized services are recommended. Southall Dep. 315:15-316:22, 334:18-336:9, Nov. 7, 2017.

0481.   Without reliable data on actual need and utilization of specialized services, HHSC cannot forecast the type, amount, frequency, duration, and cost of needed specialized services, or determine if its PASRR program is having the intended effect of promoting independence and facilitating community integration. Both Plaintiffs' and Defendants' PASRR experts agreed that ready access to data on delivery of PASRR services is critical to oversight of a PASRR system. Yet HHSC's PASRR system fails to have this critical component. Trial Tr. 1497:7-12, Oct. 23, 2018 (Weston); Trial Tr. 2679:25-2680:21, Nov. 1, 2018 (Bruni); PPI X 1906 at 27-31 (Weston Report).

0482.   The manager of HHSC's PASRR Unit is not aware of any HHSC report showing the total number of people with IDD in nursing facilities who had specialized services recommended at their IDT meetings, and to her knowledge, the State does not track that information or the percent of people who had specialized services agreed to at their IDT meetings. Trial Tr. 2483:4-15, Oct. 31, 2018 (Willems). Although Ms. Turner disagreed with the statement that "without reliable data on actual need and utilization of specialized services, HHSC cannot forecast the type, amount, frequency and duration and cost of specialized services," and claimed that HHSC does have some cost data on utilization, she ignored the predicate of the statement concerning data that is based on actual need. Trial Tr. 3774:6-17, Nov. 9, 2018 (Turner). As documented in the QSR (Outcome Measure 2-5), specialized services are being provided to less than 15 % of individuals who need them. PPI X 318 at 14 (finding that only 14 % of individuals with IDD in nursing facilities are receiving needed specialized services). Thus, HHSC's actual cost data does not and cannot be used to project the cost of needed specialized services.

0483.   HHSC conducted an analysis of the historical cost of specialized services actually provided

and projected future costs based upon limited data and no reliable information on the actual need for specialized services that are based upon individual assessments. The HHSC analysis was presented to the legislature in a PASRR Specialized Services Cost Report in March 2017. Trial Tr. 3852:9-3853:6, Nov. 9, 2018 (Turner); DX 322.

0484.    Additionally, HHSC leadership recognized that failing to seek and obtain funds sufficient to meet the specialized service needs of persons with IDD in nursing facilities would violate PASRR, and would put the State at risk for being out of compliance with federal PASRR requirements. PPI X 6 (email from HHSC officials discussing PASRR funding); PPI X 324 (DADS Recommendation for Legislative Priorities/LAR – Delivery of Specialized Services for Persons with IDD in Nursing Facilities).

2.    Specialized services are infrequently provided

0485.    Dr. O'Connor analyzed the specialized services recommended on the PE form, the IDT form, and the PASRR Specialized Services (SPT) form between September 1, 2016 and September 1, 2017, for adults with IDD confirmed on their most recent PASRR Evaluation. Dr. O'Connor analyzed the recommendations made at all meetings or evaluations conducted in the time period, as well as the most recent meeting. Trial Tr. 979:6-981:2, Oct. 19, 2018 (O'Connor); Trial Tr. 987:17-988:2, Oct. 19, 2018 (O'Connor) (explaining that the data available shows only what services were recommended, not whether people actually received those services); PPI X 648 at tabs 1-2; PPI X 650 at tab 1; PPI X 1208 at 13-14 (O'Connor Rebuttal Report).

0486.    According to Dr. O'Connor's analysis of Texas' data, only about one-third of individuals in nursing facilities who had a positive PE between September 1, 2016 and September 1, 2017 were recommended for nursing facility specialized services, and less than one-quarter were recommended for LIDDA specialized services by their Service Planning Teams at the most recent meeting. Further, Dr. O'Connor testified that the number of recommended specialized services decreased from

the PASRR Level 2 Evaluation to the IDT and SPT meetings. Trial Tr. 984:14-987:16, Oct. 19, 2018 (O'Connor); PPI X 648 at tab 2; PPI X 650 at tab 1; PPI X 662 (showing that for the group analyzed, nursing facility specialized services were recommended to 79 % of people at the PE, 53 % at the last IDT, and 37 % at the last SPT, and LIDDA specialized services other than Service Coordination and Alternate Placement were recommended for 80 % of individuals at the PE, 27 % at the last IDT, and 25 % at the last SPT); PPI X 666; PPI X 1208 at 13-14 (O'Connor Rebuttal Report). In other words, many of the individuals for whom the PE recommended specialized services subsequently lost those recommended services by the time of the IDT and SPT meetings. Trial Tr. 984:14-987:16, Oct. 19, 2018 (O'Connor); PPI X 648 at tabs 1-2; PPI X 650 at tab 1; PPI X 666; PPI X 658; PPI X 1208 at 13-14 (O'Connor Rebuttal Report). These team meetings are intended to ensure that individuals' needs are identified and that services to meet those needs are provided, not to diminish the services that individuals receive. These numbers highlight fundamental flaws in Texas' PASRR program. Trial Tr. 1498:25-1501:1, Oct. 23, 2018 (Weston); PPI X 662; PPI X 1907 at 12 (Weston Rebuttal Report); T. Hernandez Dep. 64:14-67:13, Jan. 9, 2018 (admitting that under federal regulations PASRR evaluators determine what specialized services are needed); T. Hernandez Dep. 64:14-67:13, Jan. 9, 2018 (interdisciplinary teams and not PASRR evaluators determine what assessments are needed and what services are provided).

0487.   These very low recommendation rates are indicative of the lack of a comprehensive functional assessment as well as factors related to nursing facility reluctance to participate in the PASRR program, the uncertainty of payment, and the concern of duplication of services on the part of nursing facility clinical staff. Trial Tr. 1230:4-12, Oct. 22, 2018 (Webster) (testifying that the low use of specialized services suggests that the service planning process is ineffective or deficient); Trial Tr. 1235:1-3, 1239:13-20, Oct. 22, 2018 (Webster) (testifying that there is a relationship between comprehensive functional assessments and specialized services, and the low numbers of specialized

services recommendations indicate that comprehensive functional assessments are not occurring); PPI X 1762 at 29 (Webster Report).

0488.   Available data based only on service *recommendations*, and not actual service *delivery*, indicate that very few adults with IDD in nursing facilities receive LIDDA specialized services. PPI X 1907 at 17 (Weston Rebuttal Report).

0489.   The client review showed that the number of individuals who actually receive specialized services is lower than the number who are recommended for these services by their teams. For example, even though RF was recommended for ILST in order to visit her dying mother, she still had not received the service five months after it was recommended. Her mother passed away before she was provided transportation to visit. Trial Tr. 1630:23-1631:9, Oct. 23, 2018 (Russo); PPI X 1400 at 33-34 (Russo Report).

0490.   Specialized services identified in the PE were often not recommended or provided. Trial Tr. 502:8-10, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 26, 38, 42-43, 49, 56, 61, 81 (Pilarcik Report) (describing DP, LB, AH, VC, DK, SB, and BF). For instance, although LB's PASRR Evaluation of January 7, 2016 recommended Physical Therapy, Occupational Therapy, Speech Therapy, Durable Medical Equipment, Service Coordination, and Alternate Placement Services, she was not consistently receiving any of these services. PPI X 1280 at 36-37 (Pilarcik Report).

0491.   A June 2017 HHSC data report, which identifies the specialized services recommendations made at every Service Planning Team meeting for each individual in the "PASRR Total Population Residing in a Nursing Facility," similarly shows that very few adults with IDD in nursing facilities receive recommendations for each available specialized service. A sum of the most recent SPT recommendations recorded for each individual in this population as of June 5, 2017, indicates that while 75 % of people received recommendations for Service Coordination, fewer than 13 % of individuals received recommendations for every other type of specialized service. For example,

fewer than 2 % of individuals' SPT teams recommended any form of Behavioral Supports or Employment Assistance; fewer than 5 % recommended Day Habilitation; and, only 12.3 % recommended Independent Living Skills Training. Trial Tr. 414:24-421:13, Oct. 16, 2018 (Kim) (explaining the process used to prepare the summary of PPI X 596, which included counting the number of unique individuals whose most recent SPT meeting resulted in a "yes" recommendation for a particular specialized service, and then dividing that sum by the total unique individuals in the report – 2,999 – in order to determine the percentage of the population that was recommended for that service); Trial Tr. 1236:13-1239:20, Oct. 22, 2018 (Webster) (testifying about his review of PPI X 596 and PPI X 672 (summary chart)).

0492.   Mr. Webster testified that, in his experience, a large number of individuals with IDD would benefit from specialized services and that the number of specialized services recommendations reported in Texas is very low. Trial Tr. 1239:14-20, Oct. 22, 2018 (Webster). *See* Trial Tr. 1497:13-1498:24, Oct. 23, 2018 (Weston); PPI X 1906 at 31 (Weston Report).

0493.   Home and Community-based Services providers interviewed during the program review rarely are asked to provide Independent Living Skills Training or other LIDDA specialized services to nursing facility residents with IDD, even though they offer these same services to hundreds, if not thousands, of individuals in the community. PPI X 1762 at 30 (Webster Report); *see* Adkins Dep. 24:17-22, Oct. 30, 2018 (nursing facility resident testifying that no one has offered him Independent Living Skills service); *see also* Trial Tr. 3646:13-15, Nov. 8, 2018 (Terbush) (testifying that "a few" individuals served by the Betty Hardwick Center are receiving specialized services).

0494.   The State acknowledged the low use of specialized services in a webinar provided to nursing facilities, in which the presenter, QSR reviewer Ms. Sally Schultz, stated that in her experience visiting 140 nursing facilities throughout the state, "less than 20 % of the nursing facilities are providing any specialized services therapy." PPI X 367 at 07:00-07:12 (audio); PPI X 368 at 16

(webinar); Trial Tr. 1240:7-1241:5, Oct. 22, 2018 (Webster) (testifying about his review of the webinar and audio component); PPI X 544 at 21 (Ms. du Pree's presentation about the 2015 QSR stating, "[nursing facility] staff are unfamiliar with specialized services and how to access them").

0495.   HHSC has acknowledged that PASRR specialized services have been underutilized. PPI X 61; Cook 30(b)(6) Dep. 151:3-21, Nov. 15, 2017; Cook Dep. 205:11-206:14, Feb. 1, 2017. Ultimately, the low utilization of LIDDA specialized services means that for the majority of people with IDD in nursing facilities, their habilitative needs are not met. Trial Tr. 1501:13-20, Oct. 23, 2018 (Weston); PPI X 1907 at 17 (Weston Rebuttal Report).

0496.   Nursing facilities are unable to provide nursing facility specialized services unless a nursing facility professional requests and obtains from HHSC written approval to provide that service, creating a potentially significant gap between the identification and provision of services and the possibility of denial of clinically needed services by an official who is not part of the IDT. Trial Tr. 1501:2-12, Oct. 23, 2018 (Weston); PPI X 367; PPI X 1906 at 31 (Weston Report); Willems Dep. 99:4-23, Feb. 3, 2017; PPI X 155 (specialized service request status monthly reporting, August 2017); *see also* PPI X 1875-1879 (State's data shows that numerous requests for authorization of specialized services are either denied or sent back for more information.).

0497.   People with IDD in nursing facilities will not receive needed and recommended nursing facility specialized services unless the nursing facility staff and clinicians submit the appropriate forms for authorization from HHSC. In interviews, service coordinators and other LIDDA PASRR staff reported that nursing facilities resist making requests and providing these specialized services and that, despite HHSC nursing facility education programs, there continue to be delays in services caused by incorrect or incomplete requests for authorization. These delays result in individuals with IDD not receiving nursing facility specialized services that have been recommended in the PE or agreed to by the interdisciplinary team. Trial Tr. 1501:2-12, Oct. 23, 2018 (Weston); PPI X 354-359

(November 2016 - April 2017 HHSC reports of PASRR nursing facility specialized services requests that were received, approved and/or denied reflecting barriers to authorization for services recommended at the IDT meeting); PPI X 611 (spreadsheet containing information about class members for whom specialized services had been recommended and agreed to but not initiated); PPI X 617 (email from PASRR Unit regarding problems with Regulatory Services' nursing facility surveyors' lack of understanding of PASRR requirements); PPI X 619 (spreadsheet containing information about class members for whom nursing facilities failed to initiate agreed-upon specialized services); PPI X 1906 at 36-37 (Weston Report); T. Hernandez Dep. 239:18-240:19, Jan. 9, 2018 (admitting HHSC does not currently track inaccurate or incomplete nursing facility submissions for specialized services); Willems 30(b)(6) Dep. 47:12-25, 51:16-52:21, Oct. 16, 2017; Willems 30(b)(6) Dep. 126:24-128:6, 128:21-129:4, Jan. 11, 2018 (documenting specialized service that was recommended but not provided).

0498.   The disapproval rate by HHSC of requested nursing facility specialized services exceeds twenty percent. Other states, like Massachusetts, do not require central office approval of every specialized service. PPI X 613 (PASRR Unit email about problems with authorizations for specialized services); PPI X 1906 at 37 (Weston Report).

0499.   HHSC did not have an automated process to review authorization requests for nursing facility specialized services until June 2017. Prior to that, authorization requests were processed manually. Trial Tr. 2447:14-2448:3, 2450:12-20, Oct. 31, 2018 (Willems).

0500.   HHSC does not regularly analyze or determine the number of individuals who receive LIDDA specialized services, the type of LIDDA specialized services provided, and the amount, duration, and frequency of LIDDA specialized services actually provided. The lack of any information on the number, amount, duration, or frequency of LIDDA specialized services actually provided means there is no way of determining what is really happening for individuals with IDD

in nursing facilities. PPI X 1762 at 27 (Webster Report); Henderson Dep. 163:15-23, Nov. 14, 2017 (admitting that if the Long-Term Care Regulation Unit's quality service reviewers determine that individuals are not receiving the specialized services that they are supposed to be receiving, they do not and are not required to communicate those findings with Regulatory Services); T. Hernandez Dep. 18:21-23:2, 127:14-128:2, Jan. 9, 2018 (conceding HHSC does not track the delivery of specialized services and acknowledging that it is difficult to track which specialized services are delivered because of delays in billing and use of subcontracted service providers); Willems 30(b)(6) Dep. 144:15-23, Jan. 11, 2018.

0501.   HHSC's Regulatory Unit, which is responsible for enforcing aspects of PASRR with respect to nursing facilities, appears to have an insufficient understanding of PASRR, reflected in its review of complaints regarding nursing facilities' failure to deliver specialized services. PPI X 1906 at 32 (Weston Report); PPI X 618.

> 3.    Specialized services are not provided with the needed intensity, frequency, and duration

0502.   The 2015 QSR (Outcome Measure 2-5 for the Nursing Facility and Transition Target Populations) found that only 19 % of nursing facility residents received all needed specialized services; in 2016, the number had dropped to 14 %. Data for 2017 showed virtually no improvement, with only 16 % of individuals with IDD in nursing facilities receiving all needed specialized services. PPI X 318 at 14; PPI X 253 at 5; PPI X 1762 at 30 (Webster Report). As Ms. du Pree reported, "The lack of both [nursing facility] and LIDDA [specialized services] is apparent and there is little to no discussion of day habilitation or employment options." PPI X 317 at 11.

0503.   The 2015 QSR (Outcome Measure 2-8 for the Nursing Facility and Transition Target Populations) found that only 27 % of nursing facility residents received services with appropriate consistency and coordination. In 2016, this number dropped to 25 %. In 2017, it fell even further to

only 19 % of individuals with IDD in nursing facilities receiving consistent and coordinated specialized services. PPI X 318 at 15; PPI X 253 at 5; PPI X 1762 at 30 (Webster Report).

0504.   The 2016 QSR findings on whether specialized services are provided with the required intensity, frequency, and duration are even more troubling. As measured by Indicator 179, only 4 % of all individuals with IDD in nursing facilities receive specialized services with the intensity and frequency that they need. Put another way, 96 % of all persons with IDD in nursing facilities *do not* receive specialized services with the intensity and frequency that they need.  Trial Tr. 199:23-200:7, Oct. 15, 2018 (du Pree); PPI X 320. And as measured by Indicator 277, only 12 % receive any specialized services designed to achieve their goals and maximize their independence. Trial Tr. 200:8-15, Oct. 15, 2018 (du Pree); PPI X 320. Additionally, not only does HHSC not provide specialized services, they do not track the reasons for a specialized service denial. T. Hernandez 30(b)(6) Dep. 160:21-161:3, Oct. 5, 2017.

0505.   Of the seventeen individuals evaluated by Ms. Pilarcik as part of the initial client review, none was receiving all needed specialized services. For instance, JH was not receiving any of the specialized services necessary to address bowel incontinence, increase independence in self-care skills, improve his gait and balance, decrease the risk of aspiration, provide him an opportunity to spend time in the community and outside of his locked unit, or increase social skills. PPI X 1298 at 12, 36-37 (Pilarcik Pre-Filed Direct Test.).

0506.   None of the ten individuals evaluated by Dr. Coleman as part of the initial client review was receiving any PASRR specialized services, except Service Coordination. Despite the frequency and severity of their needs, none of the individuals were receiving ongoing, consistent, habilitative Physical Therapy, Speech Therapy, or Occupational Therapy specialized services. All ten individuals had contractures or were at risk of contractures due to their physical limitations. Six of the ten individuals needed habilitative Speech Therapy, but were not receiving it. In many instances,

individuals need this service to identify and maintain their ability to communicate, maintain their ability to eat a regular diet instead of a pureed one, and ameliorate their risk for choking and aspiration. For example, six individuals had diagnoses of dysphagia or other swallowing-related disorders that would necessitate Speech Therapy. PPI X 1299 at 5-7 (Coleman Pre-Filed Direct Test.).

0507.   Eight of the ten individuals evaluated by Dr. Coleman in the initial client review needed habilitative Physical Therapy but were not receiving it. All ten individuals had mobility challenges and used wheelchairs as a tool for greater independence – an indication that individuals would benefit from Physical Therapy to maintain strength and stability and to prevent further loss of mobility. None of the ten individuals received any LIDDA specialized services other than Service Coordination. PPI X 1299 at 6-7 (Coleman Pre-Filed Direct Test.).

0508.   For example, service coordination documentation for SW, an individual evaluated by Dr. Coleman in the initial client review, indicated that for almost two years, SW's mother had expressed interest in SW attending a Day Habilitation program. However, as of the day of Dr. Coleman's visit, the service coordinator had not explored Day Habilitation options for SW, and SW was spending most of her time at the nursing facility despite her expressed interest in participating in community activities. PPI X 1299 at 22 (Coleman Pre-Filed Direct Test.).

0509.   None of the 54 individuals in the second client review were receiving all needed specialized services with the requisite frequency, intensity, and duration. Trial Tr. 545:22-546:1, Oct. 17, 2018 (Pilarcik) (testifying that none of the twenty individuals Ms. Pilarcik reviewed were receiving all needed specialized services); Trial Tr. 860:4-864:10, Oct. 18, 2018 (Coleman) (testifying that none of the four individuals Dr. Coleman reviewed were receiving all needed specialized services); Trial Tr. 1622:7-12, Oct. 23, 2018 (Russo) (testifying that none of the sixteen individuals Ms. Russo reviewed were receiving all needed specialized services); Trial Tr. 1749:13-16, Oct. 24, 2018

(Charlot) (testifying that none of the fourteen individuals Dr. Charlot reviewed were receiving all needed specialized services); PPI X 777 at 14 (Charlot Report); PPI X 802 at 11 (Coleman Report); PPI X 1280 at 15 (Pilarcik Report); PPI X 1400 at 8 (Russo Report).

0510.   Dr. Charlot described BT, a 53-year-old man with cerebral palsy, who did receive some Physical and Occupational Therapy services, but was not receiving enough ongoing, habilitative therapies to prevent his contractures from progressing. When Dr. Charlot met BT, his hands were contracted tightly such that his fingernails, which had not been trimmed, were cutting into the palms of his hands. Trial Tr. 1751:4-1752:9, Oct. 24, 2018 (Charlot).

0511.   Although SH and her service coordinator agreed that she would benefit from ongoing Physical and Occupational Therapy, multiple nursing facilities repeatedly denied her these services or provided them only for a short time. SH explained that she felt stronger and less stiff when receiving these services and an assessment recognized that Physical Therapy was necessary to prevent contractures and promote independence. Eventually, SH had to file a formal complaint and was still not receiving habilitative Physical Therapy at her nursing facility. It appears that SH has lost skills, such as in mobility and transferring, resulting in added limitations on her ability to be independent as a result of not receiving these services. PPI X 777 at 17-20 (Charlot Report).

0512.   DBr had a PE that recommended Service Coordination, a Customized Manual Wheelchair, and Alternate Placement Services, but DBr was not receiving Alternate Placement Services, which are designed to effectuate a timely transition to the community. DBr, who has a history of traumatic brain injury and uses a wheelchair for mobility, would benefit from specialized Physical Therapy, Occupational Therapy, and Speech Therapy, but she was not receiving any of those PASRR specialized services. PPI X 802 at 13-14 (Coleman Report).

0513.   Few individuals in the second client review received ongoing, habilitative nursing facility specialized services. Some individuals received intermittent rehabilitative services, but often were

discharged after a short period of time and suffered declines in their skills. Nursing facility staff demonstrated a lack of understanding of the difference between habilitative and rehabilitative therapies and confusion about how to access PASRR specialized services. As a result of these intermittent, rehabilitative services, not tailored to individuals with IDD, the individuals' skills, functioning, and abilities frequently declined. Trial Tr. 1622:13-22, Oct. 23, 2018 (Russo); Trial Tr. 861:14-863:6, Oct. 18, 2018 (Coleman); PPI X 777 at 14 (Charlot Report); PPI X 802 at 11 (Coleman Report); PPI X 1280 at 18-19 (Pilarcik Report).

0514.    The individuals in the second client review who did receive nursing facility specialized services usually had them discontinued after a few months. Many individuals lost skills when they were discharged from time-limited rehabilitative therapies including AH, BH, BF, SH, SBa, DH, and LB. PPI X 1280 at 18 (Pilarcik Report). Almost no one received LIDDA specialized services for more than a couple of hours per week, and usually less. PPI X 1400 at 13, 22, 38-39 (Russo Report); PPI X 1280 at 34 (Pilarcik Report).

0515.    Despite RF's need for Occupational Therapy, Physical Therapy, and Speech Therapy to improve her functioning and avoid regression, she had previously only received these therapies on a time-limited, intermittent basis. Predictably, absent ongoing PASRR habilitative nursing facility specialized services, RF regressed from being able to walk up to 200 feet on level surfaces with a walker, safely transfer, and independently complete some activities of daily living using no assistive devices, to needing assistance with most activities of daily living, gaining weight likely related to fluid retention and immobility, increased difficulty standing and transferring, increased risk of falls, and increased risk of skin breakdown. Trial Tr. 1629:23-1633:2, Oct. 23, 2018 (Russo); PPI X 1400 at 33 (Russo Report).

0516.    SB, another individual in the second client review, is not receiving any LIDDA specialized services other than Service Coordination. Although she was admitted to the nursing facility in 2008,

she was not recommended for Independent Living Skills Training (ILST) until August 2, 2017 at her quarterly service planning team meeting – just a month before the fact cut-off date. Even then, ILST had not been provided by September 1, 2017 because the LIDDA had not yet identified an ILST provider. SB would have benefitted from ILST years ago, as well as specialized services that would have allowed her to participate in community activities, as she enjoys being active, engaged, and involved in community activities, including the local library. ILST would enable her to access the community more frequently than she does with only facility trips, and allow her to develop and maintain skills. PPI X 1280 at 30 (Pilarcik Report).

0517.   Many individuals in the second client review were not provided needed customized wheelchairs. Others waited for months or years as their requests were processed. Some had reportedly received customized wheelchairs, which were subsequently "lost" by the nursing facility. Consequently, each spent their days sitting in ill-fitting wheelchairs, experiencing constant pain, limited mobility, fear of falling, and many unnecessary and dangerous falls. Trial Tr. 529:22-530:5, Oct. 17, 2018 (Pilarcik); Trial Tr. 1620:11-1621:6, 1624:25-1625:10, 1635:10-12, Oct. 23, 2018 (Russo); PPI X 1280 at 24, 33, 42, 73, 81 (Pilarcik Report); PPI X 1400 at 24 (Russo Report).

0518.   Nursing facility resident Jacob Adkins testified that he was bed-bound because he did not have a wheelchair that was appropriate, despite requesting one. Adkins Dep. 18:3-19:14, Oct. 30, 2018.

0519.   AP, who was part of the second client review, had a wheelchair that was broken for almost a year. During that time, she was unable to ambulate independently. According to AP, she was extremely frustrated and cried every day. Although AP received her repaired wheelchair a couple of weeks prior to the review, the manual wheelchair's wheels were still broken, and it still did not properly accommodate AP's size. Thus, AP was forced to wear a waist restraint to keep her from falling out of her wheelchair. During the client review, AP's wheelchair continued to be in disrepair

and failed to meet her needs properly and safely. Trial Tr. 1636:18-1638:8, Oct. 23, 2018 (Russo);

PPI X 1400 at 24 (Russo Report).

0520.   Maria Rocha is a service coordinator who works in the Rio Grande Valley. Many of Ms.

Rocha's clients have been recommended for a Customized Manual Wheelchair (CMWC). This

PASRR specialized service has not been provided in a timely manner. Most individuals have had

to wait more than two years to get their CMWC. While Ms. Rocha has been able to get a few clients

wheelchairs through her persistent advocacy, most are still waiting just for an initial assessment,

which is a necessary pre-condition for seeking approval from HHSC before ordering and finally

receiving a CMWC. The lack of a CMWC has resulted in increased segregation from the community

and caused individuals to regress in terms of their ability to live as independently as possible. PI Tr.

560:9-562:2, 562:16-563:1, June 19, 2017 (Rocha) (Of 16 residents that need CMWCs, only three

had received them; those three residents waited two years to receive their CMWCs).

0521.   Several individuals who Dr. Charlot reviewed were receiving some Speech Therapy, but it

was focused on medical issues like swallowing, rather than assisting individuals to improve their

ability to communicate. Many needed this type of assistance and in some cases even requested it, but

they did not receive needed Speech Therapy. Trial Tr. 1750:5-15, Oct. 24, 2018 (Charlot); PPI X

777 at 11 (Charlot Report).

0522.   Both Ms. Pilarcik and Ms. Russo found that many individuals with behavioral symptoms

were not receiving Behavioral Support and, instead, were treated with psychotropic medications.

Ms. Russo reported, "Many of the individuals exhibited behavioral challenges such as depression,

loneliness, anxiety, frustration, anger, agitation, aggressiveness, yelling, screaming, etc. . . .

However, none of the individuals who suffered from difficult and/or challenging behaviors received

behavioral support services that were adequate, consistent, and effective in meeting their needs."

PPI X 1400 at 9 (Russo Report). *See* Trial Tr. 1622:23-25, Oct. 23, 2018 (Russo); PPI X 1280 at 18

(Pilarcik Report) (describing SBa, SE, VC, LB, AH, DPar).

0523.  Dr. Charlot found that many people who needed Behavioral Supports were not receiving them, and had not even had a behavioral assessment. Trial Tr. 1749:17-1750:4, Oct. 24, 2018 (Charlot).

0524.  LIDDA specialized services that would allow individuals to leave the nursing facility and spend time in the community were rarely recommended and almost never provided to the individuals in the second client review. For example, none of twenty individuals reviewed by Ms. Pilarcik received LIDDA specialized services that allowed them to leave the nursing facility and engage in the community. A few had been recommended for Independent Living Skills Training, but only one had received it for a short period of time, and none were receiving it at the time of the review. Trial Tr. 509:18-510:2, Oct. 17, 2018 (Pilarcik); Trial Tr. 863:7-864:10, Oct. 18, 2018 (Coleman); Trial Tr. 1623:1-5, Oct. 23, 2018 (Russo); Trial Tr. 1750:16-23; Oct. 24, 2018 (Charlot) (testifying that a common problem for people not receiving all needed specialized services was that there were "a number of people who I didn't see assessments of what their community living skills were and what they needed"); PPI X 777 at 14 (Charlot Report); PPI X 802 at 11 (Coleman Report); PPI X 1280 at 22 (Pilarcik Report).

0525.  Ms. Russo found that in the rare instances when ILST was being provided to the individuals she reviewed, it was provided in the nursing facility and did not allow the individual to spend any time in the community. LIDDA specialized services for LD was simply someone who occasionally brought him food, and for AP, it was someone who periodically came to the nursing facility and showed her flashcards. Neither individual had any opportunities to leave the nursing facility. Trial Tr. 1690:12-18, 1697:5-8, Oct. 23, 2018 (Russo).

0526.  LIDDA specialized services were further limited by the lack of transportation, use of wheelchairs, or individuals' need for assistance with activities of daily living. PPI X 777 at 14

(Charlot Report). Even Ms. Turner, the deputy associate commissioner for HHSC, acknowledged in response to a question from the Court that the only way HHSC pays for transportation to community activities or for visits to providers is if an individual is enrolled in ILST. Trial Tr. 3695:4-11, 3802:20-3803:13, Nov. 9, 2018 (Turner). And Texas' data demonstrates that of all individuals with IDD in nursing facilities who had a PASRR Evaluation in the last year, just 12.6 % had this service recommended at their last IDT meeting and 17.4 % had the service recommended at their last SPT meeting. PPI X 648 at tabs 1-2; *see also* PPI X 672 (1006 Summary of PPI X 596) (As of June 5, 2017, 12.34 % of individuals had a recommendation for ILST at their most recent SPT Meeting); Trial Tr. 414:24-421:13, Oct. 16 2018, (Kim) (testifying about the preparation of PPI X 672).

0527.   For example, CB stated that he would like to engage in community outings through ILST and attend Day Habilitation. His service coordinator agreed that this would be appropriate and allow him to experience community activities. Yet he has not received either service. Ms. Pilarcik testified, "[T]he service coordinator told me that he couldn't have Day Habilitation services because there was a problem with transportation since he was in a wheelchair." Trial Tr. 508:24-509:2, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 24 (Pilarcik Report).

0528.   DB expressed interest in attending a Day Habilitation program. However, because her nursing facility's van can only accommodate one wheelchair, it poses challenges to participating in community activities. PPI X 802 at 15-16 (Coleman Report).

0529.   Alternate Placement Services were not provided to individuals, even when this service was recommended in their PE and/or when individuals had expressed an interest in returning to the community. Trial Tr. 514:22-515:1, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 22, 36, 38, 40, 43, 45, 61, 83 (Pilarcik Report). Ms. Russo testified that of eight individuals who were recommended for Alternate Placement, none was provided transition options. Trial Tr. 1633:12-20, Oct. 23, 2018

(Russo); PPI X 1400 at 8 (Russo Report).

0530.    All of the individuals whom Ms. Rocha serves have been recommended by their SPT to receive specialized services. None of these individuals have received the recommended assessments or service plans their treating professionals recommended. As a result, they were at risk of decompensating and losing much needed skills, including the ability to perform activities of daily living and self-ambulate, and a risk of further isolation and segregation in the nursing facility.  PI Tr. 554:4-20; 555:10-18; 557:23-558:21; 560:3-7, June 19, 2017 (Rocha).

0531.    Most of the PASRR-eligible individuals Ms. Rocha serves have waited more than two years to receive needed specialized services, mostly because nursing facilities refused to provide the needed habilitative therapies. LIDDAs have not been successful in getting assistance and support from state agencies tasked with the implementation and oversight of these programs. PI Tr. 558:17-559:12, June 19, 2017 (Rocha). Some of HHSC's policies and forms have improperly restricted access to a CMWC for people with IDD who do not have certain cognitive and physical abilities. PPI X 2120 at 2; PPI X 2119 at 2 (noting that HHSC's instructions for CMWC requires that a therapist include a written statement in an assessment for a CMWC that the person has the physical and cognitive ability to operate a CMWC independently, which excludes certain people with IDD from receiving needed CMWCs so that these individuals can sit up safely in their wheelchairs, participate in activities, eat without aspirating, and prevent or slow the progression of scoliosis.).

0532.    Other individuals in nursing facilities are not receiving services even when they are requested. For example, although CS's individual service plan stated that he "would like to participate in meaningful day activities," no specialized services were listed on his ISP. Trial Tr. 3620:8-16, 3623:1-3624:13, Nov. 8, 2018 (Phillips); PPI X 1397A at 25.

0533.    The State's data from its PIRM database shows that specialized services are provided infrequently. This undercuts the State's assertions and the credibility of their witness's testimony that

LIDDAs ensure specialized service provision. *Compare* Trial Tr. 3669:16-18, Nov. 8, 2018 (Jones), *with* the following five paragraphs.

0534.   At the Harris County LIDDA, the PIRM data indicate that FB was not receiving any nursing facility specialized services, even though she needed Physical Therapy, Occupational Therapy, Speech Therapy, Day Habilitation, and ILST. The PIRM data also indicate a lack of follow up by FB's service coordinator to ensure she received specialized services. PPI X 250-A at row 838; PPI X 249-A at row 530282; *see also* PPI X 251-A at row 107. The QSR reviewer also indicated that JM's service coordinator "has not held quarterly meetings as required and has not facilitated or coordinated specialize services that would benefit [JM]." PPI X 250-A at row 1046, column DI.

0535.   At Burke Center LIDDA, the PIRM data indicate that KC was not receiving any nursing facility specialized services, even though she needed Physical Therapy and Occupational Therapy to "further improve her functioning and increase her independence." PPI X 249-A at rows 580498, 580975; PPI X 250-A at row 1113.  *See also* PPI X 251-A at rows 486, 537. The data also indicates that DN should have had assessments for specialized services like Physical Therapy, Occupational Therapy, Speech Therapy, Behavioral Services, and a CMWC, but never did. The QSR reviewer also found that DN should have had Occupational Therapy, Physical Therapy, and Speech Therapy services, but these were never provided. PPI X 249-A at rows 367548, 367570; PPI X 250-A at row 743; *see also* PPI X 251-A at rows 459 & 481.

0536.   At Dallas MetroCare LIDDA, the PIRM data indicate that MK receives no specialized services even though he would benefit from Physical Therapy, Occupational Therapy, and Employment Assistance "to improve his functioning and increase his independence." PPI X 249-A at row 485442; PPI X 250-A at row 1008. *See also* PPI X 251 at row 342. Similarly, FM received no specialized services even though the QSR reviewer found she would benefit from specialized services like Physical Therapy, Occupational Therapy, Speech Therapy, and ILST. PPI X 249-A at

row 664620; PPI X 250-A at row 1233; *see also* PPI X 251-A at row 481. In addition, quarterly meetings were not held as required for NL, and the service coordinator did not ensure that specialized services were facilitated or coordinated for NL at the nursing facility. PPI X 250-A at row 1075, column DI.

0537.    At Austin Travis County Integral Care LIDDA, the PIRM data indicate that JC, "has no goals or objectives and has not received specialized services. His day at the [nursing facility] seems very unstructured. . . . The team has never discussed the [Occupational Therapy] and [Physical Therapy] assessments recommended by the PE evaluator." Furthermore, JC's service coordinator never advocated for him to receive specialized services. As a result, JC participates in no activities. PPI X 249-A at row 415329; PPI X 250-A at row 521, column DI; *see also* PPI X 251-A at row 342.

0538.    At the Betty Hardwick Center LIDDA, the PIRM data indicate that CW should have been receiving Occupational Therapy and Speech Therapy specialized services but was not. PPI X 249-A at row 403054; PPI X 250-A at row 834; *see also* PPI X 251-A at row 486.

H.    The State fails to provide a program of Active Treatment

0539.    Active Treatment is a process and a standard of care that includes specialized services provided by the nursing facility and other services from other service providers that result in a continuous and aggressive plan of care and is directed toward the acquisition of skills and behaviors necessary for the person to function with as much self-determination and independence as possible. Active Treatment requires an integrated process of planning, documentation, team participation, goals, objectives and time lines, as well as continuous monitoring and revision as indicated through the delivery of services. PPI X 1906 at 15 (Weston Report) (citing 42 C.F.R. §§ 483.120(a)(2), 483.440(b)-(f)), *see also* Trial Tr. 1235:14-1236:3, Oct. 22, 2018 (Webster) (Active treatment "assures that whatever goals and objectives are identified . . . get implemented in every – in every context that the person finds themselves in. . . . A person with an intellectual disability needs that

kind of consistency and follow-through in order to maintain their skills, not lose them, and possibly gain more skills."); PPI X 1235 (PTAC/CMS guidance reflecting Active Treatment requirement for people with IDD in nursing facilities); PPI X 1762 at 13-14 (Webster Report); Turner Dep. 169:8-170:21, 172:5-173:1, Feb. 23, 2018 (Active Treatment requires that services be provided consistently, continuously, and carried over from setting to setting.).

0540. Federal Active Treatment standards require that an identified program of services must be provided and that there is ongoing documentation, coordination and monitoring of the service delivery. A qualified IDD professional must coordinate and monitor the delivery of services and implementation of the ISP. Data should be collected regarding the individual's response to meeting the objectives in order to measure progress and revise strategies when progress is not attained. PPI X 1906 at 15-16 (Weston Report) (citing 42 C.F.R. § 483.120(b)).

0541. A program of Active Treatment can only be developed from a comprehensive functional assessment of all need areas. In a program of Active Treatment, all team members are trained in strategies for the consistent implementation of a plan that addresses specific skill areas. All team members focus on developing the skills and behaviors necessary to meet desired objectives at structured and naturally occurring points in a person's day. This plan and skill development is implemented across settings. In a program of Active Treatment, data are collected regarding a person's progress in achieving desired objectives. Active Treatment requires a consistent and continuous approach with close monitoring, modifications, and revisions to an individualized plan based on need. Trial Tr. 1420:12-1428:9, Oct. 23, 2018 (Weston); PPI X 1906 at 32 (Weston Report).

0542. CMS provides guidelines for states regarding the survey method for determining the quality of service delivery and individualized treatment planning of an intensity and frequency to constitute a program of Active Treatment. CMS requires a comprehensive and professionally accepted survey

process consisting of interviews of the person, legally authorized representative, nursing facility team members, provider team members, observation, and documentation review to assess the process. Trial Tr. 1419:16-25, Oct. 23, 2018 (Weston); PPI X 313 (CMS's Active Treatment Standards).

0543.   CMS's survey process has four levels, similar in many respects to the QSR. At the highest level is the regulation. Second, CMS has created standards, called Conditions of Participation, which set forth the criteria that must be met to comply with the regulation. Third, CMS has developed Tags, which are elements that are evaluated and scored to determine if a Condition of Participation is met. Fourth, CMS designed Probes, which are a form of questions or queries that are used to gather information and determine if a Tag is satisfied. Finally, CMS issues guidance for assessing whether Active Treatment is met, through a protocol for combining the findings on Probes, Tags, and Conditions of Participation. This sequence, designed to measure compliance with Medicaid requirements and rules, includes many elements and terms not explicitly required by the rules. Trial Tr. 4024:20-24, 4025:20-4026:17, Oct. 13, 2018 (Howe).

0544.   The *Rolland* Active Treatment Protocol Instrument used the CMS Tags and the same sequence, with Indicators, Probes, and data points, to evaluate whether individuals with IDD in nursing facilities were receiving Active Treatment. PPI X 980. The Protocol Instrument was approved by the court as an appropriate evaluation tool to measure compliance with federal law. Trial Tr. 3917:4-10, Nov. 13, 2018 (Howe); PPI X 304 (*Rolland* Active Treatment Review Guidelines); PPI X 305 (*Rolland* Active Treatment Protocol for Class Member); PPI X 580 (*Rolland v. Patrick*, Order Approving Revised Active Treatment Standards).

0545.   Active Treatment is considered met when individuals have developed increased skills in independence and functional life areas or have maintained functioning to the maximum extent possible, and have received continuous and competent training, supervision and support to promote skills and independence and to function on a daily basis. PPI X 1906 at 17 (Weston Report).

0546.   Witnesses for both sides agree (or concede) that Active Treatment in Intermediate Care Facilities and nursing facilities is similar. Trial Tr. 258:24-259:2, Oct. 16, 2018 (du Pree); Trial Tr. 2719:21-2721:24, Nov. 1, 2018 (Williamson) ("Certainly, for younger people in nursing facilities . . . if they have an intellectual disability or a behavioral health challenge, there is certainly a focus on using – doing the same type of skilled [sic] development and helping that person, again, to maintain as much independence as they can in that nursing facility as well."); Trial Tr. 3957:1-8, 3959:22-3960:5, 3977:13-14, 4013:17-4015:25, Nov. 13, 2018 (Howe). The only difference is the setting in which treatment and services are provided.[55]

0547.   The QSR measures, *inter alia*, whether individuals with IDD in nursing facilities were receiving Active Treatment. Trial Tr. 144:11-16, Oct. 15, 2018 (du Pree).

0548.   All available evidence, from the QSR to data on LIDDA specialized services, to the absence of a comprehensive functional assessment, to the wholesale failure to even mention Active Treatment in virtually any HHSC training or monitoring documents, demonstrates that Active Treatment does not exist in Texas' PASRR system. PPI X 1907 at 16 (Weston Rebuttal Report). T. Hernandez 30(b)(6) Dep. 115:6-14, Oct. 5, 2017 (Comprehensive assessments for nursing facility specialized services are limited.); T. Hernandez 30(b)(6) Dep. 184:21-185:8, 186:9-24, Oct. 5, 2017 ("I have not seen any policy or procedure that states that nursing facilities residents receive active treatment.").

0549.   As one expert noted, it is difficult, if not almost impossible, to provide a program of Active Treatment given the inadequacy of the IDT process in identifying and providing all needed nursing facility specialized services; the inadequacy of the SPT process in identifying and providing all

---

[55]Perhaps to justify current practices, defense counsel seemed to argue that persons with IDD would be entitled to receive Active Treatment in an ICF but not in a nursing facility. This argument is nonsensical and reflects a fundamental misunderstanding of PASRR requirements. Persons with IDD often need more, not less, Active Treatment in a nursing facility than they do in an intermediate care facility. Again, it depends on individual needs, not the setting in which treatment and services are delivered.

needed LIDDA and nursing facility specialized services in the appropriate amount, frequency, intensity and duration, as defined in the individual's service plan; the acknowledged lack of coordination and integration of the nursing facility plan of care in the ISP; the lack of understanding and oversight by the service coordinator of nursing facility and LIDDA services; and the absence of a comprehensive array of specialized services available in each of the LIDDAs visited. PPI X 1762 at 31 (Webster Report).

0550.    In Texas, Active Treatment is not provided by the LIDDAs, nor is there an understanding that Active Treatment is a requirement for individuals in nursing facilities. Trial Tr. 1502:4-11, 1503:6-1504:22, Oct. 23, 2018 (Weston); Trial Tr. 1244:14-22, Oct. 22, 2018 (Webster) (testifying that the LIDDAs he interviewed demonstrated very little to no understanding of what Active Treatment is and that, based on his review, Active Treatment is not being delivered); PPI X 1301 at 12 (Webster Pre-filed Direct Test.); T. Hernandez 30(b)(6) Dep. 186:9-24, Oct. 5, 2017; Mills Dep. 123:12-124:17, Oct. 19, 2017 (indicating that the State does not require Active Treatment nor is there a current review process for failure to provide Active Treatment to persons with IDD in nursing facilities).

0551.    HHSC's PASRR program mostly includes sporadic provision of nursing facility therapies, as long as authorization is obtained, and the occasional provision of LIDDA specialized services. It lacks the essential components of assessment, engagement, monitoring, data collection, and ongoing plan revision, combined with other services, with a frequency, intensity, and duration as to constitute a federally-required program of Active Treatment. PPI X 1906 at 32 (Weston Report); *see* PPI X 2057 (meeting on PASRR Specialized Services).

0552.    HHSC fails to communicate an expectation that nursing facility or LIDDA specialized services must be of a frequency, intensity, and duration as to constitute a program of Active Treatment. HHSC staff people who are responsible for supporting and overseeing HHSC's PASRR

program are unaware of the correct definition of Active Treatment and its relevance to individuals with IDD in nursing facilities. PPI X 1906 at 33 (Weston Report); Trial Tr. 2982:4-16, Nov. 2, 2018 (Reece); Belliveau 30(b)(6) Dep. 76:17-77:21, Oct. 20, 2017 (providing incorrect definition of Active Treatment and confirming that Active Treatment is not included in PASRR trainings); Blevins Dep. 46:9-20, 165:3-6, Feb. 7, 2017 (HHSC official within LPDS responsible for providing technical assistance to LIDDAs in their service coordination for adults with IDD in nursing facilities professes ignorance of the term Active Treatment); Dionne-Vahalik Dep. 151:2-18, Dec. 19, 2017 (incorrect definition of Active Treatment); Lindsey Dep. 46:2-14, Feb. 8, 2017 (manager of LPDS section providing procedures and technical support for LIDDAs does not know what Active Treatment is); Reece Dep. 51:4-8, 281:3-282:24, Sept. 13, 2017 (CAO official who developed and applies CAO PASRR tool does not know what Active Treatment is and does not review or monitor LIDDAs for Active Treatment compliance); Willems Dep. 59:1-22, Feb. 3, 2017 (stating incorrectly that nursing facilities are not required to deliver Active Treatment).

0553.   HHSC rules and policies do not use the term Active Treatment, do not require nursing facilities or LIDDAs to provide Active Treatment, and do not monitor services to determine if they constitute Active Treatment. Trial Tr. 3807:15-25, Nov. 9, 2018 (Turner); Willems 30(b)(6) Dep. 59:1-22, Feb. 3, 2017; Reece Dep. 281:3-282:24, Sept. 13, 2017.

0554.   Most LIDDA staff interviewed were unaware of and unfamiliar with the requirement to provide Active Treatment to individuals with IDD in nursing facilities. Some LIDDA staff offered definitions of Active Treatment that displayed a fundamental misunderstanding of the requirement. Some more-experienced staff understood the concept in relation to the ICF model, but had no understanding of its application in nursing facilities. PPI X 1906 at 38-39 (Weston Report).

0555.   Like the LIDDA and HHSC staff, Defendants' expert witness on PASRR demonstrated a lack of knowledge of PASRR's Active Treatment requirement for people with IDD in nursing facilities.

This lack of knowledge of one of PASRR's fundamental requirements undermines her expertise on PASRR. Trial Tr. 2618:11-24, Nov. 1, 2018 (Bruni) (not aware of the term Active Treatment to describe care in nursing facilities).

0556.   Ms. Howe and the Massachusetts Department of Disability Services successfully revamped the specialized and nursing services provided for individuals with IDD in order to comply with the federal court's orders on Active Treatment, including creating Active Treatment technical assistance teams comprised of professionals with experience in providing Active Treatment, supplementing funding to nursing facilities to deliver Active Treatment, training nursing facility staff about Active Treatment, identifying nursing facilities with a history of deficiencies in Active Treatment, training service coordinators to monitor Active Treatment, expanding the range and location of specialized services to include more community experiences, revising the infrastructure to support Active Treatment, and working with the court monitor to evaluate Active Treatment. Trial Tr. 3917:15-3919:18, 3920:21-3921:2, Nov. 13, 2018 (Howe); PPI X 976 at 6-7 (Howe Rebuttal Report); PPI X 980 (*Rolland* Active Treatment Protocol Instrument approved by federal court to determine if individual class members in nursing facilities were receiving Active Treatment as required by federal law).

0557.   Ms. Howe was clear that the Active Treatment requirements incorporated in the court's orders in *Rolland v. Patrick* mirrored and even incorporated the CMS Active Treatment standards, provisions, and evaluation Tags that are used to assess Active Treatment in Intermediate Care Facilities. As a result of Ms. Howe's efforts, the court determined that Massachusetts and the Department of Disability Services had complied with all of its orders to provide Active Treatment and dismissed the case. Trial Tr. 3957:1-8, 3959:22-3960:5, 3977:13-14, 4017:16-4019:9, 4022:9-13, 4024:20-24, 4025:22-4026:17, Nov. 13, 2018 (Howe).

0558.   CMS's PASRR Technical Assistance Center, relied upon by Defendants' PASRR expert,

references the court orders in *Rolland v. Patrick* as establishing a standard for services to people with IDD in nursing facilities. Trial Tr. 2671:9-17, Nov. 1, 2018 (Bruni).

0559.   Nursing facility staff often are not trained in working with individuals with IDD. For example, at seventeen of the eighteen nursing facilities that Ms. Pilarcik visited, staff were not trained in IDD services or habilitation. As a result, it was virtually impossible to provide Active Treatment consistent with federal requirements. Trial Tr. 516:11-20, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 11, 24, 27, 30, 33, 52, 67, 76 (Pilarcik Report); PPI X 1400 at 9 (Russo Report); 42 C.F.R. § 483.440(c),(f).

0560.   None of the twenty-seven individuals in the initial client review received Active Treatment. PPI X 1298 at 12 (Pilarcik Pre-Filed Direct); PPI X 1299 at 6-7 (Coleman Pre-Filed Direct).

0561.   For example, BC, a 73-year old woman visited during the initial client review, was evaluated in 2015 for a new electric wheelchair, which she did not receive for six months. The record indicated that over the two years prior to the client review, there had been several recommendations for BC to be evaluated for Physical Therapy and Occupational Therapy for contractures. Despite several recommendations by the therapy department and BC's physician regarding treatment and monitoring for contractures, the nursing facility director of nursing and social worker reported that due to BC's significant contractures, she rarely gets out of bed. PPI X 1299 at 19 (Coleman Pre-Filed Direct).

0562.   NT, an individual visited by Ms. Pilarcik in the first client review, never received a continuous Active Treatment program due to the delayed and intermittent nature of specialized services and lack of any LIDDA specialized services. As a result, she has lost skills including the ability to eat some foods and maneuver her own wheelchair. Except for a brief period at the end of 2016, she has spent all of her time within the confines of the nursing facility. PPI X 1298 at 16-17 (Pilarcik Pre-Filed Direct).

0563.   Individuals do not receive services in a timely manner, or with the appropriate frequency and intensity, necessary to constitute Active Treatment. None of the 54 individuals in the second client review were receiving Active Treatment. Trial Tr. 546:2-4, Oct. 17, 2018 (Pilarcik); Trial Tr. 515:25-516:2, Oct. 17, 2018 (Pilarcik) (testifying that none of the twenty individuals Ms. Pilarcik reviewed were receiving Active Treatment); Trial Tr. 864:11-866:15, Oct. 18, 2018 (Coleman) (testifying that none of the four individuals Dr. Coleman reviewed were receiving Active Treatment); Trial Tr. 1629:12-16, Oct. 23, 2018 (Russo) (testifying that none of the sixteen individuals Ms. Russo reviewed were receiving Active Treatment); Trial Tr. 1754:25-1755:2; Oct. 24, 2018 (Charlot) (testifying that none of the fourteen people Dr. Charlot reviewed were receiving Active Treatment); PPI X 777 at 14 (Charlot Report); PPI X 802 at 11-12 (Coleman Report); PPI X 1280 at 15, 19 (Pilarcik Report); PPI X 1400 at 9 (Russo Report).

0564.   For example, BH, an individual in the second client review, was not receiving continuous Active Treatment across settings, such as community outings, that would enable her to acquire skills toward independence. She has a problem with impulse control, which causes difficulty in focusing in her therapies and yet the counseling sessions do not work in concert with her therapy team to mitigate this challenge. PPPI X 1280 at 76 (Pilarcik Report).

0565.   BL was not receiving Active Treatment or a program to address his documented behavioral challenges. His behavioral needs had been noted for years and a crisis stabilization plan dated August 2017 was in his records. However, there was no indication that staff were trained on the plan; the plan had an end date, which is not consistent with professional standards; and there was no indication that the plan was actually implemented. Further, BL had not received a comprehensive functional assessment and was not receiving specialized services other than Service Coordination, although nursing facility staff reported that such services would be beneficial. Trial Tr. 863:22-864:6, 868:7-869:17, Oct. 18, 2018 (Coleman); PPI X 802 at 18-19 (Coleman Report).

194

0566.    Because DB lacks ongoing habilitative services to teach her basic functional skills, she is not receiving Active Treatment. The time-limited therapy services that are available are not delivered in the amount and frequency that DB needs. Furthermore, DB has not been given the opportunity to attend a Day Habilitation program, although she expressed an interest in doing so in the past.  PPI X 802 at 15 (Coleman Report).

0567.    The lack of qualified and trained staff with knowledge of habilitation and IDD issues makes provision of Active Treatment nearly impossible. PPI X 1299 at 7 (Coleman Pre-Filed Direct).

0568.    The lack of accessible and available Day Habilitation and ILST providers, as well as a lack of transportation to/from community settings, are significant barriers to the provision of LIDDA specialized services. PPI X 1762 at 30 (Webster Report); *see also* Trial Tr. 1272:9-22, Oct. 22, 2018 (Webster) (finding that while the providers he reviewed asserted that they had the capacity to provide specialized services, very few were in fact providing specialized services to individuals with IDD who lived in nursing facilities and "in some instances, [they] didn't even know what PASRR was").

0569.    A June 2017 HHSC data report indicates that the percentage of individuals with IDD who were recommended for Day Habilitation specialized services was 4.83 % and the percentage who had a recommendation for ILST was 12.34 %. PPI X 596; PPI X 672. The absence of a comprehensive array of LIDDA specialized services in most LIDDA service areas illustrates the lack of an understanding of, and capacity to provide, Active Treatment. PPI X 1762 at 29-30 (Webster Report) (discussing the data in PPI X 672 and 596).

0570.    Specialized services within nursing facilities are not consistently provided and monitored as a part of a continuous, consistent, coordinated program of Active Treatment. There is no method to assess the implementation, effectiveness, and training needs of any coordinated program of service delivery, and no way to make necessary modifications towards meeting assessed needs and achieving identified goals. During interviews, no LIDDA reported that Active Treatment as defined by federal

law was occurring in a nursing facility. Trial Tr. 1502:4-11, 1503:18-1504:2, Oct. 23, 2018 (Weston); PPI X 1906 at 35 (Weston Report).

0571.   Active Treatment was mentioned in budget requests for the 2016-17 biennium, when HHSC was seeking an increased appropriation for specialized services. In this one instance where HHSC references Active Treatment, HHSC acknowledged not only the Active Treatment requirement, but also that this obligation required more funding for specialized services than had been historically provided by HHSC for people with IDD in nursing facilities. In response, the Legislature appropriated approximately $5,300,000, a significantly increased amount for PASRR specialized services for the 2016 and 2017 biennium. However, HHSC used only approximately $1,600,000 of these appropriated funds. Approximately $3,700,000 never was spent because HHSC failed to operationalize the Active Treatment requirement for people with IDD in nursing facilities. Trial Tr. 1502:12-1503:5, Oct. 23, 2018 (Weston); PPI X 1906 at 33-34 (Weston Report); PPI X 53 at 145 (HHSC FY16-17 presentation to the Legislature); PPI X 56 at 13-14, 16 (HHSC PASRR Cost Report); PPI X 1770 at 3-4 (HHSC email to answer legislative inquiry); Cook Dep. 205:11-206:14, Feb. 1, 2018.

I.      Adults with IDD in Texas nursing facilities are suffering irreparable harm as a result of not receiving Specialized Services and Active Treatment

0572.   The most serious systemic types of harm identified in the initial client review included actual harm and a significant risk of harm related to individuals' unmet need for habilitative Speech Therapy to mitigate the risk of aspiration, choking, and weight loss; actual harm and a significant risk of harm related to individuals' unmet need for Occupational and Physical Therapy to prevent painful and irreversible contractures, to prevent falls, to address mobility limitations and to prevent skin integrity problems; and actual harm and a significant risk of harm related to individuals' unmet need for habilitative Speech Therapy to allow individuals to communicate verbally or communicate

with augmentative devices and express their needs and desires to staff. PPI X 1298 at 15-17 (Pilarcik Pre-Filed Direct Test.); PPI X 1299 at 6-8 (Coleman Pre-Filed Direct Test.).

0573.   In addition, there was actual harm and a risk of harm related to individuals' unmet need for behavior support services to allow individuals to learn adaptive behaviors, improve functioning, avoid unnecessary psychotropic medications, and engage more appropriately with others; and actual harm and a risk of harm related to individuals' unmet need for other services and supports provided by the LIDDA that allow individuals to participate in more integrated, age-appropriate activities, to increase independence and functioning, and to engage with others in the community, including non-disabled peers. PPI X 1298 at 6 (Pilarcik Pre-Filed Direct Test.); PPI X 1299 at 8-9 (Coleman Pre-Filed Direct Test.).

0574.   Finally, the initial client review found that many individuals with IDD in nursing facilities were experiencing actual harm and a serious risk of harm related to their unmet need for habilitative services that were supposed to be provided through the LIDDA. These services, like Day Habilitation and ILST, are necessary to allow individuals with IDD in nursing facilities to learn new skills, maintain existing skills, improve functioning, experience new activities, increase their independence, and engage with others in the community. PPI X 1298 at 28 (Pilarcik Pre-Filed Direct Test.); PPI X 1299 at 7-8 (Coleman Pre-Filed Direct Test.).

0575.   Of the seventeen individuals evaluated by Ms. Pilarcik in the initial client review, all but one was experiencing harm from the lack of needed services and the absence of Active Treatment. PPI X 1298 at 13-14 (Pilarcik Pre-Filed Direct Test.); Diase Dep. 129:22-131:22, Nov. 1, 2017 (explaining that persons who need specialized services and do not receive them deteriorate and are cause for a health and safety concern).

0576.   For instance, AOl has been harmed by the lack of Active Treatment. He has many skills, including the ability to read in and speak two languages, and yet he is not receiving services that take

into consideration his functioning level and provide for these strengths. He has experienced a gradual decline in functional abilities and yet has not received consistent Occupational Therapy and Physical Therapy. Without these therapies, he will continue to lose his level of functioning. PPI X 1298 at 48 (Pilarcik Pre-Filed Direct Test.).

0577.   Each of the ten individuals evaluated by Dr. Coleman as part of the initial client review was at risk for harm. Many of these individuals in the initial client review were experiencing ongoing, serious harm. Most of the harm in the initial client review stemmed from the lack of a comprehensive functional assessment to identify actual habilitative needs, the failure to provide essential adaptive equipment and clinical therapy services, and the lost opportunity and sometimes actual regression due the absence of professionally appropriate habilitation. PPI X 1299 at 8 (Coleman Pre-Filed Direct Test.).

0578.   BC is a 73-year-old woman who had suffered physical harm, and was at risk of further harm, due to lack of specialized services to address her medical complexities and her unaddressed interests in community participation. BC had an increase in contractures, which limited her ability to leave the nursing facility and even to get out of bed. She was at serious risk of aspiration due to lack of speech services to monitor her oral feeding following the removal of her G-tube. BC is at risk of future harm, particularly a continued deterioration of her functional ability, if she does not receive ongoing, specialized services, including Physical and Occupational Therapy. She also is at risk of future harm for decubitus (pressure sores) due to the extensive amount of time in bed and the absence of positioning and transfer plans. PPI X 1299 at 20 (Coleman Pre-Filed Direct Test.).

0579.   DM, a 58-year-old man evaluated by Dr. Coleman in the initial client review, was interested in leaving the nursing facility and finding an alternate placement in the community. However, DM was not receiving any LIDDA specialized services such as ILST or Day Habilitation that would allow him to develop skills to function more independently or to interact with others outside the

nursing facility. PPI X 1299 at 10-11 (Coleman Pre-Filed Direct Test.).

0580.   Testimony from other individuals in the State further demonstrate the harm that results from the failure to provide specialized services and Active Treatment. Ms. Ariceli Torres is the sister of an individual with IDD living in a nursing facility in Brownsville, Texas. Since the admission of her brother, CT, to the nursing facility in 2012, Ms. Torres has been a member of his SPT and has been consistently involved in CT's care planning. PI Tr. Tr. 246:6-247:13, June 15, 2017 (Torres).

0581.   Ms. Torres testified that despite consistent requests over the last two years by CT's SPT, habilitative Physical, Occupational, and Speech Therapy, and therapy assessments have not been provided at a frequency and duration sufficient to maintain his current level of ability and to prevent further regression. In fact, Ms. Torres observed that her brother has lost considerable abilities to self-ambulate and use his hands and feet, due to progressing contractures, the effects of which could have been ameliorated through habilitative Physical Therapy and Occupational Therapy. But CT had to wait more than two years to receive habilitative Physical Therapy and Occupational Therapy evaluations. The nursing facility never shared these evaluations with the SPT. PI Tr. 252:17-254:3, June 15, 2017 (Torres).

0582.   Despite the SPT's recommendation and constant requests, CT waited almost two years for a new Customized Manual Wheelchair. Ms. Torres explained, "His wheelchair was very big with these big tires that it was scraping his arms. Every time I would go visit him he had blood coming out or scrapes." PI Tr. 255:15-24, June 15, 2017 (Torres). When the wheelchair subsequently broke, the nursing facility did not repair it. Ms. Torres testified that when she heard the wheelchair was broken, she thought, "If he cannot have his wheelchair, he cannot move around. He's not going to be able to get out of bed." PI Tr. 255:3-257:23, June 15, 2017 (Torres). Without access to a wheelchair, CT lost all ability to self-ambulate and was confined to bed for more than two months, developing skin rashes and experiencing increased isolation. PI Tr. 255:3-257:23, June 15, 2017

(Torres).

0583.    All twenty individuals evaluated by Ms. Pilarcik in the second client review who were not receiving all needed specialized services and Active Treatment were all suffering some level of harm as a result of not being provided the services they needed in order to gain skills or prevent regression. PPI X 1280 at 18 (Pilarcik Report). For example, individuals lost skills (AH, BH, BF, SH, SBa, DH, LB) and suffered new wounds (SBo, JM, DH, LB) and other injuries. BH, who has not received PASRR habilitative Physical Therapy, despite strength and balance issues, fell and broke her hip subsequent to Ms. Pilarcik's visit. Six individuals who would benefit from, but were not receiving, Behavioral Support Services have suffered harm. PPI X 1280 at 18 (Pilarcik Report) (identifying Sba, SE, VC, LB, AH, DPar).

0584.    The lack of specialized services further harmed individuals by delaying or preventing transition to the community. SH was not provided needed specialized services like Occupational and Physical Therapy, Behavioral Support, and ILST, which would have enabled him to return to the community much sooner, rather than have to remain in the nursing facility for more than a year. PPI X 1280 at 80 (Pilarcik Report). Although many individuals remain in a nursing facility to re-gain lost skills, few, if any, are receiving specialized habilitative necessary to improve independence and functioning. PPI X 1281 at 33, 38, 44.

0585.    Only one of the twenty individuals evaluated by Ms. Pilarcik received LIDDA specialized services that allowed them to gain skills and participate in activities in community. Sixteen of the twenty individuals have no regular opportunities to leave the nursing facility and spend time in the community. PPI X 1280 at 22 (Pilarcik Report) (identifying SH, JM, CB, WD).

0586.    The same is true for all sixteen individuals reviewed by Ms. Russo, and many of the other eighteen reviewed by Drs. Charlot and Coleman. PPI X 802 at 11 (Coleman Report) (noting failure to provide specialized services to address increasing difficulties with eating, swallowing, risk of

aspiration, weight loss, and behavioral needs and finding: "Failure to provide these needed services not only puts the individuals at risk for potential harm, but also impedes their ability to live an improved quality of life."); PPI X 1400 at 9 (Russo Report); *see* Trial Tr. 867:13-868:19, Oct. 18, 2018 (Pilarcik) (BL had multiple falls but there was no evidence that he was receiving Physical Therapy or had been assessed for it.); Trial Tr. 1756:10-1758:9, Oct. 24, 2018 (Charlot); PPI X 777 at 22, 27, 30, 35, 56, 66, 68 (Charlot Report).

0587.   The named plaintiffs provide further evidence of the harm suffered by individuals with IDD residing in nursing facilities in Texas. For example, Ms. Sharon Barker, the guardian of Mr. Zackowitz Morgan, testified that due to the lack of specialized services provided by the nursing facility, Mr. Morgan regressed to the point of losing the ability to self-ambulate, self-toilet, and self-transfer. Due to the lack of specialized services, Mr. Morgan gained weight, got diabetes, became insulin dependent, lost the ability to walk using crutches, lost the ability to get in and out of his bed on his own or to transfer from his wheelchair to Ms. Barker's car, and was no longer able to use a toilet for bowel movements and, instead, had to wear diapers. Trial Tr. 1300:17-1302:25, Oct. 22, 2018 (Barker).

0588.   Mr. Adkins testified that due to the lack of specialized services provided by the nursing facility, including appropriate Durable Medical Equipment, he was bed-ridden from the time he entered the nursing facility. Because of the inability to leave his bed, Mr. Adkins' mental health declined. He was also unable to take advantage of employment supports or the HCS waiver slot that he was offered. Adkins Dep. 23:5-25:7, 29:23-30:19, Oct. 30, 2018.

0589.   The State's QSR review of KP also exemplifies the harm that individuals are experiencing in nursing facilities from a lack of specialized services and Active Treatment. KP, a 36-year-old woman with Down syndrome, entered a nursing facility to recover from several broken bones. After a two-month period where she received Physical Therapy five days a week and progressed from

walking 25 steps to 75 steps, the Physical Therapy and then the Occupational Therapy became intermittent. KP experienced a sharp decline, and as of the date of her QSR review, had been living in the nursing facility for more than 273 days without any nursing facility specialized services. She had lost the ability to walk, was using a power wheelchair that had been gifted to her by a family member, and had spent most of her time in her room doing math. She also reported that she was not bathed adequately in the nursing facility, had trouble lifting her right arm, and that both of her feet had become splayed. She had not received recommended dental care, a customized knee brace, or a positioning boot. PPI X 89 at 2, 4.

0590.   According to the HHSC Director of the QSR Unit, "there can be huge downsides," for example, physical deterioration, "if a person ends up not ever being recommended or assessed for a service that they *do* need." PPI X 2056 at 2 (May 2017 email from the QSR Unit Director).

0591.   Dr. David Partridge was the only witness who disputed the opinions of experts for the United States and Plaintiffs that the people they reviewed would benefit from specialized services and were not receiving needed specialized services.

0592.   Dr. Partridge has never testified as an expert before this case. His hourly rate for his work in this case is $90. Trial Tr. 3049:21-24, Nov. 5, 2018 (Partridge).

0593.   Dr. Partridge opined about whether 54 people could benefit from specialized services, be served in the community, and had made a decision to oppose receiving community services in a report that was 11.5 pages long. Trial Tr. 3060:11-15, Nov. 5, 2018 (Partridge).

0594.   Dr. Partridge's entire career after graduating medical school in 1989, apart from an eleven-month hiatus in 1992 and 1993, was as an employee of the State. Trial Tr. 3039:7-11, 3039:21-3040:1, Nov. 5, 2018 (Partridge).

0595.   Dr. Partridge's entire experience after graduating medical school in 1989, apart from an eleven-month hiatus in 1992 and 1993, was in institutional settings. Trial Tr. 3039:7-11,

3039:21-3040:1, Nov. 5, 2018 (Partridge).

0596.    Although Dr. Partridge lives in Texas and had a month to do so, he never contacted anybody, apart from State officials and attorneys, with regard to preparing his opinion. Trial Tr. 3053:8-11, Nov. 5, 2018 (Partridge).

0597.    Ten years after Dr. Partridge became medical director at Richmond State Supported Living Center, the Department of Justice determined that numerous conditions and practices violated the constitutional and federal statutory rights of people there, including the failure to provide healthcare services, including prompt treatment, preventative services, and follow-up care. Trial Tr. 3041:3-9, 19-25, Nov. 5, 2018 (Partridge).

0598.    The Department of Justice and the State of Texas then entered a settlement agreement to, among other things, improve medical care at Richmond State Supported Living Center. Trial Tr. 3042:1-3043:4, Nov. 5, 2018 (Partridge).

0599.    A monitor and subject matter experts assessed Richmond State Supported Living Center's compliance with the settlement agreement. They came to the Center every six months, looked at records, interviewed staff, and made observations. They then issued reports setting forth their findings. Trial Tr. 3043:5-16, Nov. 5, 2018 (Partridge).

0600.    The monitor determined that Richmond State Supported Living Center did not have policies and procedures that ensured the provision of medical care consistent with current generally accepted professional standards of care. Trial Tr. 3045:11-25, Nov. 5, 2018 (Partridge).

0601.    After interviewing Dr. Partridge, the monitor and subject matter experts determined that "[o]f particular concern of the monitoring team is the clinician's lack of insight into the clinical needs of individuals with developmental disabilities." Trial Tr. 3046:1-13, 3047:7-11, Nov. 5, 2018 (Partridge).

0602.    The monitor reported, "[T]he clinical staff at the facility has had limited continuing medical

education specific to developmental disabilities." Trial Tr. 3047:12-19, Nov. 5, 2018 (Partridge).

0603.   The monitor reported, with respect to the provision of medical care at the Center, that "[a]s reported by the advanced practice registered nurse . . . clinicians often make diagnoses and prescribe treatments based on anecdotal reports by direct-care staff and without examining the individual." Trial Tr. 3047:20-3048:4 Nov. 5, 2018 (Partridge).

0604.   The monitor and his subject matter experts found that, "review of clinical records indicates a systemic lack of comprehensive evaluation and follow-up on clinical issues" regarding medical care at Richmond State Supported Living Center. Trial Tr. 3048:5-12, Nov. 5, 2018 (Partridge).

0605.   The monitor recommended, with respect to professionals responsible for providing medical care at the Center, that "[i]t is imperative that clinicians are provided a mechanism to benefit from continuing education specific to the field of developmental disabilities." Trial Tr. 3048:22-3049:1, Nov. 5, 2018 (Partridge).

0606.   The monitor and his team recommended, "Physician services must begin to reevaluate individuals in their entire caseload and ensure that an appropriate and comprehensive diagnosis is applicable to the individual and that the etiology for each diagnosis is known. This falls under the domain of standard of care practice." Trial Tr. 3049:2-11, Nov. 5, 2018 (Partridge).

0607.   A month after the monitor's first visit to the Richmond State Supported Living Center, Dr. Partridge stepped down as its medical director. Trial Tr. 3091:23-3093:7, Nov. 5, 2018 (Partridge).

0608.   Dr. Partridge's opinion in this case was based on his medical training and expertise, but the federal monitoring team responsible for assessing the medical care at the Richmond State Supported Living Center that Dr. Partridge provided did not express confidence in Dr. Partridge's medical training and expertise. Trial Tr. 3049:12-20, Nov. 5, 2018 (Partridge).

0609.   Dr. Partridge testified that therapy would not benefit a person experiencing contractures, but subsequently agreed that research maintained by the National Institute of Health of the United States

204

Department of Health and Human Services contradicted his contention. Trial Tr. 3060:19-3062:1, Nov. 5, 2018 (Partridge).

0610.   Dr. Partridge contended that certain people reviewed by experts for Plaintiffs and the United States could not benefit from specialized services because they had dementia. But he later agreed that their PASRR evaluations expressly stated "no" to the question of, "[a]re the individual's dementia symptoms so severe that they cannot be expected to benefit from PASRR specialized services?" and that these records contradicted his opinion. Trial Tr. 3080:3-3084:17, Nov. 5, 2018 (Partridge).

0611.   Dr. Partridge contended that certain people reviewed by experts for Plaintiffs and the United States could not benefit from specialized services because of various identified diagnoses. But he subsequently agreed that their records included service planning team, interdisciplinary team, or PASRR evaluation recommendations that they should receive specialized services. Trial Tr. 3084:18-3087:3, 3100:9-3102:20, Nov. 5, 2018 (Partridge).

0612.   Dr. Partridge opined that sixteen people reviewed by experts for the Plaintiffs and the United States had conditions preventing them from benefitting from any kind of services or treatment designed to preserve or regain their skills. But he subsequently recanted that testimony, and said, "I know that folks can receive some habilitation." Trial Tr. 3078:24-3079:22, Nov. 5, 2018 (Partridge).

0613.   The Court finds Dr. Partridge's testimony lacking in reliability.

VIII.

Thousands of adults with IDD or related conditions are
unnecessarily segregated in Texas nursing facilities

A.    More than 3,000 adults with IDD are living in Texas nursing facilities, often for many years, to receive Medicaid-funded services

0614.   Dr. O'Connor analyzed Texas' data to determine the total census of Medicaid-eligible adults with IDD living in Texas nursing facilities. Trial Tr. 961:3-963:4, 989:12-990:8, Oct. 18, 2018 (O'Connor) (describing the methodology and data sources used for nursing facility census analysis);

PPI X 1207 at 7-9 (O'Connor Report); PPI X 646 at tab 1; PPI X 1208 at 10, 16 (O'Connor Rebuttal Report); PPI X 982 at tabs 1, 3-4.

0615.   Dr. O'Connor testified that, based on Texas' data, 3,673 Medicaid-eligible individuals with IDD were living in nursing facilities in Texas during May 2017. There were 3,308 Medicaid-eligible individuals with IDD experiencing a stay of more than ninety days in nursing facilities during May 2017. Trial Tr. 968:11-14, 969:4-7, Oct. 19, 2018 (O'Connor); PPI X 1207 at 9 (O'Connor Report); PPI X 661; PPI X 646 at tab 1. Data did not permit a conclusion regarding the census after May 2017. Trial Tr. 963:21-964:2, Oct. 19, 2018 (O'Connor) (explaining that an accurate census could not be calculated after May 2017 because MDS data is collected quarterly).

0616.   In addition, in May 2017, 2,684 Medicaid-eligible individuals with IDD were living in nursing facilities whose stay was one year or more, including 1,662 individuals whose stay was three years or more and 1,079 with stays of five years or more. The size of each of these groups has remained stable for as far back as data permit a conclusion. Trial Tr. 990:6-992:18, Oct. 19, 2018 (O'Connor); PPI X 659; PPI X 1208 at 10, 16 (O'Connor Rebuttal Report); PPI X 982 at tabs 1, 3-4.

0617.   As Medicaid-eligible individuals with IDD, these individuals are qualified individuals with disabilities.

0618.   Plaintiffs' expert Ms. Howe testified that the failure to decrease the census of people with IDD living in Texas nursing facilities indicates that Texas' PASRR program is not sufficiently diverting and transitioning people with IDD from nursing facility placement. Trial Tr. 3952:6-3953:13, Nov. 13, 2018 (Howe); *see also* PPI X 976 at 15 (Howe Rebuttal Report). In Ms. Howe's experience in Massachusetts, the nursing facility census of people with IDD decreased from 1,860 people at the start of the *Rolland* case to 200 people, including those in nursing facilities for short-term stays, at the end of the case. Trial Tr. 3950:13-19, Nov. 13, 2018 (Howe).

0619.   A United Cerebral Palsy 2016 report ranking how well state Medicaid systems serve people with IDD ranked Texas 50 out of 51, noting that Texas is a state that has "consistently remained at the bottom of the ranking since 2007 . . . primarily due to the small portion of people and resources dedicated to those in small or home-like settings." PPI X 42 at 9 (The Case for Inclusion, 2016 UCP Report).

B.      Nursing facilities are not the most integrated setting appropriate for people with IDD

0620.   The State admits, "[M]ost nursing facilities are institutions and . . . are not at all times integrated settings." Answer to United States' Complaint in Intervention, Docket no. 143 at 11.

0621.   HHSC and its officials agree that nursing facilities are institutions and that nursing facilities are segregated or restrictive settings, which are "not usually" community-based. Vasquez Dep. 129:10-15, 132:11-14, 146:20-147:4, Jan. 12, 2018 (testifying that nursing facilities are restrictive and institutional settings); Turner 30(b)(6) Dep. 222:24-223:4, Feb. 21, 2018 (testifying that "HHSC considers nursing facilities a form of institutional care"); Cochran Dep. 83:2-4, Sept. 14, 2017 (agreeing that nursing facilities are institutions); Cook Dep. 49:10-50:11, 124:6-9, Feb. 1, 2018 (testifying that nursing facilities are institutional placements); Diase Dep. 78:18-21, Nov. 1, 2017 (testifying that nursing facilities are segregated institutions); *see* PPI X 452 at 22 ("All CFC services will be provided in a home or community based setting, which does <u>not</u> include a: nursing facility . . ." (emphasis in original)); Williamson 30(b)(6) Dep. 91:22-92:18, Jan. 10, 2018 (testifying that people with IDD living in community have more opportunities for engagement and more flexibility over activities).

0622.   Experts in the field of serving people with IDD testified that nursing facilities are institutions or segregated or congregate settings. Trial Tr. 681:24-682:1, Oct. 17, 2018 (Pilarcik) (testifying that "[n]ursing facilities are segregated"); Trial Tr. 2255:13-21, Oct. 26, 2018 (Sawyer) (testifying that she "would consider a nursing facility an institution"); Trial Tr. 1952:13-18, Oct. 24, 2018

(Wehmeyer) (testifying that "[a] congregate setting is a setting in which a larger amount of people and staff are involved, so, yes, I would say that a nursing home is a congregate facility"); Trial Tr. 1738:7-19, 1761:3-19, Oct. 24, 2018 (Charlot) (explaining that that nursing facilities generally, and those she visited in Texas, are more segregated than typical community settings and that people with disabilities in nursing facilities are congregated together and subject to routines).

0623.   Individuals with IDD who live in nursing facilities experience limitations on their mobility. Jennings Dep. 17:1-18:9, Oct. 29, 2018 (testifying that when group home resident lived in a nursing facility she "was basically confined to the wheelchair or bed"); Adkins Dep. 18:18-20:7, Oct. 30, 2018 (testifying that he was bed-ridden in a nursing facility for seven-and-a-half months because he did not have a wheelchair); *see* Trial Tr. 1110:7-14, 1114:14-19, 1115:4-8; Oct. 19, 2018 (Preskey) (testifying that KH was "mainly using a wheelchair" when he moved from the nursing facility but after living in the community "generally walks without using a wheelchair").

0624.   Individuals in nursing facilities get fewer opportunities for community integration and activities than those living in the community. Trial Tr. 1109:17-24; Oct. 19, 2018 (Preskey) ("I believe they get more stimulation, more community integration and activities, more one-on-one attention in the community settings at group homes versus in a nursing facility."); Trial Tr. 1145:1-11, Oct. 19, 2018 (Phetsavong) (testifying that named plaintiff Mr. Vanisone Thongphanh never goes outside the nursing facility for fresh air or a walk); Adkins Dep. 20:8-16, Oct. 30, 2018 (testifying that he did not leave the nursing facility since moving in, but would have liked to go the movies and the mall); Trial Tr. 2056:13-20; Oct. 25, 2018 (Meisel) (testifying that there is no space in her room to have a group of people over for dinner and there is nowhere for guests to sit but the bed); *see* Trial Tr. 1508:2-1509:1, Oct. 23, 2018 (Weston); PPI X 1 at 5 ("Over the past half-century we have learned that large institutions . . . limit community interaction and involvement for some of our most vulnerable citizens."); PPI X 1435 at 5 (State Long-Term Care Ombudsman Report

reporting frequent complaints from nursing facility residents regarding the availability, choice, and appropriateness of activities); PPI X 1400 at 9 (Russo Report) (reporting that individuals in the client review "needlessly suffered isolation, rejection, and, sometimes, segregation from others"); PPI X 1906 at 41 (Weston Report) (opining that individuals who successfully transition from nursing facilities have more opportunities to be active and integrated in the community).

0625.   Individuals in nursing facilities often sit in their rooms or in the facility with limited interaction with others. *Compare* Trial Tr. 1107:24-1108:12, Oct. 19, 2018 (Preskey) (testifying that in nursing facilities, she "witnessed a lack of stimulation. I witnessed people generally in their bedrooms or in their beds. Some with the television on, many without the television on. Little interaction, if any, amongst the staff and the consumers."); Trial Tr. 2084:25-2085:18; Oct. 25, 2018 (Rideout) (describing visits to nursing facilities, where people "were just kind of sitting" in front of rooms without any attendants present and people were "sitting in wheelchairs or in regular chairs outside the rooms" without anyone interacting with them); Adkins Dep. 20:17-22, Oct. 30, 2018 (nursing facility resident testifying that he observes "other residents in the hallway just sitting in their wheelchairs on one side or the other"), *with* Kelli Green Dep. 9:4-7; 22:1-7, Mar. 16, 2018 (Mr. Eric Steward's sister testified that her brother loved living in his community group home because he had his own room and felt independent and enjoyed barbecues, the park, picnics, eating out and going to the movies.); Trial Tr. 882:10-18, Oct. 18, 2018 (Coleman) (testifying that unlike integrated settings, when individuals unnecessarily remain in nursing facilities, they do not have the opportunity "[to] enjoy the community, and people in the community, as well as activities in the community" and that remaining in the nursing facility limits socialization skills).

0626.   In contrast, individuals with IDD who live in community settings have many opportunities for community activities and interaction with people without disabilities. Trial Tr. 343:4-346:8, Oct. 16, 2018 (Morrell) (testifying that in his host home, he does activities in the community with his host

family and his friends at Day Habilitation); Trial Tr. 367:16-368:14, Oct. 16, 2018 (Carrasco) (describing the activities in the community that Mr. Morrell participates in at Day Habilitation and with his host family); Trial Tr. 1100:22-1101:7; Oct. 19, 2018 (Preskey) (testifying that individuals in host homes often go to Day Habilitation or competitive employment during the day, "[a]nd based on what the activities that their family has planned, that's what they do for the evening. Very typical of what we might do."); Trial Tr. 1103:18-1105:22; Oct. 19, 2018 (Preskey) (describing available activities for individuals living in the community and receiving services from CALAB, including volunteering at Meals on Wheels, food banks, and Habitat for Humanity; visiting museums; going bowling; visiting Six Flags; attending church; going to restaurants; attending the Texas State Fair; and going to Ranger games); Trial Tr. 2074:13-2076:3; Oct. 25, 2018 (Rideout) (describing activities available to people participating in Reaching Maximum Independence's Day Habilitation program, such as engaging in volunteer activities and interacting with other volunteers); Trial Tr. 2078:24-2081:18; Oct. 25, 2018 (Rideout) (describing daily activities of individuals who live in Reaching Maximum Independence's group homes, such as attending Day Habilitation, going to school, working, going shopping, and going to the movies); Trial Tr. 3652A:5-3652B:19, Nov. 8, 2018 (Terbush) (testifying about an individual with IDD who transitioned from a nursing facility where he was in a wheelchair, mostly kept to himself and stayed in his room, and was not interested in nursing facility activities. After transitioning successfully to the community, he "opened up and blossomed" into a "[t]otally different person." He is able to walk, is awake all day and very social, and is able to go to the moves, the zoo, museums – opportunities that were not available in the nursing facility).

0627.   Individuals in nursing facilities frequently complain that they are unable to exercise choice, rights, and preferences. Trial Tr. 2802:3-2802:7, Nov. 1, 2018 (Ducayet); PPI X 1434 at 5 (Office of the State Long-Term Care Ombudsman Annual Report, State FY13-14); PPI X 1435 at 5 (Office

of the State Long-Term Care Ombudsman Annual Report, FY15-16); *see* Trial Tr. 1936:8-22, Oct. 24, 2018 (Wehmeyer) (testifying about a study that found that settings with 16 or more people were significantly less likely to provide opportunities for choice).

0628.   Nursing facilities do not allow for privacy for residents. Trial Tr. 2054:9-25, Oct. 25, 2018 (Meisel) (testifying that she does not like living in the nursing facility and would like to live somewhere else because there is no privacy in the nursing facility and staff members come into her room approximately every 30 minutes); Trial Tr. 2055:5-17, Oct. 25, 2018 (Meisel) (testifying that she has had three or four roommates since she moved to the nursing facility and she prefers a room of her own because "people like their own space"); Trial Tr. 358:10-14, 374:18-22; Oct. 16, 2018 (Carrasco) (testifying that Mr. Morrell shared a "very small" room in the nursing facility).

0629.   Many individuals in the client review had no opportunities to leave the nursing facility and spend time in the community. Trial Tr. 863:12-17, Oct. 18, 2018 (Coleman) (only one of four individuals Dr. Coleman reviewed had regular opportunities to leave nursing facility); PPI X 1280 at 22 (Pilarcik Report) (only four of twenty individuals Ms. Pilarcik reviewed regularly left nursing facility). Ms. Russo found only one person of sixteen received specialized services that allow him to leave the nursing facility regularly. PPI X 1400 at 11 (Russo Report).

0630.   The friend and guardian of named plaintiff Mr. Morgan testified that while Mr. Morgan was in a nursing facility, he was unable to attend church or go to the movies, things he had done prior to his admission. He did not attend Day Habilitation or receive any services to develop his independent living or vocational skills. Trial Tr. 1291:6-21, Oct. 22, 2018 (Barker). Ms. Barker testified that the nursing facility was "definitely inappropriate" for Mr. Morgan. "He was a 37-year-old male. He was very active. He was able to move around. He needed crutches, but he was able to move around with the crutches and do things. From the time he was there, he was isolated from people his age. He was not able to go out and do things in the community that he had been doing most of his life. It was just

a complete change for him. As a result, he had medical conditions that deteriorated. He lost the ability to walk with the crutches and required insulin, gained weight, just socially, physically, every kind of way it was just downhill." Trial Tr. 1300:17-1301:24, Oct. 22, 2018 (Barker).

0631.    The next friend of named plaintiff Mr. Vanisone Thongphanh testified that when he lived in the community, he lived in a four-bedroom home in a suburban neighborhood. He would spend time in the living room or kitchen with staff and other residents. He would take walks through the neighborhood, greet his neighbors, and enjoy the weather. Trial Tr. 1171:8-1173:17, Oct. 19, 2018 (Mastin). In the nursing facility, Mr. Thongphanh spends almost all of his time in his room, lying in his bed, in a hospital gown. He is usually by himself with the television on. Trial Tr. 1175:24-1176:23, Oct. 19, 2018 (Mastin). His next friend testified that Mr. Thongphanh was not involved in any nursing facility activities. "As far as I know, he was not. And I assumed that he was not, given the fact that he was in his hospital gown; that if he was – if they had him going to some of the activities in the – in the common areas, that they would at least get him dressed for that. But my impression was that he was in his room all the time. And he certainly – when I was there, he certainly was." Trial Tr. 1175:24-1176:23, Oct. 19, 2018 (Mastin).

C.    Individuals with IDD in Texas nursing facilities are appropriate to move to the community

0632.    Most people with IDD can transition to the community with appropriate supports. PPI X 1906 at 20 (Weston Report).

0633.    Plaintiffs' and Defendants' experts agree that individuals with IDD with medical conditions do not usually require nursing facility placement. People with significant medical issues, including feeding tubes, seizure disorders, and breathing treatments can all be supported in community settings. Trial Tr. 2146:19-21, Oct. 26, 2018 (Sawyer) (testifying that individuals with complex medical needs can be served in the community); Trial Tr. 1681:14-24, Oct. 23, 2018 (Russo) (testifying that with appropriate supports and services all individuals can be served in the

community); Trial Tr. 491:4-492:4, Oct. 17, 2018 (Pilarcik) (testifying to successfully serving individuals with complex medical needs in the community); PPI X 1280 at 12 (describing "the widespread professional consensus that virtually all individuals with I/DD can benefit from integrated living arrangements with supports"); Trial Tr. 3371:9-15, Nov. 6, 2018 (Shea-Delaney) (Defendants' expert on community services, testifying about a report she signed onto from the Massachusetts *Olmstead* advisory group subcommittee: "Q. You signed onto a report that made this statement: 'For more than two decades, researchers, as well as community service providers, have recognized that, with proper funding and the appropriate kinds of supports, all individuals with disabilities can be served in small community-based settings.' Did I read that correctly, ma'am? A. Yes. I think that's true."); *see* PPI X 1906 at 20 (Weston Report) (opining that transition from a nursing facility with appropriate community supports is possible for most people with IDD regardless of age, medical condition, or length of institutionalization); *see also* Trial Tr. 153:19-154:11, Oct. 15, 2018 (du Pree) (In 2016, the QSR found that "there are very few people in any of the samples where it was the nursing home team who was recommending continued stay in the nursing home.").

0634.   Texans with IDD, who have a range of medical needs, successfully live in the community, where Texas community service providers are able to meet their medical needs. Trial Tr. 360:13-361:6, Oct. 16, 2018 (Carrasco) (testifying about an individual who lives in her host home who requires "hands-on care" with feeding and bathing and is "medically fragile"); Trial Tr. 1100:11-21; Oct. 19, 2018 (Preskey) (testifying that CALAB, Inc., a community-based provider, has provided support to individuals who need behavior supports, medical nursing supports, Physical Therapy, Occupational Therapy, and day-to-day care); Trial Tr. 4067:20-4069:3, Nov. 14, 2018 (Piccola) (describing a person who is "extremely medically complex" who "actively participates in his community"); Trial Tr. 2078:2-4, Oct. 25, 2018 (Rideout) (testifying that Reaching Maximum Independence serves people who need "pretty much round-the-clock care" in the community);

Jennings Dep. 11:24-12:12, Oct. 29, 2018 (testifying that Family Faith Residential Care has served individuals with seizure disorders, cerebral palsy, feeding tubes, and traches in the community); Jennings Dep. 17:1-18, Oct. 29, 2018 (testifying about group home resident, AP, who has a tracheotomy and a feeding tube).

0635.   Waiver services in Texas are intended to serve people who otherwise meet an institutional level of care, including nursing facility or ICF level of care. PPI X 445 at 2-3.

0636.   Plaintiffs' experts testified that individuals with dementia can be, and frequently are being, served in the community. Trial Tr. 531:22-24, Oct. 17, 2018 (Pilarcik); Trial Tr. 1638:14-16, Oct. 23, 2018 (Russo); Trial Tr. 1763:5-11, Oct. 24, 2018 (Charlot); Trial Tr. 882:3-9, Oct. 18, 2018 (Coleman).

0637.   Texans with IDD who have complex behavioral needs successfully live in the community, where Texas community service providers are able to meet their behavioral needs. Trial Tr.1100:11-16, Oct. 19, 2018 (Preskey) (community provider testifying that individuals served in the community often "need behavior supports because of their very challenging behaviors"); Trial Tr. 1116:3-11, Oct. 19, 2018 (Preskey) (testifying that CALAB has served individuals who have psychiatric diagnoses and individuals with significant behavioral needs successfully in the community); Jennings Dep. 13:21-15:6, Oct. 29, 2018 (testifying that named plaintiff Patricia Ferrer has bipolar disorder and schizophrenia and has been successfully served in the community).

0638.   HHSC, its officials, and its experts agree that people with complex medical and behavioral needs live successfully and can be served in the community. Bishop Dep. 33:19-25, Mar. 13, 2018 (testifying that she helped people with IDD who were medically fragile transition to the community); Bishop Dep. 131:23-132:1, Mar. 13, 2018 (testifying that, with the right supports and services, everyone with IDD can successfully be served in the community); Diase Dep. 247:13-248:8, 248:9-24, Nov. 1, 2017; Dionne-Vahalik 30(b)(6) Dep. 156:25-158:19, Oct. 12, 2017; Snyder Dep.

235:9-237:4, Nov. 16, 2017; Vasquez Dep. 177:18-22, Jan. 12, 2018; Jalomo 30(b)(6) Dep. 191:15-22, Nov. 2, 2017; *see* Trial Tr. 3847:20-24, Nov. 9, 2018 (Turner) (testifying that HHSC agrees that most individuals with IDD are appropriate for transition to the community with the appropriate supports, consistent with their informed choice); Trial Tr. 3050:7-11, Nov. 5, 2018 (Partridge) ("I would imagine" that people with complex medical needs are living successfully in the community in Texas.); PPI X 544 at 12 (PowerPoint from State QSR consultant Kathryn du Pree which states that "21 % (36) individuals in the sample who transitioned or diverted had significant behavioral challenges" and "20 % (34) of the individuals in the [2015 QSR] sample who transitioned or diverted had significant medical issues.").

0639.   Individuals with tracheotomies live successfully in the community in Texas. Trial Tr. 2083:2-4, Oct. 25, 2018 (Rideout) (testifying that Reaching Maximum Independence serves people with tracheotomies in the community); Trial Tr. 1115:15, Oct. 19, 2018 (Preskey) ("We have served folks with traches."); Jennings Dep. 11:24-12:9, Oct. 29, 2018 (testifying that Family Faith residential care has served individuals with tracheotomies in the community); Jennings Dep. 17:1-18, Oct. 29, 2018 (testifying about group home resident, AP, who has a tracheotomy); Jalomo 30(b)(6) Dep. 191:23-192:1, Nov. 2, 2017; *see also* Trial Tr. 3050:12-16, Nov. 5, 2018 (Partridge).

0640.   Individuals who use oxygen live successfully in the community in Texas. Trial Tr. 3050:17-20, Nov. 5, 2018 (Partridge); Jalomo 30(b)(6) Dep. 192:2-4, Nov. 2, 2017.

0641.   Individuals who are undergoing dialysis live successfully in the community in Texas. Trial Tr. 3050:21-23, Nov. 5, 2018 (Partridge); Jalomo 30(b)(6) Dep. 192:8-11, Nov. 2, 2017.

0642.   Individuals with seizure disorders live successfully in the community in Texas. Trial Tr. 2082:13-18, Oct. 25, 2018 (Rideout) (testifying that "a large majority" of individuals that Reaching Maximum Independence successfully serves in the community have seizure disorders); Jennings Dep. 11:24-12:1, Oct. 29, 2018 (testifying that Family Faith Residential Care has served individuals

with seizure disorders in the community); Jennings Dep. 13:21-15:6, Oct. 29, 2018 (testifying that named plaintiff Patricia Ferrer has epilepsy and has been successfully served in the community); Jennings Dep. 19:19-20:12, Oct. 29, 2018 (testifying that Family Faith Residential Care is able to meet the needs of group home residents who have epilepsy).

0643.   Individuals with cerebral palsy live successfully in the community in Texas. Jennings Dep. 12:2-4, Oct. 29, 2018 (testifying that Family Faith Residential Care has served individuals with cerebral palsy in the community).

0644.   Individuals with feeding tubes live successfully in the community in Texas. Trial Tr. 1115:15-16, Oct. 19, 2018 (Preskey) ("We've served people with G-tubes."); Trial Tr. 2082:19-2083:1, Oct. 25, 2018 (Rideout) (testifying that Reaching Maximum Independence is able to and has served people with feeding tubes or G-tubes in the community); Jennings Dep. 12:5-7, Oct. 29, 2018 (testifying that Family Faith Residential Care has served individuals with feeding tubes in the community); Jennings Dep. 17:1-18, Oct. 29, 2018 (testifying about group home resident, AP, who has a feeding tube).

0645.   Individuals with colostomies live successfully in the community in Texas. Trial Tr.1115:16-17, Oct. 19, 2018 (Preskey).

0646.   Individuals with catheters live successfully in the community in Texas. Trial Tr. 1115:18-19, Oct. 19, 2018 (Preskey); Trial Tr. 2083: 5-8, Oct. 25, 2018 (Rideout) (testifying that Reaching Maximum Independence serves people with catheters in the community and that they serve "a couple of individuals, they're actually in the apartment program, and have learned to use the catheters on their own"); Trial Tr. 2063:24-2064:4, Oct. 25, 2018 (Meisel) ("[A] lot of people have catheters and they aren't in nursing homes.").

0647.   Individuals can receive suctioning and wound care in the community in Texas. Trial Tr. 2083:9-11, Oct. 25, 2018 (Rideout) (testifying that Reaching Maximum Independence has served

people in the community in the past who need suctioning or wound care).

0648.    When comparing the people with IDD who Texas reported to have transitioned out of nursing facilities to the community since January 1, 2014, with those who Texas reported to be living in nursing facilities on August 28, 2017, these two groups have similar rates of diagnoses or care needs like dialysis, suctioning, tracheostomies, ventilators, behavioral symptoms, and cognitive loss/dementia. Those who transitioned to the community have only slightly lower rates of diagnoses or care needs like Alzheimer's and non-Alzheimer's dementia, oxygen therapy, and feeding tubes. Thus, many people who have these diagnoses or needs transition to and live in the community. PPI X 655 (Characteristics of People with IDD Living in Nursing Facilities vs Community); *see* Trial Tr. 1395:14-22, 1396:12-23, 1397:4-11, 1397:23-1399:3, 1399:10-1400:7, 1401:3-1402:8, Oct. 22, 2018 (Parker) (identifying the voluminous data files and reports produced by Texas used to compile information in PPI X 655 – PPI X 284, 2104-A at tab 1, 2108, 2109, and 2110 – and explaining that the summary exhibit calculates the rates at which individuals in each population had certain diagnoses in their MDS assessments); *see also* PPI X 592 (Minimum Data Set form used to collect MDS data presented in PPI X 655).

0649.    Defendants' experts acknowledged that Texas has the capacity to serve people with high medical needs in the community. Trial Tr. 3049:25-3050:6, Nov. 5, 2018 (Partridge); *see* Trial Tr. 3326:1-17, Nov. 6, 2018 (Shea-Delaney) (describing HCS waiver services and noting that nursing is an important HCS waiver service "because these are often . . . medically complex people").

0650.    Individuals in the client review were similar to people living in the community in Texas, Massachusetts, District of Columbia, Georgia, New York, Tennessee, Virginia, and other states where the IDD professionals routinely work. Trial Tr. 528:8-22, Oct. 17, 2018 (Pilarcik); Trial Tr. 1598:7-14, Oct. 23, 2018 (Russo); Trial Tr. 1762:10-1763:4, Oct. 24, 2018 (Charlot); Trial Tr. 878:20-879:3, 879:11-20, Oct. 18, 2018 (Coleman).

0651.  Ms. Pilarcik has successfully served individuals with complex medical needs including g-tubes, tracheotomies, and dementia in the community. Many had formerly lived in nursing facilities and were transitioned to community settings as part of the *Rolland* initiative. Others had lived in large Intermediate Care Facilities. All were living more independent lives in the community, gained skills, participated in community activities, and spent time with non-disabled peers. Trial Tr. 491:4-25, Oct. 17, 2018 (Pilarcik).

0652.  Virtually all of the individuals with IDD and complex medical, dementia, or neurological conditions that Ms. Russo serves are living successfully in and benefitting from the community. They are similar to the individuals she reviewed in Texas. Trial Tr. 1596:18-1598:14, 1629:8-11, Oct. 23, 2018 (Russo).

0653.  Dr. Coleman has successfully supported individuals with IDD with complex behavioral needs in the community. For example, she has supported individuals with self-injurious behaviors, physical aggression, and elopement. In some instances, people's behaviors have decreased significantly after moving from an institution to a community setting. Trial Tr. 880:19-882:2, Oct. 18, 2018 (Coleman).

0654.  Fifty-three of the 54 individuals in the second client review are appropriate for transition to the community. Trial Tr. 546:12-14, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 16 (Pilarcik Report); *see also* Trial Tr. 878:12-879:20, Oct. 18, 2018 (Coleman) (testifying that the four people she reviewed "would benefit and would be appropriate for community based living"); PPI X 802 at 12 (Coleman Report); Trial Tr. 1760:23-1761:2, Oct. 24, 2018 (Charlot) (testifying that "every one" of the fourteen individuals Dr. Charlot reviewed were appropriate for living in the community); PPI X 777 at 15 (Charlot Report); Trial Tr. 1636:9-13, Oct. 23, 2018 (Russo) (testifying that all sixteen people she reviewed would be appropriate for community living); PPI X 1400 at 10 (Russo Report).

0655.  For example, Dr. Coleman found that DBr was appropriate for and would benefit from living in the community. In fact, DBr's service coordinator had indicated that DBr would function well in

a community setting, and this was also noted in DBr's PASRR Evaluation. Trial Tr. 891:2-13, Oct. 18, 2018 (Coleman); PPI X 802 at 14 (Coleman Report).

0656.   Dr. Coleman also testified that in her experience, BL's behavioral needs could be easily supported in the community. BL's mother also believed that he would do better in a smaller environment. Nursing facility staff reported that BL's behaviors are more challenging than they can handle and that his behavioral and psychiatric needs are not being met at the nursing facility. Trial Tr. 867:13-868:1, 882:19-883:16, Oct. 18, 2018 (Coleman); PPI X 802 at 18-20 (Coleman Report) (noting that the impact of continued institutionalization includes that BL is at "risk of continued increase in behavioral challenges due to lack of appropriate mental and behavior interventions").

0657.   Additionally, people with very similar needs to JuG live safely in community settings. Staff who work with JuG all indicated that he would benefit from greater access to activities and that he would do well in the community. One of his past service coordinators reported that JuG "would like to live in a group home" in the town near his "family and friends, and to have access to the community." PPI X 777 at 50-51 (Charlot Report).

0658.   Before entering the nursing facility, CT lived at home, where he had regular interaction with his family and was involved in daily community activities and a Day Habilitation program. Day Habilitation helped support and enhance CT's communication abilities, and helped him maintain functional mobility by receiving Physical Therapy, Occupational Therapy, and other related activities for mitigating the effects of his contractures. His sister notes that her brother expressed quite a bit of joy when participating in Day Habilitation and related activities. In fact, she stated that CT was very communicative when participating in Day Habilitation and that the program helped increase and improve his communication skills. PI Tr. 247:22-249:19.

0659.   Prior to her status as named plaintiff, Ms. Patricia Ferrer's record consistently indicated that her needs could not be met in the community. After she became a named plaintiff and received

advocacy from Disability Rights Texas, Ms. Ferrer transitioned within three months of the initial meeting to discuss community living options. She has lived successfully in a group home for five years. "The LIDDA service coordination notes consistently show that she is pleased with her group home and enjoys going to day habilitation." PPI X 1281 at 19 (Pilarcik Rebuttal Report). Since transitioning to the community, her physical health has improved; she has only had one seizure – the reason for her admission to the nursing facility – since moving to the group home in 2012. She has not been physically aggressive and is receiving support for other maladaptive behaviors. Trial Tr. 4215:11-23, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 18-19 (Pilarcik Rebuttal Report); Jennings Dep. 14:18-15:6, Oct. 29, 2018.

0660.   Despite statements from nursing facility staff and service coordinators that each named plaintiff could not be served in the community, most of the twelve named plaintiffs have transitioned from a nursing facility to the community, where they lived successfully for years. PPI X 1281, *passim*. (Pilarcik Rebuttal Report). For example, the mother of named plaintiff Ms. Linda Arizpe "reported that the nursing facility did not agree with her [daughter] coming home with supports and felt that her health was too precarious to be managed in the community, though that clearly has not proven to be the case." PPI X 1281 at 16 (Pilarcik Rebuttal Report).

0661.   Defendants' expert, Dr. Partridge, did not conduct physical assessments of any people with IDD that he opined about, nor did he interview them, their family members or guardians, their service coordinators, LIDDA staff, or nursing facility staff. Additionally, Dr. Partridge did not identify any standards in his report, apart from his experience, for determining who could be served in a community setting. Yet Dr. Partridge was the only trial witness who disputed Plaintiffs' and the United States' experts' findings that individuals they reviewed were appropriate for, and would benefit from, receiving services in a community setting. Trial Tr. 3005:6-14, Nov. 2, 2018 (Partridge); Trial Tr. 3051:-17-3052:4-23, Nov. 5, 2018 (Partridge).

0662.   Dr. Partridge opined that a person would need to be "habilitated" enough to go into the community. Trial Tr. 3054:19-3055:7, Nov. 5, 2018 (Partridge). But Dr. Partridge did not know the extent to which a person must be habilitated before being able to move from a nursing facility to the community. Trial Tr. 3057:24-3058:11, Nov. 5, 2018 (Partridge).

0663.   Dr. Partridge contended that certain people Plaintiffs' and the United States' experts reviewed could not transition into the community due to various conditions, but he agreed that their records included assessments or reports showing that they could transition to the community. Trial Tr. 3087:7-3090:14, Nov. 5, 2018 (Partridge).

0664.   Dr. Partridge contended that certain people reviewed by experts for Plaintiffs and the United States could not transition into the community due to a diagnosis of dementia, but he agreed that thirty percent of people with IDD who had transitioned from Texas nursing facilities had a diagnosis of non-Alzheimer's dementia and ninety percent of these people had some form of cognitive loss or dementia, according to a compilation of Minimum Data Set diagnoses, and that this showed that people with dementia were transitioning from Texas nursing facilities to community settings. Trial Tr. 3090:20-3091:22, Nov. 5, 2018 (Partridge); *see* PPI X 655.

0665.   Dr. Partridge did not compare services available in the community to those being provided in nursing facilities in determining whether a person could be "habilitated enough to go into the community," even though he agreed that, for his analysis, it would have mattered whether nursing services were available in community settings. Trial Tr. 3054:19-3055:11, Nov. 5, 2018 (Partridge).

0666.   Dr. Partridge agreed that relevant considerations about whether someone could be served in the community include whether occupational therapy, physical therapy, cognitive rehabilitation therapy, behavior supports, dental treatment, dietary supports, direct care supports, and transition supports were available in the community, but he did not know which services and supports are available in the community under the HCS waiver. Trial Tr. 3055:16-3056:24, Nov. 5, 2018

(Partridge). In fact, nursing, occupational therapy, physical therapy, cognitive rehabilitation therapy, behavior supports, dental treatment, dietary supports, direct care supports, and transition supports are all available under the HCS waiver. DX 712 at 40-46 (Texas Long-Term Services and Supports Waiver Programs, Aug. 24, 2017); DX 665 at 4 (Making Informed Choices - Community Living Options Information Process for Legally Authorized Representatives of Residents in Nursing Facilities). Dr. Partridge did not know of any services available in a nursing facility that are not available in the HCS waiver. Trial Tr. 3056:25-3057:8, Nov. 5, 2018 (Partridge).

D.    Individuals with IDD in Texas nursing facilities are experiencing irreparable harm from unnecessary institutionalization, including denial of the well-established benefits of community living

0667.    Long-term institutionalization causes harms from deprivation of important federal rights. Additionally, it is associated with documented negative consequences, including high levels of apathy and dependency; increased passivity and submissiveness; decreased levels of adaptive behavior; increased levels of maladaptive behavior; limited acquisition of and decline in self-help and daily living skills; limited language acquisition and decline in communication skills and abilities; decreased attention to tasks; poor health outcomes, including increased obesity; and poor psychosocial adjustment. PPI X 1763 at 13 (Wehmeyer Report); PPI X 777 at 11-12 (Charlot Report); *see* PPI X 625 at 18 (HHS's Healthcare Quality Plan recognizing that "[m]isuse, underuse, and overuse of care, including receiving care in a more intensive or restrictive setting than needed, can lead to poor outcomes and high cost").

0668.    Individuals with IDD in Texas nursing facilities experience significant harm to their health and safety, including losing skills they previously possessed, as a result of the State's failure to identify, evaluate, assess, coordinate, deliver, and monitor Specialized Services and Active Treatment. PPI X 1299 at 17, 20, 24, 27, 38, 42 (Coleman Pre-Filed Direct Test.); PPI X 1298 *passim* (Pilarcik Pre-Filed Direct Test.); PPI X 318 at 3 ("There were 18 Health and Safety concerns

222

filed in 2016 by QSR Reviewers"); *see* PPI X 88 at 3-5 (email between Dr. Diase, Ms. du Pree and QSR reviewers regarding initiating complaint to HHSC Consumer Rights and Services for nursing facility's failure to provide Specialized Physical Therapy and Occupational Therapy with needed frequency); Diase Dep. 129:11-131:22, 266:25-268:17, 273:2-20; 275:2-9; 275:18-277:20, Nov. 1, 2017 (describing lack of consistent therapy and resulting regression); Jennings Dep. 17:1-18:9, Oct. 29, 2018 (stating when group home client AP lived in a nursing facility she was underweight and "basically confined to the wheelchair or bed").

0669.   Individuals with IDD in Texas nursing facilities experienced contractures and other degeneration while not receiving necessary services to prevent or limit their worsening condition. PPI X 1299 at 10-11, 19-20 (Coleman Pre-Filed Direct Test.); PPI X 1298 *passim* (Pilarcik Pre-Filed Direct Test.).

0670.   Individuals with IDD in Texas nursing facilities are harmed through a lack of contact with their communities, including community activities and community integration. PPI X 1298 *passim* (Pilarcik Pre-Filed Direct Test.); PPI X 1299 at 5-7 (Coleman Pre-Filed Direct Test.); PPI X 1 at 5 (stating that large institutions have negative outcomes for individuals with IDD). Most individuals that Plaintiffs' experts assessed in the initial client review rarely left the grounds of the nursing facility. PPI X 1298 at 12 (Pilarcik Pre-Filed Direct Test.) ("since the nursing facility staff do not understand the PASRR system, they rarely consider other Specialized Services such as Independent Living Skills Training (ILS), Day Habilitation or Behavioral Health Services. As a result some people have just begin to receive ILS services after years of confinement in a nursing facility, while many individuals are still not being considered for these services."); *see also* PPI X 1299 at 5-6 (Coleman Pre-Filed Direct Test.) (finding that of the 10 individuals reviewed, 7 had not left the nursing facility in many years, and none enjoyed community outings, although at least 6 had documentation in their records that they would benefit from Day Habilitation and/or ILS training).

Many individuals in the second client review, and others who live in nursing facilities, spend most of their time isolated in their rooms. Trial Tr. 1757:14-1758:9, Oct. 24, 2018 (Charlot) (describing individuals who spent most of their time in their rooms, including RS who had suffered a blood clot which can result from sitting too much); PPI X 89 at 2, 4 (QSR review of KP, describing how the 39-year-old lost the ability to walk while in the nursing facility and now spends most of her time in her room doing math); PPI X 1400 at 9 (Russo Report) ("Most of the individuals reviewed had not been outside the nursing home . . . in many weeks, and more likely, years.").

0671.   Dr. Charlot reported that some nursing facility staff told her they felt younger residents "were suffering from being segregated from their natural peer groups." PPI X 777 at 15 (Charlot Report).

0672.   Mr. Jacob Adkins, a twenty-eight-year-old man who was bedridden in a nursing facility, testified that being in bed for seven months, with limited interaction, took a toll on his mental health. "I felt sad all the time. I wasn't eating. I wasn't sleeping." Adkins Dep. 23:5-22, Oct. 30, 2018.

0673.   The provider for Mr. Morell, a named plaintiff, testified that she "know[s] for a fact that Mr. Morrell is alive today because he moved out of the nursing facility." Trial Tr. 396:7-8, Oct. 16, 2018 (Carrasco). She explained that Mr. Morrell's doctor believed that, according to Mr. Morrell's bloodwork, he should have been on hospice when he moved out of the nursing facility. Trial Tr. 396:12-15, Oct. 16, 2018 (Carrasco); see Trial Tr. 396:16-19, Oct. 16, 2018 (Carrasco) (The Court: "So in your view, he's doing better off, these positive life changes are attributable [to] not living at the nursing home?" The Witness: "Yes, sir.").

0674.   Ms. Barker testified about the extensive harm Mr. Morgan suffered while residing in a nursing facility. While residing in a nursing facility, Mr. Morgan received inadequate medical care. He gained so much weight that he developed diabetes and became dependent on insulin. During one visit, when Mr. Morgan complained of foot pain, Ms. Barker examined his foot and discovered a horribly infected wound. The wound was so severe that he was immediately hospitalized for

treatment. The nursing facility was previously unaware of the wound. Trial Tr. 1292:1-17, Oct. 22, 2018 (Barker). While in the nursing facility, Mr. Morgan lost the ability to ambulate and was confined to a wheelchair. Ms. Barker explained one of the consequences: "[T]he wheelchair would not fit into the toilet area. So this may seem gross, but in the nursing home he basically, whenever he had to have a bowel movement, he would just basically go. He was in diapers, and they said, 'Let us know when you need to be cleaned up.' So after he would soil himself, then they would clean him up." Trial Tr. 1289:19-24, Oct. 22, 2018 (Barker).

0675.   Named plaintiff Mr. Richard Krause, a man in his thirties, was also placed in diapers during his stay in the nursing facility. His father testified that when he visited his son in the nursing facility, "He would be laying in bed. He would have a diaper on. He would be in a gown. Incoherent sometime[s]." Trial Tr. 2185:6-7, Oct. 26, 2018 (Krause).

0676.   Ms. Arizpe is a 49-year-old woman who lived in a nursing facility for 12 years despite her family's persistent desire for her to return to the community. While in the nursing facility she suffered sexual assault, was confined to her bed, developed pressure sores, was in pain, and would frequently scream and cry out. PPI X 2193B; ECF No. 108-2 at 16. Without needed specialized services, her physical condition declined significantly. PPI X 1281 at 16 (Pilarcik Rebuttal Report);

0677.   Dr. Michael Wehmeyer, an expert in self-determination and choice for people with intellectual disabilities, is the Ross and Marianna Beach Distinguished Professor in Special Education at the University of Kansas (KU) and the Chairperson of the Department of Special Education at KU, which is consistently the nation's highest ranked public graduate program in special education. He has studied issues about self-determination and people with intellectual disability for more than 25 years, and every major national intellectual disability organization has recognized him with lifetime research awards. PPI X 1763 at 5-6 (Wehmeyer Report). He testified that studies have shown that "the people who move from a congregate environment into a

noncongregate community-based environment have enhanced self-determination and greater number of choices" and "that choice opportunity is linked to life satisfaction and quality of life." Trial Tr. 1942:22-1944:2, 19:45:22-1946:12, Oct. 24, 2018 (Wehmeyer); *see* PPI X 1 at 6-7 ("Three decades of deinstitutionalization studies have found that people who move from institutions to smaller community settings are happier, healthier, have more control over their lives, and are better able to function independently after they move . . . . It is clear from decades of studies that people with IDD have happier, healthier, and more independent lives when they live in smaller community-based residences than in larger institutional settings."); *see* PPI X 1 at 8 ("[T]he benefits of living in smaller, community settings include increased choice and self-determination, larger social networks and more friends, increased access to mainstream community facilities, greater participation in community life, more chances to develop and maintain skills that foster independence, a better material standard of living, increased acceptance from other members of the community, and greater overall satisfaction with their lives as expressed by people with IDD themselves and their families . . . .").

0678.    These findings are true for individuals with IDD in Texas living in community settings, who have more opportunities to practice independence and make choices than individuals with IDD who live in institutional settings such as nursing facilities. Trial Tr. 358:8-359:2, Oct. 16, 2018 (Carrasco) (testifying that host homes are different than nursing facilities because in host homes individuals have their own room, participate in family life, and make choices about daily activities); Trial Tr. 1106:2-12, Oct. 19, 2018 (Preskey) (testifying that some individuals living at CALAB group homes assist with meal preparation, invite their family members to enjoy dinner with them at the group home, and take care of cats as part of their responsibilities); Trial Tr. 1100:22-1102:17, Oct. 19, 2018 (Preskey) (testifying that some individuals who live in the community through CALAB are employed at stores and restaurants and those that go to Day Habilitation (as well as their guardian or advocate)

can choose which Day Habilitation program to attend); Trial Tr. 1102:18-1103:17, Oct. 19, 2018 (Preskey) (testifying that if individuals served by CALAB do not work or go to Day Habilitation, then they can go to college or work on college applications during the day); Trial Tr. 1113:22-1114:5, Oct. 19, 2018 (Preskey) (describing how KH is encouraged to participate in as many household chores as he can); Trial Tr. 1736:23-1738:7-19, Oct. 24, 2018 (Charlot) (describing research that people with IDD living in community settings learn to make more choices and explaining lack of individual routines and choices in nursing facilities); PPI X 777 at 10-11 (Charlot Report).

0679.   Individuals with IDD who live in the community have more control over their personal surroundings, whereas people living in nursing facilities may lack that control. Trial Tr. 2085:19-2086:2, Oct. 25, 2018 (Rideout) (testifying that nursing facility rooms that she visited "looked like your typical hospital room," whereas bedrooms for individuals served by Reaching Maximum Independence in the community are "personalized" because "[o]ur homes belong to the individuals we serve."); Trial Tr. 1113:13-18, Oct. 19, 2018 (Preskey) (testifying that KH's bedroom in his group home "has his keyboard. It has Johnny Cash murals all over his ceilings and walls, per his request"); *see* Jennings Dep. 22:8-17, Oct. 29, 2018 (testifying that DR, who transitioned from a nursing facility to a group home, has "more independence" and "gets to live a more normal life").

0680.   Outcome studies document the benefits of community living. PPI X 1 at 5-7 ("The majority of studies conducted in the U.S. have found that outcomes such as greater individual choice, satisfaction, housing stability, higher levels of adaptive behavior, and community participation are positively related to smaller and more integrated residential settings."); PPI X 770 at 4 (summarizing studies of the outcomes of nearly 5,000 people with IDD who moved from large institutions to community settings and finding consistently positive outcomes in daily living skills); PPI X 771 at 11-14 (summarizing studies of the outcomes of 2,600 people with IDD who moved from large

227

institutions to the community, most of which found that statistically significant improvements in adaptive behavior are associated with moving to the community).

0681.  Individuals with IDD who have moved from nursing facilities to community settings regularly experience positive health outcomes. Trial Tr. 386:14-18, 396:7-19, Oct. 16, 2018 (Carrasco) (testifying that Mr. Morrell's health has improved since he moved from the nursing facility into the community, as evidenced by his lab work); *see* Trial Tr. 1110:7-14, 1114:14-23, 1115:4-8, Oct. 19, 2018 (Preskey) (testifying that KH has "done really well" since moving from the nursing facility, that he has not faced the wound care issues that he experienced in the nursing facility, and that he has started ambulating more than he did in the nursing facility); Jennings Dep. 19:7-18, Oct. 29, 2018 (testifying that the overall health of AP, who transitioned from a nursing facility to a group home, has improved).

0682.  The State's experts acknowledged the benefits of community living for individuals with IDD. Trial Tr. 3062:14-3065:21, 3066:5-25, Nov. 5, 2018 (Partridge) (acknowledging accuracy of 2017 HHS report demonstrating that people moving from institutions to community experience higher life satisfaction, fewer depressive symptoms, higher satisfaction with care they receive, decreases in perceived unmet care needs, higher levels of dignity and respect, and higher satisfaction with living arrangements); Trial Tr. 3062:14-3065:21, 3066:5-25, Nov. 5, 2018 (Partridge) (agreeing that study showed that keeping a person in an institution would subject the person to life satisfaction deprivation, and higher levels of depressive symptoms); Trial Tr. 3371:16-21, Nov. 6, 2018 (Shea-Delaney) (discussing a report that Ms. Shea-Delaney signed onto as part of the Massachusetts *Olmstead* advisory group subcommittee which stated "By every measure, living in a community shows clear increases in quality of life compared to living in larger congregate settings."); PPI X 1220 at 7, 29 (U.S. Dep't of Health and Human Services report on The Money Follows the Person Rebalancing Demonstration, explaining that people moving from institutions to the community

experience higher life satisfaction, have fewer depressive symptoms, experience higher satisfaction with the care they receive, experience decreases in perceived unmet care needs, have higher levels of dignity and respect, and experience higher satisfaction with their living arrangements).

0683.    While in the nursing facility, Mr. Thongphanh was usually in his room alone, in bed wearing a hospital robe and watching TV. In contrast, after he moved to a community home, he typically was dressed and sitting in his wheelchair in the common area of the home interacting with his housemates and staff. In the community, Mr. Thongphanh attended Day Habilitation, where he had additional opportunities to meet and interact with individuals from other community homes. Mr. Thongphanh enjoyed his experience living in a community group home. Trial Tr. 1176:5-1178:5, Oct. 19, 2018 (Mastin).

0684.    Named plaintiff Mr. Morell's community services provider testified that Mr. Morrell is "a changed man" since moving from a nursing facility to the community. Trial Tr. 377:10-18, 386:10-24, Oct. 16, 2018 (Carrasco) (describing the improvements in Mr. Morrell's quality of life since he moved to the community).

IX.

Large numbers of Individuals with IDD have not made an
informed and meaningful choice to enter or remain in Texas nursing facilities

A.    Data show a large number of people with IDD in Texas nursing facilities are interested in transitioning to the community or learning more about the community

0685.    According to the 2016 QSR scores and Ms. du Pree's testimony, 56 of the 121 individuals with IDD in nursing facilities who were surveyed (approximately forty-six percent) had some interest in transitioning from the nursing facility. Trial Tr. 188:17-21, Oct. 15, 2018 (du Pree); PPI X 318 at 2; du Pree Dep. 240:1-8, Feb. 6, 2018.

0686.    Despite a lack of individualized transition planning, actions to address barriers to transition, adequate information, and visits to community settings, 39 of the 54 individuals in the second client

review expressed an interest in learning more about the community, and more than half were interested in transitioning to the community. Trial Tr. 548:19-549:1, Oct. 17, 2018 (Pilarcik); Trial Tr. 888:7-889:2, Oct. 18, 2018 (Coleman); Trial Tr. 1766:1-22, Oct. 24, 2018 (Charlot) (testifying that of the fourteen people Dr. Charlot reviewed, "nine different people either said, 'Yeah, I really do want to go live in the community' or 'I would be willing to hear more information about this; the door is not closed on that as a possibility'"); Trial Tr. 1638:21-1639:9, Oct. 23, 2018 (Russo) (testifying that twelve of the sixteen people Ms. Russo reviewed expressed an interest in moving to the community and two of the remaining four people wanted to learn more about the community); PPI X 1280 at 17 (Pilarcik Report); PPI X 802 at 12 (Coleman Report).

0687.   According to Dr. Wehmeyer, an expert in self-determination and choice for people with disabilities, these results clearly suggest that people in the client review sample have expressed preferences about living in the community. Trial Tr. 1956:4-1957:1, Oct. 24, 2018 (Wehmeyer) (testifying that the client review results "are very strong statement of interest and preference").

B.    Many Individuals with IDD affirmatively want to live in the community but nevertheless remain in Nursing Facilities or lived in Nursing Facilities longer than they wanted due to inadequate transition assistance

0688.   People with IDD are institutionalized in Texas when they do not want or need to be in an institution. PPI X 1 at 4 ("Self-advocacy groups representing people with disabilities have clear positions on residential services and supports. They demand smaller, community, person-centered residential services that promote community living and participation."); Diase Dep. 51:20-52:12, Nov. 1, 2017; *see* Trial Tr. 346:12-14, Oct. 16, 2018 (Morrell) (Q: "And, Joe, would you ever want to go back to live in the nursing home?" A: "No.").

0689.   The client reviewers consistently found that many individuals wanted to transition to the community yet had received no assistance from their service coordinators and were still residing in nursing facilities. Many individuals or their family members clearly and articulately told the

reviewers that they would like to leave the nursing facility and live in the community. For example:

i.    "SE has consistently stated from the time of her admission, and at every meeting since then, that she wants to return to Tyler, Texas." PPI X 1280 at 41 (Pilarcik Report);

ii.   "AH clearly indicated that her preference is to return home." PPI X 1280 at 44 (Pilarcik Report);

iii.  "SJ's sister informed this reviewer that she would love for SJ to live in a smaller, more individualized place." PPI X 1400 at 14 (Russo Report);

iv.   "NF reported to this reviewer that she wanted to live in the community again so that she could, 'Get my life going again,' 'Visit my friends,' 'Go to church,' and 'See my momma's people.' The service coordinator's notes reflect NF's frequent expression of her desire to move to the community."  PPI X 1400 at 23 (Russo Report);

v.    "When LD was asked if he would like to live in a home, if he would like to live with other people, even if that meant that he was not closer to his sister, he replied 'Yes' and 'Yes.' When LD was asked if he would tell his Service Coordinator what he told this reviewer, he said, 'Yes.' When LD was asked why he wanted to move, he replied, 'Because been here a long time (sic).'" PPI X 1400 at 28 (Russo Report);

vi.   "When this reviewer asked RF if she wanted to live someplace else such as a home possibly with other people, she replied, 'Yes.' When this reviewer asked RF if she would move out of the nursing facility to a home in the community, RF replied, 'Yes.' When this reviewer asked RF if she wanted to move to a home that was closer to her family, RF replied, 'Si?, Gonzales,' which is the name of the town where RF grew up." PPI X  1400 at 32 (Russo Report);

vii.  "During this reviewer's interview with RW, he was unsure who his Service

Coordinator was, but he offered that he would like to leave the nursing facility and go to Clover, where his relatives live." PPI X 1400 at 31 (Russo Report);

viii.   "During my conversation with OL, she indicated her strong desire to leave the nursing facility saying, 'I would do it right away: quick, fast, in a hurry.'" PPI X 1400 at 36 (Russo Report);

ix.   "During our conversation, JA shared with me that she would like to live in a home, but wondered who would want to live with her; how her home would be paid for and what her sister, Jeanie, would think of the idea adding 'I'd love to live in a house if people would cook for me. If Jeanie thinks [moving to the community] is okay, then yes!'" PPI X 1400 at 44 (Russo Report);

x.   "During this reviewer's interview with SP, she clearly stated her desire to move out of the nursing facility and into a community home. She fondly recalled her memories of living in her home and the simple pleasures that were what she lived for – sitting with her beloved cat and dog, going outside, going to parks, looking at the trees and nature – all things, she loves and has lived without for over six years." PPI X 1400 at 51 (Russo Report); and

xi.   TM is a 28-year-old woman who referred to the nursing facility as "jail for old people," and who "desperately wanted to not live there." Trial Tr. 1758:13-1759:5, 1760:1-19, Oct. 24, 2018 (Charlot); PPI X 777 at 23 (Charlot Report).

0690.   Mr. Lenwood Krause testified that if he had been provided information about community options he would have chosen for his son, Richard Krause, to live in the community instead of in nursing facilities. When asked by the Court "And in those four nursing homes, did any nursing home staff or whoever in that nursing home provide you necessary information as to what options you could – your son could utilize out there in the community?" He responded "No," he had never

received information about community options. When he received concrete information from Disability Rights Texas, Mr. Krause moved quickly to select a provider and transition Richard Krause to the community. Trial Tr. 2190:21-2191:22, 2205:13-2206:2, Oct. 26, 2018 (Krause). *See also* PPI X 1281 at 34-36 (Pilarcik Report).

0691.   Ms. Barker testified that she cried the day she learned that Mr. Morgan had been moved to a nursing facility and her goal was always for him to return to the community. The nursing facility staff were always aware that both Ms. Barker and Mr. Morgan wanted Mr. Morgan to return to the community. "From the time we went in, they knew that that's what he wanted and that's what I wanted for him . . . So early, early on board, I was calling for help, trying to get him out." Ms. Barker testified that her efforts were unsuccessful until she contacted Disability Rights Texas and Mr. Morgan became a named plaintiff in this case. Trial Tr. 1294:17-1295:17, Oct. 22, 2018 (Barker).

0692.   Ms. Arizpe's parents, who were also her guardians, consistently advocated for supports and services needed to move her back home with them. Trial Tr. 4207:20-23, Nov. 14, 2018 (Pilarcik) ("And during all of this time, they were very adamant that they wanted her to be able to return home with the appropriate support so that they could care for her in their own home."). However, it was not until seven years after her admission, after becoming a named plaintiff, that Ms. Arizpe was given that opportunity in 2012 through an HCS slot offered in response to this lawsuit. PPI X 2193B at 23. "The Arizpes' disappointment, frustration, and confusion with the system is evident throughout [ ] service coordinator's notes. In 2012, it was noted that the Arizpes had been personally paying for transportation for Linda to visit them in their home, but were considering ending the visits because it was too heartbreaking to watch Linda cry every time she was returned to the nursing facility." PPI X 1281 at 16 (Pilarcik Report).

0693.   As of September 1, 2017, three of the named plaintiffs were still residing in nursing facilities even though they and/or their guardians had expressed clearly and repeatedly their preference for

community living. Mr. Kent had resided in a nursing facility since 2008, Mr. Eric Steward since January 1999, and Mr. Thongphanh since April 2016. PPI X 1281 at 43, 12, 28 (Pilarcik Report); *see also* PPI X 2189A at 10 (stating that after waiting for home modifications, Mr. Steward ultimately was not able to move into the home that he had selected).

0694.    Mr. Adkins testified that moving into a nursing facility was not his choice; he was not informed of any other options. Adkins Dep. 13:11-14:1, 16:10-17:12, Oct. 30, 2018. He testified that if someone had offered him the option to live in his own apartment or in a group home with the supports he needed, he would have wanted to do that. Adkins Dep. 17:20-18:2, Oct. 30, 2018. As of September 1, 2017, Mr. Adkins wanted to be living in the community, but remained in a nursing facility. Adkins Dep. 32:12-19, Oct. 30, 2018.

0695.    Ms. Meisel also testified that as of September 1, 2017, she wanted to live in the community, but remained in a nursing facility. Trial Tr. 2054:9-14, 2055:1-2, 2062:24-2063:1, Oct. 25, 2018 (Meisel).

C.    The State fails to provide adequate information and opportunities to allow Individuals with IDD to make an informed and meaningful choice about whether to enter or remain in a Nursing Facility

1.    Choice must be informed

0696.    To ensure that people with IDD are not unnecessarily segregated, people must be given an informed and meaningful choice about where to live. Trial Tr. 146:2-147:4, Oct. 15, 2018 (du Pree) (explaining informed choice and that QSR Outcome measure looking at informed choice was drafted to incorporate federal PASRR and ADA requirements); Trial Tr. 2149:19-2151:4, Oct. 26, 2018 (Sawyer); Trial Tr. 1738:24-1739:15, 1771:3-22, Oct. 24, 2018 (Charlot) (explaining that evidence shows huge benefits to living in the community, and it is essential to ensure that someone has given up the right to live in the community only after making an informed choice to do so); PPI X 1578 at 17-19, 40 (Sawyer Report).

0697.  As HHSC and its officials have stated, it is important that individuals with IDD receive services in the most integrated setting consistent with their informed choice.  Jalomo 30(b)(6) Dep. 66:14-17, 76:1-9, Nov. 2, 2017; Bishop Dep. 186:24-187:2, Mar. 13, 2018 (testifying that HHSC wants to ensure that people are making informed choices when they are selecting services); Gaines Dep. 36:14-24, Feb. 27, 2018 (agreeing that "people with disabilities have the right to receive the treatment and services they need in the most integrated setting of their choosing").

0698.  Providing an informed and meaningful choice requires giving the individual and his/her guardian individualized information about the full range of available options for appropriate community services and supports to meet the individual's specific needs. Trial Tr. 146:2-25, Oct. 15, 2018 (du Pree) (information needed to allow an informed choice must take into account the person's cognitive disability and the effect of institutionalization); Trial Tr. 1504:6-1505:5, 1506:1-8, 1509:17-1510:8, Oct. 23, 2018 (Weston); Trial Tr. 3567:21-3568:9, Nov. 8, 2018 (Thompson) (testifying that it is important for people to understand that there are services in the community that can meet their needs when deciding to transition); PPI X 1280 at 14-15 (Pilarcik Report); PPI X 1906 at 19-20 (Weston Report); Bishop Dep. 198:14-19, Mar. 13, 2018; Williamson Dep. 30:5-10, Feb. 22, 2018.

0699.  As reflected in HHSC testimony and documents, including the State's Promoting Independence Plan, HHSC agrees that part of the framework of a Long Term Services and Supports system is that "[i]ndividuals should be well informed about their program options, including community-based programs, and allowed the opportunity to make choices among affordable services and supports." PPI X 193 at 9; *see also* Snyder Dep. 283:9-24, Nov. 16, 2017; Jalomo 30(b)(6) Dep. 77:11-15, Nov. 2, 2017 (testifying that it is generally important for individuals with IDD to be well informed about their options regarding where they receive services and support); Gaines Dep. 55:18-56:1, Feb. 27, 2018 (testifying that she agrees with the statement that "individuals should be

well informed about their program options including community-based programs and allowed the opportunity to make choices among affordable services and supports"); Jones 30(b)(6) Dep. 118:11-119:23, Oct. 17, 2017 (agreeing that people should be well informed about community-based programs so that they have a choice of where services would be delivered and that they should be presented with options in a way that they are able to understand and appreciate).

0700.   In 2015, five years after this litigation began, the State began requiring that service coordinators provide information to individuals with IDD residing in nursing facilities to inform them about the range of community living service and support options and alternatives, using HHSC-approved materials. 40 Tex. Admin. Code § 17.501(b)(2)(A), *repealed and replaced by* 26 Tex. Admin. Code § 303.601(c) (assigning responsibility to habilitation coordinators); *see* Southall 30(b)(6) Dep. 277:5-278:4, Oct. 4, 2017.

0701.   HHSC's LIDDA Performance Contract incorporates this requirement, stating that the service coordinator provide information the State developed about community living options to nursing facility residents and their LAR at the first interdisciplinary team meeting and at least every six months thereafter.  For individuals refusing Service Coordination, the service coordinator is required to provide the same information at the initial meeting with the individual and LAR and at least semi-annually thereafter. PPI X 535 at 6 (FY16-17 Performance Contract, Attach. G, Sec. I(D)(5)).

0702.   According to HHSC, this requirement's purpose is to ensure that the service coordinators discuss community living options (CLO) with the individual so that they are aware of their options of living in the community. Southall 30(b)(6) Dep. 225:21-226:9; 226:22-227:3, Oct. 4, 2017; *see* Turner Dep. 184:23-185:3, Feb. 23, 2018. The individual's LAR (if any) must be part of the CLO discussion. Southall 30(b)(6) Dep. 240:3-20 Oct. 4, 2017.

0703.   HHSC expects that in CLO conversations, service coordinators should be knowledgeable about, and explain, the particular services and supports that would be appropriate for the individual.

Trial Tr. 2869:15-23, Nov. 2, 2018 (Southall); Southall 30(b)(6) Dep. 232:11-21, Oct. 4, 2017. Service coordinators should also identify and learn about the individual's concerns, preferences, and unique service needs. Trial Tr. 2867:10-13, 2870:14-17, Nov. 2, 2018 (Southall); Jalomo 30(b)(6) Dep. 84:9-20, Nov. 2, 2017; Southall Dep. 173:1-7, Nov. 7, 2017. Concerns about community living must be documented on the CLO form. PPI X 266 at 3 (CLO form, Form 1039); PPI X 172 at 4 (CLO form instructions direct to "list any issues, concerns, and questions identified by the individual and LAR"); *see* PPI X 431 (CLO form 1039 and instructions).

0704.   Service coordinators are responsible for tailoring CLO discussions to address a person's communication barriers. Southall 30(b)(6) Dep. 236:21-237:12, Oct. 4, 2017.

0705.   HHSC's LIDDA Performance Contract also requires that service coordinators arrange for visits to community programs as appropriate, address concerns about community living with the service planning team, and provide semi-annual informational and educational opportunities to nursing facility residents and the LAR. The LIDDA Performance Contract identifies peer-to-peer and family-to-family programs, tours of community services and supports, and the opportunity to meet with other individuals living and working in the community, their families, and community providers, as potential educational and informational activities. PPI X 535 at 6 (February 2017 Amendment to LIDDA Performance Contract Attachment G); PPI X 1578 at 18 (Sawyer Report).

0706.   These educational opportunities are intended to help people understand what moving to the community would mean for them and learn more about what community options exist. Trial Tr. 3614:6-16, Nov. 8, 2018 (Phillips); *see* Trial Tr. 145:11-17, Oct. 15, 2018 (du Pree) (describing LIDDA educational opportunities measured by QSR Outcome Measure 2-6 as a way for people to "learn more directly about what the community service options are"). LIDDAs have informed the State that such educational opportunities are important in ensuring that individuals have made an informed choice. *See* PPI X 271-A at tab 2, row 38 (2017 Quarter 2 ECC compilation report noting

"the importance of overnight trial visits for clients to make the most informed decision on community placement").

0707.   HHSC expects that, to ensure that a person has made an informed choice to remain in a nursing facility, the LIDDAs do everything the contract requires to explain options; make sure they have appropriate involvement of LARs or other people in their life that they want to be involved in the process; and to address any issues with understanding or communication through the CLO process to make sure the nursing facility residents fully understand and are able to express their desires. Turner Dep. 185:22-186:9, Feb. 23 2018.

0708.   To ensure that a person has made an informed choice to stay in a nursing facility, it is necessary to ask the individual, ask the LAR, guardian, and involved family member, look at the service coordinator notes to see what type of education was provided, and ask the service coordinator. Diase Dep. 176:1-11, Nov. 1, 2017.

0709.   The service coordinator notes should include the CLO information presented, whether the individual or family, LAR, or guardian expressed any concerns, the service coordinator's responses and efforts to address those concerns, whether visits to the community were offered or undertaken, and other factors. Diase Dep. 176:12-23, Nov. 1, 2017.

0710.   The informed choice assessment should also include whether the range of options available to the individual had been presented to him or her, based on individual circumstances and in response to interview questions. du Pree Dep. 142:7-144:7, Feb. 6, 2018.

0711.   To assess informed choice, it is also important to know whether the individual has been in previous community settings and whether or not that was a good experience for them. Schultz Dep. 142:15-143:8, Dec. 18, 2017; *see* du Pree Dep. 146:24-147:17, Feb. 6, 2018.

0712.   In determining whether a person with IDD in a nursing facility had chosen to refuse community services, the QSR reviewers considered whether any activities, such as community visits,

were provided. du Pree Dep. 73:12-76:24, 79:13-81:16, Feb. 6, 2018; Schultz Dep. 145:7-15, Dec. 18, 2017.

>   2.   People with IDD, especially people who have been institutionalized, require additional supports to make informed choices
>
>   a.   Individuals with IDD face significant obstacles to making informed choices

0713.   Intellectual disability manifests as global impairments in cognitive and intellectual functioning. These impairments include language acquisition and comprehension, memory functions, reasoning and idea production, perceptual abilities and social cognition, and learning and knowledge acquisition. Trial Tr. 1911:11-20, 1927:4-16, Oct. 24, 2018 (Wehmeyer); PPI X 1763 at 8 (Wehmeyer Report); PPI X 567 at 13, 15-16 (describing impact of intellectual disability on receptive and expressive communication).

0714.   Such impairments constrain a person's capacity to discern preferences and make choices. PPI X 1763 at 8 (Wehmeyer Report).

0715.   For example, people with IDD often have difficulty understanding abstract ideas, like an offer to live in the community, in a new home that the person has never seen, at some point in the future. Trial Tr. 1928:14-1931:1, Oct. 24, 2018 (Wehmeyer) (a characteristic of learners with IDD is that they may not be able to generalize, i.e., take information that they have learned or acquired in one context and apply it to a different context); Trial Tr. 1739:16-1740:14, Oct. 24, 2018 (Charlot) (explaining that people with IDD can have difficulty with abstraction or hypotheticals); PPI X 777 at 13 (Charlot Report); du Pree Dep. 138:6-12, Feb. 6, 2018. Similarly, people with IDD, who do not generalize from one context to another, "may have limited capacity to reason and understand that one particular picture might actually be intending to reflect a whole range of things." Trial Tr. 1941:1-14, Oct. 24, 2018 (Wehmeyer).

0716.   People tend to overestimate the language comprehension abilities of individuals with

intellectual disability and so fail to provide individualized information in formats that ensure that individuals with intellectual disability can understand and act upon it. Trial Tr. 1940:5-25, Oct. 24, 2018 (Wehmeyer); PPI X 1763 at 10 (Wehmeyer Report); PPI X 567 at 13 (explaining that "familiar staff" who work with people with IDD tend to overestimate language comprehension).

0717.    People with intellectual disability frequently do not receive instruction, supports, and opportunities to learn and engage in more cognitively complex activities such as decision-making or problem solving. PPI X 1763 at 8 (Wehmeyer Report). People with IDD "have far fewer opportunities to make choices in their lives than almost anyone else." Trial Tr. 1934:4-1935:10, Oct. 24, 2018 (Wehmeyer); *see* PPI X 567 at 18 ("Individuals with severe to profound ID have historically been given few to no opportunities to make basic choices . . .").

0718.    Dr. Wehmeyer testified that virtually any person with IDD has been taught or treated using practices "based upon principles of examining and providing stimuli, or prompts, or antecedents, and then shaping or leading to the performance of a desired behavior, and then followed by reinforcements to reinforce that behavior." An unintended consequence of those practices is that people become "prompt dependent" and "acquiescent." Therefore, if one just asked "Do you like this?" or "Are you satisfied with this?" then "the likelihood is that people with intellectual disability will just acquiesce." Trial Tr. 1936:23-1940:4, Oct. 24, 2018 (Wehmeyer).

0719.    Practices that emphasize external prompts, over-reliance on verbal instructions and directions, and a tendency toward protection (and segregation) result in outer-directedness, acquiescence, a lack of self-determination, and hopelessness in people with intellectual disability. Trial Tr. 1936:23-1938:4, Oct. 24, 2018 (Wehmeyer); PPI X 1763 at 10-11 (Wehmeyer Report); PPI X 777 at 12 (Charlot Report).

0720.    Individuals with IDD often fear the unknown, resist change, and prefer familiar routines. It is essential that they be engaged in a trusting and dependable relationship with a service coordinator

or other specialist who is sensitive to individuals' limited life experiences and limited choices in their daily lives and who gradually but consistently introduces them to the possibilities of community living. Trial Tr. 2150:7- 2151:4, Oct. 26, 2018 (Sawyer); PPI X 1762 at 15 (Webster Report); PPI X 1578 at 39.

> b.    Institutionalization further hinders the ability of people with IDD to make informed choices

0721.   People with IDD in nursing facilities and similar institutions face significant barriers to making meaningful choices and having their preferences understood. PPI X 1763 at 15-16 (Wehmeyer Report).

0722.   Long-term institutionalization diminishes one's ability to express preferences and make choices. *See* Trial Tr. 1741:15-1743:13, Oct. 24, 2018 (Charlot) ("And now it's just accepted, like people – it's 101 that we know that if people with IDD, who have a harder time expressing their wants and needs, are in situations that are too regimented and less flexible, that they can come to just stop telling you what they want because they learn to be kind of helpless even though they aren't helpless."); PPI X 777 at 12 (Charlot Report); PPI X 1763 at 11, 14-15 (Wehmeyer Report).

0723.   Individuals living in large congregate settings have significantly fewer opportunities for choice. Trial Tr. 1936:8-22, 1942:22-1944:2, Oct. 24, 2018 (Wehmeyer); Trial Tr. 1741:15-1743:13, Oct. 24, 2018 (Charlot) ("If you're in a facility, you just don't have as much choice."); PPI X 777 at 12 (Charlot Report).

0724.   Individuals with IDD in nursing facilities have often been in facilities for years without the chance to see or even envision life in community settings. Trial Tr. 2150:14-24, Oct. 26, 2018 (Sawyer); PPI X 1578 at 39 (Sawyer Report). They may not remember or ever have really known the benefits of those other options. Trial Tr. 3601:19-25, Nov. 8, 2018 (Phillips) (noting that a primary reason individuals are hesitant to transition is that they have been in the nursing facility for

a long time); du Pree Dep. 139:12-19, Feb. 6, 2018. As a result, many individuals with IDD in nursing facilities may have become accustomed to isolated and segregated lifestyles, leaving them, and their families, fearful of abuse, neglect, or other mistreatment if placed in the larger community. Trial Tr. 2150:14-16; Oct. 26, 2018 (Sawyer); PPI X 1578 at 39 (Sawyer Report).

0725.  Institutionalization is associated with high levels of apathy and dependency, increased passivity and submissiveness, and learned helplessness and fear of retribution. Trial Tr. 1741:15-1743:13, Oct. 24, 2018 (Charlot); PPI X 1763 at 14 (Wehmeyer Report); PPI X 777 at 12 (Charlot Report). These phenomena may lead individuals to state, outwardly, that they are happy in the institution when they are actually unhappy there. PPI X 777 at 12 (Charlot Report).

      3.      Informed choice requires concrete information and community experiences

0726.  Information must be provided at levels at which individuals can understand it. Trial Tr. 1941:1-1942:21, Oct. 24, 2018 (Wehmeyer). People with intellectual disabilities will need systematic, extensive supports and repeated experiences to successfully learn about and express preferences and to make choices. Trial Tr. 1739:16-1740:14, Oct. 24, 2018 (Charlot); PPI X 1763 at 7-8, 17-18, 20 (Wehmeyer Report); PPI X 777 at 11 (Charlot Report). Anyone who is working with a person with IDD must go beyond giving verbal information or asking verbal questions to provide "truly informed choice." Trial Tr. 1941:15-20, Oct. 24, 2018 (Wehmeyer).

0727.  Informed choice requires presenting individualized information in a manner that accommodates the individual's cognitive disabilities and any history of institutionalization. Trial Tr. 146:2-25, Oct. 15, 2018 (du Pree); Trial Tr. 1199:7-21, Oct. 22, 2018 (Webster) (testifying that "decisions like this are complicated and challenging for people who have an intellectual disability . . . especially if they've been in a nursing facility for a very long time, it requires a high degree of sensitivity and patience" and that in his office, "we continued to speak to them . . . and give them invitations to look into what community options were there"); Trial Tr. 1254:21-1255:16, Oct. 22,

2018 (Webster) ("When an individual has lived in a nursing facility for a long time, activities related to informed choice need to be done in progressively small steps to allow the person to understand what the opportunity is. . . . [I]t needs to be done very, very deliberately and thoughtfully, knowing what the person is like and what their interests are.").

0728.    Presentations of alternative services based on assessed need must be clear and understandable. Multiple methods of communication are necessary to ensure that individuals with IDD truly understand their options and how community supports and services would apply to them. These methods include addressing individuals' communication barriers; providing extended time for processing information; repetition; using simple language and open questions; confirmation that individuals understand the information; and addressing barriers. Trial Tr. 1504:6-1505:5, 1506:1-8, 1509:17-1510:8, Oct. 23, 2018 (Weston); Trial Tr. 1739:16-1741:14, Oct. 24, 2018 (Charlot) (describing multiple formats used to convey information and importance of addressing fears and other barriers); PPI X 1906 at 41 (Weston Report); PPI X 777 at 11-14 (Charlot Report) ("[I]nformation should be provided regularly and in multiple formats. It is important that the person presenting options . . . has used every possible tool to address barriers and to insure the person really understands options so the default position is not simply to stay in a facility.").

0729.    Some individuals with cognitive disabilities will require decision-making supports provided by guardians, trusted friends or family members, or chosen supported decision-makers. Trial Tr. 1748:14-1749:12, Oct. 24, 2018 (Charlot) (describing CB, whose service coordinator and other caregivers agreed with Dr. Charlot that he likely could not cognitively understand his options, but did not have a guardian); PPI X 777 at 11 (Charlot Report) (stating that some people will need guardians to make informed choices); PPI X 1763 at 19 (Wehmeyer Report) (describing supported decision-making models).

0730.    Because many individuals with IDD have difficulty understanding abstract concepts, many

will require modeling, concrete experiences, repetition, and information provided in multiple formats to grasp information. Thus, to ensure an individual makes an informed choice about community living, professionals commonly use methods such as visits to community settings, showing videos, inviting a person to a party instead of a formal tour, and linking people who have had positive experiences, among others. Trial Tr. 1253:9-14, Oct. 22, 2018 (Webster) ("[I]t's actually going out and seeing things, having concrete experiences, leaving the facility, going into the community . . . [h]aving an opportunity to talk to people who have been served in the community and what that life is like for them."); *see* Trial Tr. 1252:22-1253:18, Oct. 22, 2018 (Webster); Trial Tr. 146:2-25, Oct. 15, 2018 (du Pree) (visits to community programs and meeting other individuals "similar to you living the way you might want to live" is particularly important for making an informed choice); PPI X 1762 at 14-15 (Webster Report) (concrete information and concrete experiences of community activities are particularly important for individuals with IDD); PPI X 1762 at 15 (Webster Report) ("Because [individuals with IDD] have difficulty visioning and relating to unknown situations or new environments, they often need to see an alternative placement, engage in an actual living experience, or speak with an individual who has moved to such a placement, in order to understand the differences between living in a nursing facility or a community setting."); PPI X 41 at 17 (HHSC webinar, including an overview of person-centered practices, noting that "concrete life experiences" are needed for people to make "meaningful choices").

0731. Direct experiences of community living alternatives – opportunities to both see and experience a community home, and engagement with others who have made the transition from institutions to community living – are the most powerful, most important, and most effective methods for providing information. PPI X 1763 at 19 (Wehmeyer Report) ("[M]ost aspects and options of living in the community cannot be determined and ultimately selected unless and until there is direct experience with that alternative."); PPI X 1906 at 19-20 (Weston Report); *see* PPI X

1578 at 40 (Sawyer Report); *see also* Trial Tr. 2149:13-2150:1; 2150:7-24, Oct. 26, 2018 (Sawyer); Trial Tr. 534:6-25, Oct. 17, 2018 (Pilarcik).

0732.   It is usually important for individuals and families to visit, see programs, and observe staff and consumer interactions, to make an informed judgment about whether the individual's needs can be met in the community. du Pree Dep. 76:15-22, Feb. 6, 2018; Trial Tr. 1942:5-7, Oct. 24, 2018 (Wehmeyer) ("Preference and interest is all about interaction with things. We can't know that we like something until we've tried it by and large.").

0733.   Seeing and experiencing a place or program is important, in part, because a lack of cognitive ability may sometimes mean that a person may not understand something that was just discussed. Even for someone who has more cognitive ability there are often fears or trepidation about transition. In both cases, providing concrete information is often helpful to aid decision-making. du Pree Dep. 138:19-139:1, Feb. 6, 2018. This is particularly important for people who have been in a nursing facility or other institution for a long time. Trial Tr. 2150:7-2151:13, Oct. 26, 2018 (Sawyer); du Pree Dep. 139:6-7; 20-24, Feb. 6, 2018.

0734.   If a person in a nursing facility has not had an opportunity to hear from community providers or visit community programs, that person has not made an informed choice to oppose receiving community services.  Schultz Dep. 144:24-145:15, Dec. 18, 2017; du Pree Dep.136:13-137:18, Feb. 6, 2018.

0735.   Ms. Turner agrees that individuals with IDD should be able to make an informed choice about where to live, that providing information in a manner that they can understand is helpful to making an informed choice, that providing experiences in the community is helpful to making an informed choice, and that providing visits to community providers is helpful to make an informed choice of where to live. Trial Tr. 3808:4-22, Nov. 9, 2018 (Turner); Turner Dep. 187:24-188:6, Feb. 23, 2018 (testifying that "some people learn best by experience" to help them learn about the

community).

0736.    Participation in programs that expose people to the community, like LIDDA specialized services, allow them to understand the differences between institutional and community settings. Trial Tr. 1254:15-20, Oct. 22, 2018 (Webster) (specialized services, if they are provided in the community, are "a great opportunity for a person to find out what services in the community might be like for that individual"); Trial Tr. 1511:8-16, Oct. 23, 2018 (Weston) ("primary strategy" for providing informed choice is delivery of community-based specialized services); PPI X 1762 at 14-15 (Webster Report); PPI X 777 at 11 (Charlot Report); Turner Dep. 164:6-15, Feb. 23, 2018.

0737.    For *Rolland* class members, specialized services allowed them to regularly spend time in the community, which was a critical factor in providing informed choice and facilitating their decision to transition to the community. Trial Tr. 497:3-17, 498:4-16, Oct. 17, 2018 (Pilarcik).

0738.    It is also important to individualize the educational activity to meet the individual's particular needs. Trial Tr. 2885:5-8, Nov. 2, 2018 (Southall); PPI X 777 at 11 (Charlot Report); Southall Dep. 235:5-21, Nov. 7, 2017.  LIDDAs must offer particular educational activities that would be effective for an individual to understand what living in the community would be like so that the individual can understand his/her community living options. Trial Tr. 2885:5-18, Nov. 2, 2018 (Southall) (particular activities, such as meeting with a peer who transitioned from a nursing facility, can help some individuals understand what living in the community might be like); Trial Tr. 1254:2-20, Oct. 22, 2018 (Webster) (describing family-to-family and peer-to-peer programs); Southall Dep. 236:5-14, Nov. 7, 2017.

0739.    Information about community living options should include the timing of availability of community options, location, the distance from the person's family, a description of the house, other residents, and available activities. *See* PPI X 1578 at 17 (Sawyer Report); Diase Dep. 174:23-175:25, Nov. 1, 2017; du Pree Dep.143:11-144:7, Feb. 6, 2018.

246

0740.  Ms. Turner agrees that individuals with IDD should be able to make an informed choice about where to live, that providing information in a manner that they can understand is helpful to making an informed choice, that providing experiences in the community is helpful to making an informed choice, and that providing visits to community providers is helpful to making an informed choice where to live.  Trial Tr. 3808:4-22, Nov. 9, 2018 (Turner).

0741.  The State legislature has called for HHSC to improve individuals' access to services and supports by ensuring individuals receive information about all available programs and services, including employment and least restrictive housing assistance and educating individuals on how to apply for the programs and services. PPI X 1772 at 7 (2016 Annual Report on Implementation of Acute and Long-Term Services and Supports, setting out goals for acute care services and long-term services and supports for people with IDD); *see* PPI X 1562 at 9 (2015 Annual Report on Implementation of Acute and Long-Term Services and Supports Systems Redesign for Individuals with Intellectual and Developmental Disabilities, noting the same goal, as well as goals of reducing unnecessary institutionalization and promoting person-centered planning and community inclusion).

    4.      Informed choice requires individualized information about the community settings that meet the individual's particular needs and preferences

0742.  State officials acknowledge that the CLO process should be individualized and address a person's needs and preferences. Trial Tr. 2867:6-12, 2870:3-5, Nov. 2, 2018 (Southall) (testifying that it is important for service coordinator to understand how to communicate with individuals and to learn about their concerns); Turner Dep. 165:5-166:20, Feb. 23, 2018; Bishop Dep. 86:8-13, 189:3-8, Mar. 13, 2018.

0743.  Person-centered planning is a planning process for people with IDD that ensures the person is at the center of the process. It is a generally accepted standard in the IDD field across the United States. Trial Tr. 2036:18-21, Oct. 25, 2018 (Wehmeyer). Person-centered planning is an ongoing

process that enables the discovery, directly from the person, about what is important to the person. Trial Tr. 1741:15-1742:18, Oct. 24, 2018 (Charlot); Trial Tr. 2151:19-2152:4, Oct. 26, 2018 (Sawyer); PPI X 777 at 11 (Charlot Report); *see* PPI X 36 at 8 (HHSC's Instructor Guide for Introduction to Person-Centered Planning, defining person-centered planning as a tool to identify a person's skills, preferences, and needs). This information includes where the person wants to live. PPI X 1578 at 17 (Sawyer Report); PPI X 1 at 9 ("An effective residential support team works together with the individual, to determine what is best for the individual using person-centered planning. . . . Most critically, the person with a disability and their family should be at the center of the planning process and have control over that process."); Bishop Dep. 86:21-87:13, Mar. 13, 2018.

0744.   HHSC acknowledges that person-centered planning is a federal requirement for individuals with IDD. Bishop Dep. 46:6-20, 116:23-117:20, Mar. 13, 2018; *see* PPI X 34 at 10-11 (HHS Introduction to Person-Centered Planning power point, explaining that "(CMS) now requires person-centered planning and services for Medicaid Home and Community-Based Service programs (HCBS), intermediate care facilities (ICF), nursing homes, Community First Choice (CFC) services, and home health services"); *see also* PPI X 34 at 22 (noting that people living in nursing homes are among those who can benefit from person-centered planning).

0745.   State law also requires that HHSC use person-centered planning. PPI X 185 at 20 (November 2015 System Redesign Report); Bishop Dep. 119:24-120:4, Mar. 13, 2018 (describing State statute on person-centered planning).

0746.   HHSC requires that LIDDA service coordinators be trained on person-centered planning and use person-centered planning to develop plans of services and supports for people receiving service coordination. 40 Tex. Admin. Code § 2.556(a) (requiring LIDDAs to use person-directed planning), *transferred to* 26 Tex. Admin. Code § 331.11; 40 Tex. Admin. Code § 2.560(b)(2) (describing person-centered service planning training requirements for LIDDA service coordinators), *transferred*

*to* 26 Tex. Admin. Code § 331.19); PPI X 35 at 5-6, 14 (email attaching a copy of State Senate Bill 7, directing HHSC to develop acute and long-term care services for people with IDD that promote "[p]erson-centered planning, self-direction, self-determination, community inclusion and customized integrated competitive employment."); Bishop Dep. 123:15-124:10, Mar. 13, 2018.

0747.   Additionally, HHSC has acknowledged that person-centered processes are to be "required and monitored as to the implementation and use of person-centered needs assessment, service planning and service coordination policies and protocols that encourage self-determination and provide opportunities for self-direction of services." PPI X 185 at 20 (November 2015 System Redesign Report).

0748.   HHSC's person-directed planning approach includes helping individuals to understand the services that would enable them to live successfully in the community. Jalomo 30(b)(6) Dep. 95:9-22, Nov. 2, 2017; *see* Bishop Dep. 116:19-22, Mar. 3, 2018 (explaining that HHSC and DADS use "person-centered" and "person-directed" planning to describe the same process).

0749.   According to HHSC representatives, LIDDA staff and others having the CLO discussion with an individual with IDD in a nursing facility should be aware of the setting the individual was living in before he or she came to the nursing facility. Jalomo 30(b)(6) Dep. 93:20-94:3, Nov. 2, 2017. If the person was previously in a community setting, the LIDDA staff should seek to learn what worked and did not work for the person in that setting and what would be needed for the person to return to that setting. Jalomo 30(b)(6) Dep. 94:4-11, Nov. 2, 2017.

     5.     The State does not regularly provide opportunities to visit community providers or tour community settings

0750.   HHSC's LIDDA Performance Contract requires facilitation of visits to community programs where appropriate and addressing concerns about community living with the service planning team. PPI X 535 at 6; Jalomo 30(b)(6) Dep. 144:12-145:6, Nov. 2, 2017. Other than the State

Administrative Code and Attachment G of the LIDDA Performance Contract, no other additional policies or procedures about this requirement exist. Southall 30(b)(6) Dep. 278:5-19, Oct. 4, 2017.

0751.   HHSC officials acknowledge that it is always appropriate to facilitate visits to community programs unless individuals or their LARs already know where they want to move. Southall 30(b)(6) Dep. 167:12-17, Oct. 4, 2017. Such visits should be offered even if individuals have not expressed an interest in moving to the community. Southall 30(b)(6) Dep. 168:12-17, 233:9-234:5, 288:20-289:2, Oct. 4, 2017; Turner Dep. 179:15-19, 180:6-16, Feb. 23, 2018; *see* Bishop Dep. 36:1-6, 84:5-18, Mar. 13, 2018 (acknowledging that taking people into community to visit potential residential settings facilitates choice process).

0752.   However, LIDDAs do not provide regular visits to community programs and providers. PPI X 1906 at 42 (Weston Report); PPI X 1762 at 34 (Webster Report) (service coordinators "rarely employed a variety of the proven decision-making aids – many of which are listed in Texas' own policies – that are practical, real, or provide actual experiences to help an individual with I/DD understand their options, such as . . . tours of residential services and community programs"); *see* Trial Tr. 3594:24-3595:6, 3603:19-23, Nov. 8, 2018 (Phillips) (Team leader of the Harris Center testified that "there's a neighboring county that conduct[s] tours of actual homes" although the Harris Center is one of the largest LIDDAs in the State).

0753.   If visits occur, it is only for individuals who have already expressed an interest in transitioning to the community. Trial Tr. 3552:22-3553:9, Nov. 8, 2018 (Thompson).

0754.   HHSC's failure to provide community exploratory activities unless an individual has expressed an interest in transition does not take into consideration the possibility that individuals with IDD who have been in nursing facilities for years may have become accustomed to isolated and segregated lifestyles and fearful of being abused, neglected, or otherwise mistreated if placed in the larger community. Trial Tr. 2150:7-2151:4; 2152:11-22, Oct. 26, 2018 (Sawyer); PPI X 1578 at 39

(Sawyer Report).

0755.    The client review found that only one person or their guardian out of fifty-four people reviewed had visited community living or support providers. PPI X 422 at 3 (aggregate findings from client review).

0756.    None of the sixteen individuals Ms. Russo reviewed had visited a community provider. Trial Tr. 1639:25-1640:2, Oct. 23, 2018 (Russo). No individuals Ms. Pilarcik reviewed had an overnight visit to a provider. Trial Tr. 543:3-7, Oct. 17, 2018 (Pilarcik). None of the individuals Dr. Charlot reviewed had been provided a visit to a community setting. Trial Tr. 1767:5-9, Oct. 24, 2018 (Charlot); PPI X 777 at 16 (Charlot Report).

0757.    Only one of the twenty individuals Ms. Pilarcik reviewed had visited a community provider. For that one individual, DP, the visit led him to consider moving to the community after decades in a segregated setting. He stated, "I like this house, but I want to look at other houses." But six months later, a second visit still had not occurred. Trial Tr. 817:3-19, Oct. 18, 2018 (Pilarcik).

0758.    JM rarely leaves the nursing facility, has not toured any community programs, and does not interact with people other than staff or other nursing facility residents. He has no remotely recent experiential knowledge of community services since his admission to a nursing facility in 2005. Therefore, JM has not been provided adequate information and opportunities to make an informed choice to remain in the nursing facility. PPI X 1280 at 60 (Pilarcik Report).

0759.    MH's service coordinator acknowledged that it would be helpful to offer MH and his mother the opportunity to visit a group home. Although she thought MH would enjoy visiting community homes, the service coordinator stated that the LIDDA staff do not take clients on visits to community homes or day programs. The LIDDA also noted that its experiences with nursing facilities have revealed that the nursing facilities do not, as a rule, provide transportation for their residents to participate in day programs, visit providers, or community events. PPI X 1400 at 48 (Russo Report).

0760.  Lack of transportation is a barrier to facilitating community visits. *See, e.g.,* Trial Tr. 3653:17-25, Nov. 8, 2018 (Terbush) (the Betty Hardwick LIDDA does not have the capability to transport people in wheelchairs to tour community-based settings, and must rely on a provider or nursing facility to do so). Neither the LIDDA nor the nursing facility is reimbursed for the cost of transportation related to participating in community activities or visiting a community provider unless the individual is receiving Independent Living Skills Training (ILST). As noted previously, this is a LIDDA specialized service that is rarely recommended.

6.    The State does not provide people with IDD in nursing facilities with opportunities to engage in the community, either through LIDDA specialized services or other means

0761.  "LIDDAs fail to provide specialized services and other opportunities to learn about and participate in community activities for most nursing facility residents." Trial Tr. 1511:8-24, Oct. 23, 2018 (Weston); PPI X 672; PPI X 1906 at 40(Weston Report).

0762.  Of the sixteen individuals Ms. Russo reviewed in the client review, eight were recommended for Alternate Placement Services, but none was receiving Alternate Placement Services or had an ISP that discussed transition options at the time of her review. Trial Tr. 1633:9-20, Oct. 23, 2018 (Russo).

0763.  Dr. Charlot testified that the individuals she reviewed seldom were able to leave the nursing facility, and when they did, it would be a non-individualized group trip. She also reported that almost none were receiving ILST, which would have enabled them to experience life in the community and learn community living skills. Trial Tr. 1767:10-24, Oct. 24, 2018 (Charlot); PPI X 777 at 16 (Charlot Report).

0764.  For example, PO is a 58 year old man diagnosed with moderate intellectual disabilities, general paresis, Major Depressive Disorder, and several serious medical conditions who resides in a nursing facility. Because of his disabilities, PO cannot walk and therefore uses a wheelchair.

Although PO could benefit from specialized services including ILST, PO did not receive these specialized services because the LIDDA responsible for providing with him services did not have an ILST provider with a wheelchair accessible van. PPI X 777 at 71-74 (Charlot Report).

0765.  In another instance, Dr. Charlot reviewed BT, a 53 year old man who has significant congenital motor symptoms, intellectual disability, and a diagnosis of Cerebral Palsy who resides in a nursing facility. Because of his disabilities, BT cannot walk and therefore uses a wheelchair. BT needs specialized services, including ILST and Day Habilitation services. BT was recommended to receive ILST so he could experience going to the movies, but has not been provided these specialized services because there is no provider available who has a wheelchair accessible van. Instead, his team took the ILST service out of his service plan. BT also has not been provided with Day Habilitation services because no provider has been identified to meet his needs. Trial Tr. 1753:8-22, Oct. 24, 2018 (Charlot); PPI X 777 at 28-32 (Charlot Report).

0766.  Lastly, after experiencing decades of trauma living in an old schoolhouse and working at a turkey farm in Iowa, and then being transferred to a nursing facility in west Texas, named plaintiff Mr. Kent spent years isolated in a nursing facility with no specialized services. After he became a named plaintiff and Disability Rights Texas assisted him, he began receiving ILST and had regular exposure to the community, received ongoing individualized opportunities to explore community living options, and toured two different group homes. Through these services, he gained an understanding of the community and eventually chose to transition to the community. Ms. Pilarcik explained that Mr. Kent provides a clear example of the individualized and ongoing support necessary to help individuals with IDD make informed choices about living options. Trial Tr. 4199:21-4205:15, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 43-46 (Pilarcik Rebuttal Report).

7.    The State does not provide educational opportunities to individuals with IDD in nursing facilities, such as provider fairs, peer-to-peer meetings, or family-to-family meetings, which would help them learn more about community living

0767.    Peer-to-peer and family-to-family programs are invaluable in helping people with IDD in nursing facilities make informed choices about where to live. PPI X 1906 at 19-20 (Weston Report); Jalomo 30(b)(6) Dep. 154:12-21, Nov. 2, 2017; Bishop Dep. 178:4-179:2, Mar. 13, 2018; *see* Adkins Dep. 29:7-12, Oct. 30, 2018 (nursing facility resident testifying that it would have been helpful to speak with someone who had needs similar to his who was living outside of a nursing home).

0768.    LIDDAs are required to report the educational opportunities offered to individuals with IDD and their LARs regarding community living options. As noted above, such opportunities must be offered at least semi-annually to comply with the Performance Contract.

0769.    However, at the Harris Center, which was serving more than 200 individuals with IDD in nursing facilities during the relevant period, no individuals or LARs were reported as attending educational opportunities during the first or third quarters of Fiscal Year 2017. Trial Tr. 3614:17-3615:21, 3617:25-3618:21, Nov. 8, 2018 (Phillips). Just two LARs and zero residents attended the LIDDA's presentation in the second quarter of Fiscal Year 2017. Trial Tr. 3617:2-24, Nov. 8, 2018 (Phillips).

0770.    Although HHSC requires LIDDAs to provide information about educational activities, no one within HHSC's CAO office or the IDD Services Unit is responsible for tracking whether LIDDAs have failed to provide educational opportunities and CAO does not take follow up action about educational opportunities. Trial Tr. 2893:11-2894:3, Nov. 2, 2018 (Southall).

0771.    The data reported shows that in each of the first three quarters in Fiscal Year 2017, LIDDAs reported that fewer than seventeen percent of individuals with IDD in nursing facilities participated in these educational activities. PPI X 1906 at 41-42 (Weston Report); PPI X 270, 434, 435 (Statewide LIDDA Quarterly Reports for FY17 Quarters 1-3); *compare* PPI X 270 at tab 2 (the total

number of nursing facility residents statewide is 3,206), *with* PPI X 270 at tab 4 (the total number of residents who attended the educational opportunities is 439); *see also* Trial Tr. 1262:23-1264:11, Oct. 22, 2018 (Webster) (testifying about his review of the LIDDA quarterly reports and the "very low participation" in educational opportunities). While some of these individuals participated in activities such as tours, peer-to-peer discussions, or family-to-family discussions, many attended group presentations. *See generally* PPI X 270, 434, 435 (Statewide LIDDA Quarterly Reports for FY17 Quarters 1-3); PPI X 259-262 (Statewide LIDDA Quarterly Reports for FY16) at tab 4.

0772.   Few family sessions were reported in LIDDAs' quarterly reports. *See* PPI X 259-A at tab 2; PPI X 260-A at tab 2; PPI X 261-A at tab 2; PPI X 262-A at tab 2 ; PPI X 270-A at tab 2; PPI X 434-A at tab 2 ; PPI X 435-A at tab 2; PPI X 1578 at 55 (Sawyer Report); *see also* Trial Tr. 2162:15-2163:1, Oct. 26, 2018 (Sawyer).

0773.   The QSR also reflects this performance. Outcome Measure 2-6 measures whether, at least semi-annually, LIDDAs offer individuals and their LARs education and information about community options "that explain the benefits of community living, address their concerns about community living, and that assist them to make informed choices about whether to move to the community. This information is provided by people knowledgeable about community supports and services and may include opportunities for individuals to visit community programs and talk to individuals with I/DD living in the community and their families." In 2015, compliance with this measure for the Transition and Nursing Home Populations was only fifteen percent; in 2016, the number was twenty-one percent. In 2017, through September 1, 2017, this number dropped to sixteen percent for the Transition and Nursing Home Populations and, for the Nursing Home Population, was also just sixteen percent. Thus, in 2017, eighty-four percent of nursing facility residents did not receive adequate information and education about living options in the community. PPI X 318 at 14; PPI X 254 at 8; PPI X 253 at 5; PPI X 1762 at 35 (Webster Report).

0774.   Only twenty-one percent of the nursing facility residents surveyed in the 2016 QSR received any education from LIDDAs apart from the CLO. du Pree Dep. 257:5-258:6, Feb. 6, 2018.

0775.   The client review similarly found an absence of educational activities about community living.

0776.   No individuals Ms. Pilarcik reviewed had seen a video describing community options. Trial Tr. 543:20-23, Oct. 17, 2018 (Pilarcik).

0777.   No individuals Ms. Pilarcik reviewed had a peer-to-peer discussion, family-to-family discussion, or had an opportunity to meet with or learn from a peer who had successfully moved to the community or a family member of an individual who had successfully moved to the community. Trial Tr. 543:8-16, Oct. 17, 2018 (Pilarcik).

0778.   Dr. Coleman's review yielded similar results.  DBr, for example, had no opportunity to speak with individuals who had transitioned out of nursing facilities, and her mother had no opportunity to speak with individuals whose family members had transitioned out. Trial Tr. 891:24-892:6, Oct. 18, 2018 (Coleman); PPI X 802 at 13 (Coleman Report).

0779.   Nursing facility residents who testified at trial likewise have not been offered the opportunity to speak with a peer who was living outside the nursing home. Adkins Dep. 29:3-12, Oct. 30, 2018 (testifying that even after expressing an interest in moving, he did not have the chance to speak with a peer who was living outside the nursing home); Trial Tr. 2064:12-15, Oct. 25, 2018 (Meisel) (Q: "Has anyone ever offered to connect you with someone else similar to you who has moved into the community?" A: "No. I do believe that that would have made a difference as well.").

0780.   No individuals Ms. Pilarcik reviewed attended community living option fairs or provider meetings. Trial Tr. 543:17-19, Oct. 17, 2018 (Pilarcik).

0781.   The State's community service providers testified that they have not heard of, been invited to, or participated in provider fairs at nursing facilities or provider fairs where individuals from

nursing facilities attend. Trial Tr. 364:14-17, Oct. 16, 2018 (Carrasco) (testimony from community services provider in Lubbock that, while she has participated in provider fairs involving individuals who are leaving a State Supported Living Center, she has not been invited to participate at a provider fair for individuals transitioning from nursing facilities); Trial Tr. 1127:1-1128:2, Oct. 19, 2018 (Preskey) (testimony from community services provider in the Dallas Fort Worth region that, while she has participated in provider fairs at various locations including State Supported Living Centers, she had not been invited to and had never heard about a provider fair targeted at individuals in nursing facilities, and to her knowledge she had never met an individual in a nursing facility or their guardian at a provider fair); Trial Tr. 2087:21-2089:18, Oct. 25, 2018 (Rideout) (testimony from community services provider in the San Antonio area that although she has attended provider fairs organized by LIDDAs or state schools, she has never attended a provider fair at a nursing facility, is not aware of any provider fairs at nursing facilities, has never been invited to come to a nursing facility to speak with people with IDD or their families about community options, and has never spoken to a person with IDD who lives in a nursing facility at the provider fairs she has attended); Jennings Dep. 27:16-25, Oct. 29, 2018 (testimony from community services provider in the Dallas Fort Worth region).

0782.   The State's community service providers have not been invited to or participated in other educational opportunities focused on individuals in nursing facilities, despite the State's use of these opportunities for other populations of individuals with IDD. Trial Tr. 364:18-365:9, Oct. 16, 2018 (Carrasco) (describing inclusion tours, where individuals at the Lubbock State Supported Living Center will "come out and tour different homes from providers in the community," and testifying that the provider agency had not been invited to participate in inclusion tours for individuals with IDD transitioning from nursing facilities); Trial Tr. 2086:13-2087:6, Oct. 25, 2018 (Rideout) (testifying that no one with IDD who is living in a nursing facility, nor their family members, has

toured any of Reaching Maximum Independence's homes or programs or participated in its Day Habilitation program).

        8.     The State's CLO process is neither individualized for people with IDD in nursing facilities, nor tailored to their ability to understand and to their cognitive and other disabilities

0783.  The CLO process that HHSC requires and LIDDAs implement is often ineffective in promoting and supporting transition to the community. Trial Tr. 1507:8-19, Oct. 23, 2018 (Weston); PPI X 1906 at 41-42 (Weston Report).

0784.  Standard pamphlets provided to individuals and LARs include information regarding available community options. However, this information does not provide individualized and concrete examples tailored to the individual's needs or preferences, does not use person-first and user-friendly language, and is inadequate for most individuals with IDD to make informed choices about whether to move from a nursing facility to the community. Trial Tr. 1510:21-1511:24, 1524:7-1525:5, Oct. 23, 2018 (Weston); Trial Tr. 533:4-19, Oct. 17, 2018 (Pilarcik) (the pamphlet is not sufficient for individuals with IDD or their guardians to make an informed choice); *see* PPI X 267 (CLO Pamphlet); *see also* PPI X 242 (five-page "workbook" that is the State's "Community Living Options Information Process for Nursing Facility Residents"); PPI X 243 (four-page document that is the State's "Community Living Options Information Process for Legally Authorized Representatives of Residents in Nursing Facilities").

0785.  It is clearly insufficient to provide an individual with IDD the CLO brochure, but not an individualized description of community services and supports, and then ask the individual if he or she wants to live in a nursing facility or the community. Schultz Dep. 141:13-20, Dec. 18, 2017; *see* Trial Tr. 1951:20-1952:12, Oct. 24, 2018 (Wehmeyer) (testifying that asking a person with IDD living in a nursing facility to choose where to live based on a generic brochure is not enough).

0786.  Nursing facility residents with IDD testified about the inadequacy of the CLO process and

information about the community their service coordinators provided. Adkins Dep. 25:8-29:12, 31:11-25, Oct. 30, 2018 (nursing facility resident testifying that information provided about community living options was not detailed or tailored to his needs and preferences); Trial Tr. 2058:5-8; Oct. 25, 2018 (Meisel) ("Q. What information did they provide you about other places to live? A. I don't think that was very sufficient because I don't remember getting much of anything." Trial Tr. 2058:15-23, 2067:12-14; Oct. 25, 2018 (Meisel) (testimony that service coordinators had not included her family in discussions about community living options though her mother could have benefitted from more information about community options); Trial Tr. 3774:18-23, 2058:24-2059:2, Oct. 25, 2018 (Meisel) ("Q. Do you think your service coordinators have been a helpful source of information for learning about places that you could live? A. No, just about group homes.").

0787.   In interviews,  LIDDA staff reported that CLO conversations often focused on the nursing facility and began with "Are you happy here?" or "Can we get you anything to make your life in the nursing facility more comfortable?" or other similar superficial, routine, or suggestive questions that are not likely to inspire meaningful dialogue about transition. PPI X 1762 at 34 (Webster Report); *see* Trial Tr. 1257:7-13, Oct. 22, 2018 (Webster). However, HHSC officials admit that if someone with IDD says that they "like" or are "happy" living in a nursing facility, it does not mean that the person is opposed to living in the community. Bishop Dep. 197:7-11, Mar. 13, 2018.

0788.   Further, Dr. Wehmeyer testified that asking a binary question like "Do you want to live in a nursing facility or live somewhere else" before providing a person with community experiences or concrete planning is not an effective approach. Trial Tr. 1951:1-19, Oct. 24, 2018 (Wehmeyer).

0789.   CLO "conversations do not consistently address the communication and communication processing needs of some individuals with IDD" to have "a full understanding of community options." PPI X 1906 at 41 (Weston Report).

0790.   According to Plaintiffs' and the United States' experts, HHSC's consultant, an HHSC

official, individuals with IDD, and LIDDA staff, the length of CLO discussions are consistently short, often ranging in time from two to ten minutes, or occasionally up to fifteen or twenty minutes. Trial Tr. 526:11-527:4, 539:12-540:2, Oct. 17, 2018 (Pilarcik); Trial Tr. 147:23-148:17, Oct. 15, 2018 (du Pree); Trial Tr. 270:2-7, Oct. 16, 2018 (du Pree); Trial Tr. 3769:10-14, Nov. 9, 2018 (Turner); Trial Tr. 1153:12-23, Oct. 19, 2018 (Phetsavong) (legal guardian for named plaintiff testified the LIDDA spent "maybe three to five minutes" explaining various community living options and that she did not understand options); Trial Tr. 2058:11-14, Oct. 25, 2018 (Meisel) (testifying that her service coordinators came monthly for half an hour, and about ten minutes of that discussion was spent asking her about group homes); Trial Tr. 3657:14-18, Nov. 8, 2018 (Terbush).

0791.   Plaintiffs' and the United States' expert Mr. Neupert prepared a distribution of the duration of CLO encounters for Fiscal Year 2017 by six-minute increments. The summary was based on data available to him from the State's MBOW Encounter PASRR table. Trial Tr. 315:25-316:8, Oct. 16, 2018 (Neupert); *see* PPI X 665; PPI X 778 at 5 (document prepared by HHSC staff for a 30(b)(6) deposition, including a description of MBOW database).

0792.   Based on the State's MBOW data for Fiscal Year 2017, 26.8 % of total CLO encounters were less than six minutes long, 31 % were between six and twelve minutes long, and 26.4 % were between twelve and eighteen minutes long. A total of 84.2 % of CLO encounters were less than eighteen minutes long. PPI X 665.

0793.   Individuals who could not read or were blind nonetheless were provided written brochures during their CLO meetings. Trial Tr. 508:19-21, Oct. 17, 2018 (Pilarcik); Trial Tr. 1632:22-1633:2, Oct. 23, 2018 (Russo); Trial Tr. 1748:14-1749:7, Oct. 24, 2018 (Charlot). Service coordinators acknowledged that individuals did not understand the information provided. Trial Tr. 1748:14-1749:7, Oct. 24, 2018 (Charlot); PPI X 1400 at 17, 48 (Russo Report).

0794.   For example, according to RM's service coordinator's notes, RM did not appear to

understand a brief, approximately five-minute review of RM's Community Living Options. RM repeatedly was left with standardized written materials that he is unable to read or comprehend about his options for community living. Although his Service Coordinator notes that RM likely does not understand his community options and that RM is "unable to communicate where he would like to reside," the presentation of information was not tailored to his unique communication style and cognitive abilities. PPI X 1400 at 17 (Russo Report).

0795.   QSR Outcome Measures 2-6 and 2-7 assess whether semi-annual CLO discussions about community options have occurred and whether the CLO process presents a range of community alternatives, facilitates visits to community programs, and addresses concerns about community living to "better enable [individuals] to make an informed decision." Outcome Measures also assess whether people knowledgeable about community supports and services provide information, whether the benefits of community living are explained, and whether concerns about community living have been addressed to help individuals make informed choices about whether to move. PPI X 114 at 21 (Outcome Measures 2-6 and 2-7).

0796.   QSR Outcome Measure 2-7 evaluates compliance with the CLO process. Specifically, it evaluates whether, "upon admission to a [nursing facility] and at least semi-annually, the [service coordinator] will provide each individual and LAR information about community services and supports. The [service coordinator] will discuss this information with the individual and the LAR to better enable them to make an informed decision about moving to the community. The [service coordinator] discusses a range of community options and alternatives, facilitates visits to community programs, and addresses concerns about community living. The [service coordinator] will use the CLO process designed by the State to provide this community educational material." Performance on this Outcome Measure for the Nursing Facility and Transition Populations was forty-eight percent in 2015, fifty-one percent in 2016, and fifty-eight percent in 2017. For the Nursing Facility

Population alone in 2017, performance was also fifty-eight percent. PPI X 318 at 15; PPI X 254 at 8; PPI X 253 at 5; PPI X 320 at 10 (Indicator 72).

0797.   Monthly meetings with service coordinators are similarly brief and superficial. *See* Adkins Dep. 21:6-23, 25:8-22, Oct. 30, 2018 (describing meetings with service coordinator); Adkins Dep. 40:3-6, Oct. 30, 2018 (service coordinator's work to try to move nursing facility resident into community "very minimal," if existent).

0798.   According to HHSC policy, the PE is supposed to be a means to address community living options prior to admission. However, for ninety-seven percent of admissions of people with IDD to nursing facilities, the PE is not completed until after admission. HHSC has created a PASRR system that mostly eliminates pre-admission PEs, thereby eliminating the opportunity for pre-admission community living option information. Trial Tr. 3506:5-10, Nov. 2, 2018 (Blevins); PPI X 585 at 8-9.

0799.   If the State improved its CLO process by ensuring and monitoring that individuals and/or their LARs have all of the information and direct experiences that they need prior to deciding whether to leave the nursing facility with supports and services, including requiring opportunities to visit community placements, participate in community activities, attend provider fairs, and meet with other individuals with IDD who have transitioned to the community and their families to learn more about the transition process and living in the community, the State would significantly increase transitions to the community for individuals with IDD in nursing facilities. PPI X 1578 at 40 (Sawyer Report).

9.    The State's transition planning and service planning are not based on a discovery process, are not person-centered, and are not tailored to people with IDD's ability to understand and to their cognitive and other disabilities

a.    Transition planning and service planning should be ongoing, person-centered, and conducted for all individuals in an institution.

0800.   Federal PASRR regulations require ongoing evaluations to determine whether people with

IDD continue to need nursing facility level of service as well as comprehensive assessments that are fundamental to determining appropriate alternative placement and long-term supports and services. These evaluations and assessments are necessary for effective transition planning. PPI X 1906 at 20-21 (Weston Report).

0801.   "Professional standards and practice require transition planning for all individuals in an institutional setting that describes in some detail the location, living arrangement, services and supports, and preferred activities that allow the individual to live safely and productively in the community. This detailed description of what life in the community would look like is essential for the individual to make an informed and meaningful choice about community living." PPI X 1762 at 18 (Webster Report). The proactive arrangement of concrete services and supports to meet an individual's identified needs also provides a greater opportunity for long-term success in the community. PPI X 1906 at 21 (Weston Report); PPI X 1762 at 17 (Webster Report); *see* Trial Tr. 1248:5-15, Oct. 22, 2018 (Webster) (transition planning "should entail careful considerations of all the person's needs").

0802.   A transition plan should be developed for every individual at the time of admission. An ISP should include information about transition for every individual, even if an individual has not specifically indicated that she wants to leave. Trial Tr. 488:6-15, 488:24-489:6, Oct. 17, 2018 (Pilarcik); Trial Tr. 1607:12-15; Oct. 23, 2018 (Russo); Trial Tr. 870:10-872:7, Oct. 18, 2018 (Coleman); PPI X 802 at 10 (Coleman Report) ("All individuals in nursing facilities should have a transition plan in their ISP to ensure they are able to adequately consider community whenever they choose, even if they are not actively transitioning at the time."); PPI X 1762 at 12 (Webster Report) (noting importance of beginning transition planning process soon after nursing facility admission).

0803.   The LIDDA Performance Contract with HHSC reflects the importance of beginning the transition planning process soon after admission to a nursing facility because it requires that within

forty-five to seventy-five calendar days of admission, the Diversion Coordinator must review individuals admitted into a nursing facility to determine whether community living options, services, and supports that could provide an alternative to ongoing nursing facility placement have been explored. If not, the Diversion Coordinator must refer the individual to the Service Coordinator, who must explore those options. PPI X 535 at 3-4 (February 2017 Amendment to LIDDA Performance Contract Attachment G).

0804.   Even if people with IDD who live in nursing facilities do not affirmatively say that they want to live in the community when asked about living options, the services and supports that they would need to live in the community should be included in their service plan to identify what is important for them. *See* Trial Tr. 870:10-872:7, Oct. 18, 2018 (Coleman); PPI X 802 at 10 (Coleman Report); Bishop Dep. 197:22-198:8, Mar. 13, 2018.

0805.   Ms. Turner recognizes that developing transition plans for people who have not yet affirmatively chosen to live in the community is an effective way to understand what living in the community would look like and to make an informed choice about whether to stay in a nursing facility. Turner Dep. 195:5-196:14, 197:24-199:18, Feb. 23, 2018.

0806.   If an ISP meeting did not include a description of what the community might look like for that person, that indicates that the person had not made an informed choice to refuse transition. du Pree Dep. 144:19-25, Feb. 6, 2018. Likewise, if a person with IDD in a nursing facility declined a particular community placement because it did not meet the person's preference, that does not indicate that the person has made an informed choice to oppose community placement. du Pree Dep.145:1-7, Feb. 6, 2018.

0807.   Effective transition from nursing facilities requires a continuous service and transition planning process. Bishop Dep. 87:1-13, Mar. 13, 2018 (testifying that figuring out where people with IDD want to live, including learning about what is important to people, is part of an ongoing

process); PPI X 1906 at 21(Weston Report); *see* PPI X 280 (Person-Directed Plan form).

0808.   Continuous service and transition planning encourages sustained relationships with existing service providers, family members, and important community connections, which help to prevent long-term institutionalization. PPI X 1906 at 21 (Weston Report).

0809.   Person-centered service and transition planning should focus on the individual's barriers to community living and the team's efforts to address those barriers, including any concerns of the individual or family members tied to prior community placements. Trial Tr. 2151:20-2152:4, Oct. 26, 2018 (Sawyer); PPI X 1578 at 18 (Sawyer Report).

0810.   The transition plan must take into account language, learning style, cultural sensitivities, and actual opportunities to explore new experiences in the community. PPI X 1906 at 19 (Weston Report). An effective transition plan should incorporate "meaningful community opportunities, in accordance with a person's assessed needs and life vision. Community opportunities should be provided at a pace that allows for a period of adjustment to the community and a period of successful community experiences." PPI X 1906 at 40 (Weston Report).

0811.   HHSC resources and guidelines recognize the importance of person-centered planning in service planning. PPI X 28 (article posted on HHSC's website describing HHSC's commitment to person-centered planning and that person-centered planning is required for people receiving waiver services and in nursing homes); PPI X 36 (HHSC's Instructor Guide for Person-Centered Planning, which sets out the person-centered planning process and relevant federal regulations); PPI X 41 at 7 (HHS webinar providing an overview of person-centered practices and noting that the State's Senate Bill 7 "directs HHSC & DADS to promote integrated person-centered planning & person-centered services").

      b.      Service planning in Texas is inadequate and not person-centered

0812.   An ISP is the plan that reflects the services that are necessary to meet an individual's needs.

Trial Tr. 140:16-141:4, Oct. 15, 2018 (du Pree). ISPs should also incorporate individuals' desires and visions for their lives. Trial Tr. 2151:20-2152:4, Oct. 26, 2018 (Sawyer).

0813.   In Texas, the service plans for individuals with IDD in nursing facilities often do not meet professional expectations or HHSC's own requirements for adequate transition planning and are not person-centered. PPI X 422 at 2 (finding number four from Plaintiffs' and the United States' aggregate client review, concluding that only one of fifty-four people reviewed had a professionally appropriate ISP); PPI X 253 at 3 (2017 QSR Results noting a score of thirty-two percent on Outcome 6, which measures whether "[i]ndividuals in the Target Population will have a service plan developed by an interdisciplinary service planning team through a person-centered process that identifies the services and supports necessary to meet the individual's appropriately-identified needs, achieve the desired outcomes, and maximize the person's ability to live successfully in the most integrated setting consistent with their informed choice").

0814.   For example, the ISP of one individual the Harris Center LIDDA serves stated that although she would like to live on her own, at that time she wanted to remain in the nursing facility due to her health, until she could walk on her own. Trial Tr. 3626:17-3628:9, Nov. 8, 2018 (Phillips). Yet her specialized services form, completed the same day as her ISP, lists no recommendations for specialized services, including Physical Therapy, that might help the individual with her walking. Trial Tr. 3628:12-3630:9, Nov. 8, 2018 (Phillips).

0815.   QSR Outcome Measure 3-8 evaluates whether "[t]he individual [with IDD living in a nursing facility (NF)] has an ISP that includes all of the services and supports, including integrated day activities, he/she needs to achieve his/her goals, maximize his/her potential, and participate in community activities. The NF member receives all of the specialized services identified in the ISP, including alternative placement assistance and opportunities to learn about community options such as opportunities to visit community programs, in the frequency, intensity, and duration specified in

the ISP. The SPT monitors the provision of all specialized services." PPI X 1578 at 49. Compliance with QSR Outcome Measure 3-8 for the Nursing Facility and Transition Target Populations dropped from nineteen percent in 2015 to twelve percent in 2016 and 2017, and for the Nursing Facility Population alone in 2017 it was thirteen percent. PPI X 318 at 17; PPI X 253 at 6; PPI X 254 at 8; PPI X 1578 at 49-50 (Sawyer Report).

0816.   Many ISPs lacked historical information, making it impossible for a service coordinator or nursing facility social worker to know where the person previously lived, what precipitated the nursing facility admission, and what barriers had to be addressed for the person to successfully transition to the community. Trial Tr. 519:17-22, 522:10-25, Oct. 17, 2018 (Pilarcik).

0817.   For example, CB's records contained no information regarding his previous residential placements. "Neither the service coordinator nor the nursing facility staff were knowledgeable regarding his prior placements or community homes, even though this information is vital for his service coordinator to fully understand his community experiences. CB's sister visits every week and could likely provide this information, if asked." PPI X 1280 at 23.

0818.   Records for a different CB, who Dr. Charlot reviewed, also lacked essential historical information, such as how he came to live in the nursing facility and why both feet were amputated. Dr. Charlot learned this information by simply calling CB's uncle. Trial Tr. 1747:5-1748:4, Oct. 24, 2018 (Charlot).

0819.   ISPs do not reliably indicate interest in transition. The client reviewers' conversations with individuals and their guardians often contradicted the preference recorded in their ISPs. Even when service coordinators had recorded an individual's interest in the community elsewhere in their record, the relevant section in the ISP seldom reflected this interest. Trial Tr. 523:11-19, Oct. 17, 2018 (Pilarcik); Trial Tr. 877:4-11, 883:5-16, Oct. 18, 2018 (Coleman) (BL's most recent ISP was from October 2014 and stated that he wanted to remain in the nursing facility although he indicated

to Dr. Coleman that he wanted to leave).

      c.    Under HHSC's policies and practices, transition planning does not occur for all nursing facility residents with IDD

0820.   HHSC's policies and procedures do not allow individuals to make an informed choice whether to transition from the nursing facility because they usually are not provided with important information, including community exploratory activities, until they decide that they want to transition to the community. Trial Tr. 2152:11-22, Oct. 26, 2018 (Sawyer); PPI X 1578 at 39-40 (Sawyer Report).

0821.   HHSC does not actively pursue transition of individuals with IDD in nursing facilities to the community and does not sufficiently implement the goal of community living for individuals with IDD in nursing facilities if the individual initially does not "affirmatively declare[] that their choice is to leave the nursing facility." PPI X 1578 at 39 (Sawyer Report); *see* Trial Tr. 2152:11-22, Oct. 26, 2018 (Sawyer).

0822.   The transition process for the service planning team (SPT) is documented on the State's form 1041, also known as the Individual Service Plan/Transition Plan form or ISP form. Trial Tr. 1505:9-17, Oct. 23, 2018 (Weston); PPI X 1906 at 22 (Weston Report); *see* PPI X 265 (Form 1041); PPI X 175 (ISP/Transition Plan Form & Instructions).

0823.   The transition plan appears in Section 9 of the ISP form and is divided into three phases. PPI X 265 at 8-10. Prior sections of the same document relate to the service and support planning. PPI X 1906 at 22 (Weston Report); PPI X 265 at 6.

0824.   Phase I of the transition plan is developed at the initial meeting of the SPT, and is updated quarterly thereafter. PPI X 265 at 14. It documents that the individual received information about community living options. PPI X 1906 at 22 (Weston Report).

0825.   During Phase I, service coordinators must describe the individual's response to the CLO

presentation. PPI X 265 at 14, 24 (explaining that "[t]he CLO is also presented every six months thereafter, and as requested by the individual/LAR. The CLO presentation must be documented on Phase I every time it is presented."); *see* PPI X 535 at 6 (LIDDA contract requires that service coordinator complete Section 9, Phase I for certain individuals); *see also* Miller 30(b)(6) Dep. 186:10-22, Oct. 13, 2017 (there is a "direct link" between the CLO form and ISP Phase 1).

0826.   The Service Coordinator has the option to check one of two boxes – either the individual wants to "Remain in NF" or "Pursue Community Living." There is no box where an individual can say "maybe" or that they would like to learn more. Trial Tr. 3570:24-3571:10, Nov. 8, 2018 (Thompson); PPI X 265 at 8.

0827.   Phase II of the transition plan is titled "Identifying the Individual's Needs for Community Living," PPI X 265 at 9, and forms a framework for transition planning through the identification of some of the supports and services that will be needed and for designing a plan for arranging interviews and/or visits with potential providers. Trial Tr. 1248:16-19, 1250:8-1251:6, Oct. 22, 2018 (Webster); Trial Tr. 1505:18-22, Oct. 23, 2018 (Weston); PPI X 1906 at 22 (Weston Report); PPI X 265 at 20-21.

0828.   Phase II is the critical opportunity for presenting a concrete description of what living in the community might look like for the individual, including where she might live, with whom she might share a home, what she might do during the day, and what community opportunities and activities she might enjoy. Trial Tr. 1505:18-1506:8, Oct. 23, 2018 (Weston); PPI X 1906 at 22 (Weston Report).

0829.   Staff from a LIDDA who regularly completed Phase II for individuals who had not yet chosen to leave the nursing facility stated that it made an important difference in promoting informed choice and proceeding with an actual transition. PPI X 1762 at 33 (Webster Report).

0830.   The SPT will only proceed to Phase II when "pursue community living" in Phase I is

checked. PPI X 265 at 14, 24; PPI X 1762 at 32-33 (Webster Report); Miller 30(b)(6) Dep. 175:14-176:11, 177:4-15, Oct. 13, 2017 ("Phase II of the ISP becomes active when the person express[es] a desire to leave the nursing facility.").

0831.   If the box is checked yes for "chooses to remain in the NF," the transition process stops. Trial Tr. 1510:17-20, Oct. 23, 2018 (Weston); PPI X 1906 at 22 (Weston Report); PPI X 265 at 8, 14, 24 (Section 9, Phase I of HHSC's ISP/Transition Plan and its instructions state "[p]roceed to Phase II" if "'[p]ursue community living' is checked" in Phase I); PPI X 1578 at 39 (Sawyer Report); *see* Miller 30(b)(6) Dep. 175:14-176:11, 177:4-15, Oct. 13, 2017 (testifying that Phase II "becomes applicable" when a person requests to move into the community).

0832.   At that point, the service coordinator does not complete Phase II, nor does the SPT discuss any of the community issues in that section. In addition, if the box is checked yes for "chooses to remain in the NF," the service coordinator does not develop a transition plan that would include opportunities for individuals and their LARs to visit community providers among other related activities. PPI X 1578  at 39 (Sawyer Report); PPI X 265 at 8, 14, 24; *see* Miller 30(b)(6) Dep. 175:14-176:11, 177:4-15, Oct. 13, 2017.

0833.   Even a finding that someone is appropriate for community placement does not prompt the LIDDA to complete all transition plan phases. Mr. Webster found little indication that a finding in the PE that community placement was appropriate resulted in a transition plan and no suggestion that a second PE is ever completed, even when the individual had made enough gains to be considered for a community placement and is not appropriate for a continued stay in the nursing facility. PPI X 1762 at 33 (Webster Report).

0834.   Neither Section Q of the MDS nor a determination that a person's needs can be met in the community trigger a transition slot release. Trial Tr. 3503:22-3505:18, Nov. 6, 2018 (Blevins) (testifying about Exhibits DX-58 and DX-655).

0835.   According to most LIDDA staff interviewed, Phase II is not completed even for people who are considering leaving the nursing facility and want to learn more about community options, unless they have already made the express decision to leave. *See* Trial Tr. 3645:24-3646:2, Nov. 8, 2018 (Terbush) (Betty Hardwick LIDDA begins work on transition plan and tours when someone indicates they want to move out); PPI X 1762 at 33 (Webster Report).

0836.   As a result, transition plans are not consistently used as a planning tool for individuals who may require additional time to consider community options. PPI X 1906 at 39-41 (Weston Report).

0837.   Only two of the fifty-four individuals in the second client review had a description of transition options in their ISP. Trial Tr. 548:7-11, Oct. 17, 2018 (Pilarcik); Trial Tr. 887:22-25, Oct. 18, 2018 (Coleman); Trial Tr. 1766:23-1767:2, Oct. 24, 2018 (Charlot); PPI X 1280 at 16 (Pilarcik Report); PPI X 777 at 16 (Charlot Report).

0838.   In one example, LB was admitted to a nursing facility for rehabilitation after she was hospitalized for hemorrhoids – a common condition in a person her age. Her PE recommended prompt Alternate Placement as one of her specialized services. Nevertheless, Section 9, Phase II of her ISP (concerning potential community living arrangements) was left blank, and, contrary to the recommendations in her PE, there was no description or exploration of community options. It appears that no further efforts were made to determine what supports she would need to return to the community or to identify and address barriers to her prompt return home. Instead, the default became to remain in the nursing facility, despite the original assessment, past history, and benefit she would receive from increased access to community interactions. PPI X 1280 at 38 (Pilarcik Report).

0839.   Individuals in nursing facilities are thus deprived the presentation of a concrete picture of what the community might look like for the individual, a description of specific and individualized community services and locations, and a plan to address fears and apprehensions. PPI X 1578 at 39 (Sawyer Report); PPI X 1906 at 40 (Weston Report); PPI X 1762 at 18-19 (Webster Report).

0840.   Without seeing what community living really looks like and can be like, few individuals with IDD are in a position to make an informed choice whether to transition to the community or remain in the nursing facility. PPI X 1906 at 42 (Weston Report).

       d.     Transition planning is inadequate even for individuals who have expressed an interest in moving to the community

0841.   Phase II is not completed even for individuals who have expressed an interest in or want to learn more about moving to the community. Twenty-eight of fifty-four individuals from the second client review expressed an interest in transitioning to the community and thirty-nine wanted to learn more about the community. But only two had ISPs that contained an individualized description of transition options in Phase II, Section 9. Trial Tr. 548:7-11, 548:19-549:1, Oct. 17, 2018 (Pilarcik); Trial Tr. 1766:23-1767:4, Oct. 24, 2018 (Charlot); Trial Tr. 887:22-25, Oct. 18, 2018 (Coleman); PPI X 777 at 16 (Charlot Report); PPI X 1280 at 16-17 (Pilarcik Report); PPI X 802 at 12 (Coleman Report); *see* PPI X 2224 at 18 (Phase II of Mr. Adkins' Transition Plan was blank at the time he expressed interest in moving to the community).

0842.   After an individual has expressed an interest in moving, they receive only a list of providers and are expected to select one. Trial Tr. 363:16-18, Oct. 16, 2018 (Carrasco) ("And when a person is getting a slot off the waiting list, then they themselves will call because they are just given a list of providers to call.").

0843.   The list may include more than 100 providers. Trial Tr. 3571:15-3572:7, Nov. 8, 2018 (Thompson) (list for Dallas-Metrocare area includes "at least 100 certified providers").

0844.   Nursing facility resident Jacob Adkins testified that the list of providers did not include helpful information like what services the providers offered or how they could meet his needs. Adkins Dep. 27:10-29:2, Oct. 30, 2018.

0845.   HHSC has noted that one of the barriers to individuals moving into the community is

difficulty in selecting a provider. PPI X 438-A at 2 (listing as a barrier that "[p]eople are having a difficult time selecting a provider.").

0846.  Individuals who have expressed an interest in moving to the community testified that they were not provided the necessary information to make an informed decision about where to live. Trial Tr. 2059:12-23, Oct. 25, 2018 (Meisel) (testifying that she moved back to nursing facility after living in group home for two weeks because she was unaware she was not required to go to Day Habilitation and she was unaware that she could move to a different provider); Trial Tr. 2060:23-2062:4, Oct. 25, 2018 (Meisel) (testifying that before she moved to a group home, she was not offered the option of receiving services in a host home or in her own apartment, which she would have been interested in); Adkins Dep. 26:10-27:9, Oct. 30, 2018 (testifying about what happened after he told his service coordinator he hoped to live somewhere else).

0847.  Even individuals who were offered waiver slots did not receive the necessary information and were unable to make an informed choice. Trial Tr. 1611:14-20, Oct. 23, 2018 (Russo).

> 10.    The State does not address barriers to community living for individuals with IDD in or at risk of entering nursing facilities

0848.  Developmental disability agencies should address any barriers to individuals with IDD moving from nursing facilities to the community, including a person's prior negative experiences in the community, the need for medical and nursing supports, safety concerns, and fear of change. Trial Tr. 1740:20-1741:14, Oct. 24, 2018 (Charlot); Trial Tr. 2150:7-2151:4, Oct. 26, 2018 (Sawyer); PPI X 777 at 10-11 (Charlot Report). Likewise, service providers must anticipate and address the fears of individuals with IDD and their families about community living. PPI X 1578 at 39 (Sawyer Report); Trial Tr. 2150:7- 2151:4, Oct. 26, 2018 (Sawyer).

0849.  If concerns are not addressed, a person cannot be said to have made an informed choice. Diase Dep. 174:23-175:25, Nov. 1, 2017 (testifying that to make an informed choice to move out

of a nursing facility an individual needs to have information about their concerns); *see* Diase Dep. 160:22-161:18, Nov. 1, 2017; PPI X 1763 at 24 (Wehmeyer Report) ("[F]or individuals with IDD to make an informed choice about where to live, they must be provided with information and direct experiences about concrete options for living in the community that . . . addresses the fears and concerns of each person and/or family member.").

0850.   26 Tex. Admin. Code § 303.701(i) requires that if the planning team recommends continued placement in a nursing facility, that team must identify barriers to moving to a more integrated setting and describe in the ISP the steps that the team will take towards addressing these barriers. PPI X 1906 at 21 (Weston Report).

0851.   HHSC's PE, CLO, and ISP forms also reflect this requirement. PPI X 176 at 29 (space on PE form to indicate "challenges or barriers" that could impede the opportunity to return to the community); PPI X 266 at 3 (space on CLO form for service coordinator to describe how they addressed individual's concerns about community living); PPI X 265 at 8 (space on ISP form to identify barriers to people living in community and possible resolutions).

0852.   The ISP form requires ongoing documentation of the outcome of CLO presentations and, when the documented outcome is to remain in the nursing facility, the identification of barriers to community living and problem solving regarding the barriers and efforts to resolve barriers must be documented. PPI X 265 at 8-10, 24; PPI X 1578 at 18 (Sawyer Report); PPI X 1906 at 19, 22 (Weston Report).

0853.   Service coordinators are supposed to address barriers to community living during the CLO conversation if barriers have been identified. Trial Tr. 2867:10-2868:5, 2871:1-6, 2871:13-16, Nov. 2, 2018 (Southall); Southall Dep. 177:5-9, 266:7-14, Nov. 7, 2017; Turner Dep. 167:1-12, Feb. 23, 2018; Southall 30(b)(6) Dep. 238:22-239:3, 240:21-241:1, Oct. 4, 2017. Service coordinators should take information about identified barriers or concerns to the service planning team, for the team to

plan how to address that concern. Trial Tr. 2867:14-19, Nov. 2, 2018 (Southall); Southall 30(b)(6)

Dep. 239:4-13, Oct. 4, 2017.

0854.   HHSC expects service coordinators to speak with diversion coordinators about how to

resolve barriers to transitioning to community that service coordinators cannot resolve on their own

for anyone in a nursing facility with IDD. Southall Dep. 266:7-267:3, Nov. 7, 2017.

0855.   HHSC and LIDDA officials acknowledge that it is important to identify barriers to placement

in the most integrated setting and strategies to address those barriers. Trial Tr. 3604:24-3605:8, Nov.

8, 2018 (Phillips); PPI X 1906 at 20 (Weston Report); Dionne-Vahalik 30(b)(6) Dep. 172:24-173:3,

Oct. 12, 2017; Diase Dep. 147:12-17, 160:22-161:18, 163:14-164:9, 174:23-175:25, Nov. 1, 2017.

If barriers are addressed, then the individual may be able to move to the community. Diase Dep.

163:14-164:9, Nov. 1, 2017.

0856.   Special efforts must be undertaken to address the predictable barriers caused by

institutionalization, such as a loss of autonomy and increased dependency on facility staff to make

decisions. There must be targeted efforts to address individualized barriers to transition, particularly

for individuals who have been in nursing facilities for many years or who have had negative prior

experiences with certain community providers or living arrangements. Trial Tr. 2150:7-2151:4, Oct.

26, 2018 (Sawyer); Trial Tr. 872:8-18, 885:4-17, Oct. 18, 2018 (Coleman) (individuals who have

been institutionalized for a long period of time often have additional concerns and fears, which

should be addressed); Trial Tr. 3526:21-3527:3, Nov. 8, 2018 (McDonald) (testifying that barriers

to transition include "not knowing or understanding all of the options, and then of course having bad

experiences somewhere"); PPI X 1762 at 16, 21 (Webster Report).

0857.   Individuals who have made a difficult choice, such as to move to or place a loved one in an

institution, often become invested in that choice and have difficulty choosing another option even

when better options become available. A relationship of trust and additional efforts can be necessary

to overcome this challenge. Trial Tr. 3567:1-10, Nov. 8, 2018 (Thompson) (testifying that it is especially important for someone who had to make a difficult decision about entering the nursing facility to have information about what it is like to live in community); PPI X 777 at 12-13 (Charlot Report).

0858.   Concerns and barriers about community living can be addressed through education about community options, visits to community programs, and speaking to family members of individuals who successfully live in the community. Trial Tr. 884:14-885:24, Oct. 18, 2018 (Coleman) (describing strategies utilized in addressing concerns about community living). When people learn about community options, they typically choose them. Trial Tr. 3565:21-3566:2, Nov. 8, 2018 (Thompson) (the majority of people Metrocare serves choose community options over entering a nursing facility when they learn about them); Trial Tr. 3652B:20-3653:16, Nov. 8, 2018 (Terbush).

0859.   However, QSR findings demonstrate that barriers to transition for people with IDD in Texas nursing facilities are not being addressed. Compliance with Outcome Measure 3-12, which assesses whether individuals who are recommended for continued placement in a nursing facility have "a plan that documents the reasons for this decision and describes the steps the team will take to address the identified barriers to placement in the most integrated setting," dropped for the Transition and Nursing Home Populations from a mere eleven percent in 2015 to zero percent in 2016 and remained at zero percent in 2017; for just the Nursing Home Population in 2017, it was also zero percent. PPI X 1578 at 50, 99 (Sawyer Report); PPI X 254 at 9; PPI X 253 at 6; PPI X 318 at 18. These findings evidence HHSC's failure to take meaningful action to address identified deficits. PPI X 1578 at 51 (Sawyer Report).

0860.   The second client review findings further demonstrate that the barriers to transition for people with IDD in the State's nursing facilities are not being addressed. Fifty-one of fifty-four individuals in the client review did not have barriers to community living identified or addressed. Trial Tr.

1767:25-1768:11, Oct. 24, 2018 (Charlot); Trial Tr. 548:15-18, Oct. 17, 2018 (Pilarcik); Trial Tr.

888:4-6, Oct. 18, 2018 (Coleman); PPI X 802 at 12 (Coleman Report); PPI X 777 at 16; PPI X 1280

at 17, 22 (Pilarcik Report).

0861.   Many ISPs had no barriers listed or failed to identify barriers accurately. Ms. Pilarcik

reported that no ISPs identified all barriers to transition. PPI X 1280 at 22 (Pilarcik Report). Dr.

Charlot testified that she often saw a single word or phrase listed on the ISP section about barriers

and little else. Trial Tr. 1767:25-1768:11, Oct. 24, 2018 (Charlot); PPI X 777 at 16 (Charlot Report).

0862.   When barriers were identified accurately, actions were rarely taken to address concerns about

community living, prior negative experiences, limited availability of community providers in the

preferred location, and other barriers. Ms. Russo found that of the sixteen individuals she reviewed,

none had their concerns or barriers addressed. For LD, she found that LD's service coordinator

"knew there were barriers for his transition to the community because his sister had some fears and

concerns. They were not addressed." Trial Tr. 1640:3-5, 1696:12-14, Oct. 23, 2018 (Russo); Trial

Tr. 542:10-3, Oct. 17, 2018 (Pilarcik); PPI X 1280 at 22 (Pilarcik Report).

0863.   Dr. Charlot discussed how BT's guardian, his mother, was concerned about BT living in a

community setting because he had become very ill in a community placement ten years earlier. But

when Dr. Charlot asked whether she would like more information about how community services

had changed, BT's mother was open to learning more. Trial Tr. 1754:7-24, Oct. 24, 2018 (Charlot).

0864.   DBr's mother stated that she had concerns about the possibility of abuse in a community

setting but was interested in learning more about community options. However, Phase II of Section

9 of DBr's ISP was blank, and DBr's mother reported that no one from the LIDDA had addressed

her concerns. Trial Tr. 891:14-892:19, Oct. 18, 2018 (Coleman); PPI X 802 at 13-14 (Coleman

Report).

0865.   PC's PE on her admission in November 2016 noted that she could benefit from community services once stable. A second PE and service coordinator notes in 2017 reiterated this conclusion. In August 2017, PC was no further along with her transition to a group home with community supports and services than she was when she was admitted to the facility, and there was no documentation or discussion of what barriers, if any, existed, nor how the CLO process was being implemented in a way to facilitate the individual's transition. Trial Tr. 1640:14-1642:7, Oct. 23, 2018 (Russo); PPI X 1400 at 9-10 (Russo Report).

0866.   HHSC fails to comply with QSR Outcome Measure 3-12, which requires that any individual whose SPT recommends continued placement in a nursing facility must have a plan that documents the reasons for this decision and describes the steps the team will take to address the identified barriers to placement in the most integrated setting. PPI X 318 at 18; PPI X 254 at 9; PPI X 253 at 6; PPI X 1578 at 50, 99 (Sawyer Report).

0867.   In 2016, the service coordinator developed and implemented specific strategies to address concerns about community living expressed by the individual or LAR only thirty-six percent of the time. PPI X 320 at row 150, Indicator 72.

0868.   Because the State does not identify and address barriers to community living for individuals with IDD living in nursing facilities, individuals are unnecessarily institutionalized in nursing facilities. *See* PPI X 1578 at 34 (Sawyer Report). Ms. Meisel, for example, testified that when she returned to a nursing facility, she did not remember her service coordinators spending time talking with her about the problems she faced in the group home and how to address them in the future. Trial Tr. 2064:7-11; Oct. 25, 2018 (Meisel).

D.    Many Individuals with IDD have not made an informed and meaningful choice to enter or remain in a Nursing Facility

0869.   Individuals with IDD in the State's nursing facilities are not provided necessary

278

individualized information and experiences to make an informed choice to remain in a nursing facility. PPI X 1763 at 23-24 (Wehmeyer Report).

0870.   The QSR results for whether LIDDAs semi-annually offer individuals who are in nursing facilities and their LARs "education and information about community options that explain the benefits of community living, address their concerns about community living, and that assist them to make informed choices about whether to move to the community" (Outcome Measure 2-6), measured for the Nursing Facility and Transition Target Populations fifteen percent in 2015, twenty-one percent in 2016, and sixteen percent in 2017; for the Nursing Home Population alone in 2017, it was also sixteen percent. PPI X 318 at 14; PPI X 254 at 8; PPI X 253 at 5.

0871.   Forty-six of the fifty-four individuals in the second client review had not made an informed choice to remain in the nursing facilities. Trial Tr. 546:25-547:1, Oct. 17, 2018 (Pilarcik); Trial Tr. 883:17-25, Oct. 18, 2018 (Coleman); Trial Tr. 1638:21-1639:9, Oct. 23, 2018 (Russo); Trial Tr. 1764:10-12, Oct. 24, 2018 (Charlot); PPI X 1280 at 16, 21 (Pilarcik Report); PPI X 802 at 12 (Coleman Report); PPI X 1400 at 11 (Russo Report); PPI X 777 at 15-16 (Charlot Report).

0872.   For example, SS (a person Dr. Coleman reviewed) had successfully lived in a group home in the past, and SS's sister (her guardian) had not made an informed choice for SS to remain in the nursing facility. Phase II of Section 9 of the ISP did not include a specific description of transition options for SS. In addition, there was no documentation of any discussion of barriers to community-based living, nor was there documentation of how the CLO process is implemented in a way that provides individualized community opportunities to make an informed choice to remain in the nursing facility or to transition to a community-based environment. Her most recent CLO was in December 2015, eighteen months prior to the date of SS's ISP. SS and her sister had not been offered any opportunities to visit any community-based residential programs that might be appropriate and that might meet the concerns SS's sister had relating to safety. In fact, SS's sister

indicated that she was interested in exploring community living options for SS, and she did not remember having a CLO discussion. SS's service coordinator indicated that the CLO process consisted of handing out a folder and filling out forms. Trial Tr. 872:19-873:11, 877:20-878:11, Oct. 18, 2018 (Coleman); PPI X 2162A at 2, 11; PPI X 802 at 22 (Coleman Report).

0873.   In another instance, SH expressed at various times a desire to move to the community, although she had some anxiety about it. There is no evidence that her anxieties were addressed. SH also misunderstood what services would be available in the community, indicating that these had not been explored with or explained to her adequately. SH's service coordinator also explained that there were not adequate services in the area where SH wanted to live that were appropriate for SH. As a result, Dr. Charlot concluded that SH had not made an informed choice to remain in the nursing facility. PPI X 777 at 21-22 (Charlot Report).

0874.   According to DBr's January 2017 ISP, she and her mother expressed interest in touring group homes, yet there was no indication that this was actively pursued. DBr and her mother expressed interest in learning more about the community and transition to the community to Dr. Coleman. Despite this, the transition section of the ISP (Phase II of Section 9) did not include a specific description of what DBr would need for community placement nor did it identify preferred services and supports and their availability. The ISP was not person-centered because it did not include all needed services and supports, including those DBr needs to successfully transition to the community. There was no evidence in the record that DBr's concerns or her mother's concerns about safety in the community had been explored or addressed in any way. DBr was offered a waiver slot in 2015, which she declined. She subsequently expressed interest in learning more about and possibly moving to the community in 2016 and 2017, but a waiver was not subsequently offered to her. Trial Tr. 889:3-20, 891:14-892:19, 937:21-938:25, Oct. 18, 2018 (Coleman); PPI X 802 at 13-14 (Coleman Report).

0875.   Defendants' expert Ms. Bruni disagreed with Dr. Coleman's finding that DBr had not made an informed choice to remain in the nursing facility. Ms. Bruni's stated basis for disagreeing with Dr. Coleman was that she had seen no indication that DBr wanted to leave the nursing facility, based on her review of DBr's records. At trial, however, Ms. Bruni determined that her basis for disagreement with Dr. Coleman was an error: DBr had in fact expressed an interest in leaving the nursing facility, which was recorded in her ISP. Ms. Bruni also confirmed that the CLO box was checked "Remain in NF" even though DBr had indicated an interest in leaving the nursing facility. Trial Tr. 2700:8-2703:22, Nov. 1, 2018 (Bruni).

0876.   Testimony from individuals that they did not have information about community options contradicts broad testimony from LIDDA representatives that people with IDD know about community options. *Compare* Trial Tr. 2060:20-2061:17, Oct. 25, 2018 (Meisel) (individual from Austin testifying that when she was making a decision to move into the community nobody informed her about host homes or offered her placements that would allow her to do activities during the day other than Day Habilitation or allow her to receive services in her own apartment), *with* Trial Tr. 3668:6-9, Nov. 8, 2018 (Jones) (practice manager from Austin Integral Care LIDDA testifying that individuals with IDD are "aware of HCS waivers and how they can be supported in the community"), *and* Trial Tr. 3658:12-18, Nov. 8, 2018 (Terbush) (testifying that in her area, once people with IDD or their caregivers realize that diversion is an option, they typically are not interested in moving to a nursing facility).

0877.   The State's data from the PIRM undercut the State's assertions that it adequately informs individuals of community living options. Instead, the PIRM data show that individuals are not receiving adequate information about community living options.

i.      At Dallas MetroCare LIDDA, the PIRM data indicate that, even though MK's only goal on his ISP is to "live in the community," the reviewer found that there was no

evidence he was provided with semi-annual community activities, he had not received a CLO in more than a year, and had no completed CLO form. The reviewer also found that MK's service coordinator had not made him aware of community residential options and did not address MK's concerns about community living because the service coordinator was not aware of them. PPI X 250-A at row 1008, column DI; PPI X 249-A at rows 648167, 648171, 648177, 648175; *see* PPI X 251-A at rows 151, 147, 416, 153. The PIRM data also reveal that FM was not offered community education events, tours to community providers, or ILST. PPI X 250-A at row 1233, column DI. In addition, NL's service coordinator reported that community education was not offered to NL. PPI X 250-A at row 1075, column DI.

ii.    At Austin Travis County Integral Care, the PIRM data indicate that SG, who had lived at the facility for more than two years at the time of the review, had not received a CLO until shortly before the review. SG's monthly visits with her service coordinator ranged from two to ten minutes, "with the majority on the low portion of the scale." PPI X 250-A at row 710; PPI X 249-A at rows 357758, 357807; *see* PPI X 251-A at rows 149, 357. For JC, the social worker indicated that "the team does not support [JC] moving to the community or believe he can be served there because of his G tube," but the team did not conduct a formal assessment about JC's appropriateness for the community or identify any barriers to community placement. PPI X 250-A at row 521; PPI X 249-A at row 415035; *see* PPI X 251-A at row 85.

iii.    At the Harris County LIDDA, the PIRM data for FB indicate that FB's service coordinator did not discuss information with FB to help FB make informed choices about community living and did not facilitate any visits or tours to community programs. PPI X 250-A at row 838, column DI; PPI X 249-A at rows 530552,

530550; *see* PPI X 251-A at rows 416, 419. Similarly, JM's service coordinator did not hold quarterly meetings and had "not provided community living options or invited [JM]'s guardian to any semi-annual educational events." PPI X 250-A at row 1046, column DI.

0878.   Dr. David Partridge was the only defense witness who testified that people Plaintiffs' and the United States' experts identified as interested in learning about community services "have clearly indicated or [their] guardians indicated for them that they wished to remain in an institutional setting and not go out into the community." Trial Tr. 3067:23-3068:5, Nov. 5, 2018 (Partridge). However, his testimony is not credible because Dr. Partridge agreed that multiple records contradicted his assertion. Trial Tr. 3067:23-3078:3, Nov. 5, 2018 (Partridge).

0879.   CLO forms are not reliable indicators of interest in transition. Even when service coordinators for people with IDD in nursing facilities recorded that they were not interested in living in the community, QSR reviewers and reviewers in the second client review identified people with IDD in nursing facilities who were in fact interested in exploring community options. Trial Tr. 540:3-12, Oct. 17, 2018 (Pilarcik); du Pree Dep. 135:6-22, Feb. 6, 2018.

0880.   For instance, based on a QSR interview with SG, who lived at Marbridge Villa, Ms. du Pree determined that SG did not oppose transitioning to the community, notwithstanding that SG's CLO form indicated that she wanted to stay. du Pree Dep. 135:6-22, Feb. 6, 2018.

0881.   Similarly, AH clearly indicated a desire to return to the community. Despite her stated preference to live in the community, her ISP and CLO documentation for the past year indicated that she wants to remain in the nursing facility. AH is appropriate for and would benefit from living in community. In a more integrated setting, AH would have improved opportunities to achieve the primary goal identified in her ISP. She would also have access to the types of activities she cares most about – including church attendance and singing in the choir. PPI X 1280 at 44 (Pilarcik

Report).

## X.

The State fails to divert or transition people with IDD to integrated community settings

A.      LIDDAs accomplish very few diversions and transitions

0882.   Dr. O'Connor testified that, based on the State's data, the census of individuals with IDD living in nursing facilities remained stable between January 2014 and May 2017. Trial Tr. 968:11-20, Oct. 19, 2018 (O'Connor) (explaining that population has changed "virtually, not at all"); PPI X 1207 at 9 (O'Connor Report); PPI X 661; PPI X 646 at tab 1 ("MM ID-DD Summary Table").

0883.   Dr. O'Connor further testified that the State's data shows that the census of individuals with IDD living in nursing facilities for longer than ninety days remained stable between January 2014 and May 2017. Trial Tr. 969:4-10, Oct. 19, 2018 (O'Connor) (describing population of people living in nursing facilities for longer than ninety days as "remarkably stable"); *see* PPI X 1207 at 9 (O'Connor Report); PPI X 661; PPI X 646 at tab 1 (MM ID-DD Summary Table).

0884.   In addition, in May 2017, 2,684 Medicaid-eligible individuals with IDD were living in nursing facilities whose stay was one year or more, including 1,662 individuals whose stay was three years or more and 1,079 with stays of five years or more. The size of each of these groups has remained stable for as far back as data permit a conclusion. Trial Tr. 990:6-992:18, Oct. 19, 2018 (O'Connor); PPI X 1208 at 10, 16 (O'Connor Rebuttal Report); PPI X 659; PPI X 982 at tabs 1, 3-4.

0885.   Accordingly, the State is failing to successfully transition individuals with IDD with long stays from nursing facilities. *See* PPI X 1207 at 9 (O'Connor Report) ("[T]he majority of individuals remained in the facility for a long stay."); PPI X 1907 at 19-20 (Weston Rebuttal Report) (opining that if transitions and diversions were occurring effectively, she would expect a decrease in the total nursing facility census of people with IDD in Texas).

0886.   Ms. Weston found that the State's data and Dr. O'Connor's analysis reveals that there has

been no significant movement or reduction in long stay groups over many years. PPI X 1907 at 20 (Weston Rebuttal Report) (noting that the proportion of individuals with IDD in Texas nursing facilities for long periods of time is quite high, and that "data and trends for these long stay groups indicate whether people have the opportunity to move back to the community or are getting stuck in nursing facilities"); *see* Trial Tr. 1268:18-1269:5, Oct. 22, 2018 (Webster) (testifying that LIDDAs were not having very good success transitioning people in what he termed the "core group" – those who had been living in an institution for a long time); PPI X 1762 at 36 (Webster Report).

0887.   With regard to diversions, the State's data shows that the number of diversions, while increasing, remains low. In the previous four fiscal years combined, 522 individuals were successfully diverted from nursing facility admission and enrolled in HCS waiver slots (382 in Fiscal Years 2016 through 2017 and 140 individuals in Fiscal Years 2014 through 2015). Trial Tr. 1461:9-1462:7, Oct. 22, 2018 (Weston); PPI X 286 at 3, 16, 34 (Enrollment Status Report).

0888.   By comparison, in the first three quarters of Fiscal Year 2017, more than 300 individuals with IDD entered nursing facilities each quarter, which would result in 1200 admissions per year. *See* PPI X 594-A. As noted previously, the total number of individuals with IDD in nursing facilities is more than 3,000. Thus, the number of diversions per year (less than 200) accounts for a small portion of the number of individuals seeking nursing facility admission and the total nursing facility population. Trial Tr. 1462:8-20, Oct. 22, 2018 (Weston); PPI X 1906 at 24 (Weston Report).

0889.   Further, almost forty percent of the 522 diversions over the previous four years were accomplished by three of the thirty-nine LIDDAs. Population differences do not sufficiently explain these discrepancies. PPI X 1906 at 24 (Weston Report); *see* Trial Tr. 1464:10-21, Oct. 22, 2018 (Weston).

0890.   The relatively few successful diversions are often more the result of advocacy from an individual's family than from an aggressive diversion program. Trial Tr. 1227:12-23, Oct. 22, 2018

(Webster); PPI X 1762 at 23 (Webster Report); *see* Trial Tr. 3665:11-19, Nov. 8, 2018 (Jones) (testimony from LIDDA Program Manager regarding the informal and ad hoc ways people are identified for diversion).

0891.   With regard to transitions, HHSC reports that 547 individuals with IDD have transitioned from nursing facilities to community settings in Fiscal Years 2014 through 2017 combined (403 in Fiscal Years 2016 through 2017 and 144 individuals in Fiscal Years 2014 through 2015). PPI X 286 at 16, 34 (Enrollment Status Report). According to Ms. Weston, this is a low number of transitions relative to the nursing facility population. PPI X 1906 at 35 (Weston Report).

0892.   The LIDDAs' quarterly reports and other available data, as well as LIDDA staff interviews, similarly indicate low numbers of transitions relative to the population. PPI X 1906 at 39 (Weston Report); *see* Trial Tr. 1268:15-19, Oct. 22, 2018 (Webster) (finding that there were "very few" transitions).

0893.   For example, at one LIDDA, Harris Center, only five individuals transitioned from nursing facilities to the community in the third quarter of Fiscal Year 2017, although the Harris Center was serving 213 individuals in nursing facilities during that time. Trial Tr. 3604:8-17, 3609:15-3610:1, Nov. 8, 2018 (Phillips). During each of the prior two quarters, just two individuals transitioned from facilities, although Harris Center was serving more than 200 individuals with IDD in nursing facilities at that time. Trial Tr. 3611:20-3613:4, Nov. 8, 2018 (Phillips).

0894.   In the first quarter of Fiscal Year 2017, another LIDDA, the Burke Center, admitted eleven individuals with IDD to nursing facilities but failed to divert a single individual. For the same quarter, the Burke Center transitioned three individuals from nursing facilities compared to the 126 individuals in nursing facilities that it served. Trial Tr. 3548:10-23, Nov. 8, 2018 (McDonald); *see* PPI X 1458 at 34-40; *see also* Trial Tr. 3547:16-3548:3, Nov. 8, 2018 (McDonald) (reporting similar numbers for the third quarter of FY16).

0895.   Community services providers also experience the lack of transitions of individuals with IDD from nursing facilities. For example, although Reaching Maximum Independence serves approximately 140 adults with IDD in the community, no one with IDD has moved from a nursing facility to one of Reaching Maximum Independence's community-based programs. Trial Tr. 2070:11-13, 2086:9-12, Oct. 25, 2018 (Rideout).

B.    The State is, and has been, on notice of persistent barriers that prevent individuals from transitioning or diverting and receiving adequate services in the community

0896.   Service capacity, or the capacity of the system to address the needs of the individuals it is targeted to serve, is a critical component to an IDD system. Trial Tr. 2121:24-2122:3, 2145:2-9, Oct. 26, 2018 (Sawyer); *see* Trial Tr. 1272:5-8, Oct. 22, 2018 (Webster) ("There's a link, an important link, between a successful PASRR program, keeping people out of nursing facilities, and the capacity of providers to be able to support the state in getting that done.").

0897.   When planning and developing community-based services for people with IDD in nursing facilities or at risk of residing in nursing facilities, service systems must take into account that many of these individuals have high and complex medical needs and some may have significant behavioral support needs that require specific services and supports beyond those needed to address their IDD. Trial Tr. 2146:19-2147:19, Oct. 26, 2018 (Sawyer); PPI X 1578 at 40-41 (Sawyer Report).

0898.   To ensure that individuals with high medical needs are served successfully in the community, state IDD systems must ensure comprehensive assessments of individuals' medical and healthcare needs, provide enhanced monitoring, provide working healthcare plans that are easily understood by non-medical personnel, and provide competent and sufficient levels of staffing and environments. Trial Tr. 2146:19-2147:19, Oct. 26, 2018 (Sawyer); PPI X 1578 at 37 (Sawyer Report).

0899.   Instead, Texas HHSC policies reduce the availability and accessibility of services for people who have IDD and complex medical needs. Trial Tr. 4071:9-11, 4073:14-24, Nov. 14, 2018

(Piccola); PPI X 1215 at 7 (Piccola Rebuttal Report); PPI X 1578 at 20, 31-33 (Sawyer Report); *see* Trial Tr. 2145:10-19, 2147:20-25, Oct. 26, 2018 (Sawyer).

0900.   The State is aware of multiple barriers to serving individuals with IDD who have complex medical or behavioral needs in the community. Trial Tr. 2148: 1-15, Oct. 26, 2018 (Sawyer); PPI X 1578 at 21 (Sawyer Report); *see, e.g.,* PPI X 288 at 81 (HHSC Consolidated Budget Request, February 2017) ("[T]he state still has challenges in its treatment of individuals with IDD who also have complex medical and/or mental health issues. This fact has been noted by numerous stakeholders as well as Texas Sunset Commission Staff."); PPI X 1551 at tab 2 (2017 1st Quarter ECC Report noting a "[l]ack of providers to provide services to individuals with high medical/support needs" and "[p]roviders with inadequate staff to support individual's needs"); PPI X 438-A at 1 (listing as a barrier from the QSR "[l]ack of providers to provide services to individuals with high medical/behavior support needs"); PPI X 83 at 3 (July 2016 PASRR QSR Workgroup Minutes, drafted by Dr. Diase and reflecting HHSC employees' statements regarding their regular responsibilities, which states that many individuals refuse transition slots because they "have the perception that adequate nursing support is not available in community settings").

0901.   In fact, more than thirty percent of LIDDAs notified the State that a lack of medical supports or providers to serve people with high medical or other needs in the community was a persistent barrier. PPI X 1578 at 32 (Sawyer Report).

0902.   The State has acknowledged that it lacks sufficient provider capacity and resources to meet the needs of individuals with IDD who have high medical needs in the community. PPI X 185 at 24-25 (HHSC Annual Report) ("There is a clearly recognized need to develop stronger capacity within the community-based long-term services system to support individuals with IDD who have high medical needs (HMN) and want to live in the community."); Gaines Dep. 189:5-11, Feb. 27, 2018.

0903.   Without these supports, some individuals with IDD in nursing facilities will not be able to transition to the community and will remain isolated and unnecessarily segregated in nursing facilities. PPI X 1578 at 34 (Sawyer Report).

0904.   Yet, in several ways, the State has failed to implement service plans and other procedures that would facilitate and expand community-based services to individuals with high medical needs. Trial Tr. 2146:1-2147:19, Oct. 26, 2018 (Sawyer); PPI X 1578 at 31-32, 34-38 (Sawyer Report); PPI X 1215 at 7 (Piccola Rebuttal Report); *see, e.g.,* PPI X 1561 (Information Letter advising that HHSC lowered rates paid to Medicaid waiver providers, including HCS providers, for certain waiver services for people with IDD in the community); PPI X 439-A at 2 (noting that staff no longer recommended previously proposed and funded high medical needs supports).

0905.   For example, the State's tool used to establish an individual's level of support needs, the Inventory for Client and Agency Planning (ICAP), does not comprehensively assess medical need. PPI X 1762 at 38 (Webster Report); Craddock-Melchor Dep. 168:6-10, Oct. 9, 2017 (testifying that ICAP has been criticized for not comprehensively assessing medical need); *see* Trial Tr. 1117:15-21, Oct. 19, 2018 (Preskey) (describing ICAP).

0906.   Individuals in the State transitioning out of nursing facilities, including those with complex medical needs, receive inappropriate level of need scores from the ICAP. Trial Tr. 1117:22-24, 1118:13-25, Oct. 19, 2018 (Preskey) (testifying that individuals transitioning out of nursing facility do not receive appropriate level of need); Trial Tr. 4164:13-24, Nov. 14, 2018 (Piccola) ("We know people who have transitioned out and I've spoken with providers who have transitioned out with a level of need that wasn't sufficient to support the needs."); Jennings Dep. 28:7-21, Oct. 29, 2018 (community services provider's testimony that individuals with IDD usually transition out of nursing facilities with a level of need that is "a little lower than it should be").

0907.   An individual's level of need score is used to establish the rates to be paid to the provider. Trial Tr. 1117:11-13, Oct. 19, 2018 (Preskey). When providers are unwilling or unable to serve individuals with complex medical conditions, it is often because of challenges in obtaining reimbursement from the State through the level-of-need process. PPI X 1906 at 42 (Weston Report).

0908.   When an individual transitions from a State Supported Living Center (SSLC) to the community, HHSC assigns that individual the highest level of need (LON) available for medical reasons, LON 6, and an increased rate by association, for at least one year following the transition. Trial Tr. 4076:25-4077:14, Nov. 14, 2018 (Piccola); *cf.* PPI X 69 (email from HHSC officials explaining system problems for people with IDD and high medical needs transitioning from nursing facilities and proposing a similar LON assignment and transition process as the one that is used for children with high medical needs who are aging out of waivers).

0909.   However, HHSC does not provide the same enhancement for individuals with IDD transitioning from nursing facilities. Trial Tr. 4077:19-4078:3, Nov. 14, 2018 (Piccola); Craddock-Melchor Dep. 118:15-119:4; 168:23-169:4, Oct. 9, 2017 (testifying that people with IDD transitioning out of SSLCs, but not nursing facilities, automatically get assigned at least a LON 6); *see* Trial Tr. 1121:22-25, 1123:2-18, Oct. 19, 2018 (Preskey) (testifying that individuals with IDD transitioning out of SSLCs, but not nursing facilities, automatically are assigned a LON 6 for a year); PPI X 70 (HHSC document stating policy of initially assigning LON 6 to all individuals transitioning from SSLCs); PPI X 72 (HHSC policy allowing LON 6 to be assigned to individuals with High Physical Needs); PPI X 1559 at 3 (April 1, 2014 Information Letter No. 14-10 describing the process to request reconsideration or appeal of a LON assignment); PPI X 1560 (2016 Information Letter No. 16-40 explaining process that providers must follow to request a change in a LON assignment).

0910.   Such an automatic adjustment has been recommended to the State, but "HHSC has not acted" on that recommendation. Williamson 30(b)(6) Dep. 59:13-60:7, Jan. 10, 2018.

0911.   Furthermore, the process for a securing approval for a level-of-need increase, which HHSC manages, is cumbersome, labor intensive, protracted (usually several months), conducted by individuals not familiar with the individuals or their needs, and does not directly consider changed medical needs. Providers interviewed during the Program Review reported that this process discouraged them from seeking authorization for service increases. PPI X 1762 at 38 (Webster Report).  This contributes to the placement of people from residential programs into nursing facilities when their needs increase. Trial Tr. 1272:23-1274:15, Oct. 22, 2018 (Webster) (finding that providers he reviewed were able to serve individuals with IDD with complex medical or behavior needs, but that when an individual's needs change, the process for applying for level-of-need increases is "cumbersome and difficult" for providers); PPI X 1762 at 38-39 (Webster Report); PPI X 1906 at 42 (Weston Report).

0912.   Providers reviewed in the Program Review reported that if they could timely increase nursing or related support services, they could avoid nursing facility admissions and hospitalizations and instead continue to serve individuals in the community. PPI X 1762 at 38 (Webster Report).

0913.   The State is aware of many challenges with its level-of-need process. PPI X 74 (HHSC Level-Of-Need Workgroup document listing issues and improvement opportunities).

0914.   However, the State decided not to continue its Level-of-Need Workgroup, which convened to collect feedback about the level-of-need assignments and processes. Craddock-Melchor Dep. 210:20-213:14, 216:8-11, Oct. 9, 2018.

0915.   Further, despite being aware that additional supports for individuals with IDD with high medical needs would be beneficial, HHSC decided not to pursue a high medical needs change to the HCS waiver program. PPI X 1578 at 34-37 (Sawyer Report); Williamson Dep. 154:6-156:4, Feb. 22, 2018 (testifying that there was no plan to pursue this rule change as of September 1, 2017).

0916.   The high medical needs change was proposed to provide additional support for eligible

291

persons who have medical needs that exceed the service specification for current HCS services and need additional support in order to remain in, or move from an institution to, a community setting. PPI X 1578 at 34-37 (Sawyer Report); *see* PPI X 997 at 2-3 (Proposed Amendment to Texas Administrative Code Title 40 Part 1, Chapter 9 - Intellectual Disability Services).

0917.   HHSC determined that the public benefit expected from the high medical needs add-on rate would be new HCS program services that would "prevent hospitalizations, help ensure the health and safety of an individual with significant medical needs" . . . and "increase[] the likelihood that a person with high medical needs who resides in an institution, such as a nursing facility or state supported living center, is able to move from the institution and receive services in the HCS Program."  PPI X 997 at 2-3 (Proposed Amendment to Texas Administrative Code Title 40 Part 1, Chapter 9 - Intellectual Disability Services).

0918.   In 2015, the Texas Legislature appropriated funds for the 2016-2017 biennium to provide individuals with high medical needs the enhanced level of support they needed to live in the community. Trial Tr. 4073:25-4074:9, Nov. 14, 2018 (Piccola); PPI X 1215 at 7-9 (Piccola Rebuttal Report); PPI X 288 at 81; *see* PPI X 445 at 6 (HHSC waiver programs summary updated February 8, 2017 stating that high medical needs support for the HCS waiver had a planned effective date of July 2017).

0919 .  However, this initiative was halted due to HHSC rulemaking and ultimately was never implemented. Following the abrupt termination of the initiative, the State has taken no other effective action to assist individuals with complex medical needs to remain in, or transition to, the community. Williamson 30(b)(6) Dep. 64:14-66:7, 286:21-287:16, Jan. 10, 2018; Williamson Dep. 154:6-156:4, Feb. 22, 2018; *see* Trial Tr. 4075:18-4076:2, 4076:13-16, 4169:15-23, Nov. 14, 2018 (Piccola); PPI X 1215 at 8 (Piccola Rebuttal Report); *compare* PPI X 445 at 6 (HHSC waiver programs summary updated February 8, 2017 stating that high medical needs support for the HCS

waiver had a planned effective date of July 2017), *with* PPI X 457 at 6 (HHSC waiver programs summary updated August 14, 2017 deleting reference to high medical needs support for the HCS waiver).

0920.   HHSC has implemented an add-on rate for individuals with complex or high medical needs who moved from SSLCs to community-based ICFs, but not for individuals with IDD in nursing facilities seeking to transition to the community. Trial Tr. 4075:8-4076:2, Nov. 14, 2018 (Piccola).

0921.   Another continuous barrier to transition, of which the State is aware, is the lack of community placements in the individuals' desired county. Trial Tr. 2146:3-8, Oct. 26, 2018 (Sawyer) (testifying that State reports "speak to not having sufficient providers in certain geographical parts of the state that would be needed to serve the population"); PPI X 438-A at 2 (listing "lack of providers in rural areas" as a barrier); PPI X 1578 at 34 (Sawyer Report) ("The frequently-identified barrier that there is a lack of providers in particular areas of the State is also problematic."); Gaines Dep. 180:14-181:6, 204:10-25, Feb. 27, 2018.

0922.   A broad, robust network of community settings is integral to facilitating choice. Snyder Dep. 124:2-10, Nov. 16, 2018. Without a choice to move to a community setting in their desired geographic area, individuals remain in nursing facilities. PPI X 438-A at 3 ("Several individuals in [nursing facilities] would move out if they could remain in their current county to stay close to family and friends."); PPI X 1578 at 34 (Sawyer Report) ("A lack of provider capacity in areas where people want to move is a barrier to transitioning and may serve to keep individuals in nursing facilities unnecessarily.").

0923.   For example, SH is a fifty-year-old woman with cerebral palsy and a remote history of seizures who resides in a nursing facility. Due to her disabilities, SH is unable to walk and therefore uses a wheelchair. SH would like to transition to the community but has been unable to do so, in part, due to a lack of appropriate community placements available to meet her needs in the

geographical area within which she would like to live. PPI X 777 at 17-22 (Charlot Report).

0924.   However, HHSC's Director of Policy Development Support was not aware of any systemic evaluation by HHSC of challenges with provider capacity in particular areas. She testified, in fact, that HHSC does not do any systemic evaluation about provider capacity for geographic areas of the state. Williamson Dep. 47:4-25, Feb. 22, 2018.

0925.   Ms. Turner, the Deputy Associate Commissioner of IDD Services, was similarly unaware of any action being taken to address the lack of community providers in certain areas. Turner Dep. 239:20-241:4, Feb. 23, 2018.

0926.   Lack of cooperation or assistance from LIDDA and nursing facility staff during transition is also a barrier to successful transitions to the community. PPI X 1578 at 34-35 (Sawyer Report) ("Nursing facility resistance is also deeply problematic, because nursing facilities control much of the daily lives of individuals who live in them."); *see* Trial Tr. 375:1-19, Oct. 16, 2018 (Carrasco) (testifying that when Mr. Morrell transitioned "[t]here really wasn't a discharge process" because nobody was there on the day of his transition); Trial Tr. 1111:14-1113:6, Oct. 19, 2018 (Preskey) (testifying that KH experienced an eight-month delay between referral to a community provider and his move to the community in part because the nursing facility refused to order medical supplies and medications); Trial Tr. 1147:13-1149:2, Oct. 19, 2018 (Phetsavong) (nursing facility would not support transition to the community even though others agreed that a community placement was the appropriate setting).

0927.   Ms. Pilarcik found that individuals and guardians felt pressured to stay in the nursing facility or expressed fear of retaliation from the nursing facility if they pursued community options. For example, "DK poignantly stated that 'I am supposed to like it here, I am supposed to like it.'" PPI X 1280 at 22 (Pilarcik Report). For another individual, Ms. Pilarcik found that "[t]he service coordinator stated that SB has expressed a fear that the facility will get 'mad' at SB if she

participates in community options, and won't let her stay." PPI X 1280 at 31 (Pilarcik Report).

0928.    Community providers have experienced individuals who are transitioning to the community receiving an inadequate supply of medication. Trial Tr. 376:1-5, 13-19, Oct. 16, 2018 (Carrasco) (testifying that when Mr. Morrell transitioned, staff at his nursing facility said that they did not have a ten-day supply of medication on hand); Trial Tr. 1112:19-1113:12, Oct. 19, 2018 (Preskey) (testifying that for KH's transition from the nursing facility to community, the community provider only received a few days' supply of medication instead of the thirty-day supply that they requested); *see* PPI X 1578 at 32 (Sawyer Report).

0929.    The State is aware that individuals discharging from nursing facilities are often not given an adequate supply of medicine. PPI X 1551-A at tab 27 (tab titled 280) ("The access to medications is also a barrier; for individuals leaving an SSLC, they typically leave with a 30 day supply which meets the needs, however individuals discharging from a Nursing facility only leave with what they have remaining.").

0930.    The State is aware that nursing facilities' lack of cooperation from nursing facility staff is a barrier to transitions. PPI X 544 at 21 (presentation by Ms. du Pree about the 2015 QSR stating, "[Nursing facility] staff are not always supportive of community transition"); PPI X 438-A at 2 (noting as a barrier "[nursing facility] not cooperating with arranging for essential supports for a transition"); *see* PPI X 1578 at 32 (Sawyer Report).

0931.    Community providers experience delays in receiving adaptive or durable medical equipment, which has delayed individuals' transition from nursing facilities to the community. Trial Tr. 1111:14-1112:18, Oct. 19, 2018 (Preskey) (discussing delay in KH's transition from December to April because of delays in receiving his adaptive equipment, wheelchair, and medical supplies); PPI X 1578 at 32 (Sawyer Report).

0932.   The State is aware of this and other barriers to community transitions. *See* PPI X 438-A at 2 (listing as a barrier that "[t]he Managed Care Organizations are not approving to pay for shower chairs/shower trolleys. Many of the persons transitioning from Nursing Facilities need this item to safely bathe").

0933.   In fact, the State has received reports identifying this very problem. PPI X 271-A at tab 2, row 40 ("The process for getting [an individual] a new wheelchair has been onerous.").

0934.   Delays regarding adaptive equipment and other services can be attributed to the State's process for changing from institutional Medicaid to community Medicaid. PPI X 271-A at tab 2, row 44 ("The resources that are needed to address the barriers to resolve the medical service issue is the assistance of HHSC. If HHSC can prioritize the transition of Medicaid from one institution/nursing facility (NF) to the designated Medicaid waiver program [it] would be a greatly appreciated."); PPI X 1551-A at 1-2 (430) (listing the failure to change from nursing facility Medicaid to HCS Medicaid as a reason why there were delays in providing nursing services). This change in Medicaid can take thirty to forty-five days, during which time the provider may not be reimbursed for services. PPI X 438-A at 1.

0935.   LIDDAs have reported this problem to the State. *See, e.g.,* PPI X 271-A at tab 2, row 15 (report noting that durable medical equipment was "delayed due to Medicaid taking so long to switch from NF to community" and that "Wheelchair Assessment delayed due to referral process").

0936.   Without adaptive equipment, medical equipment, medications, and/or home modifications, individuals with IDD are unable to transition to the community and will remain isolated and unnecessarily segregated in nursing facilities. PPI X 1578 at 34 (Sawyer Report).

0937.   A lack of community residences that are wheelchair accessible can also delay or prevent individuals' transition from nursing facilities to the community. Trial Tr. 3673:16-21, Nov. 8, 2018 (Jones) (testifying that she has encountered a lack of wheelchair accessible homes for people with

IDD that "fluctuates"); Trial Tr. 3674:10-3676:1, 3676:25-3677:10, Nov. 8, 2018 (Jones) (discussing the LIDDA reports to HHSC regarding the lack of wheelchair accessible homes in the community); *see* PPI X 1578 at 32 (Sawyer Report) (finding that barriers to community living for people with IDD identified in HHSC depositions included lack of access to wheelchair accessible homes).

0938.   The State is regularly informed that the lack of accessible community residences is a barrier to transition. PPI X 271-A at tab 2, row 20 (2017 Quarter 2 ECC compilation report listing "[l]ack of provider group homes/host homes that are handicap accessible" as a reason for a delay); PPI X 1551-A at 1-2 (490) (2017 Quarter 1 ECC compilation report listing "[l]ack of provider group homes/host homes that are handicap accessible" as a reason for a delay); PPI X 438-A at 1 (listing as a barrier a "[l]ack of provider group homes/host homes that are handicap accessible"); PPI X 1832 at 5 (LIDDA's report to the State that "LIDDA discussed at the quarterly Provider and LA meeting the growing need for wheelchair accessible homes in the community").

0939.   The need for home modifications can delay an individual's move into the community. Trial Tr. 3664:21-24, Nov. 8, 2018 (Jones); *see* PPI X 1578 at 32 (Sawyer Report).

0940.   Finally, the State's diversion process is prohibitively burdensome because it requires that individuals with IDD seeking a diversion waiver to prevent an institutional placement exhaust all possible "community" services before they use a diversion waiver. The State requires individuals to consider placement at an ICF, which is an institutional setting, services provided through a public school, and CFC. PPI X 1215 at 16 (Piccola Rebuttal Report); *see* Trial Tr. 4101:22-4102:12, Nov. 14, 2018 (Piccola).

0941.   Requiring someone to pursue one institutional setting (an ICF) to avoid admission into another institution (a nursing facility) is at odds with the philosophy and goals of promoting independence and *Olmstead*. PPI X 1215 at 16-17 (Piccola Rebuttal Report).

0942.   The Arc of Texas has found that, many times, to access diversion services its members have had to explore unwanted ICF institutional placements and provide substantial evidence why those placements were not appropriate, all while still experiencing crisis. PPI X 1215 at 16-17 (Piccola Rebuttal Report).

0943.   Additionally, exploring CFC can also put an individual even further at risk. It requires that someone be assessed, choose a provider, find staff, train and retain staff, and document if CFC alone was able to resolve the crisis. The burden of engaging in this process and the time involved make it less likely that the individual will stabilize in the community and further increases the chances of institutionalization. CFC may augment needed services; however, it may not provide the supports and services that someone may need because of high medical needs and nursing needs.  PPI X 1215 at 17 (Piccola Rebuttal Report).

0944.   Individuals wait on average 114 days, or almost four months, between the date a diversion slot is released and the date of enrollment, which is when the waiver services needed to divert admission begin. For a population that, by definition, is at imminent risk of admission, this delay can make diversion from nursing facilities impossible. Trial Tr. 1463:21-1464:9, Oct. 22, 2018 (Weston).

C.    The State does not provide adequate training on diversion and transition

0945.   Adequate training is necessary so that individuals can avoid nursing facility placement when appropriate. PPI X 1906 at 25 (Weston Report); PPI X 1578 at 56 (Sawyer Report).

0946.   Training provided by HHSC, however, does not include critical information about essential components of diversion, transition, and service planning. PPI X 1907 at 18-19 (Weston Rebuttal Report).

0947.   For example, HHSC's trainings for LIDDAs address the requirement that a community living options discussion take place but do not include guidance about how to explain the other placement options that might be available in a way that individuals with IDD can understand. Miller 30(b)(6)

Dep. 117:23-118:17, Oct. 13, 2017; *see* PPI X 1907 at 19 (Weston Rebuttal Report).

0948.   HHSC trainings do not provide LIDDAs with guidance about how to identify, learn about, or address any concerns an individual may have about living in the community. Miller 30(b)(6) Dep. 120:13-121:25, 122:3-9, Oct. 13, 2017; *see* PPI X 1907 at 19 (Weston Rebuttal Report). Service coordinators do not receive standard guidance regarding how to learn about individuals' concerns about living in the community. Southall Dep. 173:1-14, Nov. 7, 2017.

0949.   HHSC's training related to the community living options (CLO) discussion is limited to one training called "PASRR I." PPI X 1907 at 19 (Weston Rebuttal Report); Miller 30(b)(6) Dep. 132:12-16, Oct. 13, 2017. This training does not include instructions on how to record identified barriers on the Community Living Options form. Miller 30(b)(6) Dep. 142:9-23, 142:25-144:1, 146:7-11, Oct. 13, 2017; *see* PPI X 238 (Instructor Guide for Preadmission Screening and Resident Review Processing and Service Coordination).

0950.   HHSC trainings do not provide trainees with opportunities to practice CLO conversations and receive feedback. Miller 30(b)(6) Dep. 123:1-15, Oct. 13, 2017.

0951.   HHSC trainings do not address how the initial CLO discussion differs from subsequent discussions. Miller 30(b)(6) Dep. 138:15-139:2, Oct. 13, 2017.

0952.   HHSC trainings do not address the requirements related to the provision of visits to community settings. Miller 30(b)(6) Dep. 155:19-156:3, 202:21-25, 225:9-17, Oct. 13, 2017.

0953.   HHSC does not provide training to LIDDAs on how to provide or arrange for the provision of educational or informational activities addressing community living options. Miller 30(b)(6) Dep. 160:18-161:23, Oct. 13, 2017.

0954.   HHSC does not provide trainings to LIDDA staff about how to present the State-developed materials on community options. Miller 30(b)(6) Dep. 128:15-25, 129:22-25, Oct. 13, 2017.

0955.   HHSC does not provide training about how to identify barriers that can prevent an individual

from living in the community, and HHSC's representative was not aware of any training about how to determine when an individual is best served in a community setting. Miller 30(b)(6) Dep. 203:20-24, 256:1-6, Oct. 13, 2017.

0956.   Service Coordinators receive no training on approaches to eliminating barriers to transitioning to the community, apart from training provided during the Service Coordinator's first ninety days. Southall Dep. 263:7-13, Oct. 4, 2017; *see* PPI X 172 at 5 (CLO Form 1039 Instructions stating that the CLO section addressing individuals' concerns and barriers is "self explanatory").

0957.   HHSC's LIDDA trainings do not address whether individuals with IDD who are not receiving Service Coordination but otherwise express an interest in moving to the community must have a transition plan developed. PPIX 1907 at 19 (Weston Rebuttal Report); Miller 30(b)(6) Dep. 179:5-17, Oct. 13, 2017.

0958.   HHSC trainings do not provide adequate guidance about how to document barriers on the ISP form. PPI X 1907 at 19 (Weston Rebuttal Report). For example, HHSC trainers do not provide guidance about how to complete the portion of the ISP Transition Plan related to barriers and possible resolutions, or any training about how to identify the supports an individual will need in the community and how to actually obtain the necessary supports that must be in place before an individual moves. Miller 30(b)(6) Dep. 208:22-209:17, 217:4-12, 227:22-228:19, Oct. 13, 2017.

0959.   With respect to non-HHSC trainings that LIDDAs provide to their staff, HHSC does not require training about how to have the CLO discussion. *See* Jalomo 30(b)(6) Dep. 90:19-91:10, 92:14-17, 92:24-93:12, 98:16-24, 246:21-247:10, Nov. 2, 2017.

0960.   Service coordinators lack training in person-centered planning. PPI X 29 at 5 (describing the Person-Centered Planning Process/Form Project Scope and noting that a project constraint is "[l]ack of training in Person-Centered Planning of service coordinators").

0961.   An HHSC lead trainer testified that he had not provided "Introduction to Person Centered"

training to any of the LIDDAs to which he is assigned. Miller 30(b)(6) Dep. 83:11-84:5, Oct. 13, 2017.

0962.   Service coordinators have trouble with discovering and knowing what people want. PPI X 38 at 3 (email to HHSC's Person-Centered Practices Coordinator listing what is not working in execution of person-centered planning by services coordinators).

0963.   Nursing facility resident Jacob Adkins testified that the service coordinator notes in his records wrongly state that he wanted to stay in a nursing facility. Adkins Dep. 34:16-35:11, Oct. 30, 2018.

0964.   HHSC has acknowledged that training on diversion planning is needed. Miller 30(b)(6) Dep. 255:22-24, Oct. 13, 2017.

0965.   Yet Texas fails to ensure that LIDDA staff receive adequate training about diversion practices. PPI X 1906 at 25 (Weston Report).

0966.   LIDDA training materials related to diversion focus almost exclusively on the process for requesting an HCS diversion slot. PPI X 1906 at 25 (Weston Report); *see* PPI X 238 (Preadmission Screening and Resident Review Process and Service Coordination Instructor Guide).

0967.   HHSC's trainings for LIDDA staff do not contain critical information about diversion coordination. PPI X 1907 at 18 (Weston Rebuttal Report).

0968.   Texas' 30(b)(6) witness Mr. Richard Miller admitted, "[D]iversion coordination is really not a focus of our training." Miller 30(b)(6) Dep. 127:22-23, Oct. 13, 2017; *see* PPI X 407 at 3 (moving diversion coordination training down as a training course priority). Mr. Miller did not know whether any HHSC trainings address diversion coordinators' responsibilities. Miller 30(b)(6) Dep. 239:4-19, Oct. 13, 2017.

D.  The State fails to adequately monitor, oversee, and enforce transition and diversion processes

1.  HHSC does not provide adequate oversight of LIDDAs' responsibility for the CLO process

0969.  LIDDAs are responsible for providing information about and discussing community living options. *See* PPI X 1575 at 32 (FY18-19 LIDDA Performance Contract, Attach. A-4, Art. 1.4); PPI X 535 at 5-6 (February 2017 Amendment to LIDDA Performance Contract Attachment G).

0970.  HHSC official Ms. Southall admitted that it would be concerning and alarming if only twenty-one percent of people receiving community living options discussions had appropriate and adequate discussions. Southall 30(b)(6) Dep. 309:21-310:2, Oct. 4, 2017. Yet this was the percentage of compliance determined by the QSR. PPI X 318 at 14 (Outcome Measure 2-6).

0971.  HHSC does not track how many individuals were informed about community living options prior to admission to a nursing facility. Trial Tr. 2881:3-6, Nov. 2, 2018 (Southall); Southall Dep. 220:23-221:2, Nov. 7, 2017.

0972.  HHSC does not track whether service coordinators have completed the CLO worksheet unless the individual is part of a small sample looked at during the annual review by the Contract Accountability and Oversight Unit. Trial Tr. 2874:18-2875:18, Nov. 2, 2018 (Southall); Southall Dep. 177:10-178:5, 192:20-193:4, 266:7-267:4, 268:20-269:9, Nov. 7, 2017; Jalomo 30(b)(6) Dep. 103:6-24, 105:3-8, 105:21-106:7, 147:9-11, Nov. 2, 2017.

0973.  HHSC does not track whether the person presenting the CLO is knowledgeable about community options or whether the CLO conversation is tailored to the individual.  Trial Tr. 2869:24-2870:11, Nov. 2, 2018 (Southall).

0974.  HHSC does not track the length of CLO discussions. Trial Tr. 2874:8-17, Nov. 2, 2018 (Southall).

0975.    HHSC does not confirm that required participants are present for CLO discussions. Trial Tr. 2874:2-4, Nov. 2, 2018 (Southall); Southall Dep. 188:4-11, Nov. 7, 2017.

0976.    CAO does not assess the quality of CLO discussions. Southall Dep. 210:14-18, Nov. 7, 2017; *see* Trial Tr. 2869:5-14, 2872:4-10, 2872:23-2873:9, Nov. 2, 2018 (Southall); Southall 30(b)(6) Dep. 163:1-5, Oct. 4, 2017; *see generally* Southall Dep. 268:20-269:9, Nov. 7, 2017.

0977.    There is no HHSC expectation that LIDDAs will check whether the CLO forms are completed correctly. Southall 30(b)(6) Dep. 267:5-14, Oct. 4, 2017.

0978.    HHSC does not monitor LIDDAs to ensure that they provide accommodations, opportunities, or supports to individuals with IDD to learn about community options and make an informed choice whether to transition to the community. PPI X 1578 at 54 (Sawyer Report); *see* Southall Dep. 236:4-18, Nov. 7, 2017.

0979.    HHSC does not collect information about whether LIDDAs meet the communication needs of individuals with IDD during CLO discussions, and HHSC thus cannot know whether LIDDAS provide needed accommodations to ensure that individuals with IDD understand available community options. *See* Southall Dep. 171:24-172:6, Nov. 7, 2017 (testifying that CAO does not assess whether individuals understood the CLO materials); PPI X 1118 (lack of reporting requirement regarding communication accommodations in the PASRR Reporting Manual).

0980.    HHSC expects the person facilitating the CLO discussion to address concerns about community living that have been expressed by individuals or their LAR. Southall Dep. 174:2-9, 174:14-21, Nov. 7, 2017. To assess whether the CLO process is effectively addressing individuals' concerns about transitioning to the community, the State uses the QSR. Diase Dep. 75:22-77:21, Nov. 1, 2017. However, the director of HHSC's QSR Unit did not know whether the QSRs have determined that the CLO process has a low rate of compliance in addressing individuals' concerns about transitioning to the community. Diase Dep. 77:22-78:1, Nov. 1, 2017. Nor did she know if the

CLO process is successful in overcoming barriers. Diase Dep. 75:22-77:2, Nov. 1, 2017.

0981.  HHSC does not track whether the person who is facilitating the CLO conversation has learned about or developed specific strategies to address the individual's concerns about community living. Trial Tr. 2870:18-25, 2871:7-12, Nov. 2, 2018 (Southall); Southall Dep. 173:21-174:1, 174:22-175:3, Nov. 7, 2017.

0982.  Nor does CAO evaluate service coordinators' work to address concerns and barriers unless the service coordinators' files are selected in the annual CAO audit. CAO does not track how long a concern has been pending without resolution. Trial Tr. 2872:23-2874:1, Nov. 2, 2018 (Southall); Southall Dep. 178:6-10, 178:14-23, 180:9-15, Nov. 7, 2017.

0983.  Apart from the annual CAO review, HHSC does not provide oversight to ensure follow-up activities occur to address concerns about community placement. Southall 30(b)(6) Dep. 266:12-267:4, 271:10-14, 290:7-11, Oct. 4, 2017.

0984.  HHSC does not meaningfully monitor and analyze the metrics necessary to determine whether individuals with IDD have made an informed choice to remain in nursing facilities. PPI X 1578 at 44 (Sawyer Report); *see* Southall Dep. 249:10-250:23, Nov. 7, 2017.

2.    HHSC does not provide adequate oversight of LIDDAs' responsibility to provide educational and informational activities

0985.  LIDDAs are responsible for educational and informational activities. *See* PPI X 1575 at 32 (FY18-19 LIDDA Performance Contract); PPI X 535 at 5-8 (February 2017 Amendment to LIDDA Performance Contract Attachment G); *see also* Southall Dep. 221:8-13, Nov. 7, 2017.

0986.  However, the Director of HHSC's Regulatory Services' Survey Operations Unit does not know if surveyors assess whether nursing facilities permit LIDDAs to provide educational and informational activities for residents. Lothringer 30(b)(6) Dep. 109:4-111:4, Nov. 6, 2017.

0987.  CAO does not track whether peer interactions are provided to address concerns about living

in the community. Southall 30(b)(6) Dep. 258:7-14, Oct. 4, 2017.

0988.    HHSC has not determined how many people with IDD in nursing facilities who are receiving Service Coordination have made community visits. Southall 30(b)(6) Dep. 290:21-291:10, Oct. 4, 2017.

0989.    HHSC does not monitor whether LIDDAs offer community visits and related activities to individuals if they have not affirmatively requested such experiences. PPI X 1578 at 54 (Sawyer Report); Southall Dep. 223:13-224:1, Nov. 7, 2017.

0990.    HHSC does not require reporting on and does not monitor what specific types of individual and family education are provided. PPI X 1578 at 54 (Sawyer Report); Southall Dep. 235:16-236:18, Nov. 7, 2017.

0991.    HHSC does not monitor or track the number of individuals who take tours of community programs each quarter or what programs they visit, and HHSC does not examine what difference, if any, such tours make in their choice to stay or leave a nursing facility. PPI X 1578 at 44 (Sawyer Report); Southall Dep. 243:15-245:23, Nov. 7, 2017.

0992.    HHSC does not use the information collected concerning the types of education provided to individuals with IDD and their families about community living options and related topics to determine what types of information are or are not useful in making transition decisions, and what impact the entire process has on promoting informed choice. Trial Tr. 2155:17-2156:7, Oct. 26, 2018 (Sawyer); PPI X 1578 at 54-55 (Sawyer Report); Southall Dep. 238:2-21, 249:10-250:23, Nov. 7, 2017.

      3.    HHSC does not provide adequate oversight of LIDDAs' responsibility for diversion

0993.    LIDDAs are responsible for diverting individuals with IDD at risk of entering a nursing facility, identifying any barriers to diversion, and finding resolutions to those barriers. Trial Tr. 2876:6-10, Nov. 2, 2018 (Southall) (HHSC requires that LIDDAs try to divert individuals from

nursing facilities); PPI X 535 at 3-4 (February 2017 Amendment to LIDDA Performance Contract, Attachment G); PPI X 1575 at 29-31 (FY18-19 LIDDA Performance Contract, Attachment A-4); Jalomo 30(b)(6) Dep. 203:17-204:10, Nov. 2, 2017; Gaines Dep. 38:7-21, Feb. 27, 2018.

0994.   HHSC considers it important for people who are referred to nursing facilities to be considered for diversion, but the State fails to adequately monitor, oversee, and enforce the diversion process. Trial Tr. 1474:24-1475:2, Oct. 23, 2018 (Weston); Trial Tr. 2880:15-22, Nov. 2, 2018 (Southall).

0995.   HHSC has not assessed the success of its diversion program or whether individuals who are diverted subsequently are admitted to a nursing facility. Trial Tr. 2882:9-19, Nov. 2, 2018 (Southall); Southall Dep. 307:16-24, Nov. 7, 2017.

0996.   Ms. Mirenda Blevins, HHSC's witness on enrollment relating to PASRR diversion slots and the PASRR subject matter expert for HHSC's Local Procedure and Development and Support office, confirmed that HHSC does not have policies or supports in place to increase numbers of diversion. Trial Tr. 3479:7-15, 3490:17-3491:8, Nov. 6, 2018 (Blevins) ("I don't believe that we have a policy in place for a stringent diversion program.").

0997.   Ms. Southall, the manager of the CAO Unit, is unaware that anyone at HHSC reviews, or is expected to review, nursing facility admissions to determine whether anyone could have been diverted. Trial Tr. 2884:9-23, Nov. 2, 2018 (Southall); Southall Dep. 284:21-286:3, Nov. 7, 2017.

0998.   CAO does not track whether LIDDAs are identifying barriers to diversion. Trial Tr. 2881:7-2882:8, Nov. 2, 2018 (Southall).

0999.   CAO does not assess the diversion practices of LIDDAs that have not accomplished diversions during the review period. *See* Trial Tr. 2166: 22-2167:3, Oct. 26, 2016 (Sawyer). CAO's review tool includes a section related to diversion practice, but if a LIDDA did not divert any individuals during the review period, then this portion of the tool is simply not completed. Trial Tr.

2869:5-14, 2878:23-2879:10, 2879:25-2880:10, Nov. 2, 2018 (Southall) (Q: "So CAO doesn't review diversion practices where the LIDDA is not actually diverting anyone; is that right?" A: "Yes."); PPI X 1906 at 25 (Weston Report) ("This is problematic, because HHSC fails to identify poor performance or assess the reasons for poor diversion performance.").

1000.   Associate Commissioner Gaines acknowledged that a LIDDA's failure to accomplish diversions should prompt an evaluation by HHSC. Gaines Dep. 228:5-231:8, Feb. 27, 2018 (testifying that if a LIDDA has completed no transitions or diversions during an annual review period, she would nevertheless expect the IDD Services Unit to oversee the LIDDAs' diversion and transition practices to determine "if there is some barrier" and if this is "an unusual circumstance or . . . an ongoing problem," but she did not know whether such evaluations happen in practice).

1001.   Similarly, inconsistent performance among the LIDDAs presents an opportunity for HHSC to evaluate and address barriers to diversion, and to replicate successful strategies at other LIDDAs statewide. Yet, there is no evidence that the State has conducted this comparative analysis of LIDDA diversion performance, nor is there any evidence that they have initiated enforcement actions or performance improvement actions. Trial Tr. 1464:22-1465:18, Oct. 22, 2018 (Weston); PPI X 1906 at 24 (Weston Report) ("I have seen no indication that this analysis is done, that these evaluations occur, that performance improvement initiatives are required, that enforcement actions are taken, or that successful strategies are shared.").

1002.   The wide discrepancy in LIDDA diversion performance strongly suggests that with monitoring and accountability, the number of diversions could increase substantially. PPI X 1762 at 23, 25 (Webster Report).

> 4.    HHSC does not provide adequate oversight of LIDDAs' responsibility for transition planning

1003.   HHSC is responsible for ensuring that LIDDAs facilitate transitions consistent with

individuals' choice. Gaines Dep. 39:20-40:1, Feb. 27, 2018.

1004.   The CAO annual review is HHSC's only assessment or oversight of LIDDAs' transition planning performance. The CAO looks at only one transition per LIDDA to check if the LIDDA followed the process that is outlined in the performance contract and completed the individual service plan. But if a LIDDA has not transitioned anyone from the nursing facility within the annual review period, the CAO would not review certain transition processes. Trial Tr. 2883:16-2884:4, Nov. 2, 2018 (Southall); Trial Tr. 2976:25-2980:6, Nov. 2, 2018 (Reece); PPI X 1579 at 23 (Sawyer Rebuttal Report); Reece 30(b)(6) Dep. 90:15-21, Oct. 11, 2017; Southall 30(b)(6) Dep. 156:9-14, 127:22-128:3, 144:13-21, 149:15-150:25, 156:8-14, Oct. 4, 2017; Southall Dep. 255:17-256:25, Nov. 7, 2017. For example, in such a case, the review would not assess or collect data regarding transition plan development, transition plan content, or transition plan implementation and management.  Reece 30(b)(6) Dep. 90:15-21, 91:21-92:9, Oct. 11, 2017.

1005.   Additionally, the CAO would not review transition planning for a designated resident in a nursing facility unless the option "expressed an interest in living in a community" has been determined. Reece 30(b)(6) Dep. 90:15-21, 91:21-92:9, Oct. 11, 2017.

1006.   If a LIDDA has not transitioned anyone from a nursing facility within the annual review period, the LIDDA can still receive full marks on the CAO annual review. Reece 30(b)(6) Dep. 88:21-23, Oct. 11, 2017.

1007.   If Texas provided adequate oversight of its IDD system, the fact that a transition did not occur would trigger additional oversight of the LIDDA's practices. *See* PPI X 1579 at 23-24 (Sawyer Rebuttal Report).

XI.

Texas does not oversee LIDDAs and Nursing Facilities to ensure that Individuals with IDD
receive necessary services and are not unnecessarily segregated

A.    Texas does not have an adequate quality management and improvement program

1008.   The outcomes for individuals with IDD in nursing facilities as demonstrated by the State's

own data, including the steady number of individuals with IDD in nursing facilities and the QSR

outcomes and outcome measures related to transition, among others, demonstrate that the State does

not have an effective quality assurance system that ensures individuals with IDD can transition to

the community when desired and appropriate. PPI X 1579 at 23 (Sawyer Rebuttal Report).

1009.   An effective IDD quality assurance/improvement (QA) system is essential to ensure that

individuals with IDD are getting the services that they need in order to transition to and/or remain

safely in the community and avoid unnecessary institutionalization. PPI X 1578 at 20, 43-44 (Sawyer

Report); *see also* Trial Tr. 2153:14-2154:15, Oct. 26, 2018 (Sawyer).

1010.   QA systems designed to monitor, evaluate, and improve performance are critical to serving

people with IDD in the most integrated setting to meet their needs. Trial Tr. 2122:4-6, Oct. 26, 2018

(Sawyer); PPI X 1578 at 15-16 (Sawyer Report).

1011.   A comprehensive and integrated quality assurance and management plan is common for

service systems like that in Texas and is critical in order to identify current performance and areas

in need of improvement. Trial Tr. 2122:4-6, 2153:14-2154:15, Oct. 26, 2018 (Sawyer); PPI X 1578

at 36 (Sawyer Report); PPI X 1579 at 24 (Sawyer Rebuttal Report).

1012.   It is the well-accepted standard for public IDD systems to have a quality management and

improvement program that measures performance, identifies deficiencies or gaps, takes corrective

action, and then determines if that corrective action has effectively resolved the problem. PPI X

1578 at 20, 43 (Sawyer Report); *see also* Trial Tr. 2153:3-13, 2153:16-2154:15, Oct. 26, 2018

309

(Sawyer) (opining that it is necessary for an IDD QA system to have "a full-blown, robust system that says what it is you want, how you're going to measure it, and be able to pre-measure it and then take action but take action timely.  It's the only way the system knows what it's really doing and what it's not doing.").

1013.   An integral part of an effective IDD QA system is a focus on diversion and transition of individuals from institutions, including nursing facilities. PPI X 1578 at 43 (Sawyer Report); *see also* Trial Tr. 2157:6-16, Oct. 26, 2018 (Sawyer).

1014.   Elements of an effective QA system with a focus on diversion and transition of individuals from institutions must include: measurable performance indicators for providers responsible for services and supports necessary to meet the needs of persons they serve, and specifically for individuals with IDD in nursing facilities; regular monitoring and oversight of service delivery; collection and analysis of performance data; and use of the data to implement corrective actions, including training, technical assistance, and sanctions – including termination – that will improve deficient performance and achieve desired outcomes. Trial Tr. 2153:14-2154:15, Oct. 26, 2018 (Sawyer); PPI X 1578 at 43 (Sawyer Report).

1015.   Incident management and prevention systems integrated with the IDD services systems are also critical components of an effective QA and management plan. These systems are important for vulnerable populations because they require the immediate reporting and investigation of all alleged incidents of abuse, neglect, and mistreatment of persons served. Further, these systems require that corrective and preventative actions promptly be taken to reduce and, if possible, eliminate the occurrence of such incidents to ensure the safety and general well-being of people with IDD. Trial Tr. 2154:4-15, Oct. 26, 2018 (Sawyer); PPI X 1578 at 48 (Sawyer Report).

1016.   IDD community services system leaders and policymakers must be aware of, and engaged in, the system's QA activities for the system to be effective. PPI X 1578 at 20 (Sawyer Report).

1017.    Outcome 7 of the QSR deals with a quality assurance and management system. It states, "The State will make reasonable efforts to ensure that individuals in the [Target Population] are safe and free from harm through effective incident management, risk management, and quality assurance systems." PPI X 218 at 2 (setting out the proposed review criteria and protocol for QSR Outcome 7). According to Ms. du Pree, this outcome is important to safeguarding individuals who are part of the service delivery system and for identifying trends and patterns indicating areas requiring quality improvement in order to achieve health and safety outcomes for individuals who are served. du Pree Dep. 54:8-55:4, Feb. 6, 2018. HHSC's representative agreed that such efforts are important. Jordan 30(b)(6) Dep. 83:13-23, Mar. 16, 2018.

1018.    However, Outcome 7 was not reported in the 2015 or 2016 QSRs. The State failed to provide Ms. du Pree with the necessary data to conduct her analysis of Outcome 7. du Pree Dep. 55:16-56:10, 58:2-18, Feb. 6, 2018; *see* PPI X 121 (2015 QSR report does not include Outcome 7); PPI X 318 (2016 QSR Interim Report does not include Outcome 7).

1019.    Based on her extensive review of HHSC's own documents and depositions of HHSC employees, Ms. Sawyer, Plaintiffs' and United States' IDD systems expert, found that Texas does not have a "comprehensive quality assurance, quality improvement or quality management plan" and that Texas' existing quality assurance activities for people with IDD "were not often integrated or coordinated, did not result in adequate identification and resolution to systemic problems, and did not provide for sufficient continuous improvement." Trial Tr. 2154:24-2155:16, Oct. 26, 2018 (Sawyer); PPI X 1578 at 43-45 (Sawyer Report); PPI X 1579 at 24 (Sawyer Rebuttal Report).

1020.    HHSC's Deputy Associate Commissioner for Quality and Program Improvement Andy Vasquez testified that he was not aware of any State quality assurance plan. He was not aware of any assessment by the State to determine whether it has a sufficient number of community providers to meet the need for services in the community for people with IDD or that the State had any such plan.

Nor was he aware of any analysis by the State regarding the number of people who will need specialized services. Vasquez Dep. 267:13-269:21, Jan. 12, 2018.

1021.   Michelle Martin, a director of Special Projects and Legal Services and a former director within MSS, could not identify any systemic quality improvement initiatives that existed as of September 1, 2017. Martin Dep. 275:15-276:12, Aug. 17, 2018.

1022.   The State's Long-term Care Ombudsman office is not a QA mechanism targeted at individuals with IDD. Trial Tr. 2798:19-2800:2, Nov. 1, 2018 (Ducayet).

1023.   The State does not use data in order to identify and correct problems in the system relating to the diversion and transition of individuals with IDD in nursing facilities or at risk of admission to nursing facilities and to engage in continuous improvement of the overall system. Trial Tr. 1464:22-1465:18, Oct. 22, 2018 (Weston); Trial Tr. 1474:11-1475:2, Oct. 23, 2018 (Weston); Trial Tr. 3826:4-23, Nov. 9, 2018 (Turner); PPI X 1906 at 24-27 (Weston Report); PPI X 1578 at 45 (Sawyer Report); PPI X 2111 at 13; Dionne-Vahalik Dep. 30:11-35:23, 46:12-47:13, 152:23-153:9, Dec. 19, 2017; Dionne-Vahalik 30(b)(6) Dep. 226:19-227:2, Oct. 12, 2017; Schultz Dep. 200:6-201:7, 207:1-12, Dec. 18, 2017; Southall 30(b)(6) Dep. 202:9-17, 212:9-213:12, 214:6-16, 216:10-18, Oct. 4, 2017; Jalomo Dep. 224:4-225:3, 229:22-230:21, 232:19-234:21, 236:9-240:6, Nov. 3, 2017.

1024.   For example, HHSC does not use data or take actions to analyze and reduce the number of people who return from the community to a nursing facility. Trial Tr. 2167:4-10, Oct. 26, 2018 (Sawyer) (testifying that she found no evidence that "HHSC reviews any data about people who have left a nursing facility but then have returned"); Trial Tr. 2895:10-15, 2896:18-2898:8, Nov. 2, 2018 (Southall); see PPI X 1578 at 45 (Sawyer Report); Southall Dep. 276:2-277:9, Nov. 7, 2017. Identifying if an individual who transitioned to the community was readmitted to a nursing facility would be an important way to deduce barriers to successful transitions. Trial Tr. 2895:10-15,

2896:22-2897:4, Nov. 2, 2018 (Southall).

1025.   HHSC does not aggregate and analyze data with respect to the number of individuals who chose to remain in a nursing facility, the reasons for their choice, the barriers to transition, the number or type of visits to providers, the number or type of meetings with providers, peers, or family groups, or the type of information and experiences provided to allow them to make an informed choice whether to remain in a nursing facility. Trial Tr. 3812:2-3813:21, 3826:19-3827:8, Nov. 9, 2018 (Turner); Turner Dep. 50:24-51:16, Feb. 23, 2018; Jalomo 30(b)(6) Dep. 114:7-9, Nov. 2, 2017.

1026.   HHSC does not know, nor has it conducted a study to determine, why the overall transitions of people from nursing facilities has been trending downward since 2011. PPI X 206 at 17 (2016 Revised Promoting Independence Plan, Aug. 2017, Fig. 1); Jones 30(b)(6) Dep. 170:1-21, 171:5-24, Oct. 17, 2017.

1027.   Texas' lack of a comprehensive quality assurance and management plan is demonstrative of its lack of needed oversight, infrastructure, policies, and procedures to ensure that individuals with IDD can live in the community. PPI X 1578 at 21, 43-44 (Sawyer Report); PPI X 1579 at 24 (Sawyer Rebuttal Report).

B.     Quality Service Review: The State fails to utilize the Quality Service Review as a quality assurance tool

1028.   A major deficiency in Texas' IDD oversight system is its failure adequately to consider the findings of the QSR, which was developed to track performance specific to the diversion and transition goals. PPI X 1579 at 24 (Sawyer Rebuttal Report).

1029.   The QSR is HHSC's most thorough and independent mechanism for measuring HHSC's compliance with PASRR and the ADA. Unlike the Contract Accountability and Oversight Unit review, which only assesses compliance with contract and state regulatory requirements, the QSR

assesses performance on a significantly broader variety of areas relating to outcomes for individuals with IDD. Importantly, the QSR focuses on individuals with IDD who are in, at risk of, or have transitioned from, nursing facilities. Further, the QSR includes qualitative assessments of HHSC practices and reviews outcomes for individuals with IDD. PPI X 1907 at 24-25 (Weston Rebuttal Report); PPI X 1579 at 25-27 (Sawyer Rebuttal Report).

1030.    State officials acknowledge that the QSR is important for quality assurance purposes because it provides the State with a view of information on the site where services are provided, helps the State look at individual metrics and measures, and collects information. *See, e.g.,* Vasquez Dep. 162:11-164:23, Jan. 12, 2018. Dr. Diase, who oversees the QSR unit, recognizes that it is important to review what is happening to actual people in nursing facilities, rather than just looking into policies, because there is a difference between what should be done and what is actually being done. Diase Dep. 82:13-83:11, Nov. 1, 2017. As a QSR reviewer, she observed instances where there was a disconnect between what was required and what was actually happening in practice. Diase Dep. 83:1-85:10, Nov. 1 2017.

1031.    However, Texas does not use the QSRs in a meaningful way to identify deficits in Texas' delivery of services to individuals with IDD or to make needed changes. Trial Tr. 2159:14- 2160:10, Oct. 26, 2018 (Sawyer); PPI X 1578 at 51 (Sawyer Report); PPI X 1579 at 24 (Sawyer Rebuttal Report).

1032.    HHSC official Ms. Martin admitted that the QSR is not used as a quality improvement initiative. Martin Dep. 274:11-275:6, Aug. 17, 2018.

1033.    Many HHSC managers testified that they have little awareness of the State's performance on QSR measures.

1034.    For example, Mr. Vasquez did not know if the QSR Unit tracks the problems identified by the QSR reviews. Vasquez Dep. 214:11-14, Jan. 12, 2018. When he started his position, he was not

briefed on the 2015 QSR report. Vasquez Dep. 173:24-174:3, Jan. 12, 2018.

1035.   Associate Commissioner Sonja Gaines, who oversees the IDD Services Unit and is responsible for reporting issues to senior management, was not familiar with the QSR and had not reviewed any of the results at the time of her deposition. Gaines Dep. 184:20-185:17, 243:7-21, 248:1-249:10, Feb. 27, 2018. After reviewing a summary of what the QSR entails during her deposition, Associate Commissioner Gaines acknowledged its relevance to the unit she oversees. Gaines Dep. 252:19-254:1, 254:19-256:8, 258:1-16, 259:18-22, 262:14-263:2, Feb. 27, 2018 ("All of this is relevant. All of it is relevant.").

1036.   IDD Services Director Mr. Jalomo could not recall participating in any meetings related to the 2016 QSR report and, while he expects the managers he oversees to review QSR reports, he did not recall whether they had done so. Jalomo Dep. 229:22-230:2, 225:1-3, Nov. 3, 2017.

1037.   Not only do State officials not review the QSRs, but also they do not take sufficient action to address QSR findings of deficient and non-compliant performance. PPI X 1578 at 51-52 (Sawyer Report); *see also* Trial Tr. 2159:14-2160:2, Oct. 26, 2018 (Sawyer).

1038.   HHSC's representative did not know of a "very formal" process for making decisions about how to address the recommendations in the QSR reports. Jordan 30(b)(6) Dep. 65:16-22, Mar. 16, 2018.

1039.   Multiple HHSC representatives and officials could not identify actions taken by HHSC in response to the QSR findings and recommendations. *See, e.g.,* Jordan 30(b)(6) Dep. 65:12-22, 119:21-120:21, Mar. 16, 2018; Diase Dep. 173:11-15, Nov. 1, 2017.

1040.   Mr. Jalomo had reviewed the 2016 Quarter 1 QSR report and the 2016 interim QSR report, but he could not recall anyone at HHSC taking action, or any instruction to take action, based on the findings in those reports. Jalomo Dep. 224:4-25, Nov. 3, 2017.

1041.   Although Mr. Jalomo was involved in meetings with the Deputy Associate Commissioner of IDD Services about proposed action steps in response to QSR recommendations, at the time of his deposition Mr. Jalomo did not know if any of the recommendations had been implemented. Jalomo Dep. 236:9-240:6, Nov. 3, 2017 (discussing PPI X 183 and 184).

1042.   Ms. Southall, the manager of the CAO Unit, testified that QSR reports have not been used in determining any process for the State's CAO reviews. Southall 30(b)(6) Dep. 212:9-13, Oct. 4, 2017.

1043.   CAO official Debbie Reece had not read any of Ms. du Pree's reports and she is unaware of anyone at HHSC who has incorporated Ms. du Pree's findings, data, or methodology to assess the performance of LIDDAs. Trial Tr. 2980:20-2981:14, Nov. 2, 2018 (Reece); Reece 30(b)(6) Dep. 26:16-23, 86:14-18, 89:12-17, Oct. 11, 2017; Reece Dep. 103:25-104:3, Sept. 13, 2017.

1044.   The CAO tool does not in any way incorporate the QSR data or methodology. Reece 30(b)(6) Dep. 20:22-21:3, Oct. 11, 2017.

1045.   HHSC Deputy Commissioner Kristi Jordan, the State's 30(b)(6) deposition witness testifying about the QSR, could not identify what HHSC had done in response to the QSR recommendation that the agency undertake a study to determine the number and location of small residential settings the State needs to meet the needs of the diversion and nursing facility target populations, or that the agency identify gaps in medical and nutrition management services by region. Jordan 30(b)(6) Dep. 15:17-16:25, 125:24-126:15, 126:21-127:8, Mar. 16, 2018.

1046.   Deputy Commissioner Jordan did not know whether the former DADS compared the QSR results to the results in DADS' oversight activities of the LIDDAs, or whether DADS/HHSC cross-reference QSR findings with the findings of any other State data collection or oversight activity. Jordan 30(b)(6) Dep. 132:3-6, 132:19-23, Mar. 16, 2018. Although the information collected by the QSR is important to the State, Deputy Commissioner Jordan did not know of any

protocols to ensure that this information is disseminated to other units within DADS/HHSC to whom the information is relevant, or of any processes within DADS/HHSC to monitor trends from the results of the QSR. Jordan 30(b)(6) Dep. 140:6-19, 150:1-14, Mar. 16, 2018.

1047.   Ms. Dionne-Vahalik, head of the Quality Monitoring Program section, testified that her office had made no interventions based solely on QSR results. Dionne-Vahalik Dep. 250:21-251:4, Dec. 19, 2017.

1048.   Geri Willems, Director of the PASRR Unit, has oversight of and responsibility for monitoring nursing facility compliance with PASRR, yet she stated repeatedly that her unit is not responsible for many of the QSR findings on PASRR, including those related to nursing facilities. She admitted that her unit took no action and she was unaware of any action taken in response to numerous significant drops in compliance with QSR Outcome Measures. Willems 30(b)(6) Dep. 177:8-197:19, Jan. 11, 2018.

1049.   The training department proposed getting Ms. du Pree's input on training, and sending the HHSC trainers to QSR training, but Mr. Jalomo, the director of IDD Services, never followed up. PPI X 407 (email to Anthony Jalomo recommending "things to do to improve training"); Rees Dep. 258:9-260:2, 261:1-13, 261:17-262:11, Jan. 11, 2018; *see also* PPI X 402 at 2 (Training Unit manager writing that it would be a good idea to use QSR "data to assess needs and identify the best focus for PASRR training"); Rees Dep. 194:6-14, Jan. 11, 2018 (acknowledging that he was not granted permission to work directly with the QSR Unit).

1050.   In the 2015 QSR Report, Ms. du Pree's findings on the issue of barriers to placement conclude that only 37 percent of the criteria were met. In response, Ms. du Pree recommended that the LIDDAs develop more comprehensive community living option plans to identify more specifically individual and family concerns. However, Ms. du Pree did not know whether this happened. She further recommended that HHSC/DADS use the information from the LIDDAs to

identify how to improve provider capacity. Again, she did not know whether the State had taken any action in response to this recommendation. PPI X 121 at 47; du Pree Dep. 225:12-227:4, Feb. 6, 2018.

1051.    In addition, information from the QSR is not shared throughout all relevant parts of HHSC for use in planning and systemic reforms. Trial Tr. 2159:17-2160:10, Oct. 26, 2018 (Sawyer); PPI X 1578 at 51 (Sawyer Report); *see* Southall Dep. 207:23-208:9, Nov. 7, 2017 (testifying that she had requested, but not received relevant QSR information); Henderson Dep. 163:15-23, Nov. 14, 2017 (QSR reviewers are not required to tell Regulatory Services about their findings); Willems 30(b)(6) Dep. 211:7-9, Jan. 11, 2018 (no regularly scheduled meetings between PASRR Unit and QSR reviewers); Lothringer 30(b)(6) Dep. 236:10-13, Nov. 6, 2017 (testifying that she did know not what the QSR is); Mills Dep. 142:18-21, Oct. 19, 2017 (testifying that she had not heard of a quality service review).

1052.    Mr. Vasquez, Deputy Associate Commissioner of the unit responsible for the QSR, was not aware of a policy on who should review the QSR reports. Vasquez Dep. 172:2-4, Jan. 12, 2018.

1053.    Texas does not use the QSR to provide timely feedback to LIDDAs, inhibiting their ability to improve. Trial Tr. 3582:5-3583:24, Nov. 8, 2018 (Thompson) (LIDDA COO testified that LIDDA had not received feedback from QSR review for a year); PPI X 182 at 2 (Email from LIDDA IDD Director Carey Amthor informing Mr. Jalomo and Ms. Turner that without receiving feedback from the last round of QSRs "we go for a year with the same scores because we don't know what we are doing right and what we are doing wrong – or what we need to improve on."); Jalomo Dep. 233:23-234:21, Nov. 3, 2017 (testifying that although he was aware of Mr. Amthor's email, he still did not know whether LIDDAs receive timely feedback about the results of QSR reviews). Mr. Jalomo agreed that it is important to provide the LIDDAs with feedback and that without feedback LIDDAs may not know what they are doing wrong and what they are doing right. Jalomo Dep.

234:5-21, Nov. 3, 2017.

1054.  The State's failure to use the QSR, its own QA tool, was continuing as of September 1, 2017. As of that date, the final 2016 QSR report had been delayed and was not yet released. PPI X 1578 at 52 (Sawyer Report); Vasquez Dep. 187:19-188:10, Jan. 12, 2018.

1055.  Other HHSC reviews and surveys are not a sufficient substitute for the QSR process. PPI X 107 (email among HHSC employees explaining that HHSC surveys, such as regulatory, look at much less data/activities related to PASRR than the QSR does, and in this instance gave a much higher score to the same individual than the QSR did). The CAO review, for example, only measures contract and state regulatory compliance whereas the QSR measures both processes and outcomes for people. PPI X 1579 at 27 (Sawyer Rebuttal Report); PPI X 448-A, tab 1 (comparing whether CAO also reviews certain QSR outcomes measures); PPI X 449-A, tab 1 (same).

1056.  Unlike the QSR, CAO does not measure whether "the PASRR Level II determines the services the individual needs to live in the community;" whether "the PASRR Level II appropriately assesses whether the needs of the individual can be met in the community and identifies the specialized services that the individual needs;" or whether "the strategies to address barriers to community placement reflect the strengths and preferences of the individual." PPI X 1579 at 26 (Sawyer Rebuttal Report); *see* PPI X 318 (2016 PASRR QSR Compliance Status Interim Report); PPI X 254 (QSR Review Results by Outcome Measure).

1057.  In addition, the QSR is based on a random sample; the CAO review is not. PPI X 1579 at 23 (Sawyer Rebuttal Report); Southall 30(b)(6) Dep. 129:12-131:5, Oct. 4, 2017.

1058.  Importantly, the CAO's review is focused primarily on LIDDA compliance with state imposed requirements whereas the QSR is focused primarily on the State's compliance with federal law.

1059.   The vast discrepancies between the QSR results and the findings made by the CAO demonstrate the CAO reviews' inadequacy as QA infrastructure. *Compare* PPI X 318 at 6 (2016 QSR Report) *and* PPI X 121 (2015 QSR Report) *with* PPI X 449 (listing CAO scores); *see* PPI X 1579 at 25 (Sawyer Rebuttal Report).

C.      The State does not provide adequate oversight to monitor and improve LIDDA performance

        1.      CAO annual reviews do not provide adequate LIDDA oversight

1060.   The CAO unit is responsible for annual reviews of LIDDA performance, including the provision of Service Coordination, specialized services, community living options discussions, diversion, and transition. PPI X 1907 at 22; *see* Trial Tr. 2862:8-25, Nov. 2, 2018 (Southall) (testifying that CAO conducts annual reviews to oversee LIDDAs' compliance with their obligations under the Performance Contract and Texas Administrative Code); PPI X 1575 at 2 (FY18-19 LIDDA Performance Contract); PPI X 410 at 2 (FY16-17 LIDDA Performance Contract); Southall 30(b)(6) Dep. 79:11-81:1, Oct. 4, 2017.

1061.   The annual CAO reviews, also referred to as "on-site reviews," are based on a review of one percent of individuals in each LIDDA's service area, or about three to five individuals per LIDDA. In the last review period prior to September 1, 2017, the sample size for the review of PASRR compliance was three or four individuals per LIDDA. Trial Tr. 2863:18-23, Nov. 2, 2018 (Southall); Trial Tr. 2967:1-6, Nov. 2, 2018 (Reece); PPI X 1906 at 24-25 (Weston Report); PPI X 1579 at 23 (Sawyer Rebuttal Report); Southall 30(b)(6) Dep. 117:3-19, 121:5-23, Oct. 4, 2017.

1062.   The on-site reviews consist of a review of records and data related to the individuals in the sample, as well as one interview either with the individual or legally authorized representative. Trial Tr. 2974:4-7, Nov. 2, 2018 (Reece); Trial Tr. 2863:24-2864:24, Nov. 2, 2018 (Southall) (Q. "[T]here's only required to be one interview per LIDDA, correct?" A. "Yes."); Southall 30(b)(6) Dep. 116:11-119:22, Oct. 4, 2017. CAO's record review, however, does not review records that go

back more than one year prior to the period under review. Further, there is no required interview with the service coordinator. Other performance information, such as the information in the LIDDA quarterly reports, is not considered by the CAO review. Trial Tr. 2862:22-25, 2863:24-2864:10, 2891:20-2892:1, Nov. 2, 2018 (Southall); Southall 30(b)(6) Dep. 116:11-117:19, 119:6-22, 141:17-142:23, Oct. 4, 2017; Southall Dep. 179:20-180:1, Nov. 7, 2017.

1063.    CAO staff conduct the on-site reviews using a standardized tool to monitor the LIDDAs' compliance with certain indicators. *See* PPI X 476 (example of electronic tool for PASRR program); Southall 30(b)(6) Dep. 131:9-24, 137:14-18, 139:2-5, Oct. 4, 2017. These indicators measure compliance primarily with procedural requirements, as opposed to actual consumer outcomes. PPI X 1578 at 53 (Sawyer Report); *see also* PPI X 410 at 25 (LIDDA Performance Contract FY16-17, Attachment B, Compliance Targets). CAO reviewers do not make any findings based on items not listed in the tool. Trial Tr. 2866:11-13, Nov. 2, 2018 (Southall); Southall 30(b)(6) Dep. 154:2-9, Oct. 4, 2017.

1064.    CAO's review tool does not measure compliance with key LIDDA responsibilities, including responsibilities that relate to transitioning or diverting individuals with IDD from nursing facilities. PPI X 1579 at 23-24 (Sawyer Rebuttal Report).

1065.    Although the QSR repeatedly concluded that far fewer than 50 %, and often less than 25 %, of individuals with IDD in nursing facilities received adequate interdisciplinary service teams, service planning, service coordination, service assessments, specialized services, and transition services, the CAO routinely scored the LIDDAs at 85-95 % in each of these areas. *Compare* PPI X 318 at 6 (2016 QSR Report) *and* PPI X 121 (2015 QSR Report) *with* PPI X 449-A (listing CAO scores).

1066.    Further, the CAO's review processes do not adequately measure whether the PASRR system is functioning effectively. PASRR requirements that the CAO's rating tool does not review or

measure include: whether or not people with IDD in nursing facilities are receiving Active Treatment; whether or not the LIDDA determines that the person's needs may be met in the community; whether all need areas are assessed; whether the LIDDA undertakes to identify people in the PASRR population who are in the community and at risk of admission to nursing facilities in order to facilitate diversion; whether the LIDDA undertakes efforts to address barriers to transition for people with IDD in nursing facilities who have not requested a PASRR transition slot; and whether the CLO discussions are appropriate to the person's ability to comprehend. These are critical areas of oversight without which the CAO reviews cannot effectively determine whether HHSC is complying with PASRR or has an effective diversion and transition program. Trial Tr. 1474:11-1475:2, 1479:21-24, 1503:11-17, Oct. 23, 2018 (Weston); Trial Tr. 2968:9-13, 2968:23-2969:6, 2972:3-9, 2972:24-2973:4, 2973:16-2974:10, 2879:24-2880:22, 2981:7-14, 2982:4-2983:24, Nov. 2, 2018 (Reece); PPI X 1907 at 22 (Weston Rebuttal Report); Southall Dep. 100:1-6, 170:22-175:3, 221:14-224:7, 236:5-18, 336:5-9, Nov. 7, 2017;  Reece Dep. 37:10-38:4, 97:1-9, 99:12-18, 103:25-104:3, 106:13-107:2, 229:15-230:3, 281:3-8, 281:9-282:24, 283:1-24, Sept. 13, 2017; Reece 30(b)(6) Dep. 20:22-21:3, 22:16-23, 23:23-24:7, 26:16-23, 28:11-24, 32:20-33:4, 42:18-20, 43:19-44:2, 46:7-23, 50:15-17, 60:20-61:9, 61:16-62:25, 70:3-11, 73:17-21, 79:2-9, 81:17-22, 84:23-85:2, 86:14-18, 88:21-23, 91:21-92:9, Oct. 11, 2017; Southall 30(b)(6) Dep. 251:13-16, Oct. 4, 2017.

2.    The State does not hold LIDDAs accountable

1067.    Even when HHSC does conduct reviews, collect information, or assess performance of the LIDDAs, the State fails to hold the LIDDAs accountable when problems are identified and take enforcement actions when problems are not rectified. PPI X 1578 at 55-56 (Sawyer Report); *see* Southall Dep. 150:13-17, 151:25-153:4, Nov. 7, 2017 (testimony about lack of financial penalties on LIDDAs).

1068.   Corrective Action Plans, or CAPs, are the only effort by the CAO to address noncompliance. Southall Dep. 165:18-166:4, Nov. 7, 2017. When CAP elements remain unmet at the time of a CAP compliance review, HHSC does not follow up. Southall Dep. 142:20-143:4, Nov. 7, 2017.

1069.   Even if a compliance review finds that a CAP has not been met, HHSC has not sanctioned a LIDDA. Southall 30(b)(6) Dep. 196:23-198:8, 199:5-10, Oct. 4, 2017.

1070.   As of September 1, 2017, the CAO had never imposed a financial penalty on a LIDDA for noncompliance with the PASRR section of the annual review, even though certain LIDDAs scored close to zero in compliance. Southall Dep. 150:13-17, 151:25-153:4, Nov. 7, 2017. With few exceptions, all financial penalties imposed in Fiscal Year 2016 related to the Contract Performance measures for timely PASRR PE completion and HCS Enrollment. PPI X 22 (chart showing LIDDA PE completion rates and related penalties); PPI X 136 at 7-10 (identifying only these two reasons as the "unmet performance measure"); Trial Tr. 3805:12-3806:15, Nov. 9, 2018 (Turner) (testifying about PPI X 136); Southall Dep. 150:13-17, 151:25-153:4, Nov. 7, 2017. HHSC has never issued a monetary penalty or sanction against a LIDDA for failing to provide specialized services or Active Treatment. Trial Tr. 3806:8-15, Nov. 9, 2018 (Turner); PPI X 136.

1071.   The CAO manager is not aware how long a LIDDA is allowed to be noncompliant before its contract is revoked. Trial Tr. 2860:17-25, Nov. 2, 2018 (Southall). HHSC has been on notice of these deficiencies in its oversight and enforcement structures for years. In 2015, a report by the Sunset Commission cited the failure to regulate providers and take enforcement actions, even for serious and repeat offenses; fragmented monitoring and management of contracts by hundreds of staff across the agency; and agency operations occurring in silos. Trial Tr. 2121:1-2122:19, 2125:3-21, Oct. 26, 2018 (Sawyer); PPI X 436 at 14, 17, 100-104, 117-118; Ex. P/PI 1578 at 21 (Sawyer Report); *see also* PPI X 1072 at 14, 17, 100-104, 117-118.

323

3.    The State does not effectively utilize the information it collects to monitor or improve LIDDA performance

1072.  According to IDD Services Director and HHSC representative Mr. Jalomo, results of the CAO reviews are reviewed only by the CAO staff and the lead QSR reviewer, Ms. du Pree. Jalomo 30(b)(6) Dep. 106:23-107:8, Nov. 2, 2017.

1073.  The CAO does not use its reviews or any other tool to conduct trend analysis or assess whether there is a consistent problem across a number of LIDDAs. There has never been an investigation of deficiencies that are identified in multiple LIDDAs. The CAO never looks at review findings to identify barriers to compliance. Southall 30(b)(6) Dep. 188:15-190:25, Oct. 4, 2017.

1074.  Among the CAO staff, there is a failure to review and follow-up on information about LIDDA performance. For example, the CAO provides Ms. du Pree with an annual "residential report" that contains information about individuals who have transitioned from a nursing facility to the community and are receiving services through an HCS waiver. The residential report specifies when individuals transitioned, whether they changed providers or residences, and whether they returned to a nursing facility. Yet, despite handling these reports as part of the QSR, the CAO does not use them to determine the most common reasons people switch providers or otherwise follow up on this information. Trial Tr. 2973:16-2974:10, 2983:25-2986:2, Nov. 2, 2018 (Reece); Southall Dep. 35:21-37:2, 38:11-40:5, Nov. 7, 2017; Reece 30(b)(6) Dep. 23:23-24:7, Oct. 11, 2017. The CAO does not use the residential reports to identify trends, which could explain why individuals return to nursing facilities. Southall Dep. 40:6-44:16, Nov. 7, 2017.

1075.  The residential report is never analyzed in conjunction with quarterly reports provided by LIDDAs. Southall Dep. 46:12-47:19, Nov. 7, 2017.

1076.  LIDDA quarterly reports, also called PASRR Quarterly Reports, are a required report under the QSR process. Jalomo 30(b)(6) Dep. 162:2-163:5, 164:14-166:9, Nov. 2, 2017; *see* Trial Tr.

1261:9-16, Oct. 22, 2018 (Webster) (explaining that the PASRR Reporting Manual, PPI X 1118, describes the information LIDDAs must include in their quarterly reports); PPI X 1118; *see generally* PPI X 259-262, 270, 434, 435 (statewide LIDDA quarterly reports for FY16 Q1-FY17 Q3).

1077.   In the quarterly reports, each LIDDA must report information on a number of topics including: the number of admissions, diversions, transitions, and the size of the current "target population;" the names of individuals who have indicated an interest in moving from a nursing facility and related actions taken; barriers to transition and diversion for individuals who have already decided to transition; the educational opportunities provided to individuals and their legally authorized representatives about community options, which are required by contract; and the PASRR trainings provided by LIDDAs to their staff. *See* PPI X 1118.

1078.   These reports are compiled by HHSC into a statewide report that is forwarded to the expert reviewer Ms. du Pree. Trial Tr. 2881:13-23, Nov. 2, 2018 (Southall); Southall 30(b)(6) Dep. 304:4-16, Oct. 4, 2017.

1079.   But no one in the IDD Services Unit, including the CAO, is responsible for reviewing the substance of these reports. Trial Tr. 2972:10-2974:10, 2981:7-14, Nov. 2, 2018 (Reece) (CAO does not review LIDDA quarterly reports with respect to admission, numbers of diversion and numbers of transition); Jalomo 30(b)(6) Dep. 162:2-163:5, Nov. 2, 2017; Southall 30(b)(6) Dep. 300:19-301:4, Oct. 4, 2017; Southall Dep. 167:1-16, 168:3-169:2, 295:1-10, Nov. 7, 2017 (CAO manager, Ms. Southall, made clear that she does not expect her staff to review these reports, and does not analyze the data herself.); Reece Dep. 97:1-9, Sept. 13, 2017 (CAO does not review the LIDDA quarterly reports).

1080.   Nor does the CAO do any assessment or take any action based on the data in those reports. Trial Tr. 2891:20-2893:9, Nov. 2, 2018 (Southall) (CAO does not give feedback to the LIDDAs on the quarterly reports and Ms. Southall is not aware that anyone at HHSC utilizes the LIDDA

quarterly reports to identify barriers to LIDDA compliance.); Southall 30(b)(6) Dep. 69:14-72:2, Oct. 4, 2017; Southall Dep. 282:20-283:4, 300:13-301:23, Nov. 7, 2017; Jalomo 30(b)(6) Dep. 160:8-161:17, Nov. 2, 2017; *see* Trial Tr. 1473:7-20, Oct. 23, 2018 (Weston) (CAO does not look at variations by LIDDA in the ability to divert people with IDD from nursing facilities.).

1081.  The manager of the CAO is not aware that HHSC provides LIDDAs any feedback based on the LIDDA quarterly reports, uses the LIDDA quarterly reports to monitor the LIDDAs' compliance with their contract requirements, or that there is any follow up about individuals who were identified through the LIDDA quarterly reports. Trial Tr. 2892:25-2893:3, 2894:4-10, Nov. 2, 2018 (Southall).

1082.  LIDDA PASRR and enhanced community coordination reports cite barriers encountered in both diverting and transitioning individuals from nursing facilities. PPI X 1578 at 46 (Sawyer Report).

1083.  However, the State does not use the information it receives about barriers to community placement to identify and address systemic problems and improve the system. Trial Tr. 2154:24-2155:16, Oct. 26, 2018 (Sawyer); Trial Tr. 2872:19-2874:1, Nov. 2, 2018 (Southall); PPI X 1578 at 31 (Sawyer Report).

1084.  For example, there was no evidence that the State follows up with LIDDAs that have reported no barriers for individuals who would like to transition but who have not yet transitioned. PPI X 1578 at 32-33 (Sawyer Report).

1085.  Associate Commissioner Sonja Gaines does not receive or review basic information about LIDDA performance. For example, she does not receive reports about waiver slot utilization. Gaines Dep. 75:25-76:11, Feb. 27, 2018. She does not regularly review information about the number of individuals with IDD who transition from nursing facilities. Gaines Dep. 72:16-21, Feb. 27, 2018. She does not review the enhanced community coordination quarterly reports. Gaines Dep. 202:1-203:9, Feb. 27, 2018. She does not receive reports produced by the CAO Unit, the

Performance Contracts Unit, or the PASRR Unit. Gaines Dep. 216:23-217:10, Feb. 27, 2018.

D.    The State does not provide adequate Nursing Facility oversight

      1.    Texas nursing facilities are among the worst in the country

1086.    Texas nursing facilities perform worse than the vast majority of other states, according to CMS's ratings based on health inspections, resident care quality measures, and staffing.

1087.    CMS's Five-Star Quality Rating System, available on its Nursing Home Compare Website, provides summary information to help consumers choose a nursing home in their area. Nursing facilities receive an overall rating of one through five stars. PPI X 472 at 2; *see* Trial Tr. 1492:11-20, Oct. 23, 2018 (Weston); Trial Tr. 424:17-425:1, 427:21-24, Oct. 16, 2018 (Kim); PPI X 1907 at 23 (Weston Rebuttal Report). In 2015, Texas had the highest percentage of nursing facilities with one- and two-star ratings of all states in the country. Only two states had a lower percentage of nursing facilities with five star rankings. Trial Tr. 1492:15-1495:8, Oct. 23, 2018 (Weston); PPI X 471 at 10; PPI X 472 at 11, 16; *see* PPI X 1907 at 24 (Weston Rebuttal Report).

1088.    Similarly, in 2013 and 2014, Families for Better Care issued a nationwide nursing facility report card based on standardized data elements that the Kaiser Health Foundation, CMS Nursing Home Compare, and the Office of State Long-Term Care Ombudsman compiled. In both years, Texas nursing facilities scored an "F" and were ranked among the nation's lowest. PPI X 607 at 5.

1089.    As of September 1, 2017, almost half of Texas nursing facilities still received a rating of one or two stars, the lowest possible scores, which is still among the highest portions of one- and two-star rankings in the country. PPI X 667 (summary of Nursing Home Compare ratings available as of September 1, 2017); *see* PPI X 669 (summary of Nursing Home Compare ratings available as of August 1, 2017); *see also* Trial Tr. 425:17-433:21, Oct. 16, 2018 (Kim) (explaining process used to prepare Nursing Home Compare summary exhibits, PPI X 667 and 669); Trial Tr. 552:4-556:17, Oct. 17, 2018 (Kim) (same); PPI X 670 at column CB (archived Nursing Compare data with a "File

Date" of 09/01/17, summarized in PPI X 667); PPI X 671 at column CB (archived Nursing Compare data with a "File Date" of 08/01/17, summarized in PPI X 667).

1090.    Plaintiffs' and the United States' expert Ms. Weston testified that the sustained low ranking of nursing facilities is "highly significant" for people with IDD who have been placed in nursing facilities and may be unable to speak for themselves about the quality of care provided to them. Trial Tr. 1492:15-1495:8, Oct. 23, 2018 (Weston).

1091.    The State is aware that individuals in nursing facilities frequently complain that (1) nursing facility staff do not respond to requests for help; (2) nursing facility staff do not treat them with dignity and respect; and (3) they receive inadequate assistance with toileting. Trial Tr. 2800:14-2802:2, Nov. 1, 2018 (Ducayet); PPI X 1434 at 5 (Office of the State Long-Term Care Ombudsman Annual Report, FY13-14); PPI X 1435 at 5 (Office of the State Long-Term Care Ombudsman Annual Report, FY15-16); *see* Adkins Dep. 20:17-21:5, Oct. 30, 2018 (nursing facility resident testifying that it feels like nursing staff do not care enough to treat residents).

1092.    The State is also aware that Texas nursing facility residents frequently complain about odors. PPI X 1434 at 5 (reporting that odors are a frequent complaint from nursing facility residents); PPI X 1435 at 5 (same); *see* Trial Tr. 2084:18-24, Oct. 25, 2018 (Rideout) (describing strong smell of urine at nursing facilities).

1093.    Texas nursing facilities are staffed at lower levels than experts recommend, and the Long-Term Care Ombudsman has recommended improvements to raise the quality of care in Texas nursing facilities to national standards since at least 2013. Trial Tr. 2803:24-2805:1, Nov. 1, 2018 (Ducayet); PPI X 1434 at 12 ("Fully funding the enhancement program is a practical way to raise quality of care to national standards."); PPI X 1435 at 16 (same).

1093a. Nursing facility staff are often not knowledgeable about their residents' needs. Trial Tr. 2805:2-14, Nov. 1, 2018 (Ducayet) (testifying that as State Long-Term Care Ombudsman, she

recommended that nursing facility staff training reflect resident needs). Ms. Preskey testified that she

has "been disappointed to know that [nursing facility staff] don't really know the consumers very

well. When you ask them a question, they have no understanding about the needs of the

individuals . . .". Trial Tr. 1108:13-1109:9, Oct. 19, 2018 (Preskey).

1094.   In addition to the consequential effects of isolation, nursing facility residents may receive

inadequate health care. Trial Tr. 1109:10-16, Oct. 19, 2018 (Preskey) (testifying that it appears that

necessary oversight of healthcare needs does not occur in nursing facilities and that healthcare does

not appear up to standard in nursing facilities); Trial Tr. 2055:25-2056:12, Oct. 25, 2018 (Meisel)

(testifying that her nursing facility has not met some of her medical needs and had her in the wrong

size of catheter, which means that "you wet yourself rather frequently and a lot"); PPI X 1435 at 5

(reporting frequent complaints from nursing facility residents regarding personal hygiene, medication

administration or organization, and symptoms going unattended or unnoticed); PPI X 1434 at 5

(same).

>        2.      HHSC's Quality Monitoring Program does not provide adequate nursing facility
>                oversight

1095.   QMP is the State's system intended to detect nursing facility conditions that could be

detrimental to the health, safety and welfare of all nursing facility residents. PPI X 1907 at 22-24

(Weston Rebuttal Report); *see* du Pree Dep. 35:8-13, Feb. 6, 2018; *see also* Texas Health and Safety

Code § 255.002 (the department shall analyze quality-of-care indicators that would predict the need

for the department to take action); 26 Texas Admin. Code § 554.910 (formerly 40 Tex. Admin. Code

§ 19.910).

1096.   According to a 2017 AARP report titled "Intolerable Care: A snapshot of the Texas nursing

home quality crisis," the State's nursing facility quality is "shamefully poor." AARP concluded that,

due to an inadequate state regulatory structure with insufficient powers for sanctioning violators,

"many residents of Texas nursing homes face unnecessary health and safety risks." PPI X 471 at 4 (AARP Report); Vasquez Dep. 251:16-255:2, Jan. 12, 2018 (Andy Vasquez, Deputy Associate Commissioner of the unit responsible for the QMP, did not change anything about QMP's activities as a result of the Texas AARP report.)

1097.    QMP does not look at issues related to transition of individuals with IDD from nursing facilities or diversion of these individuals from nursing facilities. Trial Tr. 2560:13-2561:1, Oct. 31, 2018 (Dionne-Vahalik); Dionne-Vahalik 30(b)(6) Dep. 234:13-21, Oct. 12, 2017.

1098.    Only some of the State's nursing facilities even receive a QMP visit. Absent a specific referral or request, QMP staff only visit the nursing facilities identified as "at risk" based on a risk assessment tool called the Early Warning System (EWS). Trial Tr. 2509:19-25, 2555:9-20, 2557:22-25, 2570:16-2571:12, Oct. 31, 2018 (Dionne-Vahalik); DX 340-A at 9 ("All QM visits are scheduled based off of information triggered through the EWS system."); Dionne-Vahalik 30(b)(6) Dep. 223:7-12, Oct. 12, 2017.

1099.    None of the EWS data points used to identify nursing facilities for a QMP visit are specific to PASRR, specialized services, transition, or diversion. Trial Tr. 2556:17-2557:16, 2559:22-2560:7, Oct. 31, 2018 (Dionne-Vahalik); Dionne-Vahalik Dep. 34:19-35:23, Dec. 19, 2017; Dionne-Vahalik 30(b)(6) Dep. 226:19-227:2, Oct. 12, 2017.

1100.    Specifically, EWS does not include data points specific to identifying facilities (1) where people with IDD are appropriate for and do not oppose community placement; (2) that fail to ask about individuals' interest in community services through MDS Section Q; or (3) that fail to refer people interested in learning about community services to local contract agencies. Trial Tr. 2557:22-2559:8, Oct. 31, 2018 (Dionne-Vahalik); Dionne-Vahalik Dep. 46:12-47:13, Dec. 19, 2017. Although HHSC official Ms. Dionne-Vahalik in her trial testimony implied that the EWS system includes such data points, this impression is not credible given her previous deposition testimony

and failure to identify data points specific to PASRR. *See* Trial Tr. 2556:1-2557:16, 2558:8-2559:8 (Dionne Vahalik).

1101.    Once facilities *are* selected for a visit, QMP conducts a screening to determine which "focus areas" to review. Trial Tr. 2560:8-2561:1, Oct. 31, 2018 (Dionne-Vahalik); PPI X 1907 at 22-24 (Weston Rebuttal Report).

1102.    Only some of the nursing facilities that QMP visits receive a PASRR focus area review – a new focus area that was not implemented until May 2017. Trial Tr. 2555:2-11, 2560:8-16; Oct. 31, 2018 (Dionne-Vahalik).

1103.    The PASRR focus area does not look at whether someone is appropriate for the community. Nor does the QMP look at issues related to the transition or diversion of individuals with IDD from nursing facilities, except for the tangentially related determination of whether MDS Section Q is completed. Trial Tr. 2527:25-2528:19, 2555:2-8, 2560:17-2561:1, Oct. 31, 2018 (Dionne-Vahalik); Dionne-Vahalik 30(b)(6) Dep. 234:13-21, Oct. 12 2017; Dionne-Vahalik Dep. 152:23-153:9, Dec. 19, 2017.

1104.    Even when PASRR is evaluated, the State monitor may choose a sample of just two residents, who may or may not have IDD or serious mental illness. Trial Tr. 2513:13-16, 2514:7-12, Oct. 31, 2018 (Dionne-Vahalik); DX 427 at 13 (QMP PASRR Focus Area guidance instructing monitors to "[c]hoose two residents . . . to include in the sample").

1105.    The QMP PASRR review considers primarily yes or no questions related to compliance with timelines and other questions that may be answered without any qualitative assessment. DX 427 at 14-16 (QMP PASRR Focus Area guidance providing instructions on completing the worksheet). There are no questions related to Active Treatment. DX 427 at 14-16; PPI X 1907 at 23 (Weston Rebuttal Report).

1106.    QMP staff are not required to have experience working with people with IDD. In fact, fewer

than five of the roughly forty QMP PASRR staff have direct experience working with people with IDD. Trial Tr. 2561:2-10, Oct. 31, 2018 (Dionne-Vahalik); Dionne-Vahalik 30(b)(6) Dep. 228:4-20, Oct. 12, 2017.

1107.  Ms. Dionne Vahalik did not provide any evidence about how QMP ensures that HHSC's policies are effectively implemented. Trial Tr. 2563:3-11, 2563:25-2564:4, Oct. 31, 2018 (Dionne-Vahalik).

1108.  At the systemic level, no reports or aggregate information have been generated for or by HHSC using the QMP screening tool. Dionne-Vahalik 30(b)(6) Dep. 237:4-22, Oct. 12, 2017.

1109.  QMP does not have authority to assess sanctions. Vasquez Dep. 46:12-47:5, Jan. 12, 2018.

1110.  Given the reported conditions of the State's nursing facilities, Ms. Weston opined: "It does not appear that QMP fulfills even its primary stated goal, which is to ensure the conditions in nursing facilities are not detrimental to individuals' health, safety, and welfare." She further concluded that QMP does not monitor fundamental practices necessary to comply with PASRR and the ADA. PPI X 1907 at 23-25 (Weston Rebuttal Report).

> 3.  HHSC's Regulatory Services Division does not provide adequate nursing facility oversight

1111.  Nursing facilities' failure to provide specialized services is supposed to be reported to the Regulatory Services' Long-Term Care Unit, formerly Consumer Rights and Services (CRS). Southall Dep. 97:14-24, Nov. 7, 2017; Vasquez Dep. 247:9-248:10, Jan. 12, 2018; Willems Dep. 64:15-65:5, Feb. 3, 2017.

1112.  However, according to the Director of the Long-term Care Unit, the Regulatory Services Division does not have any policies that have anything to do with PASRR. Henderson Dep. 73:20-25, Nov. 14, 2017.

1113.  Regulatory Services managers have not been trained in PASRR requirements, and PASRR

training for regulatory staff is minimal. Mills Dep. 116:5-118:19, Oct. 19, 2017 (head of enforcement for Regulatory Services has never received training on specialized services and appeared unfamiliar with PASRR but for her meeting with counsel to prepare for deposition); Henderson Dep. 56:18-22, 57:19-58:2, Nov. 14, 2017 (Associate Commissioner of the Long-Term Care Regulation Unit (CRS) has had no training on specialized services or Active Treatment for people with IDD in nursing facilities).

1114.    HHSC has acknowledged that CRS/Long-Term Care and regulatory surveyors charged with investigating PASRR complaints have failed to understand and substantiate nursing facilities' non-compliance with PASRR requirements when the PASRR unit or QSR reviewers report such findings. Trial Tr. 1483:22-1487:8, Oct. 23, 2018 (Weston); PPI X 618 at 2-5; PPI X 1907 at 24 (Weston Rebuttal Report); PPI X 930 and 1030 at 2-6 (Memo from Mary Henderson to Regulatory Services re IM 17-09 Surveyor Guidance PASRR Focused Reviews); Willems 30(b)(6) Dep. 38:19-39:9, Oct. 16, 2017.

1115.    CRS/Long-Term Care has failed to develop a systemic method of tracking PASRR violations and whether CRS/Long-Term Care outcomes improve the provision of needed services. *See* Mills Dep. 132:13-133:21, Oct. 19, 2017; Lothringer 30(b)(6) Dep. 182:21-185:2, Nov. 6, 2017.

1116.    Program specialists in the Regulatory Services' Survey and Certification Enforcement Unit are not required to take any training on PASRR or specialized services. Mills Dep. 126:17-127:2, Oct. 19, 2017. The office has never received a referral to review an alleged PASRR violation. Mills Dep. 119:6-10, 122:18-123:11, Oct. 19, 2017. Nor has the office been asked to review a nursing facility's failure to provide Active Treatment. Mills Dep. 124:14-17, Oct. 19, 2017.

1117.    HHSC's Regulatory Services Division does not have a method or a source for tracking overall citations for patterns or trends, limiting its ability to promote systemic quality improvement efforts. Mills Dep. 132:13-133:21, Oct. 19, 2017; Lothringer 30(b)(6) Dep. 123:21-125:8,

182:21-185:2, 187:1-18, Nov. 6, 2017.

1118.  HHSC's Regulatory Services Division does not track and has no way to track which citations

of neglect stem from failure to provide specialized services. Lothringer 30(b)(6) Dep. 123:21-125:8,

183:20-185:2, 187:1-18, Nov. 6, 2017 ("There is no way to capture that separately in our data

systems.").

E.    The State does not provide adequate training to ensure that Individuals with IDD in Nursing
      Facilities are not unnecessarily segregated

1119.  Adequate and comprehensive competency-based training of qualified staff is essential to

ensuring that individuals with IDD are transitioned successfully from nursing facilities and can

remain safely in the community and avoid readmission to nursing facilities or other institutional

settings. Such training is a well-accepted standard in public IDD service systems. Trial Tr.

2165:6-2166:1, Oct. 26, 2018 (Sawyer); PPI X 1578 at 19-20, 56 (Sawyer Report).

1120.  In a functioning IDD system, people who work with individuals with IDD must receive

training about providing services to people with IDD and the specific services provided to

individuals whom they serve. Trial Tr. 2165:15-2166:1, Oct. 26, 2018 (Sawyer); PPI X 1578 at 20

(Sawyer Report). They should also receive training about IDD, communication strategies for people

with IDD, strategies to meet the habilitative needs of people with IDD, and methods to develop and

implement their individualized service plans. PPI X 1578 at 19-20 (Sawyer Report).

1121.  For training to be successful, training offices must be able to determine how many users have

successfully completed online training, gather biographical online user data, create reports based on

online user data, collect information about online users' successes or failure rates, and collect online

feedback. PPI X 412 at 3 (May 2017 Action Memorandum for the Executive Commissioner).

1.    HHSC does not ensure that LIDDA staff receive adequate training

1122.  The State is aware of certain training deficiencies for LIDDA staff. PPI X 85 at 2 (May 2017

email between Ms. Turner, Ms. du Pree, and Dr. Diase discussing service coordinators' lack of training). PPI X 120 at 2 (email between Dr. Diase and Ms. du Pree stating that "informally we hear [LIDDAs] have not received much training").

1123.   Ms. Carolyn McDonald, a LIDDA director, testified that she informed Deputy Associate Commissioner Haley Turner that some LIDDA staff need more training and that more guidelines and training would help improve tracking and documenting an individual's progress towards goals, among other things. Trial Tr. 3544:4-18, Nov. 8, 2018 (McDonald).

1124.   While HHSC requires training for service coordinators, these requirements are minimal and primarily limited to new employee training. PPI X 1578 at 56 (Sawyer Report); Southall 30(b)(6) Dep. 237:19-238:5, 263:7-13, Oct. 4, 2017; *see* 26 Tex. Admin. Code § 331.19 (formerly 40 Tex. Admin. Code §  2.560).

1125.   HHSC considers that LIDDAs have met the training requirement if the LIDDA conducts a training but no one attends. Turner Dep. 143:2-10, Feb. 23, 2018.

1126.   After new service coordinators' initial training, no other training is required. Southall 30(b)(6) Dep. 265:17-266:3, Oct. 4, 2017; *see* PPI X 1907 at 18-19 (Weston Rebuttal Report).

1127.   The State has no minimum requirements or monitoring on frequency, duration, content, or competency evaluation of post-employment training to existing service coordinators. Southall 30(b)(6) Dep. 237:19-238:5, Oct. 4, 2017 (testifying that CAO does not regulate trainings provided by LIDDAs); *see* Rees Dep. 39:16-21, Jan. 11, 2018 (testifying that HHSC's LIDDA Training Unit "doesn't take any steps to ensure that LIDDA provides its own training"); Rees Dep. 18:9-18, Jan. 11, 2018 (testimony from the Director of LIDDA training unit testified that he does not "know much" about the training materials LIDDAs create); Miller 30(b)(6) Dep. 108:9-12, Oct. 13, 2017 (testimony from the State's 30(b)(6) witness that he was not aware if any of the LIDDA-provided trainings include a standardized curriculum); *see also* PPI X 1578 at 56 (Sawyer Report); PPI X 1907

at 19 (Weston Rebuttal Report).

1128. "The failure to establish minimum training requirements, especially competency-based training, results in a workforce with varying levels of qualified and competent staff. This leaves the system and its service recipients at risk of failure." PPI X 1578 at 57 (Sawyer Report).

1129. Although CAO is responsible for ensuring the LIDDAs have satisfied all training requirements, it does not assess the quality of the training. Southall Dep. 126:21-127:12, Nov. 7, 2017.

1130. HHSC does not track whether all new service coordinators are trained. Turner Dep.136:3-139:10, Feb. 23, 2018; Rees Dep. 35:23-36:9, Jan. 11, 2018.

1131. LIDDA reporting shows that during Fiscal Year 2017, quarters one through three, seven LIDDAs failed to provide any staff training for at least one quarter during this period and one of these LIDDAs failed to provide any staff training for two of the three quarters. PPI X 1578 at 56 (Sawyer Report).

1132. "The range of the amount of time that LIDDAs devote to staff training also varies widely, with some training being remarkably short." PPI X 1578 at 56 (Sawyer Report).

1133. The LIDDA Training Unit within IDD Services is responsible for creating and providing HHSC in-person and online trainings to LIDDA staff, including service coordinators. HHSC offers three classroom-based trainings: PASRR I (PASRR Service Coordination), PASRR II (PASRR for Service Coordinators), and a newly developed Person-Centered Planning course. DX 30 at 2; Diase Dep. 191:21-23, Nov. 1, 2017; Turner Dep. 138:14-17, Feb. 23, 2018; Miller 30(b)(6) Dep. 31:8-18, 61:21-62:4, 62:12-25, Oct. 13, 2017. Only one PASRR training is mandatory. Miller Dep. 63:1-64:3, Oct. 13, 2017 (testifying that LIDDA staff must take one PASRR training).

1134. HHSC takes minimal steps to ensure that LIDDA staff understand the material presented in their trainings. *See* Miller Dep. 87:17-88:5 (testifying that the step HHSC takes to ensure LIDDA

staff understood the material presented at the training is to "log completion" of the class).

1135.    Plaintiffs' and the United States' expert Ms. Sawyer testified that she did not see evidence of competency-based training. Trial Tr. 2166:2-11, Oct. 26, 2018 (Sawyer); *see* PPI X 1907 at 18-19 (Weston Rebuttal Report). HHSC admits that it administers some LIDDA trainings without any competency testing. Turner Dep. 136:7-12, Feb. 23, 2018; Miller 30(b)(6) Dep. 87:17-25, Oct. 13, 2017. Defendants' PASRR expert rendered no opinion to the contrary. Trial Tr. 2684:14-17, 2685:9-15, Nov. 1, 2018 (Bruni) (testifying that she "never saw any indication that there was a competency exam").

1136.    Not all LIDDA staff have completed all of the HHSC trainings. Rees 30(b)(6) Dep. 105:18-106:25, Oct. 3, 2017.

1137.    In fact, LIDDA participation in HHSC-provided online trainings is low. Rees Dep. 139:24-140:20, 241:4-242:17, Jan. 11, 2018. Nonetheless, the IDD Services Training Unit does not follow up with LIDDAs who have low participation in HHSC's online trainings. Rees Dep. 133:3-5, Jan. 11, 2018.

1138.    Further, the IDD Services Training Unit cannot track whether all HHSC-provided trainings have been successfully completed. Rees Dep. 138:8-12, Jan. 11, 2018; *see* PPI X 412 at 3 (HHS training offices lack the ability to determine how many users have successfully completed online training); PPI X 413 at 3 (meeting notes from January 2017 admitting "There is no way to monitor on who took the training or which LIDDA they are located at upon taking the training").

1139.    Finally, HHSC does not adequately oversee its own training activities. Mr. Richard Rees, the manager of the IDD Services Training Unit and 30(b)(6) witness on the subject of State efforts to evaluate the provision of LIDDA training, testified that he is not required to report LIDDA training activities to anybody at HHSC. Rees 30(b)(6) Dep. 178:10-15, Oct. 3, 2017. Mr. Rees did not recall an HHSC policy that dictates the updating of training or that addresses the collection of data on

LIDDA training. Rees 30(b)(6) Dep. 134:19-23, 153:14-22, 20:2-22:20, Oct. 3, 2017.

1140.    The client review findings exemplify the inadequacies in the LIDDAs' training. For example, KD is a 43-year-old man with an intellectual disability and Myotonic Dystrophy Type 1. His service coordinator had not received any training, apart from shadowing another service coordinator for a week, on what specialized services were available or what constituted Active Treatment. KD did not receive all of the specialized services or the Active Treatment, which he has been determined to need, in part because KD's Service Coordinator was not aware of all of the options available to KD. PPI X 777 at 52, 55-56 (Charlot Report).

1141.    Nursing facility resident Mr. Adkins testified that his service coordinator did not appear to understand the State services that would be available to him if he decided to leave the nursing facility. Adkins Dep. 29:13-17, Oct. 30, 2018.

2.    HHSC does not ensure that nursing facility staff receive adequate training

1142.    As the State is aware, "[s]ufficient, well-trained and well-supervised staff is critical to quality care in a nursing [facility]." PPI X 1434 at 6 (Office of the State Long-Term Care Ombudsman Annual Report, FY13-14); PPI X 1435 at 6 (Office of the State Long-Term Care Ombudsman Annual Report, FY15-16); see PPI X 1434 at 12 ("Continuing education is an important method of protecting residents' rights and preventing abuse and neglect."); PPI X 1435 at 16 (same).

1143.    The State Long-Term Care Ombudsman has found that training for nursing facility staff must reflect residents' needs to be effective. PPI X 1434 at 12; PPI X 1435 at 16; see Trial Tr. 2805:2-5, Nov. 1, 2018 (Ducayet).

1144.    Since at least 2013, the State Long-Term Care Ombudsman has noted that "nursing homes get little guidance about the content of their staff training" and has recommended an increase in staff training and a requirement that nursing home staff training reflect residents' needs. Trial Tr. 2805:2-14, Nov. 1, 2018 (Ducayet); PPI X 1434 at 12 (Office of the State Long-Term Care

Ombudsman Annual Report, FY13-14); PPI X 1435 at 16 (Office of the State Long-Term Care Ombudsman Annual Report, FY15-16).

1145.    Yet, in 2015, HHSC considered, but failed to adopt, a rule change to make PASRR trainings mandatory for nursing facility staff. PPI X 402 at 3 ("We are working with Regulatory to get a rule change in place that will make these trainings mandatory for [nursing facility] staff that have PASRR individuals in their facility."); Rees Dep. 221:2-222:2, Jan. 11, 2018 (testifying that he did not think the change "ever succeeded").

1146.    As of September 1, 2017, HHSC did not mandate PASRR training for nursing facility staff. Trial Tr. 1487:9-11, Oct. 23, 2018 (Weston); Belliveau 30(b)(6) Dep. 29:11-13, Oct. 20, 2017 (PASRR unit does not require nursing facilities to take any specific trainings on PASRR).

1147.    Plaintiffs' and the United States' expert Ms. Weston concluded that the trainings that the HHSC PASRR Unit provides to nursing facilities are not sufficient to promote compliance with PASRR. PPI X 1907 at 18 (Weston Rebuttal Report).

1148.    First, the PASRR Unit does not provide training about how to conduct assessments to determine what specialized services are necessary. Belliveau 30(b)(6) Dep. 71:15-19, Oct. 20, 2017.

1149.    Second, the PASRR Unit does not provide training about the need to make sure services are continuous throughout the day or training about how to ensure this happens. Belliveau 30(b)(6) Dep. 77:13-21, Oct. 20, 2017.

1150.    Third, HHSC does not ensure that the PASRR Unit staff who conduct trainings are themselves trained on PASRR. Belliveau 30(b)(6) Dep. 81:9-13, Oct. 20, 2017 (no training requirements for PASRR staff who conduct trainings).

XII.

Practices in Texas and other states demonstrate that it is reasonable for Texas to serve
Individuals with IDD in the community rather than a Nursing Facility

1151.   Plaintiffs' expert, Ms. Sawyer, testified that there are [seven] critical components of an IDD system. These components include planning; funding and resource development; service planning, coordination and delivery; service capacity; community integration and inclusion; and quality assurance and improvement. Trial Tr. 2122:20-2123:25, Oct. 26, 2018 (Sawyer); PPI X 1578 at 12-16 (Sawyer Report).

1152.   Ms. Sawyer further testified that the other jurisdictions where she has worked, including Alabama and the District of Columbia, have been able to implement the critical components of an IDD system. *See* Trial Tr. 2178: 21-2179:2, Oct. 26, 2018 (Sawyer).

1153.   It is feasible for the State to implement these critical components of an IDD system, including ensuring sufficient funding and resources to develop and provide the service capacity to meet the needs of people with IDD in the community so that people with IDD can divert and transition from nursing facilities. Trial Tr. 2178:21-2179:2, Oct. 26, 2016 (Sawyer) (It is feasible for Texas to implement all of the critical components of an IDD system.).

1154.   According to Texas stakeholders, services for Texans with disabilities in the community "on average cost significantly less than in institutions." PPI X 203 at 4 (Promoting Independence Advisory Committee Stakeholder Report 2014); *see* PPI X 436 at 16 (Texas legislative report stating that many residents of SSLCs, including those with complex medical and behavioral issues, "can be successfully served in a community setting, at a cost savings to the State").

1155.   Defendants offered no expert testimony that the modifications Plaintiffs and the United States seek in this case would be unreasonable or would fundamentally alter their service system. Instead, Defendants asked Dr. Finnie Cook to testify to the Court that she did not have an opinion on the

matter. Trial Tr. 3274:8-13, Nov. 6, 2018 (Cook) (stating that she did not know why the Defendants asked her "to tell the Court that [she does not] have an opinion" on fundamental alteration, a defense on which Defendants bear the burden of proof).

1156.   Dr. Cook agreed that for people with IDD living in nursing facilities, the State did not provide her with information about the specific needs they would have in the community, what community settings would be appropriate for them, or how many people it expected to transition to the community. Trial Tr. 3275:24-3276:5, 3278:7-3279:4, 3285:21-3287:13, Nov. 6, 2018 (Cook).

1157.   Dr. Cook acknowledged that Defendants have detailed information about the cost of serving people with IDD in nursing facilities, and did not dispute that the modifications Plaintiffs and the United States seek in this case are reasonable. Dr. Cook testified that she could not conclude that the modifications would be a fundamental alteration. Trial Tr. 3272:21-3273:3, 3274:17-3275:23, Nov. 6, 2018 (Cook) (agreeing that she "cannot formulate an opinion on whether that would be a fundamental alteration" and that a variety of cost data exists).

A.    It is reasonable for the State to appropriately identify, screen, and assess Individuals with IDD to avoid unnecessary Nursing Facility admission

1158.   It is reasonable for the State to appropriately identify, screen, and assess individuals with IDD to determine whether they can be served in community settings. *See* Trial Tr. 2178:21:2179:2, Oct. 26, 2016 (Sawyer) (It is feasible for Texas to implement all of the critical components of an IDD system.).

1159.   Ms. Howe and the Massachusetts Department of Disability Services undertook an improvement initiative on diversion. It included developing and implementing a diversion plan, improving Level II evaluations to avoid unnecessary or inappropriate admissions, adding new staffing and setting aside special diversion funding to address changes in medical conditions, requiring waiver providers to continue serving individuals who are hospitalized or admitted to

nursing facilities, and creating new expectations for service providers and coordinators about avoiding admission to nursing facilities whenever possible. Trial Tr. 3921:3-3923:8, Nov. 13, 2018 (Howe); PPI X 976 at 6-7 (Howe Rebuttal Report). Similarly, Mr. Webster testified that as an Area Director during the implementation of the *Rolland* agreement, "[w]e did an awful lot of work with diversion" and found that as the needs of people receiving IDD services change – such as their medical needs or behavioral needs – providers may need additional support. Connections with service coordinators allowed his office to intervene and provide stability for people with IDD as their needs changed, so that they were able to remain in a community-based placement. Trial Tr. 1200:20-1201:7, Oct. 22, 2018 (Webster).

1160.  Ms. Sawyer testified that it is feasible for Texas to implement individual and system planning, including comprehensive assessments of the individuals with IDD, to determine whether, and how, individuals with IDD can be served appropriately in the community. Trial Tr. 2123:7-9, 2128:2-16, 2178:21-2179:2, Oct. 26, 2018 (Sawyer).

B.    It is reasonable for the State to ensure that Individuals with IDD make a meaningful and informed choice about whether to enter or remain in a Nursing Facility

1161.  It is reasonable for the State to effectively inform individuals with IDD of available community options. *See* Trial Tr. 2178-2179:2, Oct. 26, 2016 (Sawyer) (It is feasible for Texas to implement all of the critical components of an IDD system.); Trial Tr. 1948:6-22, Oct. 24, 2018 (Wehmeyer); Trial Tr. 3667:24-3668:1, Nov. 8, 2018 (Jones) (Q: "Are individuals always receptive to CLO meetings or to hearing about their options for community living?" A: "Yes, for the most part.").

1162.  Ms. Sawyer testified that it is feasible for Texas to implement the elements of community integration and inclusion that are necessary to effectively inform people with IDD and their families about community living options. *See* Trial Tr. 2123:19-22, 2148:16-2152:22, 2178:21-2179:2, Oct.

26, 2018 (Sawyer).

    1.    Other states have implemented policies and procedures to provide informed choice to individuals with IDD

1163.   Ms. Pilarcik and Ms. Russo both testified to their experience working in and reviewing states that have implemented policies and procedures to provide informed choice to individuals with IDD. As a result, many individuals who were initially reluctant or even opposed to leaving an institution ultimately decided to transition to the community. Trial Tr. 495:3-498:16, Oct. 17, 2018 (Pilarcik); Trial Tr. 1609:3-25, Oct. 23, 2018 (Russo).

1164.   Ms. Pilarcik testified that as a result of the court orders in *Rolland*, Massachusetts was required to offer community placements to individuals in nursing facilities, some of whom had been living in these facilities for more than twenty years. While some were immediately ready to leave, others were very concerned. Massachusetts implemented a program to ensure individuals could make an informed choice. Individuals were provided specialized services that allowed them to regularly spend time in the community. Individuals and families were offered repeated visits to specific community options. Ongoing conversations with service coordinators, providers, other families, and peers occurred. Over time, the vast majority made an informed choice to transition to the community. Trial Tr. 495:3-498:16, Oct. 17, 2018 (Pilarcik).

1165.   Ms. Russo testified about her experience with other states that had successfully implemented policies to address barriers to transition. For example, one mother in Tennessee initially had intense fears about the community saying, "My son will be the last person to leave this institution." Trial Tr. 1609:12-13, Oct. 23, 2018 (Russo). Through ongoing conversations and visits to multiple community providers, she gradually became more comfortable with the idea of her son moving, eventually choosing to transition him to the community. Ms. Russo testified, "So through this whole process, she agreed to try [her son] living in a family care home. And she never was happier when

she visited her son and saw him thriving and happy." Trial Tr. 1609:14-25, Oct. 23, 2018 (Russo).

1166.   Dr. Coleman testified to strategies she employed in Tennessee to help individuals with IDD and their families learn more about community options. Those strategies included opportunities to visit community homes and providers, having providers come to the institution to meet with individuals and their families, developing educational materials, and having one-on-one and group meetings with families. In addition, Tennessee arranged for opportunities for peer-to-peer visits and for opportunities for family members to speak with others whose relatives had successfully moved to the community, and developed a video with individuals who had moved into the community and their families. In Dr. Coleman's experience, individuals and their families generally needed multiple meetings to decide whether to transition, especially for individuals who had lived in institutions for a long time. Trial Tr. 884:14-885:24, Oct. 18, 2018 (Coleman).

1167.   Dr. Charlot testified about her experience developing a medical home model to serve individuals with IDD and mental health needs in the community. A portion of the individuals she served were among the last to transition out of a state institution because they had negative past experiences in the community and their family members were concerned about those problems reoccurring in the community. Dr. Charlot's program worked with the families to provide ongoing reassurances that individuals could be safe living in the community and that their needs would be met, including developing rapport with the individuals and families, listening to their concerns, and helping them to visit places in the community where they could live. Ultimately, individuals in the program successfully transitioned to the community and their family members were very happy that they had taken the chance to go out into the community. Trial Tr. 1729:13-1730:23, Oct. 24, 2018 (Charlot).

1168.   Ms. Howe and the Massachusetts Department of Disability Services (DDS) developed a comprehensive initiative on transition. It conducted a study of every individual with IDD in nursing

facilities and categorized them into three groups: those who were interested in transitioning to the community, those who resisted transition or were uncertain, and those who clearly opposed. It then developed a focused, intensive outreach program for those in the second and even third groups to ensure they had actual community visits, services, and activities that allowed them to spend time engaged in the community. Trial Tr. 3925:4-24, Nov. 13, 2018 (Howe).

1169.   To ensure that service coordinators had sufficient time to spend with each individual in the community, DDS reduced the caseload and responsibilities of all services coordinators who served individuals with IDD in nursing facilities. Then it targeted new resources to allow all individuals who did not strongly oppose leaving the nursing facility to move into the community. Trial Tr. 3923:12-3925:24, Nov. 13, 2018 (Howe); PPI X 976 at 6-7 (Howe Rebuttal Report); *see also* Trial Tr. 1197:6-25, Oct. 22, 2018 (Webster) (testifying about the implementation of these efforts at his Area Office). With respect to the first group, those who were interested in transitioning, DDS Area Offices engaged in transition planning, arranging for services, and building the capacity of the provider system. With respect to the second and third groups, those who were uncertain about transition or opposed, DDS focused on offering community-based experiences, including specialized services. Service coordinators would continue to talk with people, not simply to ask whether they want to leave, but to ask what kind of things they would like to experience in the community. As Mr. Webster describes, these served as "invitations for a person to become part of the community, if that's what they'd like." Trial Tr. 1198:1-1199:1, Oct. 22, 2018 (Webster). DDS also employed other strategies such as family-to-family and peer-to-peer conversations about transition, "programs that have been successful across the country." Trial Tr. 1199:2-3, Oct. 22, 2018 (Webster). Ultimately, individuals from all three groups were able to transition to the community. Trial Tr. 1200:8-19, Oct. 22, 2018 (Webster).

1170.   Specialized services can be an important and effective strategy for informing individuals about the benefits of community living. Ms. Howe and DDS developed and implemented a program of specialized services that provided Active Treatment to all individuals with IDD in nursing facilities and that offered these individuals regular and ongoing opportunities to engage in community activities through specialized services offered outside of the nursing facility. These specialized services were an important feature of the Massachusetts transition program and resulted in many individuals, who initially were reluctant or opposed to community living, deciding to leave the nursing facility and transition to an integrated setting. Trial Tr. 3917:11-3919:18, 3920:21-3921:2, Nov. 13, 2018 (Howe); Trial Tr. 1511:8-24, Oct. 23, 2018 (Weston); PPI X 976 at 9-10 (Howe Rebuttal Report).

1171.   As a result of the efforts of Ms. Howe and DDS to comply with federal court orders in *Rolland*, the number of individuals with IDD in nursing facilities decreased by more than eighty percent – from more than 1600 to approximately 200. Trial Tr. 1417:3-17, Oct. 22, 2018 (Weston); Trial Tr. 3950:6-23, Nov. 13, 2018 (Howe); PPI X 1906 at 6 (Weston Report); *see also* Trial Tr. 1202:20-23, Oct. 22, 2018 (Webster); PPI X 1762 at 7 (Webster Report). In Texas, on the other hand, in the five years leading up to trial, the census only decreased by twenty-eight individuals out of more than 3,600. This shows a significant failure to accomplish the goals and requirements of PASRR and the ADA. Trial Tr. 3952:6-3953:16, Nov. 13, 2018 (Howe).

2.      Providing informed choice would not require entirely new services

1172.   The State has already adopted supported decision-making, which recognizes that there are steps to learning how to make a decision. Trial Tr. 1948:6-1949:24, Oct. 24, 2018 (Wehmeyer).

1173.   According to Dr. Wehmeyer, it is possible to implement a person-centered planning process that uses the same system and the same steps to create support plans that are still very individualized and very personalized. Trial Tr. 1949:25-1950:25, Oct. 24, 2018 (Wehmeyer).

1174.   The State already provides additional assistance to people transitioning out of SSLCs through Community Transition Support Specialists, whose duties are to provide education and support to help individuals successfully transition from SSLCs into the community. One form of assistance is the opportunity for individuals to spend a week in the community to identify whether they like it. *See* Trial Tr. 2024:10-23, Oct. 25, 2018 (Wehmeyer). This support is only available to individuals moving from SSLCs. PPI X 1489 at 9-10 (Promoting Independence Advisory Committee Fiscal Year 2017 First Quarter Agency Report).

1175.   LIDDAs and SSLCs already host provider fairs for people with IDD to learn about community service providers, but provider fairs rarely, if ever, take place at nursing facilities. Trial Tr. 2088:3-2089:18, Oct. 25, 2018 (Rideout) (testifying that she participates in many provider fairs through LIDDAs or SSLCs, but has never been invited to a provider fair at a nursing facility, has never heard of a provider fair at a facility, and has never spoken at a provider fair to anyone with IDD who lives in a nursing facility).

C.   It is reasonable for the State to ensure that Individuals with IDD can live in the most integrated setting appropriate to their needs

1176.   It is reasonable for the State to provide sufficient community supports and services to individuals who are institutionalized in or referred to placement in nursing facilities to ensure they can live in the most integrated setting appropriate to their needs. *See* Trial Tr. 2178:21-2179:3, Oct. 26, 2018 (Sawyer) (It is feasible for Texas to implement all of the critical components of an IDD system.).

1.   Other state IDD systems serve individuals with IDD in the community

1177.   There is overwhelming evidence that people with IDD can be served in the community.

1178.   The nationwide trend has been for individuals to transition from institutions to community settings. PPI X 1 at 6 ("Taking into account state-operated facilities and nursing homes, the number

347

of people with IDD living in institutions has decreased from approximately 275,000 in the 1960s to fewer than 50,000 . . .".).

1179.   Other states serve individuals with IDD, including individuals with complex medical needs, in the community without reliance on nursing facilities. PPI X 1634 at 65 tbl. 1.11 (In-Home and Residential Long Term Services and Supports for Persons with IDD: Status and Trends 2015) (reporting that only thirty-seven people with IDD live in Arizona nursing facilities); *see* Snyder Dep. 230:12-17, 232:19-235:8, Nov. 16, 2017.

1180.   "Many States have found HCBS waivers to be a cost-effective means to provide comprehensive community services in the most integrated setting appropriate to the needs of the individuals enrolled." PPI X 1881 at 9 (Letter from CMS to State Medicaid Directors, July 25, 2000).

1181.   Ms. Sawyer, in her former role as the Commissioner of the Alabama Department of Mental Health, and the State of Alabama successfully transitioned people with IDD from institutional settings to the community. Supports and services to individuals included individuals with IDD who had complex medical and/or behavioral support needs. Trial Tr. 2109:12-2110:15, Oct. 26, 2018 (Sawyer). As a result of this effort, Alabama was able to close three of its institutions for people with IDD. Trial Tr. 2110:1-2, Oct. 26, 2018 (Sawyer); *see also* Trial Tr. 2390: 9-13, Oct. 27, 2018 (Sawyer); PPI X 1578 at 8-9, 65 (Sawyer Report).

1182.   Ms. Sawyer and the District of Columbia expanded community services for people with IDD through measures including the expansion of Medicaid waiver services. Trial Tr. 2112:16-23, Oct. 26, 2018 (Sawyer); PPI X 1578 at 9-10, 65 (Sawyer Report).

1183.   Other experts testified that they have successfully served individuals with IDD with high levels of need in the community in other states. *See* Trial Tr. 490:24-491:25, Oct. 17, 2018 (Pilarcik); Trial Tr. 1596:18-1598:14, Oct. 23, 2018 (Russo); Trial Tr. 879:11-882:9, Oct. 18, 2018 (Coleman).

1184.   When the HHSC Deputy Commissioner for Medicaid and Chip Services Jami Snyder

administered Medicaid programs for Arizona, that state did not have a long wait list for waiver services. Snyder Dep. 244:17-21, Nov. 16, 2017. In Ms. Snyder's experience, it is possible for states to operate an IDD service system in a fiscally sound way without maintaining lists for people waiting for IDD services. Snyder Dep. 245:13-18, Nov. 16, 2017.

2.  The State can support individuals with IDD in the community

1185.  The HCS waiver in Texas already funds essential residential options for individuals with IDD who want to live in the community, including group homes, host homes, and services in an individual's own home. The HCS waiver also provides for a wide array of other services for people with IDD, such as nursing, Physical Therapy, Occupational Therapy, Speech Therapy, and adaptive aids. Trial Tr. 1096:3-9, Oct. 19, 2018 (Preskey).

1186.  HHSC's policies contemplate that individuals with IDD can be supported in the community. Trial Tr. 3660:13-17, Nov. 8, 2018 (Jones) (testifying that HHSC's policies encourage individuals with IDD living in nursing facilities to move to the community if it is the individual's choice); Trial Tr. 3516:13-17, Nov. 8, 2018 (McDonald); Trial Tr. 3551:4-7, Nov. 8, 2018 (Thompson); Trial Tr. 3593:5-7, Nov. 8, 2018 (Phillips); Trial Tr. 3636:11-14, Nov. 8, 2018 (Terbush).

1187.  The State has successfully transitioned individuals with IDD from other institutions into the community. Trial Tr. 1125:17-1126:25, Oct. 19, 2018 (Preskey) (community provider testimony that in five years CALAB, Inc. received fifty or more referrals and completed about thirty transitions of people from SSLCs to the community but only received two or three referrals and completed one or two transitions of people from nursing facilities to the community); PPI X 1489 at 9 (Promoting Independence Advisory Committee FY2017 Q1 Agency Report) (noting that the SSLC overall census has decreased from 3,982 in September 2011, to 3,547 in September 2013, to 3,083 in November 2016, and noting that the population at each of the thirteen SSLCs decreased from September 2011 to November 2016); *see* DX 109 (Promoting Independence Advisory Committee

Stakeholder Report).

1188.   Plaintiffs' and the United States' expert Mr. Kyle Piccola testified that although criteria for admission to SSLCs are more stringent than for nursing facilities, the population of people with IDD in SSLCs has dropped by seventy-five percent, while the population of people with IDD in nursing facilities has remained steady, showing that the latter population has been left behind. Trial Tr. 4116:8-22, Nov. 14, 2018 (Piccola); *cf.* PPI X 1907 at 20 (Weston Rebuttal Report) ("If transitions and diversions were occurring effectively, I would expect a decrease in the total nursing facility census of people with IDD, but that has not occurred in Texas. . . . [T]his expectation was realized in Massachusetts after we implemented our PASRR and transition program, paying equal attention to both preventing unnecessary admissions and promoting prompt discharges.").

1189.   The State is currently serving individuals with varying levels of need in the community. PPI X 1125 at 2-3.

1190.   Individuals with complex medical needs can be served in the community with the services provided by the Texas HCS waiver. Trial Tr. 2146: 19-21, Oct. 26, 2018 (Sawyer); Trial Tr. 3657:23-3658:8, Nov. 8, 2018 (Terbush) (testifying that providers in her area are able to service people with complex medical needs, and that there is a good array of community-based services in Betty Hardwick's service area, but that she does not know about the provider array in the other thirty-eight service areas); Trial Tr. 3326:1-17, Nov. 6, 2018 (Shea-Delaney) (describing the services provided by the HCS waiver and noting that services like nursing are "very important because these are often . . . medically complex people.").

D.    It is reasonable for the State to provide sufficient training and effective oversight and monitoring to ensure that its IDD system meets its intended goals

1191.   Based on the evidence presented, IDD systems need to provide adequate training to staff so that individuals with IDD can avoid unnecessary nursing facility admission, be transitioned

successfully from nursing facilities, receive person-centered planning, and remain safely in the community and avoid readmission to nursing facilities or other institutional settings, and it is reasonable for Texas to do so.

1192.   Based on the evidence presented, IDD systems need to have a quality management and improvement program that measures performance, identifies deficiencies or gaps, takes corrective action, and determines if such corrective action has effectively resolved problems, and it is reasonable for Texas to have such a program.

XIII.

The State does not have an effectively working *Olmstead* Plan

1193.   The Supreme Court issued its *Olmstead* decision in June 1999, holding that "[u]njustified isolation is properly regarded as discrimination based on disability" and unnecessary segregation of persons with disabilities is a violation of the ADA's integration mandate. *Olmstead v. L.C.*, 527 U.S. 581, 119 S. Ct. 2176, 2185 (1999).

1194.   Following the Supreme Court decision in *Olmstead*, the Health Care Financing Administration, now CMS, issued a letter to State Medicaid Directors reiterating that "no one should have to live in an institution or nursing home if they can live in the community with the right support," and stating that "[o]ur goal is to integrate people with disabilities into the social mainstream, promote equality of opportunity and maximize individual choice." PPI X 598 at 2 (letter dated January 14, 2000).

1195.   The letter strongly urged States to "[d]evelop a comprehensive, effectively working plan (or plans) to strengthen community service systems and serve people with disabilities in the most integrated setting appropriate to their needs" and provided technical assistance to guide States in the planning process. PPI X 598 at 5-11.

1196. Key principles that are "critically important" to *Olmstead* planning and implementation include:

    a.    The evaluation of "the adequacy with which the State is conducting thorough, objective and periodic reviews of all individuals with disabilities in institutional settings (such as . . . nursing facilities . . .) to determine the extent to which they can and should receive services in a more integrated setting," PPI X 598 at 7;

    b.    A "reliable sense of how many individuals with disabilities are currently institutionalized and are eligible for services in community-based settings," consideration of "what information and data collection systems exist to enable the State to make this determination" and, where appropriate, improvements to those data collection systems, PPI X 598 at 8;

    c.    The evaluation of "whether existing assessment procedures are adequate to identify individuals in the community who are at risk of placement in an unnecessarily restrictive setting," and the establishment of "procedures to avoid unjustifiable institutionalization in the first place," PPI X 598 at 7-8;

    d.    The identification of "what community-based services are available in the State" and the assessment of "the extent to which these programs are able to serve people in the most integrated setting appropriate," PPI X 598 at 8;

    e.    A review of the funding sources available to increase community-based services and a consideration of efforts under way to coordinate access to these services, PPI X 598 at 9;

    f.    An assessment of "how well the current service system works for different groups," PPI X 598 at 9;

g.  An examination of the operation of waiting lists, and what might be done to ensure people are coming off waiting lists and receive needed community services at a reasonable pace, PPI X 598 at 9;

h.  A plan that ensures individuals and their families have the opportunity to make informed choices regarding how their needs can best be met in community or institutional settings, and addressing the information, education, and referral systems that would be useful, PPI X 598 at 9;

i.  The evaluation of "how quality assurance and quality improvement can be conducted effectively as more people with disabilities live in community settings," PPI X 598 at 9; and

j.  An "opportunity for interested persons, including individuals with disabilities and their representatives, to be integral participants in plan development and follow-up," PPI X 598 at 7.

1197.  Compliance with professionally accepted standards in the field of IDD services is necessary to having an effectively working *Olmstead* Plan. *See* Trial Tr. 2392:19-2393:4, Oct. 27, 2018 (Sawyer).

1198.  A plan to eliminate unnecessary segregation of individuals with disabilities should clearly identify and focus on specific groups of individuals who are in specific types of segregated settings. For each group, there should be specific, measurable goals and benchmarks, including the numbers and time frames of community integration. Without these elements, meaningful change and progress are unlikely. Trial Tr. 2167:16-2168:21, 2170:8-2171:12, Oct. 26, 2018 (Sawyer).

1199.  Mr. Kyle Piccola, chief government and community relations officer for the Arc of Texas, testified as an expert for Plaintiffs and the United States regarding services for individuals with IDD.

353

His expertise is based on extensive experience in fields that affect individuals with IDD including work with HHSC policies and procedures and advocacy for this population in multiple states. Trial Tr. 4038:21-25, 4040:6-4042:13, 4042:18-4043:18, 4047:10-4050:24, 4059:19-4060:17, Nov. 13-14, 2018 (Piccola); PPI X 302.

1200.    Mr. Piccola testified that an *Olmstead* Plan must be more than aspirational; it needs to have real resources to meet the intended goals; it needs to be validated; and it should permit people timely access to services. Trial Tr. 4063:15-4064:11, 4137:2-13, 4138:6-9, Nov. 14, 2018 (Piccola); *see* Trial Tr. 2167:16-2168:21, Oct. 26, 2018 (Sawyer); PPI X 1578 at 58 (Sawyer Report).

1201.    The "Promoting Independence Plan" was Texas' response to the *Olmstead* integration mandate. Trial Tr. 2168:22-24, 2169:6-13, Oct. 26, 2018 (Sawyer); Trial Tr. 4064:12-19, Nov. 14, 2018 (Piccola); PPI X 1007 at 2 (Letter from HHSC Executive Commissioner Smith stating that the Promoting Independence Plan serves, in part, as the State's response to *Olmstead*); PPI X 192 at 5 (2001 Texas Promoting Independence Plan, which states that it is a plan in response to *Olmstead*); PPI X 1578 at 57 (Sawyer Report); Turner 30(b)(6) Dep. 202:4-8, Feb. 21, 2018; Jones Dep. 42:4-23, Oct. 17, 2017; Williamson 30(b)(6) Dep. 264:8-14, Jan. 10, 2018.

1202.    Mr. Piccola concluded that the State's Promoting Independence Plan is not comprehensive, is not moving at a reasonable pace, and is not effectively working in a manner that ensures that people with IDD do not unnecessarily enter or remain in nursing facilities. Trial Tr. 4065:14-17, 4066:20-4067:9, Nov. 14, 2018 (Piccola) (The State lacks a comprehensive, effectively working system that allows individuals with IDD who have high or complex support needs to live in the community in a reliable way.); PPI X 1215 at 6 (Piccola Rebuttal Report); *see* PPI X 1578 at 59-60 (Sawyer Report).

1203.   The State's *Olmstead* Plan does not contain goals about individuals with IDD in nursing facilities. Trial Tr. 2170:13-2171:2, Oct. 26, 2018 (Sawyer); Ex. P/PI 1578 at 59 (Sawyer Report). HHSC officials were unaware of goals for increasing transitions or diversions for people with IDD living in nursing facilities. Turner Dep. 14:5-15, Feb. 23, 2018; Gaines Dep. 69:7-16, Feb. 27, 2018; Turner 30(b)(6) Dep. 233:24-234:13; 236:21-237:14, Feb. 21, 2018 (testifying that HHSC had not determined how many transitions or diversions it expected to complete in the last biennium).

1204.   The State's "Promoting Independence Plan" has proven to be aspirational at best.

A.      The State has not shown a history or past commitment to deinstitutionalization, outside the context of this litigation

1205.   The State has shown little commitment to address the needs of Texans with IDD. PPI X 1215 at 7, 13 (Piccola Rebuttal Report).

1206.   A plan to eliminate unnecessary segregation of individuals with disabilities should include formal input from stakeholders. *See* Trial Tr. 2175:6-2176:23, Oct. 26, 2018 (Sawyer).

1207.   Yet the State repeatedly has failed to implement recommendations of the Promoting Independence Advisory Committee (PIAC), the major vehicle for stakeholder input on community services for people with disabilities. Trial Tr. 4111:5-4112:5, 4158:15-24, 4159:21-4160:1, Nov. 14, 2018 (Piccola); PPI X 1215 at 8 (Piccola Rebuttal Report); PPI X 1010 at 6, 9 (2016 PIAC Stakeholder Report); PPI X 1579 at 9-10 (Sawyer Rebuttal Report); PPI X 439; Williamson Dep. 165:16-166:4, Feb. 22, 2018.

1208.   Due to HHSC's disregard of many important PIAC recommendations, the State's *Olmstead* plan reflects HHSC's priorities, not PIAC's priorities. Trial Tr. 4108:23-4112:5, Nov. 14, 2018 (Piccola); PPI X 1215 at 12-13 (Piccola Rebuttal Report); PPI X 1579 at 10 (Sawyer Rebuttal Report).

1209.   Further, the State has discontinued relevant workgroups. Diase Dep. 59:18-60:11, Nov. 1,

2017 (testifying about the Steward Workgroup); *infra*, § XIII. E., p. 371 (describing how the State discontinued the PIAC).

1210.    The State only began addressing the needs of people with IDD in nursing facilities after this litigation began. Trial Tr. 4064:20-4065:13, Nov. 14, 2018 (Piccola); PPI X 1215 at 7, 13 (Piccola Rebuttal Report); *see* PPI X 87 at 2-3 (March 23, 2017 email among HHSC staff discussing the need before the fact cutoff for "a more focused effort on the program side in relation to the Steward lawsuit").

1211.    Prior to the case, the State's Promoting Independence Plan did not address individuals with IDD living in nursing facilities who needed access to the HCS waiver, even though stakeholders had recommended that change for years. These individuals instead were required to put their name on the interest list and wait years until they got to the top of the list. PPI X 1215 at 9 (Piccola Rebuttal Report); PPI X 43 at 14 (Promoting Independence Advisory Committee Stakeholder Report recommended in 2012 to "include within the Promoting Independence Plan individuals with intellectual and developmental disabilities in nursing facilities"); *see* PPI X 201 at 14; PPI X 202 at 19 (2012 Revised Texas Promoting Independence Plan, memorializing the State's first request for targeted HCS slots for individuals transitioning from nursing facilities).

1212.    From Fiscal Year 2008 to Fiscal Year 2013, the State did not have any dedicated nursing facility diversion or transition slots for adults with IDD. Turner 30(b)(6) Dep. 205:1-14, Feb. 21, 2018; *see* PPI X 522 at 3 (Promoting Independence historical allocation of waiver slots showing no resources or slots); PPI X 1215 at 9 (Piccola Rebuttal Report).

1213.    Fiscal Years 2014 through 2015 – after this lawsuit began – was the first biennium with slots set aside for nursing facility transition and diversion. PPI X 58 at 3 (Comparison of Appropriated to Filled Promoting Independence Slots, FY12-FY17); PPI X 524 at 3 (HHSC's FY17 waiver

utilization report showing past and present utilization); PPI X 526 at 3 (HHSC's FY17 utilization report showing increased utilization and demand for waiver slots over time). At that point, the Promoting Independence Plan was modified to reflect only the number of slots allocated by the Legislature. PPI X 193 at 19.

1214.    It was also because of this litigation that the State began the QSR process. Diase Dep. 79:1-5, Nov. 1, 2017. Yet, even as of the fact cutoff, little, if anything, had been done to implement recommendations in the QSR report.

B.    The State's plan is not working to decrease the census of Individuals with IDD in Nursing Facilities

1215.    "Demonstrated progress in transitioning and diverting individuals with IDD from institutions, with a commensurate decrease in the total census, is an important part of ensuring that a system of care for individuals with IDD, and any related plan, is effective and working as intended." PPI X 1579 at 12 (Sawyer Rebuttal Report).

1216.    Defense expert Ms. Shea-Delaney acknowledges that a decrease in the census of people with IDD in nursing facilities would be "clear evidence of progress" and "reflect a system that is effective and working as intended." DX 1065 at 11-12 (Shea-Delaney Report).

1217.    The State continues to have one of the largest institutionalized populations in the nation. PPI X 1634 at 160; PPI X 192 at 19 (initial Promoting Independence Plan).

1218.    The population of individuals with IDD in nursing facilities has stayed relatively constant over the four years prior to the fact cut off date. Trial Tr. 968:11-20, 969:4-10, Oct. 19, 2018 (O'Connor) (explaining that population has changed "virtually, not at all"); PPI X 1207 at 9 (O'Connor Report); PPI X 661; PPI X 646 at tab 1; PPI X 1579 at 11-12 (Sawyer Rebuttal Report); PPI X 1215 at 10 (Piccola Rebuttal Report).

1219.    Ms. Shea-Delaney's assertion that the census of individuals with IDD in the State's nursing

facilities dropped from August 2015 to August 2017 is not credible because it is based on the comparison of two reports that rely on different data sources and thus are not comparable. Trial Tr. 3332:13-24, Nov. 6, 2018 (Shea-Delaney) (retracting her report statements about a census reduction); Trial Tr. 3336:25-3337:15, Nov. 6, 2018 (Shea-Delaney) (testifying that conclusions she drew were "comparing apples and oranges because the data sources were different"); Trial Tr. 994:9-998:18, Oct. 19, 2018 (O'Connor) (explaining reasons that it would not "be consistent with professional standards" to conclude that census dropped by comparing the two reports); PPI X 1208 at 8-9, 16 (O'Connor Rebuttal Report); PPI X 283, 284.

1220.    Comparisons of State census reports using consistent methodology demonstrate that, for the periods Ms. Shea-Delaney considered, the census of individuals with IDD in Texas nursing facilities increased. From June 2016 to August 2017, there was an increase of 13.6 %. Trial Tr. 994:9-998:18, Oct. 19, 2018 (O'Connor); PPI X 1208 at 8-9 (O'Connor Rebuttal Report); PPI X 283, 284; PPI X 1209-1211.

1221.    The State's stable census over the most recent four-year period for which data are available indicates that the State is not reducing the numbers of people segregated in nursing facilities consistent with its *Olmstead* obligations. Trial Tr. 968:11-20, 969:4-10, 999:10-13, Oct. 19, 2018 (O'Connor); Trial Tr. 4116:8-22, Nov. 14, 2018 (Piccola); PPI X 1207 at 9 (O'Connor Report); PPI X 661; PPI X 646 at tab 1; PPI X 1579 at 11-12; PPI X 1215 at 10, 17 (Piccola Rebuttal Report).

1222.    Further, the State's IDD system has not reached the point where transitions from nursing facilities have plateaued. Rather, utilization of transition slots increased between Fiscal Years 2016 and 2017. PPI X 1579 at 12 (Sawyer Rebuttal Report).

C.       The State has a long waiting list, which does not move at a reasonable pace

1223.    An effectively working *Olmstead* Plan should include an examination of the operation of

waiting lists, and what might be done to ensure people are coming off waiting lists and receive needed community services at a reasonable pace. PPI X 598 at 9.

1224.   HHSC acknowledged in its first Promoting Independence Plan, dated January 1, 2001, that its then-existing waiver wait list of more than 40,000 people "clearly illustrate[d] the need for expanded capacity in the community Medicaid waiver programs." PPI X 192 at 24 (original Promoting Independence Plan); Jones Dep. 59:17-60:16, Oct. 17, 2017.

1225.   As of December 2014, the unduplicated count of individuals on DADS/HHSC interest lists was 100,480, which is about two-and-one-half times the number of people on wait lists for waiver services in 2001, when the first Promoting Independence Plan was issued. Jones Dep. 120:10-121:3, Oct. 17, 2017.

1226.   By August 31, 2015, the interest list for the HCS waiver alone was 73,002 people. By August 31, 2017, that interest list had increased to 87,496 people, nearly twenty percent in two years. Trial Tr. 2173:20-2174:25, Oct. 26, 2018 (Sawyer) (noting that State's own data shows that the number of people with IDD on the State's HCS interest list increased by from approximately 73,000 at the end of August of 2015 to approximately 87,000 by the end of August 2017); PPI X 1579 at 15 (Sawyer Rebuttal Report).

1227.   With limited exceptions, HHSC stopped releasing HCS interest list waiver slots because of a budgetary shortfall beginning in October 2016. PPI X 51 at 3; Cochran Dep. 204:22-207:22, Sept. 14, 2017.

1228.   As of August 31, 2017, the HCS interest list was more than twelve years long. Trial Tr. 4083:7-15, 20-23, Nov. 14, 2018 (Piccola); PPI X 289 at 59-60 (Interest List and Waiver Caseload Summary Archive from HHSC website, stating that HCS interest list has grown from 73,002 on August 31, 2015 to 87,496 on August 31, 2017 and that 1,546 people have been waiting more than

twelve years on the HCS interest list); PPI X 1215 at 10 (Piccola Rebuttal Report); *see* PPI X 1579 at 15 (Sawyer Rebuttal Report).

1229.   HHSC has acknowledged that twelve years is a long time to wait for services. Jones Dep. 124:22-125:4, 125:15-126:5, Oct. 17, 2017.

1230.   The State is aware of the need to reduce, and ultimately eliminate, its community interest lists to prevent the unnecessary institutionalization of individuals. PPI X 192 at 32 (original Promoting Independence Plan); Jones Dep. 60:17-61:18, Oct. 17, 2017.

1231.   Eliminating waiting lists has remained the PIAC's top priority. PPI X 1002 at 16, 1007 at 17.

1232.   The State's *Olmstead* Plan cannot be considered to be moving at a reasonable pace when individuals with IDD have to wait more than a decade to receive needed waiver services to remain in the community. PPI X 1215 at 10 (Piccola Rebuttal Report).

1233.   Yet HHSC did nothing to address this wait list as of September 1, 2017. Its final Consolidated Budget Request did not even request funding to address the wait list. Trial Tr. 4082:23-4084:6, 4083:16-19, Nov. 14, 2018 (Piccola); PPI X 1215 at 9 (Piccola Rebuttal Report); PPI X 288 (Consolidated Budget Request 2018-2019).

1234.   The State's massive waiting list for waiver services harms Texans with IDD by creating a crisis-driven system that forces individuals and families into medical, behavioral, and family crisis because they are unable to receive critical services. This is a direct result of a lack of accessible, available, and timely community waiver services. This crisis-driven system puts individuals with IDD at great risk of entering an institution such as a nursing facility. Trial Tr. 4084:1-4087:6, Nov. 14, 2018 (Piccola); PPI X 1215 at 10 (Piccola Rebuttal Report).

1235.   Although the State's waiting list to receive waiver services in the community is years long, the State does not maintain a waiting list for institutional services, and individuals on the waiting list

for waiver services can at any time enter a nursing facility or SSLC if they meet the eligibility requirements to receive services. Trial Tr. 4088:12-23, Nov. 14, 2018 (Piccola); PPI X 1215 at 10-11, 17 (Piccola Rebuttal Report).

1236.   While HHSC official Ms. Williamson testified that individuals with IDD who are over the age of twenty-one, Medicaid eligible, and at risk of living in a nursing facility can bypass the interest list, she also admitted that if the State disagrees that they are at risk, they end up on the interest list. At that point, an eligibility determination will not begin until they reach the top of the waiting list. Trial Tr. 2779:19-25, 2781:6-25, Nov. 1, 2018 (Williamson) (State chose to structure its program such that people have to wait on a list for several years until their eligibility is determined. It is not a CMS requirement.); PPI X 533 at 7.

D.    The State underutilized and ultimately reduced the waiver slots targeted to serve this population

1237.   The HCS waiver is the primary vehicle for individuals with IDD to transition or divert from nursing facility placement. Other 1915(c) waiver programs have limitations, including a lack of residential services, restrictive eligibility criteria, or long waiting lists.

1238.   The State's approach to complying with PASRR and supporting individuals to remain in the community or transition to the community and avoid institutional placement is through legislatively approved diversion and transition slots in the HCS program. Slots such as these, which are targeted for particular initiatives under the State's Promoting Independence Plan, are called "Promoting Independence Slots" or "targeted waiver slots." Trial Tr. 4090:23-4091:8, Nov. 14, 2018 (Piccola); PPI X 45 at 22 (2016 Revised Texas Promoting Independence Plan); PPI X 5 at 5 (funding nursing facility transition and diversion slots "will help Texas meet federal preadmission screening and resident review (PASRR) requirements"); *see* PPI X 523 at 6 (HHSC budget request claimed that funding for both new waiver slots and specialized services was "essential to the state's compliance

with federal PASRR requirements").

1239.   Targeted waiver slots allow a particular group, such as people with IDD in nursing facilities, to have priority for waiver slots. These slots provide access to community services and supports for individuals with IDD to leave or avoid admission to nursing facilities. Trial Tr. 4090:23-4091:8, Nov. 14, 2018 (Piccola); PPI X 45 at 22.

1240.   The State has underutilized its waiver slots and failed to take sufficient action to increase waiver slot utilization meaningfully for individuals with IDD in, or at risk of entering, nursing facilities. Trial Tr.  2126:24-2137:21, Oct. 26. 2018 (Sawyer) (testifying that it was "obvious" that the State underutilized its waiver slots and failed to do the needed analysis to determine what caused the underutilization and to take steps to remediate the problem); PPI X 1578 at 22 (Sawyer Report).

1.      Underutilization of waiver slots

1241.   In Fiscal Years 2008 to 2014, there were no targeted HCS nursing facility waiver slots, meaning, if a person was in a nursing facility and wanted to move to an HCS community program, they would have to go on the interest list. PPI X 56 at 15; Turner 30(b)(6) Dep. 211:20-212:1, Feb. 21, 2018.

1242.   For the 2014-2015 biennium, the State Legislature appropriated funds for 510 HCS waiver slots for individuals with IDD to transition or be diverted from nursing facilities. PPI X 56 at 15 (HHSC February 2017 Cost Report notes that in FY14 and FY15, there were 360 transition slots and 150 HCS diversion slots appropriated for this population).

1243.   For Fiscal Years 2016 through 2017, HHSC requested, and the State Legislature appropriated, funds for 1300 HCS slots for individuals transitioning and diverting from nursing facilities. Trial Tr. 2135:22-2136:12, Oct. 26, 2018 (Sawyer); Trial Tr. 4091:16-4092:1, Nov. 14, 2018 (Piccola); PPI X 1578 at 23-24 (Sawyer Report); PPI X 1490-A at tab 1 (spreadsheet of slots

for FY16-17, indicating allocation of slots: 680 for nursing facility transition, 20 for nursing facility children, and 600 for nursing facility diversion); *see* PPI X 1489 at 2; PPI X 794 at 14 (legislative appropriations request for FY16-2017 requesting 1300 nursing facility transition and diversion slots); PPI X 5 at 5.

1244.   The annual enrollment or utilization of transition slots is less than the number of slots allocated by the Legislature in each of the fiscal years for which data are available. PPI X 1578 at 26 (Sawyer Report).

1245.   In the first biennium (Fiscal Years 2014 through 2015) approximately forty percent of the slots allocated were utilized, and in Fiscal Years 2016 through 2017, there was enrollment of only fifty-nine percent of the slots. PPI X 1578 at 26 (Sawyer Report).

1246.   In Fiscal Years 2016 through 2017, only twenty-six percent of people who expressed an interest in transitioning to the community, as reflected in the PE, ultimately accepted a waiver slot. *See* PPI X 1490 at tab 1; PPI X 51 at 4.

1247.   Utilization of diversion slots dropped from 93 % in Fiscal Years 2014 through 2015 to 63.67 % in Fiscal Years 2016 through 2017 (after a significant increase in the number of slots allocated). PPI X 1578 at 26 (Sawyer Report).

1248.   The barriers to community placement may lead to underutilization of waiver slots. PPI X 1578 at 26 (Sawyer Report).

1249.   Ms. Sawyer testified that when there is an underutilization or decline in utilization of waiver slots, "it is imperative that the system would want to know why." Trial Tr. 2156:8-2157:16, 2137:19-21, Oct. 26, 2018 (Sawyer). The low acceptance of waiver slots by individuals who expressed an interest in transitioning should have prompted the State to conduct a closer review of the reasons that slots were not used. PPI X 1578 at 30 (Sawyer Report).

1250.  Yet HHSC does not track the necessary information to understand accurately and comprehensively the utilization, and in the State's case, its underutilization, of Medicaid-funded waiver slots for individuals with IDD in nursing facilities. Trial Tr. 2156:8-2157:16, 2137:19-21, Oct. 26, 2018 (Sawyer); PPI X 1578 at 46- 47 (Sawyer Report).

1251.  HHSC's document to track the reasons for decline, denial, withdrawal, or discharge of HSC nursing facility and diversion slots in Fiscal Years 2016 through 2017 simply listed "nursing facility" as the reason more than eighty percent of the time. PPI X 1490 at tab 1.

1252.  HHSC does not aggregate and analyze that information to determine the reasons why individuals or their LARs decline community service options. PPI X 1578 at 47 (Sawyer Report).

1253.  HHSC did not analyze or take action to address the fact that two LIDDAs utilized zero diversion slots during four fiscal years, four LIDDAs used only one diversion during four years, and four LIDDAs used four or fewer transition slots from Fiscal Years 2014 through 2017. PPI X 1578 at 27 (Sawyer Report).

1254.  HHSC did not do a comprehensive analysis to understand why service utilization rates were lower than expected, nor did it develop and implement appropriate measures to address the problem. PPI X 1578 at 27 (Sawyer Report); Turner Dep. 51:23-52:4, Feb. 23, 2018; Jalomo Dep. 131:3-18, Nov. 3, 2017.

1255.  Ms. Sawyer opined that there are real consequences to people with IDD seeking to transition or divert from nursing facilities when there is a failure to analyze the reasons for underutilization of waivers – these individuals "will remain in these type settings, in these nursing facilities or other institutions, and not – and be segregated and not move." Trial Tr. 2157:6-16, Oct. 26, 2018 (Sawyer).

    2.    Reduction of waiver slots

1256.  For the 2018 through 2019 biennium, HHSC initially represented to the Legislature that 600

364

diversion slots and 700 HCS transition waiver slots were needed. Trial Tr. 2137:22-2138:6, Oct. 26, 2018 (Sawyer); PPI X 2211 at 8 (Memo to the Executive Commissioner); PPI X 58 at 3.

1257.   This request was reasonable in light of demand, need, the increased utilization from Fiscal Years 2014 through 2015 to Fiscal Years 2016 through 2017, and HHSC's hope that diversions will continue to increase. PPI X 1578 at 26-27 (Sawyer Report); Turner 30(b)(6) Dep. 74:13-19, Feb. 21, 2018; *see* Trial Tr. 2142:11- 22, Oct. 26, 2018 (Sawyer).

1258.   In its request for funding for the 1,300 transition and diversion slots, HHSC specifically acknowledged that "without these slots, the interest list will be the only way for [] individuals to enroll in the HCS and MDCP waivers for which the wait can be up to 12 years." Gaines Dep. 115:2-11, Feb. 27, 2018.

1259.   HHSC's initial request was undercut by its subsequent communications to the Legislature, appearing to indicate that fewer diversion slots would suffice. PPI X 53 at 103-08; *see* PPI X 60; PPI X 62; Cook Dep. 113:22-114:2, Feb. 1, 2018 (confirming that HHSC provided the Legislature with projection that only 450 transition slots and 300 diversion slots would be enrolled by the biennium's end).

1260.   HHSC ultimately provided revised numbers to the Legislature the day after Executive Commissioner Smith instructed HHSC staff, "Let's go with what we think is the most reasonable scenario." PPI X 62 at 2-3; Cook Dep. 226:10-13, 228:11-16, Feb. 1, 2018.

1261.   The revised numbers came from the actual enrollment in nursing facility diversion and transition slots for biennium 2016 and 2017. They were not based on the number of people with IDD in nursing facilities who do not oppose community placement, nor did HHSC seek to determine the number of people who do not oppose community placement. Cook Dep. 224:24-225:11, 270:24-273:17, Feb. 1, 2017.

1262.  In fact, the key managers responsible for IDD services and LIDDA oversight are unaware of any HHSC analysis or projections about the number of HCS diversion slots they expect individuals will need in future fiscal years. Turner 30(b)(6) Dep. 234:15-24, 236:21-237:14, Feb. 21, 2018; Gaines Dep. 68:7-15, Feb. 27, 2018.

1263.  It is not clear whether HHSC considered the upward trend in slot utilization to project expected need. Available documentation of the information communicated to the Legislature does not mention any hope or expectation that diversions will increase over time. PPI X 1906 at 26 (Weston Report); PPI X 1578 at 26-27 (Sawyer Report); *see* Trial Tr. 2142:11-22, Oct. 26, 2018 (Sawyer) (finding that number of HCS waiver slots used in FY16-17 were greater than number ultimately requested and allocated for FY18-19).

1264.  Ultimately, HHSC received only 150 transition slots and 150 diversion slots for Fiscal Years 2018 through 2019. Trial Tr. 4092:2-4092:8, Nov. 14, 2018 (Piccola); PPI X 1002 at 23 (2016 Revised Texas Promoting Independence Plan); PPI X 533 at 7-8 (HCS Enrollment Plan for FY18-19); *see* Trial Tr. 2138:11-17, Oct. 26, 2018 (Sawyer); PPI X 1578 at 22-24 (Sawyer Report); Turner Dep. 55:9-16, Feb. 23, 2018; Cochran Dep. 176:3-9, Sept. 14, 2017.

1265.  The allocation was significantly less than what was requested.  Trial Tr. 2137:22-2138:6, Oct. 26, 2018 (Sawyer); PPI X 1578 at 23-24 (Sawyer Report).

1266.  The allocation was also less than the slots actually used in the previous biennium. Before the 2016-2017 biennium was over, the State had used more than double the nursing facility transition and diversion slots they were allocated in the 2018-2019 biennium. Cochran Dep. 238:17-241:5, Sept. 14, 2017.

1267.  This was also a significant decrease in the number of available waiver slots from the previous biennium. Trial Tr. 4091:16-4092:6, 4096:5-15, Nov. 14, 2018 (Piccola) (roughly 90 % reduction);

PPI X 1907 at 21 (Weston Rebuttal Report); *see* Trial Tr. 2141:2-14, 2142:11-2143:2, Oct. 26, 2018 (Sawyer); PPI X 1002 at 9; PPI X 1007 at 19; PPI X 533 at 8 (HCS Enrollment Plan for FY18-19); PPI X 286 at 2; PPI X 58; PPI X 1578 at 24-25 (Sawyer Report); PPI X 1215 at 7, 13 (Piccola Rebuttal Report); PPI X 60 at 5 (HHSC spreadsheet used to calculate lower appropriation of slots for 18-19 biennium).

1268.   Less than twenty-two percent of the number of nursing facility transition slots that were available in Fiscal Years 2016 through 2017 were appropriated in 2018 through 2019. Only twenty-five percent of the nursing facility diversion slots available in Fiscal Years 2016 through 2017 were appropriated in 2018 through 2019. PPI X 1579 at 8 (Sawyer Rebuttal Report); *see* Cochran Dep. 176:3-179:4, Sept. 14, 2017.

1269.   The actual availability of FY 2018 through 2019 slots was further reduced because any person who was in the enrollment process but not accepted as a waiver participant as of August 31, 2017 has to be counted against the FY 2018 through 2019 number, thereby reducing the available transition slots by two-thirds and the number of diversion slots by almost half. Trial Tr. 4091:16-4092:8, 4094:24-4096:15, Nov. 14, 2018 (Piccola); Trial Tr. 2141:2-14; Oct. 26, 2018 (Sawyer); PPI X 1578 at 24 (Sawyer Report); *see* PPI X 533 at 8 (HCS Waiver Slot Enrollment Plan states "HHSC expects some individuals will not complete HCS enrollment activities by the end of the 2016-2017 biennium. These individuals are considered to be carryover and will be taken out of the 2018-2019 biennium slot appropriations before the monthly slot releases begin."); Cochran Dep. 225:15-226:23, Sept. 14, 2017.

1270.   As a result, HHSC had only fifty of the appropriated transition slots available for the entire Fiscal Year 2018 through 2019 biennium for individuals with IDD in nursing facilities and only seventy-nine of the appropriated diversion slots available for all of Fiscal Years 2018 through 2019

to prevent nursing facility placement for people with IDD. Trial Tr. 2141:15-2142:1, Oct. 26, 2018 (Sawyer); PPI X 1578 at 25 (Sawyer Report); PPI X 1215 at 10 (Piccola Rebuttal Report); PPI X 286 at 26 (the thirty-seven pending and thirty-four pre-enrolled carried over and required slots appropriated for FY17-18, leaving only seventy-nine unused slots available); Cochran Dep. 225:15-226:23, 242:16-246:4, 250:17-251:18, Sept. 14, 2017; Turner Dep. 70:20-74:10, 102:2-19, 104:15-105:8, Feb. 23, 2018; Gaines Dep. 163:24-164:5, Feb. 27. 2018.

1271.   Under the Fiscal Years 2018 through 2019 Waiver Slot Enrollment Plan, beginning on September 1, 2017, the transition slots originally allocated for Fiscal Year 2018 were held for use only in Fiscal Year 2019 thus making no transition slots available from the allocated slots for people with IDD seeking to transition from nursing facilities in Fiscal Year 2018. Trial Tr. 2143:3-12, Oct. 26, 2016 (Sawyer); PPI X 533 (HCS Enrollment Plan for FY18-19); PPI X 1578 at 24 (Sawyer Report); Cochran Dep. 245:23-246:4, 247:12-14, Sept. 14, 2017.

1272.   The contingency plan to address the cut in waiver slots is to use attrition slots. "Attrition slots" are waiver slots that were vacated because of someone leaving the HCS program as a result of death, departure from the State, or another reason. PPI X 1578 at 25 (Sawyer Report); *see* Trial Tr. 2143:13-22, Oct. 26, 2018 (Sawyer); PPI X 51 at 6. Other populations waiting for HCS slots, such as people seeking to leave other kinds of institutions or people in crisis, must compete for these same slots. PPI X 1578 at 25 (Sawyer Report). People with IDD who would like to transition from nursing facilities fall third on the list of prioritization for attrition slots, behind people in crisis and people being diverted from institutions. PPI X 1579 at 9 (Sawyer Rebuttal Report); PPI X 532 at 9-10 (listing prioritization for attrition slots); Turner Dep. 96:11-22, Feb. 23, 2018 (referring to PPI X 532); *see* Trial Tr. 2143:23-2144:16, Oct. 26, 2018 (Sawyer); PPI X 1578 at 24-25 (Sawyer Report); PPI X 1579 at 8-9 (Sawyer Rebuttal Report); Cochran Dep. 253:23-256:3, 262:15-19, Sept.

14, 2017 (referring to PPI X 532).

1273.   HHSC has acknowledged the risk in light of the reduced appropriation that slots will not be available to meet the needs of people with IDD who want to be diverted or transitioned from nursing facilities, including the risk that the attrition slots will not be available in sufficient quantities to accommodate the PASRR population. PPI X 531 at 9 (email from Ms. Turner attaching draft enrollment plan for the 2018-2019 biennium stating, "Unfortunately, the allocations HHSC received will not be sufficient to meet the demand and will cause LPDS to have internal waiting list for the next available slot."); PPI X 530 at 4 (email from Ms. Turner regarding FY18-19 budget impact stating, "potential that individuals who want to leave [nursing facility] will not be able to because of no slot availability"); Turner Dep. 95:16-99:17, Feb. 23, 2018; *see* PPI X 532 at 9-10 (final enrollment plan).

1274.   Associate Commissioner Gaines acknowledged that diversion and transition slots needed for the Fiscal Years 2018 through 2019 biennium "was something that was really important," and that she was concerned about the reduction in slots. Gaines Dep. 127:9-16, 129:1-130:2, Feb. 27, 2018.

1275.   Ms. Turner stated that the negative consequences of this reduction on individuals who needed diversion slots would be increased admissions to nursing facilities and SSLCs. PPI X 530 at 4. The impact on individuals who needed transition slots was that they would remain in nursing facilities unnecessarily. PPI X 530 at 4.

1276.   Prior to September 1, 2017, HHSC officials expected that individuals with IDD who sought an attrition slot would wind up on a request list. PPI X 51 at 6 ("[T]he demand for crisis slots may exhaust the attrition slots before reaching other high priority target groups such as nursing facility transition."); Cochran Dep. 248:14-249:6, Sept. 14, 2017 (testifying that nobody did an analysis of how long someone might wait on a request list for an attrition slot); Cochran Dep. 247:21-248:1,

Sept. 14, 2017 ("For that fiscal year of 2018, what would happen to people who requested Nursing Facility Transition slots? . . . [T]here would be a request list."); Cochran Dep. 259:15-260:6, Sept. 14, 2017 (agreeing that because nobody had done an estimate of how many attrition slots would be available, nobody knew how many people would be able to get attrition slots).

1277.   In fact, as of September 1, 2017, HHSC was maintaining a "request list" for people needing crisis diversion slots to avoid imminent institutionalization. Cochran Dep. 261:22-25, Sept. 14, 2017; *see* Cochran Dep. 247:21-248:7, Sept. 14, 2017 (testifying that for individuals who requested nursing facility transition slots in FY18, there would be a request list for an attrition slot).

1278.   For example, in response to a request made by named plaintiff Mr. Kent's service coordinator for paperwork to request an HHSC PASRR transition slot, Ms. Blevins on behalf of HHSC wrote that "[w]e are not releasing slots at this time and that all requests coming in will be put on a list by date and time received to be released as attrition becomes available." Ms. Blevins' September 1, 2017 email statement is inconsistent with her effort during trial testimony to suggest that as of the fact cut-off, HHSC has "always" released slots when requested. Ms. Blevin's email indicates that HHSC was not releasing PASRR slots as of September 1, 2017. Trial Tr. 3464:16-23, 3492:5-3494:16, Nov. 6, 2018 (Blevins); PPI X 1974A.

1279.   Testimony indicates that HHSC suppresses demand for slots as a way of dealing with the low number of slots the Legislature granted. HHSC elected not to show a video that promoted diversion from nursing facilities because of concern that the video could lead to more interest compared to the number of slots the Legislature granted. Rees 30(b)(6) Dep. 135:7-140:10, Oct. 3, 2017.

1280.   Because of the slot reduction, HHSC discontinued its auto-release program for transition waiver slots, which had previously offered an HCS waiver to each person with IDD in a nursing facility who, during a PE, expressed an interest in living in the community. PPI X 51; *see* PPI X

1762 at 36 (Webster Report); PPI X 1578 at 29 (Sawyer Report); PPI X 530 at 4 (memo about impact of reduction in funded HCS diversion and transition slots, acknowledging that HHSC would have to halt or diminish its auto-release process "because there are not enough slots relative to demand"); Turner Dep. 37:14-22, 43:14-23, Feb. 23, 2018 (describing auto-release program); Turner Dep. 71:14-17, 92:11-18, Feb. 23, 2018 (describing HHSC's decision to terminate it); *see* Gaines Dep. 135:15-136:4, Feb. 27, 2018. The program was a valuable way to promptly identify individuals for transition and increase the number of transitions from nursing facilities to the community. PPI X 1762 at 36 (Webster Report); PPI X 1578 at 29-30 (Sawyer Report).

1281.   Due to the decrease in transition and diversion waiver slots and the absence of interest list waiver slots in the Fiscal Years 2018 through 2019 biennium, more people from more categories and settings are competing for the limited number of available waiver services and any vacancies that arise in existing waiver services. PPI X 1579 at 15 (Sawyer Rebuttal Report); PPI X 852 (email chain between HHSC officials regarding HCS slots and attrition).

1282.   At the end of the day, the State does not know the actual number of individuals who desire transition or the number at risk of nursing facility placement who would need diversion slots, and it does not have goals regarding the number of diversions and transitions it hopes to accomplish. Without this information, the State cannot ensure that its *Olmstead* Plan is moving people out of nursing facilities at a reasonable pace. PPI X 1579 at 13 (Sawyer Rebuttal Report); *see* Turner Dep. 14:5-15, Feb. 23, 2018. In fact, the most recent update to the State's Promoting Independence Plan drastically diminished diversion and transition expectations based solely on the reduced waiver slots funded for the biennium. PPI X 1002 at 22-23.

E.      The State abolished the major vehicle for oversight and accountability of its *Olmstead* Plan

1283.   The State established the PIAC, formerly the Promoting Independence Advisory Board, as

its major vehicle for stakeholder input on community services for people with disabilities and the preparation of the Promoting Independence Plan. Trial Tr. 4111:5-19, Nov. 14, 2018 (Piccola); PPI X 1009 at 6 (2014/2015 Revised Promoting Independence Plan); Jones Dep. 29:19-22; 62:8-19; 64:20-22, Oct. 17, 2017; *see* Trial Tr. 3884:22-3885:5, Nov. 13, 2018 (Borel); Trial Tr. 2754:16-2755:3, Nov. 1, 2018 (Williamson); PPI X 1579 at 9 (Sawyer Rebuttal Report). The Promoting Independence Advisory Board dates back to 2000. PPI X 192 at 5.

1284.   The PIAC was tasked with overseeing the initiatives within the State's *Olmstead* Plan, making additional recommendations for new initiatives, and providing overall oversight on the State's compliance with the *Olmstead* decision. Trial Tr. 4043:25-4044:8, 4045:17-4046:18, Nov. 13, 2018 (Piccola); PPI X 473 at 4-5; PPI X 202 at 15-16 (2012 Revised Promoting Independence Plan); PPI X 193 at 5, 50 (2014/2015 Revised Texas Promoting Independence Plan states that the "Plan provides the comprehensive working plan called for as a response to the Supreme Court ruling in *Olmstead*"); PPI X 461 at 15; Jones Dep. 102:25-103:17, 113:2-13, 168:14-169:2, Oct. 17, 2017; Snyder Dep. 271:10-25, 272:8-273:15; 274:19-275:21, Nov. 16, 2017; Williamson 30(b)(6) Dep. 264:17-265:3, Jan. 10, 2018.

1285.   The State recognized the PIAC "as one of the leading forums in providing policy leadership and oversight of the long-term services and supports system" as well as "the long history of the [PIAC] and its contribution to Texas' progress in complying with the *Olmstead* decision . . .".  PPI X 193 at 6, 12 (2014/2015 Revised Promoting Independence Plan); *see* PPI X 629 at 3 (July 2017 email from HHSC Associate Commissioner Jami Snyder); Jones Dep. 109:7-18, Oct. 17, 2017; *see also* Trial Tr. 3884:18-3885:5, Nov. 13, 2018 (Borel); Trial Tr. 4044:9-4045:12, Nov. 13, 2018 (Piccola); PPI X 1579 at 9 (Sawyer Rebuttal Report).

1286.   Mr. Dennis Borel, who served on the PIAC for more than a decade, testified that the PIAC,

in contrast to other State stakeholder groups, was "easily the best." "It had the broadest type membership from not only advocates for the consumers but providers and State agency personnel." Trial Tr. 3884:18-3885:12, Nov. 13, 2018 (Borel).

1287.   No other committee or work group discussed at trial was tasked with overseeing the State's *Olmstead* Plan. Trial Tr. 4168:4-18, Nov. 14, 2018 (Piccola).

1288.   When the PIAC was created, the HHSC Executive Commissioner exempted it from abolition. PPI X 198 at 7; PPI X 193 at 11 (2014-2015 Texas Promoting Independence Plan); *see* Jones Dep. 109:7-18, Oct. 17, 2017.

1289.   Although the PIAC's enabling statute allowed the committee to be discontinued after a certain time, the HHSC Executive Commissioner had the discretion to keep the committee in operation. Trial Tr. 4121:12-4122:15, Nov. 14, 2018 (Piccola); Trial Tr. 3877:22-3878:12, 3879:6-8, Nov. 13, 2018 (Borel); PPI X 629 at 3; Williamson Dep. 132:6-11, 144:21-146:8, Feb. 22, 2018. The Commissioner repeatedly did so. Trial Tr. 3876:5-9, Nov. 13, 2018 (Borel).

1290.   Ultimately, and in furtherance of its control over the plan and the process, HHSC unilaterally dissolved the PIAC in August 2017. Trial Tr. 3877:22-3878:12, Nov. 13, 2018 (Borel); Trial Tr. 1421:6-10, November 14, 2018 (Piccola); PPI X 475 at 2 (email from Jami Snyder to PIAC members notifying them that August 23, 2017 would be the last PIAC meeting).

1291.   Abruptly disbanding the PIAC has hurt the State's ability to effectively reduce segregation of individuals with IDD in nursing facilities. PPI X 1578 at 59-60 (Sawyer Report); PPI X 1579 at 10 (Sawyer Rebuttal Report); *see* Snyder Dep. 303:8-23, 304:4-6, Nov. 16, 2017.

F.    The State lacks system-level analysis and planning for integrated services and supports

1292.   An effectively working *Olmstead* Plan should identify "what community-based services are available in the State" and assess "the extent to which these programs are able to serve people in the

373

most integrated setting appropriate." PPI X 598 at 8.

1293.   Service capacity, or the system's capacity to address the needs of the individuals it is targeted to serve, is a critical component to an IDD system. Trial Tr. 2123:16-18, Oct. 26, 2018 (Sawyer); *see* Trial Tr. 1272:5-8, Oct. 22, 2018 (Webster) ("There's a link, an important link, between a successful PASRR program, keeping people out of nursing facilities, and the capacity of providers to be able to support the state in getting that done.").

1294.   To ensure that individuals with IDD are not unnecessarily segregated, a state must have access to individualized community living arrangements that address their needs and preferences, including the full array of medical, behavioral, adaptive, habilitative, residential, transportation, employment, and other supports they need. PPI X 1578 at 10, 14-16 (Sawyer Report). The state must also have access to sufficient community services provider capacity. PPI X 1578 at 10, 14-15, 19 (Sawyer Report).

1295.   Ensuring access to these resources requires system-level planning, which utilizes the aggregate results of all individual needs assessed, as well as other information and data to develop systems of services needed for all persons with IDD. Trial Tr. 2127:18-2128:1, 2128:9-16, Oct. 26, 2018 (Sawyer); PPI X 1578 at 12-13 (Sawyer Report); PPI X 1579 at 14 (Sawyer Rebuttal Report) (opining that "an ongoing careful and methodical assessment of the needs of individuals with IDD" is essential to ensuring an adequate plan for individuals with IDD to transition to the community).

1296.   Assessing and planning community services for individuals with IDD must include comprehensive healthcare needs data about the relevant individuals. This data and information must be based on current clinical and functional assessments such as medical evaluations, physical assessments, medication reviews, occupational assessments, and other aspects of a comprehensive functional assessment. This data must then be used in developing the services and supports

individuals with IDD will require to live and function effectively in community settings. Trial Tr. 2128:9-25, Oct. 26, 2018 (Sawyer); PPI X 1578 at 41 (Sawyer Report).

1297.    Assessing and planning community services for individuals with IDD also requires that state agencies understand the common characteristics that place individuals at risk of admission. This is necessary to plan for needed services and then to ensure that these services are available to meet those needs in the community and avoid unnecessary institutionalization. In addition, agencies should have an understanding of the number of individuals who are eligible for, and do not oppose, services in the community to plan for the number of diversions and transitions that are feasible. Trial Tr. 1452:6-1453:5, 1454:14-1455:4, Oct. 22, 2018 (Weston); PPI X 1906 at 12-13 (Weston Report).

1298.    To determine the needed amount of available resources, provider capacity, and Medicaid waiver slots, the public IDD system must assess and plan for the number of people who will be at risk of institutionalization and who will be interested in transitioning out of institutions. Trial Tr. 2121:8-11, 2123:7-9, 2127:18-2128:8, Oct. 26, 2018 (Sawyer).

1299.    Comprehensive analysis of gaps in the State's service system is necessary to meaningfully plan for and develop community-based services. PPI X 1578 at 41 (Sawyer Report).

1300.    In planning its community service system, a state must consider and address existing problems, barriers, gaps, and deficiencies in the system. A state must consider the unique needs of particular populations that may be difficult to serve, assess whether the system is currently meeting those needs, and respond if the system is not meeting those needs. Trial Tr. 2128:2-25, Oct. 26, 2018 (Sawyer); PPI X at 19 (Sawyer Report).

1301.    HHSC, however, does not use data to identify needs of people with IDD in nursing facilities which, in turn, are not sufficiently addressed through the State's diversion or transition activities or community services. Jalomo 30(b)(6) Dep. 202:4-203:11, Nov. 2, 2017; Turner 30(b)(6) Dep.

229:17-230:14; 231:14-23, Feb. 21, 2018; Cochran Dep. 278:19-24, Sept. 14, 2017 (Q: "Has anyone from IDD Services studied barriers to . . . people with IDD in nursing facilities transitioning to the community? . . ." A: "Not that I'm aware. I don't recall.").

1302.   Nor does the State gather data and other information about the assessed needs of individuals currently residing in nursing facilities or individuals diverting from or transitioning from nursing facilities. PPI X 1578 at 42-43 (Sawyer Report); PPI X 1579 at 14 (Sawyer Rebuttal Report); Belliveau 30(b)(6) Dep. 162:18-163:22, Oct. 20, 2017.

1303.   HHSC's PASRR Unit does not collect data about the number of individuals who can be served in an alternate setting other than a nursing facility according to the IDT, nor is the manager of the PASRR Unit aware of whether anyone else at HHSC collects that data. Trial Tr. 2465:17-2466:22, Oct. 31, 2018 (Willems).

1304.   Ms. Turner, HHSC's 30(b)(6) designee, had no idea how many diversions occur without the use of a diversion waiver slot, or whether this is even considered a diversion, since the agency does not track this information. Turner Dep. 11:6-25, Feb. 23, 2018. Similarly, Ms. Turner did not know if there is any information or aggregate data about the needs of individuals who are diverted, the costs of a diversion, or the agency's goals for diversion. Turner Dep. 13:5-14:15, Feb. 23, 2018.

1305.   In addition, key HHSC managers could not recall any analysis of information that might inform planning and improvement efforts, such as an assessment of the sources and reasons for admission, successful and unsuccessful strategies to avoid admission, the characteristics that place people at risk of admission, or an assessment of the referring entities that generate the most number of admissions. Turner 30(b)(6) Dep. 232:13-233:23, Feb. 21, 2018; Jalomo 30(b)(6) Dep. 202:21-203:11, Nov. 2, 2017.

1306.   Such analysis would have supported an appropriation request for additional diversion waiver

slots needed to support the needs of this population. PPI X 1906 at 26 (Weston Report).

1307.  Nor does the State conduct a comprehensive analysis of gaps in its service system to meaningfully plan for and develop community-based services so that individuals with IDD can successfully transition from nursing facilities or avoid admission to nursing facilities. PPI X 1578 at 40-41 (Sawyer Report).

1308.  For example, HHSC has not adequately evaluated whether sufficient systemic provider capacity exists to meet the needs of individuals with IDD in the HCS waiver program. PPI X 1578 at 43 (Sawyer Report); *see* PPI X 438-A at 1-2 (stating that barriers include a lack of providers); Williamson Dep. 43:13-44:4, Feb. 22, 2018.

1309.  In particular, HHSC does not systemically evaluate whether sufficient provider capacity exists to meet the needs of individuals with high medical and/or complex behavioral needs or for geographic areas throughout the State. PPI X 1578 at 42 (Sawyer Report); *see* Williamson Dep. 46:1-48:15, Feb. 22, 2018.

1310.  The overall decline in the QSR scores from 2015 to 2017 illustrates, as Ms. Sawyer opined, that the State's IDD System is "not planning for the services that are needed, delivering the services in a way that they are needed, [ ] does not have the services that are needed, and [ ] people are not transitioning, if it is deemed appropriate and they should so desire, or they're not being diverted to prevent going into these nursing facilities because of the fact that they are continuing to just show a stagnant, if not a decline, in their performance in those two areas." Trial Tr. 2164:8-19, Oct. 26, 2018 (Sawyer).

G.    Defendants' evidence does not establish an effectively working *Olmstead* Plan

1311.  Simply asserting that the State has an *Olmstead* Plan because it provides a waiver slot to anyone who asks for it is incorrect. It is necessary to have a comprehensive view of whether people

have the choice to live in the community, all aspects must be monitored and validated, and waiver services must be able to support an individual's needs. Trial Tr. 4065:14-4066:19, Nov. 14, 2018 (Piccola).

1312.  Defendants' expert Ms. Shea-Delaney's opinion about the State's *Olmstead* Plan is not credible. She did not analyze implementation of the Plan, despite agreeing that "policies are only as good as their implementation." *See* Trial Tr. 3342:24-3343:2, Nov. 6, 2018 (Shea-Delaney) (Q: "Correct me if I'm wrong, but it's fair to say in government that policies are only as good as their implementation. Is that right?" A: "I would agree with that, uh-hum."); Trial Tr. 3347:20-21, Nov. 6, 2018 (Shea-Delaney) ("[W]hat I'm telling you is that I didn't deal with matters of implementation . . .".); *see also* Trial Tr. 3353:3-7, 3343:10-13, Nov. 6, 2018 (Shea-Delaney). Nor did she review relevant materials such as Dr. O'Connor's report. Trial Tr. 3351:5-8, Nov. 6, 2018 (Shea-Delaney). Ms. Shea-Delaney was therefore unaware of Dr. O'Connor's findings, for example, that forty percent of the initial IDT meetings had no representative from the LIDDA present or that on PASRR Level I forms, the question "Where would this individual like to live now?" was not answered ninety-nine percent of the time. Trial Tr. 3351:5-8, 3359:2-13, Nov. 6, 2018 (Shea-Delaney). Ms. Shea-Delaney also failed to review portions of the QSR that would indicate whether an *Olmstead* Plan is working. *See* Trial Tr. 3354:18-3357:10, 3385:19-22, Nov. 6, 2018 (Shea-Delaney).

## XIV.

## The named plaintiffs

1313.  All of the named plaintiffs are appropriate for and would benefit from living in the community. None has made an informed choice to remain in a nursing facility yet they each spent years of their lives segregated in these facilities. PPI X 1281 at 10-11 (Pilarcik Rebuttal Report). In fact, most, if not all, would probably still be living in nursing facilities if it were not for unique

efforts by State and LIDDA officials due to their status as named plaintiffs, as well as the intensive

advocacy by Disability Rights Texas (DRTx) to secure them services and community options that

were previously denied and not provided. PPI X 1281at 8 (Pilarcik Rebuttal Report).

1314.    Ms. Pilarcik conducted a third client review in April 2018 that focused on the twelve named

plaintiffs in order to address the findings and opinions set forth in the reports of two defense experts,

Ms. Shea-Delaney and Ms. Bruni. Trial Tr. 4180:24-4181:7, 4181:15-20, Nov. 14, 2018 (Pilarcik);

PPI X 1281 at 5 (Pilarcik Rebuttal Report). The review also included named plaintiff Melvin Oatman

who was excluded from Defendants' expert review. PPI X 1281 at 5 (Pilarcik Rebuttal Report).

1315.    For this third client review, Ms. Pilarcik collected and read nursing facility and LIDDA

records for the two years prior to September 1, 2017, or the two years prior to a person's transition

to the community, and then conducted interviews with each named plaintiff and their guardian, as

well as provider staff and family members. Trial Tr. 4181:21-4182:6, 4182:15-24, Nov. 14, 2018

(Pilarcik); PPI X 1281 at 6-7 (Pilarcik Rebuttal Report). Ms. Pilarcik used the same questions,

inquiries, factors, and consideration as she did in the second client review. PPI X 1281 at 6 (Pilarcik

Rebuttal Report).

1316.    Ms. Pilarcik found that the records for many of the named plaintiffs often conflicted with the

information that she learned directly from individuals and their guardians in both her previous review

and this review. Trial Tr. 4183:16-4184:4, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 7 (Pilarcik

Rebuttal Report). She testified, "[T]here's really no substitute for speaking directly to an individual

and hearing from them in their own words what their preferences are, what their dreams are, what

they feel their needs are, how they feel they're doing. In addition to which, it's how I've conducted

other client reviews that I've done." Trial Tr. 4184:20-25, Nov. 14, 2018 (Pilarcik).

1317.    In contrast, Ms. Bruni and Ms. Shea-Delaney relied solely on records and conversations with

a few pre-selected State officials to make their findings. Neither Ms. Bruni nor Ms. Shea-Delaney spoke with any of the named plaintiffs, any of their guardians or family members, any staff person who has worked with them, any professional who has ever served them, anyone who personally knows or has ever met them, or anyone with direct knowledge of the nursing facility or community residential program where the individual lives. This method of evaluating the strengths and needs of individuals with disabilities, the adequacy and appropriateness of the environment where they live, the services they receive, or the preferences they might have is inconsistent with professional standards for evaluating individuals with IDD and forming clinical opinions about their needs, preferences, and services. Trial Tr. 4184:5-8, 4184:13-4185:3, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 7 (Pilarcik Rebuttal Report).

1318.   Ms. Pilarcik found numerous incorrect and misleading statements made by Ms. Bruni and Ms. Shea-Delaney about the named plaintiffs, as well as numerous omissions in their findings and conclusions. Trial Tr. 4210:10-20, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 9, 13, 15, 18, 29, 30, 32, 34, 39, 42, 45, 48, 49 (Pilarcik Rebuttal Report).

1319.   The methodology used by Ms. Bruni and Ms. Shea-Delaney in conducting their reviews and forming their opinions of the adequacy of services and appropriateness of transitions for the named plaintiffs, taken together with their lack of experience in conducting such reviews, renders their opinions unreliable with respect to the named plaintiffs. *See* PPI X 1281 at 7-8 (Pilarcik Rebuttal Report).

1320.   Given the unique status of the named plaintiffs, it is not possible for Ms. Bruni and Ms. Shea-Delaney to extrapolate from any findings they made for these twelve individuals as to the effectiveness of HHSC's PASRR or transition program. Trial Tr. 4206:11-21, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8 (Pilarcik Rebuttal Report).

1321.   After providing Ms. Bruni's complete expert report to the Plaintiffs and United States on March 30, 2018, and without notice to the Court or the Plaintiffs and United States, at trial Defendants submitted, for the first time, a redacted version of Ms. Bruni's report that deleted all of her findings about the named plaintiffs. The Court admonished Defendants for this tactic, refused to consider the redacted report, and instructed Defendants to re-submit an unredacted version of the report if they sought to introduce it as an exhibit. Trial Tr. 2585:5-20, 2586:21-2587:9, 2633:25-2634:17, 2636:5-20, 2645:2-21, Nov. 1, 2018 (Bruni). Ms. Bruni's opinions relating to the named plaintiffs are directly undermined by the records and credible trial testimony from named plaintiffs and their guardians. Trial Tr. 2180:14-2206:3 (Krause); Trial Tr. 341:11-355:14 (Morrell); Trial Tr. 355:20-411:20 (Carrasco); *see generally* PPI X 1281 (Pilarcik Rebuttal Report).

1322.   The clinical needs of the named plaintiffs were similar to the thirty-seven individuals reviewed by Ms. Pilarcik in her previous two reviews, but their services and service planning changed dramatically after joining the lawsuit as named plaintiffs. Trial Tr. 4193:24-4194:10, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8 (Pilarcik Rebuttal Report). There were significant changes in their treatment planning, services, community options, oversight from the State, and ultimately their outcomes. Trial Tr. 4196:9-19, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8-9 (Pilarcik Rebuttal Report). After joining the lawsuit as named plaintiffs, they had service planning teams that consisted of eight or ten people, compared to their teams before then, or the teams of the other thirty-seven individuals that Ms. Pilarcik reviewed, which usually included only two or three people. Unlike the named plaintiffs' situations before they entered the lawsuit, clinical staff from both the nursing facility and the LIDDA attended their service planning meetings, and their meetings included more robust discussions of services and supports. Trial Tr. 4196:17-4197:8, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8-9, 13 (Pilarcik Rebuttal Report).

1323.  After the named plaintiffs joined the litigation, they had service plans that contained meaningful goals compared to their prior plans, or the service plans of the other thirty-seven individuals evaluated by Ms. Pilarcik. The named plaintiffs received more nursing facility and LIDDA specialized services, and received these services longer and more frequently than they had before the lawsuit when they were rarely provided with *any* specialized services. Trial Tr. 4198:3-15, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8-9 (Pilarcik Rebuttal Report).

1324.  Because of their status as named plaintiffs, there was increased State oversight of their services as evidenced by the attendance of LIDDA supervisory staff at meetings and requests from HHSC for updates on progress. Trial Tr. 4198:16-23, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8 (Pilarcik Rebuttal Report).

1325.  Although the initial situations and levels of need of the named plaintiffs mirrored those of individuals from the random sample, their outcomes were dramatically changed. Their status as named plaintiffs, in combination with direct individual advocacy from DRTx, provided these individuals with far more attention, services, engagement, opportunities, service coordination, and State oversight than that offered to the thirty-seven individuals that Ms. Pilarcik saw during the two prior reviews. Seven of the named plaintiffs were able to move to the community, compared to none of the thirty-seven individuals in the first and second reviews, and all the named plaintiffs were receiving more specialized services than the randomly selected population. Trial Tr. 4198:24-4199:12, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 15-16 (Pilarcik Rebuttal Report).

1326.  After the named plaintiffs joined the lawsuit, transition efforts for them became remarkably different from the limited, if any, transition activities that occurred for most of the twenty individuals with IDD in nursing facilities that Ms. Pilarcik reviewed, and for most of the other thirty-four randomly selected individuals that the other IDD professionals visited as part of the second client

review. The named plaintiffs received more specialized services in the community; had more exposure to the community; had more opportunities to gain skills and prevent loss; were more intensively engaged in transition planning; and were provided more independent advocacy than virtually any of the twenty people Ms. Pilarcik saw. PPI X 1281 at 8 (Pilarcik Rebuttal Report).

1327. The changed situations of the named plaintiffs demonstrate that, with focused efforts and appropriate transition planning, individuals with complex medical needs, like Ms. Arizpe, and individuals with significant behavioral challenges, like Ms. Ferrer, and individuals with significant trauma histories and long-term institutionalization that impair their capacity to make informed decisions about where to live, like Mr. Kent, Mr. Barefield, Mr. Morrell, and Mr. Tommy Johnson, will make an informed decision to leave the nursing facility and can successfully transition to the community. Trial Tr. 4204:4-17, 4207:10-4210:15, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8 (Pilarcik Rebuttal Report).

1328. Absent their status as named plaintiffs and ongoing advocacy from DRTx, transition would not have occurred or would have been significantly delayed for all of the named plaintiffs. Trial Tr. 4213:14-20, 4215:5-8, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8 (Pilarcik Rebuttal Report). As a result, the named plaintiffs' outcomes do not provide evidence that the State has a functioning PASRR or transition system. Trial Tr. 4198:24-4199:12 Nov. 14, 2018 (Pilarcik); PPI X 1281 at 8 (Pilarcik Rebuttal Report). In fact, it shows the opposite because the named plaintiffs had to bring suit after languishing in nursing facilities for years before receiving the assessments, services, and support to which they were entitled.

1329. Ms. Shea-Delaney's opinion that the named plaintiffs' circumstances are evidence that the State's system is working is undermined by her testimony that she was unaware of significant, relevant facts about the named plaintiffs. Trial Tr. 3377:7-3382:22, Nov. 6, 2018 (Shea-Delaney)

(testifying that for multiple named plaintiffs she was unaware of significant facts).

1330.   None of the twelve named plaintiffs received a comprehensive functional assessment while residing in a nursing facility. Without a comprehensive functional assessment, there is no basis for planning and delivering necessary specialized services. The result is a service plan that often fails to address basic habilitative needs and fails to identify needed services. It also results in a plan that has low expectations, lack of clear direction, fragmentation, and lost opportunities for maintenance or growth of skills in independent living and self-determination. This is repeatedly evident in the experiences of the named plaintiffs, whose needs were often overlooked or incorrectly evaluated before they joined the lawsuit. PPI X 1281 at 9 (Pilarcik Rebuttal Report).

1331.   While no individuals were receiving all needed specialized services before their status as named plaintiffs and representation by DRTx, it appears that one individual, Mr. Johnson, may have finally received all needed specialized services in the months before September 1, 2017. Every individual reviewed was denied opportunities to increase skills, avoid deterioration, and maximize independence and self-determination. PPI X 1281 at 9 (Pilarcik Rebuttal Report).

1332.   None of the twelve named plaintiffs received Active Treatment while in the nursing facility. Without Active Treatment, none of the twelve individuals was receiving a program that meets the federally mandated standard of care and that is directed toward the acquisition of behaviors necessary for the individual to function with as much self-determination and independence as possible. PPI X 1281 at 10 (Pilarcik Rebuttal Report).

1333.   Five of the twelve named plaintiffs had a professionally appropriate ISP, although for two individuals, this only occurred after transition planning was initiated and the focus shifted to moving to the community. PPI X 1281 at 10 (Pilarcik Rebuttal Report). This is in contrast to the previous client review where Ms. Pilarcik found only one had an appropriate ISP, and even that one was for

a person who was on palliative care. PPI X 1280 at 16 (Pilarcik Report) ("only 1 of the 54 individuals had a professionally appropriate ISP"). Of the individuals reviewed by each of the other experts, none had an appropriate ISP. *See id.*

1334.   All twelve of the named plaintiffs would benefit from community living and could be safely served in the community. PPI X 1281 at 10 (Pilarcik Rebuttal Report).

1335.   Named plaintiff Ms. Hernandez could have been served in the community for the majority of her time in the nursing facility. Since her health began to decline in late 2016, it is likely that at some point between that time and September 1, 2017, it would have become inappropriate for her to transition to the community. Ms. Pilarcik has served individuals in both group homes and host homes who have very similar medical challenges as Ms. Hernandez, and who successfully avoided nursing facility placement for the entirety of their lives. PPI X 1281 at 10 (Pilarcik Rebuttal Report).

1336.   All but one of the named plaintiffs and their guardians have clearly chosen to leave the nursing facility. The remaining individual, Mr. Johnson, suffered decades of physical, psychological, and economic abuse when he was forced to live in an uninhabitable old school house with other men and made to do excruciating work for long hours and virtually no pay on a turkey farm in Iowa that became the subject of state and federal investigations. PPI X 1281 at 10-11 (Pilarcik Rebuttal Report).

A.    Eric Steward

1337.   Mr. Eric Steward initially entered a nursing facility in 1999 after split-brain surgery to diminish the severity and frequency of his seizures. He remained in the nursing facility until 2013, during the pendency of this lawsuit, when he obtained an HCS waiver slot and transitioned to a community placement. He returned to a nursing facility in January 2017, where he continued to reside as of September 1, 2017, despite his expressed desire to leave the nursing facility and live in

the community. PPI X 2189B at 87; PPI X 2189A at 2; PPI X 1281 at 12 (Pilarcik Rebuttal Report); *see* Trial Tr. 4216:9-4217:5, 4217:20-23, Nov. 14, 2018 (Pilarcik) ("He has said he wants to return to the community.").

1338.   Mr. Steward is very social, has many friends, and enjoys outings, arts and crafts, music, and playing video games. Trial Tr. 4216:25-4217:1, Nov. 14, 2018 (Pilarcik) ("He is very social. He likes to go out. He likes to do things."); PPI X 1281 at 12 (Pilarcik Rebuttal Report).

1339.   During Mr. Steward's thirteen-year stay in the nursing facility, he received no specialized services. Once he became a named plaintiff in this lawsuit, DRTx began to advocate for vocational and other specialized services. PPI X 2189A at 2.

1340.   Mr. Steward and his family members consistently desired to explore community living options and transition out of the nursing facility. After becoming a named plaintiff, Mr. Steward was awarded an HCS slot in 2013 and, with support from DRTx, transitioned to a community placement where he lived successfully for approximately four years. PPI X 1281 at 13 (Pilarcik Rebuttal Report).

1341.   Mr. Steward returned to the nursing facility in 2017 as an expedited admission for convalescent care lasting more than thirty days, following a hospital stay resulting from an acute medical episode. PPI X 2189B at 59, 87.

1342.   During this nursing facility admission, several specialized services were recommended for Mr. Steward. However, he experienced delays in receiving those services due to an incorrect Medicaid eligibility determination by the State's agency contracted to make those determinations. PPI X 2189B at 60-62, 114, 117.

1343.   His most recent ISP was developed by an SPT consisting of himself, his sister, two representatives from DRTx, his service coordinator, and nursing facility staff. The ISP indicates that

Mr. Steward is actively searching for alternate placement aided by his sister and DRTx. PPI X 2189B at 81.

1344.    Mr. Steward received many, but not all, necessary specialized services during his most recent nursing facility stay. For instance, he did not receive Day Habilitation services because the nursing facility did not have access to public transportation and neither the nursing facility nor the LIDDA provided transportation. Trial Tr. 4218:12-4219:4, Nov. 14, 2018 (Pilarcik) ("He has been requesting to go to day habilitation, in fact, the day habilitation program that he'd gone to previously, and I believe that they had an opening for him, but there's no transportation available to take him to day [habilitation].") Additionally, his Occupational Therapy and Physical Therapy services were interrupted because a State agency responsible for making disability determinations determined that Mr. Steward was no longer eligible for specialized services because they erroneously determined that he did not have IDD. *See* PPI X 2189B at 60-62; PPI X 1281 at 12 (Pilarcik Rebuttal Report).

1345.    Unlike the individuals in the client review, Mr. Steward has a person-centered, professionally appropriate Individual Service Plan, because of his sister's ongoing involvement in his care and planning as well as representation in this lawsuit by DRTx. Trial Tr. 4218:3-11, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 13 (Pilarcik Rebuttal Report).

1346.    Mr. Steward continues to request community placement and his SPT agrees that he is appropriate and capable of returning to the community. Mr. Steward and his SPT continue to work to identify an appropriate provider. Trial Tr. 4217:20-23, Nov. 14, 2018 (Pilarcik); PPI X 1281 at 13 (Pilarcik Rebuttal Report).

1347.    Mr. Steward is an appropriate candidate for living in the community. "The medical diagnoses that he has can be and are supported in the community with appropriate supports including on-going nursing monitoring and coordination." PPI X 1281 at 13 (Pilarcik Rebuttal Report).

1348.   Mr. Steward has not made an informed choice to stay in the nursing facility and, in fact, has actively worked with his SPT to identify an appropriate community placement. However, almost a year after his re-admission to the nursing facility, an appropriate and available placement had not been identified. PPI X 1281 at 13 (Pilarcik Rebuttal Report).

1349.   Mr. Steward's status as a named plaintiff and the involvement of DRTx has had a major impact on the services he receives and his quality of life. DRTx actively researched appropriate providers and arranged visits; supported the active involvement of his family; attended every SPT meeting and followed up whenever there was a problem with denial of services. PPI X 1281 at 13-14 (Pilarcik Rebuttal Report).

B.      Linda Arizpe[56]

1350.   Ms. Linda Arizpe is a 49-year-old woman who was diagnosed with developmental disabilities as a young child and has complex medical needs. She enjoys being in the swimming pool, listening to music, being shown a special photo album, being outside, and being read to. PPI X 2193B at 9.

1351.   Ms. Arizpe was first admitted to a nursing facility in 2005 after suffering a brain injury resulting from cardiac arrest. Trial Tr. 4207:9-16, Nov. 14, 2018 (Pilarcik); PPI X 2193B at 9. While in the nursing facility she suffered sexual assault, was confined to her bed, developed pressure sores, was in pain, and would frequently scream and cry out. PPI X 2193B at 11; PPI X 1281 at 15-16 (Pilarcik Rebuttal Report). After being sexually abused in the first nursing facility, she moved to a different facility in 2008. PPI X 2193B at 11.

1352.   Ms. Arizpe did not receive specialized services in any of the nursing facilities that she had lived in since 2005 even though although a PASRR screening conducted in 2011 showed that

---

[56]*See* docket no. 706.

specialized services were indicated. PPI X 2193B at 33. Despite these recommendations and the efforts of her parents/legal guardians, the only specialized service Ms. Arizpe received was Service Coordination. In fact, no consideration was given to other specialized services including habilitative therapies that were necessary to help her maintain her skills, prevent regression, prevent the development of pressure sores and other skin afflictions, and prevent decline in her physical condition. PPI X 1281 at 15 (Pilarcik Rebuttal Report).

1353.   Without the necessary services, Ms. Arizpe's physical condition declined significantly during her stay in the two nursing facilities. PPI X 1281 at 16 (Pilarcik Rebuttal Report); Docket no. 111-1 at 13-16.  Ms. Arizpe developed what is known as severe "frog-leg" deformity. Docket no. 111-1 at 13-16.  The development of this deformity was preventable. Docket no. 111-1 at 15. In addition, Ms. Arizpe's "hips [ ] lost their range of motion as [a] result of her continuous confinement to her bed for an extended period of time and not receiving necessary specialized services." Docket no. 111-1 at 15.

1354.   The lack of specialized services also prevented Ms. Arizpe from enjoying the simple pleasure of tasting food. She had a g-tube for feeding while in the nursing facility. After she was finally approved for community placement and left the nursing facility, her condition improved and she was no longer restricted to a g-tube. PPI X 1281 at 16 (Pilarcik Rebuttal Report).

1355.   Even though Ms. Arizpe's family consistently advocated for her to move home, it was not until almost eight years after her admission, after becoming a named plaintiff and receiving advocacy from DRTx, that Ms. Arizpe was given the opportunity to leave the segregated nursing facility and return home to her community and her family. In 2012, Ms. Arizpe was offered an HCS slot in response to the first motion for preliminary injunction in this lawsuit. PPI X 2193B at 23; PPI X 1281 at 16 (Pilarcik Rebuttal Report); *see* Trial Tr. 4207:20-23, Nov. 14, 2018 (Pilarcik).

1356.  Even after being awarded an HCS slot, it took another year for all necessary home modifications to be completed and to obtain all necessary durable medical aids and equipment. PPI X 1281 at 16 (Pilarcik Rebuttal Report); PPI X 2193B at 2-4.

1357.  Despite nursing facility claims that Ms. Arizpe's health was too precarious to be managed at home, she was finally able to move back home with her family after years of unnecessary institutionalization. PPI X 1281 at 16 (Pilarcik Rebuttal Report).

1358.  Ms. Arizpe benefitted tremendously from living in the community at home with her parents, and was much happier. She no longer required a g-tube for feeding or an indwelling urinary catheter, and was no longer suffering from pressure sores. PPI X 1281 at 16 (Pilarcik Rebuttal Report). She finally received specialized services and "[s]he's able to go swimming in the family pool. She does not scream or cry out in pain, and she's integrated as part of their family." Trial Tr. 4210:7-9, Nov. 14, 2018 (Pilarcik).

1359.  Ms. Arizpe's status as a named plaintiff and the involvement of DRTx had a major positive impact on the services she received and the quality of life she experienced. DRTx participated in all of Ms. Arizpe's planning meetings, helped find an HCS provider in her area, and worked through a lengthy approval process to get all the Durable Medical Equipment she needed for a safe transition to her family home. PPI X 2193B at 3, 9, 17, 23; PPI X 1281 at 16-17 (Pilarcik Rebuttal Report).

C.    Patricia Ferrer

1360.  Ms. Patricia Ferrer is a 54-year-old woman who was admitted to a nursing facility in 2008. PPI X 1281 at 18 (Pilarcik Rebuttal Report). Before her mother decided to admit her to the nursing facility, Ms. Ferrer lived in the community with her family. However, her own care needs as well as her father's medical condition became too difficult for her mother to manage on her own and Ms. Ferrer was moved to the nursing facility. PPI X 2195B at 22.

1361.   Ms. Ferrer is "described as being a kind spirit, having a good sense of humor. She enjoys arts and crafts. She likes to go shopping." Trial Tr. 4214:4-6, Nov. 14, 2018 (Pilarcik).

1362.   Ms. Ferrer did not receive a comprehensive functional assessment providing information regarding her strengths, needs, and preferences while in the nursing facility. Instead, Ms. Ferrer was in the facility for four years before being evaluated for PASRR services, which then incorrectly determined that she did not have IDD. In addition, she did not receive assessments of her sensorimotor development, auditory functioning, adaptive behaviors, nutritional status, vocational skills, development of speech and language, affective, cognitive, and social functioning. PPI X 1281 at 18 (Pilarcik Rebuttal Report).

1363.   Ms. Ferrer did not receive any specialized services in the nursing facility except Service Coordination despite heightened communication between her LIDDA and DADS due to this lawsuit. PPI X 2195B at 15, 18, 20. Instead, in 2011 her service coordinator terminated services to Ms. Ferrer after a CLO meeting where Ms. Ferrer was given confusing questions about sheltered workshops and assisted living facilities. Because Ms. Ferrer did not understand these options, the service coordinator terminated all services to Ms. Ferrer. PPI X 2195B at 16.

1364.   Without specialized services, Ms. Ferrer eventually experienced a documented decrease in her abilities to perform several activities of daily living. When she expressly requested habilitative Physical Therapy, she was denied this specialized service because of an erroneous PASRR determination. PPI X 1281 at 18-19 (Pilarcik Rebuttal Report).

1365.   In the nursing facility, Ms. Ferrer had incidents of physical aggression against other residents, but did not receive any Behavioral Support or even a behavioral assessment. Trial Tr. 4214:8-11, Nov. 14, 2018 (Pilarcik), PPI X 1281 at 9 (Pilarcik Rebuttal Report); PPI X 2195B at 24, 26.

1366.   Ms. Ferrer did not make an informed choice to stay in the nursing facility. In 2012, after

DRTx began assisting her, and almost four years after her initial nursing facility admission, community living options were finally discussed with Ms. Ferrer's SPT. It was at that point that she told her care team that she was interested in a community placement and possibly a part-time job. PPI X 1281 at 19 (Pilarcik Rebuttal Report). Ms. Ferrer chose to access an HCS slot and transition to a community group home. PPI X 2195B at 18-20.

1367.   In late 2012, Ms. Ferrer transitioned to an HCS group home where she has lived successfully since. PPI X 2195B at 30.

1368.   Ms. Ferrer's life has improved dramatically since transitioning to the community. She enjoys going to Day Habilitation and going out to eat. She likes the people she lives with and is particularly fond of a woman named Melba. Her physical health and maladaptive behaviors have improved. Trial Tr. 4215:11-23, Nov. 14, 2018 (Pilarcik); PPI X 2195B at 32-33.

1369.   Ms. Ferrer now receives Behavior Supports, Physical Therapy, Day Habilitation, Psychiatric Services, and consistent Service Coordination. She has an ISP that is person-centered, contains relevant information about her strengths, needs, and preferences, and has appropriate outcomes. Ms. Ferrer has had no physically aggressive incidents while living in the group home. She is very pleased with her group home, goes on community outings, and has developed relationships with peers. PPI X 1281 at 19 (Pilarcik Rebuttal Report); PPI X 2195B at 2-3; Jennings Dep. 13:21-15:6, Oct. 29, 2018 (testifying that Ms. Ferrer was "less combative" and "more content" after moving into a group home).

1370.   Ms. Ferrer's status as a named plaintiff and the involvement of DRTx has had a major positive impact on the services she receives and her quality of life. Without DRTx's advocacy, she never would have received concrete information about moving to the community and may have continued indefinitely in the nursing facility without appropriate assessments or services. PPI X

1281 at 20 (Pilarcik Rebuttal Report); Trial Tr. 4215 5-8, Nov. 14, 2018 (Pilarcik) (Q: "And based on your experience in conducting the other two reviews, do you believe that her transition to the community would have happened without DRT?" A: "No, I do not.").

D.    Zackowitz Morgan

1371.   Mr. Zackowitz (Zak) Morgan is a 47-year-old gentleman who likes Bingo, music, going to the library, searching the internet, and going out to eat. He enjoys performing office-related tasks such as shredding and filing. PPI X 2199B at 11.

1372.   Mr. Morgan was placed into an SSLC as a four-year-old child. As a teenager, he lived in a six-bed Intermediate Care Facility for a number of years. On January 25, 2008, the ICF provider transferred him to a nursing facility. PPI X 1281 at 21 (Pilarcik Rebuttal Report).

1373.   Ms. Barker, Mr. Morgan's friend and guardian, testified about the extensive harm Mr. Morgan suffered while residing in a nursing facility. Trial Tr. 1293:19-1294:16, Oct. 22, 2018 (Barker).

1374.   Mr. Morgan did not have a comprehensive functional assessment for nearly all of his time living in a nursing facility. While he did receive various assessments during his nursing facility stay, the majority of his assessments were done after he received his HCS slot in September 2012, more than four years after his admission and just three months before leaving the nursing facility. PPI X 1281 at 21 (Pilarcik Rebuttal Report).

1375.   Mr. Morgan did not receive all necessary specialized services during his time in the nursing facility. As a result, his skill levels in personal care, socialization, and adaptive care regressed. He also lost transfer and standing skills, which eventually caused him to lose his ability to walk. Mr. Morgan developed diabetes. During his nursing facility stay, he gained more than eighty pounds complicating his diabetes care. *See* PPI X 2199B at 8. Mr. Morgan did not receive Day Habilitation,

Vocational Training, or community activities while institutionalized and did not get habilitative Physical Therapy until after he requested an HCS slot in July 2012. PPI X 1281 at 21 (Pilarcik Rebuttal Report).

1376.   Ms. Barker testified that from the time Mr. Morgan entered the nursing facility he became isolated from people his age; he was not able to do things in the community that he had been doing most of his life; and his physical condition deteriorated to the point that he became too weak and heavy to get out of his wheelchair and into Ms. Barker's car, thereby forcing him to spend his birthday in the nursing facility. Trial Tr. 1287:10-1288:20, 1301:16-19, Oct. 22, 2018 (Barker).

1377.   Mr. Morgan went into the nursing facility as an active 37-year-old male who could self-ambulate on crutches. While in the nursing facility, he gained significant weight due to not having a proper nutrition plan; he lost the ability to walk; he lost the ability to self-transfer; he lost the ability to self-toilet and was forced to wear a diaper; and he became an insulin-dependent diabetic. Trial Tr. 1289:9-1290:19, 1300:17-1301:24, Oct. 22, 2018 (Barker).

1378.   Mr. Morgan eventually did have an individual service plan that was person-centered and professionally appropriate during his time at the nursing facility. However, this plan was not created until *after* he decided to move to the community and was not reflective of the nursing facility plans that were done prior to his acceptance of an HCS slot. PPI X 1281 at 22 (Pilarcik Rebuttal Report).

1379.   Mr. Morgan spent five years in a segregated nursing facility before he was able to transition back to the community even though he and Ms. Barker always wanted him to move back to the community. PPI X 1281 at 21 (Pilarcik Rebuttal Report); *see* Trial Tr. 1294:17-1295:17, Oct. 22, 2018 (Barker).

1380.   Ms. Barker testified that it was her belief that Mr. Morgan only received an HCS waiver slot due to his status as a client of DRTx and his involvement as a named plaintiff in this litigation. Trial

Tr. 1301:25-1302:20, Oct. 22, 2018 (Barker).

1381.  Mr. Morgan has benefitted greatly from living in the community. He regained many of the skills lost while in the nursing facility, including an increase in standing and transfer abilities and a significant weight reduction that has enabled him to manage his diabetes better. In the community, Mr. Morgan regularly attends Day Habilitation, receives Physical and Occupational Therapy as well as Service Coordination, has more friends and enjoys a variety of activities in the community. His provider has also helped him address his serious dental problems although it is taking longer than he would prefer due to waiver cost caps for dental services. Trial Tr. 1303:20-1306:1, Oct. 22, 2018 (Barker); PPI X 1281 at 22 (Pilarcik Rebuttal Report).

1382.  Ms. Pilarcik reported that during her review, "Mr. Morgan told me that he is much happier, he likes living in the group home much better than the nursing facility, they give him the help he needs, the food is good, and he feels much better with less weight." PPI X 1281 at 22 (Pilarcik Rebuttal Report).

1383.  Mr. Morgan's status as a named plaintiff and the involvement of DRTx has had a major positive impact on the services he receives and his quality of life. DRTx attended all of his SPT meetings and helped locate appropriate providers when he was able to access an HCS slot. It is likely that Mr. Morgan would still be in a nursing facility without their help. Trial Tr. 1302:13-20, Oct. 22, 2018 (Barker); PPI X 1281 at 22-23 (Pilarcik Rebuttal Report) (testifying that advocacy plus Mr. Morgan's status as a named plaintiff has made an important difference in his life).

E.    Maria Hernandez

1384.  Ms. Maria Hernandez was a 28-year-old woman who resided in a nursing facility in San Antonio for eleven years. Ms. Hernandez was admitted to a nursing facility when she was fourteen years old. PPI X 1281 at 24 (Pilarcik Rebuttal Report).

1385.   Despite all of her medical challenges, Ms. Hernandez would smile and coo at her family, loved to be around them, and enjoyed their stimulation. She liked music and enjoyed quiet time. She would respond to people, especially those familiar to her, although she could no longer speak. According to her ISP, Ms. Hernandez was able to communicate "through smiling, chuckles, physical gestures, and some vocalizations." Ms. Hernandez waved at people when they were leaving. She liked to watch activities around her and be out of bed. PPI X 1281 at 24 (Pilarcik Rebuttal Report).

1386.   Ms. Hernandez did not receive a PASRR Evaluation until 2016, almost ten years after her admission. PPI X 1281 at 24 (Pilarcik Rebuttal Report); PPI X 2194B at 105. Ms. Hernandez received no specialized services and was increasingly isolated in her room. Once she became a named plaintiff in this lawsuit, DRTx, along with Ms. Hernandez's mother and other SPT members, advocated for her to receive Occupational and Speech Therapy, a CMWC, and Day Habilitation. PPI X 2194B at 16.

1387.   However, despite consistent advocacy from DRTx, the nursing facility staff never recommended these interventions, and no specialized services ever were provided to Ms. Hernandez. PPI X 2194B at 4-16. "The team consistently recommended therapies and the nursing facility Director of Rehabilitation resisted, stating that Ms. Hernandez had reached maximum potential. The director repeatedly refused to provide therapies other than for [ ] two months, over two years,

. . . despite the requests for these services by Ms. Hernandez's mother and her LIDDA service coordinator. In 2016, a new director arrived and agreed to provide therapies; unfortunately, by this time Ms. Hernandez had begun having multiple hospitalizations and was not capable of participating in therapies." PPI X 1281 at 25 (Pilarcik Rebuttal Report).

1388.   Ms. Hernandez's 2016 PE recommended Service Coordination, Alternate Placement, Independent Living Skills Training, Occupational Therapy, Physical Therapy, Speech Therapy, a

Customized Manual Wheelchair (CMWC) and other Durable Medical Equipment. PPI X 1281 at 25 (Pilarcik Rebuttal Report); *see* PPI X 2194B at 110. Of these recommendations, Ms. Hernandez received only Service Coordination, a CMWC, and one month of habilitative Physical Therapy to assist her to adjust to her new CMWC. PPI X  1281 at 25 (Pilarcik Rebuttal Report).

1389.   If Ms. Hernandez had been allowed access to these specialized services before her medical decline, she would have been able to lead a more independent and functional life. Because her strengths, needs, and preferences were not adequately assessed, Ms. Hernandez did not receive specialized services that would have enabled her to maintain her strength and mobility. PPI X 1281 at 25 (Pilarcik Rebuttal Report).

1390.   Ms. Hernandez's mother and guardian consistently tried to transition Ms. Hernandez to a community setting. PPI X 2194B at 2, 47-50, 60, 66, 68. After Ms. Hernandez became a named plaintiff in this lawsuit, she was offered an HCS waiver slot in December 2013. PPI X 2194B at 34. Ms. Hernandez still waited years for a nursing facility transition to the community even though she had a waiver slot.

1391.   Because Ms. Hernandez had complex medical needs, DRTx advocated for a plan review by the LIDDA Regional Support Team Nurse. Her report indicated Ms. Hernandez could receive all necessary services and supports in the community. *See* PPI X 2194B at 71-81.

1392.   Despite constant advocacy by Ms. Hernandez's mother and DRTx over more than a year and a half, Ms. Hernandez was unable to complete her transition to the community. PPI X 2194B at 34, 35, 37, 39, 41, 43.

1393.   Ms. Hernandez would have benefitted from living in the community during the years her health was stable. Although alternate placement was her singular outcome on her ISP, and despite considerable efforts by her mother and DRTx to identify appropriate providers, she was never

provided the opportunity to leave the nursing facility and live in the community. Eventually her health declined to the point that discharge planning was put on hold. PPI X 1281 at 26 (Pilarcik Rebuttal Report).

F.    Vanisone Thongphanh

1394.   Mr. Vanisone Thongphanh is a 40-year-old man who was admitted to a nursing facility in 2010 after being hospitalized for an acute medical condition. Before this time, he had lived in the community for several years in an HCS group home. PPI X 2198B at 22. He transitioned back to a community group home in 2014 and was readmitted to a nursing facility in April 2016 after another hospitalization. His PL1s conducted in 2013 and 2016 identify him as an exempt hospital discharge, requiring less than thirty days of care in a nursing facility. Nevertheless, Mr. Thongphanh spent years of his life living in a nursing facility, and, despite the wishes of his guardian, remained in a nursing facility as of September 1, 2017. PPI X 2198B at 60, 44; PPI X 1281 at 28 (Pilarcik Rebuttal Report).

1395.   Mr. Thongphanh responds to people and has a beautiful smile. He enjoys watching activities but is unable to participate. He had a corporate guardian until his sister found him through an internet search. She became his guardian in the spring of 2017. She is a nurse and is involved in his life. PPI X 1281 at 28-29 (Pilarcik Rebuttal Report).

1396.   While in the community, Mr. Thongphanh lived in a four-bedroom home in a suburban neighborhood. He spent time in the living room or kitchen with staff and other residents. He had the opportunity to be part of his community – he would take walks through the neighborhood, greet his neighbors, and enjoy the weather. Trial Tr. 1171:8-1173:17, 1174:14-21, Oct. 19, 2018 (Mastin). Mr. Thongphanh also had the opportunity to go to Day Habilitation where he would meet residents from other community homes. Trial Tr. 1177:4-1178:5, Oct. 19, 2018 (Mastin).

1397.   Now, Mr. Thongphanh spends most of his time in the nursing facility in his bed and does not

participate in nursing facility activities.  Trial Tr. 1175:24-1176:23, Oct. 19, 2018 (Mastin).

1398.   Mr. Thongphanh would benefit from a community placement. His sister and guardian, who is a nurse, does not believe he needs to remain in a nursing facility and has advocated for his transition to the community. PPI X 2198B at 28. Mr. Thongphanh has lived in an HCS group home twice when he had medical conditions similar to his current status. Individuals similar to Mr. Thongphanh are being served successfully in appropriate community settings. However, staff at the nursing facility have resisted his return to the community. PPI X 1281 at 29 (Pilarcik Rebuttal Report); PPI X 2198B at 26-27.

1399.   Throughout Mr. Thongphanh's current nursing facility admission, the SPT has not been in agreement about Mr. Thongphanh's medical support needs in order for him to transition back to the community. PPI X 2198B 26-28, 32. For example, there was considerable discussion around Mr. Thongphanh's need for suctioning, but notes in the records conflicted with nursing facility staff assertions that he needed suctioning often. PPI X 2198B at 2-3 (no signs of aspiration or suctioning needs during oral feeding with speech therapy); PPI X 2198B at 11, 27 (MDS nurse reported he was suctioned all shifts); PPI X 2198B at 28, 48 (no suctioning during morning shifts).

1400.   Ms. Vira Phetsavong, Mr. Thongphanh's sister and legal guardian, testified that at Mr. Thongphanh's transition meeting in October 2016, the nursing facility staff did not disagree with the decision to transfer him from the nursing facility to a community home. A month later, in November 2016, at what was supposed to be Mr. Thongphanh's final discharge meeting, the nursing facility doctor (who did not attend the transition meeting) said that he would not authorize his transition. Nursing facility staff claimed that Mr. Thongphanh's need for suctioning could not be met in the community. However, the nursing facility never produced the medical documentation to support this claim despite Ms. Phetsavong's requests for that documentation. Because of the nursing facility's

decision, Mr. Thongphanh was not able to get the medication or equipment needed for him to transfer to the community safely. Trial Tr. 1146:15-1148:22, Oct. 19, 2018 (Phetsavong).

1401.    In May 2017, Ms. Phetsavong requested another meeting to transition her brother from the nursing facility to the community. At the transition meeting that occurred in August 2017, the nursing facility again refused to authorize his transfer to the community, citing medical concerns related to suctioning, but again not providing any medical documentation to support their claim. And once again, without the nursing facility agreeing to Mr. Thongphanh's transition, he could not get the items he would need to transfer safely. Ms. Phetsavong, a registered nurse who has suctioned many patients, did not have any concerns that Mr. Thongphanh's need for suctioning could not be met in the community. Trial Tr. 1149:12-1150:22 Oct. 19, 2018 (Phetsavong).

1402.    On August 16, 2017, despite considerable barriers from nursing facility staff and his previous court-appointed guardian, Mr. Thongphanh's SPT convened a Community Living Discharge Plan meeting to begin discharge planning so that Mr. Thongphanh could finally return to a group home in the community. PPI X 2198B at 45.

1403.    Notwithstanding the nursing facility's efforts to keep Mr. Thongphanh institutionalized, he and his guardian have made an informed choice to have Mr. Thongphanh return to the community. PPI X 1281 at 29 (Pilarcik Rebuttal Report). This is ironic in light of the fact that when Mr. Thongphanh was admitted to the nursing facility in April of 2016, the facility categorized Mr. Thongphanh's admission as an exempted hospital discharge, expecting his nursing facility stay to be no longer than thirty days. PPI X 2198B at 60.

1404.    As of September 1, 2017, Mr. Thongphanh was still residing in a nursing facility against the expressed wishes of his guardian. PPI X 1281 at 30 (Pilarcik Rebuttal Report).

G.     Melvin Oatman

1405.   Mr. Melvin Oatman is a 54-year-old gentleman who was admitted to a nursing facility in 2007 after experiencing a stroke. He resided in a nursing facility for almost nine years, almost all without any specialized services or rehabilitative services. Prior to the nursing facility, he lived with family and experienced periods of homelessness. PPI X 1281 at 31 (Pilarcik Rebuttal Report).

1406.   While in the nursing facility, Mr. Oatman did not receive all necessary specialized services. Despite his gait disturbance and his movement disorder, he did not receive Occupational, Physical, or Speech Therapy while he was a resident of the nursing facility. During his nursing facility stay, he would have benefitted from ILS to expose him to the community. He also would have benefitted from Alternate Placement Services prior to 2016 when transition planning began. PPI X 1281 at 32 (Pilarcik Rebuttal Report).

1407.   Mr. Oatman does not have an Individual Service Plan that is person-centered and professionally appropriate for his strengths, preferences, needs, and age. Despite assessments over nine years that found Mr. Oatman to be a person with IDD, mental illness, or a related condition, DADS subsequently determined that Mr. Oatman did not have any qualifying PASRR condition. As a result, an ISP was never developed for Mr. Oatman. PPI X 1281 at 32 (Pilarcik Rebuttal Report).

1408.   Mr. Oatman made an informed decision to move out of the nursing facility with the assistance of DRTx. PPI X 1281 at 32 (Pilarcik Rebuttal Report).

1409.   Mr. Oatman is able to communicate his preferences and expresses pleasure in living in his own apartment and working. He enjoys making money and uses it to purchase decorations for his home, to go shopping, and to go to the movies. He is able to walk to the movies and Walmart from his apartment. He uses public transportation to get to and from work and works five days a week.

PPI X 1281 at 31 (Pilarcik Rebuttal Report).

1410.  He receives assistance from attendant services for 3-4 hours, five days a week with no services on the weekend. The attendant comes in around 4 p.m. when he gets home from work, helps him set up his dinner, makes sure he has his lunch for the next day, and sets up breakfast. The attendant also sets up his multiple medications, which are very extensive given his serious chronic diseases. The attendant also does some light housework and some laundry. PPI X 1281 at 31 (Pilarcik Rebuttal Report).

1411.  Mr. Oatman has benefitted from his existing community placement as evident from his enthusiastic expressions of satisfaction with his apartment, his job that generates extra money, and his social and recreational activities – all of which are a result of his ability to live independently, with some supports. Even though his 2013 PE indicated that he could live in the community with supports, Mr. Oatman endured another three years of segregated living before his discharge-planning meeting was held on June 22, 2016. PPI X 1281 at 32 (Pilarcik Rebuttal Report).

1412.  Planning for his discharge was done without any assistance from the LIDDA and was done exclusively with the nursing facility and DRTx. DRTx assisted Mr. Oatman in obtaining a housing voucher, food stamps, and a Star Plus waiver slot. PPI X 1281 at 32 (Pilarcik Rebuttal Report).

1413.  Mr. Oatman's status as a named plaintiff and the involvement of DRTx had a positive impact on the services he received and the quality of life he can now experience. Although DADS had identified Mr. Oatman as a person who could live independently in the community with supports, he remained institutionalized for three more years before successfully being transitioned to the community. DRTx's continued advocacy ensured that he has the opportunity to enjoy an integrated life outside of the nursing facility where he lives in his own apartment, maintains competitive employment, and enjoys recreational activities in the community. PPI X 1281 at 32-33 (Pilarcik

Rebuttal Report).

H.    Richard Krause

1414.   Mr. Richard Krause is a 37-year-old gentleman who was admitted to a nursing facility in 2001, and then spent thirteen years living in four different facilities. He suffered a traumatic brain injury at the age of twenty and after his lengthy hospitalization and rehabilitation lived at home with his father and stepmother. Trial Tr. 2181:13-25, Oct. 26, 2018 (Krause); PPI X 1281 at 34 (Pilarcik Rebuttal Report); PPI X 2196B at 9.

1415.   Prior to his head injury, Mr. R. Krause graduated from high school and had begun electrical trade school. He is very social and now enjoys working at his Day Habilitation program. He still enjoys sports, particularly football and baseball. He loves to eat and go out to dances. He enjoys hunting and fishing. His family is very involved and his father, Mr. Lenwood Krause, is his legal guardian. PPI X 1281 at 34 (Pilarcik Rebuttal Report).

1416.   During cross-examination, Defendants asked Mr. L. Krause, "And who made the decision to move him into that nursing facility?" Mr. L. Krause explained, "I just had heart surgery the day he had his accident, and my wife and daughter wanted me to see if we could put him in a place because we – we at the time . . . I was taking him to Warm Springs three times a week for rehab and to the doctor. And that was putting the bind on me." Trial Tr. 2200:5-12, Oct. 26, 2018 (Krause). Mr. L. Krause was not offered any alternatives and did not make an informed choice for his son to enter or remain in the nursing facility. Trial Tr. 2203:2-12, Oct. 26, 2018 (Krause) (testifying that he wanted his son to remain in the community, but was provided no information about community living options and supports).

1417.   Mr. L. Krause described how in one nursing facility, his son (who is 6'6" tall) had a bed and wheelchair that were too small for him; how he was dressed in diapers and a gown; and how he

could use the bathroom on his own before he entered nursing facilities but lost that skill while living in the facilities. He told the Court that his son did not have contact with people his own age; he was not ever able to leave the nursing facility; he could not visit his family at home; and he was not even offered Day Habilitation, Vocational Training, or ILS. Trial Tr. 2185: 4-2186:24, Oct. 26, 2018 (Krause) (Q: "When you would go to see Richard at River City, what would he be doing?" A: "He would be lying in bed. He would have a diaper on. He would be in a gown. Incoherent sometime[s]."); Trial Tr. 2187:1-2 Oct. 26, 2018. (Krause) ("The only time he got to go out was when they took him to the doctor.").

1418.   Despite being in nursing facilities since 2001, Mr. R. Krause did not have a PASRR L2 Evaluation completed until February 11, 2014. This assessment was done only after the intervention of DRTx. PPI X 2196B at 19-50.

1419.   Mr. L. Krause testified that after the first nursing facility, his son was never taken out into the community. Trial Tr. 2205:16-2206:2, Oct. 26, 2018 (Krause) (Court: "You say never. Do you really mean never or maybe they did it once or twice?" A: "They never did." Court: "Period?" A: "Period.").

1420.   Mr. R. Krause's October 15, 2013 MDS Quarterly Resident Assessment and Care Screening shows that he was not properly identified as having a developmental disability (i.e., related condition). PPI X 2196B at 128.

1421.   Mr. R. Krause did not receive all necessary specialized services while he was in the nursing facility (River City Care Center) and only received habilitative Physical, Occupational and Speech Therapy as a part of his transition after an HCS slot had been identified. Despite his SPT's recommendation and professional assessment, Mr. R. Krause was not able to access a customized power wheelchair while in the nursing facility because staff felt he would not be able to operate it,

thereby preventing him from having any mobility device until he was in a community placement. Richard Krause did not receive Day Habilitation or ILS while in the nursing facility – two specialized services that he could have greatly benefitted from given his age and history. PPI X 1281 at 34-35 (Pilarcik Rebuttal Report).

1422.   Mr. L. Krause, a retired firefighter from Victoria, Texas, testified that his son languished in Texas nursing facilities for thirteen years before being given the option to leave the nursing facility to go into the community. Trial Tr. 2203:14-2204:18, Oct. 26, 2018 (Krause).

1423.   Mr. L. Krause testified that his son received sporadic Physical and Occupational Therapy and was not given a Customized Manual Wheelchair that fit his 6'6" frame until DRTx intervened on his behalf. Trial. Tr. 2192:10-2193:17, Oct. 26, 2018 (Krause). Because of the paucity of Physical and Occupational Therapy along with the failure to get him out of the bed and into a suitable wheelchair, Mr. R. Krause's physical conditioned worsened while in the nursing facility. Trial Tr. 2188:14-22, 2189:8-13, Oct. 26, 2018 (Krause).

1424.   Mr. L. Krause testified that he received no information about his son's community options before the intervention of DRTx. Trial Tr. 2190:10-2191:19, Oct. 26, 2018 (Krause).

1425.   Mr. R. Krause has benefitted from living in the community. Since moving to the community, he has received specialized rehabilitation for his traumatic brain injury, which enabled him to regain the ability to ambulate short distances and use a walker, increase transfer abilities, improve self-care skills, and improve his speech. He consistently attends Day Habilitation, has a job, and frequently participates in community activities and outings. He uses his customized power wheelchair and receives Physical Therapy. Trial Tr. 2195:13-2199:5, Oct. 26, 2018 (Krause); PPI X 1281 at 35 (Pilarcik Rebuttal Report).

1426.   Mr. L. Krause testified that if he had been provided information about community options

he would have chosen for his son to live in the community much sooner. The Court asked, "[a]nd in those four nursing homes, did any nursing home staff or whoever in that nursing home provide you necessary information as to what options you could – your son could utilize out there in the community?" Mr. L. Krause responded, "No," he had never received information about community options. Trial Tr. 2204:4-10, Oct. 26, 2018 (Krause). Once Mr. L. Krause finally received concrete information from DRTx, he moved quickly to select a provider and transition his son to the community. Trial Tr. 2190:21-2191:9, 2191:16-22, Oct. 26, 2018 (Krause); PPI X 1281 at 35-36 (Pilarcik Rebuttal Report).

1427.   Ms. Bruni opined, "Mr. Krause's situation would appear to support the successes of the Texas PASRR program." Trial Tr. 2639:5-2643:3, Nov. 1, 2018 (Bruni). Based on Mr. L. Krause's testimony and Ms. Pilarcik's thorough review of Mr. R. Krause's situation, just the opposite is true. Mr. R. Krause spent many years in an institution when he could have been living in the community.

I.    Leonard Barefield

1428.   Mr. Leonard Barefield was admitted to a nursing facility in Midland, Texas in 2008 after being rescued from Henry's Turkey Farm in Atalissa, Iowa where he had experienced decades of abuse, neglect and exploitation. PPI X 2192B at 4, 25-26. Mr. Barefield did not receive a complete PASRR Level I assessment until 2013, almost five years later, which indicated he was admitted to the nursing facility as an exempted admission requiring less than thirty days of nursing facility services. Trial Tr. 4224:17-20, Nov. 14, 2018 (Pilarcik); PPI X 2192B at 38.

1429.   At the time Mr. Barefield was initially returned to Texas, the LIDDA discussed providing some services for Mr. Barefield. However, those attempts were thwarted by HHSC when the LIDDA was told to "take no further action" due to ongoing investigations into Henry's Turkey Farm. PPI X 2192B at 25-26.

1430.    Mr. Barefield did not receive any specialized services, assessments, or Service Coordination from 2009 to 2013, when he became a named plaintiff in this lawsuit. The only specialized service recommended for him on his August 2013 PASRR Evaluation was Service Coordination. PPI X 2192B at 47.

1431.    Mr. Barefield's first ISP was developed in November 2014. At that time, the SPT only consisted of the service coordinator and nursing facility staff and resulted in no specialized service recommendations, despite discussion about Mr. Barefield's fall risk, speech impairment, and need for a hearing aide to assist in communication. PPI X 2192B at 7, 74, and 75.

1432.    Mr. Barefield did not receive all necessary specialized services while in the nursing facility. Service Coordination did not begin until 2014, approximately six years after his admission. He received rehabilitative Occupational and Physical Therapy for short, sporadic periods, despite indication he would benefit from continuous habilitative therapies. He did not receive Day Habilitation or ILS and was never evaluated for vocational preferences, despite decades of working prior to the nursing facility admission. PPI X 1281 at 37 (Pilarcik Rebuttal Report).

1433.    For the six and a half years that Mr. Barefield was at the nursing facility, he did not receive a program of Active Treatment continuously implemented. He did not receive a comprehensive functional assessment so his needs, strengths, and preferences were not identified. He did not receive any of the necessary specialized services, except for intermittent rehabilitative therapies and Service Coordination. He spent much of his time in bed watching television or outside smoking. He did not even eat most of his meals in the dining room. After decades of abusive living and working conditions, his life primarily consisted of watching television, eating, and sleeping punctuated with smoking breaks. PPI X 1281 at 38 (Pilarcik Rebuttal Report).

1434.    Similar to his ISP, Mr. Barefield's initial Community Living Options, conducted before

DRTx was part of his SPT, indicated he was not interested in leaving the nursing facility. PPI X 2192B at 41, 78. However, shortly after DRTx became actively involved in Mr. Barefield's SPT, he decided he would like to transition to a community placement. PPI X 2192B at 79-80.

1435.   With support from DRTx, Mr. Barefield expressed interest in transitioning to the community in April 2015. Staff from one of the providers invited him to an overnight visit, which occurred in July of 2015, and he decided to move as soon as possible. Once Mr. Barefield had the concrete experience of seeing a group home and of having appropriate supports based upon his strengths, needs, and preferences, he quickly decided to leave the nursing facility. PPI X 1281 at 38 (Pilarcik Rebuttal Report).

1436.   Mr. Barefield transitioned to an HCS group home on September 1, 2015. PPI X 2192B at 5, 81. As of September 1, 2017, he has lived happily and successfully in his group home since his transition. With the involvement of DRTx, Mr. Barefield finally had enough concrete information about community living and support services to make an informed decision to transition back to the community. It is most likely the single most important reason that he lives today in a group home and is able to say that his life is a lot better and that he gets to do the things that he likes to do. PPI X 1281 at 39 (Pilarcik Rebuttal Report).

1437.   After his transfer to the group home, Mr. Barefield began attending a Day Habilitation program five times a week. He is also active in accessing the community and goes out three or four times a week. Community nurses have taught him to do his own blood checks and give himself his daily insulin injections. He takes care of all his medical supplies, his diabetes is stable, and he is healthy. These significant achievements recognize his abilities for independence and self-determination and highlight the missed opportunities during his almost seven-year stay in a segregated nursing facility. PPI X 1281 at 38 (Pilarcik Rebuttal Report).

1438.   During Ms. Pilarcik's review, Mr. Barefield told her that living in the community is a lot better and he has his independence – "no one is watching over me every minute and I get to do the things I like to do." He has had his teeth taken care of including dentures and his health is stable. PPI X 1281 at 38 (Pilarcik Rebuttal Report).

J.    Tommy Johnson

1439.   Mr. Tommy Johnson was admitted to a nursing facility in Midland, Texas, in 2008 after being rescued from Henry's Turkey Farm in Atalissa, Iowa, where he had experienced decades of abuse, neglect, and exploitation. PPI X 2197B at 117. One of his service coordination notes later described the conditions at the farm as "deplorable." PPI X 2197B at 37.

1440.   Mr. Johnson did not receive a complete PASRR Level I assessment until 2013, almost five years later, which indicated he was admitted to the nursing facility as an exempted admission requiring less than thirty days of nursing facility services. PPI X 2197B at 131.

1441.   At the time Mr. Johnson initially was returned to Texas, he indicated he wanted to move and get a job. The LIDDA discussed accessing some services for Mr. Johnson. However, those attempts were thwarted by HHSC when the LIDDA was told to "take no further action" due to ongoing investigations into Henry's Turkey Farm. PPI X 2197B at 118-119.

1442.   Mr. Johnson did not receive any specialized services, assessments, or Service Coordination from 2009 to 2013, when he became a named plaintiff in this lawsuit. The only specialized service recommended for him on his August 2013 PASRR Evaluation was Service Coordination. PPI X 2197B at 139.

1443.   Mr. Johnson's first ISP was developed in March 2015, which resulted in no specialized service recommendations, despite discussion about Mr. Johnson's fall risk and cataracts. PPI X 2197B at 64.

1444.    After DRTx and Mr. Johnson (personally) began participating in his SPT meetings, the team agreed he should be evaluated for Physical, Occupational, and Speech Therapy. PPI X 2197B at 51. In 2016, after deciding to transfer to a new facility, Mr. Johnson's PE recommended specialized Physical and Occupational Therapy, Alternate Placement, and Service Coordination. PPI X 2197B at 7-8. His SPT, including DRTx, adopted these recommendations in Mr. Johnson's ISP, with the addition of ILS. PPI X 2197B at 35-36. Day Habilitation services ended when he transitioned to a different nursing facility that did not have access to a Day Habilitation facility within a reasonable distance. Mr. Johnson was never evaluated for vocational preferences, despite decades of working prior to the nursing facility admission. PPI X 1281 at 40-41 (Pilarcik Rebuttal Report).

1445.    From the time he first returned to Texas in 2008, Mr. Johnson periodically expressed interest in community living options, and he participated regularly in Day Habilitation while living in Midland. PPI X 2197B at 54, 78-79. Despite his own statements and decisions to participate in community activities, service coordinators consistently concluded that Mr. Johnson did not want to leave the nursing facility. PPI X 2197B at 41, 52-53, 68, 73-74.

1446.    Mr. Johnson did not have a person-centered, professionally appropriate individual service plan until 2016. Previous ISPs only had one outcome centered on taking naps. Although it was well known that Mr. Johnson worked for many years under abusive conditions, his SPT never recommended he be assessed for possible post-traumatic stress disorder resulting from his experiences. None of his ISPs identify supports or services necessary to live in the community. PPI X 1281 at 42 (Pilarcik Rebuttal Report).

1447.    Mr. Johnson would benefit from living in the community. He requires minimal assistance with daily needs and through ILS he has become more social and interested in the community. PPI X 1281 at 42 (Pilarcik Rebuttal Report).

1448.   Significant efforts have not been made to address barriers to transition, including Mr. Johnson's trauma history, understandable fears of certain living situations, and lack of recent exposure to new possibilities for community integration. He expressed a desire a leave the segregated nursing facility as far back as 2009, but before he began receiving ILS training in 2016, he had no regular opportunities to experience the community. Prior to beginning ILS training, his only concept of living in the community was in a setting where he was abused for thirty years. PPI X 1281 at 42 (Pilarcik Rebuttal Report).

1449.   It is unlikely that Mr. Johnson made an informed choice to remain in the nursing facility. He spent decades in a segregated and abusive setting with virtually no opportunities to learn about community options and he received no services or supports that would allow him to participate in community activities. PPI X 1281 at 42 (Pilarcik Rebuttal Report).

K.    Johnny Kent

1450.   Mr. Johnny Kent was admitted to a nursing facility in Midland, Texas in 2008 after being rescued from Henry's Turkey Farm in Atalissa, Iowa, where he had experienced decades of abuse, neglect and exploitation. PPI X 2191B at 6. Mr. Kent did not receive a complete PASRR Level I assessment until 2013, almost five years later, which indicated he was admitted to the nursing facility as an exempted admission requiring less than thirty days of nursing facility services. Trial Tr. 4224:17-20, Nov. 14, 2018 (Pilarcik); PPI X 2191B at 20.

1451.   At the time Mr. Kent initially was returned to Texas, the LIDDA discussed accessing some services with Mr. Kent. However, those attempts were thwarted by HHSC when the LIDDA was told to "take no further action" due to ongoing investigations into Henry's Turkey Farm. PPI X 2191B at 4.

1452.   Mr. Kent did not receive any specialized services, assessments, or Service Coordination from

2009 to 2013, when he became a named plaintiff in this lawsuit. Service Coordination is the only specialized service included on the LIDDA Plan of Care in May 2014. PPI X 2191B at 8. In 2016, several years after becoming a named plaintiff, Mr. Kent's LIDDA Plan of Care includes specialized Physical and Occupational Therapy and community supports in addition to Service Coordination. PPI X 2191B at 38.

1453.   Mr. Kent's first ISP was developed in November 2014. At that time, the SPT only consisted of the Service Coordinator and nursing facility staff and resulted in no specialized service recommendations, despite discussion about Mr. Kent's fall risk and exhibition of inappropriate behaviors. PPI X 2191B at 30.

1454.   After DRTx and Mr. Kent (personally) began participating in his SPT meetings, the team agreed he should be evaluated for Physical, Occupational, and Speech Therapy. PPI X 2191B at 28. In 2016, after deciding to transfer to a new facility, Mr. Kent's PE recommended specialized Physical and Occupational Therapy, ILS training, Behavior Supports, Alternate Placement, and Service Coordination. PPI X 2191B at 57-58. His SPT, including DRTx, adopted these recommendations in Mr. Kent's ISP. PPI X 2191B at 98-99.

1455.   Mr. Kent did not have a person-centered, professionally appropriate individual service plan during his time at the nursing facility. Although it was well known that he worked for many years under abusive conditions, his SPT never recommended that he be assessed for possible post-traumatic stress disorder resulting from these conditions. His ISP does not recognize his abilities and preferences and does not allow for opportunities for work or socialization, two of his strong preferences. PPI X 1281 at 44 (Pilarcik Rebuttal Report).

1456.   Mr. Kent would benefit from living in the community. He has minimal healthcare needs and enjoys socializing. He first expressed a desire to leave the nursing facility as early as 2009, but

concerted transition efforts did not start until 2017, eight years later, as a result of advocacy from DRTx. Before he began receiving ILS training in 2016, he had no regular opportunities to experience the community. PPI X 1281 at 45 (Pilarcik Rebuttal Report).

1457.   Mr. Kent periodically expressed interest in community living options and did participate in group home and Day Habilitation center tours while living in Midland. PPI X 2191B at 27. In 2017, Mr. Kent again expressed a desire to explore community living options and visited several providers identified by DRTx in Killeen, Texas. On August 31, 2017, Mr. Kent indicated he wanted to transition into the community and the West Texas Center LIDDA requested an HCS slot. On September 1, 2017, HHSC indicated to West Texas Center that no HCS slots were available and that Mr. Kent would have to wait for an attrition slot to become available in order to transition. PPI X 2191B at 91-92.

1458.   Mr. Kent's status as a named plaintiff and the involvement of DRTx has had a positive impact on the services he received and his quality of life. DRTx assisted him to understand his community living options and offered him concrete examples, including arranging several visits to community homes, to provide Mr. Kent the opportunity to make an informed choice. PPI X 1281 at 45 (Pilarcik Rebuttal Report).

L.      Joseph Morrell[57]

1459.   Mr. Joseph (Joe) Morrell was admitted to a nursing facility in Midland, Texas, in 2008 after being rescued from Henry's Turkey Farm in Atalissa, Iowa, where he had experienced decades of abuse, neglect and exploitation. PPI X 2190B at 3. Mr. Morrell did not receive a complete PASRR Level I assessment until 2013, almost five years later, which indicated he was admitted to the nursing facility as an exempted admission requiring less than thirty days of nursing facility services. Trial

---

[57] *See* docket no. 709.

Tr. 4224:17-20, Nov. 14, 2018 (Pilarcik); PPI X 2190B at 48. Section E, which should have described where Mr. Morrell would like to live and the kind of people he would like to live with, was blank. He lived in the nursing facility for seven years. Trial Tr. 4224:21-23, 4225:11-24, Nov. 14, 2018 (Pilarcik); Trial Tr. 368:23-369:3, Oct. 16, 2018 (Carrasco); PPI X 2190B at 46-47.

1460.   At the time Mr. Morrell initially was returned to Texas, the LIDDA discussed accessing some services with Mr. Morrell. However, those attempts were thwarted by HHSC when the LIDDA was told to "take no further action" due to ongoing investigations into Henry's Turkey Farm. PPI X 2190B at 3.

1461.   Mr. Morrell did not receive any specialized services, assessments, or Service Coordination from 2009 to 2013, when he became a named plaintiff in this lawsuit. The only specialized service recommended for him on his August 2013 PASRR Evaluation was Service Coordination. PPI X 2190B at 54.

1462.   His first ISP was developed in November 2014. At that time, the SPT only consisted of the service coordinator and nursing facility staff and resulted in no specialized service recommendations, despite discussion about Mr. Morrell's unsteady gait and loss of vision in one eye. PPI X 2190B at 9.

1463.   Mr. Morrell did not receive all the necessary specialized services while in the nursing facility. He experienced vision loss while at the nursing facility and never received Physical or Occupational Therapy to help him ambulate and increase his ability to navigate in his environment. PPI X 1281 at 47-48 (Pilarcik Rebuttal Report).

1464.   While in the nursing facility, Mr. Morrell spent much of his time eating, sleeping, and watching television, which further contributed to his generalized weakness. For the years he was in the nursing facility he engaged in essentially no nursing facility-related activities. PPI X 1281 at 48

(Pilarcik Rebuttal Report).

1465.  After DRTx and Mr. Morrell, himself, began participating in his SPT meetings, the team agreed he should be evaluated for Physical, Occupational, and Speech Therapy. However, there were significant delays in receiving these services due to facility staffing and difficulties billing the services. PPI X 2190B at 23, 34, 36. Once the therapies began, the facility had problems billing and threatened to end specialized services for Mr. Morrell because of their inability to navigate HHSC's billing requirements. Mr. Morrell only received habilitative Occupational, Physical, and Speech Therapy after he decided to transition to a community placement. Further, Mr. Morrell never received Independent Living Skills training that would have enabled him to access the community and maintain the vocational skills he had developed over the thirty years he had worked. PPI X 1281 at 47-48 (Pilarcik Rebuttal Report).

1466.  Mr. Morrell did not have a person-centered individual service plan that was appropriate to his developmental strengths, needs and preferences. His ISP had one stated outcome – to remain as independent as possible – yet there were no goals, objectives, or specialized services, such as ILS training, included in his ISP to help him achieve this goal. Although it was well known that Mr. Morrell worked for many years under abusive conditions, his SPT never recommended he be assessed for possible post-traumatic stress disorder resulting from these living conditions. PPI X 1281 at 48-49 (Pilarcik Rebuttal Report).

1467.  Mr. Morrell finally began receiving LIDDA specialized services and began attending Day Habilitation in 2016. PPI X 2190B at 85. When Mr. Morrell began receiving Service Coordination from the LIDDA, almost six years after entering the nursing facility, his Service Coordinator consistently reported that he was not interested in pursuing alternate placement in the community. PPI X 2190B at 92.

1468.   After discussions and experiences in the community through participation in Day Habilitation, Mr. Morrell decided he wanted to pursue a community placement and DRTx assisted him to find a provider who could meet his needs. PPI X 2190B at 85. Mr. Morrell transitioned to an HCS host home on August 1, 2016. PPI X 2190B at 97.

1469.   Mr. Morrell lived in a host home in the community through community provider Marla's Community Living Services, where he began receiving services on August 1, 2016. Mr. Morrell lived in the home of Mr. Pete Ramos. Trial Tr. 365:10-366:4, Oct. 16, 2018 (Carrasco); Trial Tr. 343:4-5, Oct. 16, 2018 (Morrell).

1470.   Mr. Ramos' home was modified to meet Mr. Morrell's needs. Mr. Morrell's transition was a difficult process because the nursing facility provided little cooperation and he transitioned with undressed open wounds on his ankle that the facility had represented as healing. Mr. Morrell received extensive wound care in the community after his transition. PPI X 1281 at 48-49 (Pilarcik Rebuttal Report); PPI X 2190B at 118.

1471.   After leaving the nursing facility, Mr. Morrell's whole life changed. He lived with Mr. Ramos and his family. Mr. Morrell had his own room and the house had a yard where Mr. Morrell enjoyed spending time. Mr. Ramos' family included Mr. Morrell in all family activities including shopping, going out to eat, bowling, and going on their family vacations. Mr. Morrell stated he went to the beach in Mexico with Mr. Ramos and his family. Mr. Morrell also went to a Day Habilitation center where he played games and went with his friends on outings into town. In fact, Mr. Morrell said that he had "a lot of friends at the center." Trial Tr. 343:7-345:21, Oct.16, 2018 (Morrell); PPI X 1281 at 48 (Pilarcik Rebuttal Report).

1472.   Mr. Morrell's HCS provider, Ms. Darla Carrasco, testified about Mr. Morrell's living arrangement. Because Mr. Morrell lived in a host home, Mr. Ramos was responsible for ensuring

that all of Mr. Morrell's medical care, activities of daily living, and other necessary supports were provided. Each individual is to have their own room and wherever the family goes the individual always is to go with them unless the person does not want to go and they are able to stay by themselves. Ms. Carrasco noted that after Mr. Morrell's move to the community beginning in August 2016, he received adaptive aids, dental care, nursing services, Occupational Therapy, and Physical Therapy. And in terms of Mr. Morrell's host home family, Ms. Carrasco noted that the Ramos family was very active. As a result, Mr. Morrell went to soccer games, where they watch Mr. Ramos' son play. The Ramos family also had a YWCA membership where they went with Mr. Morrell. Trial Tr. 357:17-358:1, 358:17-25, 360:22-25, 365:18-23; 368:1-14, Oct. 16, 2018 (Carrasco).

1473.   Mr. Morrell benefitted from living in the community and testified that he would never want to go back to live in a nursing facility. He lived in a host home setting where he was able to attend Day Habilitation regularly, go to parks, go shopping, see friends, and go on vacations. Trial Tr. 343:4-346:14, Oct. 16, 2018 (Morrell) (describing his home, his host family, and the activities he participates in the community, and testifying that he would not want to go back to live in the nursing facility); Trial Tr. 355:11-13, Oct. 16, 2018 (Morrell) ("Q: Okay.  And, Joe, how long would you like to live with Pete?" A: "A long time."); Trial Tr. 377:10-18, Oct. 16, 2018 (Carrasco) ("He's just-I mean, he's just so happy. He's just, you know, vibrant. He's just a changed man. . . . [H]e just came out of his shell. He gets up every morning with a smile. He has – enjoys Pete's family. He has incorporated them as his own. He tells them he loves them every day and he now says he has a mom."); Trial Tr. 386:14-18; 396:7-19, Oct. 16, 2018 (Carrasco) (testifying that Mr. Morrell's health improved after moving from the nursing facility to the community, as evidenced by his blood work). Mr. Morrell took vacations and enjoyed visiting new places and participating in the community. PPI X 1281 at 47 (Pilarcik Rebuttal Report).

1474.  Mr. Morrell was not offered these opportunities until he became a named plaintiff and received advocacy from DRTx; as a result, he was able to move to a community setting. Trial Tr. 370:6-17, Oct. 16, 2018 (Carrasco) ("I learned that Joe and some of the other people that were there were hurt and living in some conditions that you or I wouldn't desire to live in."); *see also* Trial Tr. 368:15-22, Oct. 16, 2018 (Carrasco) (testifying that contact with an attorney from DRTx to inquire whether the provider had an opening was the first time she became aware of Mr. Morrell); Trial Tr. 373:16-25, Oct. 16, 2018 (Carrasco) (testifying that the DRTx attorney kept the process "on track . . . to support Joe in getting transitioned out into a home"); PPI X 1281 at 49 (Pilarcik Rebuttal Report).

1475.  Mr. Morrell's status as a named plaintiff and the involvement of DRTx had a major impact on the services he received and his quality of life. DRTx assisted him to understand his options and helped find an appropriate provider. They helped him gain an understanding of the community by arranging concrete examples of community placements, including multiple community visits and overnight stays, which helped Mr. Morrell make an informed choice about living options. PPI X 1281 at 49 (Pilarcik Rebuttal Report).

1476.  Ms. Bruni's conclusion that the PASRR process was followed appropriately in Mr. Morrell's case lacks credibility in the face of testimony from Mr. Morrell, his provider, and Ms. Pilarcik.  *See* Trial Tr. 2645:24-2649:24, Nov. 1, 2018 (Bruni).

1477.  Because of their status as named plaintiffs and the advocacy received from DRTx, some of the named plaintiffs were able to transition to the community. But they languished in nursing facilities for years before their long awaited transition. The evidence shows that through the years Individuals with IDD have remained in nursing facilities without needed specialized services, active treatment, or the opportunity to make an informed choice whether to enter or remain in a nursing

facility.

1478.   The deprivations suffered by the named plaintiffs as a result of systemic failures and violations under the NHRA, the Medicaid Act, the ADA, Section 504 of the Rehabilitation Act, and the implementing regulations, are representative of the class.

1479.   Consistent findings show that Texas' 2013 PASRR "redesign" – implemented three years after this litigation commenced – does not achieve the purposes or meet the requirements of applicable law. The findings show persistent failures in promptly and appropriately identifying, evaluating, and assessing individuals with IDD which, in turn, result in failures to deliver, coordinate and monitor specialized services and active treatment, which lead to failures to habilitate and/or rehabilitate such individuals, leaving them unable to transition back into the community. These cascading failures have resulted in class members being unnecessarily segregated and isolated in nursing facilities for extended periods of time, which violates the ADA and Section 504 of the Rehabilitation Act.

XV.

Texas does not comply with the NHRA's PASRR requirements

1480.   To reiterate, the PASRR provisions of the NHRA require that all individuals who are considered for admission to a nursing facility be screened to determine if they may have intellectual or developmental disabilities.  This is referred to as the Level I PASRR screen.  42 C.F.R. § 483.112; *see also Rolland v. Romney*, 318 F.3d 42, 46 (1st Cir. 2003); *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1305 (W.D. Wash. 2015); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 287 (E.D. N.Y. 2008).

1481.   All persons whose Level I PASRR screen indicates they may have intellectual or developmental disabilities must then be assessed and evaluated to determine if they do in fact have such disabilities, whether they satisfy the nursing facility level of care criteria, whether their needs

could be met in the community through the provision of appropriate services and supports, and whether they could benefit from the provision of specialized services designed to maximize their ability for self-determination and independence. This part of the PASRR process is referred to as the Level II PASRR evaluation. 42 C.F.R. §§ 483.128, 483.132(a); *see also Rolland*, 318 F.3d at 46.

1482.    The Level II PASRR evaluation must include an assessment that analyzes current living arrangements and medical and social supports. The evaluation also must include a functional assessment of the individual's ability to engage in activities of daily living as well as several other functional areas. It then must document the level of support and services that would be needed to assist the individual to perform these activities and function with the maximum level of independence. 42 C.F.R. § 483.136.

1483.    PASRR prohibits the unnecessary nursing facility admission of people with IDD. The Level II PASRR evaluation must determine whether it would be possible to meet the individual's needs through the provision of services and supports in the community as an alternative to nursing facility placement. 42 C.F.R. § 483.132(a)(1)-(2); *see McNiece v. Jindal*, 1998 WL 175899, at *4 (E.D. La. Apr. 14, 1998) (holding that the regulation was intended to assure that "the (nursing home) placement would be selected only after less restrictive settings had been rejected because the individual's care needs are so extensive that the individual requires institutional care") (citing 57 Fed. Reg. 56450-01 at *56496).

1484.    The PASRR reviewer, as part of the Level II PASRR evaluation, also must determine if the nursing facility to which the individual is being admitted is an appropriate placement for that person. 42 C.F.R. § 483.132(a)(3). An appropriate placement, as defined in 42 C.F.R. § 483.126, is a nursing facility that can meet all of the individual's needs. Thus, the PASRR reviewer must make the determination that "the individual's needs for treatment do not exceed the level of services which can

be delivered in the NF to which the individual is admitted either through NF services alone, or, where necessary, through NF services supplemented by specialized services provided by or arranged for by the State." 42 C.F.R. § 483.126; *see McNiece*, 1998 WL 175899, at *4 ("Congress has clearly given the final authority to the PASARR evaluators to decide whether nursing home treatment is required for the applicant's [ ] condition.").[58]

1485.  If the PASRR reviewer concludes that the facility cannot meet the individual's needs and cannot provide all appropriate specialized services, the individual cannot be admitted to, or remain in, that nursing facility. 42 C.F.R. § 483.130(n) (any determination to admit an individual with IDD to a nursing facility must be supported "by assurances that the specialized services that are needed can and will be provided or arranged by the State while the individual resides in the NF").

1486.  If the Level II PASRR evaluation determines that a nursing facility resident who has been in the facility for more than thirty months prior to a PASRR evaluation does not require nursing facility services, but does require specialized services, the state has duty to offer to provide these services to the resident in an appropriate community setting. 42 U.S.C. § 1396r(e)(7)(C)(i)-(ii); 42 C.F.R. §§ 483.118(c), 483.120(b); *see also Rolland*, 318 F.3d at 46.  Thus, the NHRA requires that states provide community services and alternative placement to long-term residents of nursing facilities who need specialized services but who no longer need nursing services.

1487.  The Level II PASRR evaluation must determine whether the individual would benefit from specialized services in order to function more independently or to avoid a loss of skills. If so, the individual must be provided those specialized services either in the nursing facility or in an alternative appropriate setting. 42 U.S.C. § 1396r(e)(7)(B)(ii)(II) & (e)(7)(C); 42 C.F.R. §§ 483.112(b), 483.114(b)(2), 483.116(b)(2), 483.118(c), 483.120(b), 483.128(i)(5); *see also Rolland*

---

[58]Importantly, the State's duty to carry out these PASRR obligations (screenings, evaluations, etc.) cannot be delegated to the nursing facility.

*v. Romney*, 318 F.3d at 57 (affirming decision requiring state to provide all needed specialized services and active treatment); *Rolland v. Cellucci*, 198 F. Supp. 2d 25 (D. Mass. 2002) (requiring specialized services that constitute a program of active treatment); *Rolland v. Cellucci*, 52 F. Supp. 2d 231, 235 (D. Mass. 1999) (holding that the NHRA obligates states to provide specialized services and active treatment).

1488.    The PASRR reviewer must explain to the individual and, where applicable, to his or her legal representative, the results of the Level II PASRR evaluation, including information regarding the services that are needed and the placement options that are appropriate. 42 C.F.R. § 483.130(l)(3)(k)-(l).

1489.    The PASRR regulations create a mandatory duty on the states to provide specialized services to all persons with IDD who need them, regardless of whether they require nursing facility services. 42 C.F.R. § 483.116(b) (for residents needing both a nursing facility level of services and specialized services, then "[t]he State must provide or arrange for the provision of the specialized services needed by the individual while he or she resides in the NF").

1490.    Specialized services for individuals with IDD must include all services which are needed to implement "a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services . . . directed toward – (i) The acquisition of the behaviors necessary for the client to function with as much self-determination and independence as possible; and (ii) The prevention or deceleration of regression or loss of current optimal functional status." 42 C.F.R. § 483.120(a)(2) (incorporating the standard in 42 C.F.R. § 483.440(a)(1)); *see also Rolland*, 318 F.3d at 56-57 (rejecting state's argument that active treatment is not required and is not attainable); *Rolland v. Patrick*, 483 F. Supp. 2d 107, 113 (D. Mass. 2007) (finding that First Circuit "determined that,

422

although Defendants were not required to comply with every regulation applicable to ICF/MRs, they were required to implement the 'active treatment' aspects of the regulations as that term concerned mentally retarded residents of nursing facilities"); *Steward*, 189 F. Supp. 3d at 639-640.

1491.    Requiring active treatment for individuals with IDD adheres to the clear intent of Congress in enacting the relevant provisions of the NHRA. Any other construction would be contrary to the intent of Congress and the stated purpose of the amendments. PL 100–203 (HR 3545), PL 100–203, December 22, 1987, 101 Stat 1330 (a nursing facility must not admit any new resident who has IDD without determining "whether the individual requires active treatment."); 135 Cong. Rec. S13057-03, *S13238, 1989 WL 195142 ("If a resident is found to be [ ] mentally retarded and requires nursing facility care, the individual may reside in a facility, but the State is required to provide active treatment if the individual is found to need it."); *Idaho Health Care Ass'n v. Sullivan*, 716 F. Supp. 464, 472 (D. Idaho 1989) (Congress acted to benefit "many individuals who . . . were not receiving active treatment for their individual needs"); *Rolland*, 198 F. Supp. 2d at 29 ("Congress mandated that States provide active treatment to nursing facility residents deemed in need."); *Rolland v. Cellucci*, 138 F. Supp. 2d 110, 117 (D. Mass. 2001) ("the intent of federal law" is that individuals with IDD in nursing facilities have a right to active treatment, and the state must provide it).

1492.    Active treatment means the same thing for residents of nursing facilities as it does for residents of institutional or community programs for individuals with IDD.  57 Fed. Reg. 56450-01 at *56474 (Nov. 30, 1992) (active treatment, as defined for nursing facilities, is identical to active treatment in ICF/MRs); 57 Fed. Reg. 56450-01 at *56476 ("Congress did not see fit to alter in any way the States' responsibility to provide these services, however they are called."); *Rolland v. Cellucci*, 138 F. Supp. 2d at 117 . In other words, the setting in which treatment is provided does not

dictate or alter the mandate. Individuals with IDD who need active treatment are entitled to receive it regardless of where they reside. *See* 57 Fed. Reg. 56450-01 at *56475 (Nov. 30, 1992) ("the definition of active treatment contained in § 483.440(a)(1) is not tied to institutional care"). Defendants' argument that individuals with IDD who live in ICF/MRs are entitled to receive active treatment, but individuals with IDD who live in nursing facilities are not entitled to receive active treatment, defies common sense. With enactment of the NHRA, Congress intended to ensure that individuals with IDD receive the same services and treatment even if they are admitted to a nursing facility. Many individuals with IDD in nursing facilities may need even more aggressive treatment than individuals with IDD who live in other settings in order to avoid regression and acquire or regain skills to become independent again. But they certainly are not relegated to *less* than active treatment simply because they happen to be in a nursing facility.

1493.  States must provide individuals with IDD a program of active treatment that is "continuous" and includes an "aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services" directed toward "[t]he acquisition of the behaviors necessary for the client to function with as much self-determination and independence as possible [ ] and the prevention or deceleration of regression of [ ] optimal functional status." 57 Fed. Reg. 56450-01 at *56475; *see also Rolland v. Cellucci*, 138 F. Supp. 2d at 115-117 (rejecting argument that active treatment for individuals with IDD in nursing facilities means something different than for individuals with IDD in other settings); *Rolland*, 198 F. Supp. 2d at 32 (also rejecting argument that services only need to be "analogous to active treatment"). The meaning of active treatment – which must be continuous, aggressive, and consistent – specifically construes and

reflects Congressional intent.[59]

1494.   The intensity, duration and frequency of specialized services must be sufficient to provide active treatment, using trained and qualified staff, to each individual who needs such services. Again, the State must provide or arrange for such services. 42 C.F.R. §§ 483.120(a)(2), 483.120(b), 483.440(c)-(f); *Rolland*, 483 F. Supp. 2d at 113-14 (holding that active treatment is not confined to the definition set forth in § 483.440(a)(1) but extends to all subsections of the regulation, including §§ 483.440(a)-(f)).

1495.   The scope and breadth of specialized services cannot be arbitrarily curtailed or limited by the State in a manner that results in a level of care which is less than active treatment. *See* 42 C.F.R. § 483.440(a), (c).  In addition, the process for planning, providing and monitoring those services must comply with 42 C.F.R. §§ 483.120(a)(2), 483.120(b), and 483.440(c)-(f).  *See Rolland*, 318 F.3d at 57; *Rolland*, 483 F. Supp. 2d at 114; *Steward*, 189 F. Supp. 3d at 639.

1496.   Each individual with IDD who is admitted to a nursing facility must be provided with a comprehensive functional assessment, which is the foundation for all service planning, and which is necessary to meet the federal active treatment standard.  42 C.F.R. §§ 483.120(a)(2), 483.120(b), 483.440(c); *see also Rolland*, 483 F. Supp. 2d at 114. The comprehensive functional assessment must be developed within thirty days, must evaluate the individual's strengths and needs in numerous specific habilitative areas, and must identify needed services without regard to the actual availability of those needed services. 42 C.F.R. § 483.440(c)(3)(i)-(v); *see Rolland*, 2007 WL 7607256 (D. Mass. Aug. 2, 2007) (holding that compliance with the active treatment requirements set forth in the order accompanying the decision constitute compliance with federal law, including CMS standards);

---

[59]The record in this case reflects how the State's view that it is not obligated to adhere to an active treatment standard has resulted in a complete lack of treatment or sporadic, intermittent, and inconsistent treatment for individuals with IDD in nursing facilities.

docket no. 312-8 at 168-74 (Rolland Active Treatment Order, PI Exhibit K to Declaration of Garth Corbett).

1497. Each individual with IDD who is admitted to a nursing facility must be provided with an individualized service plan (ISP) that is developed by an interdisciplinary team (IDT) of IDD professionals, that includes measurable goals and objectives to promote the acquisition of skills and improvement in functioning, and that identifies the professionals responsible for providing and monitoring these services, as required by federal active treatment standards and procedures. 42 C.F.R. §§ 483.120(a)(2) & (b), 483.440(c)(1) & (2); *see also Rolland*, 483 F. Supp. 2d at 114; Rolland Active Treatment Order.

1498. The service plan must include: (i) interventions to support the individual toward independence; (ii) identify the location where program strategy information (which must be accessible to any person responsible for implementation) can be found; (iii) include, for those clients who lack them, training in personal skills essential for privacy and independence (including, but not limited to, toilet training, personal hygiene, dental hygiene, self-feeding, bathing, dressing, grooming, and communication of basic needs) until it has been demonstrated that the client is developmentally incapable of acquiring them; (iv) identify mechanical supports, if needed, to achieve proper body position, balance, or alignment and specify the reason for each support, the situations in which each is to be applied, and a schedule for the use of each support; (v) provide that clients who have multiple disabling conditions spend a major portion of each waking day out of bed and outside the bedroom area, moving about by various methods and devices whenever possible; and (vi) include opportunities for client choice and self-management. 42 C.F.R. §§ 483.440(c)(6)(i)-(vi).

1499. The service plan must be implemented in a manner that results in a program of active treatment, i.e., "a continuous active treatment program consisting of needed interventions and

services in sufficient number and frequency to support the achievement of the objective identified in the [IPP/ISP]," and it must be implemented by trained staff. 42 C.F.R. § 483.440(d).

1500.   If the individual requires specialized services, the State must provide those services with the frequency, intensity, and duration that meet the federal standard for active treatment. 42 C.F.R. §§ 483.440(a)-(f), 483.120(b); *see also Rolland*, 483 F. Supp. 2d at 114; Rolland Active Treatment Order.

1501.   Specialized services must be provided continuously, consistently, and aggressively in order to meet the federal standard for active treatment. 42 C.F.R. §§ 483.120(a)(2) & (b), 483.440(a)-(f); *see also Rolland*, 483 F. Supp. 2d at 114; Rolland Active Treatment Order.

1502.   Specialized services must be provided by qualified and trained staff in order to meet the federal standard for active treatment. 42 C.F.R. §§ 483.120(a)(2) & (b), 483.440(a)-(f); *see also Rolland*, 483 F. Supp. 2d at 114; Rolland Active Treatment Order.

1503.   A service coordinator or case manager is responsible for monitoring, coordinating, and ensuring the delivery of needed services and the interventions described in the service plan, as well as for modifying the plan as needed. 42 C.F.R. § 483.440(f).

1504.   Periodic reviews of the service plan must be conducted to determine whether the individual continues to need a nursing level of care and to require confinement in a nursing facility. These periodic reviews must also determine whether specialized services are necessary to address habilitation needs and provide active treatment. 42 U.S.C. §§ 1396r(b)(3)(F)(ii), 1396r(e)(7)(A)-(B); 42 C.F.R. §§ 483.128, 483.132, 483.136, 483.440(f).

1505.   Because integration back into the community is the ultimate goal, the service plan must include a section on transition that identifies concrete and preferred alternatives which would allow the individual to move to an integrated setting. 42 C.F.R. §§ 483.120(a)(2) & (b), 483.440(b) & (c);

*see also Rolland*, 483 F. Supp. 2d at 114; Rolland Active Treatment Order.

1506.  In violation of the NHRA, 42 U.S.C. § 1396r(e)(7)(A)-(B) and 42 C.F.R. §§ 483.112, 483.116, 483.126, and 483.132, Defendants have failed to develop and implement a PASRR program that timely and accurately screens nursing facility applicants for IDD before their admission to a nursing facility; assesses whether their needs can be met in an alternative, less restrictive setting than a nursing facility prior to placement in the facility; determines if the nursing facility is an appropriate placement for the individual; and advises the applicant or resident of the available alternatives to a nursing facility placement.

1507.  In violation of the NHRA, 42 U.S.C. § 1396r(e) and 42 C.F.R. §§ 483.106, 483.112, 483.116, 483.130, and 483.132, Defendants have failed to develop and implement a PASRR program that timely and accurately determines, based upon sufficient medical information, data, and records, if an individual with IDD meets the conditions and criteria for a categorical admission, including either an exempt admission or an expedited admission, and then determines, at the expiration of the time period allowed for exempt or expedited admissions, if the individual's needs can be met in an alternative, less restrictive setting than a nursing facility and if the individual needs specialized services.

1508.  In violation of the NHRA, 42 U.S.C. § 1396r(e) and 42 C.F.R. §§ 483.112, 483.116, 483.130, 483.132, 483.136, and 483.440(a)-(c), Defendants have failed to develop and implement a PASRR program that accurately identifies individuals with IDD, comprehensively evaluates all of their habilitative needs prior to admission to a nursing facility, and assesses which specialized services are appropriate to address each of those needs.

1509.  In violation of the NHRA, 42 U.S.C. § 1396r(e) and 42 C.F.R. §§ 483.126 and 483.132, Defendants have failed to develop and implement a PASRR program that appropriately determines

if the nursing facility can meet all of the individual's needs and provide all necessary specialized services to meet the federal active treatment standard.

1510.   In violation of the NHRA, 42 U.S.C. § 1396r(e), 42 C.F.R. § 483.100 *et seq.*, and 42 C.F.R. § 483.440(a) & (c), Defendants have failed to provide each individual with IDD in a nursing facility with a comprehensive functional assessment of all IDD functional areas, as necessary to identify their needs, design an individual service plan, and carry out the plan under the federal active treatment standard and procedures.

1511.   In violation of the NHRA, 42 U.S.C. § 1396r(e), 42 C.F.R. § 483.100 *et seq.*, and 42 C.F.R. § 483.440(a)-(f), Defendants have failed to provide each individual with IDD in a nursing facility with an appropriate individual service plan that is developed by an interdisciplinary team of IDD professionals, that includes measurable goals and objectives to promote the acquisition of skills and improvement in functioning, that includes transition options, and that identifies the professionals, as necessary to meet the federal active treatment standard and procedures.

1512.   In violation of the NHRA, 42 U.S.C. § 1396r(e), 42 C.F.R. § 483.100 *et seq.*, and 42 C.F.R. § 483.440(a)-(f), Defendants have failed to provide adequate service coordination to develop, implement, monitor, and modify the individual service plan and transition plan; to coordinate this plan with the nursing facility plan of care; and to ensure the delivery of all needed specialized services, as necessary to meet the federal active treatment standard and procedures.

1513.   In violation of the NHRA, 42 U.S.C. § 1396r(e), 42 C.F.R. § 483.100 *et seq.*, and 42 C.F.R. § 483.440(a)-(f), Defendants have failed to provide each individual with IDD in a nursing facility with specialized services with the frequency, intensity, and duration, with the requisite continuity, consistency, and scope, and through qualified and trained IDD staff, as necessary to meet the federal active treatment standard.

1514.   In violation of the NHRA, 42 U.S.C. § 1396r(e), 42 C.F.R. § 483.100 *et seq.*, and 42 C.F.R. § 483.440(a)-(f), Defendants have failed to ensure compliance with all PASRR requirements and plan, provide, and coordinate nursing services and specialized services, as necessary to meet the federal active treatment standard.

1515.   In violation of the NHRA, 42 U.S.C. § 1396r(e), 42 C.F.R. § 483.100 *et seq.*, and 42 C.F.R. § 483.440(a)-(f), Defendants have failed to provide the full range of needed specialized services, have failed to provide or arrange for an adequate array and capacity of service providers and IDD professionals qualified to provide these specialized services, and have failed to ensure that individuals with IDD are not inappropriately placed or retained in nursing facilities without needed services.

1516.   In violation of the NHRA, 42 U.S.C. § 1396r(e), 42 C.F.R. § 483.100 *et seq.*, and 42 C.F.R. § 483.440(a)-(f), in addition to limiting the scope and availability of specialized services for individuals with IDD, Defendants have failed to provide even those limited services to all individuals who need them in order to receive active treatment.

XVI.

Texas violates the Reasonable Promptness
and Freedom of Choice provisions of the Medicaid Act

A.      Reasonable promptness requirement

1517.   42 U.S.C. § 1396a(a)(8) of Title XIX of the Social Security Act requires states to provide Medicaid benefits to all eligible persons with reasonable promptness and for as long as medically necessary. *See Romano v. Greenstein*, 721 F.3d 373, 377-378 (5th Cir. 2013) (noting that § 1396a(a)(8) requires that a state plan for Medicaid assistance must "provide that all individuals wishing to make application for medical assistance under the plan shall have an opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible

430

individuals"); *Doe v. Chiles*, 136 F.3d 709, 721 (11th Cir. 1998) (requiring the provision of medical assistance and medically necessary services within ninety days of application); *Steward*, 189 F. Supp. 3d at 635; *Rolland v. Cellucci*, 52 F. Supp. 2d at 239-240 (failure to provide medically necessary services to individuals with IDD in nursing facilities states a claim under the reasonable promptness provision of the Medicaid Act).

1518.   The regulations defining and implementing the statutory right to the prompt provision of services, 42 C.F.R § 435.930(a) & (b), mandate that the provision of services must not be delayed by the agencies' administrative procedures. *Doe*, 136 F.3d at 717; *Rolland*, 52 F. Supp. 2d at 240.

1519.   The Court has already determined that the reasonable promptness claim presented in this case is privately enforceable under 42 U.S.C. § 1983. *Steward*, 189 F. Supp. 3d at 634-635 (citing *Romano*, 721 F.3d at 377-378) (holding that § 1396a(a)(8) satisfies both the *Blessing* three-part test and the explicit individual rights-creating language required by *Gonzaga*); *see also S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602-603 (5th Cir. 2004); *Doe v. Kidd*, 501 F.3d 348, 356-357 (4th Cir. 2007) (reasonable promptness mandate gives rise to enforceable right); *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 183 (3d Cir. 2004) (holding that an analysis based upon *Gonzaga*, *Blessing*, and other cases "compels the conclusion that the provisions invoked by plaintiffs – 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15) – unambiguously confer rights vindicable under § 1983"); *Bryson v. Shumway*, 308 F.3d 79, 88-89 (1st Cir. 2002); *Westside Mothers v. Haveman*, 289 F.3d. 852, 863 (6th Cir. 2002). *Accord Talevski*, 599 U.S. at 192 (holding NHRA provisions enforceable under § 1983).

1520.   Under PASRR, individuals with IDD at risk of entering or residing in nursing facilities must receive: (1) a pre-admission evaluation to determine if they are appropriate for community living and to identify the need for specialized services if admitted to nursing facilities; and (2) specialized

431

services that meet the federal active treatment standard, based on comprehensive functional assessments within thirty days of admission to a nursing facility. 42 U.S.C. § 1396r(e)(7); 42 C.F.R. §§ 483.112, 483.120, 483.132, 483.440(a) & (c).

1521.  Individuals with IDD at risk of admission or admitted to nursing facilities are entitled to receive Medicaid-funded evaluations, assessments and services with reasonable promptness. *Dunakin*, 99 F. Supp. 3d at 1320-21 (W.D. Wash. 2015) (clarifying that states must – with reasonable promptness – provide for services, not merely pay for them); *Rolland v. Romney*, 273 F. Supp. 2d 140, 141 (D. Mass. 2003) (in response to a motion to provide timely specialized services the court held that "Defendants must provide service plans and active treatment to each and every class member for whom specialized services is appropriate").

1522.  By its policies, practices, actions, and omissions, Texas HHSC limits pre-admission evaluations to approximately three percent of all individuals with IDD who are admitted to nursing facilities, thereby denying the remaining ninety-seven percent of individuals with IDD prompt evaluations to determine if they could be served in an alternative placement or need specialized services.  Moreover, HHSC fails to ensure that timely post-admission evaluations and the provision of medically necessary services occur immediately after the period permitted by exempt or expedited categorical admissions. This deliberate design of Texas' PASRR program, coupled with HHSC's failure to ensure timely PASRR evaluations for categorical admissions, results in extended delays and the outright denial of medically necessary care to individuals with IDD in violation of 42 U.S.C. § 1396a(a)(8).

1523.  By its policies, practices, actions and omissions, HHSC fails to promptly assess the needs of people with IDD admitted to nursing facilities, and then to promptly provide all medically necessary specialized services to meet individuals' habilitative needs, resulting in extended delays and the

432

outright denial of medically necessary care to individuals with IDD, in violation of 42 U.S.C. § 1396a(a)(8).

1524.  By its policies, practices, actions and omissions, HHSC fails to track and deliver all specialized services necessary to constitute a program of active treatment for individuals with IDD in nursing facilities, resulting in delays and outright denial of medically necessary care to individuals with IDD in nursing facilities in violation of 42 U.S.C. § 1396a(a)(8).

1525.  Texas HHSC fails to offer and ensure the timely provision, adequate array, and capacity of community services necessary for qualified individuals with IDD who are institutionalized or referred for placement in nursing facilities to live in the most integrated setting appropriate to their needs, in violation of 42 U.S.C. § 1396a(a)(8).

B.    Freedom of Choice requirement

1526.  The freedom of choice provision in § 1396n(c)(2)(C) states "a waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that . . . such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded." *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1014 (D. Minn. 2016) (citing 42 U.S.C. § 1396n(c)(2)(C)).

1527.  Corresponding regulations clarify that CMS may decline to grant a waiver or may terminate a waiver unless the state agency provides "assurance that when a beneficiary is determined to be likely to require the level of care provided in a hospital, [nursing facility], or ICF/IDD, the beneficiary or his or her legal representative will be: (1) [i]nformed of any feasible alternatives

available under the waiver; and (2) [g]iven the choice of either institutional or home and community-based services." 42 C.F.R. § 441.302(d);[60] *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 685 (S.D. Ohio 2017) (citing *Ball v. Rogers*, 492 F. 3d 1094, 1107 (9th Cir. 2007)); *Guggenberger*, 198 F. Supp. 3d at 1017-18.

1528.   The freedom of choice provisions of the Medicaid Act, 42 U.S.C. § 1396n(c)(2)(B)-(C), require states to provide individuals eligible for inpatient hospital services, nursing facility services, or an intermediate care facility for persons with IDD with: (1) notice of and equal opportunities to apply for and access medically necessary community-based services; (2) an assessment of their eligibility for feasible community-based service alternatives to a hospital, nursing facility, or intermediate care facility; and (3) meaningful choice between these institutional placements and community-based services. 42 C.F.R. § 441.302(d); *Ball*, 244 F. Supp. 3d at 685 (there are "two explicitly identified rights – (a) the right to be informed of alternatives to traditional, long-term institutional care, and (b) the right to choose among those alternatives"); *Guggenberger*, 198 F. Supp. 3d at 1017-18. The notice, assessment, and informed choice requirements apply both to individuals who are at risk of admission to a nursing facility as well as those already institutionalized in a nursing facility. *Steward*, 189 F. Supp. 3d at 637; *Dunakin*, 99 F. Supp. 3d at 1322-23; *Rolland*, 52 F. Supp. 2d at 240-41.

1529.   The Court has already determined that the freedom of choice claim presented in this case is privately enforceable under 42 U.S.C. § 1983. *Steward*, 189 F. Supp. 3d at 635-37 ("The language of Section 1396n(c)(2), in imposing a requirement upon state plans that the state assure the Secretary that certain individuals receive evaluations of their need for institutional care and information about community-based alternatives, reflects a congressional intent to create a right in those individuals

---

[60] 42 C.F.R. § 441.302 is titled "State assurances."

to such evaluations and information."). Other courts addressing the question have also found 42 U.S.C. § 1396n(c)(2)(B)-(C)'s freedom of choice provision to be privately enforceable under 42 U.S.C § 1983. *See Guggenberger*, 198 F. Supp. 3d at 1014-15; *see also Ball*, 244 F. Supp. 3d at 683-84. *Accord Talevski*, 599 U.S. at 192 (holding NHRA provisions enforceable under § 1983).

1530.    In violation of 42 U.S.C. § 1396n(c)(2)(B)-(C) and 42 C.F.R. § 441.302(d), HHSC does not provide residents of nursing facilities with IDD with: (a) notice of and equal opportunities to apply for and access medically necessary community-based services before such individuals are admitted to a nursing facility; (b) an assessment of their eligibility for such services; and (c) meaningful choice between these institutional and community-based services. According to HHSC's own data, approximately ninety-seven percent of all individuals with IDD are admitted to nursing facilities without notice, assessment, and a choice of community services.

1531.    HHSC has failed to modify its outreach, education, and choice process, and its PASRR evaluation program, so that each individual with IDD or their guardian has the freedom to make an informed and meaningful choice before entering a nursing facility, thereby violating the Freedom of Choice provision of Title XIX of the Social Security Act (Medicaid).

1532.    HHSC's failure to modify its outreach, education and choice process so that each individual with IDD or their guardian has the freedom to make an informed and meaningful choice before entering a nursing facility also violates Texas law, which requires that persons with IDD be given information about community-based options prior to being institutionalized in a nursing facility or other similar institutional setting. Tex. Gov't Code Ann. §§ 531.02442 and 531.042.

C.    Any waiver of federal rights to receive specialized services or to choose to live in the community must be knowing and informed

1533.    As Congress made clear in enacting the NHRA, a central purpose of the NHRA was to ensure that PASRR-eligible people with IDD in nursing facilities promptly receive all needed specialized

services and active treatment. This right to services constitutes a constitutionally-protected property interest. *See Guggenburger*, 198 F. Supp. 3d at 1019-20 (finding that Medicaid-eligible plaintiffs with IDD had a constitutional property interest in obtaining Medicaid-funded waiver services where they were available); *Daniels v. Woodbury Cty.*, 742 F.2d 1128, 1132 (8th Cir. 1984) ("Applicants who have met the objective eligibility criteria of a wide variety of governmental programs have been held to be entitled to protection under the due process clause.") (quoting *Holbrook v. Pitt*, 643 F.2d 1261, 1278 n.35 (7th Cir. 1981)); *McCartney ex rel. McCartney v. Cansler*, 608 F. Supp. 2d. 694, 698-99 (E.D.N.C. 2009) (Medicaid recipients have statutory rights to entitlements that implicate due process rights).

1534.   Likewise, the right to live and receive services in the community and to interact with non-disabled peers implicate liberty interests in freedom of association and freedom of movement. *Thomas S. ex rel. Brooks v. Flaherty*, 699 F. Supp. 1178, 1203-04 (W.D.N.C. 1988) (holding that the right to freedom of association of institutionalized individuals with IDD were violated where they were denied opportunities to associate with non-institutionalized persons as a result of being confined to a segregated institution.); *cf. Sawyer v. Sandstrom*, 615 F.2d 311, 316 (5th Cir. 1980) (citing *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965)) ("This right to freely associate is not limited to those associations which are 'political in the customary sense' but includes those which 'pertain to the social, legal, and economic interests of the members.'"); *Bykofsky v. Borough of Middletown*, 401 F. Supp. 1242, 1254 (M.D. Pa. 1975), *aff'd*, 535 F.2d 1245 (3d Cir. 1976), *cert. denied*, 429 U.S. 964 (1976) ("The rights of locomotion, freedom of movement, to go where one pleases, and to use the public streets in a way that does not interfere with the personal liberty of others" are implicit in the first and fourteenth amendments); *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) ("Freedom of movement is basic in our scheme of values.").

1535.   In order to relinquish or waive a federal right, such as rights under the NHRA to promptly receive specialized services and active treatment, and/or rights under the ADA to live and receive services in the most integrated setting, such a waiver must be "knowing" and "voluntary." To meet this test, the person must be provided adequate and individualized information tailored to the individual's ability to understand the nature and consequences of foregoing exercise of that right. *See United States v. Stout*, 415 F.2d 1190, 1192-93 (4th Cir. 1969) ("[F]ederal law is well-settled that waiver is the voluntary and intentional relinquishment of a known right, and courts have been disinclined lightly to presume that valuable rights have been conceded in the absence of clear evidence to the contrary.").

1536.   Individuals with IDD are especially vulnerable and at risk for unknowingly waiving their rights. *See Clark v. California*, 739 F. Supp. 2d 1168, 1185-86 (N.D. Cal. 2010) (discussing why persons with developmental disabilities are at risk of unintentionally waiving rights). In determining whether individuals have knowingly waived their rights, courts consider the totality of the circumstances, including whether the individual has an intellectual or mental disability, communication barriers, educational background, and relevant experience. *See, e.g., Gonzalez v. Hidalgo Cty.*, 489 F.2d 1043, 1047 (5th Cir. 1973) (remanding due process case where migrant worker sued housing authority and record was not clear that uneducated master tenant who signed adhesion contract spoke little English and "was 'actually aware or made aware of the significance of the fine print now relied on as a waiver of constitutional rights'"); *United States v. Klat*, 180 F.3d 264 (5th Cir. 1999) (per curiam) (holding magistrate judge did not err in refusing to dismiss plaintiff's court-appointed counsel in commitment hearing where plaintiff's mental condition and competency was directly at issue in determining if waiver of right to counsel was knowing and intelligent); *RDO Fin. Servs. Co. v. Powell*, 191 F. Supp. 2d 811, 813-14 (N.D. Tex. 2002)

(determining whether jury waiver was made knowingly, voluntarily, and intelligently); *compare Pelayo v. U.S. Border Patrol Agent No. 1*, 82 Fed. Appx. 986 (5th Cir. 2003) (affirming denial of motion to dismiss where mentally disabled person deported was alleged to have lacked the capacity to choose voluntary departure and waive his rights as evidenced by being disoriented, mumbling and unable to answer questions from border patrol agent) *with Nose v. Attorney General of the United States*, 993 F.2d 75 (5th Cir. 1993) (undisputed summary judgment evidence established that alien participating in Visa Waiver Pilot Program (VWPP) knowingly waived her right to deportation hearing where alien was highly educated person with established English language proficiency who had spent over two years at a major United States university and who had consulted with attorney to enter United States under VWPP); *Udd v. Massanari*, 245 F.3d 1096, 1102 (9th Cir. 2001) (termination of social security benefits for man with schizophrenia who was unable to understand the cessation of his benefits and the need to file an appeal in order to attempt to maintain them constituted a denial of due process).

1537.  Individuals with IDD in Texas nursing facilities should not be deemed to have opposed specialized services or community placement, and thereby relinquished their rights to receive specialized services and active treatment in the nursing facility, or their right to receive services and live in the most integrated setting, unless Texas establishes that these rights were knowingly and intentionally waived after being provided with adequate and individualized information tailored to the person's ability to understand their options and the consequences of their decisions. Defendants have an affirmative obligation to ensure that information about these rights is provided such that an individual with IDD or their guardian can make an informed and voluntary choice whether to relinquish and knowingly waive these rights.

XVII.

The State of Texas violates Title II of the Americans with Disabilities Act

A.    The ADA prohibits unnecessary institutionalization of people with disabilities

1538.    The Americans with Disabilities Act "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); *see also Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir. 1995) (quoting S. Rep. No. 101-116, at 20 (1989) (Senate Report); H.R. Rep. No. 101-485, pt. II, at 50 (1990) (House Report (Part II)), *cert. denied sub nom.*, *Sec'y of Pub. Welf. v. Idell S.*, 516 U.S. 813 (1995); H.R. Rep. No. 101-485, pt. IV, at 23 (1990).

1539.    Congress acknowledged prior to the ADA's passage that "then current laws were 'inadequate' to combat 'the pervasive problems of discrimination that people with disabilities are facing.'" *Helen L.*, 46 F.3d at 331 (quoting Senate Report at 18; House Report (Part II) at 47).  Forms of discrimination that concerned Congress included segregation of people with disabilities in institutions and their concomitant exclusion from the community and society at large.  Senate Report at 5-6 ("One of the most debilitating forms of discrimination is segregation imposed by others."); House Report (Part II) at 29 ("Discrimination against people with disabilities includes segregation[] [and] exclusion . . . .").

1540.    To this end, Congress enacted the ADA in 1990. "The ADA is a comprehensive piece of civil rights legislation which promises a new future: a future of inclusion and integration, and the end of exclusion and segregation." H.R. Rep. No. 101-485, pt. III at 26 (1990) (House Report (Part III)).

1541.    In enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social

problem;" that "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization;" and that "the Nation's proper goals regarding individuals with disabilities are to assure . . . full participation[] [and] independent living." 42 U.S.C. § 12101(a)(2)-(3), (7); *see also* House Report (Part III) at 49-50 ("The purpose of [T]itle II is to continue to break down barriers to the integrated participation of people with disabilities in all aspects of community life."). Congress further found that "individuals with disabilities continually encounter various forms of discrimination, including . . . segregation." 42 U.S.C. § 12101(a)(5).

1542.   Thus, the ADA specifies that discrimination against people with disabilities includes "segregation" and "institutionalization." 42 U.S.C. § 12101(a)(3), (5).

1543.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II "incorporates the 'non-discrimination principles' of [S]ection 504 of the Rehabilitation Act and extends them to state and local governments." *Helen L.*, 46 F.3d at 331 (footnote omitted) (quoting *Easley v. Snider*, 36 F.3d 297, 300 (3d Cir. 1994)); *see also* 42 U.S.C. § 12131.

1544.   Defendants State of Texas and HHSC are "public entit[ies]" within the meaning of Title II of the ADA and, therefore, are subject to the ADA's provisions and obligations. 42 U.S.C. § 12131(1)(A).

1545.   A state's obligations under the ADA are not limited by the scope of Medicaid requirements. Title II of the ADA creates an independent and additional legal obligation on states. *See Townsend v. Quasim*, 328 F.3d 511, 518 n.1 (9th Cir. 2003) (stating that Medicaid Act conditions are not relevant to whether plaintiffs can demonstrate a prima facie violation of the integration mandate).

A state may run afoul of the ADA even while carrying out CMS-approved state plans, waiver services, and amendments. *See, e.g., Davis v. Shah*, 821 F.3d 231, 264 (2d Cir. 2016) ("[A state's] discretion to decide whether to provide coverage . . . under the Medicaid Act, however, does not affect its duty to provide those services in a non-discriminatory manner under the ADA. A state's duties under the ADA are wholly distinct from its obligations under the Medicaid Act."); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 601-03, 614-15 (7th Cir. 2004) (allowing plaintiff's claims to proceed without regard to federal approval of state's Medicaid plan and waiver programs); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1182 (10th Cir. 2003) (even though a waiver program is optional, a state may not, under Title II of the ADA, amend optional programs in such a way as to violate the integration mandate).

1546.    Pursuant to congressional mandate, the Attorney General issued regulations implementing Title II of the ADA. *See* 42 U.S.C. § 12134(a).

1547.    The Attorney General's integration regulation implementing Title II of the ADA provides, *inter alia*, that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) ("the integration mandate"). An integrated setting is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B. at 708 (2018); *Disability Advocates, Inc. v. Paterson (DAI I)*, 598 F. Supp. 2d 289, 320 (E.D.N.Y. 2009) (concluding that "the proper interpretation of . . . 'most integrated setting' is set forth in the regulations themselves: whether a particular setting 'enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible'") (quoting 28 C.F.R. § 35.130(d), App. A).

1548.    Accordingly, the ADA and its integration mandate reflect a clear preference for community

placement. Whenever possible, "both the ADA and [Section 504 of the Rehabilitation Act] favor integrated, community-based treatment over institutionalization." *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 379 (3d Cir. 2005) (citation omitted); *see also* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d); *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 337 (D. Conn. 2008) ("The ADA's preference for integrated settings is not consistent with a procedure in which remaining at [the institution] is the default option for residents.").[61]

1549.    One form of disability discrimination under Title II, therefore, is a violation of the "integration mandate." This mandate – arising out of the statute itself, the regulations of the Attorney General implementing Title II, and the Supreme Court's decision in *Olmstead*, 527 U.S. 581 (1999) – requires that when a state provides services to people with disabilities, it must do so "in the most integrated setting appropriate to [their] needs." 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d); *Olmstead*, 527 U.S. at 592, 607.

1550.    The Supreme Court in *Olmstead* explicitly held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead*, 527 U.S. at 597. The Court noted that "in findings applicable to the entire statute, Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" *Id.* at 600. The Court held that unnecessary institutionalization violates the ADA because it "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01.

---

[61]As the court in *Messier* explained, "the defendants cannot establish compliance with the integration mandate by showing that class members never requested community placement. The Supreme Court's reasoning in *Olmstead* makes it clear that a state must do more than wait until the residents of its facilities have affirmatively asked to be placed in the state's integrated residential settings." 562 F. Supp. 2d at 337.

1551.   The Supreme Court concluded that the ADA requires public entities to provide community-based treatment and services in the most integrated setting when: (a) such placement is appropriate, (b) the affected persons do not oppose community-based treatment, and (c) community services and placement can reasonably be accommodated, taking into account the resources available to the entity and the needs of others with disabilities. *Olmstead*, 527 U.S at 607.

1552.   A public entity violates Title II of the ADA when it segregates people with disabilities in public or private facilities or promotes the segregation of people with disabilities in such facilities through its planning, system design, funding choices, or service implementation. *See, e.g.*, 28 C.F.R. § 35.130(d); *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016) (explaining that a state may "violate the integration mandate if it operates programs that segregate individuals with disabilities or through its planning, service system design, funding choices, or service implementation practices, or promotes or relies upon the segregation of individuals with disabilities in private facilities or programs") (internal quotation marks and alterations omitted); *Fisher*, 335 F.3d at 1181-82 (reversing grant of summary judgment where defendants' restructuring of medication entitlements could place people at serious risk of unnecessary institutionalization in nursing facilities); DAI I, 598 F. Supp. 2d at 316-19 (finding that defendants' planning, funding, and administration of a service system was sufficient to support an *Olmstead* claim and rejecting the argument that public entities could not be held liable when services were provided in privately-operated facilities); *see also Martin v. Taft*, 222 F. Supp. 2d 940, 981 (S.D. Ohio 2002) (finding that liability does not depend on whether the public entity owns or runs institutional settings).  In addition, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration [] [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," including unnecessary institutionalization. 28 C.F.R. § 35.130(b)(3)(i), (d); 28

C.F.R. § 41.51(b)(3)(i), (d); *see also Conn. Ofc. of Prot. & Advocacy for Persons with Disabilities v. Conn.*, 706 F. Supp. 2d 266, 277-78 (D. Conn. 2010) (plaintiffs stated a violation of the ADA where defendants' methods of administration failed to adequately assess and identify the long-term needs of people with disabilities in nursing facilities, in order to determine whether they could be served in the community, and to provide them with information regarding the availability of alternatives to nursing facility care, thereby denying them the right to choose to live in the community instead of an institution); *Dunakin*, 99 F. Supp. 3d at 1319-20 (plaintiff stated a claim for an ADA violation by alleging that defendants' failure to comply with PASRR requirements when administering its PASRR program denied plaintiff and plaintiff class the opportunity to receive an evaluation for an alternative to nursing facility placement); *Kathleen S. v. Dep't of Pub. Welfare of Pa.*, 10 F. Supp. 2d 460, 471 (E.D. Pa. 1998) (finding violation of ADA by state defendants whose methods of administration at state institution caused plaintiff class to be unnecessarily segregated in the hospital even though they were able to live in the community with appropriate supports).

1553.  Texas violates Title II of the ADA by planning, funding, designing, administering, and implementing its IDD service system in a manner that unnecessarily segregates qualified individuals with IDD in nursing facilities for whom integrated residential settings are appropriate and who do not oppose living in those settings. *See, e.g., Disability Advocates, Inc. v. Paterson (DAI II)*, 653 F. Supp. 2d 184, 187-88 (E.D.N.Y. 2009) (violation of ADA where approximately 4300 people with mental illness, virtually all of whom were qualified for and did not oppose integrated placements, were nonetheless being served in segregated settings), *vacated on other grounds*, 675 F.3d 149 (2d Cir. 2012).

1554.  Texas violates Title II of the ADA by planning, funding, designing, administering, and implementing its IDD service system in a manner that unnecessarily places qualified individuals with

IDD at serious risk of being admitted to nursing facilities, who could live in integrated settings and do not oppose living in those settings. *See, e.g., Davis*, 821 F.3d at 263 (collecting cases where "courts of appeals applying the disability discrimination claim recognized in *Olmstead* have consistently held that the risk of institutionalization can support a valid claim under the integration mandate");

1555. Texas violates Title II of the ADA by planning, administering, funding, and operating an IDD service system that: (1) results in the unnecessary admission of people with IDD to nursing facilities; (2) limits opportunities for people with IDD to transition out of nursing facilities; (3) unnecessarily retains people with IDD in segregated nursing facilities; (4) fails to provide people with IDD or their guardians with individualized information, opportunities, and supports necessary to allow them to make an informed choice[62] about whether to enter or remain in a segregated nursing facility; (5) denies timely and meaningful access to community programs; and (6) requires that people with IDD be confined in segregated institutional settings in order to receive needed services.

B.    People with IDD in Nursing Facilities are Qualified Individuals with Disabilities and are appropriate to receive services in integrated community settings

1556. Title II of the ADA provides that "'qualified individual[s] with a disability' may not 'be subjected to discrimination.'" *Olmstead*, 527 U.S. at 602 (quoting 42 U.S.C. § 12132).

1557. People with disabilities are qualified and appropriate for community-based programs, like home and community-based waiver services, for which they meet the essential eligibility requirements. *Olmstead*, 527 U.S. at 602 (qualified individuals are persons with disabilities who "mee[t] the essential eligibility requirements for the receipt of services or the participation in

---

[62]An "informed choice" includes providing adequate, individualized information in a form that accommodates a person's cognitive needs, that is a meaningful choice among actual options that are or can be made available, and with reasonable efforts to accommodate preferences and address barriers that limit such options.

programs or activities provided by a public entity") (quoting 42 U.S.C. § 12131(2)); *DAI II*, 653 F. Supp. 2d at 227 ("[T]he Supreme Court held that a setting is 'appropriate' for individuals if those individuals meet 'the essential eligibility requirements for habilitation in a community based program.'") (quoting *Olmstead*, 527 U.S. at 603).

1558.   Community placement should be considered appropriate when a state is serving persons in the community whose disabilities and support needs are similar to residents of the institution.  *See DAI II*, 653 F. Supp. 2d at 187, 245-46. Similarly, community placement should be considered appropriate when the person previously lived in the community with supports that adequately addressed similar needs. *See, e.g., Radaszewski*, 383 F.3d at 612-13 (Medicaid-eligible person who lived at home with services demonstrated that services were preferred and appropriate for him, making him a qualified individual with a disability); *Townsend*, 328 F.3d at 516 (same).

1559.   Further, a person asserting an *Olmstead* claim need not rely on a public entity's own treatment professionals to determine whether the person is qualified and appropriate to participate in the state's community service system. *See Joseph S.*, 561 F. Supp. 2d at 290-91 (rejecting the argument that the state's treatment professionals must be the ones to make an appropriateness determination); *see also Day v. District of Columbia*, 894 F. Supp. 2d 1, 23-24 (D.D.C. 2012) (recognizing that plaintiffs need not prove the public entity's treatment professionals have determined eligibility for community services and noting that "lower courts have universally rejected the absolutist interpretation proposed by defendants"); *DAI II*, 653 F. Supp. 2d at 258-59 (finding that plaintiffs need not provide determinations from state treatment professionals to demonstrate that they are qualified for community placement and noting that holding otherwise would "eviscerate the integration mandate"); *Frederick L. v. Dep't of Pub. Welfare (Frederick L. I)*, 157 F. Supp. 2d 509, 540 (E.D. Pa. 2001) (finding that states cannot avoid the integration mandate by failing to make

recommendations for community placement); *Long v. Benson*, 2008 WL 4571904, at *2 (N.D. Fla. Oct. 14, 2008) (noting that the right to receive services in the community would become "wholly illusory" if the state could deny the right by refusing to acknowledge the appropriateness of community placement).

1560.   Because Medicaid-eligible people with IDD in nursing facilities are "qualified individuals with disabilit[ies]," and meet the essential eligibility criteria of the State's long-term service system for people with IDD, the rights and protections of Title II of the ADA apply to them. *See* 42 U.S.C. § 12131(2). Medicaid-eligible individuals with IDD who meet the requisite institutional level of care (nursing facilities and/or Intermediate Care Facilities for Individuals with Intellectual and Developmental Disabilities (ICF/IID)) necessarily meet the essential eligibility criteria of the State's long-term care services system for people with IDD, including the State's Home and Community-based Services (HCS) waiver program, and are therefore qualified and appropriate for those programs. *See* 26 Tex. Admin. Code § 263.101 (2023); *see also Grooms*, 563 F. Supp. 2d at 848, 850-51 (denying summary judgment and finding that plaintiff was qualified under the ADA where he had severe, long-term disabilities, he was Medicaid-eligible, and he was at risk of being placed in a medical institution). Finally, Medicaid-eligible people with IDD who live in nursing facilities in Texas have similar needs to those already served in the State's community service system and many have previously lived in the community with similar needs. Accordingly, such individuals with IDD in or at serious risk of entering nursing facilities in Texas are appropriate for community placement.

C.    Nursing Facilities are institutions that segregate people with IDD from the community

1561.   Nursing facilities are, by definition, segregated institutions. *See* 42 U.S.C. § 1395i-3(a) (defining skilled nursing facilities as institutions); Docket no. 143, ¶ 50 ("The State of Texas admits

that most nursing facilities are institutions . . .”); *see also Doe*, 501 F.3d at 351 (discussing level of care needed to reside in “an institution like a nursing home”); *Radaszewski*, 383 F.3d at 601-02, 610 (discussing “an institutional setting – whether it be a nursing home facility, a hospital, or another type of care facility”); *Fisher*, 335 F.3d at 1181-82, 1184-85 (people at risk of entering nursing facilities were at risk of entering segregated institutions); *Thorpe v. District of Columbia*, 303 F.R.D. 120, 126 (D.D.C. 2014) (“. . . an institution (e.g., a nursing facility)”); *Cruz v. Dudek*, 2010 WL 4284955, at *16 (S.D. Fla. Oct. 12, 2010) (noting the high expense of providing “institutional care in a nursing home”).

1562.   Nursing facilities in Texas are hospital-like settings that congregate people with disabilities and isolate and segregate people with IDD from their families, peers, and communities. Texas nursing facilities meet the ADA and *Olmstead* criteria for segregated settings.

1563.   Texas nursing facilities are not integrated settings that “enable[] individuals with disabilities to interact with nondisabled persons to the fullest extent possible.” 28 C.F.R. pt. 35, App. B; *see also* Docket no. 143, ¶ 50 (“The State of Texas admits that most nursing facilities . . . are not at all times integrated settings.”).

D.     People with IDD and their guardians do not oppose receiving services in integrated settings

1564.   The ADA prohibits Texas from discriminating against people on the basis of disability, which in turn requires Texas to provide integrated, community services to qualified and appropriate individuals with disabilities who do not oppose such services. *See* 42 U.S.C. § 12132 (“[N]o qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any such entity.”); 28 C.F.R. § 35.130(d) (“A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.”); *Olmstead*, 527 U.S. at 600 (recognizing that “unjustified institutional

isolation of persons with disabilities is a form of discrimination").

1565.    Services for qualified individuals with IDD should therefore be provided in community settings where appropriate, unless the affected person knowingly opposes receiving services in the most integrated setting. *See Olmstead*, 527 U.S. at 607 (where "the affected persons do not oppose" community-based treatment, Title II of the ADA requires that states provide qualified individuals that option); 42 U.S.C. § 12201(d) ("Nothing in this Act shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit which such individual chooses not to accept."); *see also* 28 C.F.R. § 35.130(d), (e)(1) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" [but] "[n]othing in this part shall be construed to require an individual with a disability to accept [the protections] under the ADA or this part which such individual chooses not to accept."); *Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 379; *Frederick L. v. Dep't of Pub. Welfare (Frederick L. II)*, 364 F.3d 487, 492 (3d Cir. 2004); *DAI I*, 598 F. Supp. 2d at 320; *Messier*, 562 F. Supp. 2d at 337-38.

1566.    People with disabilities, their family members, or their guardians, who express an interest in transitioning to community settings cannot be said to oppose placement in such settings. *See, e.g.*, *Olmstead*, 527 U.S. at 602-03 (plaintiffs desired a community placement). Evidence that people likely would not oppose community services if provided adequate, individualized information about community services also indicates non-opposition to community-based services. *See, e.g.*, DAI II, 653 F. Supp. 2d at 260-67 (finding that plaintiffs were not opposed to community services where (1) residents had little or no choice about moving into the institutional setting, (2) many were uninformed about their options, (3) about half had "expressed an interest" in community settings, and (4) many residents, with "accurate information and a meaningful choice" would choose to

receive services in an integrated setting); *Messier*, 562 F. Supp. 2d at 332-34, 339-42 (finding that plaintiffs were not opposed to community services where a survey reflected mixed and various expressions of "interest" by guardians in community placement and an enhanced choice process included guardian statements that they would consider community placement if it met their ward's needs).

1567.    In determining whether people with disabilities who do not affirmatively request community placement oppose community placement, it is relevant whether the person had the opportunity to make an informed choice to live in the segregated setting. *See Messier*, 562 F. Supp. 2d at 337-42, 342 (rejecting the state's use of responses to a general and ambiguous survey question to exclude residents of a large institution from consideration for a community placement where responses were given without the benefit of adequate information about community placement and explaining that defendants cannot establish compliance with the integration mandate by showing that class members never affirmatively requested community placement); *DAI II*, 653 F. Supp. 2d at 260-67 (finding that plaintiffs were not opposed to living in more integrated setting where there was "convincing evidence that many would choose to live in [a community setting] if given an informed choice" and explaining that for people who had been institutionalized for a long time, it was common to be fearful, reluctant, or ambivalent about transition without additional assistance). Where people with disabilities or their guardians do not express a preference concerning community placement, they cannot be said to oppose community placement. *See* 28 C.F.R. § 35.130(d), (e)(1); *Messier*, 562 F. Supp. 2d at 337-38 ("The Supreme Court's reasoning in *Olmstead* makes it clear that a state must do more than wait until the residents of its facilities have affirmatively asked to be placed in the

state's integrated residential settings"); *DAI II*, 653 F. Supp. 2d at 260-67.[63]

1568.    In order to determine whether a person prefers to enter or remain in a segregated setting, a
state must do more than wait for a person to affirmatively request community placement. Courts
have recognized the importance of educating even non-disabled guardians and family members about
community placement options and providing "concrete options for placement" rather than an
"abstract possibility that [the person] could live in a more integrated setting." *Messier*, 562 F. Supp.
2d at 333-34, 337, 339-42 (finding that even where the process provided quarterly assessments at
which guardians could check "yes" or "no" when asked if they wanted the state to "actively pursue"
community placement, defendants' procedure was not in compliance with the ADA because the
interdisciplinary teams were permitted to refrain from considering community placement if the
guardian checked "no," depriving guardians of the opportunity to consider such placement, and
because evidence indicated that some guardians were "not familiar with what resources would be
available"); *see also Frederick L. I*, 157 F. Supp. 2d at 540 (finding that states cannot avoid the
integration mandate by failing to make recommendations for community placement); *cf.* 42 U.S.C.
§ 12201(d) (indicating that a person with a disability need not accept an accommodation, which
necessarily must first be made available); 28 C.F.R. § 35.130(d), (e)(1) (same).

1569.    While people with disabilities or their guardians may knowingly decline community services,
*see Olmstead*, 527 U.S. at 602, the state must offer appropriate services to people, consistent with
their preferences, and provide sufficient, individualized information and opportunities in order to
allow them to make an informed choice concerning whether to remain in – or, for those facing

---

[63]Texas law also embodies a preference for community placement, for example, when it requires
guardians to consider the most integrated setting for the person. *See*, *e.g.*, TEX. HEALTH & SAFETY CODE §
592.013 ("Each person with an intellectual disability has the right to live in the least restrictive setting
appropriate to the person's individual needs and abilities and in a variety of living situations . . ."); TEX.
ESTATES CODE § 1151.351(b)(4) (people under guardianship have the right to reside and receive support
services in the most integrated setting, including home-based or other community-based settings, as required
by Title II of the ADA).

admission, whether to enter – a segregated setting. Allowing people with disabilities and their guardians to make an informed choice necessarily includes providing sufficient individualized information and opportunities to ensure they understand the options available to them. *See, e.g., Messier*, 562 F. Supp. 2d at 337-39, 340-42 (finding that defendants should have given individuals and their guardians opportunity to consider community placement prior to determining that they had declined transition to the community).

1570.   When the State fails to periodically give residents of institutions sufficient, individualized information about community services, a prior indication that they prefer to remain in the facility does not necessarily mean they knowingly "oppose" community placement for purposes of *Olmstead*. When people with disabilities and their guardians have not received sufficient individualized information and opportunities, consistent with professional standards and practices for informed choice, to explore community living, they cannot be found to knowingly oppose that option. *See DAI II*, 653 F. Supp. 2d at 260-67 (relying on evidence of lack of choice in moving into an adult care home, evidence of lack of information about alternative housing options, and evidence that "with accurate information and a meaningful choice, many Adult Home residents would choose to live and receive services in a more integrated setting, such as supported housing" to determine that plaintiffs satisfied the *Olmstead* do not oppose prong); *see also Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 270 n.6 (D.N.H. 2013) ("[T]he *meaningful* exercise of a preference will be possible only *if* an adequate array of community services are available to those who do not need institutionalization, . . . and preferences may be 'conditioned by availability, . . . limited by information, and are likely to evolve in a system that complies with the ADA.'") (emphases in original); *In re District of Columbia*, 792 F.3d 96, 100 (D.C. Cir. 2015) (lack of transition services, including information regarding community alternatives to institutionalization,

could form basis for *Olmstead* claim); *Messier*, 562 F. Supp. 2d at 340-42 (finding some guardians were still "not familiar with what resources would be available" and documentation showed guardian statements that were ambivalent or undecided even after state enhanced its interdisciplinary team process to include a "quarterly assessment of choice," and concluding that process remained inadequate under ADA).

1571.  Ensuring that people with disabilities and their guardians can make an informed choice whether to enter or remain in a segregated facility includes offering particular community options, and ensuring the person has appropriate opportunities to understand what community services and activities involve, before a determination can be made that such people "oppose" that option and knowingly choose to enter or remain in a segregated facility. *See In re District of Columbia*, 792 F.3d at 100; *Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS*, 293 F.R.D. at 270 n.6; *see also Messier*, 562 F. Supp. 2d at 333-34, 340-42 (describing the importance of providing a process that enables guardians to make an informed decision about whether to transition people with IDD to the community, including continued provision of "concrete" options, education, and assessment of the person's needs in the community, even where a guardian responds "no" when asked if they would like to actively pursue transition); *DAI II*, 653 F. Supp. 2d at 260-67.

1572.  These requirements are heightened when people have disabilities that require accommodations that are necessary to enable them to make an informed choice – particularly disabilities like IDD that limit both the ability to understand and to make choices – and they do not have guardians. Ensuring people with disabilities can make an informed choice also requires that Texas reasonably accommodate their disabilities by providing individualized information about community placement and opportunities to understand community living options, consistent with professional standards and practices.

1573.   In providing "notice concerning benefits or services or written material concerning waivers of rights or consent to treatment," Texas is required to "take such steps as are necessary to ensure that qualified persons with disabilities, including those with impaired sensory or speaking skills, are not denied effective notice because of their handicap." 45 C.F.R. § 84.52(b).

1574.   Where the state fails to make adequate and appropriate community services available for a person, a person's alleged "choice" to enter an institution or to remain institutionalized does not constitute a meaningful choice to "oppose" community services as contemplated by *Olmstead* or the ADA's integration mandate. *See, e.g., Olmstead*, 527 U.S. at 593, 603 (plaintiff EW refused discharge from institutional setting to an inappropriate setting – a homeless shelter – and remained institutionalized; the Court held that EW did not oppose community integration); *Messier*, 562 F. Supp. 2d at 331, 342 (considering the actual availability of placement opportunities as relevant evidence to determining whether guardians had made an informed choice to oppose community placement).

1575.   As Congress expressly noted in its Findings, a central purpose of the ADA is to redress the historical isolation and segregation of people with disabilities and to prevent their unnecessary institutionalization. *See* 42 U.S.C. § 12101(a)(2)-(3). Congress also expressed that people with disabilities should be entitled to the same legal protections as other individuals who experience discrimination. *Id.* at § 12101(a)(4)-(8).

1576.   Additionally, as discussed above, under the ADA, people with disabilities have the right to live and receive services in the most integrated setting appropriate, which is a setting that allows people with disabilities to interact with their non-disabled peers to the fullest extent possible. *Olmstead*, 527 U.S. at 592 (citing 28 C.F.R. pt. 35, App. A, p. 450 (1998)). Consistent with courts' decisions in a variety of other contexts, before the Court can determine that people with IDD

knowingly oppose community placement, the State must have provided them with sufficient, individualized information and opportunities in order to allow them to make an informed decision whether to relinquish their right to live and receive services in the community, where appropriate, and to interact with non-disabled peers.

1577.   It is well established in ADA cases that a state has an affirmative duty to provide reasonable accommodations and effective communications to ensure that people with IDD do not improperly or unknowingly waive their rights and to ensure them an equal opportunity to participate in services and procedures. *See*, *e.g.*, *Clark*, 739 F. Supp. 2d at 1185-86 (explaining that "[m]any developmentally disabled prisoners have impaired communication skills" and "are unable to read and write. They have difficulty understanding instructions, especially multi-step instructions, and difficulty with any task that requires writing, such as filling out requests for medical or mental health care and grievances. It is difficult for them to express themselves, and they often need assistance choosing words to make their point. As a result, developmentally disabled prisoners often have difficulty communicating, self-advocating, and understanding what takes place during prison administrative proceedings and grievance processes. They are therefore at risk for unintentionally waiving their rights.") (citations omitted); *Hahn ex rel. Barta v. Linn Cty.*, 130 F. Supp. 2d 1036, 1047-48 (N.D. Iowa 2001) (denying county's motion for summary judgment where plaintiff with developmental disability sought facilitated communication as a reasonable accommodation to participate in county's developmental disability services). Courts have recognized a right to informed consent for persons who do not have IDD. *See*, *e.g.*, *Pabon v. Wright*, 459 F.3d 241, 246, 249 (2d Cir. 2006) (right to refuse medical treatment "carries with it a concomitant right to such information as a reasonable patient would deem necessary to make an informed decision regarding medical treatment," including "knowledge of the risks or consequences that a particular treatment entails");

*see also White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990) (prisoners have right to make an informed choice whether to accept medical treatment and to receive information about any available viable treatment alternatives). Individuals with IDD are entitled to no less, and effective communication is key to ensuring that they do not improperly or unknowingly waive their rights.

1578.  For people with intellectual disabilities, whose needs place them at heightened risk of unintentionally waiving their rights, reasonable accommodations include going beyond simply telling them that a service is available, and requires providing appropriate assistance to access that service, using effective communication, and otherwise ensuring that they understand what the services and processes entail. *See Clark*, 739 F. Supp. 2d at 1179 (holding that, because many people with intellectual disabilities have impaired communication skills, difficulty understanding instructions, expressing themselves, and self-advocating, "'[i]t is not enough simply to say the books are there, when the plaintiffs contend that they do not have the assistance necessary to use the books properly'" and "[o]nly through effective communication can defendants guarantee that developmentally disabled [persons] have meaningful access . . .") (*quoting Cruz v. Hauck*, 627 F.2d 710, 720 (5th Cir. 1980); *Bonner v. Lewis*, 857 F.2d 559, 562 (9th Cir. 1988) (deaf persons are entitled to interpreters); *accord Armstrong v. Davis*, 1999 WL 35799705, at *7 (N.D. Cal. Dec. 22, 1999) ("Individuals with mental retardation often are passive and dependent, and may easily acquiesce to authority."); *cf. Folkerts v. City of Waverly*, 707 F.3d 975, 983-84 (8th Cir. 2013) (police officer fulfilled duty under ADA to accommodate suspect with intellectual disabilities when officer "altered his questioning style, more fully explained the Miranda rights, interviewed [the person] in a less intimidating room, drove [the person] to his parents' home and explained the situation to them, and arranged alternative and friendlier booking procedures"). Similarly, the State must affirmatively provide people with IDD in nursing facilities with individualized information and accommodations to ensure they understand

the services available to them and to avoid "unintentionally waiving" their rights under *Olmstead* to live in an integrated setting.

1579.   Plaintiffs and the United States have satisfied *Olmstead*'s requirement to show that people with IDD are qualified and appropriate for community placement and that they "do not oppose" community placement. Many people with IDD in and at serious risk of entering Texas nursing facilities have not made an informed choice to enter or remain in a segregated nursing facility. That is, many such people with IDD have not been provided sufficient individualized information and accommodations to understand community living options, they have not been provided appropriate identification, screening, and evaluation, they have not been provided services that allow them to experience community activities, they have not been offered appropriate services to meet their needs in the community, and/or they have not otherwise made an informed choice to enter or remain in a segregated nursing facility. The evidence shows that many people with IDD in nursing facilities have expressed an interest in living in the community or an interest in learning more about the community, and that many more would not oppose living in the community if given sufficient information and opportunities to understand their options.

E.     The State can reasonably accommodate the relief sought and that relief will not fundamentally alter Texas' service system

1580.   The final prong to demonstrate an *Olmstead* violation is to show that the state can reasonably accommodate placement in the community. *Olmstead*, 527 U.S. at 607.

1581.   The ADA requires that public entities make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, including the unnecessary segregation or institutionalization of people with disabilities, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program, or activity.   28 C.F.R. § 35.130(b)(7); *see also Olmstead*, 527 U.S. at 597 (holding that

unjustified isolation is discrimination).

1582.   A plaintiff may meet its burden of showing that a modification is reasonable through a *prima facie* showing, by suggesting the existence of a plausible accommodation. *See Harrison*, 103 F.4th at 1139 (determining whether *Olmstead* accommodation is reasonable requires more than just a marginal cost comparison between community-based care and institutionalization); *Frederick L. II*, 364 F.3d at 492 n.4 (plaintiff has burden of "articulating a reasonable accommodation" that would allow institutionalized persons with disabilities to move to the community); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) (plaintiff's burden is "not a heavy one" . . . once the plaintiff suggests "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . . she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant") (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)); *United States v. Florida*, 682 F. Supp. 3d 1172, 1236-37 (S.D. Fla. 2023) (same). If the plaintiff makes that showing, then the public entity may assert as an affirmative defense, and bears the burden to prove, that the proposed modification would constitute a "fundamental alteration" of its services, programs, or activities. *Olmstead*, 527 U.S. at 603-06; *Brown*, 928 F.3d at 162-63; *Henrietta D.*, 331 F.3d at 280-81; *Frederick L. II*, 364 F.3d at 492 n.4; *United States v. Florida*, 682 F. Supp. 3d at 1241.

1583.   Although Defendants included a fundamental alteration defense in their answer, they failed to present any evidence to support the defense at trial on the merits.

1584.   Ensuring that the State timely and appropriately identifies and evaluates people with IDD; complies with obligations under federal law to assess whether people's needs could be met in the community service system; arranges services to avoid unnecessary institutionalization; provides people with IDD or their guardians the individualized information, opportunities, and services

necessary to make an informed choice about whether to enter or remain in a nursing facility; provides an appropriate service array and system capacity of community services in integrated settings such that qualified individuals with IDD can safely receive long-term care services at home or in their communities; and conducts effective monitoring, oversight, and training to ensure that its IDD system meets its intended goals constitute a reasonable modification to Texas' system of services for people with IDD and would not be a fundamental alteration of its service system. *See*, *e.g.*, *Steimel*, 823 F.3d at 911, 916-17 (modifications to prevent institutionalization were reasonable; the state "failed to carry [its] burden" – "[i]n fact, it did not even argue" – that a fundamental alteration of the programs was being sought); *Rolland v. Patrick*, 562 F. Supp. 2d 176, 180-81 (D. Mass. 2008) (finding reasonable a plan requiring the state to provide transition services, to include a transition services plan and provide specialized services and active treatment in nursing facilities).

1585.   That a requested modification advances legal mandates, or aligns with the jurisdiction's own policy or with nationally recognized practices, is evidence that the modification is reasonable. *See*, *e.g.*, *Saylor v. Regal Cinemas*, 2016 WL 4721254, at *19 (D. Md. Sept. 9, 2016) (modification was consistent with national policy).

1586.   It is reasonable for Texas to modify its policies, procedures, and practices to enable people to make an informed choice about whether to enter, or remain in, a nursing facility in order to avoid unnecessary segregation.

1587.   Texas is required by CMS to provide information and opportunities to beneficiaries in its Medicaid-funded institutional and community programs through person-centered planning processes that "[p]rovide[] necessary information and support to ensure that the individual directs the process to the maximum extent possible, and is enabled to make informed choices and decisions." 42 C.F.R. § 441.725. Conforming the State's practices to its existing obligations is inherently reasonable.

1588.   Regardless of setting, the requirements for informed choice in the person-centered planning processes ensure that people are provided with individualized information, opportunities, and support necessary to allow people with IDD to make an informed choice. 42 C.F.R. § 441.301(c) (HCBS waivers) (requiring that the person-centered planning process "[p]rovides necessary information and support to ensure that the individual directs the process to the maximum extent possible, and is enabled to make informed choices and decisions," "[o]ffers informed choices to the individual regarding the services and supports they receive and from whom," and "[r]ecords the alternative home and community-based settings that were considered by the individual"); 42 C.F.R. § 441.530(a)(1)(ii), (iv)-(v) (CFC) (services and supports must be made available in a setting that "is selected by the individual," "[f]acilitates individual choice regarding services and supports, and who provides them," and "[o]ptimizes but does not regiment individual initiative, autonomy, and independence in making life choices, including but not limited to, daily activities, physical environment, and with whom to interact"); 42 C.F.R. § 483.10(c)(1)-(5) (nursing facilities) (right to participate in the development of a person-centered plan of care).

1589.   National standards and Texas' own policies underscore the importance of providing informed choice to people with IDD and indicate that providing such choice is a reasonable modification and would not fundamentally alter Texas' system.

1590.   These reasonable modifications to Texas' program, which are necessary to comply with the ADA and reflect accepted professional standards for allowing people with IDD and their guardians to make an informed choice whether to enter or remain in a segregated setting would include ensuring that persons with IDD receive individualized information about community living and opportunities to experience community settings:

      a.     that are tailored to their ability to understand and to their cognitive and other

disabilities, *see* 28 C.F.R. § 35.160(a) (requiring public entities to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others");

b.     that address their fears, concerns, prior experiences, or barriers to living in the community;

c.     that include individualized opportunities to engage in community activities, to spend time with non-disabled peers, to visit community programs, to meet providers of community services, and to hear from families and peers about community living; and

d.     that address the impact of institutionalization on the lives, experiences, and options of people with IDD who have been in nursing facilities for many years.

1591.   It is reasonable for Texas to modify its policies, procedures and practices to divert people with IDD from being segregated in nursing facilities. National standards and Texas policy and planning documents underscore the importance of diversion in preventing unnecessary segregation.

1592.   It is reasonable for Texas to modify its policies, procedures, and practices to ensure an appropriate service array and system capacity, in order to provide sufficient community services and timely access to those services to enable people with IDD to live in the most integrated setting appropriate to their needs.

1593.   It is reasonable for Texas to modify its policies, procedures, and practices to conduct effective monitoring, oversight, and training to ensure that its IDD system meets its intended goals.

1594.   Because Texas can reasonably modify its system to accommodate the relief being sought, Plaintiffs and the United States have met their burden in proving a violation of Title II of the ADA.

461

1595.   Once a plaintiff sets out a prima facie case, a public entity may raise an affirmative defense that the proposed modification would constitute a "fundamental alteration" of its services, programs, or activities. *Olmstead*, 527 U.S. at 604; *Henrietta D.*, 331 F.3d at 280-81. As previously noted, Texas did not avail itself of the opportunity to put forward a fundamental alternation defense.

1596.   When a state already offers community services to some people with IDD, as Texas does here, providing those same services to additional people with IDD is not a fundamental alteration. *See* DAI I, 598 F. Supp. 2d at 335-36 ("Where individuals with disabilities seek to receive services in a more integrated setting – and the state already provides services to others with disabilities in that setting – assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'"); *Townsend*, 328 F.3d at 518-19 ("*Olmstead* did not regard the transfer of services to a community setting, without more, as a fundamental alteration. Indeed, such a broad reading of fundamental alteration regulation would render the protection against isolation of the disabled substanceless.").

1597.   Although a State can raise a fundamental alteration defense, to do so, it must prove that it has a "comprehensive, effectively working plan for placing qualified persons with . . . disabilities in less restrictive settings." *Frederick L. v. Dep't of Pub. Welfare of Pa. (Frederick L. III)*, 422 F.3d 151, 155-59 (3d Cir. 2005).

1598.   "[T]here is wide-spread agreement that one essential component of an 'effectively working' plan is a measurable commitment to deinstitutionalization." *Day*, 894 F. Supp. 2d at 28 (citing, *inter alia*, *Frederick L. III*, 422 F.3d at 157; *Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 381; *Williams v. Quinn*, 748 F. Supp. 2d 892, 897-98 (N.D. Ill. 2010)). An effectively working plan is one that includes and implements specific and measurable goals for community placement by a target date. *Frederick L. III*, 422 F.3d at 157; *Day*, 894 F. Supp. 2d at 28-29.

1599.   A key inquiry for whether a jurisdiction has an effectively working plan is whether it actually moves people to integrated settings and reduces the number of institutionalized people. *Day*, 894 F. Supp. 2d at 28-29 (finding that the defendant had not demonstrated a measurable commitment to deinstitutionalization based on the negligible decrease in the nursing facility population); *Jensen v. Minn. Dep't of Human Servs.*, 138 F. Supp. 3d 1068, 1071 (D. Minn. 2015) ("Vague assurances of future integrated options is insufficient; to be effective, [an] *Olmstead* Plan must demonstrate success in actually moving individuals to integrated settings in furtherance of the goals."); *see also Frederick L. III*, 422 F.3d at 157 (an effective plan must "demonstrate[] a reasonably specific and measurable commitment to deinstitutionalization for which [the State] may be held accountable").

1600.   Factors relevant to whether a state has a comprehensive, effectively working plan include whether the plan has "reasonably specific and measurable targets for community placement," including goals, benchmarks, and time frames for which the entity can be held accountable. *Frederick L. III*, 422 F.3d at 157-59 (rejecting a state's proffered *Olmstead* plan that did not have such specific and measurable targets where plan included closing "*up to* 250 [institutional] beds a year," and noting that "[g]eneral assurances and good-faith intentions neither meet the federal laws nor a patient's expectations. Their implementation may change with each administration or Secretary of Welfare, regardless of how genuine; they are simply insufficient guarantors in light of the hardship daily inflicted upon patients through unnecessary and indefinite institutionalization.") (emphasis in original); *see also Frederick L. II*, 364 F.3d at 500-01 ("it [is] unrealistic (or unduly optimistic) [to] assum[e] past progress is a reliable prediction of future programs."); *Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 383-85 ("routine, individualized review of patients does not amount to a sufficient deinstitutionalization plan" and provides "no evidence of a commitment" to comply "with the integration mandate of the ADA and RA"); *Jensen*, 138 F. Supp. 3d at 1071-74 (*Olmstead* Plan

"must contain concrete, reliable, and realistic commitments, accompanied by specific and reasonable timetables, for which the public agencies will be held accountable" and approving plan where there was "concrete baseline data and specific time lines to establish measurable goals," where goals were "not only measurable, but strategically tailored to make a significant impact in the lives of individuals with disabilities across the state," and where the state "provides a rationale for each of the metrics used, explains why each metric was chosen, and explains how each metric will adequately reflect improvement over time").

1601. To have an effectively working *Olmstead* Plan, a public entity must plan for the deinstitutionalization of specific groups of people in particular institutions. *Frederick L. III*, 422 F.3d at 158-59 (holding that the public entity could not succeed on a fundamental alteration defense when it did not articulate "when, if ever, eligible patients at [a particular institution] can expect to be discharged"); *cf. Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 383-85 (holding that a fundamental alteration defense failed when the particular population at issue was excluded from the *Olmstead* planning process). In addition, a public entity's *Olmstead* Plan should track transitions of particular groups of people who are unnecessarily segregated, such as people residing in nursing facilities, and an effective Plan should demonstrate actual reductions of those groups. *See*, *e.g.*, *Day*, 894 F. Supp. 2d at 28-29 (considering the number of people with disabilities who transitioned from nursing facilities in assessing the effectiveness of jurisdiction's *Olmstead* Plan where putative class was people with disabilities housed in nursing facilities).

1602. In addition, to demonstrate that a Plan is comprehensive and effectively working, a jurisdiction "must prioritize its allocation of funding to meet and achieve the *Olmstead* Plan's goals. The State may not rely on the excuse of insufficient funding to avoid following through on the important commitments it has made in [its] *Olmstead* Plan." *Jensen*, 138 F. Supp. 3d at 1074. As the

Third Circuit has held, "budgetary constraints alone are insufficient to establish a fundamental alteration defense." *Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 380; *see also M.R. v. Dreyfus*, 663 F.3d 1100, 1118-19 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir. 2012) (same); *Fredrick L. II*, 364 F.3d at 495; *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 995 (N.D. Ca. 2010) (rejecting defendants' justification of termination of adult day healthcare services placing plaintiffs at serious risk of institutionalization in skilled nursing facilities due to severe state budget cuts).

1603.   A comprehensive, effectively working plan is a necessary component of a successful fundamental alteration defense. Texas has failed to meet its burden to prove that it has such a plan or that its plan is effectively working for people with IDD in nursing facilities. Texas' "failure to articulate [its] commitment in the form of an adequately specific comprehensive plan for placing eligible [people] in community-based programs by a target date places the 'fundamental alteration defense' beyond its reach." *See Frederick L. III*, 422 F.3d at 158-59; *Pa. Prot. & Advocacy, Inc.*, 402 F.3d at 381-82; *Hampe v. Hamos*, 917 F. Supp. 2d 805, 821-22 (N.D. Ill. 2013).

F.   Texas uses methods to administer its services system that discriminate against people with IDD

1604.   Methods of administration, such as those utilized by Texas, "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination," 28 C.F.R. § 35.130(b)(3), including the exclusion of people with IDD from access to the services and supports that they need to reside in integrated, community settings, violate 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(3) and (d), and *Olmstead*, 527 U.S. at 607.

1605.   Methods of administration of programs, such as those utilized by Texas, that provide habilitation and support to enable people with IDD to live in community settings, but preclude or limit transition and cause such services to be largely unavailable to people in nursing facilities who have IDD and complex medical needs, violates 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(3) and (d),

and *Olmstead*, 527 U.S. at 607. *See Kathleen S.*, 10 F. Supp. 2d at 471 (finding violation of ADA by state defendants whose methods of administration at state institution caused eighty-eight people to be unnecessarily segregated in the hospital even though a community placement was the most integrated setting appropriate to their needs).

1606.    Policies and practices, such as those of Texas, that preclude or limit the ability of people with IDD and complex medical needs to transition from a nursing facility to the community by restricting the "level of need" (LON) assignment available to them violate 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(3) and (d), and *Olmstead*, 527 U.S. at 607.

1607.    The State's failure to adopt methods of administration of its IDD system that are necessary to enable people with IDD to live in the most integrated setting appropriate, including failures to (a) conduct regular or ongoing analyses of the adequacy, sufficiency, and availability of residential, day, therapy, and specialized providers and support services, and to effectively identify any service gaps or deficiencies that impede the prompt diversion or transition of people with IDD from nursing facilities; (b) develop and implement a plan to effectively address service gaps that impede the prompt diversion or transition of people with IDD from nursing facilities; (c) develop additional provider capacity and support to meet the needs of qualified individuals with IDD in, or at serious risk of entering, nursing facilities, including the needs of qualified individuals with IDD in rural areas and all counties, and the needs of qualified individuals with IDD with complex medical and/or behavioral conditions; and (d) require or otherwise ensure that HCS providers continue serving people with IDD who are temporarily in hospitals or nursing facilities, violates 42 U.S.C. § 12132 and 12201(d), 28 C.F.R. § 35.130(b)(3), (d), and (e)(1), and *Olmstead*, 527 U.S. at 607.

1608.    The State's failure to adopt methods of administration of its IDD system that are necessary to enable people with IDD in or at serious risk of entering nursing facilities to make an informed

466

choice of whether to enter or remain in a segregated setting or to transition to an integrated setting in the community violates 42 U.S.C. § 12132 and 12201(d), 28 C.F.R. § 35.130(b)(3), (b)(7), (d), and (e)(1), and *Olmstead*, 527 U.S. at 607. *See Conn. Office of Prot. & Advocacy for Persons with Disabilities*, 706 F. Supp. 2d at 277-78 (plaintiffs adequately stated a violation of the ADA where defendants' methods of administration failed to adequately provide people with disabilities in nursing facilities information regarding the availability of alternatives to nursing facility care, thereby denying them the right to choose to live in the community instead of an institution).

1609.    The State's PASRR screening and evaluation program limits its diversion resources to as few as three percent of all people with IDD who are referred for admission to nursing facilities and engages in a method of administering its Medicaid institutional and community service waiver programs that results in unnecessary institutionalization of people with IDD in nursing facilities, in violation of the ADA. *See Dunakin*, 99 F. Supp. 3d at 1320 (the allegation that defendants implement PASRR processes in a manner that perpetuates unnecessary institutionalization is sufficient to state a claim under the ADA); *see also Conn. Ofc. of Prot. & Advocacy for Persons with Disabilities*, 706 F. Supp. 2d at 277-78 (plaintiffs adequately stated a violation of the ADA where defendants' methods of administration failed to adequately assess and identify the long-term needs of people with disabilities in nursing facilities, in order to determine whether they could be served in the community); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1151, 1175-76 (N.D. Ca. 2009) (holding that plaintiffs were likely to succeed on the merits of their claim that defendants violated the ADA where defendants' methods of administration resulted in cutting funding to community-based day services and placing adults with disabilities at serious risk of institutionalization).

1610.    Texas administers its service planning policies and practices for people with IDD in nursing facilities in a manner that denies transition planning to all people who do not affirmatively request

to transition to the community and subjects them to unnecessary institutionalization, in violation of 42 U.S.C. § 12132, 28 C.F.R. § 35.130(b)(3) and (d), and *Olmstead*, 527 U.S. at 607. *Cf. Kathleen S.*, 10 F. Supp. 2d at 471 (holding that defendants used discriminatory methods of administration by failing to timely initiate plans to transition people with mental disabilities from the state hospital to the community).

1611.   People with IDD in nursing facilities could reside in integrated, community settings if they were able to access the full array of community programs, services, treatment, and supports that Defendants provide for other people with IDD and if Texas revised its diversion and transition policies and practices.

XVIII.

Texas violates the anti-discrimination provisions of Section 504 of the Rehabilitation Act

1612.   Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794(a), is a disability anti-discrimination statute that applies to recipients of federal funds.

1613.   Courts typically consider ADA and Section 504 claims together because the analysis for the claims is very similar. *See Frame v. City of Arlington*, 657 F.3d 215, 223-24 (5th Cir. 2011) ("The ADA and the Rehabilitation Act generally are interpreted *in pari materia*. Indeed, Congress has instructed courts that 'nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to such title.'"); *see also Kemp v. Holder*, 610 F.3d 231, 234-35 (5th Cir. 2010); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287-88 & n.76 (5th Cir. 2005) (en banc). Accordingly, the conclusions of law regarding Title II of the ADA apply equally to the Plaintiffs' and the United States' Section 504 claims.

1614.   Where a defendant receives federal financial assistance to operate its IDD system, it is subject

to the requirements and obligations of Section 504. 28 C.F.R. § 41.51(a).

1615.  Section 504 and accompanying regulations mandate that "Recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

1616.  Recipients of federal financial assistance are prohibited from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap." 28 C.F.R. § 41.51(b)(3)(i); 45 C.F.R. § 84.52(a).

1617.  By planning, administering, funding, and operating an IDD service system that: (1) results in the unnecessary admission and retention of people with IDD to nursing facilities; (2) limits opportunities for people with IDD to transition out of nursing facilities; (3) fails to provide people with IDD or their guardians with individualized information, opportunities, and supports necessary to allow them to make an informed choice about whether to enter or remain in a segregated nursing facility; (4) denies timely and meaningful access to community programs; and (5) requires that people with IDD be confined in segregated institutional settings in order to receive needed services, Defendants violate Section 504. 29 U.S.C. § 794(a).

1618.  Defendants' criteria and methods of administering their system of long-term services for persons with IDD, including their home and community-based services waivers, subject individuals to illegal discrimination in the form of unnecessary segregation in violation of Section 504 and its implementing regulations.

XIX.

Declaratory and injunctive relief is warranted

1619.  Declaratory relief is appropriate both to resolve disputed legal rights as well as to determine that such rights were violated by Defendants' past conduct. *See Richards Grp., Inc. v. Brock*, 2008

WL 2787899, at *4-5 (N.D. Tex. July 18, 2008) (under the Declaratory Judgment Act, courts "may declare the rights and other legal relations of any interested party seeking such declaration," and have "broad discretion" to do so) (quoting 28 U.S.C. § 2201) (internal quotation marks omitted); *see also Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991) ("Declaratory relief is a matter of district court discretion"). Plaintiffs and the United States are entitled to declaratory relief as requested.

1620.   Based on the evidence, and consistent with the findings and conclusions herein, the Court declares the rights of individuals with IDD, the State's obligations to uphold them, and the State's violation of those rights under the NHRA's PASRR requirements, including the failure to provide active treatment to people with IDD in nursing facilities, enforceable under 42 U.S.C.§ 1983; the Reasonable Promptness and Freedom of Choice provisions of the Medicaid Act, enforceable under 42 U.S.C. § 1983; and the ADA, Section 504 of the Rehabilitation Act, and *Olmstead* for failure to comply with the integration mandate and provide services in the most integrated setting for individuals with IDD who have not made an informed choice to enter or remain in nursing facilities.

1621.   Based on the evidence and the findings and conclusions herein, injunctive relief is also warranted and necessary. Upon finding the State liable for violations of federal law, the Court has the authority to enter a permanent injunction targeted to remedy the violations. Fed.R.Civ.P. 65. "To obtain permanent injunctive relief, a plaintiff must demonstrate: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Plaintiffs and the United States have met this standard and a permanent injunction is well-suited to provide the relief

necessary in this case.

1622.  Texas' actions have caused irreparable injury to people with IDD who are in nursing facilities or at serious risk of being admitted to such facilities. The irreparable injury resulting from Defendants' ongoing refusal and failure to provide people with IDD with preadmission screenings, professionally appropriate assessments of their habilitative needs, specialized services to meet those needs, and active treatment is severe and ongoing. Texas' violation of the integration mandate under the ADA, Section 504, and *Olmstead* has continued unabated, leaving individuals with IDD languishing in nursing facilities for years when they could have been living in a community setting. Even if the State has made some changes since the trial of this case, past conduct has shown a likelihood of future repetition.[64]

1623.  Most people with IDD in nursing facilities, or at serious risk of being admitted to nursing facilities, are qualified and appropriate for receiving services in the community, have not made an informed decision to enter or remain in nursing facilities, and do not oppose receiving services in the community. Although community programs are the most integrated setting appropriate to meet their needs, they remain unnecessarily institutionalized in nursing facilities, or at serious risk of such institutionalization. They are harmed by such institutionalization and deprived of living in a community setting and participating in integrated community programs. *See, e.g., Marlo M. v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010) (finding irreparable harm even if institutionalization were only temporary and recognizing the "regressive consequences" that such placements have on people); *Crabtree v. Goetz*, 2008 WL 5330506, at *25 (M.D. Tenn. Dec. 19,

---

[64]For example, the QSR statewide survey showed some improvement in 2015, but regression in 2016 and 2017. Likewise, the evidence showed diminished use and underutilization of waiver slots, rather than the expected increase. And the State dissolved PIAC, which was responsible for oversight of the State's compliance with *Olmstead*. These actions, among others, do not demonstrate a measurable commitment to PASRR compliance and deinstitutionalization.

2008) (finding that unnecessary institutionalization "would be detrimental to [plaintiffs'] care, causing, *inter alia*, mental depression, and for some Plaintiffs, a shorter life expectancy or death"); *Long v. Benson*, 2008 WL 4571903, at *2 (N.D. Fla. Oct. 14, 2008) (finding irreparable harm where person would be forced to leave his community placement and enter a nursing home and specifically recognizing the "enormous psychological blow" that such placement would cause due to the "very substantial difference in [plaintiff's] perceived quality of life in the apartment as compared to the nursing home, each day he is required to live in the nursing home"); *Cota*, 688 F. Supp. 2d at 997-98 (irreparable harm where thousands of people were placed at risk of institutionalization as a result of changes in eligibility criteria for adult day healthcare due to state budget cuts); *Brantley*, 656 F. Supp. 2d at 1176 (lack of "services [that] are necessary and critical to Plaintiffs' physical and mental well-being" will cause irreparable harm).

1624.   In *Olmstead*, the Supreme Court recognized the harm that results from unnecessary institutionalization: "[C]onfinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Olmstead*, 527 U.S. at 601.  Many people with IDD in nursing facilities remain institutionalized and are being deprived of specialized services and active treatment. Many of these people have suffered regression and deterioration. They need, but are not receiving, specialized services that would allow them to gain skills, become more independent, and function outside of an institution. They are deprived of community and family connections and the opportunity to participate in day-to-day community activities, which constitutes a form of discrimination and segregation.

1625.   In addition, the violation of federal laws enacted to protect the health, safety, welfare, and civil rights of vulnerable people is itself a form of harm. *See, e.g., EEOC v. Cosmair, Inc.*, 821 F.2d

472

1085, 1090 (5th Cir. 1987) ("[W]hen a civil rights statute is violated, 'irreparable injury should be presumed . . . .'"). By planning, administering, funding and operating its long term care service system in a manner that limits access to community programs for people with IDD, requires them to be confined in segregated institutional settings, and then fails to provide specialized services and active treatment in that institutional setting, Texas has caused irreparable harm to these individuals.

1626.   Systemic injunctive relief is warranted for failure to comply with Section 504, Title II of the ADA and *Olmstead* where, as in myriad other types of civil rights cases, a public entity's conduct, such as its failure to provide services in the most integrated setting, is generally applicable to a group of people. *See DAI II*, 653 F. Supp. 2d at 312-14; *Messier*, 562 F. Supp. 2d at 345; *see also In re District of Columbia*, 792 F.3d at 101 (rejecting request for interlocutory review of class certification where *Olmstead* claim could meet test under 23(b)(2) that "final injunctive relief . . . [would be] appropriate respecting the class as a whole"); *A.H.R.*, 2016 WL 98513, at *10-11, 14-19 (granting preliminary injunction where state health care authority failed to "arrange and pay for" sufficient private duty nursing care for group of medically complex children, stating that the authority "has an obligation to provide medically necessary services, such as the private duty nursing services at issue here, in the most integrated setting appropriate to Plaintiffs' needs").

1627.   Systemic injunctive relief for Plaintiffs is also warranted for Texas' failure to comply with the PASRR, promptness, and choice provisions in the Medicaid Act and NHRA, including failure to provide medically necessary treatment and services, which is generally applicable to a group of people. *See Rosie D. v. Romney*, 410 F. Supp. 2d 18, 23 (D. Mass. 2006) (judgment in favor of § 1983 class alleging violation of Medicaid Act for failure to provide adequate in-home services); *Rolland v. Patrick*, 483 F. Supp. 2d at 118-19 (remedial plan for NHRA violations).

1628.   Based on the evidence and the findings and conclusions herein, declaratory and injunctive

relief as requested by Plaintiffs and the United States is warranted to ensure that Texas provides people with IDD an effective diversion program and transition system and services; an informed choice to receive services in integrated settings; an appropriate array and capacity of community services to prevent unnecessary institutionalization; and effective monitoring, oversight, and training to ensure its IDD system meets its goals, as contemplated by *Olmstead* and as required by the ADA and Section 504 of the Rehabilitation Act.

1629. Based on the evidence and the findings and conclusions herein, declaratory and injunctive relief as requested by Plaintiffs is warranted here to ensure that Texas provides individuals with IDD with accurate and appropriate PASRR screenings, evaluations of alternative placements, and the need for specialized services prior to admission to a nursing facility; and comprehensive functional assessments and all needed specialized services that meet the federal standard for active treatment as set forth in 42 C.F.R. § 483.440(a)-(f) for people with IDD in a nursing facility, consistent with the NHRA and Medicaid Act.

1630. All members of the class will benefit from systemic injunctive relief to address and remedy the violations found herein. The scope of the relief granted depends upon the scope of the violation proven at trial. *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

1631. The parties shall to meet and confer up to 45 days from the date below to develop a proposed remedial order. They must submit their proposal to the Court **no later than Friday, August 1, 2025**. The proposed remedial order will address steps Defendants shall take to: (1) ensure that individuals with IDD referred to nursing facilities be accurately identified, appropriately screened, provided services in order to avoid unnecessary institutional placements, and diverted from nursing facility admission whenever appropriate; (2) if admitted to a nursing facility, ensure that all individuals with IDD receive all needed specialized services and a program of active treatment

consistent with federal standards set forth in 42 C.F.R § 483.440(a)-(f); (3) ensure that all individuals with IDD be provided information, opportunities, services, and supports that would allow them to make an informed and meaningful choice whether to enter or remain in a segregated nursing facility; and (4) ensure timely transitions to the State's community service system, with all necessary supports, if they are appropriate for and do not oppose receiving services in an integrated setting.

IT IS ORDERED that judgment will be entered for Plaintiffs and the United States after the entry of a remedial order. The Court will retain jurisdiction over this matter for purposes of entry and enforcement of the permanent injunction.

SIGNED this 17th day of June, 2025.

ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE