**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ERIC STEWARD, *et al.*, | § | |
| *Plaintiffs,* | § | |
| v. | § | |
| | § | |
| CECILE E. YOUNG, in her official capacity | § | |
| as the Executive Commissioner of | § | |
| Texas's Health and Human Services | § | |
| Commission, *et al.,* | § | |
| *Defendants.* | § | |
| | § | **Case No. 5:10-CV-1025-OLG** |
| | § | |
| THE UNITED STATES OF AMERICA, | § | |
| *Plaintiff-Intervenor,* | § | |
| v. | § | |
| | § | |
| THE STATE OF TEXAS | § | |
| *Defendant.* | § | |
| | § | |

**DEFENDANTS' OBJECTIONS TO FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

Defendants Cecile E. Young, in her official capacity as the Executive Commissioner of the
Texas Health and Human Services Commission ("Commissioner") and the State of Texas file these
objections to the Courts' Findings of Fact and Conclusions of Law ("the Findings").

## I.        INTRODUCTION AND OVERVIEW

The Commissioner oversees the largest agency in Texas, the Health and Human Services
Commission ("HHSC"). Plaintiffs filed this class action suit over 15 years ago in connection with
HHSC's administration of treatment for individuals with intellectual or developmental disabilities
("IDD"). On June 17, 2025, nearly seven years after the trial on this matter concluded, the Court
issued the Findings. As described below, HHSC objects to the entry of any findings of fact or
conclusions of law or subsequent remedial order because the stale record in this case prevents the

Court from determining there is an ongoing violation of federal law. Additionally, some of the Findings are not supported by any evidence, while others rely on facts that are outdated or disregard subsequent information provided at the request of the Court in 2022.

## II.     PROCEDURAL POSTURE

Plaintiffs filed their original lawsuit in 2010, alleging the Commissioner[1] violated 1) the integration mandate of the Americans with Disabilities Act ("ADA"), 2) Section 504 of the Rehabilitation Act, 3) Title XIX of the Social Security Act; and 4) the Nursing Home Reform Amendments ("NHRA"). On September 20, 2012, the United States intervened in the lawsuit.

As part of a later terminated Interim Settlement Agreement, the parties negotiated Quality Service Review ("QSR") metrics that would attempt to capture HHSC's success in implementing Preadmission Screening and Resident Review ("PASRR") and related program areas.

Pre-trial fact discovery closed on September 1, 2017. A five-week bench trial began on October 15, 2018. On October 11, 2022, the Court entered a text order, inviting the parties to submit to the Court "any material changes that should be brought to the Court's attention." Plaintiffs served a less than two-page advisory to the Court on November 10, 2022. Dkt. 700. Plaintiffs argued that if there were such material changes to the facts, they could only be considered at the remedial stage of the litigation and there needed to be a reasonable opportunity for discovery. By noting this objection, Plaintiffs, like the Defendants, understood the Court was requesting additional evidence in its October 2022 order. The same day, the Commissioner timely submitted extensive briefing and attached the declarations of the following individuals:

1.     Haley Turner, the Deputy Executive Commissioner of Community Services. Ms. Turner had testified at trial. There were several exhibits attached to Ms. Turner's Declaration. Dkt. 701-1.

---

[1] At the time of the original filing, Chris Taylor was the Commissioner of HHSC. Cecile Erwin Young is the current commissioner.

2.      Anne McGonigle, the Deputy Executive Commissioner of IDD Services and Preadmission Screening and Resident Review ("PASRR"). There were several exhibits attached to Ms. McGonigle's Declaration. Dkt. 701-2.

3.      Judy Southall, Director for the PASRR. Ms. Southall testified at trial, and there were exhibits attached to her declaration. Dkt. 701-3.

4.      Robin Hamilton, a Manager III with the Contract Accountability and Oversight ("CAO"), Access and Intake, Community Services. There were several exhibits attached to Ms. Hamilton's Declaration. Dkt. 701-4.

5.      Michelle Dionne-Vahalik, Associate Commissioner of Long-term Care Regulation. Ms. Dionne-Vahalik testified at trial. Dkt. 701-5.

6.      Chad Pomerleau, Director of IDD Contract Management Unit ("CMU") in the Medical and Social Services Division. There were exhibits attached to Mr. Pomerleau's declaration. Dkt. 701-6.

7.      Kent Allen, the Manager of the PASRR Training Unit for IDD Services. Mr. Allen had testified at trial. Dkt. 701-7.

This advisory detailed HHSC's compliance with federal guidelines regarding the administration of IDD services and treatment across Texas, particularly in the interim since trial. No further activity occurred in the case until June 17, 2025, when the Court issued the Findings. Dkt. 717.

## III.    OBJECTIONS

Defendants object to the entirety of the Findings, as well as specific paragraphs.

### A.    Because they are based on eight-year-old facts, the Findings do not reflect an ongoing violation of federal law.

As stated in Paragraph 0062 of the Findings, the Court chose not to consider facts after September 1, 2017, despite inviting the parties to present any material changes that occurred in the interim in its October 11, 2022, order. By carrying this fact cut-off date forward to June 2025, the Court inexplicably disregarded the material changes in fact HHSC presented to the Court in 2022. *See* Text Order docketed on Oct. 11, 2022, and Dkt. 701. This is error for at least two reasons.

*First*, eight-year-old evidence does not demonstrate the ongoing violation of law necessary to satisfy *Ex parte Young*'s requirements. And *second*, as discussed in Section B, below, many of the paragraphs make findings of fact that were shown by more recent evidence in the record to be no longer accurate and thus cannot support any prospective relief.

As a general matter, HHSC objects to any liability finding or the entry of a remedial order in this matter because it would necessarily be based on an outdated record that cannot reliably establish an ongoing violation of federal law sufficient to trigger application of *Ex parte Young,* 209 U.S. 123 (1908). As stated in Paragraph 0062 of the Findings, the Court chose not to consider facts after September 1, 2017, despite inviting the parties to present any material changes that occurred in the interim in its October 11, 2022, order. *See* Text Order docketed on Oct. 11, 2022, and Dkt. 701.

To enjoin a state official under *Ex parte Young*, there must be an "ongoing violation of federal law." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). Relatedly, any relief sought must be prospective. *Id.* But if there is no longer any ongoing violation of law, *Ex parte Young* does not apply, and no prospective relief can be ordered—because there is no relief necessary. As the Fifth Circuit has explained, "[t]he key is not the type of relief sought but whether the remedy is preventing ongoing violations of federal law as opposed to past ones." *Harrison v. Young*, 48 F.4th 331, 338 (5th Cir. 2022).

Regardless of what was the case eight years ago, the Court cannot conclude based on an eight-year-old record that the State is *currently* violating federal law. *See Webb v. Missouri Pac. R. Co.*, 98 F.3d 1067, 1069 (8th Cir. 1996) ("Even assuming the district court's findings of widespread discrimination are correct, Missouri Pacific's past transgressions will not support an injunction that was not issued until five years after the close of all the evidence."). Reversing a

permanent injunction, the Fifth Circuit held that "[i]njunctive relief is forward looking, and given the Defendants' response, including actions taken on the eve of and during trial, the permanent injunction is not warranted." *Valentine v. Collier*, 993 F.3d 270, 289 (5th Cir. 2021).

The Court, by issuing its ruling nearly eight years after the discovery cut-off, seven years after trial, and three years after the Court requested post-trial submissions, cannot possibly issue findings of fact and conclusions of law that align with *Ex parte Young*. The Court cannot know if there is, in fact, an ongoing violation of federal law that must be enjoined. The Court does not know if the Commissioner and HHSC have been and are at present complying with federal law. If there is no violation, nothing can be enjoined. As detailed through these objections, the Commissioner and HHSC had conformed their conduct to federal law at the time of trial or before the Court requested the post-trial submissions. HHSC respectfully asks the Court to sustain these objections and modify its findings of fact and conclusions of law to reflect the evidence as presented at trial and through the 2022 supplemental briefing, and, where appropriate, allow additional briefing from the parties to ensure the Court has the most current information upon which to base its decision.

### B. Some of the Findings contradict evidence submitted by HHSC at the Court's request in its 2022 advisory.

Numerous Findings are inconsistent with the demonstrated record as it exists post-trial. The following specific objections offer a representative sample of the erroneous findings made by the Court which fail to account for the information provided to the Court in HHSC's 2022 advisory submitted at the Court's request. In relying solely on evidence from on or before September 2017, the Findings are in many instances specifically disproven by evidence presented to the Court in 2022.

HHSC objects to paragraph 310, as it is contradicted by the supplemental documentation submitted in 2022, and in the case of Section D, is contradicted by the evidence submitted at trial. Paragraph 310 states that the PASRR Level 1 Screening ("PL1"), specifically sections D and E, is rarely completed. However, more current evidence indicates Sections E and D of the PL1 are completed as required and intended. They are required sections on the PL1, and the portal will not accept the form without their completion. In August 2021, Enhancement SRI[2] 2153 to the Long-Term Care ("LTC") Portal enabled and required the "Alternate Placement Preferences" subsection upon initial submission of a PL1 when positive PASRR eligibility is suspected. Dkt. 701.2 McGonigle Declaration ¶ 9, Exhibit A pg. 22 of 79.

HHSC objects to paragraph 315, as it is contradicted by the supplemental documentation submitted in 2022. Paragraph 315 is based on data collected between 2016 and 2017, almost a decade ago. More current evidence establishes that Section E of the PL1 is required to be filled out for submission of the form into the portal. In August 2021, Enhancement SRI 2153 to the LTC Portal enabled and required the "Alternate Placement Preferences" subsection upon initial submission of a PL1 when positive PASRR eligibility is suspected. Dkt. 701.2 McGonigle Declaration ¶ 9, Exhibit A pg. 22 of 79.

HHSC objects to paragraph 316, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Mr. Weston submitted his report, and paragraph 316 exclusively relies on this report. More current evidence establishes that Section E of the PL1 is required to be filled out for submission of the form into the portal. In August 2021 Enhancement SRI 2153 to the LTC Portal enabled and required the "Alternate Placement

---

[2] SRI stands for "Service Request Initiation." This is the terminology HHSC and its contractor(s) use to track improvements to the LTC Portal.

Preferences" subsection upon initial submission of a PL1 when positive PASRR eligibility is suspected. Dkt. 701.2 McGonigle Declaration ¶ 9, Exhibit A pg. 22 of 79.

HHSC objects to paragraph 325 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that Section E no longer greys out due to the August 2021 Enhancement SRI 2153 to the LTC Portal, which now requires the "Alternate Placement Preferences" subsection be completed upon initial submission of a PL1 when positive PASRR eligibility is suspected. Dkt 701.2 McGonigle Declaration at ¶ 9.

HHSC objects to paragraph 330 as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Mr. Weston issued his report, which the Court solely relies on for this finding. More current evidence establishes that Section B of the PE includes areas for self-monitoring of health status, inappropriate behaviors and independent functioning issues. Enhancement SRI 1622 to the LTC Portal updated the list of LIDDA specialized services on the PE "Section B" tab. It also added functionality for the system to auto-select the applicable LIDDA specialized services based on selections manually entered in areas of assistance needed by the individual. Dkt 701.2 McGonigle Declaration at ¶ 15-21, Exhibit A pgs 22, 32 of 79.

HHSC objects to paragraph 339, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Ms. Pilarcik and Ms. Russo submitted their reports years before trial. The PE recommends PASRR specialized services in Section B. In June 2016 Enhancement SRI 1622 to the LTC Portal updated the list of LIDDA specialized services on the PE "Section B" tab and added functionality for the system to auto-select the applicable LIDDA specialized services based on selections manually entered in areas of assistance needed by the

individual. Dkt. 701.2 McGonigle Declaration at ¶ 15-21; Dkt. 701.3 Southall Declaration at ¶ 3, 7.

HHSC objects to paragraph 378, as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that multiple trainings have been provided or implemented for referring entities to increase education and competency to prevent unnecessary institutionalization. Dkt. 701.7 Allen Declaration ¶ 16(f). PASRR conferences also have included training for REs. Dkt. 701.3 Southall Declaration ¶ 10(a)(ii)(3), (b)(ii)(2), (c)(ii)(5).

HHSC objects to paragraph 379 as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since trial and Mr. Weston's report, as there is ample evidence of HHSC's systemic approach to outreach in the 2022 supplemental documentation. Multiple trainings have been provided or implemented for referring entities to increase education and competency to prevent unnecessary institutionalization. Dkt. 701.7 Allen Declaration ¶ 16(f). PASRR conferences also have included training for REs. Dkt. 701.3 Southall Declaration ¶ 10(a)(ii)(3), (b)(ii)(2), (c)(ii)(5).

HHSC objects to paragraph 384, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since trial, as the supplemental documentation provided in the advisory shows that LIDDAs do, in fact, have a process to divert individuals. For people who have transitioned or diverted from a nursing facility ("NF"), they receive 365 days of enhanced, flexible supports via Enhanced Community Coordination ("ECC"). Should the person's needs change, the ECC Coordinator has the flexibility and monitoring frequency (monthly) to respond. The state is notified if the person's needs have changed, and the likelihood of readmission increases via ECC quarterly reporting. If the Money Follows the Person ("MFP") Oversight Specialist sees on this report that increased needs or barriers exist and it appears the ECC

Coordinator is struggling to remove those barriers or meet the person's needs, they reach out to the ECC Coordinator and offer assistance. Also, the Transition Support Team ("TST") is an additional resource available to ECC Coordinators via TA and multidisciplinary case reviews to proactively address a person's changing needs. Dkt. 701.1 Turner Declaration ¶¶ 53–55, 64, 66.

HHSC objects to paragraph 408, as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates that there is no standard assessment to determine the intensity, frequency and duration of services for each individual. However, more recent evidence establishes that the Habilitative Assessment was created in 2019 and is used to identify habilitative need of specialized services. Dkt. 701.2 McGonigle Declaration ¶ 38.

HHSC objects to paragraph 410 as it is contradicted by the supplemental documentation submitted in 2022. The finding relies solely on Mr. Weston's report, which indicates HHSC has not effectively communicated PASRR requirements. More current evidence establishes that HHSC communicates PASRR requirements and provides training about how to identify and assess habilitative needs on a consistent basis to internal staff as well as external staff. Dkt. 701.2 McGonigle Declaration at ¶ 39. New training was implemented in January 2021 to include guidance on completing the Habilitative Assessment. Dkt 701.7 Allen Declaration ¶ 16(b).

HHSC objects to paragraph 411 as it is contradicted by the supplemental documentation submitted in 2022. The finding alleges that trainers are not provided adequate guidance on how to identify habilitative needs for individuals. More current evidence establishes that HHSC communicates PASRR requirements and provides training about how to identify and assess habilitative needs on a consistent basis to internal staff as well as external staff. Dkt. 701.2 McGonigle Declaration at ¶ 39. New training was implemented in January 2021 to include guidance on completing the Habilitative Assessment. Dkt 701.7 Allen Declaration ¶ 16(b).

HHSC objects to paragraph 412 as it is contradicted by the supplemental documentation submitted in 2022. The finding alleges HHSC does not consistently review if LIDDAs are properly assessing needs. However, more current evidence establishes that the Contract Accountability and Oversight ("CAO") division reviews whether LIDDAs are appropriately assessing and recommending needed services. Dkt. 701.2 McGonigle Declaration at ¶¶ 60-61. The CAO determines if the habilitation coordinator assessed or reassessed the person's services needs using Form 1064. Dkt 701.4 Hamilton Declaration ¶¶ 4, 6, 20.

HHSC objects to paragraph 419 as it is contradicted by the supplemental documentation submitted in 2022. The finding is based on a ten-person study conducted years before trial. More current evidence establishes that the PE now auto-maps IDD specialized services based on areas of need identified in Section B. Enhancement SRI 1622 to the LTC Portal updated the list of LIDDA specialized services on the PE "Section B" tab and added functionality for the system to auto-select the applicable LIDDA specialized services based on selections manually entered in areas of assistance needed by the individual. Dkt. 701.2 McGonigle Declaration at ¶ 15-21, Exhibit A pg 32 of 79.

HHSC objects to paragraph 428, as it is contradicted by the supplemental documentation submitted in 2022. The finding suggests that there is no unified plan for individuals. More current evidence establishes that the Habilitation Service Plan (HSP) and PASRR Comprehensive Service Plan (PCSP) incorporate all agreed-upon specialized services. Dkt. 701.2 McGonigle Declaration at Exhibit A §§ 2510, 5430.

HHSC objects to paragraph 429, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since trial, and the finding suggests that there is risk that specialized services are not properly coordinated. More current evidence establishes that

Enhancement SRI 1983 to the LTC Portal was implemented in January 2019 to combine the IDT and PSS form into one PCSP form. The PCSP form, accessed by both LIDDAs and NFs, must be completed at each IDT and SPT meeting or Update Meeting, when there is need to revise Specialized Services and document those changes in the PCSP. Dkt. 701.2 McGonigle Declaration at Exhibit A § 2510; Dkt 701.3 Southall Declaration ¶ 7(a).

HHSC objects to paragraph 430 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based in part on depositions that occurred in 2017. Circumstances have changed since then and since Mr. Weston issued his report. More current evidence establishes that the IDT/SPT agrees to the specialized services to be provided to the individual. NF specialized services providers are considered members of the SPT and are expected to attend planning meetings when specialized services will be discussed. Dkt. 701.2 McGonigle Declaration Exhibit A pg. 20 of 79 ¶¶ 52-53.

HHSC objects to paragraph 432 as contradicted by the supplemental documentation submitted in 2022. The finding indicates that the PASRR unit does not monitor IDT meeting participants. Circumstances have changed since trial. More current evidence establishes that after Enhancement SRI 2310 to the LTC Portal was implemented, the PCSP form is invalidated if the LA submits an IDT meeting confirmation indicating that the LIDDA was absent from the meeting. If the LIDDA indicates they were not present, the system sends a new alert to the NF to reconvene the IDT and ensure that the LA can attend. CAO reviews the records of sample participants to determine if all required members attended the IDT/SPT meeting. Dkt. 701.1 Turner Declaration ¶ 9-11; Dkt. 701.2 McGonigle Declaration Exhibit A § 2510, 2520; Dkt. 701.4 Hamilton Declaration Exhibit B p. 71 of 83.

HHSC objects to paragraph 442, as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on one 2017 deposition, based on 2017 data, and circumstances have changed since then. More current evidence establishes that required training was developed in FY 21 and implemented in May 2021, including "Documentation of Outcomes in Person-Centered Plans." Dkt. 701.7 Allen Declaration ¶16(k).

HHSC objects to paragraph 455 as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Mr. Webster issued his report indicating there was a lack of coordination and integration for the plan of care. More current evidence establishes that the individual's plans of services and supports are coordinated as the HSP integrates the NF CCP and specialized services. The HSP includes elements that are individualized and developed through a person-centered approach. The HSP identifies a person's strengths, preferences, desired outcomes and supports, as well as specialized services. The habilitation coordinator assists in the development and revision of this coordinated plan. Dkt. 701.2 McGonigle Declaration Exhibit A p. 47-55 of 79.

HHSC objects to paragraph 458, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since HHSC representatives gave their deposition testimony and trial testimony, as well as since Mr. Weston issued his report based on old data. More current evidence establishes that the following PASRR Trainings are required: An Overview of the PASRR Process (required for the PASRR Evaluator, Habilitation Coordinator, and the ECC Coordinator, Supervisor and Team Lead); PASRR PL1 and PE (required for the PASRR Evaluator); Service Planning and Monitoring (required for the Habilitation Coordinator); and Transition and Diversion Part 1 and 2 (required for the ECC Coordinator, Supervisor and Team Lead). Dkt. 701.7 Allen Declaration ¶ 16(a)-(d), (w).

HHSC objects to paragraph 474, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Mr. Weston issued his report, the sole piece of evidence this finding relies on to conclude that PASRR reviewers "rarely" do PASRR Level II evaluations. More current evidence establishes that Enhancement SRI 1622 to the LTC Portal updated the list of LIDDA specialized services on the PE "Section B" tab and added functionality for the system to auto select the applicable LIDDA specialized services based on selections manually entered in areas of assistance needed by the individual. Dkt. 701.2 McGonigle Declaration ¶ 21Exhibit A pg 32 of 79.

HHSC objects to paragraph 750 as it is contradicted by the supplemental documentation submitted in 2022. The findings in this paragraph are based on two 2017 depositions, and circumstances have changed since these individuals were deposed. The finding indicates that there were "no other additional policies or procedures regarding LIDDA performance contracts." Dkt. 717 ¶ 0750, page 250. More current evidence establishes that in 2019, HHSC published the IDD-PASRR Handbook, which includes additional guidance and expectations regarding CLO presentation. Dkt. 701.1 Turner Declaration ¶¶ 14, 16-40, Exhibit A (see pages 24–25 of Dkt. 701.1); Dkt 701.2 McGonigle Declaration Exhibit A (see pages 56–60 of Dkt. 701.2).

HHSC objects to paragraph 783 as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates that the CLO process is "ineffective" based on one report. Dkt. 717 ¶ 0783 pg 258. More current evidence establishes that the CLO Form was created to be robust and individualized. The IDD PASRR Handbook was developed to provide detailed direction regarding the CLO process. Dkt. 701.1 Turner Declaration ¶¶ 14, 16-40; Dkt. 701.2 McGonigle Declaration Exhibit A (see pages 56–60 of Dkt. 701.2).

HHSC objects to paragraph 785, as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates that the process of providing an individual with a brochure was "clearly insufficient" and simply cites the conclusory opinion of one witness Wehmeyer. Dkt. 717 ¶ 0785 pg. 258. However, more current evidence establishes that the CLO Form was created to be robust and individualized. The IDD-PASRR Handbook was developed to provide detailed direction regarding the CLO process. Dkt. 701.1 Turner Declaration ¶¶ 14, 16-40; Dkt. 701.2, McGonigle Declaration Exhibit A (see pages 56–60 of Dkt. 701.2).

HHSC objects to paragraph 789, as it is contradicted by the supplemental documentation submitted in 2022. The finding, citing to an expert report, alleges that "CLO conversations do not consistently address the communication and communication processing needs of some individuals with IDD" to have "a full understanding of community options." Dkt. 717 ¶ 0789 pg 259. However, more current evidence establishes that section 5810 of the IDD-PASRR Handbook, published in 2019, requires that the CLO be presented "in a manner that allows the person and LAR to fully understand the options available" and "if there are barriers to the person's or LAR's full understanding of CLO, the habilitation coordinator must document these barriers in Form 1054, Community Living Options, and how they will be addressed in Form 1057, Habilitation Service Plan (HSP)." Dkt. 701.2 McGonigle Declaration Exhibit A (see pages 56–58 of Dkt. 701.2).

HHSC objects to paragraph 813, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since trial. Further, the Court has taken into account only the Plaintiffs' report, stating that service plans often do not meet expectations for adequate transition planning and has disregarded the Commissioner's trial evidence. Per 26 TAC §303.703(c), a LIDDA must: (1) ensure a service coordinator who conducts transition planning

demonstrates competency in conducting transition planning; and (2) maintain documentation of the training received by service coordinators who conduct transition planning. A service coordinator who conducts transition planning completes HHSC approved computer-based person-centered planning and practices training within the first 60 days of performing service coordination duties. New training on Transition and Diversion was implemented in January 2021. Dkt. 701.7 Allen Declaration ¶ 16(c). The LIDDAs have demonstrated a notable improvement in this element in which transition planning for individuals are person centered, and the services and supports necessary to meet the individual's needs are appropriately identified, and the plan identified and documents the desired outcome, and maximizes the person's ability to live successfully in the most integrated setting consistent with their informed choice. Dkt. 701.4 Hamilton Declaration ¶¶ 7-10.

HHSC objects to paragraph 821 as it is contradicted by the supplemental documentation submitted in 2022. The finding alleges that HHSC does not actively pursue transition or sufficiently implement goals of transition and community living. Circumstances have changed since Mr. Sawyer issued his report and since trial. More current evidence establishes that the CLO process requires habilitation coordinators to provide and discuss with the person and LAR the range of community living services, supports and alternatives. This occurs not only initially during the PE, but every six months thereafter, regardless of whether the person is receiving or has refused habilitation coordination. Dkt. 701.1 Turner Declaration ¶¶ 14, 16-47.

HHSC objects to paragraphs 822 and 823, as they are contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Mr. Weston issued his report and since trial. While the Transition Plans was in the ISP form, more current evidence establishes that the Transition Plan is now a robust standalone form. Dkt. 701.1 Turner Declaration ¶¶ 15, 57; Dkt 701.7 Allen Declaration ¶ 16(c).

HHSC objects to paragraph 826 as it is contradicted by the supplemental documentation submitted in 2022. The finding suggests that there was a binary choice for transition. Circumstances have changed since trial. More current evidence establishes that Section 5 of the Preference Regarding Transitioning of the CLO form offers five options regarding the individual's preference, including "Wants to transition into the community but wants more information before selecting a program," "Undecided," and "Unable to determine." Depending on the option selected, the form prompts to complete subsequent sections to identify barriers. Dkt. 701.7 Turner Declaration ¶ 22, Exhibit A.

HHSC objects to paragraph 836 as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Mr. Weston issued his report, which was the sole factual basis for this finding. More current evidence establishes that the CLO process serves as a planning tool and has options that an individual can select if they need more time to consider community options. Dkt. 701.7 Turner Declaration ¶¶ 22, 24.

HHSC objects to paragraph 839 as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Mr. Sawyer, Mr. Webster, and Mr. Weston issued their reports based on old data. The finding claims individuals are "deprived the presentation of a concrete picture" of transition. More current evidence establishes that the CLO process requires habilitation coordinators to provide and discuss with the person and LAR the range of community living services, supports and alternatives. Presentation of CLO includes materials describing what community living is like and discussion of apprehensions or other barriers to the person's selection of a community program. Funding for virtual reality headsets was secured and has been distributed to 29 LIDDAs so that individuals in NFs can view an immersive tour of potential community living options if they are unable to physically travel to them (e.g., a group

home located in a different part of the state). Currently LIDDAs are purchasing the equipment itemized in the contract and training on the VR equipment will begin in August. The Special Projects team (in Community Services) is lead on this initiative. Dkt. 701.1 Turner Declaration ¶¶ 16-40, 58.

HHSC objects to paragraph 842, as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates that individuals only receive a list of providers after expressing interest in moving out of a facility. Circumstances have changed since trial. More current evidence establishes that the LIDDA may assist the person or LAR with identifying what is important to the person or LAR about a provider, such as location, staffing patterns, or provider experience with certain disabilities. The LIDDA may recommend specific questions to ask the providers and contact and arrange visits to the providers the person or LAR indicate they would like to know more about. Dkt. 701.1 Turner Declaration at ¶¶ 22, 24.

HHSC objects to paragraph 862, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Ms. Pilarcik and Ms. Russo issued their reports, one of which was based on a 16-person study. More current evidence establishes that the ECC Coordinator is responsible for transition planning and monthly monitoring for the first 365 days post-transition where barriers and potential solutions to those barriers are identified, discussed, documented, and addressed. If the MFP Oversight Specialist (HHSC staff) sees on the ECC quarterly report that it appears the ECC Coordinator is struggling to remove transition barriers, they reach out to the ECC Coordinator and offer assistance. ECC Coordinators also have direct access to the MFP Oversight Specialists for assistance should they experience challenges or barriers to meeting the person's needs. Also, the TST is an additional resource available to ECC Coordinators via TA and multidisciplinary case reviews to proactively address a person's needs

and brainstorm ways to remove or mitigate barriers to transition and successful community living. Dkt. 701.1 Turner Declaration at ¶¶ 53-57, 66.

HHSC objects to paragraph 868, as it is contradicted by the supplemental documentation submitted in 2022. The Finding specifically finds that "individuals are unnecessarily institutionalized in nursing facilities." More current evidence establishes that the ECC Coordinator is responsible for transition planning and monthly monitoring for the first 365 days post-transition where barriers and potential solutions to those barriers are identified, discussed, documented, and addressed. If the MFP Oversight Specialist (HHSC staff) sees on the ECC quarterly report that it appears the ECC Coordinator is struggling to remove transition barriers, they reach out to the ECC Coordinator and offer assistance. ECC Coordinators also have direct access to the MFP Oversight Specialists for assistance should they experience challenges or barriers to meeting the person's needs. Also, the TST is an additional resource available to ECC Coordinators via TA and multidisciplinary case reviews to proactively address a person's needs and brainstorm ways to remove or mitigate barriers to transition and successful community living. Dkt. 701.1 Turner Declaration at ¶¶ 53-57, 66.

HHSC objects to paragraph 869 as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates that "Individuals with IDD in the State's nursing facilities are not provided necessary individualized information and experiences to make an informed choice to remain in a nursing facility." This Finding is based on one report issued years before trial. Circumstances have changed since Mr. Wehmeyer issued his report. HHSC provides individuals a detailed pamphlet that is discussed with individuals so they may make informed choices, and the PASRR handbook outlines instructions for habilitation coordinators to guide individuals through

the process. Dkt. 701.1 Turner Declaration at ¶¶ 14, 16-40, Exhibit B; Dkt. 701.2 McGonigle

Declaration Exhibit A (see pages 56–60 of Dkt. 701.2).

HHSC objects to paragraph 899, as it is contradicted by the supplemental documentation

submitted in 2022. The Findings suggest that "HHSC policies reduce the availability and

accessibility of services for people who have IDD and complex medical needs." Circumstances

have changed since Mr. Piccola and Mr. Sawyer issued their reports and since trial. More current

evidence establishes that the eight TSTs provide TA, education, and multidisciplinary case reviews

to all LIDDAs and waiver providers within their DSAs to support the teams supporting waiver

recipients, including those diverting from and transitioning to community-based programs, with

high medical, behavioral, or psychiatric needs. TSTs provide educational and training

opportunities and materials as requested by DSA LIDDA and provider staff and based on trends

experienced in the field in an effort to increase staff competency. ECC provides enhanced, monthly

monitoring for the first 365 days post-transition/diversion from a NF. Dkt. 701.1 Turner

Declaration ¶ 67, Exhibits D-F.

HHSC objects to paragraph 928, as it is contradicted by the supplemental documentation

submitted in 2022. The finding indicated that "Community providers have experienced individuals

who are transitioning to the community receiving an inadequate supply of medication." However,

more current evidence establishes that the IDD-PASRR Handbook was developed and published

in 2019 to address these issues. Dkt. 701-2 McGonigle Declaration Exhibit A § 3230.1; Dkt. 701.1

Turner Declaration ¶ 53.

HHSC objects to paragraph 931, as it is contradicted by the supplemental documentation

submitted in 2022. The Findings explain "Community providers experience delays in receiving

adaptive or durable medical equipment, which has delayed individuals' transition from nursing

facilities to the community." More current evidence shows that LIDDAs are consistently meeting performance measures, which includes providing equipment. Dkt. 701.1 Turner Declaration ¶ 53; Dkt. 701-4 Hamilton Declaration ¶9-11, 13; Dkt. 701.3 Southall Declaration ¶¶ 4-5.

HHSC objects to paragraph 940, as it is contradicted by the supplemental documentation submitted in 2022. Circumstances have changed since Mr. Piccola submitted his report and since trial, finding that the diversion process is "particularly burdensome." More current evidence establishes that per the IDD-PASRR Handbook, Section 3220, Requesting a Targeted NF HCS Diversion, a slot request is submitted if the LIDDA determines that a person meets criteria as outlined in this section. Submission of Form 1047 indicates that the LIDDA has determined criteria is met which includes "other adequate and appropriate community resources" as described in the PASRR handbook, "are unavailable to meet the person's needs." HHSC's Local Procedure Development and Support (LPDS) does not require evidence of those resources. Dkt 701.2 McGonigle Declaration Exhibit A § 3220.

HHSC objects to paragraph 946 as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates that HHSC training does not include information related to diversion, transition, and service planning. This is based on one report, and more current evidence establishes that mandatory, comprehensive, computer-based training was implemented in 2021 regarding diversion, transition, and service planning. Dkt. 701.7 Allen Declaration ¶ 16(b), (c), (w).

HHSC objects to paragraph 947, as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates "HHSC's trainings for LIDDAs address the requirement that a community living options discussion take place but do not include guidance about how to explain the other placement options that might be available in a way that individuals with IDD can

understand." Dkt. 717 ¶ 0947 pg. 298. However, more current evidence establishes that new training on community living options included in multiple trainings was implemented in January 2021. Training includes guidance about how to explain the other placement options that might be available in a way that individuals with IDD can understand. CLO Booklets are included in each training. Participants practice presenting options during virtual training. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (d), (w).

HHSC objects to paragraph 948, as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates HHSC does not provide LIDDAs with guidance about how to identify, learn about, or address any concerns an individual may have about living in the community nor do service coordinators receive guidance regarding how to learn about individuals' concerns about living in the community. However, more current evidence establishes that the training discussed in the objections to paragraphs 946 and 947 addresses this issue. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (w).

HHSC objects to paragraph 949 as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates that HHSC's training related to the CLO discussion is limited to one training and does not include instructions on how to record identified barriers on the Community Living Options form. However, more current evidence establishes that CLO training exists within multiple virtual trainings and includes instructions on how to record identified barriers on the CLO form. There is also a computer-based training on the CLO form. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (d), (w).

HHSC objects to paragraph 950 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that new live virtual trainings provide

trainees with the opportunity to practice CLO conversations and receive feedback. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (d), (w).

HHSC objects to paragraph 952, as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that new training includes sections for summarizing interviews and trial visits with potential providers. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (d), (w).

HHSC objects to paragraph 953 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that Service Planning and Monitoring training includes training on the Habilitative Service Plan. Dkt. 701.7 Allen Declaration at ¶ 16(b).

HHSC objects to paragraph 954 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that training on how to present state-developed material on community options is included in the PL1 and PE training, Transition and Diversion, and the Service Planning and Monitoring training. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (d), (w).

HHSC objects to paragraph 955 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that new training includes how to identify barriers that can prevent an individual from living in the community and when they are best served in the community. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (d), (w).

HHSC objects to paragraph 956 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establiehs that new training "Transition and Diversion Part II" was developed and implemented to provide additional training for ECC Coordinators after six months' experience in the field. Supplemental and reminder training for ECC coordinators is provided during annual PASRR Conferences. Dkt. 70.1.7 Allen Declaration at ¶ 16(w).

HHSC objects to paragraph 957 as it is contradicted by the supplemental documentation submitted in 2022. The finding is based in part on a 2017 deposition. More current evidence establishes that CLO continues to be offered to people who have refused service coordination every six months or when they request to talk to someone. Once a person has chosen a community program, they are assigned an ECC coordinator to develop a transition plan with them. This requirement is included in multiple LIDDA trainings. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (d), (w).

HHSC objects to paragraph 958 as it is contradicted by the supplemental documentation submitted in 2022. The finding is based solely on a 2017 deposition. More current evidence establishes that Service Planning and Monitoring training includes training on the Habilitation Service Plan to include section 7 (Preferences Regarding Transitioning). There is also new computer-based training on the HSP, while new "Transition and Diversion" training (implemented in Jan 2021) provides guidance on completing the Transition Plan related to barriers and possible solutions. In addition, the training includes how to identify the supports the individual will need in the community and how to obtain them before they move. Comprehensive training is provided in the new training "Transition and Diversion Part II" to provide additional training for ECC Coordinators after six months' experience in the field. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (w).

HHSC objects to paragraph 960 as it is contradicted by the supplemental documentation submitted in 2022. The finding argued "Service coordinators lack training in person-centered planning." Dkt. 717 ¶ 0960 pg 300. More current evidence establishes that Habilitation Coordinators are required to complete Person-Centered Thinking training provided by a certified PCT trainer. Dkt. 701.7 Allen Declaration at ¶ 16(m).

HHSC objects to paragraph 962 as it is contradicted by the supplemental documentation submitted in 2022. The finding indicates "Service coordinators have trouble with discovering and knowing what people want." More current evidence establishes that Habilitation Coordinators are required to take the Person-Centered Thinking course provided by a certified Person-Centered Thinking trainer. The course teaches discovery and learning skills to identify what people want. Service Planning and Monitoring training includes guidance on identifying what people want. Dkt. 701.7 Allen Declaration at ¶¶16(b), (m).

HHSC objects to paragraph 965 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on a report issued years before trial. More current evidence establishes that there is new training for Transition and Diversion and Transition and Diversion Part II (after 6 months of experience for ECC). Dkt. 701.7 Allen Declaration at ¶ 16(c), (w).

HHSC objects to paragraph 966 as it is contradicted by the supplemental documentation submitted in 2022. The finding is based in part on an old guide. More current evidence establishes that comprehensive training was developed on all diversion activities. For example, there is Transition and Diversion training for new staff and Transition and Diversion II for staff with six months' experience providing ECC functions. A new NF Diversion Process Checklist was developed for ECC Coordinators, and training on Community Options for People who have Mental Illness and an Intellectual or Developmental Disability: Hospital Social Worker Training was established. Dkt. 701.7 Allen Declaration at ¶16(c), (w).

HHSC objects to paragraph 967 as it is contradicted by the supplemental documentation submitted in 2022. The finding is based on a report submitted years before trial. More current evidence establishes that there is now new Transition and Diversion II Training that includes critical information about diversion coordination to include all their responsibilities. There is also

computer-based training on Form 1050- Crisis Diversion Plan. Dkt. 701.7 Allen Declaration at ¶ 16(w).

HHSC objects to paragraph 973 as it contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that HHSC now tracks if the person presenting CLO has been trained about community options.  CLO training was provided in Module II and was tracked starting in the FY 2020 tool in September 2019. The CLO form and process was revamped to incorporate the individual's knowledge of community living as well as tailoring the CLO conversation based on the individual's needs and experience. Dkt. 701.7 Allen Declaration at ¶ 16(b), (d), (x); Dkt. 701.1 Turner Declaration ¶¶ 16-47, Exhibits A-C; Dkt. 701.4 Hamilton Declaration ¶¶ 10, 20.

HHSC objects to paragraph 975 as it contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that the CAO reviews documentation of CLO discussions to determine if required participants are in attendance. Dkt. 701.4 Hamilton Declaration Exhibit B.

HHSC objects to paragraph 976, as it contradicted by the supplemental documentation submitted in 2022. The finding is based in part on a 2017 deposition. More current evidence establishes that the CAO currently monitors compliance and enforces compliance of this element by ensuring the CLO form is complete with a discussion of the barriers to transitioning and ensuring the habilitation coordinator is addressing the barriers if the person cannot transition due to those barriers. Dkt. 701.4 Hamilton Declaration ¶ 10.

HHSC objects to paragraph 977, as it contradicted by the supplemental documentation submitted in 2022. This finding is wholly based on a 2017 deposition. More current evidence

establishes that the CAO currently monitors compliance and enforces compliance of this element by ensuring the CLO form is complete. Dkt. 701.4 Hamilton Declaration at ¶¶ 10, 20, Exhibit B.

HHSC objects to paragraph 978 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based in part on a 2017 deposition, as well as the Sawyer report, both of which reflect old data. More current evidence establishes that the CAO currently monitors the CLO form 1054 and CLO discussions to determine if the LIDDA provides accommodations, opportunities, or supports to people with IDD to learn about CLO and to make informed choices to transition. Dkt. 701.1 Turner Declaration at ¶¶ 42-43; Dkt. 701.4 Hamilton Declaration ¶¶ 10, 20.

HHSC objects to paragraph 979 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that the CAO currently monitors the following elements on the revised CLO form in 2020: Section 3, CLO Presentation. A checked box would indicate that the document was explained to the individual/LAR in a method or language they understand, and a copy of the document was provided to the individual/LAR. Additionally, CAO would also review this document to ensure that the Habilitation Coordinator ("HC") assessed the barriers section which outlines whether a person needs speech services or other medical services to assist with CLO. The expectation from CAO to meet compliance on this element would include that the HC must document these actions on the CLO form and follow up with the SPT to discuss overcoming these barriers. Dkt. 701.4 Hamilton ¶¶ 10, 20, Exhibit B.

HHSC objects to paragraph 981 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that required training on Service Planning and Monitoring and PL and PE includes learning about identifying and addressing individuals' concerns or barriers about community living. Trainings include a competency exam. CAO

monitors to ensure that the HC has addressed the person's concerns or barriers with follow up. Dkt. 701.4 Hamilton Declaration at ¶¶ 10, 20, Exhibit B; Dkt. 701.7 Allen Declaration ¶ 16(b), (d).

HHSC objects to paragraph 983 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based solely on a 2017 deposition. More current evidence establishes that people who have transitioned or diverted from a NF receive 365 days of enhanced, flexible supports via ECC. The ECC Coordinator has the flexibility and monitoring frequency (monthly) to respond to challenges with community placement. The state is notified of these concerns via the ECC quarterly report. If the MFP Oversight Specialist sees on this report that barriers exist and the ECC Coordinator is not adequately taking steps to remove or mitigate these barriers, the Oversight Specialist will reach out to the ECC Coordinator and offer assistance. ECC Coordinators also have direct access to the MFP Oversight Specialists for TA should they experience challenges or barriers to meeting the person's needs. Also, the TST is an additional resource available to ECC Coordinators via TA and multidisciplinary case reviews to proactively address a person's changing needs. Finally, for TST case reviews, the TST follows the person's case for six months or until stabilization is achieved, whichever occurs first. The MFP Oversight Specialists monitor this activity via the TST quarterly report and provide TA and sit in on staffings when needed. Dkt. 701.1 Turner Declaration ¶¶ 53, 64, 66; Dkt. 701.2 McGonigle Declaration Exhibit A pgs 60-68 (IDD/PASRR Handbook "Transition from NF to Community").

HHSC objects to paragraph 987 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based solely on one 2017 deposition. More current evidence establishes that the CAO is currently tracking and monitoring integrated activities with individuals. Dkt. 701.4 Hamilton Declaration ¶ 20, Exhibit B

HHSC objects to paragraph 994 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that the CAO currently and actively monitors, oversees, and enforces the diversion process within our quality assurance reviews. Should a LIDDA be found out of compliance, a corrective action plan is requested, at minimum, to address this concern as a systemic issue. Dkt. 701.4 Hamilton Declaration ¶ 20, Exhibit B.

HHSC objects to paragraph 1005 as it is contradicted by the supplemental documentation submitted in 2022. This finding relies on one 2017 deposition. More current evidence establishes that the CAO reviews the CLO to ensure that the LIDDA documented supports and services necessary for the community for those individuals who elected to remain in the nursing facility but may express an interest to transition in the community in the future. Dkt. 701.4 Hamilton Declaration ¶¶ 10, 20, Exhibit B.

HHSC objects to paragraph 1044, as it is contradicted by the supplemental documentation submitted in 2022. This finding is based solely on one 2017 deposition. More current evidence establishes that the CAO tool includes elements from the QSR tool. Dkt. 701.4 Hamilton Declaration Exhibit B.

HHSC objects to paragraph 1057, as it is contradicted by the supplemental documentation submitted in 2022. This finding is based in part on one 2017 deposition. More current evidence establishes that the CAO tool includes elements from the QSR tool. The CAO sample methodology has consistently been and currently remains random. Dkt. 701.4 Hamilton Declaration at ¶ 14.

HHSC objects to paragraph 1061 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on data almost a decade old and cannot reasonably be the basis for prospective injunctive relief. More current evidence establishes that the CAO has

amended their sample size from three-to-four individuals to six-to-eight. Dkt. 701.4 Hamiton Declaration at ¶¶ 14-19.

HHSC objects to paragraph 1064 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that the CAO's review tool currently measures compliance with key LIDDA responsibilities, including responsibilities that relate to transitioning or diverting individuals with IDD from nursing facilities. Dkt. 701.4 Hamiton Declaration at Exhibit B.

HHSC objects to paragraph 1066 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that the CAO measures whether or not the LIDDA determines that the person's needs may be met in the community; whether all need areas are assessed; whether the LIDDA undertakes to identify people in the PASRR population who are in the community and at risk of admission to nursing facilities in order to facilitate diversion; whether the LIDDA undertakes efforts to address barriers to transition for people with IDD in nursing facilities who have not requested a PASRR transition slot; and whether the CLO discussions are appropriate to the person's ability to comprehend. Dkt. 701.4 Hamiton Declaration at Exhibit B.

HHSC objects to paragraph 1067 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based in part on a 2017 deposition. More current evidence establishes that the Contracts Management Unit assesses financial penalties and issues corrective action plans for performance noncompliance and contract noncompliance in accordance with the performance contract. Dkt. 701.6 Pomerleau Declaration ¶¶ 8–11.

HHSC objects to paragraph 1068 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on a single deposition that is almost a decade old and

cannot reasonably form the basis of prospective relief. More current evidence establishes that the CAO continues to request corrective action plans as a result of non-compliance within a quality assurance review. CAO then follows up on these elements of non-compliance as well as all other requirements within the designated tools during the following quality assurance review for that LIDDA. Any noted elements found out of compliance would merit, at minimum, a corrective action plan and a recommendation for additional contractual action, such as a sanction, which includes financial penalties. Dkt. 701.6 Pomerleau Declaration ¶¶ 8–11.; Dkt. 701.4 Hamilton Declaration ¶¶ 22–29.

HHSC objects to paragraph 1069 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on a singular deposition. More current evidence establishes that the CMU assesses financial penalties for Corrective Action Plan ("CAP") noncompliance, including for the PASRR section, and issues financial penalties for other unmet performance measures outside of PASRR PE completion and HCS Enrollment. Dkt. 701.6 Pomerleau Declaration ¶¶ 8–11, Exhibits A & B.

HHSC objects to paragraph 1070 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on data that is almost a decade old and cannot reasonably form the basis of prospective relief. More current evidence establishes that the CMU assesses financial penalties for CAP noncompliance, including for the PASRR section and also issues financial penalties for other unmet performance measures outside of PASRR PE completion and HCS Enrollment. Dkt. 701.6 Pomerleau Declaration ¶¶ 8–11, Exhibits A & B.

HHSC objects to paragraph 1073 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on a singular deposition. More current evidence establishes that the CAO has recently begun to track and trend LIDDA quality assurance

performances by programmatic and overall scores. Additionally, CAO has begun to track and trend all cited elements for each program. The top three cited elements for each quarter are presented to the LIDDAs on a quarterly basis during the IDD Consortium. CAO has been trending data regarding to reviews and presenting to the IDD Consortium at least as far back as 2019. Dkt. 701.4 Hamilton Declaration Exhibit A.

HHSC objects to paragraph 1111 as it is contradicted by the supplemental documentation submitted in 2022. The finding, in conjunction with Paragraph 1112, alleges that there is no reporting requirement for failure to provide PASRR services. More current evidence establishes that has changed based on new rulemaking. Dkt. 701.5, Vahalik Declaration ¶¶ 6, 11–13.

HHSC objects to paragraph 1112 as it is contradicted by the supplemental documentation submitted in 2022. The finding, in conjunction with Paragraph 1111, alleges that there is no reporting requirement for failure to provide PASRR services. Dkt. 717 ¶ 1112, pg. 332. This finding is based a singular 2017 deposition. However, more current evidence establishes that the survey process was initially documented via Information Memorandums (IMs) which were then placed in the Long-Term Care Regulation Nursing Facility Program Handbook, Dkt. 701.5 Vahalik Declaration ¶¶ 4–8.

HHSC objects to paragraph 1113 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on two 2017 depositions and indicates that regulatory Services managers have not been trained in PASRR requirements and PASRR training for regulatory staff is minimal. However, more current evidence establishes that mandatory training has been implemented for both managers and staff. Dkt. 701.5 Vahalik Declaration ¶¶ 7, 12–13.

HHSC objects to paragraph 1114 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on three depositions and suggests that regulators have

"failed to understand and substantiate nursing facilities' non-compliance with PASRR requirements when the PASRR unit or QSR reviewers report such findings." However, as outlined in the objection to paragraph 1113, mandatory training has been implemented for regulators and managers. Dkt. 701.5 Vahalik Declaration ¶¶ 6, 11–13.

HHSC objects to paragraph 1115 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on two 2017 depositions and indicates that "CRS/Long-Term Care has failed to develop a systemic method of tracking PASRR violations and whether CRS/Long-Term Care outcomes improve the provision of needed services." More current evidence establishes that HHSC implemented a system to track PASRR citations. Dkt. 701.5 Vahalik Declaration ¶¶ 11–14.

HHSC objects to paragraph 1116 as it is contradicted by the supplemental documentation submitted in 2022. This finding is based on three depositions and indicates program specialists are not required to take any training on PASRR or specialized services. As indicated in the objection to paragraph 1113, mandatory training has been implemented for managers and regulators. Dkt. 701.5 Vahalik Declaration ¶ 7.

HHSC objects to paragraph 1124 as it contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that new live virtual training was implemented in January 2021 to include Service Planning and Monitoring, Transition and Diversion, and PL1 and PE training. State rules list specific local training requirements for habilitation coordinators and service/ECC coordinators. Dkt. 701.7 Allen Declaration ¶¶ 14, 16(b), (c), (d), (q), (w).

HHSC objects to paragraph 1125 as it contradicted by the supplemental documentation submitted in 2022. From a contract monitoring perspective, CAO has always ensured that the

LIDDA coordinators have completed all required training. CAO would request signature sheets or certificates as evidence that the staff member attended and completed the required training. Dkt. 701.7 Allen Declaration ¶ 10; Dkt 701.7 Hamilton Declaration ¶ 11.

HHSC objects to paragraph 1130, as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that the CAO reviews all new service coordinators hired within the past 12 months. Dkt. 701.4 Hamilton Declaration Exhibit A (see page 8 to Dkt. 701.4).

HHSC objects to paragraph 1133 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that the following PASRR trainings are mandatory: An Overview of the PASRR Process (required for the PASRR Evaluator, Habilitation Coordinator, and the ECC Coordinator, Supervisor and Team Lead); PASRR PL1 and PE (required for the PASRR Evaluator); Service Planning and Monitoring (required for the Habilitation Coordinator); and Transition and Diversion Part 1 and 2 (required for the ECC Coordinator, Supervisor and Team Lead). Dkt. 701- Allen Declaration ¶ 16(a), (b), (c), (d), (w).

HHSC objects to paragraphs 1134 and 1135 as they are contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that all four PASRR live virtual trainings include a competency exam to ensure participants understand the material. Competency exams are required before a certification can be obtained for any of the virtual-led and CBT courses. Dkt. 701.7 Allen Declaration at ¶ 16(a), (b), (c), (d), (w).

HHSC objects to paragraph 1144 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that PASRR training for nursing facility staff was developed and is available in the HHS Learning Portal. The trainings include multiple

functions for the PASRR process as well as PASRR rules.  Dkt. 701.7 Allen Declaration at ¶ 16(e), (f), (g), (h), (i), (j), (o).

HHSC objects to paragraph 1150 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that since January 2021, all HHS staff (PASRR training unit, PASRR unit, and MFP) responsible for providing PASRR training to NFs and LIDDAs are required to successfully complete training on PASRR processes. Training includes assigned virtual and computer-based trainings. Dkt. 701.7 Allen Declaration at ¶ 16(b), (c), (w).

HHSC objects to paragraph 1271 as it is contradicted by the supplemental documentation submitted in 2022. This statement was related to legislative funding concerns (regarding slot allocation). More current evidence establishes that HHSC did not need to pause HCS NF transition slot releases in FY18. HHSC was able to utilize attrition and released slots for both NF transition and NF diversion on a monthly basis from September 2017 through August 2018; due to monthly releases, names did not remain on target group request lists for extended periods of time. Dkt. 701.1 Turner Declaration ¶¶ 60, 69–83.

HHSC objects to paragraph 1272 as it is contradicted by the supplemental documentation submitted in 2022. More current evidence establishes that HHSC had enough attrition slots each month to cover the requests without enforcing the priority list during FY18-19. The data shows that, to accommodate individuals who were appropriate for, and wanted to, transition out of a NF, HHSC released 504 waiver slots and enrolled 268 individuals in those slots. To accommodate individuals who were appropriate for, and wanted, diversion from a NF, HHSC released 434 waiver slots and enrolled 348 individuals in those slots. HHSC was successful at utilizing both allocation and attrition to meet needs of HCS target groups in FY18-19. The legislature has since

discontinued providing specific allocation in the General Appropriations Act, and HHSC has continued to successfully utilize attrition to meet needs across all HCS target groups.  Dkt. 701.1 Turner Declaration ¶¶ 60, 69–83.

> **B.    HHSC has made further improvements to the relevant program areas that cast doubt upon additional findings of the Court.**

Several findings are premised upon old data that have since been updated and modified based on new federal and state guidance.

HHSC objects to paragraph 338, as the Texas Administrative Code has been modified since trial, and paragraph 338 is now inconsistent with HHSC policy. 26 Tex. Admin. Code § 303.302(a)(2)(B)(IV). When the person identifies wanting to live somewhere other than a NF, the referral section is required. Field F1000 is enabled and required when this is selected. If person, answers no, then F0600 is not a required field. IA performance measure in the LIDDA contract requires that the other field must be completed 95% of the time. LIDDAs have complied 100% for the past 2 years. Additionally, individuals and LARs receive information about community living options through the CLO process, which is initially completed during the PE.

HHSC objects to paragraph 340, as the Texas Administrative Code has been modified since trial, and paragraph 340 is now inconsistent with HHSC policy. 26 TAC §303.302(a)(2)(B) requires LAs to complete the PE within seven days of receiving the PL1 or notification from the LTC portal.

HHSC objects to paragraph 343 as the Texas Administrative Code has been modified since trial, and paragraph 343 is now inconsistent with HHSC policy. 26 Tex. Admin. Code § 263.705(a)(3), (g), (h). The HCS waiver slot is not lost immediately when a person enters a NF. If a person is enrolled in HCS and subsequently admitted to an NF, their HCS services would be

put on suspension for up to 270 calendar days. The LIDDA may request 30-day extensions. The LIDDA must monitor the person while on suspension and provide updates to HHSC.

HHSC objects to paragraph 820 as the Texas Administrative Code has been modified since trial. 26 Tex. Admin. Code § 303.201(b)(4). HHSC has codified in this rule that the LIDDA must make reasonable efforts to arrange for available community services and supports in the least restrictive setting to avoid NF admission, if the individual seeking admission to a NF, or the individual's LAR on the individual's behalf, wants to remain in the community.

HHSC objects to paragraph 960 as the Texas Administrative Code has been modified since trial and requires Habilitation Coordinators complete Person-Centered Thinking training provided by a certified PCT trainer. 26 Tex. Admin. Code § 303.502.

HHSC objects to paragraph 1111 as the Texas Administrative Code has been modified since trial and requires that individuals report any failure to provide services. 26 Tex. Admin. Code § 554.2709.

HHSC objects to paragraph 1112 as the Texas Administrative Code has been modified since trial and encompasses nursing facility guidelines. 26 Tex. Admin. Code § 554 Subchapter BB.

Additionally, numerous continued and ongoing improvements to HHSC's processes cast doubt on the accuracy and relevance of many of the Court's other Findings. Given the passage of nearly three additional years from the 2022 Advisory to the present day, HHSC continues to object generally to the Findings on the basis that it is clearly erroneous to enter findings in 2025 that are known to be outdated, when HHSC could provide the Court with additional updated evidence not currently in the record to address, without limitation, the Court's Findings as to: 1) HHSC's efforts to identify and address barriers and ease the transition and diversion processes (*see* Dkt. 717 at ¶¶

419, 926, 930, 942, 998, 1024, 1240); 2) utilization and tracking of specialized services (*see* Dkt. 717 at ¶¶ 468, 476, 569); 3) delivery of CLO and educational services (*see* Dkt. 717 at ¶¶ 974, 990); 4) training on PASRR requirements and processes (*see* Dkt. 717 at ¶¶ 1126, 1138); 5) the purpose and function of HHSC's PASRR forms (*see* Dkt. 717 at ¶¶ 388, 531); 6) updates and improvements to HHSC's Promoting Independence Plan (*see* Dkt. 717 at ¶¶ 1203-04, 1206, 1209); and 7) the purpose and scope of HHSC's QMP operation (*see* Dkt. 717 at ¶ 1117).

### C.    Private plaintiffs do not have a viable cause of action under the Medicaid Act or NHRA

In June, the Supreme Court recognized that "federal statutes do not confer rights enforceable under § 1983 as a matter of course," and that when a statute is enacted pursuant to Congress's spending power, such as with Medicaid, a violation of such statute is not enforceable by private parties absent rights-creating language. *See generally Medina v. Planned Parenthood S. Atl.,* 606 U.S. ---, 145 S.Ct. 2219 (2025). None of the statutes upon which the private plaintiffs rely in the Medicaid Act or the NHRA contains such language. *See* 42 U.S.C. §§ 1396a(a)(8), 1396n(c), 1396r(e)(7). Instead of defining individual rights, they all describe the obligation of States. As a result, the Medicaid Act and NHRA claims asserted by the private plaintiffs in this matter must be dismissed. To the extent the Court would be assisted by additional briefing on this topic, HHSC requests the opportunity to do so before the entry of any order.

A further problem with the Court's conclusions is that the enforceable right cannot be created by an agency regulation. *Thurman v. Med. Transp. Mgmt., Inc.*, 982 F.3d 953, 957 (5th Cir. 2020). Instead, any enforceable right must be created through unambiguous statutory language enacted by Congress. *Id.* Accordingly, any alleged violation of a rule or regulation cannot create liability under § 1983. Only the violation of a statute can do so. Thus, no liability may be based on the alleged violation of a rule or regulation.

**D.      The QSR is not an appropriate way to measure any remedial order**

HHSC understands that Plaintiffs intend to use the QSR negotiated in 2016 and subsequently rejected by HHSC as the appropriate mechanism for determining compliance with remedial orders entered by the Court in this case. The QSR is almost a decade old and no longer accurately reflects current HHSC workflows or applicable legal and regulatory standards. Therefore, it is not an appropriate tool to measure compliance with any remedial order the Court may enter.

## IV.      CONCLUSION

For the foregoing reasons, Defendant objects to the Findings, both generally and the identified paragraphs. Accordingly, Defendant asks that Defendant's Objections described above be SUSTAINED in full and that no remedial order be issued based on said objections.

Respectfully submitted,

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

*/s/ Kimberly Gdula*
KIMBERLY GDULA
Chief
State Bar No. 24052209
STEPHANIE CRISCIONE
Assistant Attorney General
State Bar No. 24109768
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
kimberly.gdula@oag.texas.gov
stephanie.criscione@oag.texasgov
*Counsel for Defendants*

## CERTIFICATE OF CONFERENCE

I hereby certify that on July 29, I conferred with Plaintiffs and the United States via Zoom teleconferencing regarding these objections. Plaintiffs and the United States are opposed to the substance of this document.

*/s/ Kimberly Gdula*
KIMBERLY GDULA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2025, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system.  Parties may access this filing through the Court's CM/ECF System.


*/s/ Kimberly Gdula*
KIMBERLY GDULA